**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| IN RE:  PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173 |
| | Case No. 8:10-cv-2040 |
| **This document relates to:** | Hon. James D. Whittemore |
| *Insight Equity A.P. X, LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, Case No. 8:10-cv-2040 | |

**DEFENDANT TRANSITIONS OPTICAL, INC.'S MOTION TO DISMISS THE COMPLAINT OF INSIGHT EQUITY A.P. X LP, d/b/a VISION-EASE LENS WORLDWIDE, INC. AND MEMORANDUM OF LEGAL AUTHORITY IN SUPPORT THEREOF**

Defendant Transitions Optical, Inc. ("TOI"), by its undersigned counsel, hereby moves to dismiss with prejudice the Complaint of plaintiff Insight Equity A.P.X., LP, doing business as Vision-Ease Lens Worldwide, Inc. ("VE"), under Fed. R. Civ. P. 12(b)(6) for failure to state any claim on which relief can be granted.[1]  Four defects doom VE's Complaint.

*First,* the statutes of limitations applicable to VE's claims (including all of its federal claims) have expired.

*Second*, VE does not have the antitrust standing required to pursue its federal claims.

*Third*, VE has failed to allege plausible claims based upon tying or bundled discounts.

*Fourth,* the state laws pursuant to which VE has asserted claims do not permit bringing a cause of action based upon the facts alleged in the Complaint.

---

[1]   VE filed its Complaint in the United States District Court for the District of Delaware on July 27, 2010, which action was transferred to this Court on September 9, 2010.  MDL 2173 Docket No. 56.  All references to "¶ __" are to paragraphs in the July 27, 2010 Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

### FACTS

**I.     THE PARTIES AND THE PHOTOCHROMIC LENS INDUSTRY**

Prescription eyeglasses consist of ophthalmic lenses made of glass, plastic or polycarbonate, each of which has different attributes.  ¶ 13.  Lenses are designed as single-vision lenses, progressive lenses and bi-focal lenses.  Photochromic lenses are clear ophthalmic lenses that will darken when exposed to ultraviolet light present in sunlight, and fade back to clear when removed from the ultraviolet light.  ¶ 5.  The price of eyeglasses is affected by a number of features beyond whether the lenses are photochromic, including but not limited to the type and style of the frames and other lens features such as improved scratch-resistance or anti-reflective coating.

Plaintiff VE manufactures polycarbonate corrective ophthalmic lenses, including polycarbonate photochromic lenses.  ¶ 5.  VE does not manufacture clear or photochromic plastic lenses.  ¶¶ 5, 28.  Defendant TOI develops photochromic *treatments* and treats lenses purchased from others; TOI does not manufacture any ophthalmic lenses.  ¶¶ 6, 17-18.  TOI purchases untreated clear lenses from lens manufacturers, applies its proprietary photochromic technology to those lenses, then sells the treated lenses back to lens manufacturers.  ¶ 17.  TOI does not sell or distribute photochromic lenses to any downstream vendors – labs, retailers, eye care practitioners or consumers.  *Id.*  Besides VE, other lens manufacturers include Essilor, Zeiss, Hoya, Younger and others, several of which opt to have TOI apply photochromic treatment for their lenses rather than make photochromic lenses themselves.  ¶ 17, 22.

From 1992 through 2004, VE did not have proprietary photochromic technology, and relied on TOI to apply TOI's photochromic treatment to lenses VE wished to sell.  ¶¶ 25-26.  In late 2004, VE developed its own photochromic technology called LifeRx.  ¶ 26.  Whereas TOI coats the

surface of a clear lens with photochromic dye, VE fuses two polycarbonate panels over a layer of photochromic film to manufacture a photochromic lens.  *Id.*  VE's LifeRx technology can be applied only to polycarbonate lenses, while TOI's technology can be applied to most plastic or polycarbonate lenses in order to meet the demands of customers who sell either or both types of lenses.  *Id.*  VE's LifeRx technology can be applied to bifocals, while TOI's photochromic technology cannot.  *Id.*

VE's Complaint alleges that lens manufacturers generally distribute their lenses through two channels: wholesale labs and retailers.  ¶¶ 17, 18, 21.  After purchasing a lens, wholesale labs grind the lens according to a prescription, coat the lens with any additional features, fit the lens into an eyeglass frame, and sell the lens to eye care practitioners who typically are not affiliated with retailers. ¶ 19.  The independent eye care practitioners then sell the eyeglasses to consumers.

Lens manufacturers also sell lenses to national, regional and smaller retail chains (such as LensCrafters or Walmart).  ¶ 21.  Retailers grind lenses according to a prescription, coat the lenses with any additional features, and fit lenses into a frame.  *Id.*  Since retailers generally employ their own eye care practitioners, it is the retailer that sells the eyeglasses to the consumer.  *Id.*

## II.    VE'S ALLEGATIONS

VE focuses on two different sets of alleged facts.

### A.    The "Refusal to Deal" Conduct

VE alleges that TOI adopted in 1999 a general policy of refusing to deal with any lens manufacturer that sold or promoted photochromic lenses other than those purchased from TOI.  ¶ 24. VE admits it had full knowledge of TOI's policy.  ¶ 29.  VE developed its own polycarbonate photochromic lenses (LifeRx) in 2004, and started to market them "secretly" to national retailers, ultimately winning a contract with LensCrafters in June 2005.  ¶¶ 26, 27.  Upon learning that VE

-3-

was selling a competing photochromic lens, VE contends that TOI terminated its supply contract with VE effective September 30, 2005 (and that TOI stopped shipments to VE in June 2005).  ¶ 28. VE claims that its business was harmed because, while it could supply its own *polycarbonate* photochromic lenses, it could no longer supply customers that also wanted *plastic* photochromic lenses from TOI.  *Id.*

### B.    The "Exclusive Agreements" Conduct

The second TOI business practice concerns what VE calls "exclusive agreements" between TOI and certain wholesale labs and retailers.  ¶¶ 33, 34, 36.  VE alleges that, "in 2005," TOI "began an exclusionary agreement campaign."  ¶ 33.  VE does not allege or identify any contracts between TOI and a retailer or wholesale lab that were entered into *after* 2005.  The Complaint alleges that TOI entered into exclusive contracts with over 50 retailers and over 100 wholesale labs.  ¶¶ 34, 36. VE claims that TOI's exclusive contracts deprived it of access to many retailers and wholesale labs for their photochromic lens business, thereby impeding its ability to compete against TOI.  *Id.*.

VE adds that TOI's agreements with wholesale labs and retailers provide "a discount only if the customer purchases all or almost all of its photochromic lens needs from Transitions" even though the Complaint does not, and could not, allege that TOI sells directly to any wholesale lab or retailer.  ¶ 37.  According to VE, because "no other supplier has a photochromic treatment that applies to a full line of ophthalmic lenses" (*i.e.*, polycarbonate and plastic material lenses), TOI's discount structure "impairs the ability of rivals to compete for sales to these customers."  *Id.*

### C.    Other Allegations in VE's Complaint

VE recites that the Federal Trade Commission filed a Complaint and Decision and Order resolving its investigation of TOI on April 22, 2010.  ¶¶ 46-48.  Pursuant to the FTC's Decision and Order, among other things, TOI does not have any agreements or policies that limit its lens

manufacturer customers from buying or selling competing photochromic treatments, or any "exclusive" agreements with lens manufacturers relating to photochromic lenses.  ¶ 48.

According to VE, TOI's conduct has harmed VE and has adversely affected competition in the alleged relevant market for photochromic ophthalmic lenses.  ¶¶ 40-45.  VE claims that it has lost the customers "it had earned as of June 2005 and the corresponding profits it would have made on sales of Vision-Ease and Transitions products to those customers."  ¶ 44.  VE also claims that it has suffered "lost profits on sales of LifeRx that it otherwise would [sic] made to existing and potential customers after June 2005."  ¶ 45.

VE alleges that TOI's actions constitute monopolization in violation of Sherman Act Section 2 (Count I), unreasonable restraints of trade in violation of Sherman Act Section 1 (Count II), anticompetitive agreements in violation of Clayton Act Section 3 (Count III), violations of twenty states' laws (Count IV), and tortious interference with prospective business relations under either Florida or Minnesota law (Count V).

## ARGUMENT

## I.    LEGAL STANDARD FOR DISMISSAL OF ANTITRUST COMPLAINT

Antitrust discovery is expensive.  Plaintiffs can hold defendants *in terrorem*, and the "threat of discovery expense will push cost-conscious defendants to settle even anemic cases."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 559 (2007).  This is precisely why, in *Twombly* and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court affirmed the district courts' responsibility to analyze rigorously a complaint in which antitrust claims are asserted before allowing discovery to proceed. *Iqbal* requires a two-pronged approach.  First, the court should identify assertions in the complaint that, "because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 129 S. Ct. at 1950.  Second, if the complaint contains more than mere legal conclusions, the court

should "determine whether [the factual allegations] plausibly give rise to an entitlement to relief." *Id.* If the complaint fails either prong, "'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558, *quoting* 5 C. Wright & A. Miller, <u>Federal Practice and Procedure</u>, § 1216, pp. 233-234 (3d ed. 2004). To avoid dismissal, VE must set forth facts that support a plausible antitrust claim. *See American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).[2]

VE's Complaint makes clear that the statute of limitations has run on all of its federal antitrust claims, meaning that those claims should be dismissed under Fed. R. Civ. P. 12(b)(6). *See Brotherhood of Locomotive Engineers, et al. v. CSX Transportation*, 522 F.3d 1190, 1194 (11th Cir. 2008); *Avco Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494, 495 (11th Cir. 1982); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp.2d 1253, 1280 (M.D. Fla. 2009).

Moreover, the Complaint should be dismissed with prejudice because any amendment would be futile, as it could not cure the Complaint's deficiencies. *Grant v. Phillip Morris USA Tobacco Co.*, No. 09-61052-CIV, 2010 WL 565621 at *3 (S.D. Fla. Feb. 16, 2010) (dismissing with prejudice complaint barred by statute of limitations); *Cherry v. D.B. Zwirn Special Opportunities Fund, L.P.*, No. 8:09-cv-33-T-33EAJ, 2010 WL 415313, at *1-2 (M.D. Fla. Jan. 27, 2010) (dismissing complaint with prejudice on futility and other grounds).

## II.    VE'S FEDERAL CLAIMS (COUNTS I-III) ARE TIME-BARRED

VE's federal antitrust claims are founded upon two separate and distinct actions by TOI:  (1) its refusal to deal with VE, which refusal was finalized by TOI's termination of the parties'

---

[2]    In MDL practice, the law to be applied by the transferee court in deciding motions is the law of the transferee circuit.  Here, to the extent of any conflict, Eleventh Circuit law, not the law in the Third Circuit, controls.  *Various Plaintiffs v. Various Defendants (Oil Field Cases)*, 673 F. Supp. 2d 358, 362 (E.D. Pa. 2009) ("a transferee court applies the law of the circuit where it sits").

photochromic lens supply contract in 2005, and (2) its entering "exclusionary agreements" with wholesale labs and retailers beginning in 2005. The statute of limitations on claims brought under Sherman Act Sections 1 and 2 and Clayton Act Section 3 is four years. *See* 15 U.S.C. § 15(b) ("Any action to enforce any cause of action under [the antitrust laws] shall be forever barred unless commenced within four years after the cause of action accrued."); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). VE filed its Complaint on July 27, 2010 – long *after* the statute of limitations had run.

**A.     Claims Based on TOI's "Refusal to Deal" with VE Are Time-Barred**

As the Supreme Court explained, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* A refusal to deal claim accrues, and the statute of limitations on that claim begins to run, when the defendant refuses to continue or renew any contract with the plaintiff. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th Cir. 1984) ("Where rights and liabilities are finalized by a contract or by denial of a contract, and any damages are at that time provable with [the required level of] certainty, the statute of limitations begins to run at that time."); *Kaw Valley Elec. Cooperative Co., Inc. v. Kansas Electric Power Cooperative, Inc.*, 872 F2d 931, 934 (10th Cir. 1989) ("The cases have concluded that if the initial refusal is final, the statute of limitations begins to run and no new cause of action is created when the victim makes subsequent futile efforts to deal with the violator and is rebuffed.").

TOI terminated its supply contract with VE in June 2005, and termination became effective on September 30, 2005. ¶ 28. VE's allegations make plain that the termination was final and that TOI has refused to deal with VE since June 2005. *Id.* There are no allegations that VE secured a new supply deal with TOI after 2005. VE also states that it suffered immediate damage from TOI's

refusal to deal in 2005: "Vision-Ease lost all of the customers it had earned as of June 2005 and the corresponding profits it would have made on sales of Vision-Ease and Transitions products to those customers." ¶¶ 28, 44.

The antitrust claims (and any damages) based on TOI's refusal to deal with VE therefore accrued no later than September 30, 2005, meaning that the statute of limitations on those claims expired no later than September 30, 2009. VE filed its Complaint on July 27, 2010, long after the applicable four-year statute of limitations expired. Its claims based upon TOI's refusal to deal with VE should therefore be dismissed. *David Orgell, Inc. v. Geary's Stores, Inc.,* 640 F.2d 936 (9th Cir. 1981) (affirming that refusal to deal claim was time-barred where refusal to deal occurred more than four years before complaint was filed); *Kaw Valley*, 872 F.2d at 933-935 (same); *Garelick v. Goerlich's, Inc.*, 323 F.2d 854, 855 (6th Cir. 1963) (same).

### B.     Claims Based on TOI's "Exclusionary Agreements" Are Time-Barred

Wholly separate from the termination of the supply contract with TOI, VE brings antitrust claims based on the "exclusionary agreement campaign" VE alleges TOI undertook. ¶¶ 33-39, 52, 56, 61. The Complaint alleges that in 2005, in response to the competitive threat posed by Vision-Ease, Transitions began to enter into "exclusive agreements" with certain wholesale labs and retailers in order "lock up" key distribution channels for photochromic lenses. ¶¶ 33-36. VE does not allege that TOI entered into any new or different exclusionary agreements *after* 2005 – or, indeed, that TOI entered into any agreements at all *after* 2005.

The Complaint leaves no doubt that VE's antitrust claims based on "exclusive dealings" between TOI and certain wholesale labs and retailers accrued in 2005. *Zenith*, 401 U.S. at 338 (cause of action accrues "when a defendant commits an act that injures a plaintiff's business.") The four-year statute of limitations expired in 2009, nearly a year before VE filed its Complaint in July

2010. *Midwestern Waffles*, 734 F.2d at 715 (statute of limitations clock begins to run when "rights and liabilities are finalized by a contract or by denial of a contract").

### C. The Statute of Limitations Is Not Tolled, and No Exceptions Are Applicable to VE's Antitrust Claims

In certain circumstances, the running of a limitations period may be tolled or exceptions to the statute of limitations may apply. The most frequently-used theories to extend limitations periods are (1) fraudulent concealment, (2) prior government challenge to the complained-of conduct, (3) speculative damages, and (4) the "continuing violation" exception. ABA Section of Antitrust Law, Antitrust Law Developments, 893, 895-906 (6th ed. 2007). No such exception is applicable here.

**1. *Fraudulent Concealment.*** For the fraudulent concealment exception to apply, VE must show that TOI "concealed the conduct complained of," and that VE failed to "discover the facts that form the basis of his claim." *Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir.1988). VE does not allege fraudulent concealment; it admits it was fully aware of the relevant TOI business conduct. ¶¶ 27, 29, 33, 35.

**2. *Prior Government Proceeding.*** A separate government proceeding regarding the complained-of conduct tolls the statute of limitations on civil actions, but only for one year *after* the conclusion of that proceeding. 15 U.S.C. § 16(i). This rule does not revive time-barred claims. It only tolls the statute for still-viable claims. *See, e.g., City of Philadelphia v. Nucero Corp.*, Civ. A. No. 86-3628, 1987 WL 8046, *1 (E.D.Pa. March 16, 1987) ("The plain language of section 16(i) suspends the running of the statute of limitations, it does not revive it."); *Harris v. Atlantic-Richfield Co.*, 469 F. Supp. 759, 764 (E.D.N.C. 1978) (same).

The FTC filed its Complaint and Decision and Order on April 22, 2010. ¶ 46. Assuming *arguendo* that the FTC proceeding rule is applicable at all to VE's claims, the FTC proceeding nevertheless could not have revived VE's claims, which were already time-barred by the time the

FTC proceeding was initiated by the filing of a complaint and, on the same day, concluded by the filing of a Decision and Order.  Put simply, VE's claims were time-barred by the statute of limitations as of 2009, so the 2010 FTC proceeding is irrelevant to the statute of limitations considerations here.

**3.  *Speculative Damages.***  In the special circumstance where the plaintiff demonstrates that its future damages are so speculative as effectively to prohibit determining their amount and nature, the statute of limitations may be tolled.  *See Zenith,* 401 U.S. at 339.  However, mere uncertainty as to the extent or amount of the damages does not delay the accrual of the cause of action.  The harm that VE alleges here is not of the type deemed so speculative as to require tolling the statute of limitations.  *See, e.g., Florida Mun. Power Agency v. Florida Power & Light Co.*, 64 F.3d 614, 617 (11th Cir. 1995) ("Estimates are permissible and unavoidable in antitrust damage computations."); *Higgins v. New York Stock Exch.*, 942 F.2d 829, 832 (2d Cir. 1991) ("rare" case where statute of limitations tolled because of uncertainty as to damages); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1984) ("[T]he statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff."); *Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 985 F. Supp. 1440, 1446-47 (M.D. Fla. 1997), *rev'd on other grounds*, 198 F.3d 823 (11th Cir. 1999) (refusing to toll statute of limitations where plaintiff's alleged loss of future profits could have been ascertained at time of defendants' alleged infractions).  VE admits that it was aware of the purported harm that it was suffering as a result of its alleged preclusion from entering the market as of late 2005.  ¶¶ 28, 34, 36.  VE could have estimated its damages and filed suit in 2005 or at any other time during the four-year limitations period.  The speculative damages exception is inapplicable here.

**4.    *Continuing Violation.*    The "continuing violation" exception typically applies to conspiracies to fix prices or group boycotts – not alleged here by VE – "when conspirators continue to meet to fine-tune their cartel agreement."  *Midwestern Mach. Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265, 269 (8th Cir. 2004).  But, the "continuing violation" exception "[has] not been found outside the RICO or Sherman Act conspiracy context . . . because acts that 'simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations.'"  *Id.* at 270 (internal quotations omitted).  In the limited circumstances in which it applies, the "continuing violation" exception operates to extend the statute of limitations where there is not one definitive act, but also a series of "overt acts" within the limitations period, each of which causes new injury to the plaintiff.  *Zenith*, 401 U.S. at 388.

However, not every act is an "overt act" sufficient to restart the statute of limitations.  An "overt act" is (i) a new and independent act that is not merely a reaffirmation of a previous act that (ii) inflicts new and accumulating injury on the plaintiff.  *Varner v. Peterson Farms,* 371 F.3d 1011, 1019 (8th Cir. 2004) (affirming dismissal of complaint on statute of limitations grounds where plaintiff failed to allege facts to support "continuing violation" exception).  Acts that are "merely the abatable but unabated inertial consequences" of a pre-limitations action are not "overt acts" that restart the statute of limitations.  *Midwestern Mach.*, 392 F.3d at 270; *Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 517 F.2d 117, 128 (5th Cir. 1975).  Acts that simply reflect implementation or reaffirmation of a prior anticompetitive decision are merely "unabated inertial consequences." *Id.* VE has not pled, and cannot plead, the required facts for the "continuing violations" exception.

### a.    The "Continuing Violation" Exception Does Not Apply to the 2005 Termination of the Supply Contract between TOI and VE

In June 2005, TOI notified VE that the contract to supply photochromic treatment to VE's clear lenses would be terminated effective September 30, 2005.  ¶ 28.  According to VE's

Complaint, TOI had a policy that VE knew existed since at least 1999 that TOI would refuse to deal with lens manufacturers that made and sold non-TOI photochromic lenses. ¶¶ 24, 29. Any claim for damages VE may have had for TOI's "refusal to deal" accrued in 2005 when it no longer received TOI's photochromic lenses. ¶¶ 28, 44.

The Complaint makes no mention of any acts after 2005. VE does not allege any new and independent "overt acts" after 2005 with respect to the supply contract termination. VE does not allege that TOI continued to supply photochromic lenses after 2005 to VE, or that TOI failed to act on its termination notice. The contract and relationship ended effective September 30, 2005. There simply was no "overt act" thereafter to restart the limitations period.

VE thus cannot claim the "continuing violation" exception with respect to TOI's "refusal to deal" with VE in 2005. *Kaw Valley*, 872 F.2d at 934 ("The cases have concluded that if the initial refusal is final, the statute of limitations begins to run and no new cause of action is created when the victim makes subsequent futile efforts to deal with the violator and is rebuffed."); *Orgell,* 640 F.2d 936 (affirming that refusal to deal claim was time-barred where refusal to deal occurred more than four years before complaint was filed); *Garelick*, 323 F.2d at 855 (same).

> **b.    The "Continuing Violation" Exception Does Not Apply to the 2005 Agreements between TOI and Certain Wholesale Labs and Retailers**

VE separately alleges that, in 2005, TOI "began an "exclusionary agreement campaign" with a number of unidentified wholesale labs and retailers, the effect of which VE claims limited its access to those distribution outlets. ¶¶ 33-36. Here again the Complaint is devoid of any factual allegations concerning post-2005 conduct by TOI. VE does not identify a single "exclusive agreement" between TOI and any wholesale lab or retailer that was entered into after 2005.

VE fails to plead the necessary new and independent "overt act" that would form the predicate for the Court to apply the "continuing violation" exception. This failure is grounds for

dismissal of the Complaint.  *Varner,* 371 F.3d at 1019 (affirming dismissal of claims as time-barred where plaintiff failed to allege facts sufficient to satisfy "continuing violation" exception); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 227-29 (E.D.N.Y. 2003) (dismissing time-barred claims and rejecting assertion of "continuing violation" exception); *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1055-56 (5th Cir. 1982) (affirming dismissal of time-barred antitrust counterclaim and rejecting assertion of "continuing violation" exception).

Even if VE had alleged facts establishing a continuation of the "exclusionary agreement campaign" *after* 2005, such as new agreements with customers in that period, those acts would not constitute new and independent "overt acts" sufficient to restart the limitations period.  Instead, any post-2005 "exclusive agreement" between TOI and an individual wholesale lab or retailer would be a mere reaffirmation or "unabated inertial consequence" of the initial 2005 decision to engage in exclusive deals with downstream distribution channels.  *Midwestern Machinery*, 392 F.3d at 270; *Varner*, 371 F.3d at 1019.

Courts consistently recognize that performance (during the limitations period) pursuant to a prior business decision (outside the limitations period) is not a new and independent "overt act" that triggers the continuing violation exception.  *Varner*, 371 F.3d at 1020 (purchases of supplies pursuant to allegedly anticompetitive tying contract insufficient to toll limitations); *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999) (payments made pursuant to an illegal contract were "only a manifestation" of the agreement, and did not restart statute of limitations); *Kaiser Aluminum & Chemical Sales,* 677 F.2d at 1055-56 (antitrust claim accrued on date of tying arrangement and subsequent acts did not constitute continuing violation); *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-8455, 2008 U.S. Dist. LEXIS 80475 (S.D.N.Y. Oct. 10, 2008)

(finding that defendant's entering into new licensing agreement that reaffirmed existing policy did not constitute "overt act"); *In re Ciprofloxacin*, 261 F. Supp. 2d at 228-30 (payments made pursuant to allegedly unlawful agreements do not restart limitations period).

VE's Complaint alleges that TOI's business decision in 2005 to pursue "exclusive agreements" with wholesale labs and retailers was well-known to VE and the industry.  ¶¶ 31, 33-36. The repose offered by the statute of limitations cannot be readily upended by an unsubstantiated claim that TOI's business decision may have continued after 2005.

> Such practices are generally public, and injured parties are able to feel and perhaps to assess their injuries almost immediately.  But assessing antitrust consequences is often difficult, and reasonable minds might differ on that question.  In such cases it is especially important that antitrust challenges be timely made, thus minimizing the social costs of any antitrust violation but giving the parties repose for conduct that is lawful.

2 P. Areeda & H. Hovenkamp, <u>Antitrust Law</u> ¶ 320a (3d ed. 2007); *see also United States v. Kubrick*, 444 U.S. 111, 117 (1979) (statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and 'that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'"); *Midwestern Machinery*, 392 F.3d at 270 (explaining importance of strict adherence to statute of limitations where conduct giving rise to antitrust claims was a known business practice).

For the foregoing reasons, VE's First (Sherman Act Section 2), Second (Sherman Act Section 1) and Third Causes of Action (Clayton Act Section 3) should be dismissed.

## III.   VE'S ALLEGATIONS REGARDING THE EXCLUSIVE AGREEMENTS WITH CERTAIN WHOLESALE LABS AND RETAILERS FAIL TO STATE A COGNIZABLE ANTITRUST CLAIM

In an antitrust case, a private plaintiff seeking antitrust damages, as VE does here, must establish not only "standing" in the conventional Article III sense, but also "antitrust standing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc); *Palmyra Park Hosp., Inc. v.*

*Phoebe Putney Mem. Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010); *Florida Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). This means that VE must show that it suffered "antitrust injury," or "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The antitrust standing requirement "prevents losses that stem from competition from supporting suits by private plaintiffs . . . [and] ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342-344 (1990) (emphasis in original).

A.   **VE Fails to Allege That It Has Antitrust Standing to Pursue Its Claims**

Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand*, 507 F.3d at 450; *see also Todorov*, 921 F.2d at 1448. Courts in this Circuit regularly dismiss complaints for lack of antitrust standing, including complaints alleging illegal exclusive dealing as VE does here. *See, e.g., Florida Seed*, 105 F.3d at 1375-76 (affirming grant of motion to dismiss where plaintiff suffered no antitrust injury); *Vitacost.com, Inc. v. Gaia Herbs, Inc.*, No. 06-81141-CIV, 2007 WL 951768 (S.D. Fla. 2007) (granting motion to dismiss amended complaint by competitor and would-be distributor of defendant's product); *Med. Savings Ins. Co. v. HCA, Inc.*, No. 2:04CV156, 2005 WL 1528666, at * 8 (M.D. Fla. June 24, 2005) (granting motion to dismiss where plaintiff failed to allege antitrust injury); *In re Terazosin Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336, 1368-69 (S.D. Fla. 2004) (complaint dismissed for lack of antitrust injury because plaintiff's harm was caused by failure to get needed regulatory approval, not defendant's conduct).

VE's allegations concerning TOI's exclusive agreements with downstream distributors amount to a complaint that TOI outbid it in a fight to convince some, but not all, retailers to promote TOI's photochromic lenses.  VE won a contract with a national retailer LensCrafters (and presumably others, as it has remained in the business of selling photochromic lenses since 2005).  ¶ 27.  TOI won deals as well, only more so than VE.  ¶¶ 34, 36.  If VE has been harmed at all, it was harmed not by any *anticompetitive* effect of TOI's deals, but by its own failure to compete effectively to get those contracts for itself.  VE was not harmed by any reduction in competition, but by one of the most powerful forms of rivalry encouraged by the antitrust laws – competition to be an exclusive supplier.  *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("When the consumers favor a product or practice [e.g. exclusive deals], and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than undermines competition, for what helps consumers often harms other producers").  A firm that has competed, even if with little success, for exclusive contracts, does not suffer "the kind of injury that gives rise to an antitrust claim," and therefore lacks antitrust standing.  *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (affirming summary judgment for defendant-competitor because plaintiff failed to prove antitrust standing).

Here, VE's failure to allege that it was somehow denied an opportunity to compete for the exclusive deals awarded to TOI – or to allege that it was awarded no such deals of its own – means that it is just as likely that the injuries VE has allegedly suffered resulted from too much competition rather than not enough.  A claim alleging that one has been the victim of competition to be an exclusive supplier does not state an antitrust injury, and a motion to dismiss such a claim is properly granted.  *NicSand*, 507 F.3d at 447 (affirming dismissal of a supplier's claim that a competing supplier's exclusive-dealing agreements with large retailers violated the Sherman Act for lack of

antitrust standing on the same reasoning).  VE's losses to TOI in some bids for exclusive deals with retailers "flow from the kind of competition that the antitrust laws were designed to foster," thereby preventing VE from establishing a "cognizable antitrust injury."  *Id.* at 451.  VE has not sued TOI because it wants to share retail shelf space with TOI; it sued TOI because it wants the shelf space all to itself – "[t]his is just the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect."  *Id.* at 454.  Nor does it matter that VE was a relatively smaller market entrant compared to TOI.  *Indeck Energy Services, Inc. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000) (smaller market entrant did not suffer antitrust injury when it lost a contract to the market leader, who had preserved 80 percent of the relevant market by means of exclusive contracts).

The same lack of antitrust injury dooms VE's claims concerning TOI's purported agreements with wholesale labs.  As with the retailer agreements, VE does not allege that it was precluded from competing with TOI to win such agreements for itself.  Instead, VE has alleged nothing more than its own failure to compete successfully against TOI.  VE has been harmed by the competitive process rather than by any reduction in competition.

Nor does VE possess antitrust standing with respect to its claims regarding TOI's refusal to deal with lens manufacturers that sell non-TOI photochromic lenses.  VE manufactures its own photochromic lenses and has no need for other lens manufacturers to make or sell its product; indeed, VE competes with them for sales to retailers and wholesale labs.  Thus, taking at face value VE's allegation that TOI places constraints on what VE's competitors may sell, TOI in fact made it easier for VE to succeed.  VE's Complaint makes no mention of how TOI's agreements with lens manufacturers harmed VE.  ¶¶ 29-31.  A plaintiff lacks antitrust standing to challenge a defendant's agreement with rivals where the plaintiff stands to benefit from any restrictions imposed by that agreement on its rivals.  *Atlantic Richfield*, 495 U.S. at 337-38 (gasoline dealer suffered no antitrust

injury as a result of resale price agreements between defendant and rival gasoline dealers because plaintiff would receive competitive advantage from such agreements); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 582-83 (1986) (plaintiff manufacturer lacked antitrust standing because it stood to gain from any conspiracy among defendants to raise prices).

The Eleventh Circuit has viewed exclusive dealing claims with skepticism where the plaintiff appears to be asking the court to equip it with the defendant's competitive advantage. *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991) (affirming summary judgment for defendant: "The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own.").  Courts in this Circuit have regularly recognized that exclusive dealing can enhance competition or serve a buyer's perceived needs without implicating a desire to suppress competition. *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1344 (N.D. Ga. 1987) (granting summary judgment for defendant); *Servicetrends, Inc. v. Siemens Medical Sys., Inc.*, 870 F. Supp. 1042, 1066 (N.D. Ga. 1994) (granting summary judgment for defendant).  These cases confirm that VE has not alleged any harm to itself from an *anticompetitive effect* of the claimed violation.  Absent allegations necessary to establish such antitrust injury, its claims fail as a matter of law.

**B.      VE's Allegations Concerning Tying Arrangements or Bundled Discounts Cannot Save Its Antitrust Claims From Dismissal**

In a mere two paragraphs, VE alleges that TOI was able to obtain the challenged agreements with retailers and wholesale labs by providing a "discount" only if the customer purchased all or almost all of its photochromic lens needs from TOI.  ¶¶ 37-38.  According to VE, because TOI is the only firm with a photochromic treatment that applies to a full line of lenses (both plastic and polycarbonate), the discount structure impairs the ability of rivals with less than a full line of products – such as VE, which does not offer plastic photochromic lenses – from competing for sales

to these customers.  ¶¶ 14-15, 37.  VE applies the legal labels "tying" and "bundled discounts" to the arrangements, but the Complaint does not make clear whether VE is alleging separate antitrust claims for tying and bundling.  If VE is making such claims, they fail for the reasons explained below; if VE is not, then they should be ignored because the alleged "discounts" add nothing to the issue of whether there is any antitrust injury flowing from the "exclusive agreements" with wholesale labs and retailers.

VE has failed to allege facts sufficient to meet the pleading requirements of a tying claim. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18-21 (1984).  Here, VE has alleged only one market – the photochromic lens market – rather than two separate markets (a tying market and a tied market) that TOI has attempted to tie.  In fact, VE cannot allege two separate markets because all of TOI's photochromic lenses are distributed within the same relevant market.  Having failed to allege two separate markets, VE's attempt to allege a "tying" claim fails.  *See Palmyra*, 604 F.3d 1296 n.4.

VE also does not allege facts to support a "bundling" claim.  Above-cost discounting is generally not considered anticompetitive.  *Cascade Health Sol'ns v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008); *Southeast Missouri Hosp. v. C.R. Bard, Inc.,* 616 F.3d 888, 892 (8th Cir. 2010) (vacated for *en banc* review on October 19, 2010).  In order to make out a bundled discount claim, VE would need to allege that the bundled discounts offered by TOI effectively amount to TOI pricing polycarbonate photochromic lenses – the lenses VE sells as well – below TOI's costs. *Cascade Health Sol'ns v. PeaceHealth*, 515 F.3d at 906.  But VE does not allege that TOI has discounted any of its products below any measure of cost.  Nor could it because TOI sells its photochromic lenses to lens manufacturers, who then separately set the prices for photochromic lenses and distribute them to wholesale labs and retailers.  By the time TOI offers any "discounts" to

wholesale labs or retailers, it has already sold its lenses to lens manufacturers at a price not alleged by VE to be below TOI's costs.  VE has therefore failed to allege a bundling claim.  *Atlantic Richfield,* 495 U.S. at 340 ("[S]o long as [low prices] are above predatory levels, they do not threaten competition.  Hence, they cannot give rise to antitrust injury.").

## C.    The FTC Complaint Does Not Save VE's Complaint from Dismissal

VE includes allegations from the FTC's Complaint and Decision and Order against TOI, presumably hoping to bolster its federal antitrust claims.  ¶¶ 46-48.  However, the FTC proceeding adds nothing to VE's own claims, for three reasons.  First, as plainly stated in the Decision and Order, TOI consented to the entry of the Order for settlement purposes only, and its consent explicitly did not constitute an admission that TOI had violated the law as alleged in the FTC's Complaint, or that the facts alleged in that Complaint were true.  Second, the FTC's Complaint alleged that TOI had violated Section 5 of the Federal Trade Commission Act, not Sherman Act Sections 1 or 2, or Clayton Act Section 3, as alleged in this action.  As the Supreme Court has held – in a case concerning exclusive dealing arrangements – the FTC has broad powers to declare trade practices unfair, even where those practices do not violate the Sherman and Clayton Acts.  *F.T.C. v. Brown Shoe Co.*, 384 U.S. 316, 320-21 (1966).  Even if a court had held that TOI had violated the FTC Act – and no court has so found – that holding would not provide any support for this Court to assume that TOI must therefore have violated the antitrust statutes under which VE has brought its claims.  Third, as explained above, unlike the FTC, as a private antitrust plaintiff VE must establish that it has antitrust standing to pursue its claim against TOI.  As VE's own allegations demonstrate, VE has not alleged and will not be able to establish that it has antitrust standing, so its antitrust claims should be dismissed.

## IV.   VE'S FOURTH CAUSE OF ACTION (STATE LAW CLAIMS) SHOULD BE DISMISSED

VE alleges that TOI violated twenty states' statutes prohibiting certain anti-competitive practices.  However, none of VE's state claims withstand scrutiny.

### A.   Many of VE's State Law Claims Are Time-Barred

VE has not alleged in its Complaint any anticompetitive conduct by TOI after 2005.  VE's claims under the following states' unfair competition statutes are therefore time-barred by the statutes of limitation listed below:

| | |
|---|---|
| **Alabama** | Ala. Code § 6-2-38(l) (two-year statute of limitations) |
| **Alaska** | Alaska Stat. § 45.50.531(f) (two-year statute of limitations) |
| **California** | Cal. Bus. & Prof. Code § 16750.1 (four-year statute of limitations) |
| **Colorado** | Colo. Rev. Stat. § 6-1-115 (three-year statute of limitations) |
| **Connecticut** | Conn. Gen. Stat. § 42-110g(f) (three-year statute of limitations) |
| **Florida** | Fla. Stat. § 95.11(3)(f) (four-year statute of limitations) |
| **Illinois** | 815 Ill. Comp. Stat. Ann. 505/10a(e) (three-year statute of limitations) |
| **Louisiana** | La. Rev. Stat. Ann. § 51:1409 (one-year statute of limitations) |
| **Maryland** | Md. Code Ann. Cts. & Jud. Proc. § 5-101 (three-year stat. of limitations) |
| **Massachusetts** | M.G.L.A. 260 § 2A (four-year statute of limitations) |
| **Nevada** | Nev. Rev. Stat. § 598A.220(1) (four-year statute of limitations) |
| **New Hampshire** | N.H. Rev. Stat. Ann. § 358-A:3(IV-a) (three-year statute of limitations) |
| **North Carolina** | N.C. Gen. Stat. Ann. § 75-16.2 (four-year statute of limitations) |
| **Ohio** | Ohio Rev. Code Ann. § 1345.10(C) (two-year statute of limitations) |
| **South Carolina** | S.C. Code Ann. § 39-5-150 (three-year statute of limitations) |
| **Washington** | Wash. Rev. Code § 19.86-120 (four-year statute of limitations) |

### B.   VE Has Failed to State a Claim Pursuant to Some of the State Statutes Referenced In its Fourth Cause of Action

*Arkansas.*  Ark. Code Sections 4-88-107 and 4-88-113(f) bar "deceptive trade practices," not general anticompetitive conduct that does not involve deception of some kind.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1125 (N.D.Cal. 2008).   VE's Complaint does not allege any facts that would constitute "deception," and therefore the Arkansas state law claims must be dismissed.

*Maryland.* Maryland Com. Law Code Section 13-301 lists the conduct barred by Maryland's unfair competition law, and that list does not include the *antitrust* conduct alleged by VE. *See Davidson v. Microsoft Corp.,* 792 A.2d 336, 345 (2002) ("Antitrust violations, however, are not listed in MCPA's list of prohibited activities."); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 724 n.25 (D. Md. 2001) ("[T]he actionable unfair or deceptive trade practices listed in the [MCPA] do not include monopolistic conduct").

*New Jersey.* Individuals may not bring an action under New Jersey's consumer protection act for antitrust violations without a showing that the defendant used deception, fraud, or misrepresentation. *Wilson v. General Motors Corp.*, 921 A.2d 414, 416 (N.J. 2007); *Sickles v. Cabot Corp.*, 379 NJ Super 100, 115-117 (N.J. Super. 2005). VE has not alleged facts that TOI engaged in any deceptive or fraudulent acts.

*Tennessee.* VE has asserted claims against TOI pursuant to Tennessee's consumer protection statute. Anticompetitive conduct is not actionable under that statute. *Bennett v. Visa USA, Inc.*, 198 S.W.3d 747, 755 (Tenn. App. 2006) ("the [Tennessee Consumer Protection Act] does not apply to anti-competitive conduct"); *Sherwood v. Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 WL 21780975 at *33 (Tenn. App. July 31, 2003) ("claims based upon anticompetitive conduct are not cognizable under the TCPA").

*Utah.* VE asserts claims pursuant to Utah's unfair competition statute. Utah Code §§ 13-5-2.5(1) and 13-5a-103. However, Section 13-5-2.5(1) addresses only actions brought by the state that seek an injunction. Further, the term "unfair competition" as used in 13-5a-103 is defined as conduct that constitutes: (A) malicious cyber activity; (B) infringement of a patent, trademark, or trade name; (C) a software license violation; or (D) predatory hiring practices." Utah Code § 13-5a-102(4)(a)(ii). VE does not allege that TOI undertook any such actions.

## V.      VE'S FIFTH CAUSE OF ACTION (FLORIDA AND MINNESOTA LAWS) SHOULD BE DISMISSED

In its fifth cause of action, VE alleges that TOI tortiously interfered with VE's prospective business relations under either Florida or Minnesota law.

First, VE's tortious interference claims are predicated on TOI's purported anticompetitive acts.   State law claims alleging anticompetitive activity rise or fall with the plaintiffs' federal antitrust claims.  *See, e.g., Metzler v. Bear Automotive Service Equipment Co.*, 19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998) ("where the tort is grounded on precisely the same 'anticompetitive' behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortious interference with a business relationship"); *In re Appraiser Foundation Antitrust Litig.,* 867 F. Supp. 1407, 1419 (D. Minn. 1994) (granting defendant's motion for summary judgment on plaintiff's antitrust and tortious interference claims, finding "tortious interference requires an even stronger showing of causation than antitrust claims").  Because VE's federal antitrust claims must be dismissed as insufficient as a matter of law, so must its state law claims based on the same allegations.

Further, under both Florida and Minnesota law, a tortious interference claim cannot be based on an allegation that the defendant's interference caused general harm to the plaintiff in the market; the allegation must specify a *specific relationship* that was disturbed by the defendant's actions. *Ethan Allen v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla. 1994) ("no cause of action exists [in Florida] for tortious interference with a business's relationship to the community at large."); *Southern Alliance Corp. v. Winter Haven,* 505 So.2d 489, 496 (Fla. 2d DCA 1987) (same); *Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1405 (8th Cir. 1993), *citing Hunt v. University of Minn.,* 465 N.W.2d 88, 95-96 (Minn. App. 1991) ("the mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations

under Minnesota law."); *Rowlette & Assocs. v. Calphalon Corp.*, No. C8-99-1667, 2000 WL 385502, at *9 (Minn. App. April 18, 2000) (same).

VE has not alleged a *specific* relationship with any customer (or potential customer) that was disturbed by TOI.  VE merely alleges that it had a "reasonable expectation of business advantage and benefit," and that it is "reasonably probable" that VE "would have realized its economic advantage and benefit by entering into agreements with specialty retailers, mass merchants, and retail and wholesale ophthalmic lens laboratories." ¶¶ 68, 71.  These claims seek damages for *general* interference with the photochromic lens market rather than identifying *specific* customers with which VE would have entered agreements but for TOI's conduct as required by Minnesota and Florida law.

## VI.    THE COURT SHOULD DECLINE JURISDICTION OVER THE STATE LAW CLAIMS

If this Court does not dismiss the state claims with prejudice for the reasons discussed above, it should decline to exercise jurisdiction over them.  When all the claims providing a basis for federal jurisdiction have been dismissed, as TOI submits should be the outcome here, dismissal of state claims (without prejudice) is warranted under 28 U.S.C. § 1367(c).  *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) (affirming dismissal of state law claims in light of federal claims being dismissed); *see also United Mine Workers v. Gibbs,* 383 U.S. 715, 726-27 (1966).  Dismissal of the pendent state claims here, therefore, is appropriate.

## CONCLUSION

The flaws in VE's claims identified above are so fundamental that further pleading will not cure them. For all the foregoing reasons, VE's Complaint should be dismissed in its entirety with prejudice.

Dated: October 25, 2010

By: /s/ Jonathan M. Jacobson
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Phone: (212) 999-5800
Fax: (212) 999-5899
E-mail: jjacobson@wsgr.com
Counsel for Defendant Transitions Optical, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send an electronic notice to all counsel of record who are registered to receive electronic notices. I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

| | | |
|---|---|---|
| Mark A. Maasch | Donald Amamgbo | Leila E Ely |
| **Turner & Maasch, Inc.** | **Amamgbo & Associate** | **Weinstein Kitchenoff &** |
| 550 West C Street, Suite 1150 | 7901 Oakport Street, Suite 4900 | **Asher LLC** |
| San Diego, CA 92101 | Oakland, California 94621 | 1845 Walnut Street, Suite 1100 |
| | | Philadelphia, PA 19103 |

Dated: October 25, 2010

By: /s/ Jonathan M. Jacobson
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Phone: (212) 999-5800
Fax: (212) 999-5899
E-mail: jjacobson@wsgr.com
Counsel for Defendant Transitions Optical, Inc.