UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| IN RE: PHOTOCHROMIC LENS | ) | |
| ANTITRUST LITIGATION | ) | MDL Docket No. 2173 |
| | ) | |
| _____ | ) | |
| | ) | Case No. 8:10-MD-2173-JDW-EAJ |
| This Filing Relates To: | ) | |
| | ) | |
| Case No. 8:10-CV-1158 | ) | Hon. James D. Whittemore |
| Case No. 8:10-CV-1358 | ) | |
| Case No. 8:10-CV-1825 | ) | |
| Case No. 8:10-CV-1984 | ) | |
| Case No. 8:10-CV-2043 | ) | |
| Case No. 8:10-CV-2090 | ) | |
| Case No. 3:10-CV-3099 | ) | |
| | ) | |
| _____ | ) | |

**INDIRECT PURCHASER END-USER
PLAINTIFFS' CONSOLIDATED COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................................1

JURISDICTION AND VENUE ...............................................................................................2

PARTIES ..................................................................................................................................3

THE RELEVANT MARKET ...................................................................................................6

TRANSITIONS' MONOPOLY POWER IN THE RELEVANT MARKET ..............................7

ANTICOMPETITIVE EFFECTS OF TRANSITIONS' CONDUCT ........................................8

FACTUAL BACKGROUND ...................................................................................................9

 The Photochromic Lens Industry ...................................................................................9

 Transitions' Exclusionary Dealings with Lens Casters ...................................................12

 Transitions' Exclusionary and Restrictive Dealings with Retailers and Wholesale Labs .......15

 The Federal Trade Commission Action and Consent Order .................................................17

CLASS ACTION ALLEGATIONS ........................................................................................19

INJURY TO PLAINTIFFS AND OTHER CLASS MEMBERS ..............................................21

FRAUDULENT CONCEALMENT .......................................................................................21

CLAIMS FOR RELIEF .........................................................................................................22

 Count I – Monopolization Under Florida Law ................................................................22

 Count II – Violation of State Antitrust Laws ...................................................................22

 Count III – Deceptive and Unfair Trade Practices Under Florida Law ..............................23

 Count IV – Violation of State Consumer Protection and Unfair Competition Laws ............24

 Count V –Violation of State Unjust Enrichment Laws .....................................................25

PRAYER FOR RELIEF .........................................................................................................25

JURY DEMAND ...................................................................................................................26

Indirect Purchaser End-User Plaintiffs, Howard Achtman, DeWayne Blake, John Donohoe, Keith Forbes, Amanda Gable, Gabby Klein, Edmund Moores, Caryl O'Keefe, Tom Peroni, Keith Brian Roller, Axhi Sabani, and Phyllis Sternemann (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, bring this action against defendant Transitions Optical, Inc. ("Transitions"). The allegations set forth are based upon information and belief, except those as to Plaintiffs, which are based upon personal knowledge.

## NATURE OF THE ACTION

1.    This action arises out of Transitions' anticompetitive and exclusionary efforts to monopolize the market for the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in violation of state antitrust, consumer protection and unfair practice, and unjust enrichment laws.

2.    Consumers of corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects) may purchase those lenses with the option of an add-on photochromic treatment, which protects eyes from harmful ultraviolet ("UV") light. A corrective ophthalmic lens with a photochromic treatment ("photochromic lens") will darken when it is exposed to the UV light present in sunlight and fade back to clear when it is removed from the UV light.

3.    From at least 1999 to present, Transitions possessed monopoly power in the product market for the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in the United States and, with the purpose and effect of maintaining and increasing this monopoly power, engaged in unlawful and exclusionary acts and practices that included, but were not limited to, refusing to do business with any lens caster that marketed

1

or sold a competitor's photochromic lens and entering into exclusionary agreements at all levels of the photochromic lens distribution chain.

4.     The effect of Transitions' anticompetitive and unlawful conduct has been to deny a competitive price to indirect purchasers of Transitions photochromic lenses in the United States. As a result of Transitions' anticompetitive conduct, corrective ophthalmic lenses with photochromic treatment manufactured, supplied, and/or distributed by Transitions ("Transitions photochromic lenses") were priced higher than they otherwise would have been absent Transitions' unlawful conduct, and Plaintiffs and the other Class members, indirect purchasers of Transitions photochromic lenses, were injured as a result of paying supra-competitive prices for Transitions photochromic lenses.

5.     On March 3, 2010, the Federal Trade Commission ("FTC") filed a Complaint against Transitions relating to the anticompetitive conduct alleged herein, and announced that it had entered into a proposed Consent Order with Transitions relating to such conduct. The Director of the FTC's Bureau of Competition stated in a news release accompanying the filing of the FTC Complaint and Consent Order, that "Transitions crossed the line between aggressive competition and illegal exclusionary conduct." The Director added that Transitions' "actions prevented others from competing on the merits, and consumers were forced to pay more for these lenses as a result. Such conduct runs afoul of the antitrust laws and is unacceptable."

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; at least one class member is a citizen of a different state than the defendant; and this action involves more than 100 class members.

7.     Venue is proper in this district under 28 U.S.C. § 1391, because Transitions' headquarters is located within this district and Transitions engaged in substantial conduct relevant to Plaintiffs' claims within this district.

8.     The class action lawsuits referenced in the caption above have been transferred to this Court per the Transfer Order of the Judicial Panel on Multi-District Litigation.  Plaintiffs in the transferred actions reserve their rights of remand to the districts from which they were transferred at or before the conclusion of the pre-trial proceedings.[1]

## PARTIES

9.     Plaintiff Howard Achtman is a resident of the State of Michigan. During the Class period, Plaintiff Achtman purchased, indirectly, Transitions photochromic lenses in Michigan. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Achtman paying an overcharge for his photochromic lenses. Plaintiff Achtman was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

10.     Plaintiff DeWayne Blake is a resident of the State of Kansas. During the Class period, Plaintiff Blake purchased, indirectly, Transitions photochromic lenses in Kansas. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Blake paying an overcharge for his photochromic lenses. Plaintiff Blake was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

11.     Plaintiff John Donohoe is a resident of the State of California. During the Class period, Plaintiff Donohoe purchased, indirectly, Transition's photochromic lenses in California.

---

[1] *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Donohoe paying an overcharge for his photochromic lenses. Plaintiff Donohoe was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

12.   Plaintiff Keith Forbes is a resident of the State of Maine. During the Class period, Plaintiff Forbes purchased, indirectly, Transitions photochromic lenses in Maine. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Forbes paying an overcharge for his photochromic lenses. Plaintiff Forbes was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

13.   Plaintiff Amanda Gable is a resident of the State of California. During the Class period, Plaintiff Gable purchased, indirectly, Transitions photochromic lenses in California. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Gable paying an overcharge for her photochromic lenses. Plaintiff Gable was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

14.   Plaintiff Gabby Klein is a resident of the State of New York. During the Class period, Plaintiff Klein purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Klein paying an overcharge for his photochromic lenses. Plaintiff Klein was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

15.     Plaintiff Edmund Moores is a resident of the State of New York. During the Class period, Plaintiff Moores purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Moores paying an overcharge for his photochromic lenses. Plaintiff Moores was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

16.     Plaintiff Caryl O'Keefe is a resident of the State of California. During the Class period, Plaintiff O'Keefe purchased, indirectly, Transitions photochromic lenses in California. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff O'Keefe paying an overcharge for her photochromic lenses. Plaintiff O'Keefe was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

17.     Plaintiff Tom Peroni is a resident of the State of New York. During the Class period, Plaintiff Peroni purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Peroni paying an overcharge for his photochromic lenses. Plaintiff Peroni was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

18.     Plaintiff Keith Brian Roller is a resident of the State of Florida. During the Class period, Plaintiff Roller purchased, indirectly, Transitions photochromic lenses in Florida. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Roller paying an overcharge for his

photochromic lenses. Plaintiff Roller was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

19.     Plaintiff Axhi Sabani is a resident of the State of Wisconsin. During the Class period, Plaintiff Sabani purchased, indirectly, Transitions photochromic lenses in Wisconsin. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Sabani paying an overcharge for his photochromic lenses. Plaintiff Sabani was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

20.     Plaintiff Phyllis Sternemann is a resident of the State of New York. During the Class period, Plaintiff Sternemann purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Sternemann paying an overcharge for her photochromic lenses. Plaintiff Sternemann was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

21.     Defendant Transitions Optical, Inc., is a Delaware corporation, and its principle place of business is located at 9251 Belcher Road, Pinellas Park, Florida 33782. Transitions is a joint venture between PPG Industries, Inc., which owns 51 percent of Transitions, and Essilor International SA ("Essilor International"), which owns 49 percent.

## THE RELEVANT MARKET

22.     The relevant product market is the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in the United States.

23.     Purchasers of corrective ophthalmic lenses, which are used in eyeglasses to correct vision defects, have the option to purchase them clear, tinted, polarized, or photochromic.

24.     Photochromic lenses have characteristics and uses distinct from those of clear lenses, polarized lenses (which are designed to remove glare), or fixed-tint lenses (*e.g.*, prescription sunglasses).

25.     Photochromic lenses react to changes in ultra-violate light ("UV"), and protect eyes from potentially harmful UV rays. Photochromic lenses darken when exposed to UV light, such as sunlight, and fade back to clear when removed from UV light. Photochromic lenses are also known as light-responsive lenses, variable tint lenses, or changeable tint lenses.

26.     Photochromic lenses allow users to go from sunlight to darkness and back again without changing their glasses.

27.     There are no close substitutes for photochromic lenses, and no other product significantly constrains the price of photochromic lenses.

28.     Each year, U.S. consumers purchase roughly 76 million pairs of corrective ophthalmic lenses. In 2008, photochromic lenses represented approximately 18-20% of all corrective ophthalmic lens sales in the United States, totaling approximately $630 million in sales at the wholesale level.

## TRANSITIONS' MONOPOLY POWER IN THE RELEVANT MARKET

29.     Transitions possessed monopoly power in the relevant market from at least 1999 to present. Transitions' share of the relevant market has been at least 80 percent during each of the past five years. In 2008, Transitions' market share was over 85 percent.

30.     Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unlawful, anticompetitive, and unfair methods of competition.

31.     Transitions' monopoly power in the relevant market is also demonstrated by its ability to exclude competitors and to control prices. The indicia of Transitions' monopoly power include, but are not limited to, the ability of Transitions to: (i) coerce lens casters, which manufacture and distribute corrective ophthalmic lenses, to accept exclusive dealing arrangements; (ii) price its product without regard to its competitors' prices; (iii) impose significant price increases; and (iv) withhold a desired product—a low-priced, private label photochromic lens—from consumers in the United States, even though Transitions supplies it in other markets.

### THE ANTICOMPETITIVE EFFECTS OF TRANSITIONS' CONDUCT

32.     Transitions' acts and practices had the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of Transitions' competitors in the relevant market, and of significantly raising barriers to entry for potential rivals.

33.     The above anticompetitive conduct has had the following effects, among others:

(a)     Impairing the competitive effectiveness of Transitions' competitors in the photochromic lens industry;

(b)     Artificially increasing prices of photochromic lens treatments for corrective ophthalmic lenses, including Transitions photochromic lenses;

(c)     Reducing product output in the market of photochromic lens treatments for corrective ophthalmic lenses;

(d)     Erecting and otherwise significantly raising barriers to entry into the photochromic lens industry;

(e)   Deterring, delaying, and impeding the ability of actual or potential competitors to enter or expand sales in the photochromic lens treatment industry;

(f)   Discouraging and diminishing innovation in the photochromic lens treatment field; and

(g)   Restraining, suppressing, or eliminating consumer options in the market of photochromic lens treatments for corrective ophthalmic lenses.

34.   Additionally, by effectively stifling competition, Transitions has been able to refuse to supply its low-priced, private label photochromic lens in the relevant market, notwithstanding the considerable consumer demand for such a product in the United States and that Transitions offers the product for sale outside the United States, where it faces more competition.

35.   There are no legitimate pro-competitive efficiencies that justify Transitions' conduct or outweigh its substantial anticompetitive effects.

## FACTUAL BACKGROUND

### The Photochromic Lens Industry

36.   Lens casters manufacture corrective ophthalmic lenses ("lens blanks") and sell them to Transitions.

37.   Transitions then uses its own proprietary processes to apply patented photochromic dyes and/or other photochromic materials to the lens blanks, and then sells those or other photochromic lenses back to the lens casters at a substantial mark-up. Transitions only sells its photochromic lenses to lens casters.

38.     Nearly 100 percent of all photochromic lenses are distributed and/or produced by lens casters. Attempts to bypass lens casters by fabricating photochromic lenses at lower levels of the supply chain (*e.g.*, the wholesale optical laboratories or optical retailers) have largely been abandoned as uneconomical.

39.     Lens casters sell and distribute photochromic lenses through three distribution channels: independent wholesale optical laboratories, lens caster owned wholesale labs (collectively, "Wholesale Labs"), and integrated optical retailers ("Retailers"). Wholesale labs and retailers each represent approximately one half of the downstream market. The following chart illustrates the downstream market from lens casters to the consumers of photochromic lenses:



40.     Wholesale Labs sell ophthalmic lenses, including photochromic lenses, to ophthalmologists, opticians, and optometrists (collectively, "eye care practitioners") who are not affiliated with retailers.

41.     Wholesale Labs grind lenses according to prescriptions from eye care practitioners, polish semi-finished lenses, apply certain surface treatments to lenses (such as anti-scratch and anti-reflective coatings) and, in many cases, fit lenses into eyeglass frames and deliver finished frames and lenses to eye care practitioners. Wholesale Labs also often employ a sales force to promote specific lenses to eye care practitioners.

42.     Wholesale labs are the most efficient means for a photochromic lens supplier to promote and sell its products to the thousands of independent eye care practitioners prescribing photochromic lenses to consumers. As a result, photochromic lens suppliers, including Transitions, use Wholesale Labs and their sales forces to market their lenses.

43.     There has been considerable consolidation in the Wholesale Lab segment in recent years, as lens casters have begun to acquire Wholesale Labs. Lens casters generally have used Wholesale Labs they own to sell and promote primarily their own brands of lenses.

44.     Retailers represent another important distribution channel for photochromic lenses, and include national, regional, and smaller retail chains. Retailers generally employ their own eye care practitioners who deal directly with consumers. In addition, retailers grind and fit lenses into eyeglass frames and deliver frames with finished lenses to consumers.

45.     Because retailers usually employ their own eye care practitioners, the retail channel is generally an efficient means for promoting and selling photochromic lenses to consumers as compared to the wholesale lab channel.

46.    A decision by the corporate headquarters of one retail chain to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of the practitioners who are employed by that retailer. The retail channel has also witnessed significant consolidation over time.

47.    Eye care practitioners and retailers sell finished eye glasses, including those with photochromic lenses, to consumers.

### Transitions' Exclusionary Dealings with Lens Casters

48.    Transitions entered into exclusive dealing arrangements, including written agreements, with a number of lens casters that collectively account for over 80% of the photochromic lens sales in the United States. This practice effectively foreclosed any competitor or potential competitor of Transitions from dealing with those lens casters.

49.    At the lens caster level, Transitions' anticompetitive acts and practices included, but were not limited to: (1) publicizing that it would not do business with any lens caster that sold or promoted a photochromic lens that was not a Transitions photochromic lens ("competitor's photochromic lens"); (2) entering into exclusionary agreements with certain lens casters; (3) threatening to terminate its dealings with lens casters that would not sell Transitions photochromic lenses on an exclusive basis; (4) terminating its relationship with a lens caster that purchased a competitor's photochromic lens product; and (5) terminating its relationship with a lens caster that developed its own competing photochromic lens treatment, which it sought to incorporate into its own lenses and subsequently sell.

50.    In 1999, Corning Inc. ("Corning") introduced a new plastic photochromic lens, SunSensors, which was a direct competitor to Transitions photochromic lenses.

51.     Transitions responded to this competitive threat by terminating its relationship with the first lens caster that began selling the SunSensors lens, Signet Armorlite, Inc.

52.      Thereafter, Transitions has refused to do business with any lens caster that sells or promotes a competitor's photochromic lens. Transitions enforced this policy by, among other things, entering into agreements with certain lens casters that expressly require exclusivity, and through publicizing its policy throughout the lens caster community.

53.     Transitions' exclusionary practices at the lens caster level effectively precluded even lens casters that had not signed exclusive agreements with Transitions from selling or marketing a competitor's photochromic lens, because such lens casters were aware of Transitions' exclusive dealings policy.

54.     The next time Transitions was faced with a potential threat to its market dominance, it again retaliated against the relevant lens caster by terminating its relationship with the lens caster—in this case, Vision-Ease.

55.     In 2005, Vision-Ease, a lens caster, introduced its own propriety film-based photochromic technology under the brand name LifeRx. LifeRx photochromic lenses are comparable in quality to Transitions photochromic lenses. Whereas Transitions photochromic treatment adheres to all plastic and polycarbonate lens matters, LifeRx treatment adheres only to polycarbonate.

56.     In June 2005, around the time LifeRx was introduced, Transitions notified Vision-Ease that it was canceling its contractual relationship with Vision-Ease, effective September 30, 2005. During the three months thereafter, Transitions refused to fill any order submitted by Vision-Ease.

57.    Vision-Ease was able to keep LifeRx on the market only by entering into secret negotiations with one of the largest optical retailers in the United States, which committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

58.    Transitions' dominant market position and publicized policy of refusing to do business with any lens caster that sold or promoted a competitor's photochromic lens provided lens casters with powerful economic incentives to deal with Transitions on an exclusive basis. Transitions' "all-or-nothing" exclusivity policy made clear that any lens caster selling or promoting a competitor's photochromic lens would be forced to forgo significant revenues from the sale of Transitions photochromic lenses, which can represent up to 40 percent of a lens caster's overall profits. In addition, a lens caster's inability to offer Transitions photochromic lenses is likely to jeopardize significant sales of its clear corrective ophthalmic lenses as well, because many chain retailers and wholesale labs (and their eye care practitioner customers) prefer to buy both clear and photochromic versions of the same lens.

59.    Transitions' exclusionary acts and practices had the purpose and effect of effectively preventing any competitor supplier of photochromic lenses, such as Corning, from partnering with lens casters to bring their products to market, which is the only economically efficient means to distribute photochromic lenses.

60.    No major lens caster has been willing to sell the SunSensors plastic photochromic lens since Transitions terminated Signet. Without access to effective distribution, Corning has been unable to pose a competitive threat to Transitions' monopoly, and has had little incentive to invest in research and development to further innovate and improve its product.

61.    Transitions' exclusionary acts and practices also served to erect significant barriers to entry by the lens casters themselves, which can supply their own ophthalmic lenses.

14

Since Transitions terminated its relationship with Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a new line of photochromic lens in the United States.

62.     Lens casters that are exclusive to Transitions collectively account for over 85% of the photochromic lens sales in the United States.

### Transitions' Exclusionary and Restrictive Dealings with Retailers and Wholesale Labs

63.     Transitions also entered into exclusionary and restrictive agreements with its indirect customers: retailers and wholesale labs. These agreements foreclosed downstream outlets for photochromic lenses and created significant barriers to entry.

64.     Transitions entered into long-term exclusionary agreements that are not easily terminable with over 50 retailers, including many of the largest retail chains, with the purpose and effect of impeding entry into the relevant market.

65.     These exclusionary agreements served to deprive Transitions' competitors, such as Vision-Ease and Corning, with access to many large retailers, which is one of the most efficient channels of distribution for photochromic lenses to consumers.

66.     The exclusionary agreements also served to discourage and blunt the force of any attempt to enter into the relevant market or to otherwise constrain Transitions' exercise of monopoly power.

67.     Transitions also entered into exclusionary agreements with Wholesale Labs that restricted the ability of competitors to promote or sell photochromic lenses to independent eye care practitioners unaffiliated with any retail chain.

68.     Transitions entered into over 100 agreements with Wholesale Labs, including 23 of the top 30 independent Wholesale Labs, requiring the Wholesale Lab to sell Transitions

photochromic lenses as its "preferred" photochromic lenses, and not to promote any competing photochromic lens.

69.    The anticompetitive effect of these Wholesale Lab agreements was further augmented by the fact that at least 50 percent of all Wholesale Labs are owned by lens casters that sell Transitions photochromic lenses on an exclusive basis. As a result, rival suppliers of photochromic lenses had only limited access to these lens caster-owned wholesale labs as well.

70.    Additionally, Transitions' agreements with retailers and Wholesale Labs generally provided for a discount or a rebate if all or almost all of the photochromic lenses they sold were supplied by Transitions. Because no other supplier has a photochromic treatment that applies to a full line of ophthalmic lenses, Transitions' discount structure impaired the ability of competitors to compete for sales to these entities. It also erected a significant entry barrier by limiting the ability of a rival to enter the market with a new photochromic treatment that applies to less than a full line of ophthalmic lenses.

71.    Transitions' exclusive and restrictive agreements with Wholesale Labs and Retailers deprived its rivals of access to outlets for the distribution and sale of competing photochromic lenses, and impaired their ability to compete effectively with Transitions or to pose a significant threat to its monopoly. These agreements also deterred incremental entry by a supplier with a photochromic treatment that applies to less than the full line of ophthalmic lenses, and reinforce and strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions. Transitions' exclusionary practices foreclose its rivals, in whole or in part, from a substantial share—as much as 40 percent or more—of the entire downstream photochromic lens market.

**Federal Trade Commission Action and Consent Order**

72.     On March 3, 2010, the FTC released a complaint against Transitions (the "FTC Complaint") and announced that it had entered into a Consent Order with Transitions pursuant to which Transitions "agreed to stop using allegedly anticompetitive practices to maintain its monopoly and increase prices" and, more specifically, "agreed to a range of restrictions, including an agreement to stop all exclusive dealing practices that pose a threat to competition."

73.     The FTC Complaint, among other things:

    (a)     Defined the relevant product market as the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses;

    (b)     Alleged that Transitions holds monopoly power in the relevant market;

    (c)     Alleged that Transitions engaged in unlawful and unfair anticompetitive and exclusionary conduct to maintain its monopoly in the relevant market; and

    (d)     Identifies Transitions' overwhelming market share and the significant barriers to entering the relevant market faced by potential competitors as evidence of Transitions' monopoly power.

74.     The FTC Order, which is in effect for 20 years, among other things:

    (a)     Prohibits Transitions from entering into any agreement or policy that limits its customers' ability to directly or indirectly buy, sell, or compete in the relevant market;

(b)     Bars Transitions from limiting the information that its customers give to consumers regarding its competitor's photochromic lens treatments;

(c)     Prevents Transitions from imposing exclusivity on individual product brands of eyeglass lenses, ensuring that lens casters can sell competitor's photochromic lenses in addition to Transitions photochromic lenses;

(d)     For a period of 10 years, offering or imposing the following types of discounts to customers: (i) market share discounts that are based on what percentage of a customer's photochromic lens sales are Transitions' lenses; (ii) discounts that are applied retroactively once a customer's sales reach a specific threshold. For example, Transitions cannot provide discounts on the first 999 units that are contingent on the customer purchasing the one-thousandth unit; and (iii) bundling discounts so that customers purchasing more than one line of photochromic lenses obtain additional discounts;

(e)     Restricts Transitions from retaliating against a customer that buys or sells Transitions' lenses on a non-exclusive basis; and

(f)     Instructs Transitions to design and operate an Antitrust Compliance Program to comply with the FTC's Order and other antitrust laws.

## CLASS ACTION ALLEGATIONS

75.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and the following similarly situated individuals:

> All persons who indirectly purchased in the United States photochromic lenses manufactured and/or distributed by Transitions, for their own use and not for resale, at any time from January 1, 1999, to the present (the "Class"). Excluded from the Class are Transitions and its parents, subsidiaries, and affiliates; all federal, state, or local governmental entities; and any judge or judicial officer presiding over this matter.

76.     In the alternative, Plaintiffs seek certification of the following State Classes where at least one Plaintiff resides: California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin.

77.     Based on the nature of the trade and commerce involved, Plaintiffs believe the total number of Class members to be in the tens of thousands. Thus, the Class is so numerous that joinder of all members is impracticable.

78.     There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. Such common questions include, but are not limited to:

(a)     Whether Transitions possessed monopoly power in the relevant market;

(b)     Whether Transitions entered into unlawful and anticompetitive exclusionary agreements, thereby unreasonably restraining trade;

(c)     Whether Transitions conduct resulted in an artificial increase in the prices of photochromic lenses in the relevant market, exceeding the price that would have been determined by a competitive market;

19

(d)    Whether Transitions engaged in exclusionary acts and practices, which included, but were not limited to, entering into exclusive dealing arrangements that foreclose their rivals from key distribution channels;

(e)    The existence, duration, and illegality of the monopolization, attempted monopolization, and/or the exclusive dealing arrangements alleged herein;

(f)    The amount by which Transitions' illegal, unfair, and/or deceptive trade practices inflated the price of photochromic lenses over the amount they would have been in a competitive market unaffected by Transitions' illegal acts;

(g)    The effect and extent of injuries sustained by Plaintiffs and the other members of the Class, and the appropriate type and/or measure of damages;

(h)    Whether Transitions took affirmative steps to conceal the exclusive dealing arrangements alleged herein; and

(i)    Whether Plaintiffs and other members of the Class are entitled to declaratory and/or injunctive relief.

79.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the other members of the Class are similarly situated, as they each suffered injury by paying prices for photochromic lenses that were artificially inflated as a result of Transitions unlawful conduct.

80.    Plaintiffs and their counsel will fairly and adequately represent the interests of the Class. Plaintiffs have no interests adverse to or which irreconcilably conflict with the interests of

other members of the Class. Also, Plaintiffs' counsel is experienced and competent in the prosecution of complex class action litigation.

81.     A class action is the superior method to fairly and efficiently adjudicate this controversy. A class action will permit the large number of similarly situated Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions engender. Plaintiffs' believe there will no difficulty in the management of this matter as a class action.

## INJURY TO PLAINTIFFS AND OTHER CLASS MEMBERS

82.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the other members of the Class paid supra-competitive prices for Transitions photochromic lenses during the Class period.  The supra-competitive prices of Transitions photochromic lenses resulting from Defendant's anticompetitive conduct have been passed on to Plaintiffs and the other members of the Class. By reason of the violations alleged, Plaintiffs and the other members of the Class paid higher prices for Transitions photochromic lenses than they would have paid in absence of Transitions unlawful conduct and, as a result, have been injured and have suffered damages.

## FRAUDULENT CONCEALMENT

83.     The running of any statute of limitations has been suspended with respect to any claims that Plaintiffs and the other members of the Class have sustained as a result of the unlawful combination and conspiracy alleged herein and with respect to their rights to injunctive relief by virtue of fraudulent concealment. Transitions, through various devices and techniques of secrecy, affirmatively and fraudulently concealed the existence of the unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

### COUNT I

### (Monopolization Under Florida Law)

84.  Plaintiffs incorporate and re-allege, as though fully set forth herein, Paragraphs 1-83 of this Complaint.

85.  Transitions acted in violation of Florida law through conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power.

86.  Transitions' anticompetitive acts described herein were in violation of Fla. Stat. §§ 501 *et seq.*

87.  As a direct and proximate result of Transitions' unlawful conduct, Class members were injured through paying inflated, supra-competitive prices for Transitions photochromic lenses that they would not have paid absent such conduct.

88.  The injury to Plaintiffs and the Class is the type of injury Florida law is designed to prevent and remedy, and the injury flows from Defendants' unlawful conduct.

89.  Plaintiffs seek all damages, including actual, multiple, and punitive, as permitted by law for the injury they and other Class members suffered as a result of Transitions' violation of Florida law.

### COUNT II

### (Violation of State Antitrust Laws)

90.  Plaintiffs incorporate and re-allege, as though fully set forth herein, Paragraphs 1-83 of this Complaint.

91.  Transitions acted in violation of the state antitrust laws outlined below through conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power.

92.     Transitions anticompetitive acts described herein were in violation of the following State antitrust statutes: Cal. Bus. & Prof. Code §§ 16700 *et seq.*; K.S.A. §§ 50-101 *et seq.*; 10 Me. Rev. Stat. §§ 1101 *et seq.*; Mich. Comp. Laws. Ann. §§ 445.771 *et seq.*; N.Y. Gen. Bus. Law. §§ 340 *et seq.*; and Wis. Stat. § 133.01 *et seq.*

93.     As a direct and proximate result of Transitions' unlawful conduct, Class members in each of these states were injured through paying inflated, supra-competitive prices for Transitions photochromic lenses that they would not have paid absent such conduct.

94.     The injury to Plaintiffs and the Class is the type of injury these state antitrust laws are designed to prevent and remedy, and the injury flows from Defendants' unlawful conduct.

95.     Plaintiffs and the Class seek all damages, including actual, multiple, and punitive, as permitted by law for the injury they suffered as a result of Transitions' violation of the aforementioned State antitrust statutes.

## COUNT III

### (Deceptive and Unfair Trade Practices Under Florida Law)

96.     Plaintiffs incorporate and re-allege, as though fully set forth herein, Paragraphs 1-83 of this Complaint.

97.     Transitions engaged in unfair, unlawful, unconscionable, deceptive and/or fraudulent acts or practices in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201 *et seq.*

98.     As a direct and proximate result of Transitions' conduct, the price of Transitions' photochromic lenses was artificially inflated in the relevant market.

99. Plaintiffs and the other Class members suffered injury and damage by reason of paying an overcharge for their Transitions' photochromic lenses, which cost more than they would have absent Transitions' unlawful and anticompetitive conduct as described herein.

100. Plaintiffs and the Class seek all equitable relief and damages, including actual, multiple, and punitive, as permitted by law for the injury they suffered as a result of Transitions' violation of the aforementioned State consumer protection and unfair practice acts.

## COUNT IV

### (Violation of State Consumer Protection and Unfair Practice Act Laws)

101. Plaintiffs incorporate and re-allege, as though fully set forth herein, Paragraphs 1-83 of this Complaint.

102. Transitions engaged in unfair, unlawful, unconscionable, deceptive and/or fraudulent acts or practices in violation of the following state consumer protection and unfair competition statutes: Cal. Bus. & Prof. Code §§ 17200 *et seq.*; K.S.A. §§ 50-623 *et seq.*; 5 Me. Rev. Stat. § 207 *et seq.*; Mich. Stat. §§445.901 *et seq.*; N.Y. Gen. Bus. Law §§ 349 *et seq.*; and Wis. Stat. §§ 100.20 *et seq.*

103. As a direct and proximate result of Transitions' conduct, the price of Transitions' photochromic lenses was artificially inflated in the relevant market.

104. Plaintiffs and the other Class members suffered injury and damage by reason of paying an overcharge for their Transitions' photochromic lenses, which cost more than they would have absent Transitions' unlawful and anticompetitive conduct as described herein.

105. Plaintiffs and the Class seek all equitable relief and damages, including actual, multiple, and punitive, as permitted by law for the injury they suffered as a result of Transitions' violation of the aforementioned State consumer protection and unfair practice acts.

## COUNT V

### (Unjust Enrichment)

106.    Plaintiffs incorporate and re-allege, as though fully set forth herein, Paragraphs 1-83 of this Complaint.

107.    Transitions anticompetitive and unlawful conduct alleged herein was in violation of unjust enrichment law in the following states: California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin.

108.    Transitions received and retained benefits in the form of excess profits as a result of Plaintiffs' and the other Class members' purchase of photochromic lenses during the Class period.

109.    Plaintiffs and the other Class members suffered injury and damage by reason of paying an overcharge for their Transitions' photochromic lenses, which cost more than they would have absent Transitions' unlawful and anticompetitive conduct as described herein.

110.    It would be unjust and inequitable for Transitions to retain the excess profits it collected as a result of its unlawful and anticompetitive acts and practices detailed herein this Complaint.

111.    Plaintiffs seek for Transitions to disgorge all profits collected as a result of Plaintiffs' and the other Class members' paying supra-competitive prices for Transitions photochromic lenses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court enter an Order:

(a)    Certifying the claims alleged as a class action pursuant to Fed. R.

Civ. P. 23, and designating Plaintiffs as representative plaintiffs for

the Class and Interim Co-Lead Counsel for the Indirect Purchaser

End-User Plaintiffs as counsel for the Class;

(b)     Declaring Transitions' conduct to be in violation of the state

antitrust, consumer protection and unfair competition, and unjust

enrichment laws as alleged herein.

(c)     Awarding Plaintiffs and the Class all equitable relief and actual,

multiple, and/or putative damages available under applicable law;

(d)     Awarding Plaintiffs and the Class the reasonable attorneys' fees,

costs, and expenses incurred in litigating this matter; and

(e)     Granting any such other relief deemed proper by the Court.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all individual and Class claims so triable.

Dated:   December 13, 2010

Respectfully submitted,

/s/ Ben Barnow
Ben Barnow
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com

/s/ Lance A. Harke
Lance A. Harke
Harke Lance A. Harke, P.A.
HARKE CLASBY & BUSHMAN LLP
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8220
Fax: (305) 536-8229
lharke@harkeclasby.com

/s/ Michael M. Buchman
Michael M. Buchman
POMERANTZ HAUDEK GROSSMAN &
  GROSS LLP
100 Park Avenue, 26th Floor
New York, NY  10117
Tel: (212) 661-1100
Fax: (212) 661-8665
mbuchman@pomlaw.com


/s/ Susan G. Kupfer
Susan G. Kupfer
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA  94111
Tel: (415) 972-8160
Fax: (415) 972-8166
skupfer@glancylaw.com

*Interim Co-Lead Counsel for the*
*Putative Indirect Purchaser End-User Class*

Christopher C. Casper
JAMES, HOYER, NEWCOMER,
  SMILJANICH, & YANCHUNIS, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL  33609
Tel: (813) 286-4100
Fax: (813) 286-4174
ccasper@jameshoyer.com


*Interim Liaison Counsel for the*
*Putative Indirect Purchaser End-User Class*

### Certificate of Service by Electronic Means

The undersigned hereby certifies that the proceeding document was caused to be served electronically this 13th day of December 2010 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Ben Barnow
Ben Barnow
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com