# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| IN RE PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173 |
| This document relates to cases: | Case No. 8:10-md-02173-JDW-EAJ |
| | Hon. James D. Whittemore |

This document relates to cases:

      8:10-cv-0984-T-27
      8:10-cv-1004-T-27
      8:10-cv-1032-T-27
      8:10-cv-1783-T-27
      8:10-cv-1791-T-27
      8:10-cv-1850-T-27
      8:10-cv-1852-T-27
      8:10-cv-1955-T-27
      8:10-cv-2041-T-27
      8:10-cv-2042-T-27
      8:10-cv-2044-T-27
      8:10-cv-2051-T-27
      8:10-cv-2061-T-27
      8:10-cv-2062-T-27
      8:10-cv-2063-T-27
      8:10-cv-2064-T-27
      8:10-cv-2171-T-27

## DIRECT PURCHASER PLAINTIFFS'
## CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PARTIES AND INTERESTED NON-PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

INTERSTATE TRADE AND COMMERCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RELEVANT MARKET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      Distribution of Eyeglass Lenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      Photochromic Lenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      Transitions Holds Monopoly Power in the Relevant Market . . . . . . . . . . . . . . . . . . 12

      Transitions' Exclusionary Practices at the Lens Caster Level . . . . . . . . . . . . . . . . . 15

      SunSensors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      Vision-Ease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      Transitions' Exclusionary Practices at the Wholesale Lab Level . . . . . . . . . . . . . . 20

      Transitions' Exclusionary Practices at the Optical Retailer Level . . . . . . . . . . . . . 23

      Transitions' Anticompetitive Bundled Discounts . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      Essilor and Transitions' Conspiracy To Monopolize the Market
      and Restrain Trade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      FTC Action Against Transitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT . . . . . . . . . . . . . . . . . . 31

DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    COUNT I - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2:
    Monopolization, Against Defendant Transitions Only  . . . . . . . . . . . . . . . . . . . . . . 35

    COUNT II - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2:
    Attempted Monopolization, Against Defendant Transitions Only  . . . . . . . . . . . . . 37

    COUNT III - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2:
    Conspiracy to Monopolize, Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . 39

    COUNT IV - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2:
    Conspiracy to Attempt to Monopolize, Against All Defendants . . . . . . . . . . . . . . . 42

    COUNT V - Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1:
    Conspiracy to Restrain Trade, Against All Defendants . . . . . . . . . . . . . . . . . . . . . . 44

PRAYER FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Direct Purchaser Plaintiffs Nouveau Vision, Inc., Optical Supply, Inc., Florida Optical Express, Inc., Central Illinois Vision Associates, Ltd., B&B Eyes, Inc. and Carmel Mountain Vision Care ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action under the federal antitrust laws, Sections 1 and 2 of the Sherman Antitrust Act. 15 U.S.C. §§ 1, 2. The allegations herein are made on information and belief, except those as to Plaintiffs, which are made on personal knowledge.

## NATURE OF THE ACTION

1.     This action arises out of Defendants' long-standing conspiracy to monopolize the market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses. As a result of that conspiracy, defendant Transitions Optical, Inc. ("Transitions") maintains an 85 percent share of that market, to the concurrent benefit of its co-conspirator defendants Essilor of America, Inc. ("Essilor of America") and Essilor Laboratories of America, Inc. ("ELOA"). Transitions is a joint venture in which Essilor of America's parent company owns a 49 percent share. But the benefit to the Essilor corporate family (collectively "Essilor") resulting from the anticompetitive conduct that precipitated this action far exceeds Essilor's share of Transitions' profits.

2.     Corrective ophthalmic lenses are used in eyeglasses to correct vision defects. Consumers of corrective ophthalmic lenses may purchase those lenses with a photochromic treatment, which alleviates the discomfort associated with exposure to bright sunlight. Lenses with photochromic treatments ("photochromic lenses") darken when they are exposed to the ultraviolet light in sunlight, and fade to clear when they are no longer exposed to such light.

3.      The markets in which Plaintiffs and Defendants operate are depicted in Figure 1 below.  Lens manufacturers (more commonly known as "lens casters") sell untreated lenses ("lens blanks") to Transitions.  Transitions applies photochromic treatments to those lenses, and sells them to the lens casters, who distribute them into the downstream markets.



***Figure 1***

4.      Beginning in the early 1990s, shortly after Transitions' formation, and continuing through at least March of 2010,  Defendants embarked on a course of conduct that restrained trade at every level of the above-referenced markets.  No later than 1994, Essilor entered into an agreement with Transitions, terminable only by Essilor, that required

Transitions to purchase seventy percent of its lens blank supply from Essilor.  The result is that Essilor's sales have grown as Transitions' monopoly has grown.  That agreement remains in effect today.

5.      Transitions itself has repeatedly taken steps to obtain and maintain its 85 percent market share, unfairly disadvantage and, in some cases, eliminate its competitors in the photochromic treatment market.  Among other things, Transitions entered into exclusive dealing agreements with lens casters that accounted for 80 percent of the lens caster market, and threatened to terminate any lens caster that dealt with its competitors.  One lens caster that sacrificed its Transitions business rather than capitulate was eventually acquired by Essilor.  Another lens caster that developed its own photochromic treatment was summarily terminated by Transitions.

6.      Moreover, rather than appealing to laboratories and retailers lower in the distribution chain via advertising and competitive pricing, Transitions entered into a series of anticompetitive arrangements with those entities – exclusive dealing agreements with some, and purchase share-based or bundling discounts with others – even though Transitions does not sell its products to firms at those levels in the distribution chain.

7.      Essilor further facilitated Transitions' interests by embarking on a campaign to purchase previously independent wholesale laboratories, all of which were induced to fill their photochromic lens needs entirely or primarily with Transitions' products.  Essilor likewise cooperated directly with Transitions to further the latter's interests, in meetings and seminars, and by binding itself in advance to annual purchases at predetermined levels.

8.     All of the above resulted in an FTC investigation of Transitions, which in turn resulted in Transitions entering into a consent decree that precluded much of the above-referenced conduct.

9.     However, the purchasers who have paid supracompetitive premium prices for Transitions lenses during the relevant period have not been made whole for Defendants' antitrust violations.  Hence this action.

## JURISDICTION AND VENUE

10.     The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.  §§ 1, 2.  Plaintiffs seek treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

11.     The jurisdiction of this Court is founded on Sections 4 and 12 and of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and on 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15(a) and 22) and 28 U.S.C. § 1391(b) and (c) in that Defendants are located in, licensed to do business in and/or do business in this District, and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

## PARTIES AND INTERESTED NON-PARTIES

13.     Plaintiff Nouveau Vision, Inc. ("Nouveau Vision") is a corporation organized under the laws of the state of Washington, with its principal place of business in Redmond Washington.  Nouveau Vision is an independent wholesale optical laboratory.  During the

Class Period[1], Nouveau Vision purchased photochromic lenses from Defendant Essilor of America, Inc.

14.     Plaintiff Optical Supply, Inc. ("Optical Supply") is a corporation organized under the laws of Alabama with its principal place of business located in Rainbow City, Alabama.  Optical Supply is an independent wholesale optical laboratory.  During the Class Period, Optical Supply purchased photochromic lenses from Essilor Lenses, a division of Defendant Essilor of America, Inc.

15.     Plaintiff Florida Optical Express, Inc. ("Florida Optical") is a Florida corporation with its principal place of business located in Altamonte Springs, Florida. Florida Optical is an independent wholesale optical laboratory.  During the Class Period, Florida Optical purchased photochromic lenses from Defendant Essilor of America, Inc.

16.     Plaintiff Central Illinois Vision Associates, Ltd ("Central Illinois") is a corporation organized under the laws of the State of Illinois with its principal place of business located in Charleston, Illinois.  Central Illinois is an optical retailer and optometric practice.  During the Class Period, Central Illinois purchased photochromic lenses from Midland Optical, a wholesale ophthalmic laboratory owned and controlled by Defendant Essilor Laboratories of America, Inc.

17.     Plaintiff B&B Eyes, Inc. ("B&B Eyes") is a New York corporation with its principal place of business located in New York, New York.  B&B Eyes is an optical retailer and eye-care practitioner.  During the Class Period, B&B Eyes purchased photochromic

---

[1]   *See infra* ¶ 127 (defining "Class Period").

lenses from 21st Century Optics, Inc. and Tri-Supreme, wholesale ophthalmic laboratories owned and controlled by Defendant Essilor Laboratories of America, Inc.

18.     Plaintiff Carmel Mountain Vision Care ("Carmel Mountain") is an independent optometry practice with its principal place of business located in San Diego, California.  Carmel Mountain is an optical retailer and eye-care practitioner.  Carmel Mountain purchased photochromic lenses directly from Nassau Lens Company, Empire Optical, Inc. and Custom Eyes, wholesale ophthalmic laboratories owned and controlled by Defendant Essilor Laboratories of America, Inc.

19.     Defendant Transitions Optical, Inc. ("Transitions") is a Delaware corporation with its principal place of business in Pinellas Park, Florida.  Transitions is a joint venture of PPG Industries Inc. ("PPG"), which owns 51 percent of Transitions, and Essilor International SA ("Essilor International"), the parent company of defendant Essilor of America, Inc., which owns 49 percent of Transitions.  Transitions is the nation's largest manufacturer and seller of photochromic treatments, accounting for at least 80 percent of all such sales during the last five years, and more than 85 percent of such sales in 2008.  Due to Defendants' anticompetitive, exclusionary conduct in the Photochromic Lens Market, Transitions has consistently maintained a 25 percent annual growth rate in its business.

20.     Defendant Essilor of America, Inc. ("Essilor of America") is a Delaware corporation with its principal place of business in Dallas, Texas.  Essilor of America is a wholly-owned subsidiary of Essilor International, a French corporation that is one of the world's largest lens manufacturers.  Essilor of America sells more lenses than any other

manufacturer in the United States.  In recent years, Essilor International has consolidated and expanded its interests in the United States.

22. Defendant Essilor Laboratories of America, Inc. ("ELOA") is a North Carolina corporation with its principal place of business in Dallas, Texas.

22. Essilor International, Defendant Essilor of America and Defendant ELOA, are collectively referred to herein as "Essilor." Essilor of America and ELOA are collectively referred to herein as the "Essilor Defendants."

23. Essilor International and/or the Essilor Defendants own and/or control numerous laboratories that sell photochromic lenses at the wholesale level throughout the United States.  Those laboratories are referred to herein as the "Essilor-owned Labs."

24. In 2008, Essilor International's worldwide revenues were $3 billion, with 41.3 percent (approximately $1.27 billion) of those revenues generated in the United States, through its United States interests, including the Essilor Defendants.

## INTERSTATE TRADE AND COMMERCE

25. Throughout the Class Period, Defendants manufactured, produced, sold and/or shipped substantial quantities of Transitions lenses in a continuous and uninterrupted flow of transactions in interstate commerce throughout the United States, including within this District.  Defendants' unlawful activities that are the subject of this Complaint were within the flow of, and have had a direct and substantial effect on, interstate trade and commerce.

**RELEVANT MARKET**

26.     The relevant market is the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States – the Photochromic Treatment Market.

27.     Purchasers of corrective ophthalmic lenses have the option to purchase them clear, tinted or photochromic.

28.     Photochromic lenses have characteristics and uses distinct from those of clear corrective ophthalmic lenses, polarized lenses (which are designed to remove glare), and fixed-tint lenses (prescription sunglasses).

29.     The defining characteristic of a photochromic lens is that it responds to changes in light.  When exposed to UV light, a photochromic lens darkens; when UV light is removed, a photochromic lens fades back to clear.  Photochromic lenses are also known as light-responsive lenses, variable tint lenses, or changeable tint lenses.

30.     Photochromic lenses allow consumers to go from sunlight to darkness and back again without changing their glasses.

31.     There are no close substitutes for photochromic lenses, and no other product significantly constrains the prices of photochromic lenses.

32.     Clear and tinted lenses are not good substitutes for photochromic lenses because they require the wearer to carry an additional product (and most likely a carrying case) to provide the same features that a single pair of photochromic lenses offer.  An extra pair of corrective lenses can be a significant additional expense, and clip-on sunglass attachments can be both difficult to find and expensive to match to regular eyeglasses.

33.      In 2008, photochromic lenses represented approximately 18 to 19 percent of all corrective ophthalmic lenses sold in the United States, totaling approximately $630 million in sales at the wholesale level.

34.      Although only 18 to 19 percent of all ophthalmic lenses sold in the U.S. are photochromic, they account for 47% of lens value at the manufacturing level.

## FACTUAL BACKGROUND

### Distribution of Eyeglass Lenses

35.      The distribution of ophthalmic lenses generally includes three stages:  (1) manufacture of lens blanks (including, for some lenses, the application of photochromic treatments by Transitions or one of its competitors) by lens casters; (2) lens casters' sales to wholesale ophthalmic laboratory ("Wholesale Lab") or integrated optical retailer (*i.e.*, a retailer operated in conjunction with an ophthalmic laboratory), where prescriptions are ground into lenses; and (3) sale either to an independent eye care practitioner in the case of Wholesale Labs, or directly to the consumer in the case of integrated optical retailers.  *See supra*, Figure 1.

36.      Lens casters convert raw materials supplied by chemical and glassmaking companies into lenses (*e.g.*, single-vision lenses, bifocals, trifocals and progressive lenses).  PPG is a supplier of those raw materials, particularly to Essilor of America.  Lens casters do not grind lenses to comply with lens prescriptions.

37.      Essilor of America is the dominant lens caster in the United States, and owns at least two lens manufacturing facilities, in Carbondale, Pennsylvania and Dudley, Massachusetts.

9

38.     Lens casters sell and distribute photochromic lenses alongside clear corrective ophthalmic lenses through two distribution channels:  wholesale optical laboratories and optical retailers, each of which represent approximately one half of the downstream market.

39.     Independent Wholesale Labs sell ophthalmic lenses, including photochromic lenses, to ophthalmologists, opticians and optometrists (collectively "eye care practitioners") and other retailers who are not affiliated with integrated optical retailers.

40.     Wholesale Labs grind lenses according to prescriptions from eye-care practitioners, polish semi-finished lenses, apply certain surface treatments (such as anti-scratch and anti-reflective coatings), and in many instances fit lenses into eyeglass frames and deliver finished eyeglasses to eye-care practitioners.  Wholesale Labs also typically employ a sales force to promote specific lenses to eye-care practitioners.

41.     Certain Wholesale Labs are owned by, controlled by or otherwise integrated with lens casters.  Other Wholesale Labs are owned and operated by optical retail chains that generally provide both laboratory and eye-care practitioner (*i.e.*, ophthalmology, optometrist and optician services) services.  Yet other Wholesale Labs, including Plaintiffs Nouveau Vision, Optical Supply and Florida Optical, operate independent of any lens caster or retailer.

42.     There has been considerable consolidation in the Wholesale Lab channel in recent years as lens casters have begun to acquire Wholesale Labs.  Lens casters generally have used these Wholesale Labs to sell and promote primarily their own brand of lenses.

43.     During the period relevant to this Complaint, EOLA has owned numerous Wholesale Labs throughout the United States, and acquired complete or majority ownership

in at least 30 Wholesale Labs between 2006 and 2008 and at least 10 additional Wholesale Labs in 2009.

44.    Essilor claims on a widely-read web page that the "Essilor Laboratories network" consists of "more than 90 optical laboratories" and identifies 40 of those optical laboratories.  *See* http://company.monster.com/essilor.aspx.

45.    Seventy-seven of the wholesale prescription laboratories owned and/or controlled by Essilor are identified in Essilor press releases; Essilor's 2008 Registration Document[2] (at 139-40); Essilor's 2009 Registration Document[3] (at 142-43); and various laboratory websites.  All of those laboratories are identified on Exhibit A to this Complaint.

46.    Optical retailers represent the other important distribution channel for photochromic lenses, and include national, regional and smaller retail chains, such as LensCrafters, Pearle, Eye Care Centers of America, Wal-Mart and Costco.  Retailers generally employ their own eye care practitioners who deal directly with consumers.  In addition, retailers grind and fit lenses into eyeglass frames and deliver the frame with the finished lens to the consumer.

47.    A decision by the corporate headquarters of one of the retail chains to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of all the practitioners who are employed by that retailer.  The retail channel has also witnessed significant consolidation over time.

48.    Eye-care practitioners and retail chains sell finished eyeglasses to consumers.

---

[2] Available at http://www.essilor.com/IMG/pdf/Essilor_2008_RD.pdf.

[3] Available at http://www.essilor.com/IMG/pdf/ESSILOR_2009RegistrationDocument.pdf.

11

**Photochromic Lenses**

49.     Lens casters such as Essilor, Zeiss, Hoya, Younger and Shamir, produce lens blanks and sell them to Transitions for photochromic treatment.  Transitions applies photochromic treatments to the lenses, and sells those or other lenses back to the lens casters at a substantial mark-up, after which the treated lenses are distributed via the above-referenced distribution chain.

50.     Transitions treats ophthalmic lenses with photochromic treatments. Transitions sells treated lenses only to the relatively small number of lens casters, as selling them directly to the many Wholesale Labs or optical retailers would be inefficient. Moreover, many Wholesale Labs prefer to purchase all or most of their lenses from a single source, and would be reluctant to do otherwise.

51.     Lens casters sell and distribute photochromic lenses alongside their clear corrective ophthalmic lenses.

**Transitions Holds Monopoly Power in the Relevant Market**

52.     In 1990, PPG and Essilor resolved a patent lawsuit in part by establishing Transitions as a joint venture of the two companies.  PPG owns 51 percent of Transitions, and Essilor International owns the remaining 49 percent.  As explained by Richard Rompala, the vice president of PPG's chemicals group:  "The joint venture [Transitions] would combine the production, distribution and marketing capabilities of Essilor with the technical expertise in ophthalmic plastics demonstrated by PPG."

53.     Essilor was the key driver in the formation of Transitions, and a willing and active participant in its monopolistic scheme.  Essilor provided the distribution network and

marketing expertise necessary to both create Transitions and exploit its unique position to engage in monopolistic behavior.  As Rick Elias, Chief Executive of Transitions, stated in a January 2008 interview, "PPG sold raw materials to the optical lens industry.  But we didn't know about making or distributing lenses.  We don't make the lens, we apply the photochromic treatment to the lens.  So we developed a strategy to partner with our biggest customer, Essilor International.  They had the network; we had the technology."  As a supplier to Essilor, PPG likewise benefits from Transitions' conduct in ways far beyond those of a typical shareholder in a joint venture.

54.     Essilor's involvement in Transitions' business is significantly more than just that of a typical minority shareholder.  Throughout the Class Period, Essilor has actively participated in and knowingly assisted and facilitated Transitions' monopolistic conduct.  According to a recent analysis of the FTC Action by an industry insider, Transitions' anticompetitive actions and exclusive contracts mirror Essilor's anticompetitive tactics in its attempts to exclude its competitors from other markets.

55.     Essilor and Transitions' anticompetitive practices and tactics were devised and implemented by Essilor long before establishing Transitions, in connection with its Varilux lenses and coatings distribution network.  Essilor has used the same tactics to dominate the entire optical industry in the United States, where the Essilor-owned Labs are prevented from promoting any other lens brand over Varilux lenses and Essilor coatings.  Likewise, those same laboratories purchase almost all of their photochromic lenses from Transitions, via Essilor of America.

13

56.     Beginning with its inception in 1990, Essilor directly assisted Transitions with its distribution needs.  Before 2001, Essilor held lens blank inventory that Transitions drew from as needed, applied the treatment, then shipped the lenses to lens casters.  For certain specialty products, Transitions applied the photochromic treatment, then ship the lenses to the Essilor of America distribution center, from which they were shipped to lens casters.

57.     In addition, at least three former Essilor officers became Transitions officers:

a.     In January 2003, Guy Jouffroy, the Vice President of Global Engineering at Essilor International, moved to Transitions to become its Executive Vice President of Operations;

b.     In 2005, Franck Carlier, the Systems Integration Director for Essilor of America, moved to Transitions and became its Global Information Technology Director.  Carlier also previously held positions at Essilor International; and

c.     In 2006, Gretchen Walsh, who had served as Associate General Counsel at Essilor of America for eight years, became General Counsel of Transitions.

58.     Essilor is also inextricably involved in the technological aspects of Transitions' photochromic business.  For example, an international patent application that was filed on June 18, 2009, titled "Photochromic Coating Exhibiting Improved Performance And Reduced Yellowness," lists four applicants: Essilor International, Transitions, and two American inventors.

59.     There are three types of photochromic lens substrates:  glass, plastic and polycarbonate.  Glass lenses comprise less than three percent of the photochromic lens market.  Plastic and polycarbonate lenses each comprise approximately half of the remainder.

14

60.     Transitions possesses monopoly power in the relevant market.  The sellers of plastic photochromic treatments are Transitions, Signet Armorlite, Corning/Hoya and Rodenstock.  Transitions' market share of plastic photochromic lenses exceeds 90 percent.

61.     Only Transitions and Vision-Ease sell polycarbonate photochromic lenses to lens casters.  Transitions' market share of polycarbonate photochromic lenses is approximately 85 percent.

62.     Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (a) product development costs; (b) capital requirements; (c) intellectual property rights; (d) technological expertise; (e) regulatory requirements; and (f)  Defendants' unfair methods of competition.

63.     Transitions' monopoly power is reflected in its ability to exclude competitors and to control prices.  The indicia of Transitions' monopoly power include, but are not limited to, Transitions' ability to: (a) coerce lens casters to accept exclusive dealing arrangements; (b) price its products without regard to its competitors' prices; (c) impose premium prices, which it maintained while prices for other eyewear products were declining; and (d) withhold a desired product – a low-priced, private label photochromic lens – from consumers in the United States, even though Transitions supplies it in other markets.

**Transitions' Exclusionary Practices at the Lens Caster Level**

64.     Since before 2005 and continuing at least up to the beginning of 2010 and the intervention of the Federal Trade Commission investigation described below, Transitions entered into exclusive dealing arrangements with lens casters, including written agreements,

as a part of a course of conduct carried out by Defendants in concert to achieve and/or maintain Transitions' monopoly in the photochromic treatment market.

65.     These exclusive dealing arrangements with lens casters foreclosed Transitions' competitors from dealing with those lens casters, which collectively accounted for over 80 percent of photochromic lens sales in the United States.  The purpose and effect of the arrangements was to restrain competition in the relevant market.

66.     Moreover, Transitions refused to deal with any lens caster that sold or promoted a competing photochromic lens.  Those lens casters included Vision-Ease, Rodenstock, Indo, Corning, and Signet Armorlite in the United States alone.  Transitions enforced that exclusionary policy by, among other things, entering into agreements with certain lens casters that expressly require exclusivity, and by publicizing its exclusive dealing policy in the marketplace.

67.     At the lens caster level – the only effective distribution channel for photochromic treatments – Transitions' anticompetitive polices included, but were not limited to: (1) adopting and announcing a general policy that it would not deal with lens casters that sold or promoted any competing photochromic lens; (2) threatening to terminate its dealings with lens casters that would not sell Transitions' lenses on an exclusive basis; and (3) terminating a lens caster that developed a competing photochromic treatment.

68.     Transitions' exclusionary policies at the lens caster level effectively precluded even those lens casters that have not signed exclusivity agreements with Transitions from dealing with Transitions' competitors, as those lens casters were aware of Transitions' policy.

69.     Because of Transitions' dominant market position and its exclusivity demands, lens casters were faced with two unfavorable options:  (1) sacrificing their ability to sell Transitions products to Wholesale Labs, which accounted for at least 40 percent of most lens casters' revenues, or (2) endangering their sales of clear lenses, as many retailers and Wholesale Labs prefer to buy both clear and photochromic versions of the same lenses. A lens caster's inability to sell Transitions lenses to those Wholesale Labs and retailers – many of whom have their own exclusivity agreements with Transitions – would deprive any such lens caster of substantial numbers of potential customers.

70.     Lens casters that are exclusive to Transitions collectively account for over 80 percent of photochromic lens sales in the United States.

### SunSensors

71.     In 1999, Transitions' rival Corning Inc. introduced a new plastic photochromic lens, SunSensors, that might have competed with Transitions' plastic photochromic lenses.

72.     Transitions responded to the competitive threat of the introduction of SunSensors by terminating the first lens caster to sell SunSensors lenses, Signet Armorlite, Inc. ("Signet").

73.     Transitions sent a clear message to the industry that it would not tolerate competition.

74.     The message was received by the industry loud and clear:  no major lens caster has been willing to sell Corning's SunSensors plastic photochromic lens since Transitions terminated Signet.  Signet nevertheless continued to sell SunSensors lenses.

75.     Consistent with Defendants' general practice, Essilor recently removed Signet as a competitive threat, when EOA Holding Co., Inc., a wholly-owned subsidiary of Essilor International, purchased Signet.

76.     Through their contracts and policies, Transitions and Essilor have deprived Corning and other rival and potential rival photochromic treatment suppliers of the most effective distribution channel – lens casters – thereby removing them as a competitive threat to Transitions' monopoly and effectively deterring such firms from investing in research and development to improve the photochromic products on the market today.

### Vision-Ease

77.     At all relevant times, Vision-Ease has been a lens caster.  Vision-Ease began purchasing Transitions' products in 1992.  After Vision-Ease began to develop its own photochromic product in the early 2000s, Transitions approached Vision-Ease about exclusively licensing its technology. Vision-Ease ultimately declined because the proposed terms unduly favored Transitions.  When Vision-Ease's former corporate parent filed for bankruptcy in 2004, Transitions offered to purchase Vision-Ease in the bankruptcy proceeding, but was outbid by Insight Equity.

78.     In 2005, Vision-Ease introduced a proprietary film-based photochromic technology under the brand name LifeRx.  Whereas Transitions coats the surface of a clear lens with photochromic dye, Vision-Ease fuses two polycarbonate panels over a layer of photochromic film.  The quality of the two products is comparable.  The key differences relevant to this action are (1) Transitions' treatment adheres to all plastic and polycarbonate lens materials, but Vision-Ease's treatment adheres only to polycarbonate, and (2) Vision-

18

Ease's film is applied to multi-focal polycarbonate lenses, while Transitions' treatment does not.

79.     Vision-Ease did not market LifeRx as it would have preferred because of Transitions' monopoly power and its anticipated retaliatory action.  Vision-Ease was able to keep its LifeRx product on the market only by entering into secret negotiations with, LensCrafters, one of the largest optical retailers in the United States, which committed to providing Vision-Ease with enough business for Visio-Ease to risk the loss of its Transitions sales.

80.     In June 2005, at or around the time that Vision-Ease began to supply LensCrafters with LifeRx lenses, Transitions gave Vision-Ease notice it would cancel their contract effective September 30, 2005.  During the run-out of the contract over the next three months, Transitions refused to meet Vision-Ease's orders and thereby made it impossible for Vision-Ease to serve its existing customers.

81.     For several years after the termination of the contract, Transitions refused to supply Vision-Ease with any photochromic lenses – either polycarbonate or plastic. Transitions' refusal to supply Vision-Ease with any plastic photochromic lenses was particularly significant because (1) Vision-Ease's continued sales of such lenses would have been mutually profitable; and (2) since the only competitive photochromic lens that Vision-Ease offered (and was capable of offering) was polycarbonate, Transitions' refusal to supply plastic prevented Vision-Ease from offering customers a full line of photochromic lenses.

82.     Absent its conspiracy with Transitions, it was contrary to Essilor's independent economic self-interest for two of Transitions' competitors to be eliminated from

the relevant market, as those competitors (Corning and Vision-Ease) were both responsible for increased price competition in the market, in which Essilor was a buyer.

83.     Starting in late 2005, Vision-Ease's inventory was limited to its own photochromic polycarbonates.  Meanwhile, other lens casters who were not in competition with Transitions, and purchased photochromic lenses only from Transitions, retained access to Transitions' full line of photochromic plastic and polycarbonate lenses.

84.     As a result of Transitions' and Essilor's actions, Corning and Vision-Ease have been unable to threaten Transitions' monopoly, and have had little incentive to invest in research and development to further innovate and improve their respective photochromic technologies.

85.     Lens casters who might have otherwise developed their own photochromic technologies have learned from the Vision-Ease experience that they cannot do so absent a commitment from a large optical retailer to carry the resulting products.  Since Transitions terminated Vision-Ease for introducing LifeRx in 2005, no other company has introduced a new line of photochromic lenses in the United States.

### Transitions' Exclusionary Practices at the Wholesale Lab Level

86.     Unlike traditional competition based upon price and advertising, Transitions entered into agreements both at the laboratory level and retail level, (i.e., with parties to which Transitions did not sell directly) requiring those parties to exclusively promote Transitions' products and obtain discounts in the form of "Business Building Funds."  These agreements, together with the understanding with Essilor that all Essilor-owned Labs will favor Transitions' photochromic lenses, unreasonably restrained competition and allowed

Transitions to obtain and/or maintain its monopoly in the market for photochromic treatments.

87.     In particular, since before 2005 and continuing at least up to the beginning of 2010 and the intervention of the Federal Trade Commission investigation, *see infra* ¶¶ 114-17, Transitions entered into exclusive dealing arrangements with Wholesale Labs, including Essilor-owned Labs, pursuant to a course of conduct carried out by Defendants in concert to facilitate and/or maintain Transitions' monopoly in the photochromic treatment market.

88.     At least half of all Wholesale Labs in the United States – including the Essilor-owned Labs – are owned by lens casters that sell only Transitions' photochromic lenses (which account for 80 percent of the lens caster market), thereby substantially eliminating access to those laboratories for rival photochromic treatment suppliers.

89.     Transitions and Essilor had an understanding and arrangement that all Essilor-owned Labs would purchase only photochromic lenses that were treated by Transitions. And, of course, those labs, whenever possible, purchased those lenses from Essilor.  In a business document, Transitions states that "Essilor continues to grow in importance" to Transitions' share growth, which was due to "a combination of organic growth and an aggressive lab acquisition strategy."  Indeed, during the relevant period, Essilor has substantially facilitated Transitions' acquisition and maintenance of its monopoly via its "aggressive lab acquisition strategy."

90.     Pursuant to its plan and course of conduct to facilitate and/or maintain its monopoly in the relevant market, in addition to its agreements with Essilor and its stable of laboratories, and in order to limit its competitors' access to independent Wholesale Labs as a

21

distribution channel, Transitions has entered into agreements with over 100 Wholesale Labs, including 23 of the 30 largest independent Wholesale Labs, requiring those Wholesale Labs to sell Transitions' lenses as their preferred photochromic lens, and strictly limiting their promotion of competing photochromic lenses.

91.     Transitions established its "Star Laboratory Group Program" for the specific purpose of enhancing the marketing and sales of Transition lenses and to create hurdles to competitive threats.  To entice members, it provided "Business Building Funds" to laboratories that met certain requirements, and assisted in training sales and customer service personnel.  The "Business Building Funds" appear to be discounts to reward increased sales of Transitions lenses.  In return, among other things, laboratories must "promote Transitions lenses" as their "preferred photochromic products", verify that Transition lenses comprised a specified percentage of their sales, maintain their status and meet a prescribed growth rate.

92.     For example, according to a "2008 STAR Laboratory Group Program Agreement," STAR Program members receive an "initial payout" on in January, 2007 of $.05 per pair of lenses sold, and then receive and additional $.05 per pair if their growth is 1-10%, $.10 per pair if their growth is 11-15%, and $.30 per pair for growth exceeding 16%.  A "2009 STAR ECP Buying Group Program Agreement" offers similar funds to laboratories in exchange for promoting Transitions lenses with anti-reflective coating as the laboratories' "preferred photochromic products."

93.     The purpose and effect of the various terms in the agreements between Transitions and the Essilor-owned Labs, and between Transitions and other Wholesale Labs, was to quash those laboratories' purchases of photochromic lenses treated by anyone other

than Transitions, so as to (1) obtain and maintain Transitions' monopoly in the market for

photochromic treatments; and (2) allow Defendants to charge Plaintiffs and members of the

Class artificially high and non-competitive prices.

### Transitions' Exclusionary Practices at the Optical Retailer Level

94.     Large optical retailers are one of the most efficient channels of distribution for

photochromic lenses to consumers.  In addition to its conduct directed at competitors Corning

and Vision-Ease, and in addition to the arrangements between Transitions and the Essilor-

owned Labs, and between Transitions and other Wholesale Labs, Transitions entered into

exclusive contracts with over 50 optical retailers, including many of the largest retail chains.

Most of these exclusive agreements were long-term and included provisions making

termination onerous.  This was part of a course of conduct carried out by Defendants in

concert to facilitate and/or maintain Transitions' monopoly in the photochromic treatment

market.

95.     Transitions directed its exclusionary practices at optical retailers via: (1) long-

term exclusionary agreements with most major retailers; and (2) offering discounts only to

other retailers who sold extremely high percentages of Transitions' photochromic lenses, as

compared to Transitions' competitors.

96.     During the Class Period, Transitions entered at least 25 "Exclusive Marketing

Agreements."  For example:

a.      In or about March and April 2007, Transitions entered into an

"Exclusive Marketing Agreement" with non-party Eyemart Express, Ltd., a Texas-based

retail eye-care provider.  From April 1, 2007 through December 31, 2008, Eyemart expressly

agreed to "offer and sell through its (or its subsidiaries) retail optical outlets only

Photochromic Lenses . . . manufactured or distributed by Transitions or under the Transitions

brand name and will not market or sell any other manufacturer's Photochromic Lenses."  In

exchange for this agreement, Transitions paid $46,666 into an "Exclusivity Fund" for

Eyemart Express.

        b.      On or about April 21, 2008, Transitions entered into an "Exclusive

Marketing Agreement" with non-party Co/Op Optical, one of the leading retail eye-care

providers in southeast Michigan.  The two-year contract began January 1, 2008 and stated in

part: "[Co/Op Optical] may not sell any photochromic lenses other than Transitions lenses in

any of its locations in the United States of America during the Term of this Agreement."

This agreement followed another Marketing Agreement that was in effect between January 1,

2006 and December 31, 2007.

        97.     In addition, Transitions entered into "SRA Program" agreements with

retailers, which were similar to STAR Program agreements with laboratories, in that

Transitions provided retailers with "Business Building Funds" in exchange for the retailers'

agreement to "[p]romote Transitions lenses as SRA Partner's preferred photochromic

products," maintain sales of Transitions lenses, grow sales of Transitions, and sell a certain

percentage of Transitions lenses.  These agreements had the effect of compelling or inducing

retailers to sell Transitions lenses to the exclusion of other photochromic lenses, and shifting

sales of non-photochromic lenses to Transitions lenses.

        98.     One example of an "SRA Program" reflects the terms Transitions generally

offered.  In or about 2008, Transitions entered into a "2009 SRA Program" agreement, in

effect between January 1, 2009 and December 31, 2009 with non-party University Eye Associates, a North Carolina optometry practice. Transitions offered the retailer "Business Building Funds" in the amount of $.50 per pair of glasses if 15-17.99 percent of its sales were Transitions lenses, and $1.00 per pair if Transitions share exceeded 18 percent of its sales. In addition to these funds, the retailer received an additional "Bonus Growth Incentive" according to the following schedule, based on volume growth over the previous year:

| 5%-8.9% | 9%-11.9% | 12%-14.9% | 15%-19.9% | 20%+ |
|---|---|---|---|---|
| + $0.15/pair | + $0.25/pair | + $0.35/pair | + $0.45/pair | + $0.55/pair |

99.     These and similar agreements foreclosed downstream outlets for competing photochromic lenses, restrained existing competition, and created significant barriers to entry to rival photochromic treatment suppliers.

100.     The purpose and effect of the various terms in the above-referenced agreements between Transitions on the one hand, and the Essilor-owned Labs and the optical retailers on the other, was to exclude purchases by the optical retailers of photochromic lenses treated by anyone other than Transitions: (1) to facilitate and maintain the Transitions monopoly for photochromic treatment of lenses; and (2) to allow Defendants to charge Plaintiffs and members of the Class artificially high and non-competitive prices.

## **Transitions' Anticompetitive Bundled Discounts**

101.    Transitions' agreements with Wholesale Labs and optical retailers generally provided for discounts only to customers who purchase all, or almost all, of their photochromic lens needs from Transitions.

102.    No photochromic treatment supplier other than Transitions sells a treatment that applies to a full line of ophthalmic lenses.  Transitions' discount structure thus impairs its competitors' ability to compete for sales to those customers, as those customers can neither discontinue nor limit their sales of Transitions' products.

103.    Transitions' bundled discount arrangements erect a significant entry barrier by limiting the ability of rival photochromic treatment suppliers to enter the market with new photochromic treatments suitable for anything less than a full line of lenses.  Those arrangements also strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions.

104.    Transitions' exclusionary practices in dealing with Wholesale Labs and optical retailers foreclose its rivals, in whole or in part, from substantial shares of the photochromic lens market at those levels.

## **Essilor and Transitions' Conspiracy To Monopolize the Market and Restrain Trade**

105.    Essilor is the leading Lens Caster in the United States and owns the largest Wholesale Lab network in the United States.  Acting together, during the Class Period, Essilor and Transitions maintained Transitions' dominance in the photochromic treatment market, in large part by enforcing exclusionary policies at every level of the Photochromic Lens distribution chain.

26

106.    Transitions and Essilor do not compete with each other.  Transitions is a manufacturer and seller of photochromic treatments for lenses.  Transitions purchases untreated lenses only from lens casters and sells the treated lenses only to lens casters, including Essilor.  Essilor sells the photochromic lenses to Wholesale Labs – both independent Wholesale Labs and Essilor-owned Labs – and to integrated optical retailers, whose laboratories grind the photochromic lenses in accordance with prescriptions and sell the finished products to consumers.

107.    No later than 1994, Essilor entered into an agreement with Transitions, terminable only by Essilor, that requires Transitions to purchase 70 percent of its supply of lens blanks from Essilor.  That agreement remains in effect and, combined with Transitions' monopoly share of the photochromic treatment market, guarantees that Essilor will maintain a majority share of the market for sales of lens blanks to photochromic treatment suppliers.

108.    Moreover, since Essilor purchases only approximately 50 percent of Transitions' output, the agreement effectively ensures that lens casters other than Essilor will be required to purchase from Transitions lenses that were originally manufactured by Essilor.

109.    Essilor acted in concert with Transitions to secure and maintain Transitions' monopoly, and with the intent to do so, in at least the additional following ways:

    a.    entering into a program to purchase ownership and/or control of previously independent Wholesale Labs which competed with Essilor-owned Labs, not only in the United States but throughout the world, in part for the purpose of assuring that those laboratories would purchase only photochromic lenses that were treated by Transitions;

       b.     purchasing lens casters or entering into joint venture agreements with lens casters, not only in the United States but throughout the world, in part for the purpose of assuring that those lens casters purchased photochromic treatment of their lenses exclusively from Transitions; and

       c.     joining Transitions' efforts to purchase any firm that effectively competed with Transitions in the market for photochromic treatments and, failing that, undertaking to destroy that competitor

110.    In and around 2007, Transitions, with Essilor's cooperation and approval, undertook to purchase its competitor, Vision-Ease.  When that effort failed because of a threatened challenge by the Federal Trade Commission, Essilor adopted a goal to "kill" Vision-Ease, a major competitor of Transitions.

111.    Essilor acquired competitor Signet.  Signet had previously used Corning's SunSensors photochromic treatments.  On January 15, 2009, Essilor International subsidiary EOA Holding Co, Inc signed a share purchase agreement to acquire the entire capital of Signet Armorlite.  Signet Armorlite is headquartered in California with revenue over $130 million and 900 employees, with one manufacturing plant in Mexico, four prescription laboratories in the U.S. and Europe, and three distribution centers in Canada, Portugal and the Netherlands.  Signet Armorlite specialized in entry-level and mid-range products for independent eye care professionals and integrated retailers.

112.    At all relevant times, Essilor of America's purchases and sales of Transitions photochromic lenses were a substantial multiple of its purchases and sales of other

photochromic lenses. Those purchases were driven in whole or in substantial part to bolster Transitions' monopoly in the relevant market.

113.    At all relevant times after their purchase by one or more of the Essilor Defendants, the Essilor-owned Labs purchased and sold Transitions photochromic lenses on a substantially exclusive basis. They did so in whole or in substantial part for the purpose and effect of bolstering Transitions' monopoly in the relevant market.

### FTC Action Against Transitions

114.    On March 3, 2010, the Federal Trade Commission ("FTC") accepted for public comment an Agreement Containing Consent Order to Cease and Desist with Transitions.

115.    The FTC concurrently released a proposed complaint against Transitions (the "FTC Complaint") and the Decision and Order (the "Order") that resulted from its investigation.

116.    The FTC Complaint alleged the following, among other things:

a.    a relevant market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses (the "Photochromic Treatment Market");

b.    there are no close substitutes for photochromic lenses;

c.    Transitions has monopoly power in the Photochromic Treatment Market;

d.    there are significant barriers to entry into the Photochromic Treatment Market;

e.      Transitions used unfair methods of competition to maintain its monopoly power in the Photochromic Treatment Market; and

f.      the anticompetitive effects of Transitions' conduct include: (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Treatment Market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

117.    Among other things, the Order:

a.      prohibits Transitions from entering into any agreements or adopting any policies that limit its customers' ability to buy or sell competing photochromic treatments, or that require customers to give Transitions' products preferential treatment as compared to its competitors' products;

b.      prohibits Transitions from entering into exclusive agreements relating to photochromic lenses, or a number of related products and services;

c.      prohibits Transitions from offering discounts that are based on the degree to which its customers sell Transitions' photochromic lenses as compared to its competitors;

d.      prohibits Transitions from offering discounts that are applied retroactively after a customer's sales reach a specific threshold; and

e.      prohibits Transitions from bundling discounts such that customers purchasing more than one line of photochromic lenses obtain additional discounts.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

118.    The effects of Defendants' anticompetitive exclusionary acts have been to capture and/or maintain for Transitions more than 80 percent of the relevant market, to substantially impair and foreclose competition from Transitions' rivals from a substantial share of the relevant market, and to significantly raise barriers to entry for potential rivals.

119.    Defendants' conduct adversely affected competition and consumers by: (a) increasing or maintaining premium prices for Transitions' photochromic lenses at artificially high levels; (b) reducing the output of photochromic lenses; (c) eliminating or significantly reducing price competition for photochromic treatment and photochromic lenses; (d) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the Photochromic Treatment Market; (e) reducing innovation; and (f) reducing consumer choice among competing photochromic lenses.

120.    Absent Defendants' conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, Transitions would have reduced the price it charged to lens casters for its photochromic treatment of lenses and/or supplied its low-priced, private label photochromic lens (which it offers outside of the United States where it faces increased competition) in response to unimpaired competition from Corning, Vision-Ease and other rivals and potential rivals (*i.e.*, Wholesale Labs and/or lens casters that might have developed their own photochromic treatments).

121.    Moreover, had actual or potential photochromic treatment suppliers not been substantially foreclosed or stifled by Defendants' anticompetitive conduct from effectively competing in the market for such products, those competitors and/or potential competitors

would have sold much more of their products, gained a larger market share and achieved economies of scale and scope that could have further driven down prices in the marketplace.

122.    By unlawfully excluding and impairing competition, Defendants' conduct has caused Plaintiffs and other Class members to pay more for photochromic lenses than they otherwise would have paid absent Transitions' illegal, exclusionary conduct.

123.    As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Transitions lenses they purchased.

## DAMAGES

124.    Had potential competitors been able to threaten to enter, enter and/or remain in the market unimpeded by Defendants' illegal conduct, Plaintiffs and other members of the Class would have been able to, *inter alia*, purchase photochromic lenses treated by Transitions for lower prices.

125.    Because of the Defendants' conspiracy, and Essilor's ownership and control of the Essilor-owned Labs, Plaintiffs and other class members who purchased lenses treated by Transitions paid artificially high and supracompetitive prices.

126.    Members of the Class have, as a consequence, sustained losses and damage to their business and property in the form of overcharges.  The full amount of such damages will be calculated after discovery and upon proof at trial.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3), on their own behalf and as representatives of the following class

of persons and entities (the "Class"):

> All persons or entities that purchased Transitions lenses directly from any
> Defendant or any Essilor-owned Lab at any time between March 3, 2006[4] and
> the present (the "Class Period").  Excluded from the Class are Defendants and
> their subsidiaries, parents, or affiliates, whether or not named as a Defendant
> in this Complaint, and government entities.

128.    The members of the Class all purchase Transitions' lenses directly from

Defendants and/or Essilor-owned Labs.

129.    EOLA and the Essilor-owned Labs have no economic interest or incentive to

make claims similar to those alleged in this Complaint against Transitions and/or Essilor.

Therefore, there is no risk of duplicative recoveries.

130.    The Class is individually so numerous that joinder of all members is

impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at

this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably

believe that there are at least hundreds of members in the Class and that their identities can

be learned from records in Defendants' possession, custody or control, including records in

the possession of the Essilor-owned Labs.  Class members are geographically dispersed

throughout the United States.

131.    Plaintiffs' claims are typical of the claims of the other members of the Class.

Plaintiffs and the members of the Class have all sustained damage in that, during the Class

---

[4]    March 3, 2006 is four years prior to the filing of the FTC Action.

Period, they purchased Transitions lenses directly from a Defendant and/or an Essilor-owned

Lab at artificially maintained, non-competitive prices, established by the Defendants' actions

in connection with the anticompetitive behavior alleged herein.  Defendants' anticompetitive

conduct, the effects of such violations, and the relief sought are all issues or questions that

are common to Plaintiffs and the other Class members.

132.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class action and antitrust

litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the

other Class members.

133.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.

134.    The questions of law and fact common to the Class include, but are not

limited to:

a.    whether the development, manufacture and sale of photochromic
treatments for corrective ophthalmic lenses in the United States (the "Photochromic
Treatment Market") is the relevant market in this case;

b.    whether Transitions possesses monopoly power in the Photochromic
Treatment Market;

c.    whether, through the conduct alleged herein, Transitions willfully
acquired or maintained or enhanced its monopoly power in the Photochromic Treatment
Market;

d.    whether, through the conduct alleged herein, Defendants conspired to
confer or maintain or enhance Transitions' monopoly power in the Photochromic Treatment
Market;

e.    whether Defendants conspired to engage in unlawful exclusionary
conduct to impair the opportunities of Transitions' actual or potential rivals in the
Photochromic Treatment Market;

34

f.      whether Transitions entered into exclusionary agreements that unreasonably restrained trade and impaired its actual or potential rivals in the Photochromic Treatment Market;

g.      whether Defendants engaged in a contract, combination or conspiracy among themselves to unreasonably restrain trade and impair Transitions' actual or potential rivals in the Photochromic Treatment Market;

h.      whether, and to what extent, Defendants' conduct caused Class members to pay supracompetitive prices and, thereby, suffer antitrust injuries; and

i.      whether Plaintiffs and Class members are entitled to any damages and, if so, the appropriate Class-wide measure of damages.

135.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.  There will be no material difficulty in the management of this action as a class action on behalf of the Class.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Monopolization**
**Against Defendant Transitions Only**

136.    Plaintiffs incorporate by reference the preceding allegations.

137.    Transitions acquired, willfully maintained and unlawfully exercised monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

a.    at the lens caster level, by: (1) entering into exclusive dealing arrangements with lens casters, including written exclusive dealing agreements, *see supra* ¶¶ 64-65; (2) adopting and publicly announcing a general policy of refusing to deal with lens casters that sell or promote any competing photochromic lens; (3) threatening to terminate lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating a lens caster that developed a competing photochromic treatment; and

b.    at the Wholesale Lab and optical retailer levels, by: (1) entering into long-term exclusionary agreements with most major optical retailers; (2) entering into agreements with Wholesale Labs requiring that they promote Transitions' lenses as their preferred photochromic lens and withhold normal sales efforts for competing photochromic lenses; and (3) offering discounts only to customers who sold only, or almost only, Transitions' photochromic lenses.

138.    EOLA and the Essilor-owned Labs have no economic interest or incentive to make claims similar to those alleged in this Complaint against Transitions and/or Essilor. Therefore, there is no risk of duplicative recoveries.

139.    Transitions has effectively excluded competition from a significant portion of the relevant market, maintained its dominant market share in the relevant market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive

products, by maintaining prices at artificially high levels, and by reaping the benefits of its

illegally obtained and maintained monopoly power.

140.    There is no legitimate business justification for Transitions' actions and the

conduct through which it maintained its monopoly power in the relevant market.  The

anticompetitive effects of Transitions' conduct far outweigh any conceivable procompetitive

benefits or justifications.  Even if such justification had existed, any possible procompetitive

benefits could have been obtained by less restrictive alternatives.

141.    As a direct and proximate result of Transitions' anticompetitive conduct,

Plaintiffs and members of the Class have been injured in their business or property by

Transitions' monopolization of the relevant market.  Without limiting the generality of the

foregoing, Plaintiffs and the other members of the Class have been forced to pay artificially

high and supracompetitive prices for Transitions photochromic lenses, prices higher than

they would have paid absent Transitions' unlawful conduct.

## COUNT II
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Attempted Monopolization Against Defendant Transitions Only

142.    Plaintiffs incorporate by reference the preceding allegations.

143.    Transitions unlawfully attempted to acquire monopoly power in the relevant

market during the Class Period, with the intention of doing so, through the exclusionary,

anticompetitive conduct set forth above, including, but not limited to:

a.    at the lens caster level, by: (1) entering into exclusive dealing

arrangements with lens casters, including written exclusive dealing agreements, *see supra* ¶¶

64-65; (2) adopting and publicly announcing a general policy of refusing to deal with lens

casters that sell or promote any competing photochromic lens; (3) threatening to terminate

lens casters that would not sell Transitions' lenses on an exclusive basis; and (4) terminating

a lens caster that developed a competing  photochromic treatment; and

       b.     at the Wholesale Lab and optical retailer levels, by: (1) entering into

long-term exclusionary agreements with most major optical retailers; (2) entering into

agreements with Wholesale Labs requiring that they promote Transitions' lenses as their

preferred photochromic lens and withhold normal sales efforts for competing photochromic

lenses; and (3) offering discounts only to customers who sold only, or almost only,

Transitions' photochromic lenses.

144.    To the extent that Transitions had not already acquired and maintained

monopoly power in the relevant market during the Class Period, the conduct described herein

resulted in a dangerous probability it would acquire and maintain such monopoly power.

145.    EOLA and the Essilor-owned Labs have no economic interest or incentive to

make claims similar to those alleged in this Complaint against Transitions and/or Essilor.

Therefore, there is no risk of duplicative recoveries.

146.    Transitions has attempted to exclude competition from the relevant market,

and profited from its anticompetitive conduct by unlawfully limiting the market shares of less

expensive, superior competitive products, by maintaining prices at artificially high levels,

and by reaping the benefits of its attempt to acquire monopoly power.

147.    There is no legitimate business justification for Transitions' actions and the

conduct through which it attempted to acquire monopoly power in the relevant market.  The

anticompetitive effects of Transitions' conduct far outweigh any conceivable procompetitive

benefits or justifications.  Even if such justification had existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

148.    As a direct and proximate result of Transitions' anticompetitive conduct, Plaintiffs and members of the Class have been injured in their business or property by Transitions' attempt to monopolize the relevant market.  Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay artificially high and supracompetitive prices for Transitions photochromic lenses, prices higher than they would have paid absent Transitions' unlawful conduct.

**COUNT III**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Conspiracy to Monopolize Against All Defendants**

149.    Plaintiffs incorporate by reference the preceding allegations.

150.    As set forth above, the Essilor Defendants, having previously taken similar actions in other markets, agreed with Transitions to actively join and facilitate Transitions' efforts to acquire, willfully maintain and unlawfully exercise monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

a.    entering into an agreement, terminable only by Essilor, that Essilor would supply at least 70 percent of Transitions' requirements for lens blanks, and that Essilor would have the right of first refusal to manufacture other specialty lenses needed by Transitions;

b.    purchasing and selling only Transitions' photochromic lenses;

39

c.      exercising their control over the Essilor-owned Labs to compel or induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

d.      in the case of Essilor of America, entering into agreements that effectively compelled or induced its independent Wholesale Lab customers to purchase and sell only Transitions' photochromic lenses.

e.      collaborating closely with Transitions as to new products, including instances in which Essilor was "involved in the details of the launch (pricing, obsolescence, inventory levels)" of Transitions' T6 product;

f.      engaging in joint seminars with Transitions, and joint promotions "to grow the category and gain market share in Transitions sales";

g.      engaging in acquisition strategy and purchasing labs in part so that Transitions could further maintain and enhance its monopoly power; and

h.      entering into a distribution agreement with Transitions whereby Essilor forecasted its demands and then committed to purchasing 90 to 110 percent of those forecasted amounts, effectively granting Transitions a decided competitive advantage in planning its production, and ensuring that Transitions would not be left with an excess or shortage of product.

151.   Essilor was incentivized to and did facilitate Transitions' monopoly because Essilor earned significant returns on its sale of lens blanks to Transitions in addition to those on its 49 percent share of Transitions' stock.

152.     Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary arrangements and understandings with Transitions, with each other, and with the Essilor-owned Labs, that effectively blocked rival photochromic treatment suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing through the Essilor-owned Labs.

153.     Each of the Defendants has committed at least one overt act – such as agreeing to the above-referenced exclusionary polices and practices, and selling Transitions lenses at supracompetitive prices – to further the conspiracy.

154.     Each of the Defendants intended that the conspiracy to monopolize alleged herein would maintain and enhance Transitions' monopoly power and injure Plaintiffs and the Class thereby.

155.     To the extent that Transitions had not already acquired and maintained monopoly power in the relevant market during the Class Period, the conduct described herein resulted in a dangerous probability it would acquire and maintain such monopoly power.

156.     As a direct and proximate result of Transitions' exclusionary agreements, Essilor's exclusionary agreements, Essilor's Wholesale Lab acquisition program and other anticompetitive acts described above, Plaintiffs and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiffs and the Class consists of paying artificially inflated prices for photochromic lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

**COUNT IV**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Conspiracy to Attempt to Monopolize**
**Against All Defendants**

157.     Plaintiffs incorporate by reference the preceding allegations.

158.     As set forth above, the Defendants agreed that the Essilor Defendants, having previously taken similar actions in other markets, would actively join and facilitate Transitions' efforts to acquire monopoly power in the relevant market during the Class Period, with the intention that Transitions acquire such power, through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

a.     entering into an agreement, terminable only by Essilor, that Essilor would supply at least 70 percent of Transitions' requirements for lens blanks, and that Essilor would have the right of first refusal to manufacture other specialty lenses needed by Transitions;

b.     purchasing and selling only Transitions' photochromic lenses;

c.     exercising their control over the Essilor-owned Labs to compel or induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

d.     in the case of Essilor of America, entering into agreements that effectively compelled or induced its independent Wholesale Lab customers to purchase and sell only Transitions' photochromic lenses.

e.     collaborating closely with Transitions as to new products, including instances in which Essilor was "involved in the details of the launch (pricing, obsolescence, inventory levels)" of Transitions' T6 product;

42

f.      engaging in joint seminars with Transitions, and joint promotions "to grow the category and gain market share in Transitions sales";

g.      engaging in acquisition strategy and purchasing labs in part so that Transitions could further maintain and enhance its monopoly power; and

h.      entering into a distribution agreement with Transitions whereby Essilor forecasted its demands and then committed to purchasing 90 to 110 percent of those forecasted amounts, effectively granting Transitions a decided competitive advantage in planning its production, and ensuring that Transitions would not be left with an excess or shortage of product.

159.    Essilor was incentivized to and did facilitate Transitions' monopoly because Essilor earned significant returns on its sale of lens blanks to Transitions in addition to those on its 49 percent share of Transitions' stock.

160.    Pursuant to their anti-competitive conspiracy, the Essilor Defendants agreed to enter into anticompetitive exclusionary arrangements and understandings with Transitions, with each other, and with the Essilor-owned Labs, that effectively blocked rival photochromic treatment suppliers from contracting with the Essilor Defendants and prevented those rivals from distributing through the Essilor-owned Labs.

161.    Each of the Defendants intended that the conspiracy to attempt to monopolize alleged herein would facilitate Transitions' acquisition of monopoly power and injure Plaintiffs and the Class thereby.

162.    Each of the Defendants has committed at least one overt act – such as agreeing to the above-referenced exclusionary polices and practices, and selling Transitions lenses at supracompetitive prices – to further the conspiracy.

163.    As a direct and proximate result of Transitions' exclusionary agreements, Essilor's exclusionary agreements, Essilor's Wholesale Lab acquisition program and other anticompetitive acts described above, Plaintiffs and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiffs and the Class consists of paying artificially inflated prices for Transitions photochromic lenses. Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

**COUNT V**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1:  Conspiracy to Restrain Trade Against All Defendants**

164.    Plaintiffs incorporate by reference the preceding allegations.

165.    As set forth above, the Essilor Defendants actively joined in and facilitated Transitions' efforts to unreasonably restrain competition in the relevant market through the exclusionary, anticompetitive policies and conduct set forth above, which constituted a combination and conspiracy and violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

166.    As set forth above, the Essilor Defendants actively joined in and facilitated the combination and conspiracy through the exclusionary, anticompetitive conduct set forth above, including, but not limited to:

a.    entering into an agreement, terminable only by Essilor, that Essilor would supply at least 70 percent of Transitions' requirements for lens blanks, and that

44

Essilor would have the right of first refusal to manufacture other specialty lenses needed by Transitions;

       b.      purchasing and selling only Transitions' photochromic lenses;

       c.      exercising their control over the Essilor-owned Labs to compel or induce them to substantially limit their purchases and sales of photochromic lenses to Transitions photochromic lenses; and

       d.      in the case of Essilor of America, entering into agreements that effectively compelled or induced its independent Wholesale Lab customers to purchase and sell only Transitions' photochromic lenses.

       e.      collaborating closely with Transitions as to new products, including instances in which Essilor was "involved in the details of the launch (pricing, obsolescence, inventory levels)" of Transitions' T6 product;

       f.      engaging in joint seminars with Transitions, and joint promotions "to grow the category and gain market share in Transitions sales";

       g.      engaging in acquisition strategy and purchasing labs in part so that Transitions could further maintain and enhance its monopoly power; and

       h.      entering into a distribution agreement with Transitions whereby Essilor forecasted its demands and then committed to purchasing 90 to 110 percent of those forecasted amounts, effectively granting Transitions a decided competitive advantage in planning its production, and ensuring that Transitions would not be left with an excess or shortage of product.

167.    Essilor was incentivized to and did facilitate Transitions' monopoly because Essilor earned large returns on its sale of lens blanks to Transitions in addition to those on its 49 percent share of Transitions' stock.

168.    There is no legitimate business justification for Defendants' actions and the conduct through which they effect the combination and conspiracy.

169.    As a result of the combination and conspiracy, Transitions has effectively restrained competition in the relevant market, maintained its dominant market share in the relevant market, and profited from its anticompetitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high and supracompetitive levels, and by reaping the benefits of its illegally obtained and maintained monopoly power.

170.    The anticompetitive effects of Defendants' conduct far outweigh any conceivable procompetitive benefits or justifications.  Even if such justification had existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives. As a direct and proximate result of Transitions' various agreements, policies and practices described herein, Essilor's acquisition of Transitions' competitors and attempts to eliminate such competitors, Essilor's Wholesale Lab acquisition program and other anticompetitive acts of Defendants described above, Plaintiffs and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiffs and the Class consists of paying artificially inflated and supracompetitive prices for Transitions photochromic lenses.  Such injury, in the form of overcharges, is the type of injury the antitrust laws were designed to prevent and flows directly from Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following:

A.      Certification of the Class defined in this Complaint pursuant to Federal Rule of Civil Procedure 23(b)(3);

B.      Defendants' actions described herein be adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

C.      Plaintiffs and the Class recover damages, as provided by law, that they are determined to have sustained, and that judgment in favor of Plaintiffs be entered against Defendants;

D.      Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

E.      Plaintiffs and the Class be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## **JURY DEMAND**

Plaintiffs hereby demands a trial by jury on all issues so triable.


Dated:  November 19, 2010

ENGLANDER & FISCHER, P.A.

_____/s/   John W. Waechter_____
Leonard S. Englander, FBN 198846
John W. Waechter, FBN 47151
721 First Avenue North
St. Petersburg, FL 33701
Telephone:  (727) 898-7210
Fax:  (727) 898-7218
E mail:  jwaechter@eandflaw.com

*Liaison Counsel for the Direct Purchaser Plaintiffs*

47

**BERGER & MONTAGUE, P.C**.

_____/s/  H. Laddie Montague, Jr._____
H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
E mail:  hlmontague@bm.net


**GRANT & EISENHOFER P.A.**

_____/s/  Linda P. Nussbaum_____
Linda P. Nussbaum
Robert G. Eisler
John D. Radice
Susan R. Schwaiger
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone:  (646) 722-8500
Fax:  (646) 722-8501
E mail:  lnussbaum@gelaw.com


**LABATON SUCHAROW LLP**

_____/s/  Bernard Persky_____
Bernard Persky
Kellie C. Lerner
Ryan G. Kriger
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Fax:  (212) 818-0477
E mail:  bpersky@labaton.com


***Interim Co-Lead Counsel for the Direct
Purchaser Plaintiffs***

# EXHIBIT A

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| 1 | 21st Century Optics Inc. | 80 | January 26, 2005- a prescription laboratory based in Long Island City, New York. A distributor of Varilux and Crizal brand products, 21st Century Optics has annual sales of $15.5 million. |
| 2 | Abba Optical | | July 7, 2009 – prescription laboratory with $2.2 million in revenue, in Georgia |
| 3 | ACO Lab Inc | 80 | January 12, 2006 –"full-service laboratory" located in Los Angeles, with approximately 2,100 prescription jobs "rolling off the assembly line every business day." Commerce, California, revenue of $3.8 million, distributor of Varilux and Crizal brands. |
| 4 | Accu Rx Inc. | 80 | January 25, 2006, prescription laboratory in Johnston, Rhode Island, with revenues of $5.8 million and 38 employees.  Specializes in wholesale |
| 5 | Advance Optical | 90 | April 4, 2008 – prescription laboratory with $6.1 million in revenue, based in Rochester, New York |
| 6 | Apex Optical | | July 7, 2009 – prescription laboratory with $2.7 million in revenue, in Florida |
| 7 | Avisia | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 8 | Barnet & Ramel Optical | | July 7, 2009 – prescription laboratory with $10.8 million in revenue, in Nebraska |
| 9 | Bartley Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 10 | Beitler McKee Company | 90 | January 25, 2007 – prescription laboratory that distributes Varilux products, based in Pittsburgh, Pennsylvania with $13 million in revenue and 78 employees. |
| 11 | Bell Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 12 | Bristow Optical | | Identified as one of the 90 optical laboratories in the |

|    | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|----|--------------|-------------------------------|-----------------------------------------------------------------------------------|
|    |              |                               | "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 13 | Collard Rose | 80 | January 29, 2009 – a prescription laboratory and Varilux distributor in California with $7.5 million in revenue |
| 14 | Crown Optical |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 15 | Custom Eyes |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 16 | Dash Lab |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 17 | DBL Labs |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 18 | Dependable Optics Inc. | 80 | January 29, 2009 - prescription laboratory in New York with revenue approx $2 million |
| 19 | Deschutes Optical, Inc. | 80 | July 17, 2008 – prescription laboratory, based in Oregon and Idaho, $2.7 million in revenue |
| 20 | Dibok Aspen Optical | 80 | October 19, 2006 - prescription laboratory in Mesa, Arizona, that distributes Varilux products with annual sales approx $6.6 million |
| 21 | Duffens Optical |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 22 | Dunlaw Optical | 80 | January 27, 2004 – prescription laboratory in Lawton, Oklahoma - $2 million in sales in western Oklahoma and northern Texas; Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 23 | East Coast Opthalmic |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on |

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| | | | November 16, 2010) |
| 24 | ELOA New Jersey | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 25 | Elite Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 26 | Empire Optical, Inc. | 85 | April 4, 2008 – large optical laboratory located in North Hollywood. A distributor of Varilux lenses, the company has 168 employees and $23 million in full-year revenue. Empire has major potential for developing Essilor lenses and enables the Group to increase its market share in the nation's most populous state. |
| 27 | Eye Care Express Lab Inc | 80 | March 9, 2006 - prescription lens laboratory based in Houston Texas with revenues of $3.9 million |
| 28 | Focus Optical Labs, Inc | 80 | January 12, 2006 – Chicago, IL – revenue of $3.5 million – distributor of Varilux and Crizal brands. "Full service optical laboratory." |
| 29 | Future Optics Inc | 80 | July 20, 2006 – prescription lens laboratory located in Largo, Florida |
| 30 | GK Optical | | December 6, 2007 – a group of two prescription laboratories located in Indiana |
| 31 | Gold Optical Enterprises, Inc | | December 6, 2007 – prescription laboratory located in Fayetteville, North Carolina |
| 32 | Heard Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 33 | Homer Optical Company | 100 | July 20, 2006 – the twelfth largest wholesale optical laboratory in the U.S. serving independent eye care professional and the owner of four prescription lens laboratories in Maryland, Pennsylvania, Virginia and New York |
| 34 | Interstate Optical | 80 | January 10, 2008- one of the country's five largest independent laboratories. Interstate's two laboratories in Mansfield, Ohio and Indianapolis Indiana serve eye care professionals in 32 states. The company has full-year sales of $26 million and 210 employees |
| 35 | Joes's Creek | | Identified as one of the 90 optical laboratories in the |

3

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| | | | "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 36 | Jorgenson Optical Supply Company | 80 | July 21, 2005 - located near Seattle, Washington, has 55 employees and reported $7.6 million in sales in 2004.  The acquisition will enable the Group to improve its services to opticians and optometrists in Washington, where it previously did not have any operations.  Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 37 | Kosh Opthalmic | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 38 | McLeod Optical | | July 7, 2009  – joint acquisition with Vision Service Plan (Essilor with majority), McLeod Optical is a prescription laboratory in Rhode Island with $10 million in revenue |
| 39 | Meridian Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 40 | MGM Optical | 80 | October 20, 2005 – Puerto Rico based prescription laboratory and Varilux distributor with $2 million in sales; Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 41 | Midland Optical | 80 | February 15, 2005 - a prescription laboratory headquartered in St. Louis, Missouri.  An authorized distributor of Varilux brand products, Midland Optical generates $16.5 million in sales and employs 150 people.  It caters to independent eye care professionals located primarily in Missouri and Illinois.  Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 42 | Milroy Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| 43 | Nassau Lens Company, Inc. (Nassau Vision Group) | 100 | June 2, 2003 – "full service labs;" the country's number one direct distributor of stock lenses to eye care professionals, 12 locations, 400 employees and $62 million in sales |
| 44 | New City Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 45 | Next Generation | 100 | January 29, 2009 – prescription laboratory in Minnesota with $3.5 million in revenue |
| 46 | Omega Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 47 | Omni Optical Lab | | September 10, 2003 – a prescription lab owned by Consolidated Vision Group, which also owns one of the top ten U.S. optical chains. Omni Optical Lab delivers a wide range of products to eye care professionals in six southern U.S. states. With 80 employees in Beaumont, Texas, it reported sales of $11 million in 2002. Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 48 | Opal Lite Inc. | 100 | July 21, 2004 - Distributor of Varilux brand products in El Monte, near Los Angeles, California. Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 49 | Optical One | 80 | July 21, 2005 – prescription laboratory with sales of $8.6 million in the fiscal year ended March 31, 2005, is based in Ohio and has 53 employees. It will strengthen Essilor's presence in the region alongside Select Optical, which was acquired in 2004. Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 50 | Optical Suppliers Inc. (Hawaii) | 85 | July 23, 2003 - the largest prescription laboratory in Hawaii and a distributor of Varilux lenses. Optical Suppliers Inc. has sales of $5 million and employs 50 people. Identified as one of the 90 optical laboratories in |

|  | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
|  |  |  | the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 51 | Opti-Craft |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 52 | Optimatrix | 80 | July 17, 2008 – prescription laboratory based in Alabama with $4.6 million in revenue |
| 53 | Optogenics |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 54 | Ozarks Optical Laboratories | 80 | July 20, 2006 – prescription lens laboratory in Springfield Missouri |
| 55 | Pech Optical | 80 | January 29, 2009 - a prescription laboratory and Varilux distributor in Iowa with $37 million in revenue |
| 56 | Peninsula Optical Lab. | 80 | January 25, 2007 – prescription laboratories that distribute Varilux products, based in Seattle, Washington has 40 employees and revenues of $5.5 million |
| 57 | PerfeRx Optical Co Inc | 80 | April 20, 2006 – full service laboratory and a Varilux distributor in Massachusetts |
| 58 | Personal Eyes Optical Lab | 80 | March 8, 2007 – full service laboratory based in Minneapolis, Minnesota with annual revenue of $2 million and 14 employees. |
| 59 | Precision Optical Lab. (Tennessee) | 80 | July 20, 2006 – prescription lens laboratory in Gallaway, Tennessee |
| 60 | Precision Optical Co. (Connecticut) | 80 | July 20, 2006 – prescription lens laboratory in Hartford, Connecticut |
| 61 | Precision Optics |  | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 62 | Premier Optics, Inc |  | December 6, 2007 – acquired assets - prescription laboratory located in Belmont, North Carolina |
| 63 | Rainbow Optical Labs inc |  | February 21, 2008 – prescription laboratory with $3 million in revenue based in Puerto Rico. |
| 64 | Select Optical Inc. | 100 | July 21, 2004 - one of the largest independent laboratories in the state of Ohio, is based in Columbus where it employs 80 people and generates annual sales of $9.8 million. With $4.6 million in sales and 44 employees. |

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| | | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 65 | S&G Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 66 | Southern Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 67 | Southwest Lens | 65 | January 29, 2009 – a prescription laboratory and Varilux distributor in Texas with $5 million in revenue |
| 68 | Specialty Lens Corp. | 100 | March 4, 2003 – designs, manufactures and markets prescription polarized sunglass lenses, 40 employees and $4 million in sales – part of Essilor's North American Production Division |
| 69 | Spectrum Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 70 | SunStar Inc. | 80 | September 7, 2006 - a prescription lens laboratory with operations in Nevada and Utah representing annual revenues of $7.7 million. |
| 71 | Sutherlin Optical Company | 85 | June 20, 2007 – a prescription laboratory and distributor of Varilux brand, with $13 million in revenue and 75 employees, with customers mainly in Missouri and Kansas |
| 72 | Top Network | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 73 | Tri Supreme Optical LLC | 100 | 2004 – optical wholesale laboratory – Farmingdale, New York.  Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 74 | Twin City Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |

| | Company Name | 2008 Interest / Voting Rights % | Business Description / Date of Essilor Press Release for Announcement of Acquisition |
|---|---|---|---|
| 75 | Vision-Craft Inc. | 80 | January 26, 2005 - prescription laboratory that distributes the Varilux brand in and around Detroit, Michigan. Vision-Craft has annual sales of $4.3 million.  Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |
| 76 | Vision Pointe Optical | | July 7, 2009 – prescription laboratory with $1.1 million in revenue, in Idaho |
| 77 | WOS Optical | | Identified as one of the 90 optical laboratories in the "Essilor Laboratories network" at **http://company.monster.com/essilor.aspx** (accessed on November 16, 2010) |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Direct

Purchaser Plaintiffs' Consolidated Amended Complaint was filed electronically with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

counsel of record, and e-mailed to counsel for all parties on this the 19th day of November,

2010.

**BERGER & MONTAGUE, P.C**.

*/s/  Bart D. Cohen*
H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Fax:  (215) 875-4604
E mail:  bcohen@bm.net

*Interim Co-Lead Counsel for the Direct*
*Purchaser Plaintiffs*