**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| IN RE: PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173 |
| This document relates to: ALL ACTIONS | Case No. 8:10-md-2173-JDW-EAJ Hon. James D. Whittemore |

**TRANSITIONS OPTICAL, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF VISION-EASE'S AMENDED MOTION TO COMPEL TRANSITIONS TO PRODUCE DOCUMENTS CREATED AFTER APRIL 1, 2009 AND FROM THREE ADDITIONAL EMPLOYEES**

**INTRODUCTION**

Plaintiff Vision-Ease, which is a rival seller of photochromic lenses, asks defendant Transitions Optical, Inc. ("TOI") to incur an additional $1.6 million in discovery costs for a fishing expedition. This would be on top of the millions TOI will have spent to comply with Vision-Ease's other document requests. TOI has agreed to produce millions of pages of emails, reports, memos, presentations and data to Vision-Ease. The material spans 11 years (2000 to 2011), and comes from 35 employees, including all of its most senior executives – TOI only has 67 employees in its entire North America executive, sales, marketing, finance and product development teams. Enough is enough.

Vision-Ease now demands production of even more documents covering the period April 2009 to January 2011. As explained later, several hoops have to be jumped to understand the relevance of this time period. Nevertheless, in addition to the nine custodians TOI already has agreed to search, Vision-Ease wants the emails of 26 employees

who reported to the nine during this 20-month period. The importance of the nine custodians cannot be emphasized enough. These are the TOI employees with the most knowledge about the relevant facts and direct responsibility for TOI's business. Included here are the President and CEO, the CFO, the General Manager for all U.S. operations, and the heads of all the major departments. If the 26 underlings had something of significance to say, the emails would be captured and produced in the documents of their nine supervisors. Vision-Ease's hope that the 26 lower-level custodians will have unique "smoking gun" emails does not justify the $1.4 million it will cost TOI to search their files.

Moreover, TOI will be producing material from its central files for the 20-month period (as well as dating back to 2000). This resource includes TOI's pricing, sales and financial data, contracts and other significant material that go to the heart of Vision-Ease's claims. The sales and other business activities of the 26 lower-level employees will be encapsulated in this central repository. Combined with the emails, memos, periodic reports, and strategy presentations included within the documents of the nine senior executives, the discovery from the central files provides the most complete and meaningful picture of what TOI thought, said and did (or did not do) from April 2009 to January 2011.

Second, Vision-Ease wants documents from three more employees beyond the 35 TOI has agreed to produce. "What's three more?" Vision-Ease argues. But as the documents cited by Vision-Ease make clear, these three custodians are cumulative of the other 35 employees' documents. That is likely another $165,000.00 that will have been wasted.

TOI has tried to be reasonable and cooperative in providing discovery. However, Vision-Ease overreaches with its latest requests. The discovery sought is cumulative, and its diminishing value is far outweighed by the burden on TOI. Vision-Ease should not be permitted to impose an additional $1.6 million tax on its rival.

## TOI'S COMPLIANCE WITH PLAINTIFFS' DOCUMENT REQUESTS

*The Photochromic Lens Antitrust Multi-District Litigation ("MDL")*

In this multi-party litigation, the plaintiffs consist of (i) Vision-Ease, (ii) a putative class of labs and retailers and (iii) a putative class of consumers; and the defendants consist of TOI and, in one of the class actions, Essilor of America, Inc., and Essilor Laboratories of America, Inc. (collectively, "Essilor"). Photochromic lenses are clear ophthalmic lenses that darken when exposed to the ultraviolet light present in sunlight, and fade back to clear when removed from the ultraviolet light. Compl. ¶ 5.[1] TOI purchases clear lenses from lens casters, such as Essilor, applies its proprietary photochromic technology, and then sells the treated lenses to lens casters. *Id.* ¶ 17. Lens casters then sell TOI-brand lenses and others to wholesale optical labs and retailers. *Id.* ¶ 18. Vision-Ease, which is a lens caster, manufactures and sells its own photochromic lenses to labs and retailers. *Id.* ¶¶ 5, 28. TOI once supplied Vision-Ease with TOI lenses, but that arrangement ceased in 2005 after Vision-Ease launched its own line of photochromic lenses. *Id.* ¶ 28.

Vision-Ease and the class plaintiffs allege, in summary, that TOI acted in an anticompetitive manner both independently and in concert with Essilor by engaging in exclusive dealing arrangements with lens casters, labs and retailers. Vision-Ease claims that TOI's acts have hindered or prevented Vision-Ease from marketing and selling photochromic lenses to downstream customers in competition with TOI. *Id.* ¶ 3.

---

[1] Vision-Ease filed its Complaint in the United States District Court for the District of Delaware on July 27, 2010, which action was transferred to this Court on September 9, 2010. MDL 2173 Docket No. 56.

*The Prior Federal Trade Commission Investigation and Consent Agreement*

This MDL grew out of the FTC's investigation of TOI's exclusive dealing arrangements with lens casters, labs and retailers. That investigation formally commenced on March 10, 2009. Declaration of Lisa A. Davis ("Davis Decl.") ¶ 2. TOI agreed to produce relevant material to the FTC dating through April 2009. TOI produced 12 CD-ROMs of data concerning finances, sales, products, and pricing, together with 1.1 million pages of documents collected from 32 custodians. *Id.* ¶ 3.

On March 3, 2010, the FTC announced it had reached a Consent Agreement with TOI, and on April 22, 2010, the FTC issued a Decision and Order implementing that agreement. *See* Ex. 1 to the Amended Declaration of F. Matthew Ralph ("Ralph Decl.") (Dkt. 142). Under the Consent Agreement, TOI agreed to cease and desist from entering into certain types of exclusive arrangements with lens casters. *Id.* at § II.A. With respect to labs, managed care and retailers, the FTC agreed that TOI could enter into exclusive arrangements with certain conditions. *Id.* at § II.B.

*Discovery in This MDL*

In October 2010, TOI produced to all plaintiffs the same material it provided to the FTC. Davis Decl. ¶ 6. On January 21, 2011, Vision-Ease and the lab/retailer class plaintiffs served their first document requests – 108 requests spanning 2000 to the present.[2] *Id.* ¶ 7. Over the past few months, TOI, Vision-Ease and the lab/retailer class plaintiffs engaged in extensive "meet and confer" negotiations. TOI made four important and productive proposals, all of which significantly increased the scope of discovery material beyond what it produced to the FTC: (1) TOI agreed to extend the relevant time period for certain types of documents from 2005 to 2000; (2) TOI agreed to extend the relevant time

---

[2] The lab/retailer class plaintiffs have not joined in Vision-Ease's motion to compel.

period for nine key executives and its central files from April 1, 2009 to January 1, 2011; (3) TOI agreed to produce additional documents from new and old custodians; and (4) TOI agreed to expand the types of documents it would search. *Id.* ¶ 20. This increased discovery likely will result in the production of well over a million pages of more documents, and cost TOI millions of dollars more in litigation expenses. *Id.* ¶ 20.

We summarize the negotiations with respect to the two remaining items in dispute. *First*, TOI sought to narrow production of documents created after April 1, 2009, *i.e.*, after the FTC had notified TOI that it had commenced its investigation, to the nine key executives with the most knowledge and relevant information, together with material from central databases (e.g., sales and financial data, reports, contracts etc.) through January 1, 2011. Davis Decl. ¶¶ 9,15; Ralph Decl Ex. 2, Ex. 7. Plaintiffs agreed with the January 1, 2011 limit, but insisted that documents for *all 35* custodians be searched. As a compromise, TOI suggested that plaintiffs review the files of the nine custodians and then determine whether the 26 others were necessary. Davis Decl. ¶ 17; Ralph Decl. Ex. 8. Plaintiffs rejected both proposals.

*Second*, TOI sought to narrow the number of custodians to be searched to 35 employees. Davis Decl. ¶ 9; Ralph Decl Ex. 8. TOI initially proposed 33 custodians and provided detailed information about them. Davis Decl. ¶ 11; *see also* Ralph Decl. Ex. 3. Plaintiffs indicated that they would accept the 33 custodians but only if six more were added, including the three custodians whose addition Vision-Ease now seeks to compel: Patience Hansen, Bette Zaret, and Laura Starman. Davis Decl. ¶ 14; Ralph Decl. Ex. 6. TOI agreed to add two of the six (Laurent Dosseville and Kevin Birkel). Davis Decl. ¶ 15; Ralph Decl. Ex. 7. With respect to Hansen, Zaret and Starman, TOI explained that their documents would be cumulative, and proposed in the alternative that plaintiffs substitute

these three employees among the other 35 custodians.  Davis Decl. ¶ 18; Ralph Decl. Ex. 8.  Plaintiffs refused.

## ARGUMENT

I. **THE BURDEN OF REVIEWING AND PRODUCING DOCUMENTS CREATED AFTER APRIL 1, 2009 FROM 26 ADDITIONAL CUSTODIANS OUTWEIGHS THE LIKELY BENEFIT OF SUCH DISCOVERY**

   A. **Vision-Ease's Discovery Requests Are Unreasonably Cumulative, Duplicative, and Any Benefits of the Discovery are Outweighed by the Burden and Expense to TOI**

Fed.R.Civ.P. 26(b)(2)(C)(i) & (ii) require the Court to limit the extent of discovery otherwise allowed if it determines that: (i) the discovery sought is "unreasonably cumulative or duplicative," or (ii) "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Vision-Ease's requests fall short on both grounds.

The central theme of Vision-Ease's complaint is that since 2000, TOI's exclusive dealing arrangements with lens casters, labs and retailers foreclosed it from key distribution channels and diminished its ability to compete effectively against TOI in the marketing and selling of Vision-Ease's photochromic lenses.[3]  The FTC investigated TOI's exclusive dealing arrangements, and in 2010 TOI and the FTC entered into a Consent Agreement, which Vision-Ease believes "makes the case for discovery in this period even stronger."  Motion at 10.[4]  The FTC Consent Agreement provides that TOI would cease certain types

---

[3] Vision-Ease also claims that it was further harmed when TOI stopped selling TOI-brand photochromic lenses to Vision-Ease in 2005.  Vision-Ease does not explain the relevance of the post-FTC discovery material to this claim.  There can be none because whatever harm Vision-Ease suffered necessarily occurred well before the FTC's investigation.

[4] Vision-Ease's Amended Motion to Compel ("Motion") is available as entry 140 in the ECF docket for Case No. 10-md-2173 in the United States District Court for the Middle District of Florida.

of exclusive deals with lens casters. However, the FTC allowed TOI to enter into exclusive arrangements with certain conditions with labs, retailers and managed care. Thus, the relevance of the FTC investigation and Consent Agreement are mixed at best.

Despite Vision-Ease's conjecture and speculation about the relevance of the post-FTC discovery, in the spirit of compromise to avoid burdening the Court with discovery disputes TOI offered to collect material from (i) the nine key executives with the most knowledge and direct responsibility for the core business areas of this litigation, and (2) central files containing all the relevant sales and financial reports and data. The positions of the nine TOI executives during the April 2009 to January 2011 timeframe of interest to Vision-Ease were as follows:

1. David Cole, General Manager for the U.S.
2. Brett Craig, President until his departure in May 2010
3. Rick Elias, President and Chief Executive Officer
4. Alex Louw, Director of National Retail
5. Brian Hauser, Director of Lens Manufacturing and Trade Channel Sales
6. Pat Huot, Director of Managed Vision Care
7. John Ligas, Director of Product Leadership (Research & Development)
8. Elliott Reshard, Business Manager for the Essilor account
9. Eric Zaretsky, Chief Financial Officer

Davis Decl. ¶ 15.

Messrs. Cole and Elias are the most senior executives at TOI, with responsibility for overseeing the entire business (as well as Mr. Craig until May 2010). Declaration of Alex Louw ("Louw Decl.") ¶ 8. Mr. Louw headed the National Retail group, with responsibility for TOI's relationships with approximately the top twenty national retailers of prescription eyeglasses, such as Costco, Walmart, Sears, and Lenscrafters. Mr. Hauser headed the Lens Manufacturing and Trade Channel Sales group, with responsibility for TOI's relationships with all lens casters, wholesale labs, and smaller or regional retailers. *Id.* ¶ 6. Mr. Huot headed relationships with managed care. The other executives are in charge of functions

more removed from sales and marketing, but nevertheless likely may have responsive documents.

With these nine executives then, TOI will have searched the employees with direct responsibility for assessing strategies, formulating plans, making decisions, executing plans and managing relationships with lens caster, labs, retailers and managed care during the FTC's investigation and after the FTC Consent Agreement. Their emails will include communications with lower-level sales and marketing people during the 20-month period. If there are meaningful insights to be gleaned or "smoking guns" to be had for Vision-Ease, they will come from the documents of these nine custodians.

Unsatisfied with the evidence from TOI's leadership, Vision-Ease insists upon production of emails from 26 lower-level employees, bringing the total number of custodians for the 20-month period since the FTC started its investigation to 35. That would be 35 custodians in an organization with a total of 67 employees in its entire North American sales, marketing and finance operations. Fifteen of these 26 additional custodians report directly to Messrs. Hauser, Louw and/or Reshard, and are cumulative because they would have communicated matters of sales interest to at least one of the three. The remaining nine employees either have no responsibilities at all for U.S. sales, or fill positions with no need or discretion to determine the kind or amount of incentives TOI makes available to its customers. Davis Decl. ¶¶ 11, 13; Ralph Decl. Exs. 3, 5.

Vision-Ease speculates that these 26 custodians may have "highly relevant" emails about the FTC investigation and Consent Agreement – important enough to bolster Vision-Ease's case but not so important to share with their supervisors. Motion at 11. But if we suspend common sense and suppose TOI's lower-level employees had "candid assessments" that mattered, *id.*, those emails would still be cumulative of the discovery from the reams of data and reports from TOI's central files that Vision-Ease will receive.

Those central files contain what matters most to this case: data, reports, and contracts reflecting TOI's prices, discounts and rebates, sales, finances and relationships with lens casters, labs, retailers and managed care. Further, monthly sales reports that will be included within the documents of the nine key executives include information about TOI's sales and marketing performance, developments within the industry, analysis of competitors and aggregated sales data. The day-to-day work of the 26 custodians are rolled up and captured in these materials. If, for example, the FTC investigation and Consent Agreement caused TOI's business to deteriorate because of limitations on exclusive dealing (and bolstered Vision-Ease's business), the sales data and contracts would show that change. The ruminations or sound bites from lower-level employee emails would add nothing of value to the antitrust analysis.

### B. The Burden of Expanding the Date Range for 26 Additional Custodians is Extraordinary and Cannot Be Justified

TOI has agreed to provide plaintiffs with discovery covering a larger time period and more categories of documents than produced to the FTC. The cost to TOI of this increased discovery alone will run into the millions of dollars. The approximate cost of extending the date range for a single TOI custodian from April 1, 2009 to January 1, 2011 will be approximately $55,000. Davis Decl. ¶ 21. This estimate includes the costs of collecting, processing, hosting, reviewing, and preparing the custodian's documents for production. Stretched to 26 more custodians, TOI likely will incur over $1.4 million more to satisfy Vision-Ease's curiosity. Davis Decl. ¶ 21. The burden on TOI is too great, and the likelihood of reward for Vision-Ease is too remote to justify such waste of resources.

## II. VISION-EASE'S EXHIBITS DEMONSTRATE THAT OTHER PROPOSED CUSTODIANS CAN PROVIDE THE INFORMATION PLAINTIFFS EXPECT TO OBTAIN FROM THE DOCUMENTS OF BETTE ZARET, PATIENCE HANSEN, AND LAURA STARMAN

Vision-Ease separately asks the Court to compel TOI to add three additional custodians to the 35 whose responsive documents it has already agreed to provide. However, a simple review of the business documents attached by Vision-Ease in support of its motion shows that these three custodians are merely cumulative of the other 35. These three custodians are unlikely to provide information not available from other custodians, and certainly are not so unique to justify the $165,000.00 litigation cost likely incurred by TOI to collect, process and produce their documents. Davis Decl. ¶ 20.

### A. Bette Zaret

Vision-Ease's Motion demonstrates the extent of Bette Zaret's connection and interaction with no fewer than 8 of TOI's proposed custodians. Motion at 13. It is clear from the face of the documents Vision-Ease cites that that in addition to Bette Zaret, the documents also went to many of the 35 custodians: Exhibit 23 went to Patty Spivey; Exhibit 24 went to David Cole, Brett Craig, Cliona Curran, Rick Elias, John Ligas, and Michael Ruggeri; and Exhibit 25 went to Brett Craig, David Cole, John Ligas, Rick Elias, and Michael Ruggeri.

### B. Patience Hansen

Vision-Ease seeks to justify adding Patience Hansen as a custodian because she has knowledge of TOI's conduct in connection with Wal-Mart. But Patience Hansen is in the marketing group, and it is the sales group, headed by Mr. Louw, that controls and manages the relationship with Wal-Mart. Louw Decl. ¶ 9. Moreover, Ms. Hansen is not the only person at TOI who was kept up to date on TOI's dealings with Wal-Mart. As with the Exhibits cited for Bette Zaret, the Exhibits for Ms. Hansen show that the 35 custodians received and forwarded the same information to each other. *See* Exhibits 26-30.

### C. Laura Starman

TOI has already agreed to provide plaintiffs with documents and other information concerning the rebates and discounts TOI paid to its direct and indirect customers. Davis Decl. ¶ 16. Ms. Starman accounts for those rebates and discounts. The most reliable and efficient source of that information is TOI's financial reporting system, not Ms. Starman's emails (or anyone else's). Motion at 17. For example, Exhibit 18, a memorandum from Michael Ruggeri (one of the 35 custodians TOI will produce) alerting Ms. Starman and a host of employees with accounting responsibilities at other TOI entities about the terms and conditions under which TOI would henceforth do business with Carl Zeiss Vision is hardly the only document available to plaintiffs to establish the terms of that relationship, and certainly not the best such document. That would be the agreement itself, which TOI has already produced to plaintiffs. *See* TOI_0612830 (document designated Highly Confidential and therefore not attached). As with the other two custodians Vision-Ease seeks to add, the exhibits Vision-Ease appended to its motion demonstrate that many of the 35 custodians received the same documents. *See* Exhibits 10-14.

### **CONCLUSION**

For all of the foregoing reasons, defendant TOI respectfully requests that Vision-Ease's motion to compel be denied.

Dated:      July 28, 2011

Respectfully submitted,

/s/ Chul Pak
Chul Pak
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Phone: (212) 999-5800
Fax: (212) 999-5899
E-mail:  cpak@wsgr.com

*Counsel for Defendant Transitions Optical, Inc.*

**CERTIFICATE OF SERVICE**

  I hereby certify that I caused a true and correct copy of the foregoing Transitions Optical, Inc.'s Memorandum in Opposition to Plaintiff Vision-Ease's Amended Motion to Compel Transitions to Produce Documents Created After April 1, 2009 and From Three Particular Employees to be served via ECF on this 28th day of July 2011.

Dated: July 28, 2011

                    s/ Chul Pak