<div align="center">

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

</div>

| | |
|---|---|
| IN RE: PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173 |
| | Case No. 8:10-cv-2040 |
| THIS DOCUMENT RELATES TO: | Hon. James D. Whittemore |
| Insight Equity A.P. X, LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc., Case No. 8:10-cv-2040 | **AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Insight Equity A.P. X, LP, d/b/a Vision-Ease Lens Worldwide, Inc. ("Vision-Ease" or "VEL"), for its Amended Complaint against Defendant Transitions Optical, Inc. ("Transitions" or "TOI") states and alleges as follows:

<div align="center">

**NATURE OF THE ACTION**

</div>

1.     On July 27, 2010, Vision-Ease commenced this civil action against Transitions in the United States District Court for the District of Delaware for damages and injunctive relief arising out of Transitions' violations of the antitrust laws of the United States and various state laws prohibiting unfair or unconscionable practices.  The case was subsequently transferred to the Middle District of Florida for pretrial proceedings by the Judicial Panel on Multidistrict Litigation.  Vision-Ease has not waived its right to request that this case be remanded to the District of Delaware after pretrial proceedings in this Court.

2.     Transitions has engaged in anticompetitive acts to maintain monopoly power and unfairly restrain trade in the United States photochromic ophthalmic lens market.  Transitions' conduct has had a foreseeable and substantial effect on national commerce by reducing competition, raising prices, and restricting output.

3.      Transitions' anticompetitive acts have harmed the public by causing higher prices and reducing offerings for photochromic ophthalmic lenses, stifling product research and development, and raising barriers of entry to prevent competition.  Transitions' acts have harmed Vision-Ease by hindering or preventing Vision-Ease from marketing and selling photochromic lenses in competition with Transitions' photochromic lenses.

4.      On information and belief, Transitions has maintained its monopoly power by engaging in a variety of actions that cumulatively thwarted competition and foreclosed substantial portions of the retail and wholesale distribution channels.  This conduct includes, at a minimum: (a) terminating the supply agreements of, and otherwise retaliating against, customers who deal with competing photochromic manufacturers; (b) refusing to deal with competitors or customers who offer competitive products; (c) paying downstream customers not to deal with competitors; and (d) inducing wholesale labs and retailers to enter into contracts that expressly bar them from offering competing photochromic lenses or that offer incentives that have the de facto effect of barring competing products.

## PARTIES

5.      Plaintiff Insight Equity A.P. X, LP is a limited partnership organized under the laws of the State of Texas, which does business as Vision-Ease Lens Worldwide.  Vision-Ease is headquartered in Ramsey, Minnesota.  Vision-Ease manufactures corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects), including a polycarbonate photochromic lens.  A photochromic lens will darken when it is exposed to the ultraviolet ("UV") light present in sunlight, and fade back to clear when it is removed from the UV light.

6.      Defendant Transitions is a corporation duly organized, existing, and doing business under the laws of the State of Delaware.  Transitions' headquarters are at 9251 Belcher

Road, Pinellas Park, Florida 33782.  Transitions develops, manufactures, and sells photochromic

treatments for corrective ophthalmic lenses.

## JURISDICTION AND VENUE

7.      Both the United States District Court for the District of Delaware and this Court

have subject matter jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337,

1367(a).  This action arises under the federal antitrust statutes (U.S.C. Title 15).  The

anticompetitive acts of Transitions that are the subject of this action include acts that Transitions

committed throughout the United States that had a reasonably foreseeable, direct, and substantial

effect upon United States commerce, including but not limited to commerce among the states.

The state law claims are so related to the federal antitrust law claims that they are part of the

same case or controversy.

8.      Both the United States District Court for the District of Delaware and this Court

have personal jurisdiction over Transitions pursuant to 15 U.S.C. § 22.  Transitions is

incorporated in the District of Delaware and headquartered in this District.  Transitions transacts

business and offers its products in both Districts.  Substantial interstate trade and commerce

involved in, and affected by, the alleged violations of law occurred within both Districts.  The

acts complained of have had, and will have, substantial effects in both Districts.

9.      Venue is proper in both Districts pursuant to 15 U.S.C. § 22 and 28 U.S.C. §

1391(b) and (c) because Transitions, as a corporation, is "deemed to reside in any judicial district

in which it is subject to personal jurisdiction."

**FACTUAL BACKGROUND**

I.    **RELEVANT MARKET**

10.    The relevant product market is photochromic ophthalmic lenses.  Purchasers of corrective ophthalmic lenses have the option to purchase them clear, tinted, or photochromic. The defining characteristic of a photochromic lens is that it responds to light (more precisely, to changes in light).  When exposed to UV light, a photochromic lens darkens; when UV light is removed, a photochromic lens fades back to clear.  Photochromic lenses are also known as light responsive lenses, variable tint lenses, or changeable tint lenses.

11.    Photochromic lenses allow consumers to go from sunlight to darkness and back again without changing their glasses.  Clear and tinted lenses are not good substitutes for photochromic lenses because they require the wearer to carry an additional product (and most likely a carrying case) to provide the same features that a single pair of photochromic lenses offers.  An extra pair of corrective lenses can be a significant additional expense, and clip-on sunglass attachments can be both difficult to find and expensive to match to a regular eyeglasses.

12.    The relevant geographic market is the United States.  Although only a relatively small (but growing) percentage of all ophthalmic lenses sold in the U.S. are photochromic, they account for about half of lens value at the manufacturer level.

II.    **TRANSITIONS HAS MONOPOLY POWER IN THE RELEVANT MARKET**

13.    There are three types of photochromic lens substrates: glass, plastic, and polycarbonate.  Glass lenses constitute a negligible portion of the photochromic lens market (less than 3%).  Plastic and polycarbonate lenses each constitute approximately 49% of the U.S. photochromic lens market.

14.     There are two major competitors for the manufacture of plastic photochromic lenses in the United States.  Transitions dominates plastic photochromic lenses with a share of approximately 90%.  Corning's SunSensors technology, which is distributed through Signet Armorlite and a few other smaller lens casters, represents most of the remaining 10%.

15.     Likewise there are two major competitors for the manufacture of polycarbonate photochromic lenses in the United States.  Transitions similarly dominates the polycarbonate segment with a share of approximately 85%.  Vision-Ease comprises most of the remaining 15% of the segment.

16.     Transitions has monopoly power because it controls over 85% of the total photochromic lens market and because, at all relevant times, it was the only photochromic manufacturer that could produce both plastic and polycarbonate photochromic lenses.  Transitions' monopoly power is also demonstrated by its ability to exclude competitors and control prices, as alleged below.

17.     Transitions' prices are not constrained by the threat of entry into the photochromic lens market due to a number of significant entry barriers:  (i) product development costs; (ii) intellectual property rights; (iii) capital requirements; (iv) regulatory requirements; (v) access to distribution channels; and (vi) Transitions' exclusionary anticompetitive conduct.

18.     Due to its monopoly power and exclusionary conduct, Transitions is able to charge supracompetitive prices for its photochromic lenses and to raise prices (even retrospectively) without regard to the reactions of its customers.  Transitions knows that its customers have no alternative but to accept such price increases, and Transitions uses the pricing power to enforce exclusivity or extract concessions from its customers.

III.     **THE DISTRIBUTION OF PHOTOCHROMIC LENSES**

19.     Transitions lenses generally reach consumers in the following way.  Lens casters (e.g., Essilor, Carl Zeiss Vision,  Hoya, Younger, Shamir, et al.) manufacture untreated lenses (also called "lens blanks") and sell them to Transitions.  Transitions applies photochromic coating to the lens blanks and sells them back to the lens manufacturers at a substantial mark-up.

20.     Lens casters – Transitions' customers –  are an efficient distribution channel because each already has substantial relationships with the entities that make up two distribution channels for their clear and tinted ophthalmic lenses: wholesale optical laboratories ("wholesale labs") and integrated optical retailers ("integrated retailers"), each of which represents approximately half of the downstream market.

21.     Wholesale labs grind lenses according to prescriptions, fit the lenses into eyeglass frames, and sell the frames with the finished lenses (including photochromic lenses) to independent eye care practitioners ("ECPs"), who are not affiliated with integrated retailers. Independent ECPs (i.e., ophthalmologists, opticians and optometrists) sell the finished ophthalmic eyeglasses to consumers.

22.     Wholesale labs have undergone substantial consolidation in recent years as lens casters have begun to acquire them.  Three of Transitions' largest customers – Essilor, Carl Zeiss Vision, and Hoya – own and operate extensive wholesale lab networks in the United States. Essilor owns or controls approximately 50% of U.S. wholesale labs.  Lab networks owned or controlled by lens casters primarily distribute that lens caster's products.

23.     Integrated retailers include national specialty chains (e.g., LensCrafters, Pearle, Cole,  Eye Care Centers of America) and mass merchandisers (e.g., Wal-Mart, Costco, Shopko). Integrated retailers generally employ their own ECPs who deal directly with consumers.  In

addition, integrated retailers grind and fit lenses into eyeglass frames and deliver the frame with the finished lens to the consumer.

24.     Integrated retailers are an efficient distribution channel because they employ their own ECPs, who deal directly with consumers and can generate demand for a product simply by offering it in their stores.  A decision by the corporate headquarters of one integrated retailer to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of all its ECPs.

25.     The chart on the following page depicts how Transitions' photochromic lenses are distributed to consumers:



**Overview of Photochromic Lens Market**

## IV.   TRANSITIONS' ACTIONS TO MONOPOLIZE THE PHOTOCHROMIC LENS MARKET

26.     Since Transitions' customers – the lens casters – compete with each other to sell Transitions lenses to downstream customers, there is intrabrand competition in Transitions lenses (after Transitions reaps its monopoly profit).  But throughout the history of the photochromic

lens industry, Transitions has engaged in a course of exclusionary conduct designed to eliminate or limit interbrand competition between Transitions's photochromic technology and the technologies of competitors like Corning or Vision-Ease.

27.     Transitions' business model is based on the use of its monopoly power to impose "exclusivity" on all of it downstream customers, direct and indirect.  Transitions determines whether it is winning by the number of exclusive or de facto exclusive agreements it has in place.

### A.     Transitions Locks Up Distribution by Lens Casters

28.     Transitions has historically entered into agreements with lens casters that expressly or implicitly bar them from carrying competing photochromic lenses has engaged in retaliatory conduct against customers who sought to develop, sell, or promote competing photochromic lenses including, for example, terminating their supply of photochromic lenses.

29.     Transitions enforces its lens casters' exclusivity by threats and coercion, such as refusing to deal with lens casters who offer competing products or by conditioning the amount of its price increases on a lens caster's exclusivity.

30.     Lens casters who want to sell a competing photochromic lens can be terminated by Transitions and forced to forgo significant revenues from the sale of Transitions' products, which can represent up to 40 percent of a lens manufacturer's overall profit.  In addition, a lens caster's inability to offer Transitions' photochromic lenses is also likely to jeopardize significant sales of its clear corrective ophthalmic lenses because many chain retailers and wholesale labs (and their eye care practitioner customers) prefer to buy both clear and photochromic versions of the same lens.

31.     These types of exclusivity arrangements impose substantial barriers to entering the photochromic lens industry by denying access to lens casters, one of the most efficient distribution channels for photochromic lenses.

32.     Lens casters that are exclusive to Transitions collectively account for over 85% of photochromic lens sales in the United States.

**B.     Transitions Retaliates against Plastic Photochromic Manufacturer Corning**

33.     Before 1990, Corning Inc. was the primary supplier of photochromic lenses in the United States.  Corning's photochromic lenses were made of glass that was made with photochromic chemical compounds.  During this period, the photochromic market was very small compared to today.

34.     In about 1991, Transitions began offering plastic photochromic lenses. Transitions' offering both expanded the photochromic market and eroded Corning's dominant share.

35.     In or around 1996, Corning sought to introduce a plastic photochromic technology, SunSensors®, in competition with Transitions.  Since Corning could not manufacture or distribute SunSensors itself, Corning sought to license its technology to lens casters.  Transitions created barriers to Corning's entry by, among other things, threatening to terminate the supply agreements of any lens caster who agreed to deal with Corning.

36.     In 1998, Corning filed suit against Transitions in the United States District Court for the Western District of New York, Civil Action No. 98-CV-6436L, alleging, inter alia, that Transitions had monopolized or attempted to monopolize the photochromic lens market by retaliating against, or threatening to retaliate against, any lens caster that dealt with Corning's new competing photochromic technology.

37.     Corning and Transitions settled that litigation by Consent Judgment, pursuant to which Transitions agreed for a period of two years not to punish any of its existing customers who chose also to deal with Corning.  Lens caster Signet Armorlite ("Signet") was a Transitions customer at the time of the Consent Judgment.

## C.     Transitions Retaliates against Lens Caster Signet Armorlite

38.     Lens caster Signet Armorlite had a supply agreement to purchase photochromic lenses from Transitions in 1998 but was interested in obtaining a second supplier. Notwithstanding the terms of its Consent Judgment with Corning, Transitions engaged in a variety of conduct to deter its customer Signet from dealing with Corning.

39.     When Signet nevertheless reached a deal with Corning, Transitions terminated Signet's supply agreement.

40.     In 2002, Signet filed suit against Transitions in the United States District Court for the Southern District of California, Case No. 02-CV-0417, alleging, inter alia, that Transitions had monopolized, or attempted to monopolize, the photochromic lens market by engaging in a variety of retaliatory conduct against Signet in order to deter Signet from dealing with Corning.  Upon information and belief, Transitions reached a confidential settlement with Signet before any litigation took place.

41.     Transitions' exclusionary acts and practices harm competition.  No major lens caster has been willing to sell Corning's SunSensors® plastic photochromic lens since Transitions terminated Signet.  Without access to effective distribution, Corning has been unable to pose a competitive threat to Transitions' monopoly, and has had little incentive to invest in research and development to further innovate and improve its product.

**D.      Transitions Retaliates against Vision-Ease**

42.      Vision-Ease became a purchaser of Transitions' products in 1992, and the two companies enjoyed a mutually profitable relationship until 2005.

**1.      Vision-Ease Develops an Alternative Photochromic Technology**

43.      During the 1990s, Vision-Ease commenced research into photochromic technology.   Vision-Ease eventually made important strides towards developing a viable alternative method of creating photochromic ophthalmic lenses which was ultimately named LifeRx.

44.      Transitions' photochromic method involved dipping lens blanks in photochromic dye.  This method, known as "imbibation," applies a photochromic coating to the surface of clear lenses.   The LifeRx method, in contrast, involves a "film sandwich," whereby a layer of photochromic film is fused between two clear polycarbonate lens panels.  The two methods produce photochromic lenses of comparable quality.

45.      At all relevant times, the key differences in these methods relevant to this action were (1) Transitions' technology applied to all plastic and polycarbonate lens materials, but LifeRx technology applied only to polycarbonate, and (2) LifeRx technology applied to multi-focal lenses, while Transitions' did not.

**2.      Transitions Tries Unsuccessfully to Prevent Vision-Ease from Commercializing Its Technology**

46.      In approximately 2003, Transitions approached Vision-Ease about exclusively licensing its LifeRx technology.  Vision-Ease ultimately declined because the terms were too one-sided in Transitions' favor.

47.     When Vision-Ease's former corporate parent filed for bankruptcy in 2004, Transitions made an offer to purchase Vision-Ease in the bankruptcy proceeding but was out-bid by Insight Equity.

48.     During this period (approximately 2003 to 2004), Vision-Ease extensively analyzed the relative costs and benefits of licensing its LifeRx technology to Transitions or commercializing it and competing with Transitions.  In analyzing whether to compete with Transitions, a fundamental assumption was that Transitions would retaliate by terminating Vision-Ease's supply agreement.

49.     Vision-Ease decided that, for commercialization to be viable, it would be necessary for Vision-Ease to obtain a substantial contractual demand for its photochromic lenses before it scaled them for mass production.  Only with such assured volume would it make sense for Vision-Ease to challenge Transitions' monopoly and make the necessary capital expenditure for manufacturing capacity, because volume was necessary to offset the anticipated adverse effects of Transitions' terminating its supply agreement.

50.     Vision-Ease thus did not market LifeRx as it would have done but for Transitions' monopoly power and its anticipated retaliatory action.  Vision-Ease privately marketed its new product to national retailers, where Vision-Ease would be unable to market test its product but where it could be assured a sufficient initial demand to offset anticipated losses of Transitions business.  Only when Vision-Ease managed to secure a verbal commitment by LensCrafters in late 2004, did Vision-Ease finally decide to commercialize LifeRx and compete with Transitions.

51.     Transitions recognized that LifeRx represented a major competitive threat after a long period of virtually no competition.  Transitions struck back in several important, anticompetitive, and continuing ways.

### 3. Transitions Terminates Vision-Ease's Supply Agreement

52.     In June 2005, before Vision-Ease had announced the launch of LifeRx but when Vision-Ease was preparing to ship LifeRx lenses to LensCrafters in anticipation of the launch, Transitions gave Vision-Ease notice it would cancel their contract effective September 30, 2005. During the run-out of the contract over the next three months, Transitions refused to meet Vision-Ease's orders and thereby made it impossible for Vision-Ease to protect its existing customers.  After the termination of the contract, Transitions refused to supply any further photochromic lenses – either polycarbonate or plastic – in the United States.

53.     Transitions' termination of its supply agreement with Vision-Ease, although anticipated, was nevertheless particularly significant because (1) Vision-Ease's continued sales of such lenses would have been mutually profitable, especially in the absence of Transitions' exclusionary behavior with retailers and wholesale labs described below, and (2) the only proprietary photochromic lens that Vision-Ease offered (and was capable of offering) was polycarbonate, so Transitions' refusal to supply plastic prevented Vision-Ease from offering customers a full line of photochromic lenses.  Starting in late 2005, Vision-Ease's inventory was limited to photochromic polycarbonates.  Meanwhile, other lens manufacturers who were not in competition with Transitions retained access to Transitions' full line of photochromic plastic and polycarbonate lenses.

54.     After Transitions terminated Vision-Ease's supply agreement, Transitions actively helped its remaining customers, especially Essilor, attack Vision-Ease's business at the accounts where Vision-Ease formerly sold Transitions.

55.     Transitions continued to refuse to deal with Vision-Ease for several years after terminating Vision-Ease's supply agreement, but the 2005 termination was not final and

irrevocable.  In 2009, Transitions offered another supply agreement to Vision-Ease for one type of photochromic lenses.

### E.  Transitions Maintains Its Monopoly through Exclusionary Incentive Programs and Pays Key Accounts Not to Deal with Vision-Ease

56.     Not content with its termination of Vision-Ease's supply agreement, Transitions used further exclusionary tactics to blunt the force of Vision-Ease's entry into the photochromic lens market.  Transitions established a goal of stopping entry of LifeRx at any other significant retail account.

57.     Beginning in 2005 and continuing through 2009, Transitions used up-front payments and/or rebates to induce over 50 key retailers, including many of the largest chains,  to enter into long-term exclusive agreements that were difficult to terminate.  These were not cases where Transitions competed for, and won, business at retail accounts that were interested in long term contracts or exclusivity; Transitions essentially paid these accounts not to deal with Vision-Ease.

58.     Transitions initiated this campaign in direct response to the competitive threat posed by LifeRx, and its purpose was to foreclose outlets for LifeRx.  Transitions recognized that Vision-Ease had entered the market with a low-price strategy.  Unwilling to surrender its monopoly profits, Transitions responded to the competitive threat by entering into agreements to restrict the overall market for LifeRx.  These agreements were designed to enforce Transitions' efforts to crush photochromic competition and own the market.

59.     Even when it implemented this strategy, Transitions knew that the strategy was illegal.

60.     During the same period, Transitions also modified and enhanced existing incentive programs to increase their exclusionary effects.

61.     As far back as 1999, Transitions offered an annual incentive program to retailers that (1) required the retailer to sell Transitions' lenses as its "preferred" photochromic lens and not to promote any competing photochromic lens, and (2) conditioned semi-annual rebates on a retailer's selling Transitions lenses as a certain proportion of all ophthalmic lenses sold.  For example, if 10% of all the lenses sold by a retailer during a particular period were photochromic, the retailer would earn a certain rebate.  If Transitions' share of overall sales was higher, the retailer would earn a higher rebate.  Transitions required the retailers to remit sales data, purportedly so that Transitions could verify whether the retailer met the applicable rebate levels.  But Transitions used the sales data to set the rebate levels such that a participating retailer would be unable to sell any competing photochromic lenses if it wished to obtain the rebates.  Each year, Transitions adjusted the qualifying rebate levels to ensure that they were consistent with the intended exclusionary effect.  Transitions thus used targeted rebates to maintain its dominant market share and exclude rivals.

62.     Starting in 1999, Transitions also used a similar annual incentive program with wholesale labs that required similar preferred treatment and that conditioned rebates on a combination of Transitions' sales volume, Transitions' share, and the wholesale labs' "loyalty" to Transitions.

63.     In 2005, in response to the competitive threat posed by Vision-Ease, Transitions changed its existing annual incentive programs to strengthen their exclusionary effects.  Between 2005 and 2007, Transitions amended the default retailer program to replace the provision for "preferred" status with a provision for "exclusive" status.  Transitions also strengthened the de facto exclusionary effects of this program by adding rebates for growing Transitions' sales volume.

64.     In 2005, Transitions also refined the wholesale lab program to give increased value to larger labs which controlled more of the photochromic lens market.

65.     Between 2005 and 2009, Transitions entered into an average of approximately 50 such retailer incentive contracts per year and an average of approximately 90 such wholesale lab incentive contracts per year.  Many of the accounts under contract varied from year to year, so the total number of accounts that were affected by Transitions' exclusionary practices during the entire period substantially exceeds the number of contracts in force in any given year.  Most of these contracts were executed or renewed after July 27, 2006.  Others were executed before July 27, 2006 but remained in effect for substantial periods after July 27, 2006.

66.     If Transitions had not engaged in its various exclusionary practices after Transitions terminated Vision-Ease's supply agreement in 2005, Transitions and Vision-Ease would have had strong incentives, based on mutual profitability, to reach a new supply agreement.

67.     Transitions used these various contracts to monopolize access to the largest wholesale and retail accounts and to deny Vision-Ease access to those accounts.  Transitions thus choked off the most efficient distribution channels for LifeRx and further constrained Vision-Ease's access to smaller wholesale labs and retail accounts.  These anticompetitive actions confined Vision-Ease to selling LifeRx to less efficient and less profitable distribution channels and diminished Vision-Ease's ability to constrain Transitions' exercise of monopoly power.

### F.     Transitions' Absolute Monopoly on the Full Line of Photochromic Products Enhances the Exclusionary Effects of its Other Conduct

68.     Transitions' anticompetitive conduct is effective not only because Transitions has monopoly power in the photochromic lens market, but also because, at all relevant times, Transitions was the only photochromic manufacturer that could offer photochromic lenses in

both plastic and polycarbonate.  Corning (and its manufacturers) can offer a plastic photochromic lens, but not a polycarbonate photochromic lens.  At all relevant times, Vision-Ease could offer a polycarbonate photochromic lens, but not a plastic photochromic lens.

69.     Retailers who offer photochromic lenses to consumers typically want to offer them in the broadest possible range of lens materials and refractive indices.  For this reason, unless they wish to offer Transitions' lenses exclusively, they must necessarily deal with at least two suppliers.

70.     Due to Transitions' market power and exclusionary conduct, most lens casters, wholesale labs, and retailers are dependent upon on access to at least some supply of Transitions' lenses, particularly to the extent that they wish to offer both plastic and polycarbonate photochromic lenses to their customers.  Consequently, when Transitions offers to supply its photochromic lenses to its direct or indirect customers on condition of exclusivity, it is usually an offer they cannot refuse.  Transitions' absolute monopoly on the full line of photochromic lenses enhanced the coercive effects of its other exclusionary conduct.

## V.     ANTICOMPETITIVE EFFECTS OF TRANSITIONS' CONDUCT

71.     The acts and practices of Transitions as alleged herein had the purpose, capacity, tendency, and effect of impairing the competitive effectiveness of Transitions' rivals in the relevant market, and of significantly raising barriers to entry for potential rivals.  Transitions maintained its monopoly power by the exclusionary conduct alleged herein, and not by legitimate competition on the merits.

72.     Transitions' conduct also adversely affects competition and consumers by (i) increasing the prices and reducing the output of photochromic lenses; (ii) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their

sales in the photochromic lens market; (iii) reducing innovation; and (iv) reducing consumer choice among competing photochromic lenses.

73.     Additionally, by effectively stifling competition, Transitions has been able to refuse to supply its low-priced, private label photochromic lens in the U.S. market, notwithstanding considerable consumer demand for such a product.  Transitions offers this product for sale outside the United States where it faces more competition.

74.     Transitions' exclusionary practices foreclose its rivals, in whole or in part, from a substantial share – as much as 40 percent or more – of the entire downstream photochromic lens market.

75.     Potential entrants observed Transitions' exclusionary campaign and were deterred from entering the market.

76.     There are no legitimate procompetitive efficiencies that justify Transitions' conduct or outweigh its substantial anticompetitive effects.

## VI.    TRANSITIONS' ANTICOMPETITIVE SCHEME SUCCEEDED IN INJURING VISION-EASE, JUST AS TRANSITIONS INTENDED

77.     As a result of Transitions' anticompetitive conduct, Vision-Ease lost virtually all of the customers it had earned as of June 2005 and the corresponding profits it would have made on sales of Vision-Ease and Transitions products to those customers.

78.     Vision-Ease also lost profits on sales of LifeRx that it otherwise would have made to existing and potential customers after June 2005.

## VII.   FTC ACTION AGAINST TRANSITIONS

79.     On April 22, 2010, after a period for notice and comment, the Federal Trade Commission ("FTC") filed a Complaint and Decision and Order against Transitions.

80.     The FTC Complaint alleges the following, among other things:

    i.       A relevant market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses and the absence of close substitutes for photochromic lenses;

    ii.      Transitions has monopoly power in the photochromic lens market;

    iii.     Significant barriers to entry into the photochromic lens market;

    iv.     Transitions used unfair methods of competition to maintain its monopoly power in the photochromic lens market, including exclusionary conduct, exclusive contracts that foreclosed substantially all distribution channels for competing photochromic lenses, and bundled discounts; and

    v.      Anticompetitive effects including:  (1) increasing the prices and reducing the output of photochromic lenses; (2) deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales in the photochromic lens market; (3) reducing innovation; and (4) reducing consumer choice among competing photochromic lenses.

81.     Pursuant to the Decision and Order, Transitions agreed to cease and desist from a broad range of conduct that the FTC believed was anticompetitive.  That the FTC required Transitions to cease and desist from such conduct strongly implies that Transitions had, in fact, been engaging in the conduct.  Among other things, the Order:

    i.       Prohibits Transitions from entering into any agreements or adopting any policies that limit its customers' ability to buy or sell competing photochromic treatments, or that require customers to give Transitions' products preferential treatment as compared to its competitors' products;

    ii.      Prohibits Transitions from entering into exclusive agreements relating to photochromic lenses, or a number of related products and services;

    iii.     Prohibits Transitions from offering discounts that are based on the degree to which its customers sell Transitions' photochromic lenses as compared to its competitors;

    iv.     Prohibits Transitions from offering discounts that are applied retroactively after a customer's sales reach a specific threshold; and

    v.      Prohibits Transitions from bundling discounts such that customers purchasing more than one line of photochromic lenses obtain additional discounts.

## CAUSES OF ACTION

### COUNT I – Violation of Sherman Act § 2 (15 U.S.C. § 2)

82.     Vision-Ease re alleges and incorporates by reference paragraphs 1 to 78.

83.     Transitions possesses monopoly power in the photochromic ophthalmic lens market.  Transition has excluded competition and has obtained monopoly profits from the sale of its photochromic lenses.

84.     Transitions willfully acquired and maintains this monopoly power through its anticompetitive conduct, which includes its exclusionary contracts.

85.     Transitions' anticompetitive conduct, which includes its exclusionary contracts and bundled rebates, has adversely affected competition in the photochromic ophthalmic lens market by excluding competition (including, but not limited to, competition by Vision-Ease), raising prices, and reducing product innovation.

86.     Transitions has not maintained its monopoly power as a result of superior product, business acumen, or historical accident.

87.     Transitions' conduct has directly and proximately damaged Vision-Ease in an amount to be proven at trial.

### COUNT II – Violation of Sherman Act § 1 (15 U.S.C. § 1)

88.     Vision-Ease re alleges and incorporates by reference paragraphs 1 to 84.

89.     Transitions, through concerted actions, entered into a number of exclusionary and anticompetitive contracts with third parties.

90.     Transitions' contracts with third parties constitute unreasonable restraints of trade in photochromic ophthalmic lenses.

91.     These restraints have resulted in increased prices, have impaired and restrained product innovation, and have excluded competition in photochromic ophthalmic lenses.

92.     Transitions' conduct has directly and proximately damaged Vision-Ease in an amount to be proven at trial.

### COUNT III – Violation of Clayton Act § 3 (15 U.S.C. § 14)

93.     Vision-Ease re alleges and incorporates by reference paragraphs 1 to 89.

94.     Transitions has entered into contracts and agreements with third parties that provide rebates and/or discounts to those third parties provided the third party buys all or virtually all of its photochromic ophthalmic lenses from Transitions.

95.     The effect of Transitions' contracts and agreements is to substantially lessen competition in the market for photochromic ophthalmic lenses and to maintain Transitions' monopoly power.  Vision-Ease's photochromic ophthalmic lenses have thus largely been excluded from the market.

96.     Transitions' conduct has directly and proximately damaged Vision-Ease in an amount to be proven at trial.

### COUNT IV – Violation of State Laws Prohibiting
### Unfair or Unconscionable Practices

97.     Vision-Ease re alleges and incorporates by reference paragraphs 1 to 93.

98.     Transitions has engaged in unfair and unconscionable conduct by limiting and excluding competition in the photochromic ophthalmic lens market, in violation of the following statutes:

      i.      Alabama – Ala. Code §§ 8-19-5 and 8-19-10;

      ii.     Alaska – Alaska Stat. §§ 45.50.471; 45.50.531 to.537;

      iii.    Arkansas – Ark. Code §§ 4-88-107 and 4-88-113(f);

      iv.      California – Cal. Bus. & Prof. Code §§ 17200, 17203 and 17206;

      v.      Colorado – Col. Stat. § 6-1-113;

      vi.      Connecticut – Conn. Stat. §§ 42-110b and 42-110g;

      vii.      Florida – Fla. Stat. §§ 501.204, 501.211 and 501.2105;

      viii.      Illinois – Ill. Rev. Stat. ch. 815 §§ 505/2 and 505/10a;

      ix.      Louisiana – La. R. S. §§ 51:1405(A) and 51:1409(A);

      x.      Massachusetts – Mass. Gen. Laws Ch. 93A §§ 2, 11;

      xi.      Nevada – Nev. Rev. Stat. §§ 598A.060 and 598A.210;

      xii.      New Hampshire – N.H. Rev. Stat. § 358-A:2 and 358-A:10;

      xiii.      North Carolina – N.C. Gen. Stat. §§ 75-2.1 and 75-16;

      xiv.      Ohio – Ohio Stat. §§ 1345.03 and 1345.09;

      xv.      South Carolina – S.C. Code §§ 39-5-20 and 39-5-140;

      xvi.      Utah – Utah Code § 13-5-14;

      xvii.      Washington – Wash. Rev. Code §§ 19.86.020 to.040 and 19.86.090.

99.      Transitions' conduct has directly and proximately damaged Vision-Ease in an amount to be proven at trial, and Transitions may recover, as may be applicable under each statute, actual damages, treble damages, punitive damages, civil penalties, attorney fees, and injunctive relief.

      **WHEREFORE**, Vision-Ease respectfully requests that the Court enter judgment against Transitions on each of the above pleaded causes of action and grant the following relief:

100.      Grant Vision-Ease its actual damages;

101.      Grant Vision-Ease additional and treble damages as provided by federal statute;

102.      Award punitive damages as the Court deems appropriate;

103.    Grant Vision-Ease its costs and disbursements, including reasonable attorneys'
fees and pre judgment and post judgment interest at the maximum rate permitted by law;

104.    Grant permanent injunctive relief; and

105.    Grant such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Vision-Ease demands a
jury trial as to all issues triable by jury.


Dated:  November 2, 2011                    DORSEY & WHITNEY LLP



                                            By s/ F. Matthew Ralph
                                                Michael A. Lindsay
                                                F. Matthew Ralph
                                            50 South Sixth Street, Suite 1500
                                            Minneapolis, MN 55402
                                            Tel: (612) 340-2600
                                            Email: ralph.matthew@dorsey.com


                                            *Attorneys for Plaintiff Insight Equity A.P. X, LP,
                                            d/b/a Vision-Ease Lens Worldwide*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2011, I caused the foregoing Amended Complaint and Jury Demand to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all counsel of record.

<div style="margin-left:40%;">

s/ F. Matthew Ralph
F. Matthew Ralph
MN Atty No. 0323202
ralph.matthew@dorsey.com
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN  55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Insight Equity A.P. X, LP, d/b/a*
*Vision-Ease Lens Worldwide*

</div>