UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| IN RE: PHOTOCHROMIC LENS | ) | |
| ANTITRUST LITIGATION | ) | MDL Docket No. 2173 |
| | ) | |
| _____ | ) | |
| | ) | Case No. 8:10-MD-2173-JDW-EAJ |
| This Filing Relates To: | ) | |
| | ) | |
| Case No. 8:10-CV-1158 | ) | Hon. James D. Whittemore |
| Case No. 8:10-CV-1358 | ) | |
| Case No. 8:10-CV-1825 | ) | |
| Case No. 8:10-CV-1840 | ) | |
| Case No. 8:10-CV-2089 | ) | |
| Case No. 8:10-CV-2090 | ) | |
| Case No. 8:10-CV-2091 | ) | |
| Case No. 8:10-CV-2418 | ) | |
| _____ | ) | |

**FIRST AMENDED CONSOLIDATED COMPLAINT
OF INDIRECT PURCHASER END-USER PLAINTIFFS**

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 3

PARTIES ............................................................................................................................. 3

CO-CONSPIRATORS .......................................................................................................... 6

THE RELEVANT MARKET ............................................................................................... 7

TRANSITIONS' MONOPOLY POWER IN THE RELEVANT MARKET ........................ 8

FACTUAL BACKGROUND ............................................................................................... 9

    The Photochromic Lens Industry ................................................................................... 9

    Transitions' Exclusionary Dealings with Lens Casters ................................................ 13

    Transitions' Exclusionary and Restrictive Dealings with Retailers and Wholesale Labs ........ 16

    Any Overcharge Passes Through the Chain of Distribution to Consumer-End Users ............. 18

    Federal Trade Commission Action and Consent Order ................................................ 19

CLASS ACTION ALLEGATIONS ................................................................................... 20

INJURY TO PLAINTIFFS AND THE CLASS MEMBERS ........................................... 22

CLAIMS FOR RELIEF ..................................................................................................... 24

    COUNT I (Deceptive and Unfair Trade Practices Under Florida Law) ....................... 24

    COUNT II (Violation of State Antitrust Laws) ........................................................... 26

    COUNT III (Violation of State Consumer Protection and Unfair Practice Act Laws) ........... 31

    COUNT IV (Unjust Enrichment) ................................................................................. 36

PRAYER FOR RELIEF ..................................................................................................... 37

JURY TRIAL DEMAND ................................................................................................... 37

Indirect Purchaser End-User Plaintiffs, Howard Achtman, John Donohoe, Keith Forbes, Amanda Gable, Gabby Klein, Edmund Moores, Caryl O'Keefe, Keith Brian Roller, Axhi Sabani, Phyllis Sternemann,  and Eldridge Donald Wilcox (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through counsel, bring this action against defendant Transitions Optical, Inc. ("Transitions"). The allegations set forth are based upon information and belief, except those as to Plaintiffs, which are based upon personal knowledge.

### NATURE OF THE ACTION

1.      This action arises out of Transitions' anticompetitive and exclusionary efforts to monopolize the market for the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in violation of state antitrust, consumer protection and unfair practice, and unjust enrichment laws.

2.      Consumers of corrective ophthalmic lenses (lenses used in eyeglasses to correct vision defects) may purchase those lenses with the option of an add-on photochromic treatment, which protects eyes from harmful ultraviolet ("UV") light. A corrective ophthalmic lens with a photochromic treatment ("photochromic lens") will darken when it is exposed to the UV light present in sunlight and fade back to clear when it is removed from the UV light.

3.       The cost of the treated photochromic lens to the consumer is traceable through the chain of distribution from the initial application of the photochromic treatment by Transitions through the lens casters to the wholesale laboratories to eye care practitioners and retailers. Integrated retailers combine the functions of wholesale laboratories and eye care practitioners in one business and sell to consumers with fewer steps in the chain. Consumer purchasers typically see the treated lens as a separate line item on their prescriptions and/or their invoices for eyeglasses.

1

4.     From at least 1999 to present, Transitions possessed monopoly power in the product market for the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in the United States and, with the purpose and effect of maintaining and increasing this monopoly power, engaged in unlawful and exclusionary acts and practices that included, but were not limited to, refusing to do business with any lens caster that marketed or sold a competitor's photochromic lens and entering into exclusionary agreements at all levels of the photochromic lens distribution chain.

5.     The effect of Transitions' anticompetitive and unlawful conduct has been to deny a competitive price to indirect purchasers of Transitions photochromic lenses in the United States. As a result of Transitions' anticompetitive conduct, corrective ophthalmic lenses with photochromic treatment manufactured, supplied, and/or distributed by Transitions were priced higher than they otherwise would have been absent Transitions' unlawful conduct, and Plaintiffs and the other class members, indirect purchasers of Transitions photochromic lenses, were injured as a result of paying supra-competitive prices for Transitions photochromic lenses.

6.     On March 3, 2010, the Federal Trade Commission ("FTC") filed a Complaint against Transitions relating to the anticompetitive conduct alleged , and announced that it had entered into a proposed Consent Order with Transitions relating to such conduct. The Director of the FTC's Bureau of Competition stated in a news release accompanying the filing of the FTC Complaint and Consent Order, that "Transitions crossed the line between aggressive competition and illegal exclusionary conduct." The Director added that Transitions' "actions prevented others from competing on the merits, and consumers were forced to pay more for these lenses as a result. Such conduct runs afoul of the antitrust laws and is unacceptable." The FTC Complaint

specifically charged that Transitions' conduct adversely affected competition and consumers in the market for photochromic lenses. FTC Complaint, ¶¶ 29-31.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; at least one class member is a citizen of a different state than the defendant; and this action involves more than 100 class members.

8.     Venue is proper in this district under 28 U.S.C. § 1391, because Transitions' headquarters is located within this district and Transitions engaged in substantial conduct relevant to Plaintiffs' claims within this district.

9.     The class action lawsuits referenced in the caption above have been transferred to this Court per the Transfer Order of the Judicial Panel on Multi-District Litigation.  Plaintiffs in the transferred actions reserve their rights of remand to the districts from which they were transferred at or before the conclusion of the pre-trial proceedings.[1]

## PARTIES

10.     Plaintiff Howard Achtman is a resident of the State of Michigan. During the Class period, Plaintiff Achtman purchased, indirectly, Transitions photochromic lenses in Michigan. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Achtman paying an overcharge for his photochromic lenses. Plaintiff Achtman was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

---

[1] *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

11.     Plaintiff John Donohoe is a resident of the State of California. During the Class period, Plaintiff Donohoe purchased, indirectly, Transition's photochromic lenses in California. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Donohoe paying an overcharge for his photochromic lenses. Plaintiff Donohoe was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

12.     Plaintiff Keith Forbes is a resident of the State of Maine. During the Class period, Plaintiff Forbes purchased, indirectly, Transitions photochromic lenses in Maine. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Forbes paying an overcharge for his photochromic lenses. Plaintiff Forbes was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

13.     Plaintiff Amanda Gable is a resident of the State of California. During the Class period, Plaintiff Gable purchased, indirectly, Transitions photochromic lenses in California. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Gable paying an overcharge for her photochromic lenses. Plaintiff Gable was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

14.     Plaintiff Gabby Klein is a resident of the State of New York. During the Class period, Plaintiff Klein purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Klein paying an overcharge for his

photochromic lenses. Plaintiff Klein was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

15.     Plaintiff Edmund Moores is a resident of the State of New York. During the Class period, Plaintiff Moores purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Moores paying an overcharge for his photochromic lenses. Plaintiff Moores was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

16.     Plaintiff Caryl O'Keefe is a resident of the State of California. During the Class period, Plaintiff O'Keefe purchased, indirectly, Transitions photochromic lenses in California. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff O'Keefe paying an overcharge for her photochromic lenses. Plaintiff O'Keefe was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

17.     Plaintiff Keith Brian Roller is a resident of the State of Florida. During the Class period, Plaintiff Roller purchased, indirectly, Transitions photochromic lenses in Florida. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Roller paying an overcharge for his photochromic lenses. Plaintiff Roller was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

18.     Plaintiff Axhi Sabani is a resident of the State of Wisconsin. During the Class period, Plaintiff Sabani purchased, indirectly, Transitions photochromic lenses in Wisconsin. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was

artificially raised in the relevant market, resulting in Plaintiff Sabani paying an overcharge for his photochromic lenses. Plaintiff Sabani was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

19.     Plaintiff Phyllis Sternemann is a resident of the State of New York. During the Class period, Plaintiff Sternemann purchased, indirectly, Transitions photochromic lenses in New York. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Sternemann paying an overcharge for her photochromic lenses. Plaintiff Sternemann was injured in that her photochromic lenses cost more than they would have absent Transitions' conduct.

20.     Plaintiff Eldridge Donald Wilcox is a resident of the State of Kansas[2].  During the Class period, Plaintiff Wilcox purchased, indirectly, Transitions photochromic lenses in Kansas. As a result of Transitions' unlawful conduct, the price of Transitions photochromic lenses was artificially raised in the relevant market, resulting in Plaintiff Wilcox paying an overcharge for his photochromic lenses.  Plaintiff Wilcox was injured in that his photochromic lenses cost more than they would have absent Transitions' conduct.

21.     Defendant Transitions Optical, Inc., is a Delaware corporation, and its principal place of business is located at 9251 Belcher Road, Pinellas Park, Florida 33782. Transitions is a joint venture between PPG Industries, Inc., which owns 51 percent of Transitions, and Essilor International SA ("Essilor International"), which owns 49 percent.

CO-CONSPIRATORS

22.     Essilor of America, Inc. is a Delaware corporation with its principal place of business in Dallas, Texas. Essilor of America, a wholly-owned subsidiary of Essilor

---

[2] The Wilcox Complaint was filed on October 24, 2011, in the United States District Court for the District of Kansas. On November 4, 2011, the Judicial Panel on Multidistrict Litigation issued Conditional Transfer Order (CTO-4), transferring the Wilcox action to this Court for coordinated or consolidated pretrial proceedings.

International, is a lens manufacturer that sells more lenses than any other manufacturer in the United States. Essilor Laboratories of America, Inc. ("EOLA") is a North Carolina corporation with its principal place of business in Dallas, Texas. EOLA owns and controls numerous wholesale laboratories throughout the United States. Essilor of America and EOLA, by virtue of their size and effect on the market, are in the position of controlling much of the chain of distribution of lenses to eye care practitioners and other retailers. They, and other unnamed co-conspirators, have conspired with and through defendant Transitions to organize and suppress competition in the market for photochromic lenses in the United States.

## THE RELEVANT MARKET

23.     The relevant product market is the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in the United States.

23.     Purchasers of corrective ophthalmic lenses, which are used in eyeglasses to correct vision defects, have the option to purchase them clear, tinted, polarized, or photochromic.

24.     Photochromic lenses have characteristics and uses distinct from those of clear lenses, polarized lenses (which are designed to remove glare), or fixed-tint lenses (e.g., prescription sunglasses).

25.     Photochromic lenses react to changes in ultra-violate light ("UV"), and protect eyes from potentially harmful UV rays. Photochromic lenses darken when exposed to UV light, such as sunlight, and fade back to clear when removed from UV light. Photochromic lenses are also known as light-responsive lenses, variable tint lenses, or changeable tint lenses.

26.     Photochromic lenses allow users to go from sunlight to darkness and back again without changing their glasses.

27.     There are no close substitutes for photochromic lenses, and no other product significantly constrains the price of photochromic lenses.

28.     Each year, U.S. consumers purchase roughly 76 million pairs of corrective ophthalmic lenses. In 2008, photochromic lenses represented approximately 18-20% of all corrective ophthalmic lens sales in the United States, totaling approximately $630 million in sales at the wholesale level.

**TRANSITIONS' MONOPOLY POWER IN THE RELEVANT MARKET**

29.     Transitions possessed monopoly power in the relevant market from at least 1999 to present. Transitions' share of the relevant market has been at least 80 percent during each of the past five years. In 2008, Transitions' market share was over 85 percent.

30.     Significant and lasting barriers make entry into the relevant market difficult. These barriers include, but are not limited to: (i) product development costs; (ii) capital requirements; (iii) intellectual property rights; (iv) regulatory requirements; and (v) Transitions' unlawful, anticompetitive, and unfair methods of competition.

31.     Transitions' monopoly power in the relevant market is also demonstrated by its ability to exclude competitors and to control prices. The indicia of Transitions' monopoly power include, but are not limited to, the ability of Transitions to: (i) coerce lens casters, which manufacture and distribute corrective ophthalmic lenses, to accept exclusive dealing arrangements; (ii) price its product without regard to its competitors' prices; (iii) impose significant price increases; and (iv) withhold a desired product—a low-priced, private label photochromic lens—from consumers in the United States, even though Transitions supplies it in other markets.

32.     There are no legitimate pro-competitive efficiencies that justify Transitions' conduct or outweigh its substantial anticompetitive effects.

## FACTUAL BACKGROUND

### The Photochromic Lens Industry

33.     Lens casters manufacture corrective ophthalmic lenses ("lens blanks") and sell them to Transitions.

34.     Transitions then uses its own proprietary processes to apply patented photochromic dyes and/or other photochromic materials to the lens blanks, and then sells those or other photochromic lenses back to the lens casters at a substantial mark-up. Transitions only sells its photochromic lenses to lens casters.

35.     Nearly 100 percent of all photochromic lenses are distributed by lens casters. Attempts to bypass lens casters by fabricating photochromic lenses at lower levels of the supply chain (e.g., the wholesale optical laboratories or optical retailers) have largely been abandoned as uneconomical.

36.     Lens casters sell and distribute photochromic lenses through three distribution channels: independent wholesale optical laboratories, lens caster-owned wholesale labs (collectively, "Wholesale Labs"), and integrated optical retailers ("Retailers"). Wholesale labs and Retailers each represent approximately one half of the downstream market. The following chart illustrates the downstream market from lens casters to the consumers of photochromic lenses:



37.     Wholesale Labs sell photochromic lenses to ophthalmologists, opticians, and optometrists (collectively, "eye care practitioners") who are not affiliated with retailers.

38.     Wholesale Labs grind lenses according to prescriptions from eye care practitioners, polish semi-finished lenses, apply certain surface treatments to lenses (such as anti-scratch and anti-reflective coatings) and, in many cases, fit lenses into eyeglass frames and deliver finished frames and lenses to eye care practitioners.

39.     Wholesale labs enable a photochromic lens supplier to promote and sell its products to the thousands of independent eye care practitioners prescribing photochromic lenses to consumers. Photochromic lens suppliers, including Transitions, use Wholesale Labs and their sales forces to aid in the marketing of their lenses.

40.     There has been considerable consolidation in the Wholesale Lab segment in recent years, as lens casters have begun to acquire Wholesale Labs. Lens casters generally have

used Wholesale Labs they own to sell and promote primarily their own brands of lenses. The Essilor entities, including the lens caster and as the owner of a majority of independent Wholesale Laboratories, participated in and took advantage of the consolidation in the industry as it affected the chain of distribution of photochromic lenses.

41.     National, regional, and smaller retail chains ("Retailers") also sell photochromic lenses to consumers. Retailers generally employ their own eye care practitioners who deal directly with consumers. In addition, retailers grind and fit lenses into eyeglass frames and deliver frames with finished lenses to consumers.

42.     A decision by the corporate headquarters of one retail chain to buy a specific photochromic lens can have an immediate impact on the prescribing behavior of the practitioners who are employed by that retailer. The retail channel has also witnessed significant consolidation over time.

43.     Eye care practitioners and integrated Retailers sell finished eye glasses, including those with photochromic lenses, to consumers.

44.     Transitions recognizes that the success of its overall business plan rests heavily on its ability to influence downstream parties, (lens casters, wholesale labs, eye care practitioners and consumers), in the chain of distribution. It does so by creating marketing initiatives to build brand awareness at both the trade and consumer levels.

45.     As part of its overall marketing plan, Transitions has constructed a nationwide advertising and marketing campaign, devised and implemented from its corporate headquarters, which is focused on directly stimulating consumer demand for its treated lenses. Among other marketing practices, Transitions instituted a nationwide media direct-to-consumer advertising

campaign, including print, television, internet and social media outreach. A sample of the marketing campaign includes:

    a.   Transitions' own webpage and portal for viewing commercial videos on the internet: http://en-us.transitions.com/en/media/Pages/Multimedia.aspx;

    b.   Transitions' official Facebook page:

        http://www.facebook.com/#!/transitionslenses?sk=wall;

    c.   youtube channels which broadcast Transitions commercials:

        http://www.youtube.com/user/TransitionsTV and

        http://www.youtube.com/user/TransitionsOptical;

    d.   A youtube posting which highlights the success of the direct-to-consumer campaign through testimonials  by those upstream from consumers in the chain: http://www.youtube.com/watch?v=4dcl4rVl7TY;

    e.   A description of Transitions' marketing campaign at http://www.eyecarebiz.com/article.aspx?article=50560 , including "During the late 1990s, Transitions conducted a multi-million dollar consumer awareness advertising campaign over a three-year period. That extensive exposure helped stimulate the rapid growth of photochromic lenses during the '90s. The same company is about to launch its most intensive consumer advertising campaign to date, running TV spots more than 700 times on network and cable stations beginning in March 2003. Print ads will run in *Newsweek*, *U.S. News & World Report*, *Parade*, *USA Weekend*, and *TV Guide*. This advertising campaign is expected to reach 113 million people. Past industry experience shows that consumer advertising can be effective for educating and informing consumers about new technology. One major benefit of this is it brings informed consumers back to their eyecare providers sooner than they normally would, to the benefit of the professions and the industry;"

    f.   Television commercials on national broadcasting and cable networks directed at consumers. For one example, there is a Transitions press release 1/15/08 about its consumer marketing and ad campaign, http://www.optiboard.com/forums/showthread.php/26920-Transitions-Optical-Introduces-New-Tv-Commercial;

g.  February 2010 Transitions press release about its ad campaign:
http://trade.transitions.com/NewsEvents/Press%20Releases/nr_New_Consumer_Outreach_2010.pdf;

h.  January 2008 interview with former CEO Rick Elias, discussing the intent of
the consumer marketing campaign at http://www.post-gazette.com/pg/08002/845756-28.stm; and

i.  Transitions organizes and sponsors a major PGA golf tournament in Tampa,
Florida every year and through this event advertises its lenses directly to
consumers and uses the resultant publicity to continue advertising in golf-
related publications, TV channels and other media.

### Transitions' Exclusionary Dealings with Lens Casters

46.   Transitions entered into exclusive dealing arrangements, including written
agreements, with a number of lens casters that collectively account for over 80% of the
photochromic lens sales in the United States.  This practice effectively foreclosed any competitor
or potential competitor of Transitions from dealing with those lens casters.

47.   At the lens caster level, Transitions' anticompetitive acts and practices included,
but were not limited to: (1) publicizing that it would not do business with any lens caster that
sold or promoted a photochromic lens that was not a Transitions photochromic lens
("competitor's photochromic lens"); (2) entering into exclusionary agreements with certain lens
casters; (3) threatening to terminate its dealings with lens casters that would not sell Transitions
photochromic lenses on an exclusive basis; (4) terminating its relationship with a lens caster that
purchased a competitor's photochromic lens product; and (5) terminating its relationship with a
lens caster that developed its own competing photochromic lens treatment, which it sought to
incorporate into its own lenses and subsequently sell.

48.   In 1999, Corning Inc. ("Corning"), based in New York State, introduced a new
plastic photochromic lens, SunSensors, which was a direct competitor to Transitions
photochromic lenses.

13

49.     Transitions responded to this competitive threat by terminating its relationship with the first lens caster that began selling the SunSensors lens, Signet Armorlite, Inc.

50.      Thereafter, Transitions has refused to do business with any lens caster that sells or promotes a competitor's photochromic lens. Transitions enforced this policy by, among other things, entering into agreements with certain lens casters that expressly require exclusivity, and through publicizing its policy throughout the lens caster community.

51.     Transitions' exclusionary practices at the lens caster level effectively precluded even lens casters that had not signed exclusive agreements with Transitions from selling or marketing a competitor's photochromic lens, because such lens casters were aware of Transitions' exclusive dealings policy.

52.     When Transitions was next faced with a potential threat to its market dominance, it again retaliated against the relevant lens caster by terminating its relationship with the lens caster—in this case, Vision-Ease.

53.     In 2005, Vision-Ease, a lens caster, introduced its own propriety film-based photochromic technology under the brand name LifeRx. LifeRx photochromic lenses are comparable in quality to Transitions photochromic lenses. Whereas Transitions photochromic treatment adheres to all plastic and polycarbonate lens matters, LifeRx treatment adheres only to polycarbonate.

54.     In June 2005, around the time LifeRx was introduced, Transitions notified Vision-Ease that it was canceling its contractual relationship with Vision-Ease, effective September 30, 2005. During the three months thereafter, Transitions refused to fill any order submitted by Vision-Ease.

55.     Vision-Ease was able to keep LifeRx on the market only by entering into negotiations with one of the largest optical retailers in the United States, which committed to providing Vision-Ease with enough business to replace its lost Transitions sales.

56.     Transitions' dominant market position and publicized policy of refusing to do business with any lens caster that sold or promoted a competitor's photochromic lens provided lens casters with powerful economic incentives to deal with Transitions on an exclusive basis. Transitions' "all-or-nothing" exclusivity policy made clear that any lens caster selling or promoting a competitor's photochromic lens would be forced to forgo significant revenues from the sale of Transitions photochromic lenses, which can represent up to 40 percent of a lens caster's overall profits. In addition, a lens caster's inability to offer Transitions photochromic lenses is likely to jeopardize significant sales of its clear corrective ophthalmic lenses as well, because many chain Retailers and Wholesale Labs (and their eye care practitioner customers) prefer to buy both clear and photochromic versions of the same lens.

57.     Transitions' exclusionary acts and practices had the purpose and effect of effectively preventing any competitor supplier of photochromic lenses, such as Corning, from partnering with lens casters to bring their products to market, which is the economically efficient means to distribute photochromic lenses.

58.     No major lens caster has been willing to sell the SunSensors plastic photochromic lens since Transitions terminated Signet. Without access to effective distribution, Corning has been unable to pose a competitive threat to Transitions' monopoly, and has had little incentive to invest in research and development to further innovate and improve its product.

59.     Transitions' exclusionary acts and practices also served to erect significant barriers to entry by the lens casters themselves, which can supply their own ophthalmic lenses.

Since Transitions terminated its relationship with Vision-Ease for introducing LifeRx in 2005, no other lens caster has introduced a new line of photochromic lens in the United States.

60.      Lens casters that are exclusive to Transitions collectively account for over 85% of the photochromic lens sales in the United States.

**Transitions' Exclusionary and Restrictive Dealings with Retailers and Wholesale Labs**

61.      Transitions also entered into exclusionary and restrictive agreements with its indirect customers: retailers and wholesale labs—non-customers of Transitions. The purpose and effect of these agreements was to foreclose downstream from selling or promoting any competitor's photochromic lenses and to create significant barriers to entry into the relevant market.

62.      Transitions entered into long-term exclusionary agreements that are not easily terminable with over 50 retailers, including many of the largest retail chains, with the purpose and effect of impeding entry into the relevant market.

63.      These exclusionary agreements served to deprive Transitions' competitors, such as Vision-Ease and Corning, of access to many large retailers.

64.      The exclusionary agreements also served to discourage and blunt the force of any attempt by another competitor to enter into the relevant market or to otherwise constrain Transitions' exercise of monopoly power.

65.      Transitions also entered into exclusionary agreements with Wholesale Labs that restricted the ability of competitors to promote or sell photochromic lenses to independent eye care practitioners unaffiliated with any retail chain.

66.      Transitions entered into over 100 agreements with Wholesale Labs, including 23 of the top 30 independent Wholesale Labs, requiring the Wholesale Lab to sell Transitions

photochromic lenses as its "preferred" photochromic lenses, and not to promote any competing photochromic lens.

67.     The anticompetitive effect of these Wholesale Lab agreements was further augmented by the fact that at least 50 percent of all Wholesale Labs are owned by EOLA and sell Transitions photochromic lenses on an exclusive basis. As a result, rival suppliers of photochromic lenses had only limited access to these Wholesale Labs.

68.     As part of its anticompetitive practice, Transitions' agreements with retailers and Wholesale Labs generally provided for a rebate if all or almost all of the photochromic lenses they sold were supplied by Transitions. Because no other supplier has a photochromic treatment that applies to a full line of ophthalmic lenses, these rebates impaired the ability of competitors to compete for sales to those entities. It also erected a significant entry barrier by limiting the ability of a rival to enter the market with a new photochromic treatment that applies to less than a full line of ophthalmic lenses.

69.     Transitions' exclusive and restrictive agreements with Wholesale Labs and Retailers deprived its rivals of access to outlets for the distribution and sale of competing photochromic lenses, and impaired their ability to compete effectively with Transitions or to pose a significant threat to its monopoly. These agreements also deterred incremental entry by a supplier with a photochromic treatment that applies to less than the full line of ophthalmic lenses, and reinforce and strengthen the barriers to entry erected by Transitions' policy of requiring that lens casters deal exclusively with Transitions. Transitions' exclusionary practices foreclose its rivals, in whole or in part, from a substantial share of the entire downstream photochromic lens market.

**Any Overcharge Passes Through the Chain of Distribution to Consumer-End Users**

70.     Transitions is aware of the prices that consumers ultimately pay for its treated lenses and is knowledgeable as to how prices to its customers at the lens caster level will negatively affect end user pricing to consumers.

71.     Transitions monitors, tracks and analyzes pricing throughout the chain of distribution to review how the charges are passed on through the levels of distribution. Transitions is therefore aware that any changes in prices to its customers at the lens caster level will ultimately result in changes in prices to consumers. Transitions has considered and discussed with its downstream resellers the ability to pass-through cost increases to the ultimate consumer.

72.     General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. *See* Hovencamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624. Prof. Hovencamp goes on to state that "Every person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

73.     Transitions' anticompetitive actions enabled it to charge its lens caster customers prices for its photochromic lenses that are in excess of what it otherwise would have been able to charge absent its monopoly power and agreements with its co-conspirators.

74.     Lens casters passed on the inflated prices of Transitions lenses to their customers, Wholesale Labs and Retailers.

75.     Wholesale Labs similarly passed on to their customers the inflated prices of Transitions lenses,  prices that were inflated as a direct and foreseeable result of Transitions' anticompetitive conduct.

76.     Eye Care Practitioners and Retailers passed on the inflated prices they paid for Transitions' lenses to their customers, including Plaintiffs. The inflated prices Plaintiffs paid are traceable to, and the foreseeable result, of the overcharges Transitions charged to its customers.

**Federal Trade Commission Action and Consent Order**

77.     On March 3, 2010, the FTC released a Complaint against Transitions (the "FTC Complaint") and announced that it had entered into a Consent Order with Transitions pursuant to which Transitions "agreed to stop using allegedly anticompetitive practices to maintain its monopoly and increase prices" and, more specifically, "agreed to a range of restrictions, including an agreement to stop all exclusive dealing practices that pose a threat to competition."

78.     The FTC Complaint, among other things:

a.      Defined the relevant product market as the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses;

b.      Alleged that Transitions holds monopoly power in the relevant market;

c.      Alleged that Transitions engaged in unlawful and unfair anticompetitive and exclusionary conduct to maintain its monopoly in the relevant market; and

d.      Identifies Transitions' overwhelming market share and the significant barriers to entering the relevant market faced by potential competitors as evidence of Transitions' monopoly power.

79.     The FTC Order, which is in effect for 20 years, among other things:

a.      Prohibits Transitions from entering into any agreement or policy that limits its customers' ability to directly or indirectly buy, sell, or compete in the relevant market;

b.      Bars Transitions from limiting the information that its customers give to consumers regarding its competitor's photochromic lens treatments;

c.      Prevents Transitions from imposing exclusivity on individual product brands of eyeglass lenses, ensuring that lens casters can sell competitor's photochromic lenses in addition to Transitions photochromic lenses;

19

d.  For a period of 10 years, offering or imposing the following types of discounts to customers: (i) market share discounts that are based on what percentage of a customer's photochromic lens sales are Transitions' lenses; (ii) discounts that are applied retroactively once a customer's sales reach a specific threshold. For example, Transitions cannot provide discounts on the first 999 units that are contingent on the customer purchasing the one-thousandth unit; and (iii) bundling discounts so that customers purchasing more than one line of photochromic lenses obtain additional discounts;

e.  Restricts Transitions from retaliating against a customer that buys or sells Transitions' lenses on a non-exclusive basis; and

f.  Instructs Transitions to design and operate an Antitrust Compliance Program to comply with the FTC's Order and other antitrust laws.

## CLASS ACTION ALLEGATIONS

80.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and the following similarly situated individuals:

All persons who indirectly purchased in the United States photochromic lenses manufactured and/or distributed by Transitions, for their own use and not for resale, at any time from January 1, 1999, to the present (the "Class"). Excluded from the Class are Transitions and its parents, subsidiaries, and affiliates; all federal, state, or local governmental entities; and any judge or judicial officer presiding over this matter.

81.  In the alternative, Plaintiffs seek certification of the following classes under state law causes of action where at least one Plaintiff resides: California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin.

82.  Based on the nature of the trade and commerce involved, Plaintiffs believe the total number of Class members to be at least in the tens of thousands. Thus, the Class is so numerous that joinder of all members is impracticable.

83.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. Such common questions include, but are not limited to:

(a)     Whether Transitions possessed monopoly power in the relevant market;

(b)     Whether Transitions entered into unlawful and anticompetitive exclusionary agreements, thereby unreasonably restraining trade;

(c)     Whether Transitions' conduct resulted in an artificial increase in the prices of photochromic lenses in the relevant market, exceeding the price that would have been determined by a competitive market;

(d)     Whether Transitions engaged in exclusionary acts and practices, which included, but were not limited to, entering into exclusive dealing arrangements that foreclose their rivals from key distribution channels;

(e)     The existence, duration, and illegality of the monopolization, attempted monopolization, and/or the exclusive dealing arrangements alleged;

(f)     The amount by which Transitions' illegal, unfair, and/or deceptive trade practices inflated the price of photochromic lenses over the amount they would have been in a competitive market unaffected by Transitions' illegal acts;

(g)     The effect and extent of injuries sustained by Plaintiffs and the other members of the Class, and the appropriate type and/or measure of damages;

(h)     Whether Transitions took affirmative steps to conceal the exclusive dealing arrangements alleged ; and

(i)     Whether Plaintiffs and other members of the Class are entitled to equitable relief.

84.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and the other members of the Class are similarly situated, as they each suffered injury by paying prices for photochromic lenses that were artificially inflated as a result of Transitions' unlawful conduct.

85.     Plaintiffs and their counsel will fairly and adequately represent the interests of the Class. Plaintiffs have no interests adverse to or which irreconcilably conflict with the interests of other members of the Class. Also, Plaintiffs' counsel is experienced and competent in the prosecution of complex class action litigation.

86.     A class action is the superior method to fairly and efficiently adjudicate this controversy. A class action will permit the large number of similarly situated Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions engender. Plaintiffs' believe there will no difficulty in the management of this matter as a class action.

## INJURY TO PLAINTIFFS AND THE CLASS MEMBERS

87.     The FTC Complaint charged that Transitions' conduct adversely affects competition and consumers by:

a.  increasing the prices and reducing the output of photochromic lenses;

b.  deterring, delaying and impeding the ability of Transitions' actual or potential competitors to enter or to expand their sales of photochromic lenses;

c.  reducing innovation;

d.  reducing consumer choice among competing photochromic lenses; and

22

e. by effectively stifling competition, Transitions has been able to refuse to supply its low-priced, private label photochromic lenses in the U.S. market, notwithstanding considerable consumer demand in that market for such a product.

88. Transitions' conduct has harmed consumers by depriving its rivals of the incentive to innovate and to develop competing photochromic lenses. If faced with more competition, Transitions would likely have a greater incentive to invest greater resources in research and development. Innovation and development of competing lens products would ultimately benefit consumers of photochromic lenses by offering them a wider selection of treated lens products at more competitive pricing.

89. As a direct and proximate result of Defendant's restrictive and exclusionary practices, competition in the market for photochromic lenses has been suppressed. This has resulted in higher prices for the lenses. The overcharges imposed at the level of Transitions' customers, the lens casters, are traceable through the distribution chain by resellers at all levels to consumers, the ultimate customers. The result is that Plaintiffs paid higher prices for Transitions photochromic lenses than they would have paid in the absence of Transitions' unlawful conduct and, as a result, have been injured and have suffered damages.

**FRAUDULENT CONCEALMENT/DELAYED DISCOVERY**

90. Defendant affirmatively concealed anti-competitive conduct from Plaintiffs and class members, and Plaintiffs and class members were unaware of Defendant's antitrust violations until the public announcement of the FTC consent decree. Defendant accomplished this fraudulent concealment by maintaining strict confidentiality over exclusivity agreements, lens prices, and other terms of their agreements, and requiring their direct customers to keep such information confidential. As a result, the running of any statute of limitations was suspended as to the claims of Plaintiffs and class members until such time that the true nature of Defendant's

anti-competitive practices were publicly disclosed, and the claims of Plaintiffs and class members did not accrue until the public disclosure of Defendant's anti-competitive practices because Plaintiffs and class members did not discover, and could not have discovered, the facts underlying their cause of action against Defendant even through the exercise of reasonable diligence.

## CLAIMS FOR RELIEF

### COUNT I
### (Deceptive and Unfair Trade Practices Under Florida Law)

91.    Plaintiffs incorporate and re-allege, as though fully set forth, Paragraphs 1-90, of this Complaint.

92.    Transitions' contracts, combinations, actions, and conspiracies were entered into, carried out, effectuated and perfected within the State of Florida. Transitions' conduct in Florida injured all class members throughout the United States. This claim for relief under Florida law is brought on behalf of all class members, whether or not they are Florida residents.

93.    Florida law applies to Transitions' conduct and practices because of the weight of the following significant contacts:

      a.    Transitions maintains its world headquarters in Pinellas Park, Florida where it houses manufacturing operations, sales, marketing, product research and development and administrative functions. At this location, Transitions employs several hundred people.   All lens research and development occurs at the Pinellas Park research facility.  All of its manufacturing for the U.S. market takes place in Pinellas Park;

      b.    Transitions' commercial practices and pricing decisions were devised, negotiated, and implemented nationwide from its Pinellas Park facility. Transitions' policy and practice of refusing to do business with any lens caster that marketed or sold a competing photochromic lens product was hatched and effectuated from Transitions' Florida headquarters.  Toward this end, Transitions conceived, drafted, executed and stored the exclusionary agreements, which are the subject of this litigation, at its corporate

headquarters. Implementation and enforcement of these anticompetitive agreements were conceived, prepared and discussed by Transitions' employees at its corporate headquarters;

c.  Transitions' contracts with its customers and exclusionary agreements that are the subject of this litigation typically required that Florida law govern any dispute. Also, in accordance with the agreements, those with whom it contracted typically agreed to submit to a forum either in a court of competent jurisdiction in and for Pineallas County, Florida, or to undertake arbitration in St. Petersburg, Florida;

d.  The direct-to-consumer marketing strategies described in Pars. 44-45 were devised, prepared, implemented, finalized and delivered to consumers by Transitions' employees based in Pinellas Park, Florida;

e.  Transitions maintains a customer service center in Pinellas Park, Florida to promote and support Transitions lenses.  It encourages the public to contact it at its Pinellas Park, Florida facility and it routinely issues press releases to its customers and to the public concerning its products from that facility.

94.  Defendant's anti-competitive and unlawful conduct constituted a violation of the Florida Deceptive and Unfair Trade Practices Act, § 501.203(3) Fla. Stat. (2010), because Defendant's acts and practices:

a.  were unfair methods of competition and unfair acts in the conduct of trade and commerce, § 501.204(1), Fla. Stat. (2010);

b.  violated the standards of unfairness as set forth and interpreted by the Federal Trade Commission and the federal courts, § 501.203(3)(b), Fla. Stat. (2010); and

c.  constituted an unlawful monopolization or attempt to monopolize the relevant market, §§ 542.19 & 501.203(3)(c), Fla. Stat. (2010).

95.  As a direct and proximate result of Defendant's violations of FDUTPA, Plaintiffs and Class Members suffered a loss and were injured by paying an overcharge for Transitions' photochromic lenses, the prices of which were inflated due to Defendant's' unlawful and anti-competitive conduct.  § 501.211(2), Fla. Stat. (2010).

96.  The harm to Plaintiffs and the Class is set forth more particularly at Pars. 87-89 and are incorporated here by reference.

97.     Plaintiffs and the Class are entitled to actual and punitive damages, equitable relief, and reasonable attorneys' fees as a result of the injuries and losses suffered due to Defendant's violations of FDUTPA.

## COUNT II
## (Violation of State Antitrust Laws)

98.     Plaintiffs incorporate and re-allege, as though fully set forth, Paragraphs 1-90 of this Complaint.

99.     <u>California</u>: By reason of the foregoing, defendant Transitions has violated California Business and Professions Code, Section 16720 *et seq*., as follows:

    a.     Beginning no later than 1999 and continuing to today, defendant Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of photochromic lenses, the purpose of which was to enableTransitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in California in violation of Section 16720 *et seq*.

    b.     Defendant Transitions' unlawful conduct  has had, *inter alia,* the following effects:

       i.     price competition in the market for the sale of photochromic lenses has been restrained, suppressed and/or eliminated in the State of California;

       ii.     prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels in the State of California; and

       iii.     End-user consumers who purchased Transitions photochromic lenses in the State of California have been deprived of the benefit of free and open competition.

    c.     During the relevant period, defendant Transitions' unlawful conduct substantially affected California commerce.

    d.     As a direct and proximate result of Transitions' unlawful conduct, the Plaintiffs have been injured in their business and property in that they paid more for Transitions photochromic lenses than they otherwise would have paid in the absence of Transitions' unlawful conduct.

    e.      As a result of defendant Transitions' unlawful conduct in violation of Section 16720 *et seq.* Plaintiffs seek all forms of relief under Section 16750(a) of the California Business and Professions Code, including treble damages and the costs of suit, and reasonable attorneys' fees.

100.   <u>Kansas</u>: By reason of the foregoing, defendant Transitions has violated Kansas Stat. Ann. §§50-101 *et seq*. as follows:

    a.      Beginning no later than 1999 and continuing to today, Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of Transitions photochromic lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in Kansas.

    b.      Transitions' unlawful conduct has had, *inter alia,* the following effects:

        i.      price competition in the market for the sale of photochromic lenses has been restrained, suppressed and/or eliminated in the State of Kansas;

        ii.      prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels in the State of Kansas; and

        iii.      End-user consumers who purchased Transitions photochromic lenses in the State of Kansas have been deprived of the benefit of free and open competition

    c.      During the Class Period, Transitions' unlawful conduct substantially affected Kansas commerce.

    d.      Transitions' unlawful conduct had a significant intrastate impact in Kansas because, *inter alia*, Transitions lenses were sold to customers in Kansas and Transitions entered into exclusionary or restrictive agreements with retailers and wholesale labs in Kansas.

    e.      As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured in their business and property.

    f.      By reason of the foregoing, Transitions' unlawful conduct violated Kansas Stat. Ann. §§50-101 *et seq*.  Accordingly, Plaintiffs seek all forms of relief available under Kansas Stat. Ann. §§50-101 *et seq*.

101.   <u>Maine</u>: By reason of the foregoing, Transitions has violated Maine Rev. Stat. Ann. 10, §§1101 *et seq*. as follows:

a.  Beginning no later than 1999 and continuing to today, Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of photochromic lenses, the purpose of which was to enable defendant Transitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in Maine.

b.  Transitions' unlawful conduct alleged has had, *inter alia,* the following effects:

    i.  price competition in the market for the sale of photochromic lenses has been restrained, suppressed and/or eliminated in the State of Maine;

    ii.  prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels in the State of Maine; and

    iii.  End-user consumers who purchased Transitions photochromic lenses in the State of Maine have been deprived of the benefit of free and open competition.

c.  During the Class Period, Transitions' unlawful conduct substantially affected Maine commerce.

d.  As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

e.  By reason of the foregoing, Transitions' unlawful conduct violated Maine Rev. Stat. Ann. 10, §§1101 *et seq.* Accordingly, Plaintiffs seek all forms of relief available under Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

102.  <u>Wisconsin</u>: By reason of the foregoing, Transitions has violated Wisconsin Stat.

§§133.01 *et seq.* as follows:

a.  Beginning no later than 1999 and continuing to today, Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of Transitions photochromic lenses, the purpose of which was to enableTransitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in Wisconsin.

b.  Transitions' unlawful conduct alleged has had, *inter alia,* the following effects:

    i.  price competition in the market for the sale of Transitions' photochromic lenses has been restrained, suppressed and/or eliminated in the State of Wisconsin;

      ii.      prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels in the State of Wisconsin; and

      iv.      End-user consumers who purchased Transitions photochromic lenses in the State of Wisconsin have been deprived of the benefit of free and open competition.

c.      During the Class Period, Transitions' unlawful conduct substantially affected Wisconsin commerce.

d.      As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured in their business and property.

e.      By reason of the foregoing,  Transitions' unlawful conduct violated Wisconsin Stat. §§133.01 *et seq*.  Accordingly, Plaintiffs seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq*.

103.      <u>Michigan</u>: By reason of the foregoing, Transitions has violated Michigan Compiled Laws §§ 445.73, *et seq*. as follows:

a.      Beginning no later than 1999 and continuing to today, Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of Transitions' photochromic lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in Michigan.

b.      Transitions' unlawful conduct alleged  has had, *inter alia,* the following effects:

      i.      price competition in the market for sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated in the State of Michigan;

      ii.      prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels in the State of  Michigan; and

      iii.      End-user consumers who purchased Transitions photochromic lenses in the State of Michigan have been deprived of the benefit of free and open competition

c.      During the Class Period, Transitions' unlawful conduct substantially affected Michigan commerce.

d.      As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured in their business and property and are threatened with further injury.

e.      By reason of the foregoing, Transitions' unlawful conduct violated Michigan Compiled Laws §§ 445.773, et *seq*.  Accordingly, Plaintiffs, seek all relief available under Michigan Compiled Laws §§ 445.73, *et seq*.

104.   <u>New York:</u>  By reason of the foregoing, Transitions has violated New York General Business Laws § 340 *et seq*. as follows:

a.      Beginning no later than 1999 and continuing to today,  Transitions and its co-conspirators entered into and engaged in a continuing unlawful contract, combination or conspiracy in restraint of trade and commerce by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of Transitions' photochromic lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in violation of  New York General Business Law § 340 *et seq.*

b.      Transitions' unlawful conduct alleged  has had, *inter alia,* the following effects:

    i.      price competition in the sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated throughout New York;

    ii.     competitor Corning, located in New York, was affected by Transitions' unlawful conduct;

    iii.    downstream resellers in New York were harmed by Transitions' unlawful conduct;

    iv.    prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels throughout New York; and

    v.     Consumers who purchased Transitions  photochromic lenses in the State of New York paid inflated prices for the lenses and have been deprived of the benefit of free and open competition throughout New York.

c.      During the Class Period, Transitions' unlawful conduct had a significant intrastate impact in New York because, *inter alia*, Transitions affected its competitor in New York, sold to customers in New York and entered into exclusionary or restrictive agreements with retailers and wholesale labs in New York.

d.      As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured in their business and property and is threatened with further injury.

     e.      By reason of the foregoing,  Transition violated New York General Business Law § 340 *et seq*.  Accordingly, Plaintiffs seek all forms of relief available under New York G.B.L. § 340 *et seq*.

## COUNT III
### (Violation of State Consumer Protection and Unfair Practices Act Laws)

105.    Plaintiffs incorporate and re-allege, as though fully set forth, Paragraphs 1-90 of this Complaint.

106.    Transitions' engagement in the unlawful and uncompetitive conduct are important facts that a reasonable consumer would consider relevant when purchasing a photochromic lens. It was Transitions' policy to conceal this conduct from the public and to mislead the public regarding its efforts to preserve its monopoly power in the relevant market.

107.    California:   By reason of the foregoing, defendant Transitions has violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. as follows:

     a.      Defendant committed acts of unfair competition, as defined by § 17200, *et seq*., by entering into and engaging in a continuing unfair, unlawful and/or fraudulent contract, combination or conspiracy in restraint of trade and commerce by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of photochromic lenses, the purpose of which was to enable defendant Transitions to fix, raise and stabilize the price of photochromic lenses at supra-competitive levels in California.

     b.      The acts, omissions, misrepresentations, practices and non-disclosures of Transitions constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of section § 17200, *et seq.*, including, but not limited to violating the California Cartwright Act, Cal. Bus. & Prof. Code Section 16720 *et seq*.

     c.      Transitions' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Cartwright Act.

     d.      Transitions' acts or practices are fraudulent or deceptive within the meaning of § 17200, et seq.

e.     Transitions' conduct was ultimately carried out, effectuated, and perfected within the state of California by, *inter alia*, selling Transitions photochromic lenses at supra-competitive levels throughout the State of California.

f.     Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Transitions as result of the business acts and practices described above.

108.   <u>New York</u>:   By reason of the foregoing, Transitions has violated New York

General Business Law § 349 *et seq*. as follows:

a.     Transitions acted in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, its photochromic lenses in New York and took efforts to conceal its unlawful conduct from Plaintiffs.

b.     Transitions' illegally monopolistic conduct substantially affected New York commerce and consumers and substantially impacted New York's public interest.

c.     Transitions' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York State to have an honest marketplace where economic activity is conducted in a competitive manner.

d.     Transitions made statements about its photochromic lenses that it knew would be seen by New York residents.  These statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of the price for Transitions' photochromic lenses.  New York residents relied upon these statements and were harmed.

e.     Transitions' unlawful conduct alleged has had, *inter alia*, the following effects:

i.     price competition in the sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated throughout the State of  New York;

ii.    prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels throughout the State of New York; and

iii.   Plaintiffs paid supracompetitive, artificially inflated prices for Transitions photochromic lenses and have been deprived of the benefit of free and open competition throughout New York.

32

f.     As consumers at the end of the chain of distribution, the Plaintiffs were specific targets of Transitions' unlawful conduct.

g.     Plaintiffs seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

109.     <u>Maine</u>:  By reason of the foregoing, Transitions has violated 5 Me. Rev. Stat. § 207 *et seq*. as follows:

a.     Defendant acted in violation of Maine's Unfair Trade Practices Law by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of its photochromic lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of its photochromic lenses at supra-competitive levels in Maine.

b.     This conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of 5 Me. Rev. Stat. § 207.

c.     Transitions' unlawful conduct alleged has had, *inter alia,* the following effects:

i.     price competition in the sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated throughout the State of Maine;

ii.     prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels throughout the State of Maine; and

iii.     Plaintiffs paid supracompetitive, artificially inflated prices for Transitions' photochromic lenses and have been deprived of the benefit of free and open competition throughout Maine.

d.     During the Class Period, defendant Transitions' illegal conduct substantially affected Maine commerce and consumers and substantially impacted Maine's public interest.

e.     As a direct and proximate result of Transitions' unlawful conduct, Plaintiffs have been injured.

f.     Transitions has engaged in unfair methods of competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207 et seq and, accordingly, Plaintiffs seek all relief available under that statute.

110.    <u>Kansas</u>:  By reason of the foregoing, Transitions has violated K.S.A. §§ 50-623 *et seq*. as follows:

e.     Transitions acted in violation of the Kansas Consumer Protection Act by conspiring to and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of its photochromic lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of Transitions photochromic lenses at supra-competitive levels in Kansas.

f.     The foregoing conduct constitutes "unconscionable acts and practices," and "deceptive acts and practices" within the meaning of K.S.A. §§ 50-623, 626, 627.

g.     Transitions' unlawful conduct alleged has had, *inter alia,* the following effects:

i.     price competition in the sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated throughout the State of Kansas;

ii.     prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels throughout the State of Kansas; and

iii.     Plaintiffs paid supracompetitive, artificially inflated prices for Transitions' photochromic lenses and have been deprived of the benefit of free and open competition throughout Kansas.

h.     During the Class Period, Defendant's illegal conduct substantially affected Kansas commerce and consumers and substantially impacted Kansas's public interest.

i.     As a direct and proximate result of Defendant's unlawful monopolistic conduct, Plaintiffs have been injured.

j.     Transitions has engaged in unfair methods of competition or unfair or deceptive acts or practices in violation of K.S.A. §§ 50-623 *et seq*. and, accordingly, Plaintiffs seeks all relief available under that statute.

111.    <u>Michigan</u>:  By reason of the foregoing, defendant Transitions has violated Mich. Stat. §§445.901 *et seq.* as follows:

34

a.    Defendant acted in violation of Michigan's Consumer Protection Act by conspiring to, and acting to acquire, maintain, and increase Transitions' monopoly power in the market for the development, manufacture, and sale of its photochromic  lenses, the purpose of which was to enable Transitions to fix, raise and stabilize the price of its photochromic lenses at supra-competitive levels in Michigan.

b.    The foregoing conduct constitutes "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" within the meaning of Mich. Stat. §§445.903.

c.    Transitions' unlawful conduct alleged has had, *inter alia,* the following effects:

  i.    price competition in the sale of Transitions photochromic lenses has been restrained, suppressed and/or eliminated throughout the State of Michigan;

  ii.    prices for Transitions photochromic lenses have been raised and maintained at artificially high, non-competitive levels throughout the State of Michigan; and

  iii.    Plaintiffs paid supracompetitive, artificially inflated prices for Transitions' photochromic lenses and have been deprived of the benefit of free and open competition throughout Michigan.

d.    During the Class Period, Transitions' illegal conduct substantially affected Michigan commerce and consumers and substantially impacted Michigan's public interest.

e.    Transitions made statements about its photochromic lenses that it knew would be seen by Michigan residents.  These statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of the price for Transitions  photochromic lenses. Michigan residents relied upon these statements and suffered harm.

f.    As a direct and proximate result of Transitions' unlawful monopolistic conduct, Plaintiffs have been injured.

g.    Transitions has engaged in unfair methods of competition or unfair or deceptive acts or practices in violation of Mich. Stat. §§445.901 *et seq*. and, accordingly, Plaintiffs seeks all relief available under that statute.

## COUNT IV
### (Unjust Enrichment)

112.    Plaintiffs incorporate and re-allege, as though fully set forth, Paragraphs 1-90 of this Complaint.

113.    Transitions' anticompetitive and unlawful conduct was in violation of unjust enrichment law in the following states: California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin.

114.    As to Plaintiffs in the State of Kansas, as more specifically set forth in Pars. 70-76 and Pars. 87-89, Plaintiffs conferred a benefit on Transitions through the purchase of its photochromic lenses at prices elevated due to Transitions' unlawful conduct and Transitions was or should have been aware that consumers purchasing its photochromic lenses in Kansas had conferred a benefit upon it. Transitions retained the results of the overcharge, to the detriment of Plaintiffs.

115.    As to all states, Transitions received and retained benefits in the form of excess profits as a result of Plaintiffs' and the other class members' purchase of photochromic lenses during the Class period.

116.    Plaintiffs and other class members suffered injury and damage by reason of paying an overcharge for their Transitions photochromic lenses, which cost more than they would have absent Transitions' unlawful and anticompetitive conduct.

117.    It would be unjust and inequitable for Transitions to retain the excess profits it collected as a result of its unlawful and anticompetitive acts and practices detailed in this Complaint.

118.    Plaintiffs seek for Transitions to disgorge all profits collected as a result of Plaintiffs' and other class members' paying supra-competitive prices for Transitions photochromic lenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court enter an Order:

(a)    Certifying the claims alleged as a class action pursuant to Fed. R. Civ. P. 23, and designating Plaintiffs as representative plaintiffs for the Class and Interim Co-Lead Counsel for the Indirect Purchaser End-User Plaintiffs as counsel for the Class;

(b)    Declaring Transitions' conduct to be in violation of the state antitrust, consumer protection and unfair competition, and unjust enrichment laws as alleged;

(c)    Awarding Plaintiffs and the Class all equitable relief and actual, multiple, and/or putative damages available under applicable law;

(d)    Awarding Plaintiffs and the Class the reasonable attorneys' fees, costs, and expenses incurred in litigating this matter; and

(e)    Granting any such other relief deemed proper by the Court.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all individual and Class claims so triable.

Dated:   November 14, 2011

                                        Respectfully submitted,

                                        /s/ Susan G. Kupfer
                                        _____
                                        Susan G. Kupfer
                                        GLANCY BINKOW & GOLDBERG LLP
                                        One Embarcadero Center, Suite 760
                                        San Francisco, CA  94111

Tel: (415) 972-8160
Fax: (415) 972-8166
skupfer@glancylaw.com


/s/ Ben Barnow

Ben Barnow
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com


/s/ Lance A. Harke

Lance A. Harke
Harke Lance A. Harke, P.A.
HARKE CLASBY & BUSHMAN LLP
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8220
Fax: (305) 536-8229
lharke@harkeclasby.com


/s/ Michael M. Buchman

Michael M. Buchman
POMERANTZ HAUDEK GROSSMAN &
  GROSS LLP
100 Park Avenue, 26th Floor
New York, NY  10117
Tel: (212) 661-1100
Fax: (212) 661-8665
mbuchman@pomlaw.com


*Interim Co-Lead Counsel for the
Putative Indirect Purchaser End-User Class*

Christopher C. Casper
JAMES, HOYER, NEWCOMER,
  SMILJANICH, & YANCHUNIS, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL  33609
Tel: (813) 286-4100

Fax: (813) 286-4174
ccasper@jameshoyer.com

*Interim Liaison Counsel for the*
*Putative Indirect Purchaser End-User Class*

### <u>Certificate of Service by Electronic Means</u>

The undersigned hereby certifies that the preceding document was caused to be served electronically this 14th day of November 2011 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


        /s/ Susan G. Kupfer
          Susan G. Kupfer