**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

IN RE: PHOTOCHROMIC LENS
ANTITRUST LITIGATION

                                        MDL Case No.: 8:10-MD-2173-T-27EAJ

_____/

**ORDER**

      Before the court are Defendants Transitions Optical, Inc., Essilor of America, Inc., and Essilor Laboratories of America, Inc.'s **Motion to Compel** (Dkt. 209) and the Direct Purchaser Plaintiffs' **Amended Opposition** (Dkt. 220 Ex. 1). The court heard oral argument on the motion on January 25, 2012. For the reasons explained below, Defendants' motion to compel is **GRANTED** in part and **DENIED** in part.

**Background**

      Transitions Optical, Inc. ("Transitions") purchases prescription eyeglass lenses ("ophthalmic lenses") from lens casters and applies a photochromic treatment that causes the lenses to darken when exposed to sunlight and fade back to clear when removed from sunlight ("photochromic lenses"). Transitions then sells the photochromic lenses back to lens casters, and lens casters sell the photochromic lenses to downstream markets, such as wholesale laboratories and retailers.

      The Direct Purchaser Plaintiffs represent a potential class of wholesale laboratories and retailers that purchased Transitions products from entities owned or controlled by one of the Essilor Defendants, Essilor of America, Inc. and Essilor Laboratories of America, Inc. The Indirect Purchaser Plaintiffs represent a potential class of individuals who purchased Transitions photochromic lenses from downstream entities, such as retailers and eye-care practitioners.

      The Direct and Indirect Purchaser Plaintiffs allege that they paid inflated prices for

photochromic lenses as a result of Transitions's anticompetitive conduct. Transitions allegedly entered into exclusive dealing arrangements with wholesale laboratories, retailers, and lens casters and refused to deal with lens casters that sold or promoted competing products. The Essilor Defendants own or control wholesale laboratories that sell photochromic lenses. The Essilor Defendants allegedly conspired with Transitions to monopolize the relevant market and restrain trade.

The Direct Purchaser Plaintiffs assert five counts against Defendants for violation of the Sherman Act, as amended, 15 U.S.C. § 1 et seq. The Indirect Purchaser Plaintiffs assert four counts against Transitions for violations of state antitrust law, state unfair trade practices law, and unjust enrichment.

## Discussion

The parties are currently engaged in class-certification discovery. Defendants seek to compel the Direct Purchaser Plaintiffs to produce information regarding: (1) the relationship between the Direct Purchaser Plaintiffs and purchasers lower in the distribution chain ("downstream discovery"); and (2) products other than photochromic lenses ("market discovery").[1] The court will first address the Direct Purchaser Plaintiffs' general objections to Defendants' discovery requests before turning to the parties' arguments regarding downstream and market discovery.

**1.     The Direct Purchaser Plaintiffs' General Objections**

A court must limit the scope of discovery if finds that: (1) the discovery sought is

---

[1] A summary of the disputed discovery requests is attached as an exhibit to the declaration of Defendants' counsel, Mr. Jeffrey C. Bank (Dkt. 210 Ex. 1). The Direct Purchaser Plaintiffs dispute the accuracy of this summary and filed their own summary of the disputed discovery requests (Dkt. 220 Ex. 2 at 4-7).

unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive; or (2) the burden of the proposed discovery outweighs the likely benefits considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake, and the importance of the discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C).

The Direct Purchaser Plaintiffs object to Defendants' discovery requests as unduly burdensome. The Direct Purchaser Plaintiffs' response includes an affidavit from Scott Clarke, O.D. ("Dr. Clarke"), a principal for Central Illinois Vision Associates, Ltd. ("CIVA"), one of the Direct Purchaser Plaintiffs (Dkt. 220 Ex. 2 at 9-10). Dr. Clarke avers that information regarding CIVA's purchases and sales are contained in patient records that are kept only in paper format. CIVA must review its records prior to production to redact protected patient information. And because tinted lenses and sunwear comprise only fifteen percent of CIVA's business, CIVA's burden would increase by a factor of seven if it were required to produce information relating to its purchases and sales of non-photochromic products, according to Dr. Clarke.

As discussed below, the Direct Purchaser Plaintiffs agree to produce information regarding their photochromic lens purchases. Such production will require the Direct Purchaser Plaintiffs to search their records. Dr. Clarke's affidavit does not reveal whether searching for records relating to non-photochromic products will significantly increase the burden of the search. Dr. Clarke does indicate that the burden of redacting and producing records may increase by as much as a factor of seven if non-photochromic products are included. However, there is no indication as to the number of records that might be involved or how long production might take. Even assuming that Dr. Clarke's affidavit represents the burden faced by a typical direct purchaser, the Direct Purchaser

Plaintiffs have not demonstrated that their burden of production outweighs the likely benefits of discovery (discussed below) considering the importance of the issues at stake, the amount in controversy, and the parties' resources.

The Direct Purchaser Plaintiffs also contend that the information sought by Defendants can be obtained from other sources, including industry trade associations and Transitions itself. For example, the Direct Purchaser Plaintiffs state that The Vision Council, an industry trade association of which Defendants are members, routinely collects transactional data from multiple levels of the distribution chain and conducts comprehensive market research that it makes available to its members for free. The Direct Purchaser Plaintiffs also assert that Transitions collects sales data from many of its downstream retail and wholesale laboratory purchasers (see id. at 12-16).

There has been no showing that any industry trade association data is sufficient to permit the parties to conduct the market analyses required to address class certification or the merits of the Direct Purchaser Plaintiffs' claims. Certainly, at this stage of discovery, it is possible that an individualized inquiry will be necessary to determine whether potential class members share common questions of law or fact and whether the named Direct Purchaser Plaintiffs' claims are typical of those of other class members.

As to the customer data collected by Transitions, a review of Transitions's customer agreements indicates that Transitions collects information relating to the total number of lenses its customers sell each month (id.). The agreements do not indicate that Transitions collects pricing data or information regarding the dollar amount of its customers' sales (Dkt. 221). As a result, neither the trade association data nor Transitions's customer data justify limiting the scope of discovery from the Direct Purchaser Plaintiffs.

4

**2.      Downstream Discovery**

Downstream discovery may include, among other things, information concerning the plaintiffs' use, manufacture, sale, marketing, distribution or supply of a product to entities and individuals lower in the distribution chain.  See In re Vitamins Antitrust Litig., 198 F.R.D. 296, 297 (D.D.C. 2000).  In general, discovery of downstream information is not appropriate when a potential class of antitrust plaintiffs is seeking damages for overcharges.  See In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-MD-1775, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010); In re Vitamins, 198 F.R.D. at 300-01.  This rule stems from Supreme Court decisions holding that price-fixing claims may not be defended by proving that the plaintiffs did not suffer damages because they were able to pass overcharges on to their downstream customers.  In re Air Cargo, 2010 WL 4916723, at *2 (citing Ill. Brick Co. v. Illinois, 431 U.S. 720 (1977) and Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968)).  One consideration underlying the Supreme Court's decision to bar the "pass-on" defense was an unwillingness to complicate cases with attempts to trace the effect of overcharges on the plaintiffs' prices, sales, costs, and profits.  See id. (citing Ill. Brick Co., 431 U.S. at 725).

Downstream information may be discoverable if the plaintiffs are attempting to recover damages for lost profits, see In re Air Cargo, 2010 WL 4916723, at *4 (citing Air Tech Equip., Ltd. v. Humidity Ventilation Sys., Inc., No. 05-CV-77 CPS, 2006 WL 3193720, at *2 (E.D.N.Y. Nov. 2, 2006)), or if there is a fundamental conflict of interest among class members, see Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1192-93 (11th Cir. 2003).  "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class."  Id. at 1189.

5

Defendants argue that downstream discovery should be allowed because a conflict of interest may exist among potential direct purchaser class members. According to Defendants, some direct purchasers might have benefitted from Defendants' alleged anticompetitive conduct by receiving discounts pursuant to the exclusive agreements. However, the Direct Purchaser Plaintiffs aver that none of the named Plaintiffs – the entities from which downstream discovery is sought – benefitted from Defendants' anticompetitive conduct because none of the named Plaintiffs entered into the exclusive agreements that are the source of the alleged benefit.

In seeking downstream discovery, Defendants rely on Valley Drug where the Eleventh Circuit allowed the defendants to take downstream discovery to determine whether the most significant plaintiffs, including three wholesalers whose transactions accounted for over fifty percent of the plaintiffs' total claims, received a net benefit from the defendants' anticompetitive conduct. Id. at 1188, 1190. The plaintiffs in Valley Drug were wholesalers that purchased pharmaceuticals directly from one of the defendants. Id. at 1186. The plaintiffs alleged that the defendants entered into unlawful market-allocation agreements that kept less expensive generic pharmaceuticals off the market. Id. The net-benefit theory stemmed from the fact that some of the plaintiffs sold their products on a cost-plus basis, which allowed them to charge the same percentage mark-up as their acquisition costs. Id. at 1190. Thus, some of the plaintiffs arguably benefitted from the higher acquisition cost of brand-named pharmaceuticals. Id. at 1190-91. In justifying downstream discovery, the appellate court noted that cost-plus sales alone would be insufficient to prove a conflict if it were not for the specific nature of the product and industry involved. Id. at 1191.

Here, Defendants have not identified any direct purchasers that benefitted from Defendants' conduct or provided any information regarding the extent of the alleged benefit. And Defendants

do not identify any factors specific to the nature of the product or industry that support the existence of a conflict of interest. Defendants assert that downstream discovery might reveal a conflict of interest between the named and unnamed Direct Purchaser Plaintiffs. However, this assertion, without more, does not support the existence of a potential conflict of interest that justifies downstream discovery.

Defendants also submit that some unnamed class members might benefit from a lost profits theory of damages, which would depend entirely on downstream discovery. The Direct Purchaser Plaintiffs respond that they are seeking damages based on overcharges, not lost profits, because overcharges are the standard measure of damages in cases such as this one. See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 424 F.3d 363, 374 (3d Cir. 2005). As the Direct Purchaser Plaintiffs are seeking to recover for overcharges, downstream discovery is not relevant to the issue of damages. The mere possibility that some unnamed plaintiffs could benefit from a lost profits theory of damages does not justify the discovery sought. See In re Air Cargo, 2010 WL 4916723, at *4; In re Vitamins, 198 F.R.D. at 301.

Defendants also maintain that downstream discovery is necessary to determine the buying power of the Direct Purchaser Plaintiffs, a factor relevant to both class certification and the merits of the Direct Purchaser Plaintiffs' claims. According to Defendants, differences in buying power between Direct Purchaser Plaintiffs at different levels of the distribution chain could highlight differences in their claims. Additionally, Defendants contend that the Direct Purchaser Plaintiffs, in conjunction with certain managed care companies, have enough buying power to constrain the prices that Transitions can charge for its photochromic lenses. Defendants also seek discovery of any agreements or communications between managed care companies and the Direct Purchaser

Plaintiffs.

The Direct Purchaser Plaintiffs respond that downstream discovery is not relevant to class certification because differences in purchasing patterns or diversity in the types of businesses that make up the class do not render the class representatives' claims atypical or inadequate. Further, the Direct Purchaser Plaintiffs assert that they are small companies whose sales could not affect or inform an analysis of the downstream market. And in any event, the Direct Purchaser Plaintiffs claim that their buying power would be reflected in their purchasing records, which they have agreed to produce. The Direct Purchaser Plaintiffs also have agreed to produce a broad range of materials relating to managed care companies.

For these reasons, Defendants have not demonstrated the relevance of downstream discovery to class certification. The common issues to be resolved, if any, are not in the downstream market, but in the direct-purchaser market where Plaintiffs allege that they were overcharged. See In re Air Cargo, 2010 WL 4916723, at *3. And although Defendants claim that differences in buying power will highlight the need for individualized inquiries concerning damages, Defendants do not explain how differences in buying power affect whether the Direct Purchaser Plaintiffs' injuries are susceptible to common proof. See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 106 (2d Cir. 2007). In any event, to the extent that differences in buying power exist among the Direct Purchaser Plaintiffs, such differences will be reflected in the purchasing records that the Direct Purchaser Plaintiffs have agreed to produce. See In re Vitamins, 198 F.R.D. at 301 (quoting In re Folding Carton Antitrust Litig., No. MDL 250 (N.D. Ill. May 5, 1978)) ("[B]uyers' leverage is not determined by profits, but by volume of purchases.").

Defendants also have not demonstrated the relevance of downstream discovery to the merits

of the Direct Purchaser Plaintiffs' claims. If overcharges exist, the amount of the overcharges will be determined by examining prices in the direct-purchaser market, not the downstream market. Id. at 300. Allowing downstream discovery risks unnecessarily complicating the case with attempts to trace the effect of the alleged overcharges on the Direct Purchaser Plaintiffs' prices, sales, costs, and profits. See Ill. Brick Co., 431 U.S. at 725. And in view of the Direct Purchaser Plaintiffs' representation that they will produce materials relating to managed care companies, Defendants request for production of agreements or communications between such companies and the Direct Purchaser Plaintiffs is denied.

Lastly, Defendants contend that downstream discovery is relevant to class certification for the Indirect Purchaser Plaintiffs and the merits of their claims. Defendants claim that downstream discovery will allow them to determine whether wholesalers and retailers passed overcharges on to indirect purchasers and whether Defendants' conduct had any pro-competitive effects that lowered prices for some indirect purchasers. The Direct Purchaser Plaintiffs dispute the relevance of downstream discovery to the indirect purchaser action and submit that any discounts that indirect purchasers may have received would be better reflected in discovery from the Indirect Purchaser Plaintiffs. Further, the Direct Purchaser Plaintiffs argue that as third parties to the indirect purchaser action, they are protected from such burdensome discovery under Rule 45, Fed. R. Civ. P.

Defendants do not explain why discovery from the Indirect Purchaser Plaintiffs is insufficient to address the claims raised in that action. Defendants have not demonstrated that the relevance of downstream discovery to the indirect purchaser action justifies subjecting the Direct Purchaser Plaintiffs to the burden of such discovery.

**3.      Market Discovery**

Defining the relevant market is primarily a process of describing those groups of producers that have the ability to take significant amounts of business away from each other because of the similarity of their products. U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 995 (11th Cir. 1993) (citing Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 805 (8th Cir. 1987)). The outer boundaries of a product market are defined by the reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes.[2] Id. (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). Courts should consider how the product is used by consumers in general. Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1337 (11th Cir. 2010).

Defendants seek, among other things, discovery of documents relating to the cost, purchasing, and sales of non-photochromic products. Defendants argue that such discovery is necessary for the parties to fully understand the relevant market and analyze the impact of the alleged anticompetitive conduct. The Direct Purchaser Plaintiffs respond that non-sunwear products are not functional substitutes for photochromic lenses and should not be considered in defining the relevant market.

As discussed above, Transitions creates photochromic lenses by applying a photochromic treatment to ophthalmic lenses. The treatment causes the ophthalmic lenses to darken when exposed to sunlight and fade back to clear when removed from sunlight. The resulting photochromic lenses serve two purposes: vision correction and ultraviolet-light protection. Consequently, photochromic lenses can be considered functional substitutes for clear ophthalmic lenses as well as ultraviolet-protection products.

---

[2] "The cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another." Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1338 n.13 (11th Cir. 2010).

Documents produced by Transitions confirm that its photochromic lenses are intended to serve as a consumer's primary pair of corrective lenses (Dkt. 220 Ex. 2 at 39-41; Dkt. 222 Ex. 2 at 1-2). However, Transitions does not view its photochromic lenses as a replacement for sunglasses. According to Transitions, sunglasses are better suited for sustained outdoor use (Dkt. 220 Ex. 2 at 41) and may function in some settings where photochromic lenses do not, such as in a car. Nonetheless, photochromic lenses, like sunglasses, provide ultraviolet-light protection (Dkt. 222 Ex. 2 at 1). And sales of photochromic lenses may be linked to the sales of sunglasses (Dkt. 220 Ex. 2 at 44; Dkt. 222 Ex. 1 at 3), which presents the possibility that a cross-elasticity of demand exists between the two products. Therefore, discovery related to clear ophthalmic lenses and ultraviolet-protection products is relevant to defining the market at issue.

The Direct Purchaser Plaintiffs shall produce information relating to clear ophthalmic lenses and ultraviolet-protection products, such as sunglasses or clip-on sunglass attachments. However, the Direct Purchaser Plaintiffs do not need to produce information regarding frames, lens treatments, anti-reflective coatings, scratch-resistant coatings, or other products that do not correct vision or provide ultraviolet-light protection. The Direct Purchaser Plaintiffs need only produce information concerning these products as it relates to the direct-purchaser market, where the alleged overcharges occurred. This includes, for example, purchasing records from wholesale laboratories and retailers. However, information relating to clear ophthalmic lenses and ultraviolet-protection products is not relevant to the extent it constitutes downstream discovery.

## **Conclusion**

Accordingly, and upon consideration, it is **ORDERED** and **ADJUDGED** that Defendants' **Motion to Compel** (Dkt. 209) is **GRANTED** in part and **DENIED** consistent with this order.

**DONE AND ORDERED** in Tampa, Florida on this 7th day of February, 2012.

_____
ELIZABETH A JENKINS
United States Magistrate Judge