UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| IN RE: PHOTOCHROMIC LENS ANTITRUST LITIGATION | ) | MDL Docket No. 2173 |
| | ) | Case No. 8:10-MD-2173-JDW-EAJ |
| This Filing Relates To: | ) | |
| Case No. 8:10-CV-1158 | ) | Hon. James D. Whittemore |
| Case No. 8:10-CV-1358 | ) | |
| Case No. 8:10-CV-1825 | ) | Hon. Elizabeth A. Jenkins |
| Case No. 8:10-CV-1840 | ) | |
| Case No. 8:10-CV-2089 | ) | |
| Case No. 8:10-CV-2090 | ) | |
| Case No. 8:10-CV-2091 | ) | |
| Case No. 8:10-CV-2418 | ) | |

**INDIRECT PURCHASER END-USER PLAINTIFFS'**
**REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS


I. INTRODUCTION ....................................................1

II. STATEMENT OF FACTS ....................................................2

III. ARGUMENT ....................................................5

A. Questions Common to All Class Members Predominate ....................................................5

1. Dr. Netz's Class Certification Report ....................................................5

2. The Leonard Report ....................................................8

3. Transitions Misconstrues the Applicable Legal Standard ....................................................8

4. Transitions' Complexity Argument Fails ....................................................9

5. Dr. Leonard's Attack on Dr. Netz's Empirical Analysis is Flawed ....................................................10

6. Potential Statute of Limitations Defenses Do Not Defeat Predominance ......11

B. Florida Law Can be Applied Extraterritorially ....................................................12

C. Plaintiffs are Adequate Class Representatives ....................................................14

D. A Class Action is the Superior Method to Adjudicate the Claims at Issue.............15

IV. CONCLUSION ....................................................15

## TABLE OF AUTHORITIES

Cases

*A & M Supply v. Microsoft Corp.*,
654 N.W.2d 572 (Mich. Ct. App. 2002) .......... 9

*Am. Sales Co., Inc. v. SmithKlineBeecham Corp.*,
274 F.R.D. 127 (E.D. Pa. 2010) .......... 5

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 5

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
No. 10–23869–CIV, 2012 WL 1570057 (S.D. Fla. May 2, 2012) .......... 12, 13

*Behrend v. Comcast Corp.*,
655 F.3d 182 (3d Cir. 2011) .......... 8

*Bellinder v. Microsoft Corp.*,
Nos. 00-C-0855, 2001 WL 1397995 (Kan. Dist. Ct. Sept. 7, 2001) .......... 9

*Berry v. Budget Rent A Car Systems, Inc.*,
497 F. Supp. 2d. 1361 (S.D. Fla. 2007) .......... 13

*Bradburn Parent/Teacher Store, Inc. v. 3M*,
No. Civ. A 02-7676, 2004 LEXIS 16193 (E.D. Pa., Aug. 17, 2004) .......... 2

*Broussard v. Meineke Disc Muffler Shops, Inc.*,
155 F.3d 311 (4th Cir. 1998) .......... 12

*Campbell v. Hope Comm. Credit Union*,
No. 10-2649-STA, 2012 U.S. Dist. LEXIS 15530 (W.D. Tenn. Feb. 8, 2012) .......... 12

*Capp v. Microsoft Corp.*,
No. 00-CV-0637 (Wis. Cir. Ct., June 28, 2001) .......... 9

*Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*,
271 F.R.D. 538 (S.D. Fla. 2010) .......... 14

*Cohen v. Implant Innovations, Inc.*,
259 F.R.D. 617 (S.D. Fla. 2008) .......... 13

*Comes v. Microsoft Corp.*,
696 N.W.2d 318 (Iowa 2005) .......... 9

*Cnty. of Monroe, Fla. v. Priceline.com, Inc.*,
265 F.R.D. 659 (S.D. Fla. 2010)....................14

*Costa v. Kerzner Int'l Resorts, Inc.*,
No. 11–60663–CV, 2011 WL 2519244 (S.D. Fla. June 23, 2011)....................12, 13

*Cunningham v. PFL Life Ins. Co.*,
42 F. Supp. 2d 872 (N.D. Iowa 1999) ....................14

*Friedman v. Microsoft Corp.*,
CV-2000-000722 (Ariz. Super. Ct., Nov. 15, 2000 & July 13, 2001)....................9

*GLK, L.P. v. Four Seasons Hotel Ltd.*,
22 So. 2d 635 (Fla. Dist. Ct. App. 2009) ....................12

*Gooch v. Life Investors Ins. Co. of Am.*,
672 F.3d 402 (6th Cir. 2012) ....................12

*Gordon v. Microsoft Corp.*,
No. 00-5994, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001),
*aff'd* 645 N.W.2d 393 (Minn. 2002)....................9

*Groupo Televisa v. Telemundo Comm'cns Grp.*,
485 F.3d 1233 (11th Cir. 2007) ....................12

*Gulf Grp. Holdings, Inc. v. Coast Asset Mgt. Corp.*,
516 F. Supp. 2d 1253 (S.D. Fla. 2007)....................13

*Hearndon v. Graham*,
767 So. 2d 1179 (Fla. 2000)....................12

*Howe v. Microsoft Corp.*,
656 N.W.2d 285 (N.D. 2003) ....................9

*Hutson v. Rexall Sundown, Inc.*,
837 So. 2d 1090 (Fla. 4th DCA 2003) ....................13

*Hydrogen Peroxide*,
552 F.3d 305 (3d Cir. 2009) ....................5

*In re Flash Memory Antitrust Litig.*,
No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ....................7

*In re Flonase Antitrust Litig.*,
No. 08-CV-3301, 2012 WL 2277840 (E.D. Pa. June 18, 2012)....................6

*In re Florida Microsoft Antitrust Litig.*,
No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002) ....................................2, 9, 14

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)........................................................................................7

*In re Ins. Mgmt. Solutions Grp., Inc. Sec. Litig.*,
206 F.R.D. 514 (M.D. Fla. 2002).......................................................................................14

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)...............................................................................................11

*In re Lorazepam & Clorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002) ...........................................................................................2

*In re New Mexico Indirect Purchasers Microsoft Corp. Antitrust Litig.*,
No. D-0101-CV-2000-1697 (N.M. Dist. Ct., Sept. 30, 2002) ...........................................9

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
No. 03-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007) .............................................11

*In re South Dakota Microsoft Antitrust Litig.*,
657 N.W.2d 688 (S.D. 2003) ..........................................................................................2, 9

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009).......................................................................................10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010)....................................................................................7, 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012) ...........................................7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ..........................................7

*In re Toys "R" Us Antitrust Litig.*,
191 F.R.D. 347 (E.D.N.Y. 2000) .......................................................................................2

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
No. 04-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008).................................................9

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs.*,
225 F.R.D. 208 (S.D. Ohio May 12, 2003)........................................................................2

*Kohen v. Pacific Ins. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1504 (2010) .......... 9

*Little Caeser Enterprises, Inc. v. Smith*,
172 F.R.D. 236 (E.D. Mich. 1997) .......... 9

*McDonough v. Toys "R" Us, Inc.*,
638 F. Supp. 2d 461 (E.D. Pa. 2009) .......... 2, 5

*Melnick v. Microsoft Corp.*,
Nos. 99-CV-709-752, 2001 WL 1012261 (Me. Super. Ct., Aug. 24, 2001) .......... 9

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .......... 5

*Microsoft I-V Cases*,
No. J.C.C.P. No. 4106 (Cal. Super. Ct. Aug. 29, 2000) .......... 9

*Millennium Commc'ns Q & Fulfillment, Inc. v. Office of Att'y Gen. Dep't of Legal Affairs, State of Fla.*,
761 So. 2d 1256 (Fla. 3d DCA 2000) .......... 13

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009) .......... 9

*Montgomery v. New Piper Aircraft, Inc.*,
209 F.R.D. 221 (S.D. Fla. 2002) .......... 13

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco*,
262 F.R.D. 58 (S.D. Ohio 2003) .......... 2

*Nelson v. Freightliner*,
154 Fed. Appx. 90 (11th Cir. 2005) .......... 12

*Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.*,
601 F.3d 1159 (11th Cir. 2010) .......... 12

*Spinelli v. Capital One Bank*,
265 F.R.D. 598 (M.D. Fla. 2009) .......... 15

*Story Parchment Paper Co.*,
282 U.S. 555 (1931) .......... 6

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) .......... 5

*Trumpet Vine Investments, N.V. v. Union Capital Partners, Inc.*, 92 F.3d 1110 (11th Cir. 1996) ....................13

*Valentino v. Bond*, 2008 WL 3889603 (N.D. Fla. Aug. 19, 2008) ....................14

*Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572 (M.D. Fla. 2006) ....................11, 15

Federal Rules

Fed. R. Civ. P. 23....................2

Other Authorities

Fla. Stat. Ann. § 501.202 ....................13

Restatement (Second) of Conflict of Laws §145 cmt. e ....................14

ABA Handbook Antitrust Law Development (5th ed. 2002)....................6

Joshua P. Davis and Eric L. Cramer, *Antitrust, Class Certification and the Politics of Procedure,* 17 Geo. Mason L. Rev. 969, 984 (2010) ....................5

John H. Johnson and Gregory K. Leonard, *In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings*, 22 Antitrust 3, 108 (Summer 2008) ....................8

# I. INTRODUCTION

Transitions Optical, Inc. ("Transitions" or "TOI") abused its monopoly power in the photochromic lens market to foreclose competition for over a decade. Transitions' "all-or-nothing" policy of terminating any lens caster customer that agreed to sell a competitor's photochromic product was the bedrock of this scheme. Major lens casters Signet, Vision-Ease, and Rodenstock were summarily terminated for violating this policy.

Transitions' conduct prompted a Federal Trade Commission ("FTC") investigation. Rather than face a lengthy government prosecution, Transitions entered into a Consent Decree on April 22, 2010, which prohibited Transitions from further acting to exclude competition. *See* Decl. of Erich P. Schork ("Decl."), Ex. C (FTC Decision and Order). Despite the longevity and expansiveness of its scheme, Transitions now insists that its direct and indirect customers were not harmed at all, much less in a consistent manner, by its wrongful conduct. Given Transitions' monopolistic stranglehold on the market, this assertion defies economic principles. Moreover, its argument is rebutted by reports prepared by three economic experts: Dr. Janet S. Netz, Ph.D., Dkt. 284-1 (testifying for the indirect class on class issues); Dr. Hal Singer, Ph.D., Dkt. 286-1 ("Singer Rpt.") (testifying for the directs on class issues); and Dr. Gary L. French, Ph.D., [REDACTED]

Dr. Netz has put forth a plausible means of establishing antitrust impact and damages (pass through) using common evidence. Attempting to refute this fact, Transitions attacks Dr. Netz on grounds that her conclusions were merely "theoretical" and that her seven illustrative samples were too few. In so doing, Transitions ignores that Dr. Netz's pass-through analysis for the indirect class was empirical—it was not just theoretical—and demonstrated a pass through

rate of at least 100%. Moreover, Dr. Netz's data set included the two largest U.S retailers—Wal-Mart and Costco—which accounted for over one third of the indirect market, as well as major entities in the two other distribution chains. Dr. Netz's calculations of the size of the pass through were further validated by Dr. French. In any event, the degree of the pass through is clearly a dispute between experts, which should not be resolved at the class certification stage.

Contrary to Transitions' insistence that there are no relevant precedents, a number of courts have certified classes in similar indirect purchaser actions where it was alleged that a defendant engaged in unlawful anticompetitive activities to maintain its monopoly.[1] Ignoring these cases, Transitions attempts to alter what this case is about by re-casting and limiting Plaintiffs' claims to exclusive dealings. Courts have soundly rejected similar attempts by antitrust defendants, and the same result is appropriate here. In any event, a number of classes have been certified in consumer antitrust cases where exclusive dealing has been alleged.[2]

Thus, respectfully, the requirements of Federal Rule of Civil Procedure 23 are satisfied, and Plaintiffs' motion for class certification should be granted.

## II. STATEMENT OF FACTS

Transitions abused its monopoly power to foreclose competition for over a decade—abuses that were not limited to exclusive dealings.

[redacted]

---

[1] *In re Florida Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, *13-15 (Fla. Cir. Ct. Aug. 26, 2002) (collecting cases); *In re South Dakota Microsoft Antitrust Litig,*, 657 N.W.2d 688, 677 (S.D. 2003) (same).

[2] *See Bradburn Parent/Teacher Store, Inc. v. 3M*, 2004 U.S. Dist. LEXIS 16193, at *43 (E.D. Pa., Aug. 17, 2004); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs.*, 225 F.R.D. 208, 219 (S.D. Ohio May 12, 2003); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco*, 262 F.R.D. 58 (S.D. Ohio 2003) (certifying class in an exclusive dealings case functionally identical to this case); *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461 (E.D. Pa. 2009) (consumer class); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) (certifying settlement class of indirect purchasers); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) (same).



[redacted] The significant time, money, and intellectual property necessary to introduce a new competing photochromic product, and the risk of losing millions of dollars from the termination of their relationship with Transitions, provided lens casters with a strong incentive to submit to Transitions' exclusivity and pricing demands.[6]

*Second*, Transitions sought and obtained exclusivity and de-facto exclusivity agreements with a number of national and regional retailers and exclusionary agreements with a number of ophthalmic laboratories. Transitions' exclusionary agreements with retailers were substantially uniform—Transitions used form contracts—and its agreements with laboratories required the labs to market and sell Transitions lenses as their preferred photochromic products and prohibited the laboratories from marketing any competitor's photochromic product. The express purpose of these agreements was to foreclose competition. *See* Decl. Ex. X (TOI_0163600, at 10) [redacted]

---

[3] *See* Decl. Ex. Q (TOI_1195956); Decl. Ex. R (TOI_0830462); Decl. Ex. S (TOI_1913503); Decl. Ex. T (COR1003412); *see also* Decl. Ex. U (TOI_0812845) [redacted]

[4] *See* Decl. Ex. A (Cole Tr. pp. 340-60 (Aug. 7, 2012)); Decl. Ex. B (TOI_0067231).

[5] *See* Decl. Ex. B (TOI_0067231) [redacted] Decl. Ex V (TOI_0032422).

[6] Decl. Ex. W (TOI_0262337) [redacted]

*Third*, Transitions acted in conjunction with Essilor of America and other lens casters in response to competitors' attempts to enter the market. Typically, Transitions offered these lens casters targeted rebates—the frequency and complexity of which Transitions greatly overstates.[7] These rebates were provided to maintain Transitions' monopoly power and to quash competition, not to grow the photochromic category as Transitions asserts. [redacted]

Transitions overstates the complexity of its pricing model. Transitions used a standard formulaic pricing model (*See* Netz Rep. at 45-48) and dictated pricing to its lens caster customers. *See* Decl. Ex. Z (TOI_0957781 [redacted] Not surprisingly, Transitions' lens caster customers were not always happy with Transitions.[8] Transitions' representation that prices were individually negotiated is not supported by the record and is wrong.

[redacted]

---

7 [redacted]

8 Decl. Ex. AA [redacted]

[redacted]

## III. ARGUMENT

### A. Questions Common to All Class Members Predominance

Rigorous analysis of Rule 23 in antitrust cases will frequently lead to class certification. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814-15 (7th Cir. 2012). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).[10] Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, but only to "demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members." *In re Titanium Dioxide Antitrust Litig.*, 2012 WL 3711890, at *14 (D. Md. Aug. 28, 2012).[11]

#### 1. Dr. Netz's Class Certification Report

The Report of Dr. Janet Netz ("Netz Report") was submitted while discovery was ongoing, as it continues to be.[12] In connection with her analysis of the inflationary impact of Transitions' abuses on its direct customers, Dr. Netz performed an extensive review and analysis of Transitions' transactional pricing data; Transitions' pricing policies and practices; the nature of photochromic lens products; and the characteristics of the photochromic lens market. Netz

[9] *See* Decl. Ex. CC.

[10] *McDonough*, 638 F. Supp. 2d 461; *see also Am. Sales Co., Inc. v. SmithKlineBeecham Corp.*, 274 F.R.D. 127, 135-38 (E.D. Pa. 2010); Joshua P. Davis and Eric L. Cramer, *Antitrust, Class Certification and the Politics of Procedure*, 17 Geo. Mason L. Rev. 969, 984 (2010).

[11] Defendant's reliance on *Hydrogen Peroxide*, 552 F.3d 305 (3d Cir. 2009), for the proposition that a more stringent standard is required is misplaced. That decision has been clarified by *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011)(en banc).

[12] Plaintiffs have filed a motion to compel further transactional data from Transitions, which is currently under submission. [Dkt. 317]. Transaction data currently produced by TOI ends in May 2011.

Report ¶¶ 6-12, 44, 45-47. Dr. Netz concluded that Transitions' prices of photochromic lenses were not significantly constrained by other vision products; that significant barriers to entry existed in the photochromic market, because photochromic products are protected by intellectual property rights and access to a limited distribution chain is crucial to successful entry into the market; and that calculating impact is particularly susceptible to common proof, because Transitions sold its photochromic lenses to a small number of direct customers and Transitions used a standardized formulaic pricing model. *Id.* ¶¶ 17, 22-23 45-48.

Based on these analyses, Dr. Netz concluded that antitrust impact could reliably be established through common evidence and proposed use of a "before-and-after" benchmark approach that compared TOI's pricing prior to the FTC consent decree with its prices after the FTC consent decree.[13] This approach is a widely accepted means of measuring impact in antitrust actions—a fact TOI does not dispute. *See, e.g., In re Flonase Antitrust Litig.*, 2012 WL 2277840 (E.D. Pa. June 18, 2012); ABA Handbook Antitrust Law Development, pp. 876-79 (5th ed. 2002); *see also Story Parchment Paper Co.*, 282 U.S. 555, 561 (1931). Moreover, this approach is substantially similar to the methodology proposed and empirically tested by the direct purchasers' expert, Dr. Singer, and has now also been empirically validated by Dr. French. *See* Decl. Ex. E (Singer Report), [REDACTED]; Decl. Ex. K (Singer Merits Report [REDACTED] Decl. Ex. F (Gary French Merits Report) ("French Rep."), [REDACTED], Ex. 5.

Dr. Netz also sets forth a reliable methodology for establishing pass through using common evidence. Dr. Netz not only articulated a methodology for establishing pass through damages, she empirically validated the methodology through applying it to substantial data sets.

[13]Dr. Netz suggested two other benchmarks, a product comparison and a comparison to international market pricing, but the "before and after" benchmark seems most suitable.

In so doing, she utilized widely accepted arithmetic and regression analyses to produce illustrative studies using data produced by lens casters Essilor of America (Transitions' largest customer) and Younger; Essilor Laboratories of America (accounting for more than 50% of the lab market); retailers Wal-Mart and Costco (accounting for more than 25% of the retail market); and eye care practitioner Adirondack. Dr. Netz's case studies demonstrated that the degree of such pass through, which for each customer was estimated at over 100%, could be reliably calculated through use of common evidence.

Transitions ignores Dr. Netz's track record of contributing accepted methodologies and analyses class certification in antitrust actions. *See* Netz Report, Ex. A. For instance, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, Dr. Netz's analysis was instrumental in the court's decision to certify an indirect purchaser class of consumers who purchased price-fixed electronics and other products containing flat panel screens. 267 F.R.D. 583 (N.D. Cal. 2010). The case recently settled for over $1.1 billion. There, as in this case, Dr. Netz conducted a detailed analysis of the industry at issue, the relevant market, and the defendants' pricing practices and policies. *Id.* at 606-07. In addition to accepting Dr. Netz's conclusions at the class certification stage, the court also denied the defendants' motions to decertify the class and to exclude Dr. Netz's testimony.[14] In accepting Dr. Netz's analysis, the court found her analysis and methodology reliable both as to showing antitrust impact and pass through to the indirect purchaser consumers. *Id.* at 604; *LCD*, 2012 WL 555090, at *7-8. Plaintiffs submit that the same result is appropriate here.[15]

---

[14] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 WL 253298 (N.D. Cal. Jan. 26, 2012) (denying motion to decertify); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 WL 555090 (N.D. Cal. Feb. 21, 2012) (denying motion to exclude expert testimony).

[15] Transitions' attempts to analogize this action with *In re Flash Memory Antitrust Litigation*, 2010 WL 2332081 (N.D. Cal. June 9, 2012), and *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478 (2008), likewise fail. There, the plaintiffs alleged that the defendants fixed the prices of component products and courts concluded

### 2. The Leonard Report

Transitions' expert, Dr. Gregory Leonard, espouses a much higher standard of proof for class certification than has been accepted by the courts.[16] Dr. Leonard's professional bias in this regard is illustrated in the articles he has published on the matter and in a recent amicus brief that was submitted to the Supreme Court of the United States. Dr. Leonard contends that a class certification may be appropriate instances where every class member paid the same price for the same product at the same time, but that other purchasing situations must be examined using individualized analyses for each purchaser. This difficult, if not impossible, standard is at odds with current judicial standards on class certification. *Compare* Leonard Dep. at 72:14-81:22, *with Titanium Dioxide*, 2012 WL 3711890, at *14. The whole point of regression analysis is to provide an econometric analysis that separates the element of defendant's wrongdoing that contributes to a price shift by isolating other variables that would normally contribute to price changes.[17]

### 3. Transitions Misconstrues the Applicable Legal Standard

Plaintiffs are not required to show that every member of the proposed class was injured at the class certification stage. As leading antitrust jurist Judge Posner of the Seventh Circuit has noted:

---

that antitrust damages and impact could not be established through common evidence because prices were based on frequent re-negotiations and the products at issue were components that were later incorporated into an almost endless variety of other products at different stages of the distribution chain that were to consumers in different markets. Here, in contrast, Plaintiffs allege that Transitions abused its monopoly power and the record supports that Transitions engaged in standardized pricing and sold its products through a limited distribution chain.

[16] Leonard Deposition, pp. 15:17-25:15; *see also* John H. Johnson and Gregory K. Leonard, *In the Eye of the Beholder: Price Structure as Junk Science in Antitrust Class Certification Proceedings*, 22 Antitrust 3, 108 (Summer 2008), Decl. Ex. I, p. 5; Brief Of Economists As Amici Curiae In Support of Neither Party, dated Aug. 24, 2012, *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011), *cert. granted*, 2012 U.S. LEXIS 4754, 80 U.S.L.W. 3707 (U.S. June 25, 2012), Dec. Ex. J, pp. 4-6.

[17] For example, Dr. French's multiple regression analysis include prices as well as variables capturing prices, different products and different sellers. Decl. Ex. F, French Rep. ¶¶ 108-13.

> [A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification . . . .

*Kohen v. Pacific Ins. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1504 (2010); *Messner*, 669 F.3d at 823.[18]

**4. Transitions' Complexity Argument Fails**

Transitions' argument that this case is too complex for class treatment has been rejected in similar indirect purchaser monopolization actions. For example, in a number of state indirect purchaser actions wherein it was alleged that Microsoft had unlawfully abused its monopoly power, Microsoft argued that there were a number of complexities and variances in the marketplace and that a complex distribution chain would prohibit establishing whether, and to what extent, any monopolistic overcharge was passed on to consumers.[19] These courts overwhelmingly rejected Microsoft's complexity argument and certified indirect purchaser classes.[20] As the court explained in *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 246 (E.D. Mich. 1997):

> The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool

---

[18] *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009) ("Class certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct."); *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525, 2008 WL 1946848, at *6 (E.D. Pa. May 2, 2008) (same).

[19] *See, e.g., In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d 688, 677 (S.D. 2003).

[20] *See In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d 688, 677 (S.D. 2003); *In re Florida Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, *13-15 (Fla. Cir. Ct. Aug. 26, 2002); *Bellinder v. Microsoft Corp.*, Nos. 99-CV-17089, 2001 WL 1397995, *5-7 (Kan. Dist. Ct. Sept. 7, 2001); *Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, *8-12 (Minn. Dist. Ct. Mar. 30, 2001), *aff'd* 645 N.W.2d 393 (Minn. 2002); *In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust Litig.*, No. D-0101-CV-2000-1697 (N.M. Dist. Ct., Sept. 30, 2002); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 291-96 (N.D. 2003); *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct., June 28, 2001); *Friedman v. Microsoft Corp.*, CV-2000-000722 (Ariz. Super. Ct., Nov. 15, 2000 & July 13, 2001); *Comes v. Microsoft Corp.*, 696 N.W.2d 318 (Iowa 2005); *Microsoft I-V Cases*, No. J.C.C.P. No. 4106 (Cal. Super. Ct. Aug. 29, 2000); *but see A & M Supply v. Microsoft Corp.*, 654 N.W.2d 572 (Mich. Ct. App. 2002); *Melnick v. Microsoft Corp.*, Nos. 99-CV-709-752, 2001 WL 1012261 (Me. Super. Ct., Aug. 24, 2001).

> from plaintiffs' hands . . . If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving the issues. I believe defendants' complexity arguments are exaggerated, should not intimidate or overwhelm this Court, and should not prevail.

This argument was also rejected in *LCD* and *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 264 F.R.D. 603, 608 (N.D. Cal. 2009) ("*SRAM*"). In both cases, the indirect purchaser plaintiffs alleged that the defendants engaged in a price-fixing conspiracy, the products at issue varied and were sold in a number of markets, and the defendants sold to a variety of customers, large and small, through a variety of distribution channels. *See LCD*, 267 F.R.D. at 603; *SRAM*, 264 F.R.D. at 605-06. In those cases, as in this case, the defendants argued that product variation and the complexity of the distribution chain were too complex for pass through to be reliably established through common evidence. *See id.* The courts rejected the defendants' complexity arguments. *See LCD*, 267 F.R.D. at 604; *SRAM*, 264 F.R.D. at 614. Notably, Transitions' expert, Dr. Leonard, submitted an expert report in *SRAM* articulating the same individualized analysis he presents here in support of his conclusion that the direct purchaser class should not be certified. *SRAM*, 2008 WL 61152817, at *6-8. A similar rejection of his conclusions is warranted here.

**5. Dr. Leonard's Attack on Dr. Netz's Empirical Analysis is Flawed**

[REDACTED] TOI's objection that Dr. Netz's methodologies should have been applied to a larger data set of products for each and every customer is unavailing. The fact that Dr. Leonard was able to utilize Dr. Netz's proposed methodologies to evaluate her pass-through analysis, using a larger data set, shows that her analyses rely on common evidence and provide formulaic models to assess damages to the

Class. Leonard Dep., pp. 95-97. That Transitions' expert reached different conclusions using the same data set than Plaintiffs' expert should not bar class certification. Dr. Leonard's criticisms go to the merits of the litigation, not whether Dr. Netz's proposed models are feasible. This is especially the case here, since Dr. Netz's empirical analysis was confirmed by Dr. French in his subsequent report, which applied a refined technique to the Wal-Mart data set, and found pass-through that likewise exceeded 100%.[21] *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996) (defendants' argument that plaintiffs could not establish damages due to nature of market was insufficient to defeat class certification; that defendants' expert disagreed with plaintiffs' expert was irrelevant).

### 6. Potential Statute of Limitations Defenses Do Not Defeat Predominance

Potential statutes of limitations defenses do not create individualized issues that defeat predominance. The doctrine of fraudulent concealment is no barrier to class certification in antitrust cases such as this, where the critical question relating to application of the doctrine[22] is whether Transitions successfully concealed its unlawful conduct, not whether Plaintiffs and the other Class members knew that the prices they paid were higher than they should have been.[23]

---

[21] Dr. French has directly regressed prices consumers pay over the prices at which TOI sold its lenses to its first level customers. French Rep. ¶¶ 114-21. Dr. French prepared regression analyses using disaggregated Wal-Mart transaction data, which included nationwide retailer Wal-Mart and its subsidiary Sams Club as data sources. *Id.* ¶¶ 117-18. The Wal-Mart transaction data is the only disaggregated and complete retailer data suitable for this analysis, [redacted] And, Dr. French has done actual, reliable calculations of damages due to members of the classes proposed by Plaintiffs, using two different models. French Rep. ¶¶ 119-22. In Exhibits 14a-b and 15a-b, he has estimated the overcharge to the first purchasers, looked at the pass-through rates and then calculated damages to the consumer classes. Plaintiffs have therefore demonstrated they can show impact to consumers on a class-wide basis, using common methodologies and common evidence.

[22] The Court previously held that Plaintiffs' original complaint failed to plead fraudulent concealment with requisite specificity. Dkt. No. 180, at 15. Plaintiffs subsequently filed an amended complaint and Transitions answered Plaintiffs' amended complaint. Transitions' assertion that the Court held that Plaintiffs could not rely on fraudulent concealment is a misrepresentation of the Court's order.

[23] *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002); *In re Pressure Sensitive Labelstock Antitrust Litig.*, No. 03-1556, 2007 WL 4150666, at *21-22 (M.D. Pa. Nov. 19, 2007); *see also Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 580 (M.D. Fla. 2006) (Whittemore, J.).

Similarly, whether Plaintiffs and the other Class members reasonably should have discovered Transitions' unlawful conduct before a certain date is a common question.[24] This case is readily distinguishable from *Sacred Heart Health Systems, Inc. v. Humana Military Healthcare Services, Inc.*, 601 F.3d 1159, 1178 (11th Cir. 2010), and *Broussard v. Meineke Disc Muffler Shops, Inc.*, 155 F.3d 311, 342 (4th Cir. 1998), which are contract-based actions where courts found that a number of individualized inquiries would be necessary.

**B. Florida Law Can Be Applied Extraterritorially**

TOI is not only headquartered in Florida, but the offending misconduct was part of a business plan orchestrated nationwide from this state. Seeking to deprive consumers in 26 indirect purchaser jurisdictions[25] a remedy, Defendant contends that Florida law cannot be applied extraterritorially as the "place of injury" is singularly controlling. That is not the law. The Eleventh Circuit has made clear that "the factors are not listed in order of relative importance and that varying weight will be given to particular factors in different areas of law."[26] The place where a defendant is headquartered and the offending conduct occurred is of great importance. *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10–23869–CIV, 2012 WL 1570057, at *5-6 (S.D. Fla. May 2, 2012); *Costa v. Kerzner Int'l Resorts, Inc.*, No. 11–60663–CV, 2011 WL 2519244, at *1, 4 (S.D. Fla. June 23, 2011) (concluding that under the substantial relations test, FDUTPA applied to non-Florida claimants). The court in *Costa* made the

---

[24] Florida applies the delayed discovery doctrine to delay the accrual of FDUPTA claims. *GLK, L.P. v. Four Seasons Hotel Ltd.*, 22 So. 2d 635, 637 (Fla. Dist. Ct. App. 2009) (citing *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000)). Transitions' statement that Florida's tolling statute bars Plaintiffs' claims is wrong.

[25] Plaintiffs can advance claims of absent class members in states other than those in which they suffered injury. *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 442 (6th Cir. 2012); *Campbell v. Hope Comm. Credit Union*, 2012 U.S. Dist. LEXIS 15530 (W.D. Tenn. Feb. 8, 2012).

[26] *Groupo Televisa v. Telemundo Commc'ns Grp.*, 485 F.3d 1233, 1241 n.1, 1246 (11th Cir. 2007); *see also Nelson v. Freightliner*, 154 Fed. App'x 90, 104 (11th Cir. 2005) ("To determine which state has the most significant relationship we cannot simply add up the factors delineated in section 145 (2) and then apply the law of the sovereign with the greatest numerical totals) (internal quotations omitted).

important distinction between a case that alleges a point of sale misrepresentation where the place of injury could have significance, and a case like this, alleging an unlawful Florida-created corporate scheme. *Costa*, 2011 WL 2519244, at *1 (citing *Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 635 (S.D. Fla. 2008)). Similarly, *Barntext* makes clear that FDUPTA can be extraterritorially applied to a Florida-based scheme impacting consumers outside of Florida by holding "there are no geographical or residential restrictions contained in the express language of section 501.202 [of the FDUPTA]"[27] because the statute applies to "trade or commerce . . . wherever situated."[28]

TOI attempts to distinguish *Trumpet Vine Investments, N.V. v. Union Capital Partners, Inc.*, 92 F.3d 1110, 1116 (11th Cir. 1996), by claiming that the place of injury can only be less significant in fraudulent misrepresentation and false advertising cases. In *Trumpet Vine,* the Eleventh Circuit made clear that there is a difference between cases that "primarily. . . involve[] personal injury or products liability suits" where "the place of injury is of particular importance," and cases where a consumer purchased something in another state as a result of a fraudulent scheme carried out by a Florida corporation. *Id.* This case is far more akin to a fraudulent misrepresentation than a negligence personal injury case, and TOI's narrow interpretation of *Trumpet Vine* should be rejected.

TOI's reliance on *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221 (S.D. Fla. 2002) (defective parts manufactured outside of Florida); *Berry v. Budget Rent A Car Systems, Inc.*, 497 F. Supp. 2d. 1361 (S.D. Fla. 2007) (point of sale misrepresentation), and *Hutson v. Rexall Sundown, Inc.*, 837 So. 2d 1090 (Fla. 4th DCA 2003) (point of sale misrepresentation) is

---

[27] *Barnext Offshore,* 2012 WL 1570057, at *5-6 (citing *Millennium Commc'ns Q & Fulfillment, Inc. v. Office of Att'y Gen. Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000)).

[28] *Id.* at *5 (citing § 501.203, Fla. Stats.)*; see also Gulf Grp. Holdings*, 516 F. Supp. 2d at 1270.

misplaced. In each case, the nexus to the headquartered state was remote. Here, Transitions' headquarters are located in Florida, where all the corporate and legal decisions relating to Transitions' scheme to maintain its monopoly power through excluding competition was hatched and effectuated. In sum, each of Transition's cited cases are vastly distinguishable from this case. Under these circumstances, Florida has not only the most significant contacts with this action, but also a substantial interest in adjudicating Plaintiffs' claims, while also regulating the conduct of a company headquartered in this state.[29] To apply Florida law extraterritorially in this case is consistent with Florida law and equity because a scheme hatched and implemented in Florida injuring millions outside of Florida should logically be governed by Florida law.

**C. Plaintiffs Are Adequate Class Representatives**

TOI contends that Plaintiffs Moores, Sternemann and Sabani are inadequate class representatives because they either lack receipts of purchase or knowledge about the case. That is untrue.[30] Moreover, such arguments have been rejected. *See In re Fla. Microsoft Antitrust Litig.*, 2002 WL 31423620, at *6 (Fla. Cir. Ct. 2002). As to the knowledge argument, while it is irrelevant,[31] Plaintiffs have clearly demonstrated knowledge.[32]

---

[29] *See Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 883-84 (N.D. Iowa 1999) (applying Florida choice of law principles and determining that the law of the defendants' principal place of business applied where "the marketing and sales scheme originated in the corporate offices of the defendant," despite the fact that the plaintiffs resided in different states and purchased policies at issue in different states); *Valentino v. Bond*, 2008 WL 3889603 (N.D. Fla. Aug. 19, 2008) ("when the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous, and with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendants conduct occurred will usually be given particular weight in determining the state of the applicable law.") (citing Restatement (Second) of Conflict of Laws §145 cmt. e).

[30] While Plaintiff Sternemann did not produce a receipt documenting her purchase in or around summer of 2007 of Transitions lenses at Sears Optical, she testified that she made the purchase and actually produced, identified and entered the actual Transitions lenses she purchased from Sears into the record. *See* Decl. Ex. L, Sternemann Dep. at 9-11, 106-07 & Ex. 8.

[31] *In re Ins. Mgmt. Solutions Grp., Inc. Sec. Litig.*, 206 F.R.D. 514, 517 (M.D. Fla. 2002); *Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 538, 547 (S.D. Fla. 2010); *Cnty. of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659 (S.D. Fla. 2010).

[32] *See, e.g.*, Decl. Ex. M, E. Moores Tr., 55:3-9 (reviewed complaint before filing), 58:9-10; 74:20–75:6 (explaining his reasons for joining lawsuit); Decl. Ex. L, Sternemann Tr. at 102:4-7, 12-15, 103:24– 104:21 (reviewed

### D. A Class Action is the Superior Method to Adjudicate the Claims at Issue

A class action is the superior mechanism to adjudicate this controversy.[33] Transitions' arguments to the contrary are incorrect. *First*, Plaintiffs seek certification of a 26-jurisdiction class under FDUPTA and, in the alternative, seven statewide classes under the laws of each state. Thus, Class members' claims would never be subject to more than one substantive law, and Transitions' assertion that a trial would involve multiple state law standards is wrong. *Second*, Class members have little incentive to litigate this antitrust matter on an individual basis, where any potential recovery is minimal when compared to the costs of litigating this matter on an individual basis.[34] *Third*, Plaintiffs were able to identify that they purchased TOI's lenses based on their recollections and records, and nothing indicates that other Class members will not be able to do the same.[35] *Fourth*, Transitions' argument that any trial would involve an array of individual questions is wrong and simply restates its predominance argument.

## IV. CONCLUSION

For the foregoing reasons, in addition to those reasons stated in Plaintiffs' initial brief, Plaintiffs respectfully request that this Honorable Court enter an order granting Plaintiffs' motion for class certification.

---

complaints before filing), 104:20-21 ("I wanted to come forward and participate in this [litigation]."); Decl. Ex. N., Sabani Tr. at 10:16-18 (confirming purchase of Transitions' photochromic lenses), 33:10– 34:13, 36:2-3 (stating the case concerned TOI's "illegal" conduct in "monopolizing the photochromic lens market."), 40:21–41:1.

[33] *See* Decl. Ex. P (Response to Defendant's Objections to Trial Plan).

[34] *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572 (M.D. Fla. 2006) (Whittemore, J.) ("any interest in individual control of separate actions is negligible, as this case involves relatively small individual claims compared to the cost of complex legal issues against a relatively large entity."); *Spinelli v. Capital One Bank*, 265 F.R.D. 598 (M.D. Fla. 2009) (Jenkins, J.) (noting small size of claim would deter lawyer from pursuing action).

[35] *See, e.g.*, Decl. Ex. O (purchasing records of Plaintiffs Achtman, Donohoe, Forbes, Gable, Klein, Roller, and Wilcox referencing "Transition Lenses", "Transitions", "Transition" and/or "Trans").

Dated: October 12, 2012

/s/ Ben Barnow
Ben Barnow
Erich P. Schork
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504

/s/ Marc I. Gross
Marc I. Gross
Michael M. Buchman
POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665

/s/ Lance A. Harke
Lance A. Harke
HARKE CLASBY & BUSHMAN LLP
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8220
Fax: (305) 536-8229

/s/ Susan G. Kupfer
Susan G. Kupfer
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA 94111
Tel: (415) 972-8160
Fax: (415) 972-8166

*Interim Co-Lead Counsel for the putative Indirect Purchaser End-User Class*

**CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

The undersigned hereby certifies that the preceding document was caused to be served electronically this 12th day of October 2012 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Ben Barnow