IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN RE:<br>PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173<br>Case No.8:10-MD-2173-JDW-EAJ<br>Hon. James D. Whittemore |
| This Document Relates to:<br><br>INDIRECT PURCHASER END-USER ACTIONS | |

**EXPERT REPORT**

**of**

**GARY L. FRENCH, Ph.D.**

HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL EYES ONLY
SUBJECT TO STIPULATED PROTECTIVE ORDER, DOCKET 111-1, 112, 203, 206
AND FURTHER REVIEW PROCEDURE AND MOTION TO FILE UNDER SEAL

# Table of Contents

Table Of Exhibits ............................................................................................................ iii

I.    INTRODUCTION ............................................................................................... 1
    A.  My Qualifications ...................................................................................... 1
    B.  Plaintiffs' Allegations .............................................................................. 3
    C.  Retention and Assignment ........................................................................ 5
    D.  Assumptions and Information Sources ..................................................... 5
    E.  Summary of Opinions ............................................................................... 6

II.    PERTINENT INDUSTRY BACKGROUND ............................................................ 7
    A.  Photochromic Lens Function, Types, Designs and Materials.................... 7
    B.  The Manufacture and Distribution of Photochromic Lenses ..................... 8

III.    TRANSITIONS POSSESSED MONOPOLY POWER ............................................ 11
    A.  The Relevant Market Is Photochromic Lenses in the United States........... 11
        1.    Non-Photochromic Lenses Are Not Functional Substitutes For Photochromic Lenses ................................................................................ 12
        2.    Substantial Price Point Differences Suggest Non-Photochromic Lenses Are Not Close Economic Substitutes for Photochromic Lenses ..................................... 12
        3.    Documentary Evidence Shows That Non-Photochromic Lenses Are Not Close Economic Substitutes for Photochromic Lenses ............................................... 13
        4.    Empirical Analysis of Cross-Price Elasticity of Demand Confirms That Non-Photochromic Lenses Are Not Substitutes For Photochromic Lenses .............. 15
    B.  TOI Was Able To Exert its Market Power for Photochromic Lenses in the United States ................................................................................................ 18
        1.    Exclusive Dealing and Anticompetitive Foreclosure ......................... 19
        2.    Transitions' Anticompetitive Conduct was Pervasive ...................... 20
        3.    Transitions Sustained High Market Share ....................................... 24
    C.  Transitions Was Able to Sustain Supracompetitive Prices for Photochromic Corrective Lenses in the United States ...................................................... 26
    D.  Transitions Was Able to Restrict Output for Photochromic Corrective Lenses in the United States ...................................................................... 27
    E.  There Were Barriers to Entry in the Market for Photochromic Corrective Lenses in the United States ...................................................................... 29

IV.    ECONOMIC EVIDENCE SHOWS TOI'S MONOPOLIZATION WAS ANTICOMPETITIVE ..... 31
    A.  TOI's Conduct Foreclosed Competitor Access to Lens Casters................ 31
    B.  TOI Threatened or Terminated Relationships with Lens Casters to Enforce Exclusivity Policy ...................................................................................... 33
    C.  TOI's Conduct Injured Initial and Downstream Customers ...................... 34
        1.    Reduction of Output................................................................... 34
        2.    Supracompetitive Prices............................................................. 35
    D.  There Is No Evidence of Pro-Competitive Efficiency Justifications for TOI's Conduct ........................................................................................... 36

**V.     CLASS-WIDE DAMAGES** ........................................................................................ **39**
    A.  Reliable and Accepted Methodologies Exist to Calculate Damages to End Users on a
        Class-wide Basis ........................................................................................................ 39
    B.  The Competitive Benchmark .................................................................................... 41
    C.  Estimation of the Overcharge to TOI's First Purchasers ......................................... 45
        1.   Methodology ................................................................................................. 45
        2.   Data .............................................................................................................. 47
        3.   Lens Caster Overcharge Regression Results ................................................ 48
        4.   Total Amount of First Purchaser Overcharge ............................................... 49
    D.  Estimation of Pass-Through of Overcharge from First Purchasers to End-User
        Consumers ................................................................................................................. 49
        1.   Methodology ................................................................................................. 49
        2.   Data .............................................................................................................. 50
        3.   Results .......................................................................................................... 51
    E.  Total Pass-Through of TOI First Purchaser Overcharge to Repealer Class .............. 52
    F.  Total Pass-through of TOI First Purchaser Overcharge to Alternative Class ............ 52

**Appendix A.** ........................................................................................................................ **A-1**

**Appendix B.** ........................................................................................................................ **B-1**

**Appendix C.** ........................................................................................................................ **C-1**

# Table Of Exhibits

| Exhibit Number | Title | Page |
|---|---|---|
| 1 | Manufacture and Distribution of Photochromic Lenses | 8 |
| 2 | Average Annual Prices of Photochromic and Non-photochromic Lenses | 12 |
| 3 | Demand for Non-Photochromic Lenses | 17 |
| 4 | TOI Shares of the Photochromic Lens Market | 24 |
| 5 | Transitions Lenses Sold to Exclusive Lens Casters with Contracts, January 2002 - July 2010 | 32 |
| 6 | Standard cost, for each of top 10 products | 48 |
| 7 | Annual U.S. Population 50 and Over | 48 |
| 8 | First Purchaser Overcharge Regression Results | 48 |
| 9 a-b | First Purchaser Overcharges | 49 |
| 10 | Annual Overcharge per Lens | 49 |
| 11 | Annual Average But-for Prices | 49 |
| 12 | Pass-through Regression Results | 51 |
| 13 | U.S. Population, 1999-2010, by State | 52 |
| 14 a-b | Pass-Through Overcharges, Nationwide and to Repealer Class | 52 |
| 15 a-b | Pass-Through Overcharges to Seven Alternative Classes | 53 |

# I.   INTRODUCTION

## A.   My Qualifications

1.   I am an economist and Principal Consultant to Nathan Associates Inc., an economic consulting firm established in 1946 with offices or subsidiaries in Arlington, Virginia; Memphis, Tennessee; Irvine, California; London, U.K.; and Chennai, India. Nathan Associates provides economic, financial and statistical research and analysis to private and public sector clients in the United States and abroad. I joined Nathan Associates in 1979 and, through promotions, held numerous positions at the firm.

2.   Prior to joining Nathan Associates in 1979, I was a member of the faculties at three universities over an eight-year period. During this period, I taught undergraduate and graduate courses in economics, finance, and statistics. I earned three degrees from the University of Houston; a Bachelor of Business Administration in 1966, a Master of Arts in economics in 1971, and a Doctor of Philosophy in economics in 1973.

3.   Much of my work at Nathan Associates involves the analysis of economic, financial, marketing, and other business issues that arise in litigation. My clients have included both plaintiffs and defendants in a variety of litigation matters involving antitrust, contract, fraud and misrepresentation, tax, and various business and personal tort claims. During my career, I have been involved in well over 100 cases in federal and state courts. I have often been called upon to testify, as an expert economist, to my analysis and conclusions concerning liability issues and damages.

4.   A number of my litigation assignments have concerned issues of economic impact upon multiple plaintiffs and plaintiff classes, as well as the analytical methods that can be applied to assess damages on a class-wide basis. I have provided economic analyses and testimony regarding impact and damages in several class-action matters, including cases involving diamonds, life insurance, soft drink bottling, potash, new automobiles, disposable contact lenses, real estate brokerage services, automobile insurance, and airlines, among others. In a number of cases I have also undertaken analyses of issues pertaining to antitrust liability; including market definition, barriers to entry,

assessment of market power, and identification and proof of competitive effects. Such cases have involved markets for heavy construction equipment, fast food restaurants, airlines, waste disposal, cable television, school fundraising services, independent service organizations, wireless telephone service, and prescription drugs.

5.    On many other occasions, I have examined the economic and financial losses or damages suffered by individuals or businesses stemming from a variety of allegedly unlawful conduct. As examples, I have developed damage methodologies and calculated damages related to:

a.  Price fixing by sellers in a number of industries,

b.  The shortage of an imported brand of automobiles to a U.S. wholesale distributor,

c.  The alleged failure of a professional malpractice insurer to satisfy a claim by a law firm in a timely fashion,

d.  The alleged defects in aluminum roofing materials,

e.  The alleged breach of a lease on commercial property,

f.  The alleged breach of a contract to provide computer systems to the U.S. Department of Justice,

g.  The alleged breach of a contract to supply cellular telephones with proprietary features,

h.  The alleged breach of a franchise agreement,

i.  The alleged breach of an agency agreement between a cellular system operator and an agent,

j.  The theft or unauthorized use of trade secrets,

k.  The misrepresentation of the nature and benefits of life insurance policies,

l.  An alleged scheme to require borrowers to purchase "non-filing insurance" in lieu of securing collateral,

m.  Alleged malpractice by accounting auditors,

n.  The use of automobile parts other than those provided by original equipment manufacturers in automobile body repairs,

o.  Patent infringement,

p.  The alleged breach of a joint venture agreement to develop a commercial office building,

q.  The issuance of debit memoranda to travel agents by an airline for certain ticketing practices, and

r.   Monopolization or attempts to monopolize a number of markets.

6.   Additional information about my education, professional experience as an economist, publications, and affiliations can be found in my resume in **Appendix A**. Also included in **Appendix A** is a list of the matters in which I have testified during the last four years.

**B.   Plaintiffs' Allegations**

7.   Plaintiffs[1] allege that, since at least 1999, defendant Transitions Optical, Inc. ("Transitions," "TOI," or "defendant") engaged in anticompetitive and exclusionary conduct to monopolize the market for the development, manufacture and sale of photochromic treatments for corrective ophthalmic lenses in the United States in violation of state antitrust, consumer protection and unfair practice, and unjust enrichment laws.[2] Photochromic corrective ophthalmic lenses ("photochromic lenses") are any corrective ophthalmic lenses[3] to which photochromic materials[4] have been applied so that the lenses darken when exposed to ultraviolet (UV) radiation and lighten when removed from UV radiation.[5] According to the complaint, plaintiffs allege that Transitions, *inter alia*, refused to sell photochromic lenses to lens casters that marketed or sold a competitor's photochromic lens product and entered into exclusionary

---

[1] The named plaintiffs in this matter are Howard Achtman, John Donohoe, Keith Forbes, Amanda Gable, Gabby Klein, Edmund Moores, Caryl O'Keefe, Keith Brian Roller, Axhi Sabani, Phyllis Sternemann, and Eldridge Donald Wilcox (collectively, "Plaintiffs").

[2] First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs (November 14, 2011). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division, MDL Docket No. 2173, Case No. 8:10-md-2173 (JDW) ["Complaint" hereafter], ¶1.

[3] A corrective ophthalmic lenses is "any lens, whether finished, semi-finished or unfinished, that is designed to be used for vision correction and to be worn in eyeglass frames, including but not limited to, any single vision, bifocal, trifocal, or progressive lens made of or containing glass, polycarbonate, plastic, Trivex® or other materials." *See* Federal Trade Commission (April 22, 2010). Decision and Order (Final). *In the Matter of Transitions Optical, Inc., a Corporation* ["FTC Consent Order" hereafter], p. 3.

[4] A photochromic material is "any dye, monomer, coating, film or other substance that darkens when exposed to ultraviolet radiation and lightens when removed from ultraviolet radiation." *See*, FTC Consent Order, p. 4.

[5] *Ibid.*

agreements with its customers and other resellers of photochromic lenses.[6] The intention and consequence of defendant's conduct, according to plaintiffs, was to foreclose the market for photochromic lenses to competitors and elevate to supracompetitive levels the prices of such lenses paid by Transitions' customers and thus the retail prices paid by end-user consumers of Transitions' photochromic lenses.[7]

8.  Pursuant to Federal Rule of Civil Procedure 23, plaintiffs are seeking certification of the following 26-jurisdiction class under the Florida Unfair Deceptive Trade Practice Act ("Repealer Class" or "Indirect Purchaser Class"):[8]

> All persons who indirectly purchased photochromic lenses manufactured and/or distributed by Transitions, for their own use and not for resale, at any time from January 1, 1999, to the present (the "Class") in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, and/or Wisconsin. Excluded from the Class are Transitions and its parents, subsidiaries, and affiliates; all federal, state, or local governmental entities; and any judge or judicial officer presiding over this matter.

9.  As alternatives to the above, plaintiffs seek class certification of (i) seven repealer state antitrust, consumer protection and/or unjust enrichment classes for the class representatives' states   California, Florida, Kansas, Maine, Michigan, New York and Wisconsin ("Alternative Classes"); or (ii) a Florida consumer protection and/or unjust enrichment class with certification in the other states to be determined by the transferor courts upon MDL remand in accordance with *Lexecon, Inc. v. Milberg Weiss*, 523 U.S. 26 (1998).[9]

---

[6] Complaint at ¶¶46-69.

[7] Complaint at ¶¶87-89.

[8] Indirect Purchaser End-User Plaintiffs' Amended Motion for Class Certification and Memorandum of Law (July 2, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division, MDL Docket No. 2173, Case No. 8:10-md-2173 (JDW) ["IPP Class Motion" hereafter], footnote 4.

[9] *Ibid*, p. 5.

### C.    Retention and Assignment

10.    Counsel for plaintiffs has asked me to provide an expert opinion regarding Transitions'
conduct, whether it was anticompetitive, whether there were business justifications for
such conduct that outweighed potential anticompetitive effects, and whether such
conduct injured members of the Indirect Purchaser Class by elevating the prices they
paid to supracompetitive levels. Counsel for plaintiffs have further asked me to quantify
the amount of damages sustained by members of the Indirect Purchaser Class, whether
defined as proposed under Federal Rule of Civil Procedure 23,[10] or defined according
to proposed alternatives (i) or (ii).[11] Nathan Associates charges its usual and customary
rate of $490 per hour for my work. Neither Nathan Associates' nor my compensation in
this matter is contingent upon the outcome of this case.

### D.    Assumptions and Information Sources

11.    In preparing this report, I have reviewed documents and data produced by parties and
third parties in this matter, as well as pertinent publicly available information. Among
the information that I reviewed or instructed researchers working under my direction to
review include:

- First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs,
and transcripts of the depositions of a number of fact and expert witnesses;

- The class certification stage expert reports of Dr. Janet Netz (June 15, 2012) for the
indirect purchaser end-user class, Dr. Hal Singer (June 15, 2012) for the direct
purchaser class, and Dr. Gregory Leonard (September 17, 2012) for the defendant;

- Photochromic lens transaction data spanning December 1999 to May 2011
produced by Transitions;

- Annual data pertaining to the cost of manufacturing Transitions lenses;

- Information and data related to rebates that Transitions paid to its first purchasers;

- Data and documents produced by Transitions' alleged co-conspirators, Essilor of
America, Inc. ("EOA") and Essilor Labs of America, Inc. ("ELOA); and

---

[10] *See* ¶8, *supra.*

[11] *See* ¶9, *supra.*

- Data and documents produced by third parties, including lens casters, ophthalmic laboratories and retailers of ophthalmic lenses.

**Appendix B** to this report contains a list of the materials reviewed or available.

12. The conclusions reached in this report are based on the information and data that have been reviewed to date. In the event that additional data or information becomes available, whether through discovery or other sources, I reserve the right to reconsider these conclusions, if warranted by the additional information.

**E.   Summary of Opinions**

13. Based on analysis of relevant data and consideration of documentary evidence in this matter, I reach the following conclusions:

- The relevant market for antitrust purposes consists of that for photochromic lenses at the treatment and lens caster level in the United States;

- Transitions possessed and exercised monopoly power in the market for photochromic lenses;

- Transitions engaged in anticompetitive conduct, including the retaliatory termination of sales to customers that marketed or sold competing photochromic lenses and the entry into exclusive agreements with customers and other resellers of photochromic lenses;

- Transitions engaged in anticompetitive conduct during the class period;

- Transitions anticompetitive conduct led to supracompetitive prices paid by end consumers of photochromic lenses; and

- Nationwide overcharges are estimated as $█████████ and $█████████ during January 2000 to April 22, 2010. The aggregate damages sustained by members of the proposed Indirect Purchaser Class during this period range from $█████████ to $█████████; the aggregate damages sustained by members of the Alternative Classes, statewide classes for California, Florida, Kansas, Maine, Michigan, New York or Wisconsin, range from $█████████ to $█████████.

## II.   PERTINENT INDUSTRY BACKGROUND

### A.   Photochromic Lens Function, Types, Designs and Materials

14.   Corrective ophthalmic lenses are incorporated into eyeglass or spectacle frames and worn to provide vision correction pursuant to a prescription. Photochromic lenses are any corrective ophthalmic lenses to which photochromic materials have been applied so that the lenses darken when exposed to UV radiation and lighten when removed from UV radiation.[12] Untreated prescription lenses remain clear under all circumstances, while prescription sunglasses are always dark. Thus, photochromic lens eyeglasses, which are worn in place of both clear lens eyeglasses and sunglasses, provide a measure of convenience to the wearer. They may also provide cost savings compared to the sum of the costs of both clear untreated prescription eyeglasses and prescription sunglasses.

15.   There are three types of photochromic lenses: indoor, outdoor, and active/special use lenses.[13] Indoor photochromic lenses are the most common, and have no tint when indoors but darken when exposed to UV light outdoors. Outdoor photochromic lenses have a slight to mild tint indoors and darken outdoors. Outdoor lenses are particularly well suited for daytime driving, as indoor lenses do not adequately darken behind vehicle windshields. The newest type of photochromic lenses are the active/special use lenses designed for specific activities, such as biking, running, golfing, skiing, boating or driving.

16.   Clear ophthalmic corrective lenses can be designed as single or multifocal lenses. Single vision lenses are made with a single power to correct myopia (near-sightedness) or presbyopia (far-sightedness), while multifocal lenses have multiple powers to correct vision at more than one distance. Multi-focal lenses can be bifocal, trifocal, or

---

[12] *See* ¶7, *supra.*

[13] IBISWorld (February 2012). *Photochromic Lens Manufacturing in the U.S., IBISWorld Industry Report 5013* ["IBISWorld" hereafter], pp. 12-13.

progressive addition lenses (PALs).[14] Bifocal lenses include a prescription for myopia on the upper half and a prescription for presbyopia on the lower half, separated by a visible segment line. Trifocal lenses have the same two focal areas as bifocal lenses, but the two focal areas are separated by a third prescription area for intermediate distance. PALs correct myopia and presbyopia in a continuum from the top to the bottom of the lens with no visible segment lines.

17.    Corrective ophthalmic lenses are manufactured from glass and various types of plastic. However, because of the greater weight and thickness of glass and the higher risk of shattering of glass, today almost all ophthalmic lenses are manufactured using plastic.[15] Glass and various plastics have various refractive indices which measure the extent to which a material can bend light. Given that higher refractive indices bend light more, lenses with higher indices can provide vision correction with thinner and lighter lenses.[16] Various material categories have the following refractive indices:[17]

| | |
|---|---|
| Standard plastic | 1.498 -1.50 |
| Glass | 1.52 |
| Trivex and mid-index plastic | 1.53 -1.56 |
| Polycarbonate plastic | 1.59 |
| High-index plastic | 1.60 and greater |

**B.    The Manufacture and Distribution of Photochromic Lenses**

18.    The manufacture and distribution of photochromic lenses are depicted in **Exhibit 1**. Transitions Optical, Inc. (TOI) produces photochromic lenses in partnership with lens manufacturers, or lens casters. Lens casters include companies such as Essilor of

---

[14] Essilor of America (August 22, 2006). 2005 Transfer Pricing Documentation Study (Draft), ESOA2-21-00009006-9091 at 9011.

[15] JPMorgan (2006). Vision Ease Lens Investment Analysis Report, TOI 1133264-441 at 275 ("Glass, accounting for approximately 1.7% of the U.S. market in 2005…").

[16] Corning Incorporated (2012). About High-Index Lenses (retrieved online September 4, 2012 at http://www.corning.com/ophthalmic/products/educational_info/high_index.aspx).

[17] TOI (Undated). Optical Basics, TOI  0663338-467 at 367.

America ("EOA"), Carl Zeiss Vision ("CZV"), Sola (until it was acquired by CZV in 2005), Hoya, Vision-Ease, Younger Optical, X-Cel, Rodenstock, Seiko, Signet Armorlite (until it was acquired by EOA in 2010), Augen, Shamir/Eyal and Oakley. Lens casters supply corrective lenses (i.e., "blanks" or "substrate"), primarily from various plastic materials with varying refractive indices, to TOI. TOI then uses proprietary methods to apply patented photochromic materials to the lenses. Transitions then sells the now photochromic lenses back to the lens casters.[18]

19.    In the alternative, some lens casters are vertically integrated and apply their own photochromic materials to their own lenses. In fact, most providers of photochromic lenses are lens casters. Photochromic lens providers and their photochromic lens brands[19] include the following:

| Manufacturer | Brand | Primary Company Description |
| --- | --- | --- |
| Transitions Optical | Transitions | Photochromic treatment provider |
| Corning | SunSensors | Photochromic material provider[20] |
| Vision-Ease | Life RX, Change RX | Lens caster |
| Hoya | SunTech, Misty | Lens caster |
| Indo | Indochromic | Lens caster |
| Rodenstock | Colormatic | Lens caster |
| Signet Armorlite | KODAK Instashades | Lens caster |

20.    The above list also provides a general description of each photochromic lens provider. As shown above, most photochromic lens providers are also lens casters. However, the largest volume photochromic lens provider, TOI, is not a lens caster. For that reason, TOI buys substrate from lens casters, applies photochromic materials, and sells the

---

[18] Federal Trade Commission (March 3, 2010). Analysis to Aid Public Comment. *In the Matter of Transitions Optical, Inc., a Corporation* ["FTC Analysis" hereafter], p. 2.

[19] TOI (June 27, 2007). Optical Products 2007 BSR Briefing Document, TOI 1865482-609 at 524.

[20] Corning sells "the photochromic liquid chemical compound it has developed directly to lens makers who in turn will 'cast' the liquid into lens designs." *See*, Declaration of Eileen M. Buckley (October 12, 1998). *Corning Incorporated vs. Transitions Optical, Inc.* (United States District Court Western District of New York), TOI 1912861- 867 at 863.

9

photochromic lenses back to lens casters. In some cases, TOI purchases lens substrate particular to a lens caster, photochromically treats it, and then sells the resulting photochromic lens back to the same lens caster. In other cases, TOI purchases generic substrate from common suppliers, photochromically treats it, and makes them available to any lens caster.[21]

21.   Lens casters then sell photochromic lenses, including those obtained from TOI, to independent wholesale lens laboratories, or provide them to their own laboratories if the lens caster is vertically integrated into the wholesale lab business. Lens casters also sell photochromic lenses to optical retailers which have in-house labs. Whether independent, owned by a lens caster, or part of an optical retailer, a lens lab surfaces lenses to the patient's prescription, assembles the lenses into the selected frames, and ships the finished eyewear to the retailer or to the ECP (eye care professional) in his/her own practice or to the retail-based ECP.[22]

22.   ECPs, including ophthalmologists, optometrists, and opticians, in private practice provide eye examinations, write vision correction prescriptions, and sell finished eyewear including both glasses and contact lenses at retail to patients or ultimate consumers. Optical retailers employ ECPs to provide professional services and sell corrective prescription eyeglasses, including those with photochromic lenses, to consumers. Optical retailers include optical retail chains such as LensCrafters, Cole Vision, Pearle Vision, Hour Eyes, and For Eyes; optical departments in department stores, mass merchandisers, and warehouse clubs, such as Sears, Wal-Mart, Costco, Target, and Sam's Club; and independent optical shops. All of these retailers sell photochromic lens eyeglasses to end-user consumers, who are members of the proposed plaintiff class.

---

[21] TOI (August 25, 2002). Pricing Policy and Procedures, TOI  1916614 – 622 at 615.

[22] TOI (June 27, 2007). Optical Products 2007 BSR Briefing Document, TOI  1865482-609 at 508-509.

## III.     TRANSITIONS POSSESSED MONOPOLY POWER

23.  *Market power* is the ability to charge and maintain prices profitably above the competitive level.[23] Firms may have a little market power, a lot of market power, or something in between, depending on the extent to which they can raise price above marginal cost. Thus, all firms selling a differentiated good will have *some* market power, however slight.[24] In short, market power should actually be viewed in varying degrees.

24.  Although there is no universally accepted definition of the term *monopoly power*, it generally connotes not only a relatively high degree of market power, but a relatively high degree of market power maintained over some period of time.[25]

25.  In this section, I define the relevant market and show that TOI possessed and wielded monopoly power in that market, including the ability to charge supracompetitive prices and restrict output. I further show that TOI maintained its power over time due to the presence of barriers to entry in the relevant market.

### A.     The Relevant Market Is Photochromic Lenses in the United States

26.  Relevant markets for purposes of antitrust analysis and measuring market power are defined by the analysis of close substitutes. When defining the relevant market for a product or service, economists include all products or services that are considered economic substitutes. For two products to be economic substitutes, they first must be functional substitutes, in that they serve the same purpose or satisfy the same need or want of buyers. Two functional substitutes are also economic substitutes if they compete for the purchasers' favor and the pricing of one constrains the pricing of the other.

---

[23] Blair, R.D. and Kaserman, D.L. (2009). *Antitrust Economics*. New York: Oxford University Press ["Blair and Kaserman" hereafter], pp. 110-11.

[24] *Ibid,* pp. 110-111.

[25] *Ibid*, p. 103. *See also* ¶62, *infra*.

27.     Based upon my analysis, described below, I conclude that the relevant market in this litigation is that for photochromic lenses at the treatment and lens caster level in the United States. This determination is informed by functional differences between photochromic and non-photochromic lenses, the price differential between photochromic and non-photochromic lenses, documentary evidence that non-photochromic lenses are poor economic substitutes for photochromic lenses, and an empirical analysis of cross-price elasticity of demand between photochromic and non-photochromic lenses.

### 1.     Non-Photochromic Lenses Are Not Functional Substitutes For Photochromic Lenses

28.     At the most fundamental level, the defining characteristic of photochromic lenses is their ability to darken upon exposure to ultraviolet (UV) light and return to their clear state in the absence of UV light.[26] This characteristic distinguishes photochromic lenses from all types of non-photochromic lenses including clear corrective lenses, fixed-tint lenses (such as prescription sunglasses), as well as polarized or anti-reflective lenses (which provide protection from UV rays or glare but maintain fixed or clear tint). While photochromic lenses may be a functional substitute for non-photochromic lenses, without the variable tint attribute no single type of non-photochromic lens is a functional substitute for photochromic lenses.

### 2.     Substantial Price Point Differences Suggest Non-Photochromic Lenses Are Not Close Economic Substitutes for Photochromic Lenses

29.     The price differential between photochromic and non-photochromic lenses suggests that non-photochromic lenses are not close economic substitutes for photochromic lenses. **Exhibit 2** shows average annual prices received by lens casters for pairs of photochromic and non-photochromic corrective lenses of all materials and styles from

---

[26] Essilor of America (Undated). Transitions (presentation by Stephanie Carson, brand manager), ESOA-03-00011705 – 749 at 707.

1999 to 2012.[27] As shown in Exhibit 2, the price of photochromic lenses has averaged around $39 per pair, while the price of non-photochromic lenses has averaged around $10 per pair; thus, the price point for photochromic lenses is nearly four times higher than that of non-photochromic lenses.

30.   Photochromic lenses, and specifically Transitions brand photochromic lenses, also enjoy a price premium at the retail level. According to TOI internal documents from 2002 and 2003, "Transitions lenses are premium priced through the value chain and command, in general, a $50-$60 price premium at retail, versus a clear lens."[28] According to another TOI internal document from 2008, Transitions lenses commanded a 60 percent and greater premium relative to clear lenses at ███████ and other retailers.[29] Moreover, despite their price premium, photochromic lenses have experienced consistent sales growth relative to non-photochromic lenses,[30] which further suggests that non-photochromic lenses really do not provide significant price constraints on photochromic lenses.

### 3.   Documentary Evidence Shows That Non-Photochromic Lenses Are Not Close Economic Substitutes for Photochromic Lenses

31.   TOI's exclusive agreements with distributors of corrective lenses barred signatories from selling competing photochromic lenses, not non-photochromic lenses.[31] That TOI's exclusive agreements only sought to limit rival penetration of photochromic lenses is consistent with the conclusion that non-photochromic lenses are not a good economic substitute for photochromic lenses. Similarly, co-conspirator EOA

---

[27] VCA MSR Reports, January 2000 – February 2012. The 1999 values were calculated using reported 1999 to 2000 growth rates.

[28] TOI (June 3, 2002). Optical Products BSR Briefing Document, TOI  1995203 – 250 at 221. *See also*, TOI (June 11, 2003). Transitions Optical 2003 Business Strategy Review, TOI  1864248 – 264 at 253.

[29] TOI (June 25, 2008). Transitions Optical BSR Presentation, TOI  0620774 – 991 at 959.

[30] TOI (Undated). ███████████, TOI  0709137 – 138 at 137.

[31] Deposition of Alex Louw (May 2, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Louw Deposition" hereafter], p. 41:5-17.

acknowledged in 2004 that the non-photochromic lenses it produced were not sufficiently close substitutes to cannibalize sales of photochromic lenses. Specifically, according to the document, "EOA opportunities exist in tinted, polarized, mirror coatings, fashion Rx and plano sunwear **without** compromising photochromic sales."[32]

32. These various forms of documentary evidence support the conclusion that non-photochromic lenses are poor substitutes for photochromic lenses. Given the lack of functional and economic substitutability, it is therefore not surprising that TOI's internal documents refer to TOI as a participant in the distinct "photochromic category,"[33] "photochromic segment,"[34] or "photochromic market" and report TOI's market share based on its portion of photochromic lens sales.[35] Likewise, it is not surprising that the Vision Council of America (VCA) identifies a "photochromic lens market;"[36] a market research firm, IBISWorld, recently released a report on the "photochromic lens market" in the U.S.;[37] and a Morgan Stanley report indicated that TOI had approximately 90 percent of the "photo chromic [sic] lens market" as of 2009.[38]

---

[32] Essilor of America (2004). Sunwear 2004 Business Plan, ESOA-01-00016724 –773 at 741 (emphasis in original).

[33] TOI (2007). Transitions Optical 2007 Business Strategy, TOI  0980924 – 998 at 925.

[34] TOI (Undated). Overview, TOI  0664075 – 077 at 076. *See also*, TOI (June 2003). TOI 2003 BSR, TOI  1864006 – 051 at 007.

[35] TOI (February 9, 2009). Naming Transitions Sunwear, TOI  0036825 – 883 at 828.

[36] Vision Council of America (VCA) (2006). Q4 2006 Vision Watch-VCA Lens Index Report, TOI  0163042 - 126 at 049).

[37] IBISWorld, p. 4. This report also identifies TOI as the "major player" in a "monopolistic environment."

[38] Morgan Stanley Research North America (May 4, 2010). *PPG Industries, Inc., Highest-Growth Coatings Company, but Full Valuation* ["Morgan Stanley", hereafter], p. 23.

4.    **Empirical Analysis of Cross-Price Elasticity of Demand Confirms That Non-Photochromic Lenses Are Not Substitutes For Photochromic Lenses**

33.    Cross-price elasticity of demand measures the change in the quantity demanded of one product in response to a change in the price of another product. More generally, for any two products, *x* and *y*, the cross-price elasticity of demand may be defined as follows:

$$E_{xy} = \frac{\Delta Q_x / Q_x}{\Delta P_y / P_y}$$

where $\Delta Q_x$ is a change in $Q_x$, the quantity of *x*; $\Delta P_y$ is a change in $P_y$, the price of *y*; and $E_{xy}$ measures how the quantity demanded of *x* responds to a change in the price of *y*. The cross-price elasticity, $E_{xy}$, may be positive or negative. If $E_{xy}$ is positive, then *x* is a substitute for *y*. If $E_{xy}$ is negative, then *x* is a complement to *y*.

34.    To assess the relevant antitrust market in this matter, I relied upon monthly data at the lens caster level, the source of which was also relied upon for Exhibit 2.[39] In order to analyze the extent to which consumers responded to an increase in the price of photochromic lenses by substituting towards non-photochromic lenses, I estimated a demand equation of the form

$$\log(Q_{d,t}^n) = b_0 + b_1 \log(P_t^n) + b_2 \log(P_t^p) + b_3 \log(Pop_t) + \sum_{i=1}^{11} b_{i+3}(D_{i,t}) + u_t$$

where, at time *t*, $Q_{d,t}^n$ is the quantity demanded of non-photochromic lenses, $P_t^n$ is the price of non-photochromic lenses, $P_t^p$ is the price of photochromic lenses, $Pop_t$ is the U.S. population age 50 and over,[40] $D_{i,t}$ are monthly dichotomous variables which

---

[39] VCA MSR Reports, January 2000 – February 2012. The 1999 values were calculated using reported 1999 to 2000 growth rates.

[40] U.S. Census Bureau (2012) *The 2012 Statistical Abstract* [retrieved online September 12, 2012 from http://www.census.gov/compendia/statab/cats/population.html] , Table 7 - Resident Population by Sex and Age, and Table 8 - Intercensal Resident Population by Sex and Age. *See also*, U.S. Census Bureau (2000). The 2000 Statistical Abstract [retrieved online September 12, 2012 from

capture monthly variation in demand not captured by the other explanatory variables, and $u_t$ is the error, or disturbance, term.

35.   As shown in the equation above, all of the continuous variables are expressed in natural logarithms. With this design, the parameters on the continuous explanatory variables can all be interpreted as elasticities. Specifically, the parameter $b_1$ measures the own-price elasticity of demand for non-photochromic lenses, or the percentage change in $Q_{d,t}^n$ given a one percent change in $P_t^n$; the parameter $b_2$ measures the cross-price elasticity of demand for non-photochromic lenses, or the percentage change in $Q_{d,t}^n$ given a one percent change in $P_t^p$; and the parameter $b_3$ measures the elasticity of non-photochromic lenses with respect to the population age 50 and over, or the percentage change in $Q_{d,t}^n$ given a one percent change in $Pop_t$.

36.   If consumers view non-photochromic lenses as economic substitutes for photochromic lenses, then $b_2$ will be positive, and consumers will respond to an increase in the price for photochromic lenses by substituting non-photochromic lenses for photochromic lenses. Alternatively, if $b_2$ is negative (or zero) then non-photochromic lenses are not economic substitutes for photochromic lenses, and consumers will not respond to an increase in the price of photochromic lenses by substituting non-photochromic lenses for photochromic lenses.

37.   It is a basic tenet of economics that a product's own quantity ($Q$) and price ($P$) are jointly, or simultaneously, determined. That is, generally, $Q$ and $P$ are *endogenous*. In the context of the demand equation described above, $Q_{d,t}^n$ and $P_t^n$ are endogenous. In such circumstances, the endogenous explanatory variable,, will be correlated with the error term, $u_t$, and the usual Ordinary Least Squares (OLS) estimation will yield biased and inconsistent parameter estimates. For unbiased and consistent estimation of the

---

http://www.census.gov/prod/2001pubs/statab/sec01.pdf], p. 13. *See further*, U.S. Census Bureau (May 16, 2012). *Annual Estimates of the Resident Population by Sex and Five-Year Age Group for the United States: April 1, 2010 to July 1, 2011* (NC-EST2011-01) [retrieved online September 12, 2012 from http://www.census.gov/popest/data/national/asrh/2011/index.html].

equation, I rely upon an econometric estimation technique known as Two-Stage Least Squares (2SLS).

38.  Basically, 2SLS is a method of systematically creating *instrumental variables* to replace the endogenous variables where they appear as explanatory (or right hand-side) variables in the equation. In the first stage of 2SLS, the endogenous explanatory variable is regressed on other (exogenous) explanatory variables in the model, along with any other so-called "instruments" that may help account for variation in that endogenous variable. In the second stage, the predicted values of the endogenous variable (obtained from the first stage) are substituted into the original regression equation, which is then estimated by OLS.[41]

39.  In the specific context of the demand equation above, the first stage involves $P_t^n$ being regressed on the instruments that may help account for variation in $P_t^n$.[42] In the second stage, the predicted values of $P_t^n$ (obtained from the first stage) are substituted into the original regression equation, which is then estimated by OLS. The 2SLS results are presented in **Exhibit 3**.

40.  As shown in Exhibit 3, the own-price elasticity, $b_1$, indicates that a one percent increase in the price of non-photochromic lenses leads to an approximate decrease in the quantity demanded for non-photochromic lenses of 0.80 percent. The population elasticity, $b_3$, is positive and suggests that a one percent increase in the population age 50 and over leads to a 0.95 percent increase in the demand for non-photochromic lenses.[43]

---

[41]Gujarati, D.N. (1995). *Basic Econometrics, 3rd Ed.* McGraw-Hill: New York ["Gujarati" hereafter], pp. 687-688.

[42] The instruments include all of the exogenous variables in the demand equation, with the exception of *Pop*, which was replaced with annual dichotomous "shifters" (akin to the monthly version described in the model) for annual fluctuations and per capita disposable income, which results in a better proxy for $P_t^n$. For per capita disposable income, *see*, Bureau of Economic Analysis (August 30, 2012). *Table 2.6. Personal Income and Its Disposition, Monthly* [retrieved online September 10, 2012 from www.bea.gov] (monthly income in billions of dollars).

[43] Moreover, as also shown in Exhibit 3, these parameters are statistically significant at $p < 0.01$.

41.  Most importantly, however, the cross-price elasticity of demand, $b_2$, is negative and statistically significant. Specifically, as shown in Exhibit 3, a one percent increase in the photochromic lens price leads to a 0.44 percent decrease in the demand for non-photochromic lenses. Thus, photochromic and non-photochromic lenses are not substitutes. Consumers will not respond to an increase in prices for photochromic lenses by substituting them with non-photochromic lenses.[44]

42.  In short, this empirical analysis econometrically confirms non-photochromic lenses are not substitutes for photochromic lenses, and photochromic lenses constitute a distinct economic market.

**B.    TOI Was Able To Exert its Market Power for Photochromic Lenses in the United States**

43.  Plaintiffs allege that TOI engaged in exclusionary conduct with lens casters, the purpose of which was to foreclose TOI's actual or potential competitors from those lens casters.[45] Plaintiffs' further allege that TOI entered into exclusionary and restrictive agreements with wholesale labs and retailers, the purpose of which was to foreclose downstream entities from selling or promoting any competitor's photochromic lenses and to create significant barriers to entry into the relevant market.[46] As a result of this alleged exclusionary conduct, TOI has adversely affected competition and final purchasers by increasing the prices and reducing the output of photochromic lenses; deterring, delaying and impeding the ability of TOI's actual or potential competitors to enter or expand their sales of photochromic lenses; reducing innovation; and reducing consumer choice among competing photochromic lenses.

---

[44] In fact, these results indicate photochromic and non-photochromic lenses are complements, which is a finding supported by certain TOI internal documents. *See*, TOI  0705690 - 737 at 699-702 (Transitions lens wearers are 40% more likely to own prescription sunglasses and 30% more likely to purchase an AR coated lens than are other lens wearers). *See also*, TOI  1865482 - 615 at 515 ("[The Rx polarized sun lens category] fits with our trade centered message as an opportunity to complement Transitions lens sales as the ideal 2nd pair sale."). *See further*, Declaration of Janet Netz, Ph.D. (June 15, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Netz Class Report" hereafter], p. 20. The Netz Class Report generally contains a great deal of information and analysis about the photochromic lens industry.

[45] Complaint, ¶¶46-60.

[46] Complaint, ¶¶61-69.

44. In this section, I begin by describing exclusive dealing and anticompetitive foreclosure in general terms, which is followed by a discussion of TOI's specific alleged anticompetitive behavior. This section concludes with the consequence of TOI's alleged anticompetitive conduct (*i.e.*, TOI's share of the relevant market).

### 1. Exclusive Dealing and Anticompetitive Foreclosure

45. Exclusive dealing refers to practices that have the effect of inducing a buyer to purchase all (or effectively all) of its requirements of that product from the seller.[47] Exclusive dealing can take a variety of forms.

46. In a monopolization context, the dominant firm may, for example, engage in exclusive dealing through the use of "loyalty discounts." With a loyalty discount, the dominant seller agrees to charge compliant buyers a price that is lower than the price that the seller charges non-compliant buyers. Sometimes, the agreements involve a buyer commitment of exclusivity that cannot be violated without committing contractual breach. Other times, such contracts are terminable by the buyer, and sometimes the buyer makes no commitment at all, but simply buys at one price if it complies with the loyalty condition and a higher price if it does not. The loyalty condition may require the buyer to buy 100 percent from the seller to get the discount, or instead some lower threshold such as 80 or 90 percent.[48]

47. While exclusive dealing practices have anticompetitive effects, conceptually they may also have possible pro-competitive effects.[49] However, in the specific case of loyalty discounts, it is a misconception that these so-called "discounts" presumptively lower prices, thus serving as a pro-competitive effect. Although the word "discount" deceptively suggests otherwise, the nominal "discount" is just the difference between the compliant and noncompliant prices that a buyer chooses, and does not indicate that

---

[47] Elhauge, E. and Geradin, D. (2007). *Global Competition Law and Economics*. Hart Publishing: Oxford ["Elhauge and Geradin" hereafter], p. 454.

[48] Elhauge, E. (2009). How Loyalty Discounts Can Perversely Discourage Discounting. *Journal of Competition Law & Economics, 5*(2), pp. 189-231 ["Elhauge" hereafter], at pp. 191-192.

[49] Blair and Kaserman, pp. 437-440.

these "discount" prices are lower than those that would have occurred in the absence of the alleged anticompetitive behavior as well as the loyalty program.  In short, one should not confuse real discounts off "but-for" prices (*i.e.*, prices that would have occurred in the absence of the anticompetitive conduct) with price differences conditioned on compliance with exclusionary terms.[50]

48.   Nevertheless, exclusive dealing may theoretically have pro-competitive efficiencies along with the anticompetitive effects. Thus, the general modern view in antitrust economics is that exclusive dealing arrangements have mixed effects sufficient to warrant neither *per se* illegality nor *per se* legality; rather, exclusive dealing arrangements "should be judged under a rule of reason that weighs the likely or actual anticompetitive effects against any efficiency justifications."[51]

49.   As a practical matter, it is generally presumed that a dominant firm's exclusive dealing is anticompetitive if it creates a large enough foreclosure to impair its rivals' efficiency. Specifically, courts and scholars often conclude that exclusionary agreements should not be deemed anticompetitive unless they foreclose a "substantial" share of the market, with 20 to 40 percent often stated to be the level necessary to be "substantial" under U.S. antitrust law.[52]

## 2.   Transitions' Anticompetitive Conduct was Pervasive

50.   Plaintiffs assert that TOI utilized its market power to force lens casters to purchase its photochromic lenses on an exclusive basis. Moreover, TOI's "all-or-nothing" exclusivity policy made clear that any lens caster selling or promoting a competitor's photochromic lens would have their relationship with TOI terminated.[53]  In addition, TOI implemented a number of exclusive and restrictive agreements with wholesale labs

---

[50] Elhauge, p. 216.

[51] Elhauge and Geradin, p.459. *See also*, U.S. Department of Justice (2008). *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act* ["DOJ Single Firm Conduct" hereafter], pp. 36-38.

[52] Elhauge, p. 217.

[53] Complaint, ¶56.

and retailers to limit the sales of the products of the real and potential competitors in the downstream photochromic lens markets. TOI's agreements with labs and retailers generally provided a discount only if they purchased all or almost all of their photochromic lenses from TOI.[54]

### a.   Exclusive Dealing at the Lens Caster Level

51.   From its incipiency, TOI targeted lens casters as the route to greater market share. Specifically, when PPG and Essilor created TOI through a joint venture in 1990, the goal was to "contractually bind several of the major North American lens casters as Transitions lens distributors for three to five years" in order to "increase market share penetration by up to 300%."[55] TOI's contractually-bound exclusive lens caster customers included Essilor (from May 1990 through April 2010), Sola (from 1996 through September 2006), Optima (from June 2005 through July 2010), Shamir (from October 2006 through July 2010), Carl Zeiss Vision (from October 2006 through October 2009)[56] and Oakley (September 2006 through April 2010).[57]   These particular lens casters represented about 58 percent of TOI's sales, and about 50 percent of total U.S. photochromic lens sales from 2002 through 2010.[58] Moreover, these percentages include only those lens casters with formal exclusivity agreements; they do not include lens casters that *de facto* purchased exclusively from TOI due to the very real threat that TOI would terminate sales to lens casters that did not sell TOI photochromic lenses on an exclusive basis.[59]

---

[54] FTC Analysis, p. 4.

[55] Essilor of America (1990). Transitions® Joint Venture Business Plan, ESOA2-27-00000926 - 948 at 940.

[56] Expert Report of Gregory K. Leonard, Ph.D. – Indirect Purchaser Action (September 17, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Leonard Indirect Class Report" hereafter], p. 41, fn. 37.

[57] TOI (September 11, 2006). Lens Purchase and Sale Agreement with Oakley, TOI  0612695-733.

[58] *See* Exhibit 4, *infra.*

[59] *De facto* exclusive customers may include Younger Optics, Signet Armorlite (before 2000-2001), X-Cel, Seiko, and Hoya. *See*, *for example*, Deposition of David Cole (April 5, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Cole Deposition" hereafter].

52.   In 1999, Corning introduced "SunSensors," a new plastic photochromic lens that was a
      direct challenge to Transitions. TOI responded to this competitive threat by terminating
      the first lens caster that began selling the new SunSensors lens, Signet Armorlite, and
      by adopting a general policy not to deal with any lens caster that sold or promoted a
      competing photochromic lens.[60] Similarly, TOI conditioned its relationship with Augen
      Optics on Augen's termination of its relationship with Corning to distribute
      SunSensors.[61]

53.   Additionally, in 2005, Vision-Ease, a lens caster, introduced its own proprietary
      polycarbonate photochromic lens called "LifeRx." Prior to 2005, Vision-Ease was a
      lens caster customer of TOI, selling both plastic and polycarbonate lenses obtained
      from TOI. After Vision-Ease's introduction of LifeRx, however, TOI notified Vision-
      Ease that it was cancelling its contract to supply Vision-Ease.[62]

54.   Further, while not mandating exclusivity *per se*, a supply agreement between TOI and
      ███████████████████ stated that, "In the event that ██████ begins to sell a non-
      TOI photochromic product in the market, TOI shall have the right to terminate this
      agreement by providing ██████ with not less than 90 days written notice."[63]

55.   TOI's policy of only dealing with lens casters on an exclusive basis was well-known
      throughout the industry. For example, according to TOI, "Exclusivity is a corner stone
      of Transitions' business model and Transitions cannot accept partners on a non-
      exclusive basis. Such approaches would put at risk existing relationships with existing

Younger Optics (p. 243: 24 – p. 244: 1); Signet Armorlite (p. 235:22 – p. 236:10); X-Cel (p. 239:4-8); and Seiko (p.
238: 9-11).  *See also*, Email exchange between ████████████████ and ███████████████ (January 11-13,
2006) , TOI  0067231 – 232 at 231 ("███████████████████████████████████████████████████
██████████████████████████…").

[60] Federal Trade Commission (March 3, 2010). Complaint. *In the Matter of Transitions Optical, Inc., a Corporation*
["FTC Complaint" hereafter], ¶19.

[61] TOI (November 29, 2007). Monthly Report from Brett Craig/Mike Ruggeri to Rick Elias, TOI  1001309-317 at
313.

[62] JPMorgan (2006). Vision Ease Lens Investment Analysis Report, TOI 1133264-441 at 335.

[63] TOI (2005). Lens Supply Agreement with ███████████, TOI  1567724-742 at 728.

partners."[64] Likewise, in an email to TOI, an executive at lens caster ████████ references "the policy of TOI" of not dealing with lens casters except on an exclusive basis.[65]

### b.   Exclusive Dealing at the Lab and Retail Levels

56.   Eye care professionals (ECPs) and retailers without their own labs obtain lenses from independent or lens caster-owned labs. TOI used its "STAR Partner Lab Program" agreements to partner with labs in order to influence ECPs.[66] STAR Lab partners were prohibited from "using verbiage in any promotion or advertising that states or implies that another photochromic lens product is equal to or better than Transitions lenses in any way (performance, price, value, etc.), or that any other photochromic lens product is the account's preferred photochromic lens product."[67] STAR Lab Partners received higher monetary benefits based on share level and share growth of TOI products sold by the lab relative to other photochromic products.[68]

57.   TOI also had exclusive marketing agreements with retailers. Under such agreements, the retailers were required to market and sell only TOI's brand of photochromic lenses. In exchange for meeting the terms of these agreements, TOI provided annual payments to the retailer, TOI point-of sale displays, joint funding for photochromic promotions, and other training or promotional opportunities related to selling photochromic products.[69] TOI also entered into "STAR Partner Retail Program" agreements that

---

[64]TOI (May 3, 2005). Transitions Pre-Board Meeting, TNC  0008448.

[65] TOI (January 11-13, 2006). Email exchange between ████████████████████████████████, TOI  0067231 – 232 at 232.

[66] For more on TOI's agreements with labs, *see* Netz Class Report, pp. 31-32.

[67] TOI (2003). 2003 STAR Contract Overview (Lab Version), TOI  1740870 – 871 at 871.

[68] TOI (2007). Transitions Optical, Inc. 2007 STAR Partner Laboratory Program, TOI  1131748 - 749 at 748. *See also*, TOI (December 1, 2004). Transitions Optical, Inc. STAR Partner Laboratory Program Agreement with Balester Optical, TOI  1132199 -201 at 201.

[69] For more on TOI's agreements with retailers generally, *see* Netz Class Report, pp. 29-31 and fn 128. TOI paid retailer ████████ $██████ over the time period October 1, 2000 to October 1, 2003 to sell only TOI's "changeable" (i.e., photochromic) lenses (*see* TOI  1832853 – 858 at 853). TOI also signed agreements with other retailers such as ██████████████ (*see* TOI  1750559 – 567 at 559) and Eye Mart (*see* TOI  1131844 – 851

provided retailers with "business building funds" based on the volume of TOI lenses sold as well as TOI's share of the retailer's total photochromic lenses sold. In exchange for these benefits, STAR Retail partners were required to promote TOI's lenses as the exclusive or preferred photochromic product.[70]

### 3. Transitions Sustained High Market Share

58. **Exhibit 4** shows TOI's share of the U.S. photochromic lens market from 2002 to 2010. These market shares are based on Transitions' sales and total photochromic lens sales contained within Ophthalmic Retail Study (ORS) data collected by the Vision Council of America (VCA).[71] As shown in Exhibit 4, TOI's market share has averaged around 85 percent from 2002 through 2010.

59. My market share estimates reported in Exhibit 4 are similar to those calculated separately by Dr. Janet Netz[72] and Dr. Hal Singer[73] in prior reports in this matter, even though each utilized sources that differ from my own.[74] Moreover, my market share estimates are consistent with TOI's internal documents indicating that it possessed

---

at 844). Moreover, in 2005 TOI paid retailer ECCA $▮▮▮▮▮ as part of their exclusivity agreement. *See,* Deposition of Patrick D. Huot (May 10, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Huot Deposition" hereafter], p. 117.

[70] TOI (January 1, 2006). Transitions Optical, Inc. 2006 STAR Partner Retail Program Agreement with Sunland Optical, TOI 1132897 - 900 at 897. *See also* TOI (October 31, 2009). Transitions Optical, Inc. 2006 STAR Partner Retail Program Agreement with Thoma & Sutton Eye Care, TOI 0830317-321 at 317. *See further,* TOI (February 9, 2007). 2007 STAR Partner Retail Program Agreement with 1st Eye Care Inc, TOI 1131742 - 743 at 742.

[71] VCA ORS Projected Data (2002 – 2006) and VCA ORS Un-projected Data (2007 – 2010) (TOI 1769895, VC00085588, TOI 1769897, TOI 1770805, VC00086470, TOI 0253632, TOI 0253872, TOI 0003326, TOI 0003596, TOI 0003056, TOI 1002945, TOI 1003215, TOI 1003485, TOI 0246947, TOI 0247217, TOI 0247487, TOI 0248853, TOI 0249123, TOI 0249393, TOI 0249663, TOI 1456095, TOI 1456096, TOI 1456094, TOI 0563164, TOI 0563434, TOI 0563704, TOI 1352260, TOI 1357545, TOI 1357546, TOI 1509098, TOI 1509099, TOI 1509100, TOI 1509101, TOI 1509192, TOI 1509193, TOI 1509194, TOI 1720292, TOI 1720293, TOI 1720294, TOI 1470907, TOI 1470908, TOI 1470909, TOI 1501126, TOI 1501127, TOI 1501128, TOI 1502057, TOI 1502058, TOI 1502059, and TOI 1502060).

[72] Netz Class Report, Exhibit 6.

[73] Class Certification Report of Hal J. Singer, Ph.D. (June 15, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Singer Class Report" hereafter], Table 1.

[74] Netz Class Report, notes to Exhibit 6; and Singer Class Report, ¶50-¶53.

"80% + share in the photochromic market" as of 2008.[75] My market share estimates are also consistent with third-party reports. For example, Morgan Stanley reported that TOI had an "approximate 90 percent market share of the photo chromic [sic] lens market" as of 2009,[76] and IBISWorld reported that "Transitions Optical had an average market share of 80.0% in the years prior to 2010."[77]

60.     With the source I rely upon, I do not have sufficient data to calculate market shares for the entire Class Period. However, for the earlier years of the Class Period for which I do not have data (1999-2001), Corning and Signet Armorlite testified that TOI had approximately 95 percent of the photochromic market in 1999,[78] and Drs. Netz and Singer show TOI shares from approximately 80 percent to 86 percent in 2000 and 2001.[79] For the later years of the Class Period for which I do not have data (2011-2012), IBISWorld reported TOI's share as of 2012 was 79.7 percent.[80]

61.     All else equal, there is a positive relationship between market share and market power,[81] but there is no "bright line" test for the minimum market share required to establish *monopoly power*.[82] Nevertheless, the courts have typically required a dominant share before inferring the existence of monopoly power.[83] One summarization from case law is "a market share below 50 percent is rarely evidence of

---

[75] TOI (February 9, 2009). Naming Transitions Sunwear (TOI  0036825 – 883 at 828).

[76] Morgan Stanley, p. 23.

[77] IBISWorld, p. 4.

[78] Pittsburgh Post-Gazette (October 15, 1998). *Corning Sues PPG Venture*, §D, p. 1. *See also*, Declaration of Bruno Salvadori (October 8, 1998). *Corning Incorporated vs. Transitions Optical, Inc.*, U.S. District Court for the Western District of New York ["Salvadori Declaration" hereafter], ¶2.

[79] Netz Class Report, Exhibit 6; and Singer Class Report, Table 1.

[80] IBISWorld, p. 23.

[81] Blair and Kaserman, p. 108.

[82] Hay, G.A. (1991-1992). Market Power in Antitrust. *Antitrust Law Journal, 60*(3), pp., 807-827 ["Hay" hereafter], at p. 826.

[83] DOJ Single Firm Conduct, p. 21.

monopoly power, a share between 50 and 70 percent can occasionally show monopoly power, and a share above 70 percent is usually strong evidence of monopoly power."[84] Using any of these definitions, TOI appears to have possessed sufficiently large market shares to indicate the existence of monopoly power throughout the Class Period.

C.   **Transitions Was Able to Sustain Supracompetitive Prices for Photochromic Corrective Lenses in the United States**

62.   A principal indicator of monopoly power is a firm's ability to maintain prices above competitive levels without fear of losing sales. As the FTC pointed out, TOI was able to ignore consumer demand by refusing to supply its low-priced, private label photochromic lens in the U.S. market even though it offered the product in other geographic markets,[85] including India, Latin America, Asia, and Europe.[86] In the geographic markets where TOI offered this product, it did so "at a price point 30%-50% below TOI branded lenses."[87] According to the testimony of Essilor's former senior vice president of retail, all retail accounts, and especially LensCrafters, expressed interest in carrying a lower-cost Transitions private-label product, to which TOI's response was, "overarchingly, no."[88] TOI was largely able to avoid offering this product in the U.S because it did not face effective competition.[89]

---

[84] Hay, p. 826. *See also*, DOJ Single Firm Conduct, p. 21 (the Third Circuit stated that a share significantly larger than 55 percent has been required to establish prima facie market power, while a market share between 75 and 80 percent is more adequate to establish prima facie power).

[85] FTC Analysis, p. 5.

[86] TOI (May 21, 2009). Transitions Optical 2009 BSR Briefing Document, TOI  1735792-871 at 817-818. The one U.S. exception is TOI's limited offering of a private label product to LensCrafters from approximately 1999 to 2003. The product was only offered after LensCrafters informed Transitions of its intent to phase out sales of Transitions' lenses in favor of a private label product offered by Hoya, and the express purpose of the limited offering was to prevent Hoya from gaining a foothold in the U.S. market. *See* ESOA2-18-00011177-78.

[87] TOI (2007). Transitions Optical 2007 Business Strategy, TOI  0980924 – 998 at 947.

[88] Englehart Deposition, pp. 108-110.

[89] FTC Analysis, p. 5. *See also*, TOI  1192685-686 at 685. In response to Vision-Ease LifeRx pricing ("we have discussed introducing Acclimates at a lower cost in the market place. If we had an aggressive pricing in SV [Single Vision], perhaps we can reduce 'sticker shock' and increase the number of people into the photochromic category.").

63.  TOI's internal documents acknowledge that it operated in a business environment of "limited effective competition."[90] According to TOI, "Transitions remains the brand leader in the photochromic segment with little competitive influence or threats,"[91] and it generally did not need to "meet the competitive price" of other photochromic products in the marketplace.[92]

64.  According to IBISWorld, when Transitions dominated the industry it was able to price its goods at "substantially high levels."[93] However, since the FTC barred TOI from entering into or attempting to enter into exclusive agreements with lens casters, "other companies have slowly been gaining market share."[94] "IBISWorld expects more companies to enter the market in the next five years and for product prices to decrease."[95]

**D.  Transitions Was Able to Restrict Output for Photochromic Corrective Lenses in the United States**

65.  Another principal indicator of monopoly power is a firm's ability to restrict output. Despite acknowledging the U.S. demand for private label products, previously mentioned, TOI did not widely distribute them in the U.S. until after it entered into a Consent Agreement with the FTC.[96] The ability to withhold a desired, lower-priced product from the market is consistent with the assertion that TOI was able to restrict the industry output (in addition to sustaining supracompetitive prices).

---

[90] TOI (2005). Transitions Optical 2005 Pre-BSR, TOI 0073328-445 at 391.

[91] TOI (Undated). Overview, TOI 0664075 – 077 at 076.

[92] Louw Deposition, at 112:24-113:3 ("Q: [D]o you ever assume that in order to prevail against photochromic competition, you have to actually meet the competitive price or go below it? Is that ever an assumption? A: No. No.").

[93] IBISWorld, p. 7.

[94] IBISWorld, p. 8.

[95] IBISWorld, p. 8 and p. 18.

[96] TOI (2011). Transitions Optical 2011 Business Strategy, TOI 1465571-598 at 590 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

66.   Also, as previously discussed, TOI's exclusionary policies excluded rivals from access to lens casters, thereby restricting their output. For example, when Corning introduced SunSensors in 1999, TOI not only responded by terminating its relationship with lens caster Signet Armorlite for offering SunSensors, but adopted a general policy not to deal with any lens caster that sold or promoted a competing photochromic lens.[97] Faced with the threat of termination by TOI, no major lens caster was willing to carry SunSensors after TOI's termination of Signet.[98] In fact, TOI conditioned its relationship with Augen Optics on Augen's termination of its relationship with Corning to distribute SunSensors.[99]

67.   TOI also refused to continue to sell its photochromic products to Vision-Ease after it released LifeRx in 2005.[100] TOI also took steps to exclude Vision-Ease from laboratories and retailers through the use of exclusive agreements.[101] TOI's was therefore able to restrict the output of two of its rivals.

68.   Evidence of TOI's monopoly power to restrict industry output is only punctuated by gradual increases in competition that have occurred since its 2010 Consent Agreement with the FTC. Specifically, since TOI's exclusive dealing policies came to an end, the number of competing photochromic products supplied by rivals has started to expand,[102] the sales of existing products has started to increase,[103] and, in response, TOI has been forced to more widely introduce its lower-priced, private label in the U.S.[104]

---

[97] See ¶52, supra.

[98] FTC Analysis, p. 4.

[99] See ¶52, supra.

[100] See, ¶53, supra. See also, IBISWorld, p. 26. See further, TOI 1568587 ("We've been aware for a couple weeks now that the word on the street is the Vision-Ease will release their own photochromic—which means we will no longer be partners with them.").

[101] TOI (November 14, 2006). Optical Products 2007 LRP Presentation, TOI 0090603 – 682 at 647 ("…Vision-Ease's introduction of a polycarbonate photochromic lens (LifeRx) posed a significant competitive threat to our plan. In an attempt to mitigate the competitive threat, we aggressively set out to sign the key retail chains to exclusive agreements.") See also TOI (September 28, 2006). Monthly Report, Lab and ECP Sales, TOI 0115192.

[102] TOI (2011). Transitions Optical 2011 Business Strategy, TOI 1465571-598 at 574 ("Also accelerating in the optical marketplace is the growth of competitive trade branded photochromic product offerings. Many of these

### E.   There Were Barriers to Entry in the Market for Photochromic Corrective Lenses in the United States

69.   In order for monopoly power to last, there must be substantial barriers to entry, otherwise new entrants will easily enter the market and erode the dominant firm's prices and profits. Based on my review of the industry, I conclude that there are a number of barriers to entry in the market for photochromic lenses. While some of these entry barriers exist naturally, others appear to have been erected deliberately by TOI.

70.   There are several naturally existing barriers to entry in the market for photochromic lenses. As most photochromic lenses are manufactured under patent, *intellectual property rights* serve as a barrier to entry.[105] Firms entering the industry need to acquire a patent-holding company, license the rights to an existing patent (as TOI first attempted with Vision-Ease),[106] or engage in costly research and development to manufacture a product that can compete without infringing upon their competitors' intellectual property. Regardless, the *high capital costs* required to manufacture the products could deter some firms from entering the industry.[107]

71.   There were also barriers deliberately erected by TOI. As the FTC concluded, TOI maintained its dominance, "in significant part, by implementing exclusive agreements

---

products are coming out as 'in house' brands from Transitions Optical's lens partners such as Carl Zeiss Vision Vision, Hoya, and Augen. In April 2011, CZV has launched the trade branded PhotoFusion photochromic lens. They have targeted key retail with the objective of immediate conversion. Hoya has increased marketing efforts surrounding their Suntech product.").

[103] IBISWorld, p. 26.

[104] TOI (2011). Transitions Optical 2011 Business Strategy, TOI 1465571-598 at 590 (" ████████████████████████████████████ ████████████████████████████████ ").

[105] IBISWorld, p. 21; and FTC Analysis, p. 3.

[106] TOI (June 11, 2003). Transitions Optical 2003 Business Strategy Review TOI 1864248-264 at 263.

[107] IBISWorld, p. 21; and FTC Analysis, p. 3.

and other exclusionary policies at nearly every level of the photochromic lens distribution chain."[108]

72.  As previously discussed, at the lens caster level, TOI i) terminated its relationship with Signet for selling Corning's SunSensor;[109] ii) adopted a general policy not to deal with lens casters that sold or promoted a competing photochromic lens;[110] iii) entered into exclusive agreements with lens casters;[111] iv) announced to the industry its policy of dealing only with lens casters that sold its lenses on an exclusive basis;[112] v) threatened to terminate lens casters that did not want to sell its lenses on an exclusive basis;[113] and vi) terminated a second lens caster, Vision-Ease, that developed its own photochromic product.[114] Because of TOI's course of conduct, even lens casters that had not signed exclusive agreements had a clear understanding that they could not sell or promote a competing photochromic lens without being terminated by TOI. While this policy was coercive to lens casters, it foreclosed potential competitors from access to certain portions of distribution channels.[115] This conduct, therefore, served as a major barrier to entry.

73.  Likewise, as previously discussed, TOI also directed its exclusionary practices at labs and retailers. TOI entered into agreements with labs and retailers that required them to promote Transitions lenses as their preferred photochromic lens in exchange for monetary benefits based on share level and share growth of TOI products sold, relative

---

[108] FTC Analysis, p. 3.

[109] *See* ¶52, *supra*.

[110] *See* ¶52, *supra*.

[111] *See* ¶51, *supra*.

[112] *See* ¶55, *supra*.

[113] *See* ¶54, *supra*.

[114] *See* ¶53, *supra*.

[115] FTC Analysis, p. 3. *See also* §IV. A.,*infra*.

to other photochromic products.[116] These agreements generally provided benefits only if all or almost all photochromic lenses came from TOI. Because no other supplier had a full line of photochromic products, TOI's lab and retail agreements impaired the ability of rivals to compete. It erected a significant barrier to entry by limiting the ability of a rival to enter the market with product offerings that applied to less than a full line of ophthalmic lenses.[117]

74. Based on the above, TOI is by far the dominant firm in the photochromic lens market with an average 85 percent market share from 2002 through 2010. TOI restricted output and charged supracompetitive prices, and was able to do so for some time due to barriers to entry, some of which were erected deliberately by TOI. In short, TOI possessed and was able to wield monopoly power in the photochromic lens market.

### IV. ECONOMIC EVIDENCE SHOWS TOI'S MONOPOLIZATION WAS ANTICOMPETITIVE

75. Below, I present evidence that TOI's alleged anticompetitive conduct resulted in anticompetitive effects. These anticompetitive effects include TOI's foreclosure of its rivals' access to lens casters through exclusive agreements, which were enforced by TOI's threatening or terminating relationships with its direct customers (lens casters). This conduct not only injured TOI's direct customers (lens casters) but also downstream customers, including the plaintiff class. Moreover, I show that there is no evidence of pro-competitive justifications for TOI's conduct.

### A. TOI's Conduct Foreclosed Competitor Access to Lens Casters

76. As mentioned previously, the determination of whether TOI's exclusive agreements with lens casters were anticompetitive under the standard of substantial foreclosure is relatively straightforward. Specifically, courts and scholars often conclude that exclusionary agreements should be deemed anticompetitive if they foreclose a

---

[116] *See* ¶¶56-57, *supra*.

[117] FTC Analysis, p. 4.

"substantial" share of the market, with 20 to 40 percent often stated to be the level necessary to be "substantial" under U.S. antitrust law.[118]

77.   Most lens casters in the U.S. were exclusive to TOI, either by virtue of a written exclusive agreement, or by virtue of *de facto* purchasing exclusively from TOI due to the very real threat that TOI would terminate sales to lens casters that did not sell TOI lenses on an exclusive basis. Nevertheless, for the purposes of this analysis, I consider only those with written exclusive agreements with TOI. Exclusive lens caster customers with contracts included Essilor (from May 1990 through April 2010), Sola (from 1996 through September 2006), Optima (from June 2005 through July 2010), Shamir (from October 2006 through July 2010), Carl Zeiss Vision (from October 2006 through October 2009)[119] and Oakley (September 2006 through April 2010).[120]

78.   The foreclosure calculations are shown in **Exhibit 5**. In Exhibit 5, rows [a] through [f] provide each exclusive lens caster's purchases over their relevant timeline of exclusivity, the sum of which is in row [g]. Row [h] provides TOI's total sales over time, and row [i] provides TOI's market shares. Row [j] calculates the exclusive purchase share as a percentage of all TOI sales. Row [k] calculates the exclusive purchase share as a percentage of total photochromic sales.

79.   As shown in Exhibit 5, from 2002 through 2004 TOI's conduct foreclosed rivals within the 20 to 40 percent range often stated to be the level necessary to be "substantial" under U.S. antitrust law. From 2005 through 2009, however, TOI's conduct foreclosed rivals even in excess of the 40 percent range. Further, while these foreclosure shares already meet or exceed the generally accepted standards for anticompetitive foreclosure, they actually understate the true foreclosure for they do not account for *de facto* exclusive purchasers who purchased exclusively from TOI due to the very real

---

[118] *See* ¶49, *supra. See also*, Elhauge, p. 217.

[119] Leonard Indirect Class Report, p. 41, fn. 37.

[120] TOI (September 11, 2006). Lens Purchase and Sale Agreement with Oakley, TOI  0612695-733.

threat that TOI would terminate sales to lens casters that did not sell TOI lenses on an exclusive basis.[121]

**B.    TOI Threatened or Terminated Relationships with Lens Casters to Enforce Exclusivity Policy**

80.    As previously discussed, TOI adopted a general policy not to deal with lens casters that sold or promoted a competing photochromic lens, entered into exclusive agreements with lens casters, and announced to the industry its policy of dealing only with lens casters that sold its lenses on an exclusive basis. To enforce its policy exclusivity, TOI threatened to terminate lens casters that did not want to sell its lenses on an exclusive basis.

81.    For example, in 1999, TOI terminated its relationship with Signet Armorlite, the first lens caster that began selling Corning's new SunSensors lens.[122] Similarly, TOI conditioned its relationship with Augen Optics on Augen's termination of its relationship with Corning to distribute SunSensors.[123]

82.    Additionally, prior to 2005, Vision-Ease was a lens caster customer of TOI, selling both plastic and polycarbonate lenses from TOI. When Vision-Ease introduced its own proprietary polycarbonate photochromic lens called LifeRx in 2005, however, TOI terminated Vision-Ease's supply contract.[124]

83.    Likewise, a supply agreement between TOI and ▮▮▮▮▮▮▮▮▮▮▮▮ stated that, "In the event that ▮▮▮▮ begins to sell a non-TOI photochromic product in the market,

---

[121] *De facto* exclusive customers may include Younger Optics, Signet Armorlite (before 2000-2001), X-Cel, Seiko, and Hoya. *See*, fn 59, *supra*.

[122] *See* ¶52, *supra*.

[123] *See* ¶52, *supra*.

[124] *See* ¶53, *supra*.

TOI shall have the right to terminate this agreement by providing ▮▮▮ with not less than 90 days written notice."[125]

## C.   TOI's Conduct Injured Initial and Downstream Customers

84.   TOI's anticompetitive conduct not only injured its direct purchasers, but final customer class members, as well. These injuries take the form of reduced output and supracompetitive prices.

### 1.   Reduction of Output

85.   TOI's exclusionary policies excluded rivals from access to lens casters, thereby restricting their output. For example, faced with the threat of termination by TOI, no major lens caster was willing to carry SunSensors after TOI's termination of Signet.[126] In fact, TOI conditioned its relationship with Augen Optics on Augen's termination of its relationship with Corning to distribute SunSensors.[127] Similarly, due in part to TOI's exclusionary conduct, Vision-Ease was foreclosed from some retailers.[128] Moreover, TOI was able to ignore consumer demand and refused to supply its low-priced, private label photochromic lens in the U.S. market, even though it offered the product in other geographic markets.[129]

86.   Absent the anticompetitive and exclusionary behavior by TOI, final consumer class members would have been able to select from a wider range of photochromic ophthalmic lenses. TOI's termination of its relationship with Signet Armorlite; TOI's termination of its relationship and blocking of Vision-Ease; and TOI's withholding of a desired, lower-priced product from the market harmed final consumer class members in the form of restrained output and reduced choice.

---

[125] *See* ¶54, *supra.*

[126] FTC Analysis, p. 4.

[127] *See* ¶52, *supra.*

[128] *See* ¶67, *supra.*

[129] *See* ¶62, *supra.*

## 2.      Supracompetitive Prices

87.   Because TOI operated in "the photochromic segment with little competitive influence or threats,"[130] it did not need to "meet the competitive price" of other photochromic products, nor did it need to supply its private label photochromic lens in the U.S. market which sold "at a price point 30%-50% below TOI branded lenses."[131] In short, because of a lack of competition, TOI was able to charge supracompetitive prices.[132]

88.   TOI sells essentially all of its photochromic lenses to lens casters, a relatively small group of direct customers, at formulaic prices[133] with common "Target Margins" for a given material and design combination.[134] Given that TOI's pricing policy is "designed to be fair and consistent to all customers," and "pricing is based on Target Margin rather than different sell-price levels to customers,"[135] any increase in the Target Margin   the common element that links the prices across all lens casters   would impact all of TOI's customers. **Appendix C** to this report presents empirical evidence of the virtual uniformity of TOI's selling prices to its direct customers. In most years, prices were the same or similar across customers, and when they changed, they changed for all customers, suggesting that all first purchasers paid the high monopoly prices and were therefore injured. To the extent TOI's Target Margins were supracompetitive, all, or very nearly all, of TOI's direct customers would be injured by TOI's charging of supracompetitive prices (*i.e.*, the overcharge). My empirical estimation of the overcharge appears in this report's Section V.

---

[130] TOI (Undated). Overview, TOI  0664075 – 077 at 076.

[131] TOI (2007). Transitions Optical 2007 Business Strategy, TOI  0980924 – 998 at 947.

[132] *See* ¶¶62-64, *supra*.

[133] For specialty lenses, TOI used a "Standard Pricing Model," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ where *A* is ▮▮▮▮▮▮▮▮▮, *B* is ▮▮▮▮▮▮▮▮▮, *C* is ▮▮▮▮▮▮▮▮▮), *D* is ▮▮▮▮▮▮▮▮▮, *E* is ▮▮▮▮▮▮▮▮▮, and FG is the final goods price. *See* TOI 1916614-622 at 615. For generic lenses, although customers were assigned to different pricing tiers based on purchase volumes and other factors, the prices in each tier were determined by common Target Margins. *See*, TOI  0458837; TOI  0453863; and TOI  1188972.

[134] TOI (July 10, 2009). Letter to FTC re: Transitions Optical, Inc. – Civil Investigative Demands, TOI  1134004-029 at 013.

[135] TOI (June 2, 2009). Transition Optical Pricing Overview 2009 North America,TOI  0985411-412 at 411.

89.   For final purchaser-Class members to have been injured by TOI's supracompetitive prices, at least some portion of the overcharge imposed on lens casters must have been passed down the distribution chain. Economists refer to changes in downstream prices when upstream costs change as "pass-through" (or "pass-on"). While the extent of passing on in a particular market depends mainly upon the elasticities of demand and supply, an analysis by Harris and Sullivan (1979) "suggests that in markets in which monopoly overcharges are likely to be found, a high degree of passing on almost always occurs eventually and is likely to occur quite rapidly."[136] Harrison and Sullivan further state that, "passing on monopoly overcharges is not the exception; it is the rule."[137] Nevertheless, the quantification of the pass-through rate, and ultimately the damages borne by Class members, is an empirical question. My empirical measurement of the pass-through rate and the total damages to end-user purchasers appears in this report's Section V.

**D.   There Is No Evidence of Pro-Competitive Efficiency Justifications for TOI's Conduct**

90.   As mentioned previously, exclusive dealing practices may have possible pro-competitive or pro-efficiency effects.[138] A monopolist may rebut a showing of harm through anticompetitive conduct by demonstrating that the alleged conduct was reasonably necessary to achieve a pro-competitive result. Any such justification, if proven, must be balanced against the harm caused by the challenged conduct.[139]

91.   Pertaining to TOI's exclusive agreements with lens casters, the FTC found that no pro-competitive efficiencies justified TOI's exclusionary and anticompetitive conduct. TOI could not show that the exclusive arrangements were reasonably necessary to achieve a pro-competitive benefit, such as protecting TOI's intellectual property or technical

---

[136] Harris, R.G. and Sullivan, L.A. (1979). Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis. *University of Pennsylvania Law Review, 128*(2) ["Harris and Sullivan" hereafter], p. 274.

[137] Harris and Sullivan, p. 276.

[138] *See*, ¶48, *supra*.

[139] FTC Analysis, p. 6. *See also* ¶48, *supra*.

know-how. According to the FTC, TOI did not transfer substantial intellectual property or know-how to its customers, and, even if it did, such transfers would have been protected through existing confidentiality agreements.[140]

92.    Pertaining to TOI's exclusive and preferred agreements with labs and retailers, ███ ████████████████████████ two efficiency rationales.[141] The first rationale pertained to TOI's purported need to reduce "interbrand free-riding." Interbrand free-riding occurs when a manufacturer provides services, training, or other incentives in the promotion of its products for which it cannot easily charge its dealer, and that dealer "free-rides" on these demand-generating services by substituting a cheaper, more profitable product made by another manufacturer that does not invest in comparable services.  The FTC found, however, that TOI's concern about interbrand free-riding did not justify the substantial anticompetitive effects of TOI. According to the FTC, "The vast majority of Transitions' promotional efforts are brand-specific, reducing the significance of any free-riding concern."[142] In short, while TOI's marketing efforts may have generated consumer interest in the photochromic lenses generally, the free-riding concern was not sufficient to justify TOI's substantial anticompetitive conduct.[143]

93.    TOI's second rationale for exclusive and preferred agreements with labs and retailers pertained to TOI's purported need to reduce "bait-and-switch" selling at retail.[144] With bait-and-switch, the alleged concern is that "a salesperson may induce a customer to purchase a photochromic lens by touting the Transitions brand, and then actually deliver to the customer a non-Transitions lens without telling the customer, which may leave the customer disappointed in what he believes is a Transitions product."[145] However, other than a single customer e-mail claiming bait-and-switch happened to

---

[140] FTC Analysis, p. 6.

[141] Cole Deposition, Exhibit 10, TOI  1134117-123.

[142] FTC Analysis, p. 6.

[143] FTC Analysis, p. 6.

[144] Cole Deposition, Exhibit 10, TOI  1134117-123 at 122.

[145] Ibid.

them, TOI does not provide evidence that this phenomenon was wide-spread enough to warrant exclusive arrangements at the retail level. Moreover, as Dr. Netz points out, TOI already employed secret-shoppers and certificates of authenticity to minimize bait-and-switch, and neither of these initiatives excluded competitors from accessing labs and retailers.[146]

94.     Moreover, TOI internal documents convey that the intent of the exclusive agreements was to block its rivals, not maintain pro-competitive efficiencies. For example, according to a 2005 TOI memo,

> "Vision-Ease's introduction of a polycarbonate lens (LifeRx) posed a significant competitive threat to our plan. In an attempt to mitigate the competitive threat, we aggressively set out to sign the key retail chains to exclusive agreements."[147]

Likewise, another TOI document from 2006 says,

> "The competitive threat from LifeRx has been mitigated by signing the majority of large retail chains to exclusive agreements to distribute Transitions® lenses."[148]

Similarly, a monthly report to (TOI parent company) PPG lists "key accomplishments" of the Lab and ECP Sales Department. According to the document,

> "So far we have been able to fight [Vision-Ease] off at ████████ (40 stores), █████ (136 stores) and █████ (16 labs). We either signed a new 'exclusivity agreement' or received confirmation from the owners that they were indeed renewing their partnership with Transitions."[149]

Thus, in multiple places within its internal documents, TOI has essentially admitted that the purpose of the exclusive agreements was to block the access of its rivals, not to

---

[146] Netz Class Report, fn 153.

[147] TOI (November 14, 2006). Optical Products 2007 LRP Presentation, TOI  0090603 – 682 at 647. *See also*, TOI (November 14, 2006). Optical Products 2007 LRP Presentation, TOI-0332637 – 716 at 681.

[148] TOI (2006). Optical Products 2006 Business Strategy Review, TOI  163600 – 635 at 610.

[149] TOI (September 28, 2006). Monthly Report, Lab and ECP Sales, TOI  0115192.

protect its intellectual property, prevent interbrand free-riding, or reduce bait-and-switch.

## V.     CLASS-WIDE DAMAGES

95.   Calculation of damages sustained by the proposed plaintiff class, which is comprised of end-user consumers of Transitions lenses in certain states since January 1, 1999, involves determining first the overcharge associated with TOI's alleged misconduct that was paid by TOI's customers and then the degree to which the overcharge was passed through to consumers. Plaintiffs' allegations are that Transitions monopolized and attempted to monopolize the market for photochromic lenses as early as 1999, when it threatened Signet Armorlite, a lens caster which had partnered with Corning to produce and sell SunSensors, with termination of their supply agreement for photochromic lenses. Plaintiffs have pled a class period starting in January 1, 1999, and damages will be estimated based on sales since that date. As elaborated below, the evidence and analysis to estimate TOI's supracompetitive prices to lens casters and to determine the degree of pass through to consumers are common to members of the proposed plaintiff class. These methodologies may also be used to demonstrate impact of TOI's alleged misconduct on the Indirect Purchaser class.

### A.   Reliable and Accepted Methodologies Exist to Calculate Damages to End Users on a Class-wide Basis

96.   There are several analytical approaches available to quantify the damages sustained by members of the plaintiff class due to TOI's alleged monopolization and attempted monopolization of the market for photochromic lenses. A well-accepted and reliable approach commonly used by economists to estimate monopoly overcharges is regression analysis.[150] Regression analysis is a statistical technique that professional economists have relied upon to estimate statistical relationships between observed

---

[150] Multiple regression analysis is a statistically tool widely used in antitrust litigation settings. *See, for example*, Rubinfeld, D.L. (2011). Reference Guide on Multiple Regression. *Reference Manual on Scientific Evidence*, *Third Ed.*, National Academies Press, pp. 303-358; and Baker, J.B. and Rubinfeld, D.L. (1999). Empirical Methods in Antitrust Litigation: Review and Critique. *American Law and Economics Review*, Vol. 1, pp. 386-435.

outcomes, called the dependent variable, and factors thought to influence those outcomes, called the independent or explanatory variables.

97.  In the present context, regression analysis can be used to explain the behavior of prices of photochromic lenses that lens casters paid to Transitions attributable to market factors that influence prices, and to estimate the contribution of each explanatory variable to variation in the dependent variable. Economists posit that the price of a product over time and across transactions is determined by economic factors such as the costs of manufacturing the product, the dynamics of demand for the product, and structural characteristics of the market. The regression approach to estimating the overcharge involves "regressing" the price paid by lens casters to Transitions on these variables to explain the variation in prices.

98.  When attempting to determine the impact of TOI's alleged misconduct on the prices of its photochromic lenses, it is important to characterize the marketplace that could have materialized but for TOI's objectionable conduct. Such a marketplace may be one in which, during the near term, lens casters and labs are able to purchase photochromic lens from multiple existing suppliers. During the long run, when entry is possible, this marketplace may see TOI, Vision-Ease, and the other incumbent photochromic lens manufacturers joined both by lens casters that develop, manufacture and commercialize their own photochromic lenses, and by other firms that develop photochromic treatment technologies. End-user consumers might benefit in this world of increased competition through higher quality photochromic lenses, greater product variety, perhaps the availability of photochromic treatments on a broader range of ophthalmic lenses, and innovation, and certainly by more competitive pricing.

99.  It is also important to construct a model that reasonably captures the market dynamics that would have persisted but for TOI's alleged misconduct. In order to do so, it is necessary to develop a benchmark that is untainted by the alleged misconduct against which to compare the tainted prices. The prices of TOI's photochromic lenses thought to have been affected by the alleged misconduct are then compared with the prices of

the lenses that are believed to be reasonably free of anticompetitive effect, after controlling for salient differences in costs, demand, and other market conditions.

## B.    The Competitive Benchmark

100.   The choice of a desirable competitive benchmark depends on several considerations:

> (1) Is the potential benchmark competitive, and a good representation of the but-for world?
>
> (2) Are the market conditions (aside from TOI's alleged misconduct) surrounding the benchmark sales and the tainted sales sufficiently similar, and if not, is it possible to control for systematic differences between them?
>
> and
>
> (3) Are there sufficient data available to implement the benchmark?

Common types of benchmarks include a temporal benchmark, which is a period of time during which the misconduct did not occur, such as the period preceding or following the misconduct period; a product benchmark, which is both similar to the tainted product and not affected by the alleged misconduct; and a geographic benchmark, with sales of the product of interest in an area that was unaffected by the alleged anticompetitive conduct.

101.   A benchmark that satisfies all three conditions is the period following the FTC's Consent Order, which was issued on March 3, 2010[151] and finalized on April 22, 2010.[152] As described above, the FTC Consent Order, among other things, required Transitions to cease and desist making agreements with lens casters that required exclusivity and forbade Transitions from retaliating against customers which refused to enter into exclusive arrangements or which manufactured, purchased or distributed a competing photochromic lens.[153] By eliminating the conduct that the FTC determined

---

[151] Federal Trade Commission (March 3, 2010). Decision and Order (1st Issue). *In the Matter of Transitions Optical, Inc., a Corporation.*

[152] FTC Consent Order. *See* fn. 3, *supra*.

[153] FTC Consent Order, ¶¶IIA, IIB, and II.F.

was anticompetitive, the period following the April 22, 2010 final FTC Consent Order appears to satisfy the first condition, that TOI's anticompetitive conduct be removed.[154]

102. The second condition states that either market conditions are similar between the benchmark and the tainted period, or that differences can be systematically controlled for. The period just prior to and after the FTC Consent Order was implemented on April 22, 2010 has seen changes in the structure of the photochromic lens industry. First, during 2010 and 2011, the FTC approved two acquisitions of lens casters by Essilor International. On March 3, 2010 the FTC approved Essilor International S.A.'s proposed acquisition of Signet Armorlite, Inc.;[155] this acquisition, by Essilor International's wholly owned subsidiary, Essilor Holding Co., Inc., was subsequently consummated on April 1, 2010.[156] The FTC also approved Essilor International S.A.'s proposed acquisition of Shamir Optical Industry Ltd. on June 21, 2011.[157] Essilor International formally acquired a 50 percent stake in Shamir Optical Industry on July 1, 2011.[158]

103. The Signet Armorlite acquisition has competitive implications for the market for photochromic lenses. Among the terms of this acquisition were $6 million incentive

---

[154] In some instances, the FTC Consent Order provided TOI a window of time to comply with certain provisions of the FTC Consent Order. For example, the FTC provided TOI up to "90 days after the date of [the Consent] Order becomes final, [to] waive or modify any condition, requirement, policy, agreement, contract, or understanding with Direct Customers or Indirect Customers that is inconsistent with the terms of this Order." *See,* FTC Consent Order, ¶¶IIH. Record evidence indicates that TOI indeed terminated exclusivity agreements with Optima and Shamir in July 2010. However, TOI terminated its exclusivity agreement with EOA, the largest lens caster and TOI's largest customer, in April 2010.

[155] The FTC granted Essilor International's and Signet Armorlite's request for early termination of the waiting period following premerger notification. *See,* Letter from Donald S. Clark to Leslie C. Overton, Esq. (March 3, 2010). Re: Proposed Acquisition of Signet Armorlite, Inc. by Essilor International (Compagnie Generale d'Optique), S.A., FTC File No. 091-0047.

[156] Deposition of Bruno Salvadori (July 26, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Salvadori Deposition" hereafter], Exhibit 21: Stock Purchase Agreement By and Among EOA Holding Co., Inc., Signet Armorlite, Inc., and the Undersigned Parties Hereto (April 1, 2010), ESOA2-29-0015831—ESOA2-29-00015904.

[157] Letter from Donald S. Clark to Leslie C. Overton, Esq. (June 21, 2011). Re: Proposed Acquisition of Shamir Optical Industry Ltd. by Essilor International S.A., FTC File No. 111-0015.

[158] Shamir and Essilor *News Release* (July 1, 2011). Kibbutz Shamir and Essilor Announce the Completion of the Acquisition of 50% of Shamir Optical by Essilor.

payments to the sellers of Signet Armorlite to convert its entire line of photochromic products, Kodak InstaShades and SunSensors, to Transitions.[159] By 2011, Signet Armorlite had ceased production of several if its InstaShades products and ultimately dismantled the production line at its Tijuana plant in Mexico by early 2012.[160] Of the 250 employees at the plant at the time of the acquisition, only 30 or 40 were retained.[161] Furthermore, while Signet Armorlite has continued to manufactures SunSensors, it has done so below capacity.[162] Thus, since the FTC Consent Order, a significant independent competing manufacturer of photochromic lenses has left the market and has become a Transitions customer.

104.  Other developments since the FTC Consent Order include *de novo* entry into the manufacture of photochromic lenses and introduction of new photochromic products by an incumbent. Shortly after the FTC Consent Order in April 2010, "around mid-2010," Carl Zeiss Vision "began in earnest" to develop its own photochromic product, and, in October 2011, it introduced in the United States a photochromic lens under the trade name PhotoFusion™ in 1.50, 1.60, and 1.67 indexes, polycarbonates, for single vision and progressives.[165] In September 2010, lens caster Augen introduced AugenSOL™, a photochromic 1.50 lens in single vision, bifocal and progressive visions.[166] In April 2011, Vision-Ease expanded its photochromic product line with plastic lenses called ChangeRx™ in 1.50 index for single vision, bifocal and progressive visions.[167]

---

[159] Salvadori Deposition, p. 301:18-25; Salvadori Deposition. Exhibit 23 ("Signet product portfolio includes photochromic product [–] proprietary products Instashares and corning owens process Sunsensors (*sic*).), ESOA-01-00033234—ESAO-01-00033240 at 33237.

[160] Salvadori Deposition, pp. 332:22-333:2.

[161] Salvadori Deposition, pp. 339:18-22.

[162] Salvadori Deposition, pp. 334:18-22, 340:4-341:8.

[165] Carl Zeiss Vision 30(b)(6) Deposition of Karen Roberts (September 19, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division ["Roberts Deposition" hereafter] , pp. 82:9-83:9, 91:6-92:20. *See also*, *Vision Monday* (September 19, 2011). Zeiss Launches PhotoFusion, Self-Tinting Lens Line.

[166]Augen Press Release (August 30, 2010). Augen Launches Proprietary Photochromic Product Line.

[167] Vision-Ease Press Release (March 18, 2011). Vision-Ease Lens Introduces ChangeRx™ Plastic Photochromic Lenses.

Previously, the only photochromic lenses that Vision-Ease manufactured were of polycarbonate substrate.

105.   The entry and expansion of competition in the market for photochromic lenses reflect adjustments in the marketplace to the removal of TOI's objectionable conduct. It is precisely the effect of these adjustments on photochromic prices that render the post-FTC Consent Order period a benchmark. Differences between the tainted period and the benchmark period that are unrelated to the change in conduct but that can nevertheless affect photochromic lens prices, such as changes in the demand for photochromic lenses or the costs of producing them, can be   and are   accounted for systematically using appropriate measures of demand and cost.

106.   With respect to the third condition, that sufficient data are available, defendant Transitions has produced transaction data through May 31, 2011, which includes thirteen months following the final Consent Order. These thirteen months appear to provide a minimally sufficient post-Consent Order benchmark, as they encompass more than one year during which TOI's customers were not bound by exclusivity agreements, whether formal or informal, whether direct or indirect, and fear of retaliation. This period is of sufficient duration for some adjustments in the marketplace to the FTC's restrictions on TOI's conduct. TOI's customers had the opportunity to purchase competing photochromic products without fear of termination or retaliation, a commercial reality that could affect TOI's pricing.

107.   In the long run, however, it is apparent that adjustments to the changed marketplace include entry by new competitors. Indeed, lens casters Augen, Vision-Ease and Zeiss have all introduced new products as early as September 2010 and as recently as October 2011. The experience of Zeiss, for example, suggests that significant time is required for even an established lens caster to develop and bring to market a competing photochromic product. More time may be required for *de novo* entry by a firm that photochromically treats lenses, i.e., another company like Transitions. It is expected, therefore, that adjustment in the photochromic lens marketplace to the Consent Order, as the lens casters and the labs that purchase photochromic lenses from manufacturers,

Transitions and other incumbent manufacturers, and end-user consumers, and therefore prices, adapt to entry and the introduction of new products, would continue to occur beyond May 2011. Thus, while the TOI data through May 2011 permit a look at the early response of the market (and TOI's prices) to the changed rules, data through 2011 and into 2012 would present a more complete picture of how the market and TOI's prices have adapted to the FTC Consent Order. It is likely that these additional data will reveal how the market and prices adapted and may give rise to additional damages. I understand that plaintiffs have moved to compel production of additional TOI transaction and cost data. Should such data become available, I reserve the right to use these additional data in my analysis and, if warranted, revise my conclusions.

## C.    Estimation of the Overcharge to TOI's First Purchasers

### 1.    Methodology

108. To measure the effect of TOI's misconduct on the prices paid by lens casters, a binary indicator variable is used to distinguish the benchmark period from the misconduct period. This indicator variable takes a value of 1 during the period preceding to the April 22, 2010 FTC Final Consent Order, and a value of zero after this date. In addition, estimating a separate overcharge for each year since 2000 allows a factfinder to examine how the overcharge has changed over time. The coefficient on each of these annual indicator variables is the overcharge coefficient, from which the overcharge percentage can be calculated. Multiplying the overcharge percentage by the total value of TOI's first purchaser sales yields the overcharge in dollars. The overcharge may also be expressed in dollars per lens.

109. Once the competitive benchmark is identified, it is possible to construct a model to explain the behavior of TOI's prices to its customers by accounting for economic factors like demand and cost. There are two potential measures of demand: an annual trend and the population aged 50 and over. According to IBISWorld, people "who are over 50 years old are the fastest-growing downstream market segment for this industry"

and drive demand for photochromic lenses.[169] TOI's costs of producing photochromic lenses are measured using standard cost data from TOI's annual cost cards and are reported for each product and customer. These standard costs include substrate costs, and materials, labor and overhead costs for the photochromics, hardcoat and packaging stages, after accounting for yield at different manufacturing stages. In addition to these economic variables, it is useful to introduce "fixed effects" variables to control for transaction-specific characteristics, such as customer and product, to account for systematic differences in price levels among customers and among products.

110. The models are estimated in natural logs for price, costs, and population, and is written for Model 1 as:

$$
\begin{aligned}
\log(Price_{ijt}) = \beta_0 & + \\
& \sum_{year=2000}^{2011} \beta_{1year} 1(FTC_t) * Year_t + \\
& \beta_2 (\log(Pop50plus_t) + \\
& \beta_3 (\log(Cost_{jt}) + \\
& \sum_i \beta_{4i} 1(Cust_i) + \\
& \sum_j \beta_{5j} 1(Prod_j) + \\
& \varepsilon_{ijt}
\end{aligned}
$$

and for Model 2 as:

---

[169] IBISWorld, p. 5.

$$\log(Price_{ijt}) = \beta_0 +$$

$$\sum_{year=2000}^{2011} \beta_{1year} 1(FTC_t) * 1(Year_t) +$$

$$\beta_2(Trend_t) +$$

$$\beta_3(\log(Cost_{jt}) +$$

$$\sum_i \beta_{4i} 1(Cust_i) +$$

$$\sum_j \beta_{5j} 1(Prod_j) +$$

$$\varepsilon_{ijt}$$

where the subscripts $i$ denotes customer (*parent_cust*); $j$ denotes product (*prodtype_desc*); and $t$ denotes the sales order date; and where $\mathbf{1}(\cdot)$ is a binary indicator function; $\log(\cdot)$ is the natural logarithmic function; $FTC_t$ is an indicator variable that takes a value of 1 for dates until April 22, 2010 and a value of 0 thereafter; $Year_t$ denotes the year of the sales order date; $Pop50plus_t$ denotes annual U.S. population 50 and over; $Trend_t$ denotes an annual time trend; $Cost_{jt}$ denotes the standard cost at time $t$ for product $j$; $Cust_i$ denotes customer $i$, and $Prod_j$ denotes product $j$.

## 2.    Data

111. Transitions produced sufficient transactions and cost data to estimate the overcharge to its first purchasers.[170] The sales order dates of TOI's transaction data span December 1999 through May 2011 and include data on invoiced dollar amounts, invoiced quantities of lenses, customers, and detailed product descriptions. Returns, cancellations, credits and debits that were among the transaction data have been taken into account, where sufficient information was available to make an inference. Furthermore, the Transitions prices used in the regression analysis are net of the

---

[170]As described above in paragraph 102 to 107, TOI's data production to date is enough to provide a minimally sufficient benchmark. A longer benchmark period following the FTC Consent Order would allow for additional adjustment in the marketplace to the changes in TOI's commercial practices. Given the slow adjustments since the FTC Consent Order and that the effect of new entrants to the market would not be felt until after May 2011, additional data is needed to reflect actual market conditions after the FTC Consent Order. With this additional data, it may be determined that the anticompetitive effects of TOI's objectionable conduct are greater than those estimated with the existing benchmark period.

"rebates" which Dr. Leonard identifies from TOI's general ledger data,[171] and the regression analysis is run on data at the level of sales order, customer, product and price. TOI's annual cost card data span 2000 to 2011 and report data on year, customer, product, and manufacturing costs at different stages of production.[172] To control for cost of production in my regression analysis, I use the subtotal of standard costs at the packaging stage. Standard cost per lens for TOI's top ten products are illustrated in **Exhibit 6**. Annual population data from the U.S. Census Bureau are used to calculate the population 50 years old and over during 1999 to 2011 (**Exhibit 7**).

### 3.      Lens Caster Overcharge Regression Results

112. **Exhibit 8** tabulates the regression results of the first purchaser overcharge analysis. The results of the regression analyses confirm the anticompetitive effects of TOI's conduct during every year from 2000 to 2010, results which are robust to multiple measures of demand. As described above, Model 1 measures demand using population 50 and over, while Model 2 measures demand using an annual trend variable. The estimated overcharge coefficients are listed for each year from 2000 to 2010. In both specifications, annual overcharge coefficients are positive and statistically significant for all years. Furthermore, for both models, the estimated overcharge coefficient is highest during the first year and declines over time. In both cases, the estimated overcharge coefficient becomes economically negligible by 2010. This result is likely driven by a positive coefficient on the demand variable (in both models) and demand

---

[171] Dr. Leonard criticizes Dr. Netz and Dr. Singer for failing to account for "rebates" in their analysis of class certification issues. Yet, he acknowledges in his report that the "rebates" cannot be matched back to individual transactions, so he has criticized Dr. Netz and Dr. Singer for not taking steps that he subsequently opines are not possible. However, it is possible to make the assumption that the "rebates" identified by Dr. Leonard should be spread evenly across all transactions, which is the course of action that has been pursued here. *See*, *for example*, Leonard Indirect Class Report, ¶124. *See also*, Expert Report of Gregory K. Leonard, Ph.D. – Direct Purchaser Action (September 17, 2012). *In re: Photochromic Lens Antitrust Litigation*, U.S. District Court for the Middle District of Florida, Tampa Division, ¶107. Furthermore, for the purposes of the overcharge and price analysis, it is assumed that all payments to lens casters that Dr. Leonard characterized as a "rebate" is indeed a rebate. However, it should be noted that, among the credits that Dr. Leonard classifies as "rebates" are $15,000 for "lip blam *(sic)*" and $18,163 for "sunscreen " to Essilor in 2008, $25,000 for "ELOA cruise promo 2006" to Essilor in 2006, and $1,820 for a "Gold Promotion" to Carl Zeiss in 2010. (*See* "Lens Caster Rebate General Ledger Entries 1.xlsx" produced by Dr. Leonard.) These payments in kind and many others like them are not conventionally considered rebates. Thus, I write "rebates" (in quotes) because the term is not an accurate characterization of these payments.

[172] Because TOI did not produce the standard cost data provided for 1999, it is not possible to estimate the overcharge percentage for that year.

that is much lower during the earlier years relative to the benchmark period. With this empirical pattern, the models both predict but-for prices that are lower during the earlier years, when demand is lower. Given the relative stability of TOI's prices to lens casters over time, the lower but-for prices during the early part of the class period results in higher overcharge coefficients.

### 4.      Total Amount of First Purchaser Overcharge

113.   Calculating the annual overcharge percentage from the annual overcharge coefficient and multiplying that percentage by the dollar value of TOI's annual sales to first purchasers yield the total amount of damages each year (**Exhibits 9a and 9b**). The estimated overcharges sustained by TOI's first purchasers during 2000 to 2010 are $██████████ under Model 1 and $██████████ under Model 2. Overcharges expressed in terms of dollars per lens are, on average, 51 cents or 63 cents per lens. Annual overcharges per lens are depicted in **Exhibit 10**, and the average annual but-for prices are shown in **Exhibit 11**.

### D.      Estimation of Pass-Through of Overcharge from First Purchasers to End-User Consumers

### 1.      Methodology

114.   Once an overcharge to TOI's direct purchasers has been calculated, the question arises of whether this overcharge was passed through the supply chain to end-user consumers, and by how much. As described above and illustrated in Exhibit 1, photochromic lenses are purchased by lens casters from Transitions and re-sold to labs, whether independent wholesale labs, lens caster-owned wholesale labs, and labs that are integrated into a retailer's operations. These labs, in turn, supply the finished photochromic lenses to retailers, which may include national chains, regional chains, and independent eye care practitioners, who then sell to end-user consumers.

115.   To determine the effect of the overcharge sustained by first purchasers on retail prices paid by end-user consumers, it is useful to regress retail prices directly on first purchaser prices lagged by 12 weeks (controlling for product description, vendor,

retailer, and state), to determine the responsiveness of retail prices to changes in the prices paid by lens casters. The 12-week lag is chosen to allow for the passage of time after a lens caster places an order for photochromic lenses with TOI (*SO_date*) and before the retailer sells the finished eyeglasses to an end-user consumer.[173] When the prices used in the regression are in levels, the interpretation of the coefficient on the Transitions price is straightforward: it is the estimate of the proportion of the overcharge at the first purchaser level that is passed through to end-user consumers. When retailer data includes information about store location, it is also possible to estimate state-specific pass-through rates.

116. The pass-through model is specified as:

$$\log(Price_{ijkt}) = \beta_0 +$$
$$\sum_k \beta_{1k} \log(Cost_{jt\text{-}12}) * 1(State_k) +$$
$$\sum_k \beta_{2k} 1(State_k) +$$
$$\sum_i \beta_{3i} 1(Cust_i) +$$
$$\sum_j \beta_{4j} 1(Prod_j) +$$
$$\varepsilon_{ijt}$$

where the notation is as before, with the addition of *k* states, and where *t* is now observed weekly.[174]

## 2.   Data

117. The most complete retail-level data that has been produced in this matter come from Wal-Mart, and encompass sales by both Wal-Mart and Sam's Club. These data include daily sales information by product, vendor and store for both Wal-Mart and Sam's Club

---

[173] Substantially similar pass-through rates result when 4-week or 8-week lags are used.

[174] Because the regression analysis pools sales data from Wal-Mart and Sam's Club, an indicator variable for Sam's Club is also included, to allow for differences in the price level between these two retailers.

spanning January 2000 to December 2011. These sales data are matched at the weekly level to Transitions sales by product and vendor.

118. Plaintiffs pursued significant and extensive third-party discovery, which yielded data and documents from retailers not limited to Wal-Mart and Sam's Club, including large national retailers like National Vision, Inc. (NVI), Eye Care Centers of America (ECCA), Luxottica (which owns Pearle Vision, Cole Vision and Lens Crafters, and other retailers), and Costco, and ECPs like Adirondack, Buffalo Optical and Hubbell. VCA reported snapshots of average retail price based on its panel of retailers at a dozen points in time. However, with the exception of Wal-Mart and Sam's Club, none of these data were sufficiently detailed or extensive. In several cases, the retail price data produced were price cards or price sheets, which I cannot treat as actual selling prices.

### 3.    Results

119. The pass-through model demonstrates empirically that overcharges sustained by TOI's first purchasers were passed through to end-user consumers. **Exhibit 12** reports the pass-through ratios by state. All exceed 100 percent. This finding is evidence that all end-user consumers nationwide and all members of the Repealer Class were impacted by TOI's alleged misconduct.[175] It is assumed, for the purposes of calculating damages to end-user consumers, that the pass-through ratio does not exceed 100 percent. A pass-through ratio in excess of 100 percent implies "cost-plus" or mark-up pricing by a reseller in the supply chain, and there is evidence that some retailers engaged in mark-up pricing. Although such pricing practices would magnify the Transitions overcharge that is ultimately sustained by an end-user consumer, it is not clear to me from a legal perspective that an end-user consumer is permitted to claim damages on the reseller markup. Therefore, the pass-through ratios used in the computation of damages are capped at 100 percent.

120. The pass-through rates estimated using Wal-Mart's and Sam's Club's retail prices are a reasonable estimate of the pass-through experienced by end-user consumers who

---

[175] In the absence of Wal-Mart and Sam's Club retail locations in the District of Columbia, full pass through in D.C. is inferred using the Virginia and Maryland pass-through rates, which both exceed 100 percent.

purchased Transitions lenses from other retailers. As explained above, Wal-Mart and Sam's Club were the only retailers for which we had sufficiently disaggregated data to employ in an econometric model together with TOI data. Fortunately, these retailers are among the largest retailers in the marketplace and therefore their data encompasses a sizeable proportion of all transactions. Wal-Mart and Sam's Club purchased from EOA, Zeiss, Seiko and Younger; Wal-Mart's and Sam's Club's sales combine for over ███ percent of TOI's photochromic lens sales to EOA, Zeiss, Seiko, and Younger. In 2011, Wal-Mart's and Sam's Club's combined share of these lens casters purchases from TOI was ███ percent.

### E.   Total Pass-Through of TOI First Purchaser Overcharge to Repealer Class

121.   The Repealer Class is comprised of consumers who purchased class products from any of the 25 states plus the District of Columbia listed in the class definition above. Based on the overcharges reported in Exhibits 9a and 9b, the estimated pass-through rate of 100 percent, and the proportion of the U.S. population that these 25 states and the District of Columbia have accounted for during 2000 to 2010[176] (**Exhibit 13**), the amount of the TOI first purchaser overcharge passed through to the Repealer Class during 2000 to 2010 are estimated as $ ██████████ under Model 1 and $ ██████████ under Model 2 (**Exhibits 14a and 14b**).[177] Calculated on a nationwide basis, using U.S. sales of Transitions lenses, the TOI first purchaser overcharge that is passed through to end-user consumers is $ ██████████ (Model 1) or $ ██████████ (Model 2).

### F.   Total Pass-through of TOI First Purchaser Overcharge to Alternative Class

122.   Plaintiffs have also presented Alternative Classes   seven statewide classes for California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin. After weighting the first purchaser overcharges by state population in each year and applying

---

[176] Weighting by gross domestic product in each state yields substantially similar results.

[177] Counsel for plaintiffs have advised me that some states within the class definition permit trebled damages and/or full consideration of sums paid. It is my understanding that plaintiffs will seek damages under the full extent allowed for by statute in each of the states listed in the class definition.

state-specific pass-through rates, the estimated overcharge passed through to the Alternative Classes, in the aggregate, are $ ███████ under Model 1 and $ ███ ███ under Model 2, as detailed in **Exhibits 15a and 15b**.

* * * * *

Gary L. French, Ph.D.

October 1, 2012

Date

53

**Appendix A.**

**Curriculum Vitae**
**of**
**Gary L. French, Ph.D.**

# GARY L. FRENCH



## CURRENT POSITION

Principal Consultant, Nathan Associates Inc.

## EDUCATION

Ph.D., Economics, University of Houston, 1973

M.A., Economics, University of Houston, 1971

B.B.A., University of Houston, 1966

## SPECIALIZED EXPERIENCE, RESEARCH, OR INTEREST

Antitrust, business and asset valuation, damage analysis, class certification issues, franchising, telecommunications (especially wireless), wholesale and retail trade, and product distribution

## PAST POSITIONS

| | |
|---|---|
| 1995 2010 | Senior Vice President, Nathan Associates Inc. |
| 1987 1995 | Vice President, Nathan Associates Inc. |
| 1981 1987 | Principal Associate, Nathan Associates Inc. |
| 1979 1981 | Senior Associate, Nathan Associates Inc. |
| 1977 1979 | Independent Consultant |
| 1976 1979 | Assistant Professor of Economics, Old Dominion University |
| 1972 1976 | Assistant Professor of Economics and Finance, Texas A&I University |
| 1971 1972 | Instructor of Finance, University of Houston |

## EXPERIENCE SUMMARY

Dr. French has been a full time economic consultant for over 30 years. Most of his consulting has been related to litigation or regulation, and he has often provided expert testimony before federal and state courts and regulatory authorities. His experience extends to most kinds of litigation and to energy, telecommunications, and trade regulation. In the course of his consulting work, he has become familiar with a variety of businesses, industries, and markets. Earlier in his career, he served on the faculties of three different universities, and taught courses in economics, finance, and statistics.

## PROFESSIONAL CONSULTING EXPERTISE

Antitrust economics, including market definition, measurement of market shares, and assessments of market power and competitive impacts of horizontal and vertical restraints, predatory conduct, and monopolizing behavior

Economic, financial, marketing, and statistical analyses of issues in litigation and regulation

Analysis of damage causation and estimation of the magnitude of damages in litigation

Valuation and financial analyses of businesses and business assets

Analyses of business franchising and franchisor franchisee relationships

Survey and market research

Public policy analyses and applied economics

### *Industry Familiarity*

- Airlines
- Diamonds
- Franchise business and systems
- Insurance
- Pharmaceuticals

- Soft drink bottling
- Waste collection and disposal
- Wholesale and retail trade
- Wireless telephone, cable television, and other telecommunications

## EXPERT TESTIMONY

DR. FRENCH HAS PROVIDED ORAL EXPERT TESTIMONY IN MATTERS BEFORE THE FOLLOWING ENTITIES:

### *U.S. District Courts*

- Central District of California, Western Division
- District of Columbia
- District of Connecticut
- District of Illinois
- District of Maryland
- District of Minnesota, Third Division
- District of New Jersey
- Eastern District of Michigan
- Eastern District of Missouri, Eastern Division
- Eastern District of New York
- Eastern District of Pennsylvania
- Eastern District of Texas, Texarkana and Tyler Divisions
- Eastern District of Virginia, Norfolk and Alexandria Divisions
- Eastern District of Washington

- Middle District of Alabama, Northern Division
- Middle District of Florida, Jacksonville Division
- Middle District of Tennessee, Nashville Division
- Northern District of California, San Jose and San Francisco Divisions
- Northern District of Texas, Amarillo Division
- Southern District of Illinois
- Southern District of New York
- Southern District of Ohio, Western Division
- Southern District of Texas, Houston Division
- Western District of Arkansas
- Western District of Kentucky, Louisville
- Western District of Louisiana, Shreveport Division
- Western District of Texas, San Antonio Division

### *U.S. Bankruptcy Court*

- Middle District of Florida

- Northern District of Mississippi

*U.S. Tax Court*

*State Courts*

- Arlington County, VA
- Baltimore City, MD
- Charles County, MD
- City of Virginia Beach, VA
- Cook County, IL
- County of Maricopa, AZ
- County of Philadelphia, PA
- County of San Diego, CA

- Fairfax County, VA
- Fulton County, GA
- Harris County, TX
- Madison County, IL
- Montgomery County, MD
- Palm Beach and Alameda Counties, FL
- San Francisco County, CA
- San Joaquin County, CA
- Tarrant County, TX

*Regulatory Authorities*

- Federal Maritime Commission
- Massachusetts Department of Public Utilities

- International Trade Commission
- Office of Hearings and Appeals, U.S. Department of Energy

*Supreme Court of British Columbia, Canada*

DR. FRENCH HAS PROVIDED ONLY WRITTEN EXPERT TESTIMONY IN MATTERS BEFORE THE FOLLOWING ENTITIES:

*U.S. District Courts*

- District of South Carolina, Greenville and Columbia Divisions
- Northern District of Ohio, Eastern Division
- Northern District of Georgia

- Southern District of Florida
- Southern District of Indiana
- Southern District of Mississippi, Jackson Division

*State Courts*

- Atlantic City, NJ
- City of Alexandria, VA
- City and County of San Francisco, CA
- Cole County, MO

- Fayette County, TN
- Hamilton County, OH
- Ocean City, NJ

*Regulatory Authorities*

- Federal Communications Commission

- Department of Transportation

A 4

## SEMINARS AND PRESENTATIONS

Seminar on damage analysis and valuation, presented to Hogan & Hartson, Washington, D.C., Dec. 1985 and to Shaw, Pittman, Potts & Trowbridge, Washington, D.C., April 1986.

"Economic Damage and Valuation: Use of Forensic Economics," presented at the Twelfth Annual Convention of the Virginia Association of Defense Attorneys, October 4, 1986.

"Experts and Ethics" Panel, New York State Bar Association, 130th Annual Meeting, January 25, 2007.

## PUBLICATIONS

"Economic and Financial Expertise and Economic Damages,"  Sections II IX, co author along with Gary L. French and John L. Solow, in *Modern Scientific Evidence: The Law and Science of Expert Testimony*, 2008   2009 Edition, Volume 5, Chapter 43, *Forensics, Engineering & Economics,* David Faigman, et. al., editors, Thomson/West, 2008.

Article concerning the role of economics in litigation, "Commentary & Insight." *Legal Times* VI, No. 30 (Dec. 26, 1983/Jan. 2, 1984).

"The Redistributive Impact of the Atlanta Mass Transit System: A Comment" (with W.K. Talley). *Southern Economic Journal* 47, No. 3 (Jan. 1981).

"Linder's Trade Thesis: A Further Examination" (with J.W. Sailors and U.A Qureshi). *Southern Economic Journal* 46, No. 3 (Jan. 1980).

"A Regional Test of the Ricardian Theory of Comparative Advantage" (with U.A. Qureshi). *Atlantic Economic Journal* 6, No. 2 (July 1978).

"Factor Proportions and Regional Trade in the United States." In *Proceedings of the Southwestern Society of Economists* II, (Mar. 1977).

"Economic Development and World Trade" (with R.N. Bean). *Economic Affairs* XX, No. 8 (Aug. 1975).

"A Regional Test of the Heckscher Ohlin Theory of International Trade." *Nebraska Journal of Economics and Business* XIV, No. 3 (Summer 1975).

## AWARDS AND HONORS

National Science Foundation Graduate Traineeship, 1967  1970

Omicron Delta Epsilon

Beta Gamma Sigma

Top Ten Student, University of Houston, 1969  1970

## PROFESSIONAL MEMBERSHIPS

American Economic Association

Industrial Organization Society

National Association for Business Economics

Advisory Board, American Antitrust Institute

10/1/2012

**Matters in Which Gary L. French Has Provided Deposition and/or Trial Testimony in the Last Four Years**

| Case | Court/Agency | Number | Client | Testimony | Protective Order | Description |
|------|-------------|--------|--------|-----------|------------------|-------------|
| *Casey William Hyland, et al. v. Home Services of America, Inc., et al.* | U.S. District Court, Western District of Kentucky at Louisville | Civil Action No. 3:05-cv-612-R | Plaintiffs | Deposition Testimony | YES | Economic Analysis of antitrust liability issues including the likelihood of a pricing conspiracy among Kentucky real estate brokers, and the calculation of class-wide damages, and analysis of class certification issues |
| *Felton A. Spears, Jr et al, v. First American eAppraiseIT* | U.S. District Court for the Northern District of California, San Jose Division | Case No. 5:08-CV-00868 (RMW) | Plaintiff | Deposition Testimony | YES | Analysis to determine whether methodologies exist to estimate class-wide impact and damages to persons who purchased allegedly inflated residential property appraisals |
| *Michelle Fairhurst v. Anglo American PLC, et al.* | Supreme Court of British Columbia | No. S-07209 Vancouver Registry | Plaintiff | Cross Examination | NO | Analysis to determine whether entities in British Columbia were affected by a conspiracy of defendants to fix and raise prices of rough diamonds. |
| *In Re Neurontin Antitrust Litigation* | U.S. District Court for the District of New Jersey | Case No. 02-CV-1390 | Plaintiffs | Deposition Testimony | YES | Analysis of the class-wide impact to purchasers of a prescription drug stemming from the delay of the introduction of generic substitutes, and the quantification of the class-wide damages. |

| Case | Court/Agency | Number | Client | Testimony | Protective Order | Description |
|------|--------------|--------|--------|-----------|------------------|-------------|
| *Keith Turner v. NYU Hospitals Center, et al.* | U.S. District Court for the Southern District of New York | | Defendants | Deposition Testimony | NO | Analysis of damages to an individual alleging unlawful termination of his employment. |
| *The Apple iPod iTunes Antitrust Litigation* | U.S. District Court for the Northern District of California, San Jose Division | Case No. C 07-6507 JW | Plaintiffs | Deposition Testimony | YES | Determine whether there is common proof to show whether alleged violations impacted all or virtually all members of two proposed classes |
| *Best Pallets, Inc., et al. v. Brambles Industries, Inc., et al.* | U.S. District Court for the Western District of Arkansas | Case No. 08-2012 | Plaintiffs | Deposition Testimony | YES | Analysis of the impact and damages to shipping pallet recyclers from alleged increases in their costs by a rival |
| *Jason Tesauro, et al. v. The Quigley Corporation* | Court of Common Pleas, County of Philadelphia, Pennsylvania | Case No. 001011 | Plaintiffs | Trial Testimony | NO | Analysis and estimates of damages from an alleged breach of an implied warranty and unjust enrichment |
| *Faye Vassilatos, et al. v. Del Monte Fresh Produce Company, et al.; and Kathleen Conroy, et al. v. Fresh Del Monte Produce, Inc.* | Circuit Court for the 15th Judicial Circuit, Palm Beach County, Florida; and Superior Court for the State of California, County of Alameda | Case No. 50 2004 CA 04066, XXXX MB; and J.C.C.P. 4446 | Plaintiffs | Deposition Testimony | YES | Analysis of impact and damage methodologies for a class of indirect purchasers of extra sweet "gold" pineapples in a monopolization case |

A-7

| Case | Court/Agency | Number | Client | Testimony | Protective Order | Description |
|------|-------------|--------|--------|-----------|------------------|-------------|
| *James Casaburi, et al. Robert Werksman, et al. v. Palmone, Inc, et al.* | Superior Court of the State of California, San Francisco County | Case No. 04-435844 | Plaintiffs | Deposition Testimony | NO | Analysis of class-wide impact and damages to purchasers of a smart wireless phones missing claimed features |
| *Golden Bridge Technology, Inc. v. Nokia, Inc., et al.* | U.S. District Court, Eastern District of Texas, Tyler Division | Civil Action No. 6:06-cv-163 (LED) | Plaintiff | Deposition Testimony | YES | Analysis and Calculation of damages stemming from an alleged group boycott of wireless technology. |
| *In re Wellburtin SR Antitrust Litigation* | U.S. District Court, Eastern Division of Pennsylvania | Civil Action No. 2:04-CV-05525 | Plaintiffs | Deposition Testimony | YES | Analysis of the class-wide impact to purchasers of a brandname drug stemming from the delay of the introduction of generic substitutes, and quantification of the class-wide damages. |
| *Pioneer Valley Caskets Co., Inc. et al. v. Service Corporation International, et al.* | U.S. District Court, Southern District of Texas, Houston Division | No. 4:05-CV-03399 | Plaintiffs | Deposition Testimony | YES | Analysis of class certification, antitrust, and damage issues in a restricted distribution case |
| *National Railroad Passenger Corporation v. ExpressTrak, L.L.C.* | U.S. District Court, District of Columbia | Civil Action No. 02-1773 (RBW) | Plaintiff and Counter-Defendant | Deposition Testimony | YES | Analysis of the economic conditions for early termination of a contract |
| *Center for Elders Independence and Louis Ambrosio, et al. v. Biovail Corporation, et al.* | Superior Court of the State of California, San Joaquin County | Case No. CV 023320 | Plaintiffs | Deposition Testimony | YES | Analysis of the economic injury to the class and methodologies for measuring class-wide damages |

| Case | Court/Agency | Number | Client | Testimony | Protective Order | Description |
|------|--------------|--------|--------|-----------|------------------|-------------|
| *In re K-Dur Antitrust Litigation* | U.S. District Court, District of New Jersey | Civil Action No. 01-1652 (JAG), MDL Docket No. 1419 | Plaintiffs | Deposition Testimony | YES | Analysis of the economic injury to the class and methodologies for measuring class-wide damages, and subsequently analysis of liability issues and the quantification of class-wide damages.<br><br>March 2012 |

A-9

# Appendix B.

# Documents, Sources, and Materials Reviewed or Available

A large database of documents and data produced by TOI, co-conspirators, and third parties, a number of which were reviewed, including:

***Case Filings***

*Corning Incorporated vs. Transitions Optical, Inc.*, U.S. District Court for the Western District of New York:

> Declaration of Eileen M. Buckley (October 12, 1998).

> Declaration of Bruno Salvadori (October 8, 1998).

*In re: Photochromic Lens Antitrust Litigation*, United States District Court for the Middle District of Florida, Tampa Division, MDL Docket No. 2173, Case No. 8:10-md-2173 (JDW):

> First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs (November 14, 2011)

> Indirect Purchaser End-User Plaintiffs' Amended Motion for Class Certification and Memorandum of Law (July 2, 2012)

> Declaration of Janet Netz, Ph.D. (June 15, 2012).

> Class Certification Report of Hal J. Singer, Ph.D. (June 15, 2012).

> Expert Report of Gregory K. Leonard, Ph.D.    Direct Purchaser Action (September 17, 2012).

> Expert Report of Gregory K. Leonard, Ph.D.    Indirect Purchaser Action (September 17, 2012).

> Deposition of Transitions Optical, Inc. Under Rule 30(b)6 (David Cole) (April 5, 2012).

> Deposition of Alex Louw (May 2, 2012).

> Deposition of Jean Carrier-Guillomet, Volume I (May 7, 2012) and Volume II (May 8, 2012).

> Deposition of Patrick D. Huot (May 10, 2012).

> Deposition of Bruno Salvadori (July 26, 2012).

> Deposition of Seiko Optical Under Rule 30(b)(6) (Michael Rybacki) (September 14, 2012).

> Deposition of Carl Zeiss Vision Under Rule 30(b)(6) (Karen Roberts) (September 19, 2012).

*Scholarly Resources*

Baker, J.B. and Rubinfeld, D.L. (1999). Empirical Methods in Antitrust Litigation: Review and Critique. American Law and Economics Review, Vol. 1

Blair, R.D. and Kaserman, D.L. (2009). *Antitrust Economics*. New York: Oxford University Press

Elhauge, E. and Geradin, D. (2007). *Global Competition Law and Economics*. Hart Publishing: Oxford

Elhauge, E. (2009). How Loyalty Discounts Can Perversely Discourage Discounting. *Journal of Competition Law & Economics*, 5(2), pp. 189-231

Gujarati, D.N. (1995). *Basic Econometrics*, 3rd Ed. McGraw-Hill: New York

Harris, R.G. and Sullivan, L.A. (1979). Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis. *University of Pennsylvania Law Review*, 128(2)

Hay, G.A. (1991-1992). Market Power in Antitrust. *Antitrust Law Journal*, 60(3), pp., 807-827

Rubinfeld, D.L. (2011). Reference Guide on Multiple Regression. *Reference Manual on Scientific Evidence*, Third Edition., The National Academies Press.

*Data and Data Questions and Answers*

Letter from Lisa Davis to F. Mathew Ralph, Bart Cohen, and Michael M. Buchman, Re: In Re Photochromic Lens Antitrust Litigation, dated September 14, 2012

TOI Answers to data questions, e-mail from Lisa Davis to Joe Barton, September 26, 2012.

Disk 1 of the Vision Council of America responses to In re Photochromic Lens Antitrust Litigation   Nonparty Subpoena, produced June 13, 2012.

*News Articles*

Augen Press Release (August 30, 2010). Augen Launches Proprietary Photochromic Product Line.

Corning Incorporated (2012). About High-Index Lenses (retrieved online September 4, 2012 at http://www.corning.com/ophthalmic/products/educational_info/high_index.aspx).

IBISWorld (February 2012). Photochromic Lens Manufacturing in the U.S., IBISWorld Industry Report 5013

Morgan Stanley Research North America (May 4, 2010). PPG Industries, Inc., Highest-Growth Coatings Company, but Full Valuation

Pittsburgh Post-Gazette (October 15, 1998). Corning Sues PPG Venture, §D, p. 1.

Shamir and Essilor News Release (July 1, 2011). Kibbutz Shamir and Essilor Announce the Completion of the Acquisition of 50% of Shamir Optical by Essilor.

Vision-Ease Press Release (March 18, 2011). Vision-Ease Lens Introduces ChangeRx™ Plastic Photochromic Lenses.

Vision Monday (September 19, 2011). Zeiss Launches PhotoFusion, Self-Tinting Lens Line.

### *U.S. Government Sources*

Federal Trade Commission, *In the Matter of Transitions Optical, Inc., a Corporation*:

> Analysis to Aid Public Comment. (March 3, 2010).

> Complaint. (March 3, 2010).

> Decision and Order (1st Issue). (March 3, 2010).

> Decision and Order (Final). (April 22, 2010).

Federal Trade Commission, Letter from Donald S. Clark to Leslie C. Overton, Esq. (March 3, 2010). Re: Proposed Acquisition of Signet Armorlite, Inc. by Essilor International (Compagnie Generale d'Optique), S.A., FTC File No. 091-0047.

Federal Trade Commission, Letter from Donald S. Clark to Leslie C. Overton, Esq. (June 21, 2011). Re: Proposed Acquisition of Shamir Optical Industry Ltd. by Essilor International S.A., FTC File No. 111-0015.

Bureau of Economic Analysis (August 30, 2012). Table 2.6. Personal Income and Its Disposition, Monthly [retrieved online September 10, 2012 from www.bea.gov]

U.S. Census Bureau (2012) The 2012 Statistical Abstract [retrieved online September 12, 2012 from http://www.census.gov/compendia/statab/cats/population.html], Table 7 - Resident Population by Sex and Age, and Table 8 - Intercensal Resident Population by Sex and Age.

U.S. Census Bureau (May 16, 2012). Annual Estimates of the Resident Population by Sex and Five-Year Age Group for the United States: April 1, 2010 to July 1, 2011 (NC-EST2011-01) [retrieved online September 12, 2012 from http://www.census.gov/popest/data/national/asrh/2011/index.html].

U.S. Census Bureau, Population Division. Table 1. Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2000 to July 1, 2009 (NST-EST2009-01)

U.S. Census Bureau. Table 2. Resident Population of The 50 States, The District of Columbia, and Puerto Rico: 2010 Census

U.S. Department of Justice (2008). Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act

*Defendant and Co-Conspirator Production*

Transitions Optical, Inc., 22 December 2011, transdata_2000_2011.sas7bdat.
Transitions Optical, Inc., customer_lookup.sas7bdat.
Transitions Optical, Inc., 2012, TOI Product Lookup.xlsx.

ESOA-01-00016724   773
ESOA-01-00033234   ESAO-01-00033240 at 33237.
ESOA-03-00011705   749
ESOA2-18-00011177-78.
ESOA2-21-00009006-9091
ESOA2-27-00000926   948
ESOA2-29-0015831   ESOA2-29-00015904.

TNC_0008448
TNC_0017791
TNC_0021922.xls

TOI 1133264-441
TOI_0003056
TOI_0003326
TOI_0003596
TOI_0036825-883
TOI_0067231-232
TOI_0073328-445
TOI_0090603-682
TOI_0115192
TOI_0163042- 126
TOI_0246947
TOI_0247217
TOI_0247487
TOI_0248853
TOI_0249123
TOI_0249393
TOI_0249663
TOI_0253632
TOI_0253872
TOI_0332637-716
TOI_0453863
TOI_0458837
TOI_0563164
TOI_0563434
TOI_0563704
TOI_0612695-733.
TOI_0620774 -991
TOI_0663338-467
TOI_0664075-077

TOI_0705690-737
TOI_0709137-138
TOI_0830317-321
TOI_0980924-998
TOI_0985411-412
TOI_1001309-317
TOI_1002945
TOI_1003215
TOI_1003485
TOI_1131742-743
TOI_1131748-749
TOI_1131844 -851
TOI_1132199-201
TOI_1132897-900
TOI_1134004-029
TOI_1188972
TOI_1192685-686
TOI_1352260
TOI_1357545
TOI_1357546
TOI_1456094
TOI_1456095
TOI_1456096
TOI_1465571-598
TOI_1470907
TOI_1470908
TOI_1470909
TOI_1501126
TOI_1501127
TOI_1501128
TOI_1502057
TOI_1502058
TOI_1502059
TOI_1502060
TOI_1509098
TOI_1509099
TOI_1509100
TOI_1509101
TOI_1509192
TOI_1509193
TOI_1509194
TOI_1567724-742
TOI_1568587
TOI_163600-635
TOI_1720292
TOI_1720293

TOI_1720294
TOI_1735792-871
TOI_1740870-871
TOI_1750559-567
TOI_1769895
TOI_1769897
TOI_1770805
TOI_1806168
TOI_1806168
TOI_1806179
TOI_1806179
TOI_1806180
TOI_1806180
TOI_1806182
TOI_1806182
TOI_1832853-858
TOI_1864006-051
TOI_1864248-264
TOI_1865482-615
TOI_1865482-609
TOI_1912861-867
TOI_1916614-622
TOI_1995203-250


VC00085588
VC00086470


***Third-Party Production***

Adirondack Eye Care Center:

      2009 Opthalmic lens data.doc.
      2010 Opthalmic lens data.doc.
      2011 Opthalmic sales data.doc.
      20120411_Email re Information for photochromic issue.pdf
      Adirondack Eye Care Price List.mht
      Sales data, from Advance optical, Winchester, and Sunburst Optical.mht
      Winchester Optical Company 2012 price list.mht

Buffalo Optical:
      20120608_FW Photochromc Lens Litig Seiko & VSP Production.pdf
      BUF000002-12.pdf

Hubbell Eye:
      20120608_FW Photochromc Lens Litig Seiko & VSP Production.pdf
      HUB000001-30.pdf

NVI:

      2012.5.16 Ltr to Matthew re Subpoena.pdf
      Attachment - Transitions Lens Sales 2005 to 2011 by Brand R1.pdf

ECC-Sunburst:
      Sunburst 001    019

Luxottica Group S.p.A.:
      Transitions US Usage 2007-2011data_Sample.pdf

Wal-Mart:

      Legal Request 41688 A 5182012 Production_Key1.xlsx
      Legal Request 41688 A 5182012 Production_Key2.xlsx
      Legal Request 41688 Part 1.txt
      Legal Request 41688 Part 2.txt
      Legal Request 41689 5182012 Production.xlsb
      Legal Request 41689 A 5182012 Production.xlsx

Younger Optics:

      FTC info for spec 6 2005 to May 31 2009.xlsx
      FTC info for spec 7 2005 to May 31 2009.xls

and all other materials cited herein.

**Appendix C.**

**TOI's Annual Average Prices of Top Products Sold to Multiple Customers**



Appendix C-1. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 ST28 NG-GYHC

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-2. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 ST28 T6-GYHC

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-3. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 SFSV NG-GYHC

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-4. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 FSV NG-GYHC

Price (Dollars per Lens)

Year

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-5. Transitions Average Price for Top Multi-Customer Products, by Customer for Trans 307 ST28 T3Gy

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-6. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 SFSV T6-GYHC

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-7. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 FSV T6-GYHC

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.



Appendix C-8.Transitions Average Price for Top Multi-Customer Products, by Customer for Trans 307 ST28 XAGy

Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.

Appendix C-9. Transitions Average Price for Top Multi-Customer Products, by Customer for TRN 1.50 ST28 NG-BRHC



Source: Transitions Transaction Data.
Note: Does not account for General Ledger Rebates.

# Exhibit 1. Manufacture and Distribution of Photochromic Lenses



Exhibit 2.  Average Annual Prices of Photochromic and Non-Photochromic Lenses, 1999 - 2012

(Dollars Per Pair)



Source: VCA Lens MSR Summary.  2012 through February only.

Exhibit 3.  Demand for Non-Photochromic Lenses

dependent variable  = ln(Qn), quantity of non-photochromic lenses

| Variable | Description | Coefficient | |
|---|---|---|---|
| $ln(Pn)$ | Price of non-photochromic lenses | -0.80 | *** |
| | | (0.156) | |
| $ln(Pp)$ | Price of photochromic lenses | -0.44 | * |
| | | (0.179) | |
| $ln(Pop)$ | Population age 50 and over | 0.95 | *** |
| | | (0.158) | |
| $D_1$ | January dichotomous | 0.09 | *** |
| | | (0.023) | |
| $D_2$ | February dichotomous | 0.06 | *** |
| | | (0.024) | |
| $D_3$ | March dichotomous | 0.21 | *** |
| | | (0.023) | |
| $D_4$ | April dichotomous | 0.06 | *** |
| | | (0.023) | |
| $D_5$ | May dichotomous | 0.03 | * |
| | | (0.023) | |
| $D_6$ | June dichotomous | 0.08 | *** |
| | | (0.023) | |
| $D_7$ | July dichotomous | 0.05 | ** |
| | | (0.024) | |
| $D_8$ | August dichotomous | 0.15 | *** |
| | | (0.023) | |
| $D_9$ | September dichotomous | 0.08 | *** |
| | | (0.023) | |
| $D_{10}$ | October dichotomous | 0.04 | * |
| | | (0.023) | |
| $D_{11}$ | November dichotomous | -0.02 | |
| | | (0.023) | |
| $b0$ | Intercept | 8.02 | |
| | | (1.586) | |

Notes:

$R^2$ = 0.72, F = 24.22, N = 158.

Instruments include ln(Pp), ln(Inc), $D_1$…$D_{11}$, and annual dichotomous shifters y1999…y2010.

*** significant at α = 0.01

** significant at α = 0.05

* significant at α = 0.10

Sources:

*Pn,Qn and Pp from VCA MSR data.*

*Inc* from Bureau of Economic Analysis (August 30, 2012).
Table 2.6. Personal Income and Its Disposition, Monthly.
*Pop* from US Census Bureau. *See* Exhibit 7.

Exhibit 4. TOI Shares of the Photochromic Lens Market, 2002 - 2010

| Year | Market Share |
|------|--------------|
| 2002 | 75% |
| 2003 | 84% |
| 2004 | 84% |
| 2005 | 91% |
| 2006 | 92% |
| 2007 | 85% |
| 2008 | 81% |
| 2009 | 82% |
| 2010 | 88% |

Source: VCA ORS Projected Data (2002 – 2006) and VCA ORS Un-projected Data (2007 – 2010)
[TOI_1769895, VC00085588, TOI_1769897, TOI_1770805, VC00086470, TOI_0253632, TOI_0253872,
TOI_0003326, TOI_0003596, TOI_0003056, TOI_1002945, TOI_1003215, TOI_1003485, TOI_0246947,
TOI_0247217, TOI_0247487, TOI_0248853, TOI_0249123, TOI_0249393, TOI_0249663, TOI_1456095,
TOI_1456096, TOI_1456094, TOI_0563164, TOI_0563434, TOI_0563704, TOI_1352260, TOI_1357545,
TOI_1357546, TOI_1509098, TOI_1509099, TOI_1509100, TOI_1509101, TOI_1509192, TOI_1509193,
TOI_1509194, TOI_1720292, TOI_1720293, TOI_1720294, TOI_1470907, TOI_1470908, TOI_1470909,
TOI_1501126, TOI_1501127, TOI_1501128, TOI_1502057, TOI_1502058, TOI_1502059, TOI_1502060].

Exhibit 5.  Transitions Lenses Sold to Exclusive Lens Casters with Contracts, January 2002 - July 2010

| Row | Lens Caster | Time Period | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | ▮ | May 1990 - April 2010 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| [b] | | January 1996 - September 2006 | ▮ | ▮ | ▮ | ▮ | ▮ | - | - | - | - |
| [c] | | October 2006 - October 2009 | - | - | - | ▮ | ▮ | ▮ | ▮ | ▮ | - |
| [d] | | June 2005 - July 2010 | - | - | - | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| [e] | | October 2006 - July 2010 | - | - | - | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| [f] | | September 2006 - April 2010 | | | | | ▮ | ▮ | ▮ | ▮ | ▮ |
| [g] = ∑([a…[f]) | Total Exclusive Contract Customers | January 2002 - July 2010 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| | | | | | | | | | | | |
| [h] | Total TOI | January 2002 - July 2010 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| [i] | TOI Market Share | January 2002 - July 2010 | 75.1% | 83.7% | 83.7% | 90.6% | 90.6% | 85.2% | 80.9% | 81.5% | 87.7% |
| [j] = [h] / [i] | Exclusive Contract Customers % of TOI | January 2002 - July 2010 | 46.2% | 46.0% | 47.6% | 48.3% | 55.9% | 75.3% | 77.1% | 74.4% | 32.2% |
| [k] = [i] x [j] | Exclusive Contract Customers % of Total Photochromic | January 2002 - July 2010 | 34.7% | 38.5% | 39.9% | 43.8% | 50.6% | 64.1% | 62.4% | 60.6% | 28.3% |

Sources:

| | |
|---|---|
| [a] …[e] | Leonard Indirect Class Report, p. 41, fn. 37.  Quantities from TOI Transactions Data. |
| [f] | TOI_0612695-733.  Quantities from TOI Transactions Data |
| [h] | TOI Transactions Data. |
| [i] | VCA ORS Projected Data (2002 – 2006) and VCA ORS Un-projected Data (2007 – 2010). |



Exhibit 6. Standard Costs for Top 10 TOI Products, 2000 - 2011
(Dollars per Lens)

Note: Standard Cost measured using subtotal package costs.
Source: TOI Cost Cards: TOI_1806168, TOI_1806179, TOI_1806180, TOI_1806182, TNC_0017791.



Exhibit 7. U.S. Population 50 and over, 1999 - 2011

[a]  Estimated.
Source: Census Bureau.

Exhibit 8. First Purchaser Overcharge Regression Results

| Explanatory Variable | Model 1 | | Model 2 | |
|---|---|---|---|---|
| Population Over 50 | 0.569 | | - | |
| | (0.016) | *** | - | *** |
| Annual Trend | - | | 0.017 | |
| | - | | (0.000) | *** |
| Standard Cost | 0.122 | | 0.122 | |
| | (0.001) | *** | (0.001) | *** |
| **Annual Overcharge Coefficient** | | | | |
| 2000 | 0.124 | | 0.150 | |
| | (0.004) | *** | (0.004) | *** |
| 2001 | 0.077 | | 0.100 | |
| | (0.003) | *** | (0.004) | *** |
| 2002 | 0.062 | | 0.081 | |
| | (0.003) | *** | (0.004) | *** |
| 2003 | 0.064 | | 0.080 | |
| | (0.003) | *** | (0.003) | *** |
| 2004 | 0.057 | | 0.069 | |
| | (0.002) | *** | (0.003) | *** |
| 2005 | 0.036 | | 0.046 | |
| | (0.002) | *** | (0.002) | *** |
| 2006 | 0.024 | | 0.031 | |
| | (0.001) | *** | (0.002) | *** |
| 2007 | 0.010 | | 0.015 | |
| | 0.001 | *** | 0.001 | *** |
| 2008 | 0.016 | | 0.019 | |
| | (0.001) | *** | (0.001) | *** |
| 2009 | 0.013 | | 0.013 | |
| | (0.000) | *** | (0.000) | *** |
| 2010 | 0.002 | | 0.002 | |
| | (0.000) | *** | (0.000) | *** |
| R-squared | 0.979 | | 0.979 | |
| Number of Observations | 206,470 | | 206,470 | |

Note: Standard Error is presented in parentheses below the Coefficient.
Coefficient estimates for product description and customer fixed effects
are not shown.
*** indicates statistical significance at the 0.001 level.
** indicates statistical significance at the 0.01 level.

Exhibit 9a. First Purchaser Overcharge, Model 1

| Year | Sales | Lenses | Overcharge Percent | Overcharge Per Lens | Damages (Dollars) |
|------|-------|--------|--------------------|---------------------|-------------------|
| 2000 | | | 11.63 | 1.59 | |
| 2001 | | | 7.42 | 1.00 | |
| 2002 | | | 6.03 | 0.82 | |
| 2003 | | | 6.24 | 0.86 | |
| 2004 | | | 5.54 | 0.76 | |
| 2005 | | | 3.57 | 0.50 | |
| 2006 | | | 2.36 | 0.33 | |
| 2007 | | | 1.00 | 0.14 | |
| 2008 | | | 1.58 | 0.23 | |
| 2009 | | | 1.33 | 0.19 | |
| 2010 [a] | | | 0.19 | 0.03 | |
| | | | | | |
| Total | | | 3.62 | 0.51 | |

[a] 2010 includes only transactions through April 22, 2010.

Exhibit 9b. First Purchaser Overcharge, Model 2

| Year | Sales | Lenses | Overcharge Percent | Overcharge Per Lens | Damages (Dollars) |
|------|-------|--------|--------------------|---------------------|-------------------|
| 2000 | ███ | ███ | 13.95 | 1.90 | ███ |
| 2001 | | | 9.48 | 1.27 | ███ |
| 2002 | | | 7.76 | 1.06 | |
| 2003 | | | 7.65 | 1.05 | |
| 2004 | | | 6.67 | 0.92 | |
| 2005 | | | 4.50 | 0.63 | |
| 2006 | | | 3.05 | 0.42 | |
| 2007 | | | 1.52 | 0.22 | |
| 2008 | | | 1.86 | 0.27 | |
| 2009 | | | 1.30 | 0.19 | |
| 2010 [a] | ███ | ███ | 0.19 | 0.03 | ███ |
| | | | | | |
| Total | ███ | ███ | 4.46 | 0.63 | ███ |

[a] 2010 includes only transactions through April 22, 2010.



Exhibit 10. Estimated Overcharge per Lens by Model, 2000 - 2010



Exhibit 11. TOI Annual Average Actual and But-For Prices, 2000 - 2010
(Dollars per Lens)

**Exhibit 12. Pass Through Regression Results
based on Wal-Mart and Sam's Club Data**

| Explanatory Variable | Coefficient Estimates |
|---|---|
| **Pass Through Coefficient:** | |
| Arizona | ▮ *** |
| California | ▮ *** |
| Florida | ▮ *** |
| Hawaii | ▮ *** |
| Iowa | ▮ *** |
| Kansas | ▮ *** |
| Massachusetts | ▮ *** |
| Maine | ▮ *** |
| Michigan | ▮ *** |
| Minnesota | ▮ *** |
| Missouri | ▮ *** |
| Mississippi | ▮ *** |
| North Carolina | ▮ *** |
| North Dakota | ▮ *** |
| Nebraska | ▮ *** |
| New Hampshire | ▮ *** |
| New Mexico | ▮ *** |
| ▮▮▮▮▮ | ▮ *** |
| New York | ▮ *** |
| Oregon | ▮ *** |
| South Dakota | ▮ *** |
| Tennessee | ▮ *** |
| Vermont | ▮ *** |
| Wisconsin | ▮ *** |
| West Virginia | ▮ *** |
| Sam's Club Indicator | ▮ *** |
| R-squared | ▮ |
| Number of Observations | ▮ |

Note: Coefficient estimates for state not included in the class are not
shown. Standard Error is presented in parentheses below the
Coefficient. Coefficient estimates for product and vendor fixed
effects are not shown. "Sam's Club Indicator" takes a value of 1 for
sales by Sam's Club and zero for sales by Wal-Mart.
*** indicates statistical significance at the 0.001 level.

Exhibit 13. U.S. Population by State, 2000 - 2010

| State | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total | Percent of U.S. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Named Plaintiff States** | | | | | | | | | | | | | |
| California | 33,871,648 | 34,485,623 | 34,876,194 | 35,251,107 | 35,558,419 | 35,795,255 | 35,979,208 | 36,226,122 | 36,580,371 | 36,961,664 | 37,253,956 | 392,839,567 | 11.9% |
| Florida | 15,982,378 | 16,353,869 | 16,680,309 | 16,981,183 | 17,375,259 | 17,783,868 | 18,088,505 | 18,277,888 | 18,423,878 | 18,537,969 | 18,801,310 | 193,286,416 | 5.9% |
| Kansas | 2,688,418 | 2,701,456 | 2,712,598 | 2,721,955 | 2,730,765 | 2,741,771 | 2,755,700 | 2,775,586 | 2,797,375 | 2,818,747 | 2,853,118 | 30,297,489 | 0.9% |
| Maine | 1,274,923 | 1,284,791 | 1,293,938 | 1,303,102 | 1,308,253 | 1,311,631 | 1,314,963 | 1,317,308 | 1,319,691 | 1,318,301 | 1,328,361 | 14,375,262 | 0.4% |
| Michigan | 9,938,444 | 10,006,093 | 10,038,767 | 10,066,351 | 10,089,305 | 10,090,554 | 10,082,438 | 10,050,847 | 10,002,486 | 9,969,727 | 9,883,640 | 110,218,652 | 3.3% |
| New York | 18,976,457 | 19,088,978 | 19,161,873 | 19,231,101 | 19,297,933 | 19,330,891 | 19,356,564 | 19,422,777 | 19,467,789 | 19,541,453 | 19,378,102 | 212,253,918 | 6.4% |
| Wisconsin | 5,363,675 | 5,408,769 | 5,446,766 | 5,476,796 | 5,511,385 | 5,541,443 | 5,571,680 | 5,601,571 | 5,627,610 | 5,654,774 | 5,686,986 | 60,891,455 | 1.8% |
| | | | | | | | | | | | | | |
| *Named Plaintiff Subtotal* | *88,095,943* | *89,329,579* | *90,210,445* | *91,031,595* | *91,871,319* | *92,595,413* | *93,149,058* | *93,672,099* | *94,219,200* | *94,802,635* | *95,185,473* | *1,014,162,759* | *30.8%* |
| | | | | | | | | | | | | | |
| **Other Class States** | | | | | | | | | | | | | |
| Arizona | 5,130,632 | 5,304,417 | 5,452,108 | 5,591,206 | 5,759,425 | 5,974,834 | 6,192,100 | 6,362,241 | 6,499,377 | 6,595,778 | 6,392,017 | 65,254,135 | 2.0% |
| District of Columbia | 572,059 | 578,042 | 579,585 | 577,777 | 579,796 | 582,049 | 583,978 | 586,409 | 590,074 | 599,657 | 601,723 | 6,431,149 | 0.2% |
| Hawaii | 1,211,537 | 1,218,305 | 1,228,069 | 1,239,298 | 1,252,782 | 1,266,117 | 1,275,599 | 1,276,832 | 1,287,481 | 1,295,178 | 1,360,301 | 13,911,499 | 0.4% |
| Iowa | 2,926,324 | 2,929,424 | 2,929,264 | 2,932,799 | 2,941,358 | 2,949,450 | 2,964,391 | 2,978,719 | 2,993,987 | 3,007,856 | 3,046,355 | 32,599,927 | 1.0% |
| Massachusetts | 6,349,097 | 6,411,730 | 6,440,978 | 6,451,637 | 6,451,279 | 6,453,031 | 6,466,399 | 6,499,275 | 6,543,595 | 6,593,587 | 6,547,629 | 71,208,237 | 2.2% |
| Minnesota | 4,919,479 | 4,982,813 | 5,017,458 | 5,047,862 | 5,079,344 | 5,106,560 | 5,148,346 | 5,191,206 | 5,230,567 | 5,266,214 | 5,303,925 | 56,293,774 | 1.7% |
| Mississippi | 2,844,658 | 2,853,313 | 2,858,643 | 2,867,678 | 2,886,006 | 2,900,116 | 2,897,150 | 2,921,723 | 2,940,212 | 2,951,996 | 2,967,297 | 31,888,792 | 1.0% |
| Missouri | 5,595,211 | 5,643,986 | 5,680,852 | 5,714,847 | 5,758,444 | 5,806,639 | 5,861,572 | 5,909,824 | 5,956,335 | 5,987,580 | 5,988,927 | 63,904,217 | 1.9% |
| Nebraska | 1,711,263 | 1,717,948 | 1,725,083 | 1,733,680 | 1,742,184 | 1,751,721 | 1,760,435 | 1,769,912 | 1,781,949 | 1,796,619 | 1,826,341 | 19,317,135 | 0.6% |
| Nevada | 1,998,257 | 2,094,509 | 2,166,214 | 2,236,949 | 2,328,703 | 2,408,804 | 2,493,405 | 2,567,752 | 2,615,772 | 2,643,085 | 2,700,551 | 26,254,001 | 0.8% |
| New Hampshire | 1,235,786 | 1,256,879 | 1,271,163 | 1,281,871 | 1,292,766 | 1,301,415 | 1,311,894 | 1,317,343 | 1,321,872 | 1,324,575 | 1,316,470 | 14,232,034 | 0.4% |
| New Mexico | 1,819,046 | 1,828,809 | 1,850,035 | 1,869,683 | 1,891,829 | 1,916,538 | 1,942,608 | 1,968,731 | 1,986,763 | 2,009,671 | 2,059,179 | 21,142,892 | 0.6% |
| North Carolina | 8,049,313 | 8,203,451 | 8,316,617 | 8,416,451 | 8,531,283 | 8,669,452 | 8,866,977 | 9,064,074 | 9,247,134 | 9,380,884 | 9,535,483 | 96,281,119 | 2.9% |
| North Dakota | 642,200 | 636,267 | 633,617 | 632,809 | 636,303 | 635,365 | 636,771 | 638,202 | 641,421 | 646,844 | 672,591 | 7,052,390 | 0.2% |
| Oregon | 3,421,399 | 3,470,382 | 3,517,111 | 3,550,180 | 3,573,505 | 3,617,869 | 3,677,545 | 3,732,957 | 3,782,991 | 3,825,657 | 3,831,074 | 40,000,670 | 1.2% |
| South Dakota | 754,844 | 758,983 | 762,107 | 766,975 | 774,283 | 780,084 | 788,519 | 797,035 | 804,532 | 812,383 | 814,180 | 8,613,925 | 0.3% |
| Tennessee | 5,689,283 | 5,755,443 | 5,803,306 | 5,856,522 | 5,916,762 | 5,995,748 | 6,089,453 | 6,172,862 | 6,240,456 | 6,296,254 | 6,346,105 | 66,162,194 | 2.0% |
| Vermont | 608,827 | 612,153 | 614,950 | 616,559 | 618,145 | 618,814 | 619,985 | 620,460 | 621,049 | 621,760 | 625,741 | 6,798,443 | 0.2% |
| West Virginia | 1,808,344 | 1,798,582 | 1,799,411 | 1,802,238 | 1,803,302 | 1,803,920 | 1,807,237 | 1,811,198 | 1,814,873 | 1,819,777 | 1,852,994 | 19,921,876 | 0.6% |
| | | | | | | | | | | | | | |
| *All Class Subtotal* | *145,383,502* | *147,385,015* | *148,857,016* | *150,218,616* | *151,688,818* | *153,133,939* | *154,533,422* | *155,858,854* | *157,119,640* | *158,277,990* | *158,974,356* | *1,681,431,168* | *51.0%* |
| | | | | | | | | | | | | | |
| *U.S. Total* | *285,230,516* | *288,919,324* | *291,662,186* | *294,203,055* | *296,939,670* | *299,663,873* | *302,519,956* | *305,521,130* | *308,329,399* | *310,973,838* | *312,471,327* | *3,296,434,274* | *100.0%* |

Source: Census Bureau.

**Exhibit 14a. Pass-Through Overcharges, Nationwide and to Repealer Class, Model 1**

| Year | First Purchaser Sales | First Purchaser Lenses | First Purchaser Overcharge Percent | First Purchaser Overcharge Per Lens | First Purchaser Overcharge (Dollars) | Nationwide Indirect Purchaser Overcharge (Dollars) | Class Percent of Population | End-User Consumer Overcharge (Dollars) |
|---|---|---|---|---|---|---|---|---|
| 2000 | ▮ | ▮ | 11.63 | 1.59 | | | 50.85 | |
| 2001 | ▮ | ▮ | 7.42 | 1.00 | ▮ | ▮ | 50.97 | ▮ |
| 2002 | ▮ | ▮ | 6.03 | 0.82 | ▮ | ▮ | 51.01 | ▮ |
| 2003 | ▮ | ▮ | 6.24 | 0.86 | ▮ | ▮ | 51.04 | ▮ |
| 2004 | ▮ | ▮ | 5.54 | 0.76 | ▮ | ▮ | 51.06 | ▮ |
| 2005 | ▮ | ▮ | 3.57 | 0.50 | ▮ | ▮ | 51.08 | ▮ |
| 2006 | ▮ | ▮ | 2.36 | 0.33 | ▮ | ▮ | 51.10 | ▮ |
| 2007 | ▮ | ▮ | 1.00 | 0.14 | ▮ | ▮ | 51.08 | ▮ |
| 2008 | ▮ | ▮ | 1.58 | 0.23 | ▮ | ▮ | 51.01 | ▮ |
| 2009 | ▮ | ▮ | 1.33 | 0.19 | ▮ | ▮ | 50.96 | ▮ |
| 2010 [a] | ▮ | ▮ | 0.19 | 0.03 | ▮ | ▮ | 50.90 | ▮ |
| Total | ▮ | ▮ | 3.83 | 0.51 | ▮ | ▮ | | ▮ |

[a] 2010 includes only transactions through April 22, 2010.

 Note: Based on 100% pass-through and class share of purchases equivalent to annual population percent.

Exhibit 14b. Pass-Through Overcharges, Nationwide and to Repealer Class, Model 2

| Year | First Purchaser Sales | First Purchaser Lenses | First Purchaser Overcharge Percent | First Purchaser Overcharge Per Lens | First Purchaser Overcharge (Dollars) | Nationwide Indirect Purchaser Overcharge (Dollars) | Class Percent of Population | End-User Consumer Overcharge (Dollars) |
|---|---|---|---|---|---|---|---|---|
| 2000 | ████ | ████ | 13.95 | 1.90 | ████ | ████ | 50.85 | ████ |
| 2001 | ████ | ████ | 9.48 | 1.27 | ████ | ████ | 50.97 | ████ |
| 2002 | ████ | ████ | 7.76 | 1.06 | ████ | ████ | 51.01 | ████ |
| 2003 | ████ | ████ | 7.65 | 1.05 | ████ | ████ | 51.04 | ████ |
| 2004 | ████ | ████ | 6.67 | 0.92 | ████ | ████ | 51.06 | ████ |
| 2005 | ████ | ████ | 4.50 | 0.63 | ████ | ████ | 51.08 | ████ |
| 2006 | ████ | ████ | 3.05 | 0.42 | ████ | ████ | 51.10 | ████ |
| 2007 | ████ | ████ | 1.52 | 0.22 | ████ | ████ | 51.08 | ████ |
| 2008 | ████ | ████ | 1.86 | 0.27 | ████ | ████ | 51.01 | ████ |
| 2009 | ████ | ████ | 1.30 | 0.19 | ████ | ████ | 50.96 | ████ |
| 2010 [a] | ████ | ████ | 0.19 | 0.03 | ████ | ████ | 50.90 | ████ |
| Total | ████ | ████ | 4.72 | 0.63 | ████ | ████ | | ████ |

[a] 2010 includes only transactions through April 22, 2010.

Note: Based on 100% pass-through and class share of purchases equivalent to annual population percent.

Exhibit 15a. Model 1 Pass-Through Overcharges to Seven Alternative Classes, 2000 - 2010 (Dollars)

| Alternative Classes | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 [a] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Named Plaintiff States** | | | | | | | | | | | | |
| California | | | | | | | | | | | | |
| Florida | | | | | | | | | | | | |
| Kansas | | | | | | | | | | | | |
| Maine | | | | | | | | | | | | |
| Michigan | | | | | | | | | | | | |
| New York | | | | | | | | | | | | |
| Wisconsin | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| *Named Plaintiff Subtotal* | | | | | | | | | | | | |

[a] 2010 includes only transactions through April 22, 2010.
 Note: Based on 100% pass-through and state share of purchases equivalent to annual population percent.
Source: Census Bureau.

Exhibit 15b. Model 2 Pass-Through Overcharges To Seven Alternative Classes, 2000 - 2010 (Dollars)

| Alternative Classes | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 [a] | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Named Plaintiff States** | | | | | | | | | | | | |
| California | | | | | | | | | | | | |
| Florida | | | | | | | | | | | | |
| Kansas | | | | | | | | | | | | |
| Maine | | | | | | | | | | | | |
| Michigan | | | | | | | | | | | | |
| New York | | | | | | | | | | | | |
| Wisconsin | | | | | | | | | | | | |
| *Named Plaintiff Subtotal* | | | | | | | | | | | | |

[a] 2010 includes only transactions through April 22, 2010.
 Note: Based on 100% pass-through and state share of purchases equivalent to annual population percent.
Source: Census Bureau.

IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN RE:<br>PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173<br>Case No.8:10-MD-2173-JDW-EAJ<br>Hon. James D. Whittemore |
| This Document Relates to:<br><br>INDIRECT PURCHASER END-USER ACTIONS | |

**ERRATA**

**to**

**EXPERT REPORT of GARY L. FRENCH, Ph.D. dated October 1, 2012**

HIGHLY CONFIDENTIAL: OUTSIDE COUNSEL EYES ONLY
SUBJECT TO STIPULATED PROTECTIVE ORDER, DOCKET 111-1, 112, 203, 206
AND FURTHER REVIEW PROCEDURE AND MOTION TO FILE UNDER SEAL

1.   On October 1, 2012, I submitted an expert report on liability and damages in this matter ("French Report").

2.   In this Errata, I submit three revisions to the French Report, which are as follows:

    i.   The equation in paragraph 116 should be replaced with the following, with the *Price* and *Cost* variables entering in the equation in levels, not logs:

$$Price_{ijkt} = \beta_0 +$$
$$\sum_k \beta_{1k}(Cost_{jt\text{-}12}) * 1(State_k) +$$
$$\sum_k \beta_{2k} 1(State_k) +$$
$$\sum_i \beta_{3i} 1(Cust_i) +$$
$$\sum_j \beta_{4j} 1(Prod_j) +$$
$$\varepsilon_{ijt}$$

    ii.   Exhibit 5 of the French Report is replaced by **Revised Exhibit 5**, attached. The changes in Revised Exhibit 5 include:

- "TOI Market Share" (labeled as row "i") for 2006 now reads "92.4%." In the original Exhibit 5, the 2005 figure, "90.6%," was inadvertently reported for 2006;

- Changes to "Total TOI" (labeled as row "h") for 2002, 2008, 2009 and 2010. These changes are due to the exclusion of products that are found in the TOI Transaction data [transdata_2000_2011.sas7bdat], but are not found in "TOI Product Lookup.xlsx," per TOI's counsel's guidance in answers to plaintiff's data questions that "[i]f the transactional data is limited to the products in productlookup.xls, non-lens sales will be eliminated." The original Exhibit 5 did not account for the removal of these non-lens sales in the "Total TOI" figure, which affected those four years.

    iii.   Exhibit 12 of the French Report is replaced by **Revised Exhibit 12**, attached. The regression results reported in the original version Exhibit 12 were based on a different specification of the model, that is, a model in which the *Cost* variable is contemporaneous to the *Price* variable. The Revised Exhibit 12 reports the results

1

of the regression described in paragraph 115 of the French Report, with a twelve-week lag on the *Cost* variable.

3.  None of these revisions alter the estimated damages to the class or other conclusions in the French Report.

* * * * *

Gary L. French, Ph.D.

Oct. 3, 2012

Date

**Revised Exhibits.**

Revised Exhibit 5.  Transitions Lenses Sold to Exclusive Lens Casters with Contracts, January 2002 - July 2010

| Row | Lens Caster | Time Period | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [a] | ██████ | May 1990 - April 2010 | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| [b] | ██████ | January 1996 - September 2006 | ██ | ██ | ██ | ██ | ██ | - | - | - | - |
| [c] | ██████ | October 2006 - October 2009 | - | - | - | ██ | ██ | ██ | ██ | ██ | - |
| [d] | ██████ | June 2005 - July 2010 | - | - | - | ██ | ██ | ██ | ██ | ██ | ██ |
| [e] | ██████ | October 2006 - July 2010 | - | - | - | ██ | ██ | ██ | ██ | ██ | ██ |
| [f] | ██████ | September 2006 - April 2010 | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| [g] = ∑([a...f]) | Total Exclusive Contract Customers | January 2002 - July 2010 | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| [h] | | Total TOI | January 2002 - July 2010 | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ | ██ |
| [i] | | TOI Market Share | January 2002 - July 2010 | 75.1% | 83.7% | 83.7% | 90.6% | 92.4% | 85.2% | 80.9% | 81.5% | 87.7% |
| [j] = [h] / [i] | Exclusive Contract Customers % of TOI | January 2002 - July 2010 | 46.2% | 46.0% | 47.6% | 48.3% | 55.9% | 75.3% | 77.1% | 74.4% | 32.2% |
| [k] = [i] x [j] | Exclusive Contract Customers % of Total Photochromic | January 2002 - July 2010 | 34.7% | 38.5% | 39.9% | 43.8% | 51.6% | 64.1% | 62.4% | 60.6% | 28.3% |

Sources:

| | |
|---|---|
| [a] ...[e] | Leonard Indirect Class Report, p. 41, fn. 37.  Quantities from TOI Transactions Data. |
| [f] | TOI_0612695-733.  Quantities from TOI Transactions Data |
| [h] | TOI Transactions Data. |
| [i] | VCA ORS Projected Data (2002 – 2006) and VCA ORS Un-projected Data (2007 – 2010). |

**Revised Exhibit 12. Pass Through Regression**
**Results based on Wal-Mart and Sam's Club Data**

| Explanatory Variable | Coefficient Estimates |
|---|---|
| **Pass Through Coefficient:** | |
| Arizona | *** |
| California | *** |
| Florida | *** |
| Hawaii | *** |
| Iowa | *** |
| Kansas | *** |
| Massachusetts | *** |
| Maine | *** |
| Michigan | *** |
| Minnesota | *** |
| Missouri | *** |
| Mississippi | *** |
| North Carolina | *** |
| North Dakota | *** |
| Nebraska | *** |
| New Hampshire | *** |
| New Mexico | *** |
| Nevada | *** |
| New York | *** |
| Oregon | *** |
| South Dakota | *** |
| Tennessee | *** |
| Vermont | *** |
| Wisconsin | *** |
| West Virginia | *** |
| Sam's Club Indicator | *** |
| R-squared | |
| Number of Observations | |

Note: Coefficient estimates for state not included in the class are
not shown. Standard Error is presented in parentheses below the
Coefficient. Coefficient estimates for product and vendor fixed
effects are not shown. "Sam's Club Indicator" takes a value of 1 for
sales by Sam's Club and zero for sales by Wal-Mart.
*** indicates statistical significance at the 0.001 level.