UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| **IN RE: PHOTOCHROMIC LENS ANTITRUST LITIGATION** | MDL Docket No. 2173 |
| | Case No. 8:10-md-2173-JDW-EAJ |
| **This document relates to:** | Hon. James D. Whittemore |
| Indirect Purchaser End-User Plaintiffs | Hon. Elizabeth A. Jenkins |

INDIRECT PURCHASER END-USER PLAINTIFFS' MOTION
TO COMPEL NERA ECONOMIC CONSULTING TO COMPLY WITH SUBPOENA

The End-User Plaintiffs ("Plaintiffs") respectfully move this Court for an Order pursuant

to Federal Rules of Civil Procedure 37 and 45 compelling NERA Economic Consulting

("NERA") to comply with a subpoena, and answer questions consistent with the Subject Matter

of Testimony annexed as Exhibit A to the subpoena.[1]  *See* Exh. 1, Subpoena & Exhibit A to

Subpoena, Feb. 15, 2013.[2]

## I.   INTRODUCTION

---

[1] Pursuant to 28 U.S.C. § 1407(b), the Court, as the transferee court in this Multidistrict Litigation, possesses the ability to exercise the powers of a district judge sitting in the United States District Court for the Southern District of New York for the purposes of enforcing the subpoena in dispute, which was issued in that district.  *See, e.g., In re Photochromic Lens Antitrust Litig.*, MDL No. 10-MD-2173, [D.E. 430] at 4 (M.D. Fla. Dec. 20, 2012) ("[T]his Court has jurisdiction over the matter pursuant to the federal Multidistrict Litigation ("MDL") statute, which provides: 'The judge or judges to whom such actions are assigned . . . may exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated proceedings.'  28 U.S.C. § 1407(b).'").

[2] Exhibits 5, 6, and 7 to this motion have been filed with certain redactions.  If the Court would like to review fully unredacted versions of Exhibits 5, 6, and 7, Plaintiffs will file the unredacted exhibits, along with the appropriate motion under the local rules.

This is a motion to compel compliance with a subpoena requiring deposition testimony by NERA—the employer of Dr. Lauren J. Stiroh, Transitions Optical, Inc.'s ("TOI" or "Defendant") testifying expert economist.  The deposition was noticed to proceed on the last day of expert discovery in order to, among other things, authenticate three NERA-created memoranda recording the substance of communications Dr. Stiroh had with TOI's President, David Cole, and TOI's Head of Research and Development, John Ligas, in connection with the preparation of her expert report in this matter.  It is undisputed that Dr. Stiroh relied upon her conversations with Messrs. Cole and Ligas in connection with her report, as she frequently cites the conversations in her report as the basis for her conclusions.  Notably, one of Dr. Stiroh's conclusions concerning product market definition is directly contradicted by information obtained from Mr. Cole during her conversation with him approximately one month before her was report was served in this matter.  Defendant and NERA objected to the subpoena on February 12, 2013, stating as to each topic of examination, "[n]o testimony shall be provided on this topic."  Exh. 2, Objections of Non-Party NERA Economic Consulting & Def. Transitions Optical, Inc. to Subpoena, Feb. 12, 2013.  Rather than immediately seek a protective order in accordance with applicable rules and local practice,[3] NERA and its counsel—who also represent TOI in this matter—informed Plaintiffs' counsel that a NERA representative and one of counsel for NERA and TOI would appear for the deposition.

On February 15, 2013, a NERA representative and one of counsel for NERA and TOI appeared for the deposition. Plaintiffs' counsel began the deposition by asking the NERA

---

[3] *See* Middle District Discovery: A Handbook on Civil Discovery Practice in the U.S. District Court for the Middle District of Florida ("Middle District Discovery") (2001), at § VI.B. ("Upon receipt of objectionable discovery, a party has a duty to seek relief immediately, i.e., without waiting until the discovery is due or almost due. Upon receipt of a motion for a protective order, the Court may issue a temporary stay of discovery pending resolution of the motion.  However, a party's diligence in seeking relief is a principal factor in the decision whether to grant a stay.").

representative, "[w]ill you, please, state who your employer is?"  Exh. 3, NERA [Rough] Dep. at

3.  In response to this first question, NERA's counsel immediately instructed the witness not the

answer on non-privilege grounds and terminated the deposition.  *See* Exh. 3 at 3-5.  In

accordance with the Federal Rules of Civil Procedure, Plaintiffs' counsel provided the NERA

representative with a check in the amount of $75 for appearing, which the NERA representative

and her counsel accepted prior to exiting the deposition.

　　This conduct is contrary to the Federal Rules of Civil Procedure and local practice.[4]  Thus,

TOI, NERA and their counsel have obstructed authentication of the NERA memoranda

recording the substance of the Cole and Ligas conversations and prevented discovery of

impeachment testimony – testimony the Court is entitled to consider during *Daubert* and

summary judgment proceedings.  And, testimony a jury is entitled to hear and weigh at trial.  For

the reasons set forth below, Plaintiffs respectfully request that their motion to compel be granted

in its entirety and that the Court enter any such further and additional relief it deems just and

appropriate.

## II.　　BACKGROUND

### A.　　The Cole Interview and Memorandum

---

[4] *See* Middle District Discovery at § II.B.2 ("Occasionally during a deposition, a lawyer may instruct a deponent not to answer a question.  Rule 30(d), Federal Rules of Civil Procedure, expressly provides that a lawyer may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation established by the Court, or to present a motion to show that the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent or party.  The use of the instruction not to answer, absent the limited circumstances set forth in Rule 30(d)(1), Federal Rules of Civil Procedure, is disfavored by the Court.  A party or a lawyer who improperly instructs a deponent not to answer is subject to the expense and sanction provisions of Rule 37(a)(4).").

It is undisputed that on November 1, 2012, TOI's expert, Dr. Stiroh, conducted a telephonic conversation with TOI's President David Cole. Dr. Stiroh testified that she and her team conducted the conversation with Mr. Cole in order "to discuss the topics that were - - are referenced in later in the report." Exh. 4, Stiroh Dep. at 800:7-8, Jan. 16, 2013.[5] The conversation lasted approximately one hour. Exh. 4, Stiroh Dep. at 803:17-18. The substance of the conversation was contemporaneously recorded in an eight-page, detailed memorandum, on NERA letter head, by the "NERA Transitions Team."[6] *See* Exh. 5, Stiroh Dep. Exhibit 15, at 1. During this conversation, Mr. Cole communicated to Ms. Stiroh TOI's view that *it is not a horizontal competitor with clear lens manufacturers* and its photochromic products *do not* compete with clear lenses. *Id.* at 1-2, §II.A. The relevant statements are recorded as follows in the memorandum:

- From TOI's inception, close relationships with lens casters have been central to TOI's business model. *TOI has always sold to and through lens casters and generally does not pose a threat to them as a horizontal competitor competing for the same down stream customers.*

- TOI wanted to let lens manufacturers compete with each other on their own merits. *TOI made the commitment with lens casters to not compete with them.*

---

[5] *See* Exh. 6, Stiroh Dep. Exhibit 11 (Expert Rep. of Lauren J. Stiroh, Ph.D, Dec. 3, 2012), at 5 n.4 ("Conversation with David Cole, November 1, 2012,"), 5 n.7 (same), 5 n.8 (same), 10 (same), 5 n.12 (same); 11 n.45 (same), 11 n.48-49 (same), 12 n.51 (same); 27 n.94 (same), 27 n.96 (same), 42 n.156 (same), 44 n.185 (same); 51 n.201(same), 63 n.243 (same); 69 n.263 (same); *see also id.* at 2 ("I and members of my team have had numerous conversations with TOI employees, including David Cole, President of TOI, and John Ligas, Director of Research and Development at TOI.").

[6] Dr. Stiroh also conducted a telephonic interview with John Ligas on January 26, 2012 and October 20, 2012. Memoranda recording the substance of each of these conversations were also contemporaneously prepared by NERA personnel. *See* Composite Exh. 7, Stiroh Dep. Exhibits 17 & 18.

*Id.* at 1-2 (emphasis added).  Thus, the memorandum reflects that Mr. Cole *not once, but twice* told Dr. Stiroh that TOI and its photochromic products do not compete with clear lenses.  *Id.* Dr. Stiroh testified that she did not recall "specifically him [Mr. Cole] saying something that is similar to this [first] bullet point."  Exh. 4, Stiroh Dep. at 877:6-8.  She further testified that she did not "recall him [Mr. Cole] making a specific statement like this."  *Id.* at 877:21-22.

**B.       The December 3, 2012 Stiroh Report**

Approximately thirty-three days after conducting the Cole interview, Dr. Stiroh submitted an expert report in which she concludes that the relevant product market in this case includes *both* clear and photochromic lenses.  *See* Exh. 6, Stiroh Rep. at 2.  Dr. Stiroh concluded that the market is not limited to just photochromic products, as Plaintiffs' expert opines (*i.e.,* TOI possesses approximately 80-90% of this market (a monopolist)).  Rather, she concludes the relevant product market at the very least includes competition between *all* clear lenses and *all* photochromic products.  Therefore, according to Dr. Stiroh, TOI cannot be a monopolist given its small share in this larger market. Exh. 4, Stiroh Dep. at 807:23-25; Exh. 6, Stiroh Rep. at ¶ IV.  Notably, this conclusion is expressly contradicted by Mr. Cole's statements that TOI "generally does not pose a threat to them [lens casters] as a horizontal competitor competing for the same down stream customers," and "TOI made the commitment with lens casters not to compete with them."  *See* Exh. 5 at 1 (emphasis added).

Upon receipt of the Stiroh Expert Report, the Direct Purchaser Plaintiffs served a subpoena requiring the production of the memoranda recording the Cole and Ligas interviews. The documents were produced by Defendant.  *See* Exhs. 5 & 7.

**C.       The Stiroh Deposition**

When confronted at her deposition with the Cole memorandum containing information

that directly contradicts her relevant market conclusion, Dr. Stiroh, the senior NERA economist

on this matter, testified she did not know who prepared the memorandum,[7] why the

memorandum was prepared,[8] or even recall being told directly by her client that it does not

compete with clear lens manufacturers.  Exh. 4, Stiroh Dep. at 839:4–9, 871:25–72:4, 876:16–

77:9.  Dr. Stiroh testified that she did not know who prepared the memoranda summarizing calls

between her and Mr. Ligas (*id.* at 802:2–3), or why someone on her staff attending the call would

record the conversations in writing.  *Id*. at 804:2–5, 910:22–11:17.  It is beyond dispute that Dr.

Stiroh relied on the Cole and Ligas interviews in connection with her report.  *See supra*, n.5.  It is

also beyond dispute that the Cole and Ligas memoranda were contemporaneously prepared in

connection with the interviews. *See* Exh. 5 & Composite Exh. 7 (each was finalized within a few

days of the interviews).  Since Dr. Stiroh relied upon her conversations with Messrs. Cole and

Ligas in connection with her report and the memoranda contemporaneously capture the

substance of the communications with Messrs. Cole and Ligas, these documents are patently

discoverable. Notably, Defendant and its counsel implicitly recognized this fact by producing

these documents pursuant to the Direct Purchaser Plaintiffs' subpoena.  The documents are

discoverable information that may serve as evidence to impeach Dr. Stiroh, since her

conclusion(s), at a minimum, are inconsistent with the conversations she had with Mr. Cole in

connection with her report. Plaintiffs intend to use the memoranda during *Daubert* and summary

judgment motion practice to challenge Dr. Stiroh's product market conclusion, which is

contradicted by her own client's statements.  This is important information the Court is entitled

to consider when weighing credibility issues concerning the experts' conclusions in this case.  A

jury is also entitled to consider these memoranda when weighing credibility issues concerning

---

[7] Exh. 4, Stiroh Dep. at 802:3-4.
[8] *Id*. at 804:5.

the experts' conclusions during a trial in this matter.

### D.     The Post-Stiroh Deposition Communications with Opposing Counsel

The day after the Stiroh deposition, on or about January 17, 2013, Plaintiffs' counsel contacted TOI's counsel to request that it make a Rule 30(b)(6) witness available to authenticate the Cole and Ligas memoranda and answer a limited set of questions in a deposition that would last less than an hour.  Opposing counsel refused to make a NERA representative available and would not stipulate to the authenticity of the documents.  On February 5, 2013, Plaintiffs then served a subpoena on NERA requesting a Rule 30(b)(6) witness be made available on February 15, 2013, the last day of expert discovery, in order to authenticate the documents and address five limited topics.[9]  On February 12, 2013, Defendant objected to the subpoena and Defendant's counsel threatened to have sanctions imposed against Plaintiffs' counsel if Plaintiffs' counsel sought to proceed with the deposition to authenticate documents and obtain potential impeachment testimony.  On February 14, 2013, Plaintiffs' counsel advised Defendant that they intended to proceed the following day with the deposition.  Defendant's counsel responded as follows:

> Jeffrey Bank will attend with either Shaena McPadden or Luke Kline. Given the wholly unwarranted burden and expense this will entail, and your stubborn refusal to acknowledge the rules of civil procedure, you are responsible for all the expenses that will be incurred by Transitions in this connection.

Exh. 8, Email from J. Jacobson to M. Buchman, *et al.* (Feb. 14, 2013).

At no time on February 14, 2013, did opposing counsel inform Plaintiffs that it desired to adjourn the deposition in order to seek a protective order, as required by local rules.  Instead, and

---

[9] The subpoena served was unsigned and a subsequent signed subpoena was re-served on February 13, 2013.

in an effort to multiply the proceedings, counsel for NERA and TOI and a NERA representative appeared the next morning for the deposition, as noticed.  After the witness was sworn in and a single question was asked concerning the witness's place of employment, counsel for TOI and NERA instructed the witness not to answer the question and immediately terminated the deposition on the grounds that it was allegedly being conducted in bad faith, unreasonably harassed the witness, sought testimony from a non-testifying expert precluded under Rule 26(b)(4)(D), and was inconsistent with the parties' December 11, 2011 stipulation.  *See* Exh. 3, NERA [Rough] Dep., Feb. 14, 2013.

Under these circumstances, Plaintiffs now seek an Order compelling NERA to produce a representative in compliance with the subpoena and any additional relief the Court deems appropriate in light of TOI's and NERA's conduct, including their: (i) baseless threats designed to prevent authentication of documents and discoverable information; (ii) misleading representation that the deposition would proceed, thereby causing an unnecessary waste of time and expense; (iii) entirely improper instruction not to answer a pending question on non-privilege grounds; and (iii) baseless termination of the deposition immediately after it was commenced.

E.     **Rule 30(b)(6) Deposition Subject Matter**

Plaintiffs subpoenaed NERA to produce a representative to appear for deposition to testify on the following subject matters:

1.      NERA' s custom, habit, practice, procedure and/or protocol for taking, finalizing, and preparing memoranda or other documents recording or relating to the subject matter of communications or conversations between NERA and NERA clients or other persons.

2.      The creation, preparation and finalization of any and all memoranda, documents or data concerning or relating to all conversations with David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens, Inc.,

and the preparation of the Expert Report of Lauren J. Stiroh, Ph.D., In Re Photochromic Lens Antitrust Litigation - Achtman et al. Plaintiffs, dated Dec. 3, 2012, in particular, including, but not limited to, the Memo, dated Nov. 3, 2012, see Stiroh_0000076-83; see also Exh. 15 to Lauren Stiroh's deposition (Jan. 16, 2013).

3.      The reason(s) why memoranda, documents or recorded impressions concerning or relating to communications with persons regarding an expert report are prepared, created and/or taken.

4.      Communications within NERA concerning or relating to the conversations with David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens Inc. and the preparation of the Expert Report, in particular.

5.      The NERA employees, consultants and other persons who were present (either in-person or telephonically) during and/or participated in any conversation with David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens, Inc. and the preparation of the Expert Report, in particular.

*See* Exh. 1, Exhibit A to Subpoena to Testify at a 30(b)(6) Deposition, Feb. 4, 2013.

### F.      NERA's Objections

At the deposition, the NERA representative refused to answer even a single question.

Instead, the NERA representative terminated the deposition immediately after being sworn in, as

one of counsel for TOI and NERA objected and directed.  *See* Exh. 3, NERA [Rough] Dep., Feb.

14, 2013, at 34*; see also* page 2, *supra*. More specifically, the deposition lasted less than five

minutes and consisted of one question before counsel NERA and TOI terminated the matter:

MR. BUCHMAN [Counsel for Plaintiffs]:

Q.   Thank you for appearing.  Will you, please, state who your employer is?

MR. BANK [Counsel for Defendant TOI and NERA]:

Counsel, at this time, we move to terminate the deposition based on Rule 30(d)(3)(A) on the grounds that the deposition is being conducted in bad faith and that it unreasonably harasses the witness.

Based on the language of that rule, we demand that the deposition be suspended for the time necessary to obtain an order from the Court.

I'm also instructing the witness not to answer that question or any other question in this deposition based on Rule 30(c)(2), which states that a person may instruct a deponent not to answer to present such a motion under Rule 30(d)(3).

We've informed Plaintiffs' counsel numerous times on January 18th, February 4th, February 12th, and February 14th that the Subpoena at issue calls for deposition testimony by a non-testifying expert, and that such discovery is precluded under Rule 26, as well as the party's December 2011 stipulation regarding non-discoverability.

Also, as Mr. Jacobson has stated a couple of times in communications to Plaintiffs' counsel, we reserve the right to seek sanctions as well as costs and expenses relating to these proceedings.

At this time, Gentlemen, I think the deposition is over pending appropriate motions filed with the Court.

*See* Exh. 3, NERA [Rough] Dep. at 3-5. To date, neither TOI nor NERA has sought a motion for a protective order from the Court.[10]

## III.   ARGUMENT

Under Federal Rule of Civil Procedure 26, "[a] party may obtain discovery regarding any matter which is relevant and non-privileged." *See Roseman v. Sports & Recreation*, 165 F.R.D. 108, 110 (M.D. Fla. 1996); *see generally Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (discovery may be had regarding "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").

The test for discoverability is extremely broad and the relevant question is "'whether the documents reviewed or generated by the expert could reasonably be viewed as germane to the

---

[10] *Ferguson v. N. Broward Hosp. Dist.*, No. 10-61606-CIV, 2011 WL 1496771 (S.D. Fla. Apr. 19, 2011) ("Although the Rule [30(d)(3)(A)] does not set forth a specific time for filing a motion for protective order or a motion to terminate or limit the deposition, courts have noted that such motions must be filed 'immediately' or 'promptly' after the suspension of the deposition." ).

subject matter on which the expert has offered an opinion.'" *Id.* (quoting *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,* 257 F.R.D. 607, 614 (E.D. Cal. 2009) (quoting *SEC v. Reyes*, 2007 WL 963422, at *2 n.2 (N.D. Cal. Mar. 30, 2007)).  In the end, the court in *Tampa Bay Water* did not grant the motion to compel because it found "that the information withheld was not generated or considered in connection with the formation of the expert opinions . . . , nor is it related to their opinions . . . ." *Id.*  However, here, it is clear that the information withheld was generated and considered in connection with the formation of the expert's opinion, notwithstanding the expert's incredible self-serving statements to the contrary.  Indeed, any ambiguity must be resolved in favor of discovery. *Id.* (citing *B.C.F. Oil Ref., Inc. v. Consol. Edison Co.,* 171 F.R.D. 57, 62, 66 (S.D.N.Y. 1997)).

Dr. Stiroh testified that she relied upon the Cole and Ligas conversations in connection with her report and the report contains repeated references to these conversations.  The memoranda recording and capturing the substance of these communications is patently relevant and discoverable.  *See Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460 (E.D. Pa. 2005) ("The Court sees no principled distinction between the discoverability of oral and written communications that a testifying expert considers in fashioning her opinions.") (citing Fed. R. Civ. P. 26(a)(2)(B) (requiring disclosure of "data or other information" considered by testifying expert); *TV-3, Inc. v. Royal Ins. Co. Of Am.,* 193 F.R.D. 490, 492 (S.D. Miss. 2000) (requiring disclosure of all documents and oral communications reviewed by experts in connection with formulating opinions, even those ultimately rejected or not relied upon)).

The subpoena is tailored to elicit testimony relevant to the bases and reliability of Dr. Stiroh's expert report.  *See* Exh. 1, Exhibit A to Subpoena.  As one court recently opined:

> As a general matter, experts are permitted to sift through the available evidence
> and identify the data that they deem to be significant. They are permitted to make

inferences if evidence is missing, if those inferences are scientifically reasonable. And they are permitted to discount or explain apparently contradictory evidence, again assuming that it is scientifically appropriate to do so. *But experts cannot simply ignore contradictory evidence; they are not allowed to pick and choose the facts they find helpful and to pretend that the others do not exist.*

*Zeolla v. Ford Motor Co.*, No. 09-40106-FDS, 2013 WL 308968, at *9 (D. Mass. Jan. 24, 2013)

(emphasis added). The NERA memoranda support that Dr. Stiroh selectively ignored important

facts that contradict her ultimate conclusions. For example, one memorandum records the

following statements made by David Cole, President of TOI:

- TOI made the commitment with lens casters to not compete with them, and

- TOI has always sold to and through lens casters and generally does not pose a threat to them as a horizontal competitor competing with the same downstream customers.

Exh. 5, Stiroh Dep. Exhibit 15 at 1-2.

TOI's prior conduct further supports enforcement of the subpoena. On January 9, 2013,

TOI caused a subpoena to be served on Kenneth C. Baseman, an expert proffered by Vision-

Ease. The Baseman Subpoena seeks the production of "[a]ll notes or other recorded impressions

of any conversations or oral communications by which Douglas Hepper, Chief Executive Officer

of Vision-Ease, communicated information relied upon in the Expert Report." *See* Exh. 9,

Baseman Subpoena, Jan. 9, 2013.  Given this prior request, it is, at best, disingenuous for TOI's

counsel (who also represent NERA) to now argue that testimony relating to the creation of

contemporaneously prepared memorandum summarizing conversations relied upon by Dr. Stiroh

falls outside of the scope of permissible discovery.

Rule 26(b)(4)(D) is not applicable to the Subpoena. The Rule generally prohibits seeking

discovery from consulting experts retained in anticipation of litigation or preparation for trial.

*See* Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily, a party may not, by interrogatories or deposition,

discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.").  Plaintiffs subpoenaed NERA to produce a representative to testify regarding matters detailed in the subpoena. Plaintiffs are aware of nothing in the record supporting that NERA constitutes a non-testifying expert retained or specially employed by TOI. Under NERA's and TOI's expansive interpretation of Rule 26(b)(4)(D), experts would be encouraged to absolve themselves of any knowledge of documents, including backup data, produced by their office relating to communications or facts relied upon in their reports that contradict their conclusions, with knowledge that their employers and/or staff could not be questioned regarding the origin of such documents.  Rule 26(b)(4)(D) was not intended to facilitate such gamesmanship and has no reasonable application here.

The stipulation entered into by the Parties on December 11, 2011, likewise has no relevance to the testimony sought through the subpoena. The stipulation provides that the following types of information shall not be the subject of discovery:

a. The content of communications among and between: (i) counsel and expert witnesses; (ii) counsel and expert witnesses' staff; (iii) expert witnesses and their respective staffs; and/or (iv) expert witnesses and other expert witnesses; and

b. Notes, drafts, written communications or other types of preliminary work created by, or for, expert witnesses or their staff. The protections against discovery contained in this paragraph shall not apply to any communications or documents upon which an expert relies as a basis for any of his or her opinions or reports.

*See* Stipulation [Doc. 201].  Each NERA memorandum summarizes communications between Dr. Stiroh and a TOI executive that Dr. Stiroh relied heavily on in preparing her expert report. Paragraph (a) of the stipulation does not apply to communications between Dr. Stiroh and TOI executives.  Additionally, Dr. Stiroh relied heavily on her conversations with Messrs. Cole and

Ligas in preparing her report, and information relating to communications or documents upon which an expert relies as a basis for any of her opinions or reports are expressly exempt from paragraph (b) of the stipulation. Thus, the stipulation has no bearing on the subpoena.

Here, there is simply no basis under the case law or the local rules for TOI, NERA or their counsel to have instructed the Rule 30(b)(6) witness not to answer questions or to have terminated the deposition to authenticate discoverable information or seek impeachment evidence concerning conversations which Dr. Stiroh testified she relied upon and which she repeatedly cites to in her expert report. Accordingly, Plaintiffs respectfully submit this motion should be granted in its entirety.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that this Honorable Court order NERA Economic Consulting to comply with the subpoena issued and to produce a representative to answer questions consistent with the Subject Matter of Testimony annexed as Exhibit A to the subpoena, and enter any such further relief that the Court deems just and appropriate.

Respectfully submitted,

 s/ Christopher Casper
Christopher Casper
FBN: 048320
JAMES, HOYER, NEWCOMER,
      & SMILJANICH, P.A.
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL  33609
Tel: (813) 286-4100
Fax: (813) 286-4174
ccasper@jameshoyer.com

*Interim Liaison Counsel for the*
 *Putative Indirect Purchaser End-User Class*

  /s/ Ben Barnow
Ben Barnow
Erich P. Schork
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com

  /s/ Michael M. Buchman
Marc I. Gross
Michael M. Buchman
POMERANTZ GROSSMAN HUFFORD
   DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, NY  10016
Tel: (212) 661-1100
Fax: (212) 661-8665
mgross@pomlaw.com
mbuchman@pomlaw.com

  /s/ Lance A. Harke
Lance A. Harke
HARKE CLASBY & BUSHMAN LLP
9699 NE Second Avenue
Miami Shores, FL 33138
Tel: (305) 536-8220
Fax: (305) 536-8229
lharke@harkeclasby.com

  /s/ Susan G. Kupfer
Susan G. Kupfer
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, CA  94111
Tel: (415) 972-8160
Fax: (415) 972-8166
skupfer@glancylaw.com
jbarton@glancylaw.com

*Interim Co-Lead Counsel for the putative
Indirect Purchaser End-User Class*

## LOCAL RULE 3.01(g) CERTIFICATION

I HEREBY CERTIFY that, on February 25, 2013, pursuant to Local Rule 3.01(g), M.D.

Fla., counsel for Plaintiffs conferred with counsel for Transitions Optical and NERA Economic

Consulting.  Counsel for Transitions and NERA oppose the relief requested herein.

  s/ Christopher Casper

**<u>Certificate of Service by Electronic Means</u>**

The undersigned hereby certifies that the preceding document was caused to be served

electronically this 25th day of February 2013 with the Clerk of Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

          s/ Christopher Casper    

EXHIBIT

I

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| In re: Photochromic Antitrust Litigation | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   8:10-md-2173-JDW-EAJ |
| | ) | |
| | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | Middle District of Florida            ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  NERA Economic Consulting, 360 Hamilton Avenue, 10th Floor, White Plains, New York 10601,
      c/o Chul Pak, Esq., Wilson Sonsini Goodrich & Rosati.

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is _not_ a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment "A", Definitions, Instructions and Subject Matter of Testimony

| Place: Pomerantz Grossman Hufford Dahlstrom & Gross LLP, 600 Third Avenue, 20th Fl., New York, NY 10016, or other mutually agreeable place and time | Date and Time: 02/15/2012 9:30 am |
|---|---|

The deposition will be recorded by this method:   stenographically and videotape

☐ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   02/04/2013

  _CLERK OF COURT_

                                OR

_____               _Ada Kurtz_
_Signature of Clerk or Deputy Clerk_                _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_   Indirect Purchaser Plaintiffs
_____ , who issues or requests this subpoena, are:
Pomerantz Grossman Hufford Dahlstrom & Gross LLP, 600 Third Ave., New York, NY 10016, 212-661-1000,
AGKurtz@pomlaw.com, Adam G. Kurtz

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   8:10-md-2173-JDW-EAJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   NERA Economic Consulting
was received by me on *(date)*                          .

☐ I served the subpoena by delivering a copy to the named individual as follows: 

_____

on *(date)*                    ; or

☐ I returned the subpoena unexecuted because: 

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$                         .

My fees are $                    for travel and $                    for services, for a total of $       0.00       .

I declare under penalty of perjury that this information is true.

Date:                    

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT "A" TO SUBPOENA TO TESTIFY AT A 30(b)(6) DEPOSITION

### Definitions, Instructions and Subject Matter of Testimony

**I.    Instructions and Definitions**

1.    Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition.

2.    If you file an objection to any portion of the subpoena, please be prepared to go forward with the 30(b)(6) deposition as scheduled as to the unobjectionable Subject Matter of Testimony.

3.    "NERA" means NERA Economic Consulting and its employees, agents, staff, associates, partners, directors, executives, principals, consultants, and any other persons acting on its behalf.

4.    "Document" shall have the meaning ascribed to it in Fed. R. Civ. P. 34(a) and shall include every writing or record of every type and description in any form whatsoever (printed, handwritten, electronic, or otherwise).

5.    "Person" or "NERA client" means a natural person, corporation, association, company, subsidiary, firm, partnership, joint venture, trust, estate, agency, department, division, bureau, governmental entity, judicial person or entity, and any other legal entity, and all of their officials, directors, officers, employees, representatives, attorneys, agents and/or any other person acting on their behalf.

6.    "The Expert Report" means the Expert Report of Lauren J. Stiroh, Ph.D., In Re Photochromic Lens Antitrust Litigation - Achtman et al. Plaintiffs, dated Dec. 3, 2012.

7.    "An Expert Report" means any report prepared by NERA, in its capacity of an economic consulting firm, on behalf of any of its clients.

II.     **Subject Matter of Testimony**

1.      NERA's custom, habit, practice, procedure and/or protocol for taking, finalizing, and preparing memoranda or other documents recording or relating to the subject matter of communications or conversations between NERA and NERA clients or other persons.

2.      The creation, preparation and finalization of any and all memoranda, documents or data concerning or relating to all conversations with David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens, Inc., and the preparation of the Expert Report of Lauren J. Stiroh, Ph.D., In Re Photochromic Lens Antitrust Litigation - Achtman et al. Plaintiffs, dated Dec. 3, 2012, in particular, including, but not limited to, the Memo, dated Nov. 3, 2012, *see* Stiroh_0000076-83; *see also* Exh. 15 to Lauren Stiroh's deposition (Jan. 16, 2013).

3.      The reason(s) why memoranda, documents or recorded impressions concerning or relating to communications with persons regarding an expert report are prepared, created and/or taken.

4.      Communications within NERA concerning or relating to the conversations with David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens Inc. and the preparation of the Expert Report, in particular.

5.      The NERA employees, consultants and other persons who were present (either in-person or telephonically) during and/or participated in any conversation with  David Cole and John Ligas in connection with NERA's work on behalf of Transitions Lens, Inc. and the preparation of the Expert Report, in particular.

EXHIBIT

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: PHOTOCHROMIC LENS ANTITRUST LITIGATION | ) ) ) ) |

8:10-md-2173-JDW-EAJ (M.D. Fla.)

## OBJECTIONS OF NON-PARTY NERA ECONOMIC CONSULTING AND DEFENDANT TRANSITIONS OPTICAL, INC. TO SUBPOENA

Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), NERA Economic Consulting ("NERA") and Defendant Transitions Optical, Inc. ("Transitions"), by and through their attorneys, hereby object to the subpoena issued by Plaintiffs dated February 4, 2013 and served February 6, 2013.

### GENERAL OBJECTIONS

1. NERA and Transitions object to the subpoena in its entirety as the copy served on NERA is not signed by an attorney or by the Clerk of the U.S. District Court for the Southern District of New York (or her authorized deputy) and thus does not comport with Federal Rule of Civil Procedure 45(a).

2. NERA and Transitions object to the subpoena in its entirety as calling for deposition testimony by a non-testifying expert. The requested information is not likely to lead to the discoverability of admissible evidence, but, if it were, the time to seek the information would have been during the deposition of Dr. Lauren J. Stiroh. If Dr. Stiroh is not the intended witness, then, by definition, the subpoena is for facts known by non-testifying experts. Discovery of facts known to non-testifying experts is expressly barred by Federal Rule of Civil Procedure 26(b)(4)(D).

3. NERA and Transitions object to the subpoena in its entirety as imposing an undue burden under Federal Rule of Civil Procedure 45(c). Plaintiffs have had sufficient opportunity to

depose David Cole, John Ligas, and Dr. Stiroh, and providing further testimony is unnecessarily duplicative and burdensome. Further, preparing for and providing testimony in response to a subpoena that is expressly disallowed by Federal Rule of Civil Procedure 26(b)(4)(D) is by definition unduly burdensome.

4.      NERA and Transitions object to the subpoena in its entirety to the extent that it calls for disclosure of communications protected from discovery by Rule 26 and the parties' December 13, 2011 Stipulation Regarding Non-Discoverability of Certain Expert Materials and Communications (Docket Number 201).

5.      NERA and Transitions also object to the subpoena to the extent it seeks disclosure of communications protected from discovery by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or exemption.

6.      Plaintiffs were specifically advised that pursuing this subpoena was plainly improper and would result in a request for sanctions in a series of communications dated January 18, 2013, and February 4, 2013. Accordingly, and because the subpoena was issued without any reasonable justification, NERA and Transitions are entitled to their costs, including attorneys' fees in preparing these objections

## OBJECTIONS TO "INSTRUCTIONS AND DEFINITIONS"

1.      NERA and Transitions object to the "Instructions and Definitions" to the extent that they purport to impose burdens or requirements beyond the requirements of the Federal Rules of Civil Procedure. NERA and Transitions will not assume any burden not imposed by the applicable procedural rules and governing law.

2.      NERA and Transitions object to the term "NERA" to the extent it encompasses any person other than Dr. Stiroh, as no other persons encompassed by the defined term are

proposing to testify in the above-captioned case. Such persons are therefore not subject to discovery pursuant to Federal Rule of Civil Procedure 26(b)(4)(D). NERA and Transitions further object to the term to the extent it includes Dr. Stiroh as she has already provided deposition testimony in this matter and cannot be required to give a further deposition.

3.      NERA and Transitions object to the terms "Person" and "NERA client" to the extent they encompass any non-party to the above-captioned case as such persons are irrelevant to the above-captioned case.

4.      NERA and Transitions object to the term "An Expert Report" to the extent it covers reports or other activities not related to the above-captioned case as such reports and activities are irrelevant to the above-captioned case.

## OBJECTIONS TO "SUBJECT MATTER OF TESTIMONY"

**Topic 1:**   NERA and Transitions reassert and incorporate by reference all of the foregoing objections. In particular, this topic is overbroad and unduly burdensome to the extent it seeks discovery of policies or activities unrelated to the above-captioned case. No testimony shall be provided on this topic.

**Topic 2:**   NERA and Transitions reassert and incorporate by reference all of the foregoing objections. In particular, all communications relevant to this topic are protected from discovery by Federal Rule of Civil Procedure 26(b)(4) and the parties' December 13, 2011 Stipulation Regarding Non-Discoverability of Certain Expert Materials and Communications (Docket Number 201). No testimony shall be provided on this topic.

**Topic 3:**   NERA and Transitions reassert and incorporate by reference all of the foregoing objections. In particular, this topic is overbroad and unduly burdensome to the extent

it seeks discovery of policies or activities unrelated to the above-captioned case. No testimony shall be provided on this topic.

**Topic 4:**   NERA and Transitions reassert and incorporate by reference all of the foregoing objections. In particular, all communications relevant to this topic are protected from discovery by Federal Rule of Civil Procedure 26(b)(4) and the parties' December 13, 2011 Stipulation Regarding Non-Discoverability of Certain Expert Materials and Communications (Docket Number 201). No testimony shall be provided on this topic.

**Topic 5:**   NERA and Transitions reassert and incorporate by reference all of the foregoing objections. In particular, this topic is unduly burdensome as Dr. Stiroh already identified the participants in the calls to the best of her recollection at her depositions in these proceedings. No testimony shall be provided on this topic.

Dated: February 12, 2013

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


Jonathan M. Jacobson


Jonathan M. Jacobson
Chul Pak
Daniel P. Weick
1301 Avenue of the Americas
40th Floor
New York, NY 10019
Telephone: (212) 497-7758
Facsimile: (212) 999-5899
Email: jjacobson@wsgr.com

*Attorneys for Non-Party NERA Economic Consulting & Defendant Transitions Optical, Inc.*

EXHIBIT

3

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3        ----------------------------------X
                                            )
4        In Re:                             )Civ. No.
                                            )
5        Photochromic Antitrust Litigation )8:10-md-2173
                                            )JDW-EAJ
6                                           )
                                            )
7        ----------------------------------X

8

9                      February 15, 2013

10                     9:35 a.m.

11

12              30(b)(6) DEPOSITION OF NERA

13      ECONOMIC CONSULTING, INC., by SHEANA  C.

14      McPADDEN, held at the offices of Pomerantz

15      Grossman Hufford Dahlstrom & Gross LLP,

Page 1

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

16          600 Third Avenue, New York, New York,

17          pursuant to Subpoena, before Mayleen Ahmed

18          (Cintrón), a Registered Merit Reporter,

19          Certified Realtime Reporter, and Notary

20          Public of the State of New York.

21

22

23

24

25

                                                    2

1          A P P E A R A N C E S:

2

3          POMERANTZ GROSSMAN HUFFORD

4          DAHLSTROM & GROSS LLP

Page 2

```
                   Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT
    5                  Attorneys for Indirect Purchaser Plaintiffs


    6                    600 Third Avenue


    7                    New York, New York 10016


    8              BY: MICHAEL M. BUCHMAN, ESQ.


    9                    ADAM KURTZ, ESQ.


   10


   11         WILSON SONSINI GOODRICH & ROSATI, P.C.


   12         Attorneys for Defendants


   13              1301 Avenue of the Americas, 40th floor


   14              New York, New York 10019-6022


   15         BY: JEFFREY BANK, ESQ.


   16


   17                              -  -  -


   18


   19


   20
```

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

21

22

23

24

25

⚢

3

1       S H A E A N   C.   M C P A D D E N,

2           called as a witness, having been duly

3           sworn by a Notary Public, was examined

4           and testified as follows:

5               THE REPORTER:  Please state your

6           full name for the record.

7               THE WITNESS:  Shaena Christine

8           McPadden.

9       EXAMINATION BY

10      MR. BUCHMAN:

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

11          Q.   Good morning, Ms. McPadden.  My

12     name is Michael Buchman, and I represent the

13     Indirect Purchaser Plaintiffs, or the

14     consumers in this case.

15               Thank you for appearing.  Will

16     you, please, state who your employer is?

17               MR. BANK:  Counsel, at this time,

18          we move to terminate the deposition

19          based on Rule 30(d)(3)(A) on the

20          grounds that the deposition is being

21          conducted in bad faith and that it

22          unreasonably harasses the witness.

23               Based on the language of that

24          rule, we demand that the deposition be

25          suspended for the time necessary to

                                              4
                    Page 5

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

1          obtain an order from the Court.

2               I'm also instructing the witness

3          not to answer that question or any

4          other question in this deposition based

5          on Rule 30(c)(2), which states that a

6          person may instruct a deponent not to

7          answer to present such a motion under

8          Rule 30(d)(3).

9               We've informed Plaintiffs' counsel

10         numerous times on January 18th,

11         February 4th, February 12th, and

12         February 14th that the Subpoena at

13         issue calls for deposition testimony by

14         a nontestifying expert, and that such

15         discovery is precluded under Rule 26,

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

16          as well as the party's December 2011

17          stipulation regarding non-discoverability.

18              Also, as Mr. Jacobson has stated a

19          couple of times in communications to

20          Plaintiffs' counsel, we reserve the

21          right to seek sanctions as well as

22          costs and expenses relating to these

23          proceedings.

24              At this time, Gentlemen, I think

25          the deposition is over pending

5

1           appropriate motions filed with the

2           Court.

3               MR. BUCHMAN:  It is not over

4           because I have a statement to make as

5           well, which is that we've asked you to

Page 7

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

6            agree to authenticate the documents

7            that you produced, that being the NERA

8            documents, especially the Cole

9            memoranda, which was, I believe, Stiroh

10           Exhibit 15.  You have not gotten back

11           to us whether you will agree to

12           authenticate that document, thereby

13           requiring and necessitating this

14           deposition.

15                In addition, we disagree with your

16           position.  You had multiple

17           opportunities to seek a Protective

18           Order prior to this deposition.  You

19           could have done that.  Instead, you

20           chose to appear here today.

21                Let the record reflect that I am

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

22          handing the witness the $75 check for

23          her appearance here today.  And that by

24          having the witness sworn in, you've

25          waived any claims to burden or improper

                                                        6

1          subpoena or failure to pay the witness

2          fee, and that we believe that this

3          deposition should proceed in its

4          entirety.

5              We believe that it is

6          inappropriate for you to appear here

7          today and to terminate the deposition

8          under these circumstances.  If you

9          disagree with me, that is fine.  We

10          will take it up with the Court.  But we

11          believe it is bad faith for you to

                    Page 9

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

12          appear here today and terminate the

13          deposition when you had ample

14          opportunity to seek a Protective Order.

15              We reserve our rights to seek

16          sanctions against you based upon the

17          fact that you didn't seek the

18          Protective Order; that we've asked you

19          to authenticate the documents; and more

20          importantly, that the documents that we

21          seek authentication of were documents

22          that were prepared by NERA which

23          Ms. Stiroh claims she never saw in her

24          deposition and was unable to

25          authenticate, thereby necessitating

7

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

1          this deposition.

2                    Thank you very much, and have a

3          nice weekend.

4                    MR. BANK:  In response, Counsel, I

5          would note that the Subpoena that was

6          served on the deponent -- I believe it

7          was first served on February 4, 2013.

8          The original Subpoena called for

9          production of the witness one year ago

10         today on February 15, 2012, and that

11         original subpoena was unsigned.

12                   The amended subpoena, which was

13         served on the deponent only about 17

14         hours ago yesterday was signed by

15         counsel, but also similarly, called for

16         production a year ago today on

Page 11

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

17          February 15, 2012. Yet, the subpoena

18          was dated February 4, 2013.

19              As counsel is aware, we have 14

20          days to respond to a subpoena and

21          retain the right to seek any

22          appropriate Protective Order regarding

23          the witness.

24              MR. BUCHMAN:  That's fine.  It's

25          duly noted that the subpoena was dated

                                          8

1           2012, it was an inadvertent

2           typographical error.  With our

3           apologies.

4               But that is beside the point that

5           we've had discussions with you about

6           the Subpoena; you've never raised this

                        Page 12

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

7            issue prior to just now; and that

8            you've had ample opportunity to seek a

9            Protective Order from the Court rather

10           than appear here today.

11               You could have sought that

12           Protective Order; we would have held

13           this deposition in abeyance.  But you

14           elected to appear here today without a

15           Protective Order and then terminate the

16           deposition.

17               There is no need to further have

18           this conversation on the record.  We

19           have given you the witness check.

20           You're terminating the deposition.  And

21           we will address it with the Court.

22               MR. BANK:  I have one other note,

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

23          I apologize.   Under Rule 45(c)(B)(i),

24          which is attached to the Subpoena

25          served on the deponent, it specifically

                                                9

1           says that, "If an objection is made" --

2           and here the objections were made to

3           the Subpoena -- "the following rules

4           apply:   (i) At any time, on notice to

5           the commanded person, the serving party

6           may move the issuing court for an order

7           compelling production or inspection.

8               So, Plaintiffs had the opportunity

9           do that and did not take the

10          opportunity to do that after the

11          objections were made.

Page 14

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

12          MR. BUCHMAN:  Are you finished

13          with your speeches?  We will just bring

14          this in front of the court.  Have a

15          nice weekend.

16               MR. BANK:  Thank you.  You too.

17               (Time noted: 9:40 a.m.)

18

19

20

21

22

23

24

25

                                                    10

1               C E R T I F I C A T E

                    Page 15

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

2          STATE OF NEW YORK        )

3                                   ) ss.:

4          COUNTY OF KING           )

5

6                         I, MAYLEEN AHMED (CINTRÓN), a

7              Registered Merit Reporter, Certified

8              Realtime Reporter and Notary Public

9              within and for the State of New York,

10             do hereby certify:

11                  That the foregoing record of

12             proceedings is a full and correct

13             transcript of the stenographic notes

14             taken by me therein.

15                  I further certify that I am not

16             related to any of the parties to this

17             action by blood or marriage; and that I

                         Page 16

Rough Transcript NERA 30(b)(6) (2-15-13) (00073983).TXT

18          am in no way interested in the outcome

19          of this matter.

20              IN WITNESS WHEREOF, I have

21          hereunto set my hand this 15th day of

22          February 2013.

23

24          -------------------------------------

25          MAYLEEN AHMED (CINTRÓN), RMR, CRR, CLR

EXHIBIT

4

CONFIDENTIAL

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION
3

   IN RE:               : MDL DOCKET NO. 2173
4  PHOTOCHROMIC LENS    :
   ANTITRUST            :
5  LITIGATION           : CASE NO: 8:10-cv-2040
                        :
6  THIS DOCUMENT        :
   RELATES TO:          :
7  ALL CASES            : HON. JAMES D. WHITTEMORE
8                       *   *   *
9                  JANUARY 16, 2013
10                     *   *   *
11        Videotaped deposition of LAUREN J.
12  STIROH, Ph.D., taken at the law offices of
13  Wilson, Sonsini, Goodrich & Rosati, PC, 1301
14  Avenue of the Americas, 40th Floor
15  New York, New York, commencing at 8:59 a.m.,
16  before Debbie Leonard, Registered Diplomate
17  Reporter, Certified Realtime Reporter.
18
19
20
21
22
23                     *   *   *
      VERITEXT NATIONAL COURT REPORTING COMPANY
24               MID-ATLANTIC REGION
          1801 Market Street - Suite 1800
25               Philadelphia, PA 19103

CONFIDENTIAL

Page 800

1          LAUREN J. STIROH, Ph.D.

2          Q.     And why did you have these

3     telephone conversations with Messrs. Cole and

4     Ligas?

5          A.     The topics that we discussed

6     are referenced in the report, and so the why

7     we had the conversation was to discuss the

8     topics that were -- are referenced in later

9     in the report.

10               MR. JACOBSON:   Counsel, you're

11          aware of a subsequent conversation

12          that was discussed in the prior two

13          depositions as well, post report.

14               MR. BUCHMAN:   Yes.

15               MR. JACOBSON:   Okay.

16     BY MR. BUCHMAN:

17          Q.     And it identifies -- or strike

18     that.

19               It says, members of my team

20     have had numerous conversations with Messrs.

21     Cole and Ligas.

22               Who were the members of your

23     team that you're specifically referring to in

24     that sentence?

25          A.     They would have included

CONFIDENTIAL

Page 802

1                     LAUREN J. STIROH, Ph.D.

2              A.      I know from my prior deposition

3      that there are notes.  I don't know who took

4      them.

5              Q.      And is there a protocol for

6      note-taking at NERA when you're speaking with

7      your client?

8              A.      No, I don't think so.

9              Q.      Is there a protocol that you

10     employ when you serve as an expert when

11     you're working with your staff and you're

12     speaking with your client about topics which

13     may or may not be relied upon in connection

14     with a report?

15             A.      I do not take notes.

16     Generally, I try to listen and respond, and I

17     find I can't do that taking notes.  And so it

18     is my own practice not to do so.

19             Q.      But for those occasions where

20     conversations are held, do you have a

21     protocol if someone does decide to take notes

22     as to how they should go about taking those

23     notes?

24             A.      I do not.

25             Q.      Is it important to you that if

CONFIDENTIAL

Page 803

1              LAUREN J. STIROH, Ph.D.

2     someone does take notes during these

3     conversations, that they be thorough,

4     accurate, and complete to the extent that you

5     rely upon those notes in connection with a

6     report?

7            A.      I don't know.  I haven't relied

8     on notes.  So I don't -- for this or any

9     other report that I can recall.  So it's hard

10    to say in a hypothetical what I would expect

11    from notes that I would not rely on.

12           Q.      With regard to your

13    conversation -- with regard -- the three --

14    with regard to the conversations that you

15    had, can you generally describe for me how

16    long they lasted?

17           A.      To the best of my recollection,

18    I would say about an hour each.  But it could

19    have been longer or shorter.

20           Q.      And when were those

21    conversations held?

22           A.      The dates are reflected in my

23    report, and I think it's -- I'd rely on the

24    information there rather than any

25    recollection that I have.

CONFIDENTIAL

Page 804

1               LAUREN J. STIROH, Ph.D.

2          Q.        Do you know why notes were

3     created in connection with some of these

4     conversations?

5          A.        I don't.

6          Q.        To your knowledge, were all the

7     notes that were taken in connection with

8     these conversations produced in connection

9     with your report?

10                   MR. JACOBSON:   Objection.

11                   THE WITNESS:   There are no

12              notes in connection with my report.

13              And I guess I don't have knowledge

14              about what was produced.

15    BY MR. BUCHMAN:

16         Q.        Let me ask it a different way,

17    then.  Are you aware whether we've received

18    all the notes that were taken when these

19    conversations were held?

20         A.        I don't know that you haven't,

21    I guess, is the only way to answer that.  I

22    don't have information about notes.

23         Q.        Prior to conducting these --

24    these were telephonic conversations with

25    Messrs. Ligas and Cole, correct?

CONFIDENTIAL

Page 807

1               LAUREN J. STIROH, Ph.D.

2    submission of your report in this case, did

3    you or your staff, to your knowledge, believe

4    that it would be helpful to speak with others

5    within the industry in which Transitions does

6    business to gain information that might be

7    useful for your report?

8           A.       Not outside of information that

9    was available through deposition testimony of

10   others in the industry.

11          Q.       When did you first decide that

12   it would be helpful to speak with Messrs.

13   Ligas and Cole?

14          A.       I don't recall.

15          Q.       Now, in connection with your

16   report in this litigation, you offer an

17   opinion on the product market, correct?

18          A.       I do.

19          Q.       And what is that opinion?

20          A.       It is described in summary

21   terms on page 2, paragraph 7, sub-point I.

22   And then in more detailed terms throughout

23   the report.  But that the relevant product

24   market at issue includes both clear and

25   photochromic lenses.

CONFIDENTIAL

Page 839

1              LAUREN J. STIROH, Ph.D.

2     thorough understanding to provide an opinion

3     in this case?

4           A.      So with respect to those

5     conversations, I don't think I have a clear

6     enough recollection of them now to know -- to

7     be able to say either I did or I didn't

8     specifically have discussions on those

9     topics.

10                    From the point of view of

11    preparing an expert report and having

12    opinions that are based on an analysis and

13    review of information, I think one would not

14    put forth opinions that are based only on the

15    opinion of someone else.  You base it on the

16    analysis.

17                    So in my view, I don't think

18    there is a lot to be gained by understanding

19    the opinions in the industry separate from

20    what the actual information, transactions,

21    and market actions would reveal that would be

22    relevant to an antitrust analysis of

23    monopoly.

24           Q.      What is the business of

25    Transitions Optical?

CONFIDENTIAL

Page 871

1              LAUREN J. STIROH, Ph.D.

2        Q.      Have I raised my voice at all

3    during the day?

4        A.      In my view, your tone does

5    change from question to question.

6        Q.      But I'm not raising my voice?

7        A.      It is well modulated.

8        Q.      Thank you.  Would you please

9    answer the question, or would you like it

10   read back to you?

11       A.      Could you give it to me again?

12       Q.      Sure.  Absolutely.

13               MR. BUCHMAN:  Could you read

14           the question back, please?

15                    *   *   *

16               (The court reporter read from

17           the record as follows:)

18                    *   *   *

19               QUESTION:  "Dr. Stiroh, weren't

20           you specifically told by your client

21           in this litigation that it does not

22           horizontally compete with clear lens

23           manufacturers?"

24                    *   *   *

25               THE WITNESS:  I don't recall

Page 872

```
 1              LAUREN J. STIROH, Ph.D.
 2         being specifically told by TOI that it
 3         does not compete with lens
 4         manufacturers.
 5              My recollection -- and I would
 6         assume that -- or recall that
 7         documents would talk about a
 8         partnership between lens casters and
 9         Transitions for the way that
10         Transitions takes its products to
11         market.
12              The -- what -- my opinions on
13         what competes and what doesn't compete
14         is based on an analysis and not
15         opinion given to me by industry
16         participants.
17    BY MR. BUCHMAN:
18         Q.    Including your client?
19         A.    Including the client, yes.
20                    *   *   *
21              (Exhibit Stiroh-15 marked for
22         identification.)
23                    *   *   *
24    BY MR. BUCHMAN:
25         Q.    Dr. Stiroh, I've had marked as
```

Page 876

1                    LAUREN J. STIROH, Ph.D.

2      team that worked on your report with you that

3      was a subset team that participated in the

4      phone calls with Dave Cole and Mr. Ligas, or

5      is it the entire team that you've identified?

6           A.      I don't know who was meant to

7      be encompassed by "NERA Transitions Team."

8                    In my view, the team includes

9      more people than I can recall being on the

10     phone calls.

11          Q.      Okay.  And then the subject

12     line says this is a "Summary of Call with

13     David Cole, President of Transitions Optical

14     Inc.," correct?

15          A.      I see that, yes.

16          Q.      And if you look at Roman

17     numeral II A, "Initial Business Strategy,"

18     first bullet point, second sentence -- and

19     please correct me if I read this wrong --

20     "TOI has always sold to and through lens

21     casters and generally does not pose a threat

22     to them as a horizontal competitor competing

23     for the same downstream customers."

24                   Did I read that correctly?

25          A.      I believe you did.

Page 877

1          LAUREN J. STIROH, Ph.D.

2          Q.     During your conversation with

3    Mr. Cole on or about November 3rd, 2012, did

4    he convey that information to you as I've

5    just read it?

6          A.     I don't recall specifically him

7    saying something that is similar to this

8    bullet point.  I do recall we talked about

9    partnerships with lens casters.

10         Q.     And on the second bullet point,

11   second sentence, it says, "TOI" -- and please

12   correct me if I read this wrong.  "TOI made

13   the commitment with lens casters to not

14   compete with them."

15                Did I read that correctly?

16         A.     You have read that correctly.

17         Q.     Okay.  And during your phone

18   call with Mr. Cole on or about November 3rd

19   of 2012, do you recall him making that

20   statement to you or the -- and/or the team?

21         A.     I don't recall him making a

22   specific statement like this.  We did talk

23   about, as I recall, the fact that TOI does

24   not manufacture lenses, whereas other

25   photochromic treatment providers do

Page 910

1                  LAUREN  J.  STIROH,  Ph.D.

2      John Ligas," correct?

3              A.       Correct.

4              Q.       And the footnote 72 referencing

5      a conversation with John Ligas on October 19,

6      2012, this memo would have recorded the

7      conversation with John Ligas, correct?

8      Because it was made about the next day, and

9      it refers to the Ligas call, correct?

10                     MR.  JACOBSON:   Object to the

11                form.

12                     THE  WITNESS:   I don't think

13                it's correct to say it recorded the

14                call.  I reviewed it over lunch, as

15                you had asked, and I just don't -- the

16                things that I recall from my

17                conversation with John Ligas are noted

18                in my report.  I don't recall all of

19                the things that were in all of the

20                memos that I reviewed.

21      BY MR. BUCHMAN:

22              Q.       What is the purpose -- what was

23      the purpose of creating these memos?

24              A.       I did not create them.  I don't

25      know what the purpose was.

CONFIDENTIAL

Page 911

```
 1              LAUREN J. STIROH, Ph.D.
 2        Q.      What was the purpose for NERA
 3    creating these memos?
 4        A.      I don't know what the purpose
 5    was.  I didn't direct that they be created.
 6        Q.      So you don't know how they got
 7    created?
 8        A.      I don't know how they got
 9    created.
10        Q.      And you don't know who created
11    them?
12        A.      Correct.
13        Q.      And you don't know why they
14    were created?
15        A.      Correct.
16        Q.      Would you agree with me that
17    they appear to contain information that was
18    conveyed to you by either Mr. Ligas or
19    Mr. Cole during the calls that they reflect
20    were made?
21        A.      The information that was
22    conveyed to me by Mr. Ligas or Mr. Cole that
23    I relied upon is reflected in my report where
24    the conversations are footnoted.  To the
25    extent that there is overlap with the memos,
```

EXHIBIT 5


**NERA**
ECONOMIC CONSULTING

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: 914-448-4000 Fax: 914-448-4040
www.nera.com

**Privileged and Confidential**

# MEMO

| | |
|---|---|
| **TO:** | Transitions Merits Case Files |
| **DATE:** | November 3, 2012 |
| **FROM:** | NERA Transitions Team |
| **SUBJECT:** | Summary of Call with David Cole, President of Transitions Optical, Inc. |

On November 1, 2012, NERA personnel spoke with David Cole, President of TOI. Other participants included Gretchen Walsh (General Counsel at TOI) and Chul Pak (WSGR). Unless otherwise stated, all information below is according to Cole.

## I.   TOI's Entry into the Photochromic Category

- In the 1980s, Essilor and Sola each had a 30% share of the lens caster market.

- TOI was founded in 1990 as a joint venture ("JV") between PPG, a manufacturer of plastic monomer, and Essilor, PPG's largest customer. Tied in part to a patent Essilor owned related to photochromic processing, the JV was an effort to bring plastic lenses to a category historically dominated by glass (Corning had produced its glass photochromic PhotoGray since the 1960s).

- The JV was not instantly successful and almost reached bankruptcy in its first two years (which, in turn, impacted its owners' financial conditions). TOI's business goal was to bring photochromic products to all lens casters, and to make photochromics available across the broadest range of products and brands.

- The JV caught most lens manufacturers off guard.

## II.   Partnerships with Lens Casters

### A.  Initial Business Strategy

- From TOI's inception, close relationships with lens casters have been central to TOI's business model. TOI has always sold to and through lens casters and generally does not pose a threat to them as a horizontal competitor competing for the same downstream customers.

HIGHLY CONFIDENTIAL

EXHIBIT
Stiroh-15
OL  1/16/13

Stiroh_0000076

Privileged and Confidential

- TOI wanted to let lens manufacturers compete with each other on their own merits. TOI made the commitment with lens casters to not compete with them.

- TOI must always consider that customers may elect to manufacture their own photochromic products.

- Companies like Vision-Ease, by contrast, are positioned horizontally to other lens casters and do compete with them for downstream customers. Lens casters have no incentive to enter into licensing agreements for use of Vision-Ease's technology because they would ultimately be competing (at a cost disadvantage) with Vision-Ease for the same downstream customers.

- Given Essilor's stake in TOI, other lens casters initially partnered with TOI defensively, likely as a hedge against the plastic photochromic segment growing and capturing significant share. TOI needed to prove to lens casters that it would not give Essilor a strategic advantage and that if other lens casters could win in the marketplace, TOI would partner with them.

- TOI wanted to be able to control the quality of their products, so decided to develop partnerships with lens casters. TOI told lens casters they'd give them every opportunity to succeed.

**B. Exclusive Arrangements**

- In the early stages of the JV Sola was as influential as Essilor. Sola did not like the JV, and took the new partnership between PPG and Essilor defensively. Sola was frustrated because it wasn't getting a share of the success from the JV.

- Sola was TOI's first formal exclusive purchaser of TOI and in the early 1990s was more successful than Essilor in the marketplace. TOI eventually entered into an agreement for Sola to supply 30 percent of its generic lenses. Management of the two companies have built a strong relationship and the companies have entered into mutually beneficial ventures (e.g., a photochromic facility in Australia).

- However, TOI has few formal exclusive agreements at the lens caster level. Lens casters are not exclusive but nonetheless are very engaged with TOI in the development of their products (for example, Younger).

- As discussed further in the context of TOI's pricing (see below), the lens caster-TOI relationship is characterized by a great deal of sharing of technical information

HIGHLY CONFIDENTIAL

NERA Economic Consulting

Page 3
November 3, 2012
Summary of Call with David Cole, President of Transitions Optical, Inc.

Privileged and Confidential

related to the processing of proprietary lenses. This dynamic incents exclusivity or near-exclusivity on the part of lens casters.

- TOI positions itself as both a research arm and a sales/marketing arm of lens casters. These forms of support make exclusive arrangements rational for both parties.

## III.   Relationships with ECPs and Consumers

- ECPs are risk-averse.

- Though TOI initially had no intention of building a sales organization (and was a more lens caster-oriented company), it eventually began to allocate resources to developing brand and product awareness among ECPs, retailers, and consumers.

- Though TOI sells directly to lens casters, it seeks to influence ECP and consumer purchasing decisions to make Transitions lenses an easier sell downstream.

- TOI describes its marketing strategy as a "push-pull" model. TOI seeks to educate both consumers and ECPs in order to create a dialogue between these groups. This demand creation at the consumer level incents lens casters to sell TOI lenses.

- Given TOI's investments in marketing and product education, exclusive or preferred agreements at downstream levels prevent free-riding or bait-and-switch tactics. For example, ECPs could buy cheaper lenses but tacitly rely on TOI's category development to have consumers believe they are purchasing Transitions (this has apparently been confirmed via secret shopper tactics).

- Even though a pair of Transitions lenses passes through some combination of a lens caster, lab, ECP, and retailer, those lenses come to the marketplace as "Transitions" lenses. The primacy of the Transitions brand in the supply chain makes it imperative for TOI to continue to innovate and ensure quality because that brand in many ways stands in for—and has the capacity to bring down—multiple industry participants.

  o The same can be said of lens casters products' hurting the reputation of Transitions. TOI undergoes significant quality verifications on the lenses they receive from lens casters. For example, TOI was finding that some lens casters would sell TOI dirty lenses. TOI would apply the photochromic coating to the dirty lens, which would make the photochromic technology defective. Upon learning this, TOI implemented cleaning techniques at the beginning of its

Privileged and Confidential

processes to ensure the lenses are clean before the photochromic coating is applied. TOI has also invoked penalties on lens casters who provide TOI poor quality lenses.

- One example of the benefits to ECPs from a relationship with TOI is VisionWorks. TOI educates staff, fits TOI products into the VisionWorks business strategy, puts all marketing materials into the stores, and puts the promotions in place. Essentially, TOI works to build the VisionWorks business.

## IV.   Pricing in the Ophthalmic Lens Industry

### A.   TOI's Pricing Model

- One of TOI's business lines is the purchase and sale of generic lenses. These are highly commoditized products (SV CR-39 1.50) that TOI purchases from Essilor (and, at points in time, Sola) and sells to any lens caster. Margins are low on these products and pricing is determined volumetrically.

- TOI's other business line is proprietary products. In this business line, lens casters sell proprietary lenses in a variety of materials and designs to TOI, TOI applies its photochromic treatments to these lenses, and then sells them back to lens casters at a mark-up.[1] Broadly, TOI's selling price is determined by the following formula:

  o   [Substrate Cost] + [Cost to Manufacture] + [Target Margin]

- Of these components, target margins are the most variable and are very specific to proprietary products. As discussed below, TOI adjusted the target margins in 2009 in response to a digital surfacing issue within the industry. TOI will evaluate individual target margins on a case-by-case basis.

- The level of specification necessary to treat a proprietary product has provided and continues to provide incentives for exclusive or near-exclusive agreements between TOI and lens casters. In the early years of TOI, lens casters worked with TOI to improve yields on their products and overall yield has increased significantly over time ████████████████████████████

---

[1]   TOI purchases the lens blanks so lens casters do not bear any of the risk inherent in photochromic processing.

HIGHLY CONFIDENTIAL

NERA Economic Consulting

Privileged and Confidential

- TOI will also make adjustments by increasing rebates, providing additional co-op support, or engaging in more TV tagging.  These adjustments are typically done on a customer-specific basis.

### B. Competitive Constraints

- The largest constraints on TOI's pricing are the clear lens segment and other specialized or premium add-ons to lenses.

- The price of photochromic lenses relative to clear lenses is a key metric in pricing decisions.  TOI has had to reduce its margins on certain products over time (e.g., SV) in order not to stray too far from the price of clear lenses.  For example, TOI will reduce the price of SV lenses so the price of a TOI SV lens is not 3x the price of a clear SV lens.  Otherwise relative prices would not make clear and photochromic lenses price-competitive.

- Cole positioned ECPs as a downstream "gatekeeper."  ECPs exert significant influence over purchasing decisions, especially related to two-pair purchases, as well as add-ons or enhancements to clear lenses such as AR coatings or higher index lenses.  Photochromic lenses compete for consumer dollars ("share of wallet") with these various value-adds.

### C. Customer-Specific Pricing Initiatives

- TOI makes many price adjustments on a case-by-case basis (i.e., customer-specific).

- TOI's selling price is one component of an array of potential benefits to customers including rebates to lens casters, price roll-backs (e.g., at Wal-Mart), co-op support, and television tagging.

### D. Downstream Value-Add

- Markups are relatively larger further downstream in the optical industry.  Cole attributes this dynamic to the phenomenon of "mass customization"—i.e., the process of grinding lens to match individual prescriptions.

- Further, ECPs and retailers tend to have multiplier models that mark up prices to meet margin goals.

### E. Digital Surfacing and 2009 Price Changes

HIGHLY CONFIDENTIAL

NERA Economic Consulting

Stiroh_0000080

- TOI's target margins changed in 2009 in response to a phenomenon in the industry known as digital surfacing.[2]

- In digital surfacing, a SFSV lens is processed into a progressive lens by a lens caster after (re-)purchase from TOI. In essence, an inexpensive lens is purchased and then re-surfaced downstream, shifting the value-add dynamics of the supply chain.

- To account for this shift, TOI raised its target margins on SFSV (i.e., the lenses processed into progressives downstream) and decreased its target margins on FSV. While these changes were potentially offsetting, the ultimate price impact to lens casters was heavily dependent on their product mix.

- Carl Zeiss was the lens caster that was most heavily involved in digital resurfacing, substituting purchases of PAL lenses with SFSV lenses.

- In some cases, TOI tried to influence lens casters' product mix to defray some of the impact of the pricing changes.



F.  **Elimination of Tiered Pricing**

- In 2010, TOI eliminated tiered pricing. All pricing was moved to the highest (i.e., cheapest) tier, so the impact (if any) would be positive/beneficial for customers.

V.  **Private Label Strategy**

A. **Rationale and Perception**

- TOI's private label strategy was originally a means of getting more consumers into the category. TOI's private label products were sold at a lower price point (a ~30 percent discount) than current-generation branded products.

---

[2]  The economic recession beginning in late 2008 prevented TOI from making price increases in 2009 it otherwise would have made.

Privileged and Confidential

- Cole believes that private label lines never achieved significant penetration in large part because ECPs were not confident in the product and feared performance defects or lack of consumer satisfaction.

## B. TOI's "Views" Line at LensCrafters

- TOI did not want to cannibalize sales of its branded products, so private label products were only a small percentage of its product mix.

- Private label products were sold in the US (and possibly are still?), but unsuccessfully. TOI sold a private label product rebranded by LensCrafters as "Views," in the late 1990s, though it never achieved more than four percent penetration and declined over the period.

- Per LensCrafters' decision, Views was eventually displaced by Vision-Ease's LifeRx after its launch in 2005.

- Acclimates and Views were unpopular in the US due brand recognition issues as well as the private labels' inability to achieve availability across all products.

## VI. Relationship and Competition with Vision-Ease

- TOI and Vision-Ease had discussions for the development of a poly bi-focal pursuant to which Vision-Ease would develop the lenses but TOI would sell them as a Transitions product.

- In December 2009, TOI and Vision-Ease entered into a lens supply agreement for VE to purchase plastic 1.50s, though Vision-Ease ultimately never purchased lenses from TOI.

  o TOI offered this agreement in response to the FTC settlement (the alternative apparently would have been to offer agreements to all lens casters with which TOI had previously terminated agreements). Cole cited Vision-Ease's management's inability to overcome their egos as a reason for not resuming sales of Transitions after this agreement was in place.

- Despite Vision-Ease's appeals to the FTC (and in the current litigation), plastic lenses (in clear or photochromic) were never a strategic imperative for the company. VE was never interested in selling plastic 1.50s. If they were, VE could have purchased Transitions products from other retailers.

Privileged and Confidential

- Some consumers have conflated LifeRx's delamination with Transitions lenses (i.e., have believe Transitions lenses had delaminated) and continue to do so today.

- VE and TOI have different business strategies. VE competes with lens casters in the marketplace while TOI has tried to never compete directly with lens casters.

- VE's photochromic process is more self-contained than TOI's. VE has to make a photochromic lens during the lens manufacturing process.

HIGHLY CONFIDENTIAL

NERA Economic Consulting

Stiroh_0000083

# EXHIBIT

# 6



# NERA
ECONOMIC CONSULTING

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER



# Expert Report of Lauren J. Stiroh, Ph.D.

In Re Photochromic Lens Antitrust Litigation –
Achtman et al. Plaintiffs

December 3, 2012



EXHIBIT

Stiroh-11

DL   1/16/13

Contains Highly Confidential Information—Subject to Protective Order

documents and data referenced therein; additional documents and deposition testimony produced in connection with this case; and other publicly available documents.

6.   I have also submitted reports in two separate matters concerning the economic impact of much of the same conduct that is at issue here. My reports in those matters are the Expert Report of Lauren J. Stiroh, Ph.D. in connection with *In Re Photochromic Lens Antitrust Litigation – Nouveau Vision, Inc. et al. Plaintiffs* and the Expert Report of Lauren J. Stiroh, Ph.D. in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.* My opinions in this matter are informed by the analysis and research conducted for those related reports, as well as this report. The opinions expressed in this report are also based on my training and experience as an economist. A complete list of the sources of information and materials I relied upon in forming my opinion is presented in **Exhibit 2**. In addition to the materials listed in **Exhibit 2**, I and members of my team have had numerous conversations with TOI employees, including David Cole, President of TOI, and John Ligas, Director of Research and Development at TOI.

## D.   Summary of Opinions

7.   Based on my analysis to date, I have reached the following opinions:

   i.   The relevant market at issue includes both photochromic and non-photochromic lenses. Empirical analysis reveals that the prices of photochromic lenses and non-photochromic lenses move together, respond in similar ways to common economic conditions, and that the price of non-photochromic lenses constrains the price of photochromic lenses. Record evidence supports these empirical findings. The testimony of industry participants, TOI's ordinary course documents, and TOI's customer agreements all support the opinion that photochromic lenses are a segment of the wider market for ophthalmic lenses and that photochromic and non-photochromic lenses are viable competitive alternatives to each other.

   ii.   TOI cannot impose an anticompetitive price increase in a properly defined relevant market. TOI's price is constrained by competitive alternatives including clear lenses and photochromic lenses manufactured by other entities. TOI would not have the ability to impose an anticompetitive price increase even if the market was restricted to photochromic lenses. TOI faces pricing constraints from photochromic competitors as well as downstream purchasers, including lens casters, eye care practitioners, and retailers.

   iii.   TOI's customer and reseller agreements do not foreclose competition in the photochromic lens segment. Record evidence shows that TOI's agreements do not prevent and have not prevented its competitors from making sales of photochromic products to the wholesale laboratories and retailers with STAR agreements, BBF agreements, or even alleged "exclusive" agreements. In addition to direct evidence that TOI's agreements have not foreclosed competition,

Contains Highly Confidential Information—Subject to Protective Order

lens caster and wholesale lens distributor while ELOA is the largest optical lab network in the US.[4]  Both EOA and ELOA are owned by Essilor International SA.[5]

12.   TOI is a Delaware corporation with its principal place of business in Pinellas Park, Florida.[6]  TOI was founded in 1990 through a joint venture between PPG Industries Inc. ("PPG") and Essilor International SA ("Essilor International") for the purpose of developing a plastic photochromic lens.[7]  The joint venture was brought about in an effort to bring plastic lenses to the photochromic segment of the industry, which had traditionally been available in glass.[8]  The joint venture was structured with PPG having 51 percent ownership and Essilor International having 49 percent ownership in TOI.[9]

13.   Photochromic lenses are prescription lenses that have been treated with a photochromic coating.  The first glass photochromic product was produced by Corning Incorporated ("Corning") in the 1960s.[10]  The coating activates, or darkens, upon exposure to ultraviolet rays and fades back to a clear lens when no longer exposed to sunlight.[11]  At the time of the joint venture, photochromic coatings had only been successfully applied to glass lenses using a technique developed by Corning.[12]  Transitions lenses were the first commercially successful plastic photochromic lenses.[13]

14.   TOI introduced its first photochromic lenses in 1991.  Since then, it has continued to improve its product offerings through subsequent generations to increase activation rate and fade speed and to make its photochromic option available for more lens types.  In 1992, TOI began manufacturing its second generation of Transitions lenses, which

---

[4] "About Us," www.eloa.com/About+Us/ (Accessed October 15, 2012) and "Essilor USA The Leader in Optical Lenses," www.essilorusa.com/EN/aboutus/EssilorUSA/Pages/default.aspx (Accessed October 15, 2012).  In the 1980s before the inception of TOI, EOA had a 30 percent share of the lens manufacturing industry.  (Conversation with David Cole, President at TOI, November 1, 2012.)

[5] "Essilor USA The Leader in Optical Lenses," www.essilorusa.com/EN/aboutus/EssilorUSA/Pages/default.aspx (Accessed November 28, 2012) and "Essilor USA Organization," www.essilorusa.com/EN/aboutus/EssilorUSAPages/Organization.aspx (Accessed November 28, 2012).

[6] Indirect Purchaser Complaint, p. 6.

[7] "About PPG Industries," www.ppg.com/en/ourcompany/Pages/default.aspx (Accessed November 28, 2012).  In 1990, Essilor owned a patent related to photochromic processing and PPG was a leading manufacturer of plastics.  (Conversation with David Cole, November 1, 2012.)

[8] Conversation with David Cole, November 1, 2012.

[9] Indirect Purchaser Complaint, p. 6.

[10] Conversation with David Cole, November 1, 2012.

[11] "The Benefits of Transitions® Adaptive Lenses," http://en-us.transitions.com/en/explore/see-the-difference.aspx (Accessed September 6, 2012).  Indirect Purchaser Complaint, p. 7.

[12] Conversation with David Cole, November 1, 2012.

[13] "Focal Point - Photochromic Lenses: Success Through Balance," http://www.essilortransitions.com/resources/essilor-focalpoint.pdf (Accessed November 13, 2012).

Contains Highly Confidential Information—Subject to Protective Order

("VSP"), the largest vision benefits provider in the US,[39] offers three advertised plans: the choice plan, the signature plan and the exam plus plan. These plans advertise co-payments of $62-82 on photochromic lenses or a discount of 20 percent on lens options.[40]

29. Managed vision care and vision insurance plans cover about half of the US population. Survey results indicate that in 2011, 48 percent of the US adult population was covered by a managed vision care or vision insurance plan.[42] Documentary and survey evidence suggest that this percentage has been relatively stable throughout the recent years.[43]

30. As described further later in my report, any examination of harm to consumers of ophthalmic lenses of any kind is incomplete without a thorough consideration of issues related to these vision plans.

31. Plaintiffs in this matter include any consumers who purchased photochromic lenses manufactured by TOI during the period from January 1999 to the present (the "Class Period") in the US (the "Class").[44]   **Figure 1** illustrates the distribution chains for TOI products.

---

[39] "About VSP," https://www.vsp.com/about-vsp.html, (Accessed November 28, 2012).

[40] Co-pays vary based on lens type (i.e. single-vision, multifocal, etc.). See VSP's website for information on the three plans listed above, at https://visionplans.vsp.com/vsp-plans.html?WT.ac=tn-vspplans (Accessed December 1, 2012).

[41] EyeMed Vision Care Blue View GA, EVC-000015 ("EyeMed Plan 1"), EyeMed Vision Care University Health System, February 28, 2011, EVC-000023 in EVC-000022-3 ("EyeMed Plan 2"), EyeMed Vision Care, May 9, 2012, EVC-000038 – 45 in EVC-000036 – 47 ("EyeMed Multiple Plans").

[42] "2012 Consumer Perceptions of Managed Vision Care," *Jobson Optical Research*, 2012, p. 6.

[43] In 2003, approximately 48 percent of the US population was covered by pre-paid, employer sponsored managed vision care. By 2005, managed vision care programs represented about half of all lenses sold, and about 48 percent of consumers had a vision plan. In 2008, 2009 and 2010, 49 percent, 50 percent and 43 percent of survey respondents in the US were covered by a managed vision care or insurance plan respectively. (See BSR Update GMC Meeting, June 2003, TOI_0114231 in TOI_0114169 – 282 (Exhibit 30 of the Deposition of Johanna DiChiara, former Account Executive at TOI, July 6, 2012 ("DiChiara Deposition")); Optical Products 2006 Business Strategy Review, TOI_0982609 in TOI_0982597 – 652 (Exhibit 22 of the Deposition of Rick Elias, Senior Vice President of Optical Products and Specialty Materials at PPG, July 27, 2012 ("Elias Deposition")); Lens Manufacturers Managed Care and National Retail at TOI, December 14, 2005, TOI_0843755 in TOI_0843749 – 78 (Exhibit 11 of the Deposition of Patrick D. Huot, Director of Managed Care and Online Retail, May 10, 2012 ("Huot Deposition")) and "2012 Consumer Perceptions of Managed Vision Care," *Jobson Optical Research*, 2012, p.16).

[44] Indirect Purchaser Complaint, p. 20.

Contains Highly Confidential Information—Subject to Protective Order

**Figure 1 (Reproduced from Indirect Purchaser Complaint)**



## D.    TOI's Relationships with Lens Casters

32.    From TOI's inception, close relationships with lens casters have been central to its business model to enable TOI to maintain control over the quality of its products.[45] Generally, these relationships involve a substantial sharing of proprietary information and data, including business strategies and technical information, with the goal of transforming high quality clear lenses into high quality photochromic products.[46] TOI serves as an extension of lens casters' manufacturing, development, and marketing efforts in its partnership with lens casters. For example, President of TOI, David Cole, explained that TOI partners with lens casters to obtain a wide array of lens blanks. TOI sells its photochromic products directly back to lens casters allowing them to carry a wide

---

[45] Conversation with David Cole, November 1, 2012.

[46] Affidavit of David J. Cole in *re: Corning Incorporated v. Transitions Optical, Inc.*, January 15, 1999 ("Affidavit of David Cole in Corning Litigation") (Exhibit 4 of the Cole Deposition August 7, 2012), p. 4.

Contains Highly Confidential Information—Subject to Protective Order

array of photochromic products. TOI also helps promote its products and innovate the product line, making TOI an extension of lens casters' research and development arm.[47]

33.   TOI has partnerships with many lens casters. Below, I explain two of those important partnerships in more detail.

34.   Sola was one of TOI's most important lens caster partners in the early days of the joint venture. Sola was an independent lens caster that, in the 1980s, had an estimated 30 percent share of the ophthalmic lens manufacturing industry.[48]  I understand that Sola was initially hesitant to do business with TOI, because of TOI's relationship with Essilor International. TOI sought to ensure Sola, and its customers generally, that it would strive to maintain fairness among all its customers and not exhibit favoritism toward Essilor entity. Eventually Sola became the first lens caster outside the joint venture to enter into an exclusive agreement with TOI.[49]  In 2005, Sola merged with Carl Zeiss Vision. The combined entity became the leading global supplier of ophthalmic lenses.[50]

35.   The partnership between Sola and TOI proved successful. Sola became the second largest purchaser of Transitions lenses after EOA.[51]  Sola negotiated an agreement with TOI to supply 30 percent of the lens blanks for TOI's generic products, whereas previously TOI had been sourcing the entire generic supply from Essilor International and its subsidiaries. TOI and Sola became sufficiently close partners that TOI constructed a manufacturing facility in Australia, where Sola is based, so that Sola's supply needs could be better met.[52]

36.   In addition, TOI has also maintained a partnership with Hoya and has helped Hoya develop relationships with downstream customers.

---

[47] Deposition of David Cole, President at TOI, August 9, 2012 ("Cole Deposition August 9, 2012"), pp. 311 – 2.  Cole Deposition August 7, 2012, pp. 311 – 2.

[48] Conversation with David Cole, November 1, 2012.

[49] Conversation with David Cole, November 1, 2012.

[50] "Abstract: The 21st Century," http://vision.zeiss.com/about-us/en_de/company-history/abstract_the_21st_century.html (Accessed November 13, 2012) ("Abstract: The 21st Century").

[51] Conversation with David Cole, November 1, 2012.

[52] Conversation with David Cole, November 1, 2012 and Agreement for Termination of Lease and Reployment of Assets between TOI and Carl Zeiss Vision, September 26, 2006 ("TOI-CZV Termination of Lease"), TOI_0611632 – 6.

Contains Highly Confidential Information—Subject to Protective Order

█████████████████████████████████████████████

## IV.  Relevant Market

37.  The economic analysis of a plaintiff's antitrust claims typically begins with defining the relevant market.  As a general matter, the purpose of market definition in the context of antitrust analysis is to evaluate the range of competitive alternatives that are available to a firm's customers.[54]  The greater the number of options that are available to a consumer, the lesser the scope for an accused monopolist to profit from attempting to raise price.  If an accused monopolist cannot profit from a price increase, then it does not have market power, and therefore is unable to affect market prices via the conduct at issue in the case.

38.  The Supreme Court has held that products "reasonably interchangeable by consumers for the same purposes" make up the relevant product market.[55]  Consumers use TOI's photochromic lenses to correct their vision and provide protection from the sun's glare when the glasses are worn outdoors.  Plaintiffs and their expert have asserted that because photochromic lenses have a unique attribute, in that they darken when exposed to direct sunlight, they are in a separate relevant market from other lenses.  In this section, I evaluate whether other non-photochromic ophthalmic products are sufficiently interchangeable by consumers for photochromic lenses that they constrain the prices that TOI and other manufacturers are able to charge for photochromic lenses.

39.  Specifically, I evaluate whether consumers are likely to view clear lenses as a substitute for photochromic lenses and would opt to purchase clear lenses instead of photochromic lenses if faced with an anticompetitive price increase for photochromic lenses.  I analyze both quantitative and qualitative information in reaching my opinions.  Using available market data, I apply two separate empirical tests of relevant market definition to data produced by Plaintiffs, Defendants, and independent third parties.  Both tests suggest that photochromic and non-photochromic lenses compete in the same relevant market, and that the prices of non-photochromic lenses serve as competitive constraints on the price of photochromic lenses.[56]

---

[53] Deposition of Michael Ness, President of Hoya Lens of America and former Vice President of Marketing and Sales at Vision-Ease, August 21, 2012 ("Ness Deposition Vol. I"), pp. 48 – 53 and Email from David Cole to Barney Dougher in re: ████ May 18. 2009 ████████ Hoya_0012653 – 4 (Exhibit 20 of the Deposition of Paul Bernard Dougher, President of Hoya Vision Care North America, August 20, 2012 ("Dougher Deposition")).

[54] US Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* issued August 19, 2010 ("2010 Horizontal Merger Guidelines"), p. 7.

[55] See *US v. E.I. du Pont De Nemours and Co.*, 351 U.S. 377, 76 S.Ct. 994 (1956).

[56] For purposes of this report, I accept Plaintiffs' definition of the geographic market as the United States.

Contains Highly Confidential Information—Subject to Protective Order

40.    The first empirical test examines co-price movements over time between photochromic and non-photochromic lenses.  If the prices of these two products are found to move closely in step with each other, this is evidence that both products are being affected by similar market forces and price shocks.  This approach has received support in economic literature.  Economists George Stigler and Robert Sherwin describe this method as "captur[ing] the essential role of competition in dominating the price movements within each part of the market."[57]  I find the prices of photochromic and non-photochromic lenses to be highly correlated over time.  This indicates that the two categories of products are affected by similar market forces and provides evidence that they are in the same relevant market.

41.    A second empirical test examines the effect of a change in the price of the hypothesized competing product, non-photochromic lenses, on consumer demand for the product whose market scope is in question, photochromic lenses.  Specifically, this test estimates the "cross-price elasticity of demand" for photochromic lenses with respect to the price of non-photochromic lenses.  The cross-price elasticity of demand measures the percent change in the quantity of photochromic lenses purchased in response to a one percent change in the price of non-photochromic lenses.  Estimating the cross-price elasticity of demand is a commonly employed technique for defining the relevant product market as it provides a direct measure of consumer willingness to substitute from one product to another in response to a price change.[58]  Applying this test, I find that as non-photochromics become relatively less expensive and/or photochromics become relatively more expensive, consumers move away from photochromic lenses.  The sensitivity of photochromic demand to the price of non-photochromic products serves to constrain the price of photochromic lenses.

42.    Documents, data, and testimony produced in this litigation also support the opinion that non-photochromics, specifically clear lenses, constrain the price of photochromic lenses.  TOI grew by convincing ophthalmic lens wearers to switch from clear lenses to photochromic lenses.  Since its inception, TOI has viewed clear lenses as its primary competition and has focused its marketing efforts on convincing clear lens buyers to switch to photochromic lenses.

43.    The following sections describe in greater detail the quantitative and qualitative analyses outlined above.  The analysis of market data, documents, and deposition testimony produced in this case all demonstrate that the appropriate relevant market in which to evaluate TOI's conduct includes non-photochromic lenses in addition to photochromic lenses.

---

[57] See George Stigler and Robert Sherwin, "The Extent of the Market," *Journal of Law and Economics*, Vol. 28, No. 3 (1985): 555 – 85, at p. 557.

[58] See Order in the matter of *In Re Live Concert Antitrust Litigation*, United States District Court for the Central District of California, filed on March 23, 2012, pp. 29 – 30.

Contains Highly Confidential Information—Subject to Protective Order

## A.   Quantitative Evidence Shows that Photochromic Lenses Are in the Same Relevant Market as Non-Photochromic Lenses

### 1.   Analysis of Co-Price Movements Shows that Photochromic and Non-Photochromic Lenses Are in the Same Relevant Market

44.   As discussed above, one method for determining whether two products are in the same relevant market is to measure the extent to which their prices movements are correlated.[59] A positive and statistically significant correlation in the prices of two goods is considered evidence of those goods belonging to the same relevant market. For instance, Richard Posner concludes that "The cleanest approach [to determining a relevant market] involves measuring the correlation between price movements..."[60]

45.   The logic behind the correlation test is that if two goods belong to the same relevant market, then their prices will be similarly affected by common market forces, resulting in the prices of these two goods moving together over time. In contrast, if two products were in different markets, then one would expect them to be affected by individual market forces, perhaps in addition to some common market forces, causing more independent price movements over time.

46.   Data produced by the Vision Council Association ("VCA") indicate that the price of photochromic lenses is highly positively correlated with the price of non-photochromic lenses.[61] VCA data provide monthly observations for the average price of photochromic and non-photochromic lenses separately. Calculating the correlation of the average monthly price of photochromic lenses and the average monthly price of all non-photochromic lenses from January 2000 through February 2012 yields:

$$\text{Correlation}(P_t^{Photochromic}, P_t^{Non-Photochromic}) = 0.902$$

47.   This high degree of positive price correlation suggests that the two products are responding in similar ways to similar market forces.[62] However there are a number of caveats to this conclusion. First, because all lenses (photochromic and non-

---

[59] Correlation is a statistical measure of the degree to which two series move in unison. Correlation is, by definition, bound between -1 and 1, with a correlation near 1 indicating that the two series move together in the same direction, a correlation near -1 indicating that the two series move together but in opposite directions, and a correlation near zero indicating that the two series are likely unrelated. For a discussion on the use of correlation between price movements to show whether two products are close substitutes see, e.g., Richard Posner, Antitrust Law 2nd Edition (University of Chicago Press, 2001) ("Posner Antitrust Law"), pp. 149 – 51. See also, Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, (Addison Wesley, 2005) ("Carlton and Perloff"), pp. 647 – 8.

[60] See Posner Antitrust Law, p. 149.

[61] This is the same data relied upon by Dr. French for use in his market definition analysis.

[62] The correlation is statistically significant at the 99 percent level.

Contains Highly Confidential Information—Subject to Protective Order

photochromic) incorporate the same base material, changes in the underlying cost of the substrate will also lead to similar changes in the prices of the products. Thus, additional tests are needed to determine whether the high correlation of the two price series is an artifact of underlying cost changes affecting both markets, or reflects the prices of the two products responding in similar ways to common demand shocks.

48.    In addition, VCA data do not disaggregate "non-photochromic lenses" into sub-categories of "clear" and "tinted" lenses. If it were the case that clear lenses are substitutes for photochromic lenses while tinted lenses are complements, then the VCA data are likely to understate any positive price correlation in the two broad categories. This is because a potential substitute is being aggregated with a potential complement, creating opposing forces in price movements.

49.    Furthermore, while the above correlation test informs us that the prices of photochromic and non-photochromic lenses tend to move together over time, it is important to distinguish whether this correlation is indeed the result of common economic forces affecting both of these goods in a relevant market, or simply a byproduct of the fact that prices tend to increase over time, so two independent price series may appear correlated simply due to inflation.

50.    To add robustness to my correlation analysis, I perform three robustness checks on the data to control for such phenomena. I evaluate 1) whether the correlation persists after de-trending the data, 2) whether the correlation persists after removing the common cost component of prices and, 3) whether the prices of photochromic and non-photochromic lenses are co-integrated, allowing us to infer that they indeed move together. The results of all three tests (which are described in greater detail in the footnote to this sentence) supports my opinion that the high correlation that is observed between the prices of photochromics and non-photochromics suggests that they are in the same relevant market and are affected by common economic forces.[63]

---

[63] In the first robustness check, I de-trend each price series, thereby removing the part of the series that naturally drifts upwards over time, and leaving only the price movements that are caused by non-inflationary economic factors. A correlation test of the de-trended series returns a correlation value of 0.498, which is statistically significant at the 0.001 percent level. Similarly, in my second robustness check, I de-trend each price series, but do so by removing the part of the series that is associated with changes in a price index for plastics and resins, key inputs in the cost of lenses, photochromic or otherwise. A correlation test of these two cost-de-trended series returns a correlation value of 0.66, which is statistically significant at the 0.001 percent level. A third robustness check involves tests of what statisticians refer to as cointegration. A series of values that tends to drift over time away from their current level, without coming back to that original level, is referred to as a non-stationary series. If two non-stationary series tend to drift together, those series are said to be cointegrated. Cointegrated series may differ from one another by varying amounts in the short run due to short run economic factors that affect one but not the other, but in the long run, they tend to move together. Both a Dickey-Fuller and Phillips-Perron test inform us that both photochromic and non-photochromic prices are non-stationary. The Johansen test of cointegration informs us that the prices of photochromic and non-photochromic lenses are indeed cointegrated. These tests are significant with 99 percent confidence and, as such, further suggest that photochromic and non-photochromic lenses are affected by common economic forces in the same relevant market. I perform the Johansen test using three lags, as this is the proper number to include according to Akaike's information criterion, Schwarz's Bayesian information criterion, and the

Contains Highly Confidential Information—Subject to Protective Order

51.     The finding of a high, positive, and statistically significant degree of price correlation between photochromic and (broadly defined) non-photochromic lenses is one piece of evidence that non-photochromic lenses are in the same relevant market as photochromic lenses. Below, I describe additional tests that further indicate that non-photochromic lenses constrain the price of photochromic lenses.

## 2.     Analysis of Cross-Price Elasticities Demonstrates that Non-Photochromic Lenses Constrain the Prices of Photochromic Lenses

52.     Cross-price elasticity of demand measures the percent change in sales of one good in response to a one percent change in the price of another good. A positive, and statistically significant, cross-price elasticity of demand between two products indicates that the two products are substitutes in the eyes of consumers. An increase in the price of one product leads to an increase in sales of the other product suggesting that consumers substitute away from one of the products when it becomes relatively more expensive and toward the other product that has become relatively less expensive.

53.     A negative (and statistically significant) cross-price elasticity indicates that the two products are complements in the eyes of consumers. When the price of one product increases, the combined price of the two products that consumers like to purchase together is now higher, and consumers respond by buying less of the bundle.

54.     The cross-price elasticity also measures the degree to which the price of one good is constrained by the price of another good within a relevant market. If the cross-price elasticity is small, then a change to the price of one product has little impact on demand for the other product.

55.     As such, the cross-price elasticity of demand for photochromics with respect to the price of non-photochromics will inform us of the extent to which consumers shift their purchases of lenses away from photochromics in response to a decrease in the price of non-photochromic lenses. In their textbook on the economics of industrial organization, economists Carlton and Perloff discuss the use of cross-price elasticities to determine a relevant market in antitrust litigation writing:

> To intelligently discuss a cross-elasticity, one must specify whether it is the cross-elasticity of Product A with respect to the price of Product B or vice versa. Although these two different cross-elasticities are usually not

---

Hannan and Quinn information criterion. See Robert Pindyck and Daniel Rubinfeld, Econometric Models and Economic Forecasts, Fourth Edition, (McGraw-Hill, 1998) ("Pindyck and Rubinfeld"), Chapter 16. In addition, see Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, Fourth Edition, (South Western Cengage Learning, 2009) ("Wooldridge"), Chapter 18, and Johansen, Søren, "Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregressive Models," *Econometrica*, Vol. 59, No. 6 (November, 1991), pp. 1551 – 80.

Contains Highly Confidential Information—Subject to Protective Order

distinguished in court decisions, they are not equal in general.   The
relevant cross-elasticity of demand when the question is whether the
market for Product A should include Product B is the cross-elasticity of
demand for Product A with respect to the price of Product B.[64]

56.   In this case, we are trying to answer the question: are photochromics in the same relevant
market as non-photochromics? Put in terms of the description offered by Carlton and
Perloff: "The relevant cross-elasticity of demand when the question is whether the market
for [photochromics] should include [non-photochromics] is the cross-elasticity of demand
for [photochromics] with respect to the price of [non-photochromics]." In other words, it
will inform us of whether the prices of photochromic lenses are constrained by the prices
of non-photochromic lenses. If non-photochromic prices do constrain photochromic
prices – i.e. if the cross-price elasticity of demand for photochromics with respect to the
price of non-photochromics is found to be positive – this would suggest that these
products are sold in the same relevant market and photochromic producers compete for
sales with producers of non-photochromics.

57.   I use VCA data to calculate the cross-price elasticity of demand for photochromic lenses
with respect to the price of non-photochromic lenses.[65]  Specifically, I utilize an
estimation technique known as "two-stage least squares" ("2SLS") to estimate the
following regression:

$$\ln(Q_t^p) = b_0 + b_1 \ln(P_t^p) + b_2 \ln(P_t^n) + b_3 Age_t + b_4 Income_t + b_5 Trend + \sum_{i=1}^{11} b_{i+5}(D_{i,t}) + u_t$$

58.   Where $Q_t^p$ is the left-hand-side ("LHS") or dependent variable that is being explained by
right-hand-side ("RHS") or independent variables.  Here $Q_t^p$ represents the quantity of all
photochromic lenses purchased during month t, $P_t^p$ represents the average price of
photochromic lenses during month t, $P_t^n$ represents the average price of non-
photochromic lenses during month t, $Age_t$ is the median age in the US in year t, $Income_t$
is the median US income in month t, $Trend$ is a deterministic linear time trend that
increases at a rate of one unit per year, and $D_{i,t}$ are 11 indicators for each month of the
year except for one.[66]  The term $u_t$ is an error term.

---

[64] Carlton and Perloff, p. 648.

[65] Dr. French also uses VCA data to estimate the cross-elasticity of demand, but calculates the cross-elasticity of demand for non-photochromics with respect to the price of photochromics.  As described above, and further discussed in my critique of Dr. French's analysis, the equation as specified here (which is also supported by Carlton and Perloff) is an important piece of the analysis that Dr. French's analysis ignored.

[66] Median US income is used rather than total or average US income because median income is a more representative measure of household wellbeing than these other two options.

Contains Highly Confidential Information—Subject to Protective Order

59.   Because the quantity of a good sold and its price are simultaneously determined through the interaction of supply and demand, economists refer to Q and P as being endogenous. In this case, endogeneity arises because price influences quantity sold, but quantity sold may also influence the price. This endogeneity problem results in standard regression estimation procedures producing biased results, because one of the supposedly independent RHS variables (Price) is not actually independent, instead it is being influenced by the LHS variable (Quantity). One solution to the endogeneity problem is the 2SLS approach employed by the present analysis, which uses instrumental variables to isolate supply shifters in order to control for some of this endogeneity bias.[67] By determining the effect of shifting supply on prices and quantities, while demand is presumably not changing, one is able to more cleanly estimate demand.

60.   **Figure 2** describes the basic idea behind 2SLS analysis (aka instrumental variables analysis) as used for demand estimation.[68] The graph on the left shows the seemingly pattern-less cloud of prices and quantities one would observe in the data as a result of varying levels of supply and demand that jointly determine prices over time, as pictured in the second figure. The graph on the right shows how, by isolating just changes in supply (i.e. through instrumental variables and 2SLS analysis), we are able to obtain an idea about the shape of the demand curve.[69]

---

[67] Instrumental variables are the variables selected by the econometrician to help control for the endogeneity problem by accounting for only the endogenous portion of the endogenous RHS variable without imposing upon the remaining, non-endogenous, portion of the endogenous variable. See James Stock and Mark Watson, Introduction to Econometrics, (Pearson Education, Inc. 2003) ("Stock and Watson"), p. 333 ("A valid instrumental variable ('instrument') must satisfy two conditions, known as instrument relevance and instrument exogeneity: 1. Instrument Relevance: [correlation of the endogenous variable and the instrumental variable is non-zero]. 2. Instrument Exogeneity: [correlation of the instruments and the omitted variables is zero].... The two conditions for a valid instrument are vital for instrumental variables regression....")

[68] Stock and Watson, p.336.

[69] Dr. French also acknowledges this endogeneity problem and likewise employs a 2SLS analysis using instrumental variables.

Contains Highly Confidential Information—Subject to Protective Order

## Figure 2



61. In the 2SLS analysis presented below I treat the prices of photochromic lenses as being endogenous with the quantity of photochromic lenses sold, and control for this using a monthly Producer Price Index (PPI) for plastics and resins.[70] This PPI is a sensible instrument as it is likely to cause shifts in photochromic supply, but not demand.

62. **Exhibit 3** presents the results of this 2SLS analysis.

63. The relevant cross-price elasticity is provided by the coefficient estimate for the natural log of the price of non-photochromics, $ln(P_i^n)$. According to my analysis, a one percent increase in the price of non-photochromic lenses leads to an increase in demand for photochromic lenses of 1.69 percent. Conversely, as the price of non-photochromic lenses decreases, the results show that consumers will shift their consumption away from photochromic lenses. This estimate of cross-price elasticity is statistically significant and therefore evidence that non-photochromic lens prices constrain the price of photochromic lenses in the relevant market.

64. The negative and statistically significant coefficient for the natural log of the price of photochromics $ln(P_i^p)$ is the expected sign for a product with a downward sloping demand curve. The value of -2.71 tells us that a one percent increase in the price of photochromics will result in a 2.71 percent decrease in sales of photochromic lenses. Because this value is greater than one in magnitude, we refer to demand for photochromic lenses as being elastic, and infer that an increase in the price of photochromic lenses will result in a decrease in total revenues obtained from the sale of these lenses.[71]

---

[70] See US Bureau of Labor Statistics: Producer Price Index – Commodity Series [Series ID = WPU66].

[71] "If demand is very responsive to price – that is, it is very elastic [greater than 1 in magnitude] – then an increase in price will reduce demand so much that revenue will fall." (Hal R. Varian, Intermediate Microeconomics, A Modern Approach, 5th Edition, (W. W. Norton & Company, 1999) ("Varian"), p. 271.)

Contains Highly Confidential Information—Subject to Protective Order

65. As mentioned above, one limitation of the VCA data is that clear and tinted prescription lenses are grouped into a singular "non-photochromic" category. To the extent that some categories of products in the non-photochromic segment are, in fact, complements to photochromics (e.g., tinted lenses), the degree of substitutability described by the above elasticity analysis would likely be understated, meaning that photochromic sales may actually be even more sensitive to the prices of clear lenses than is indicated by **Exhibit 3**. This would mean that the cross-price elasticity estimate of 1.69 should be treated as a conservative estimate of the degree to which consumers shift away from photochromics in response to a decrease in non-photochromic prices (or an increase in the relative photochromic prices).

**B.   Qualitative Evidence Shows that Photochromic Lenses Compete With Non-Photochromic Lenses**

66. Customer switching behavior is an important indicator of the range of competitive alternatives in a relevant market. The products or companies that a firm focuses on when trying to drive more sales of its own products indicate the types of products or companies that the firm views as its competitors.

67. Since its inception, TOI has focused its marketing efforts on converting wearers of clear lenses to photochromic lenses. Every wearer of clear lenses is a potential customer for photochromic lenses. Indeed, I understand from John Ligas, Director of Research and Development at TOI, that TOI has sought to develop a photochromic lens for almost every corresponding clear lens design.[72] To convert clear lens wearers to photochromic lenses, TOI and other manufacturers of photochromic lenses must price their products such that the price to the consumer of adding photochromic treatments is commensurate with the added benefit the consumer gains by having lenses that darken when exposed to sunlight.

68. The potential for consumer switching from clear to photochromic lenses is at the core of TOI's growth strategy. Throughout TOI's annual Business Strategy Reviews ("BSR"s), the company has recognized its primary competition as the "clear lens market" and its primary growth opportunity as greater penetration of that segment.[73] Consistent with this strategy, TOI business metrics regularly measure the penetration of Transitions lenses as a percentage of the entire prescription lens market.[74]

---

[72] Conversation with John Ligas, Director of Research and Development at TOI, October 19, 2012.

[73] See, e.g., 2007 BSR, TOI_0980940 in TOI_0980924 – 98. (TOI states that it "considers its primary competition and growth opportunity to be greater penetration of the clear lens market, and has defined it as the primary strategic growth opportunity upon the continued conversion of clear lens wearers to photochromic lenses.")

[74] See, e.g., Transitions Optical 2009 Business Strategy Review ("2009 BSR"), TOI_1735808 in TOI_1735792 – 871. (TOI notes that it had been successful in "continuing to take share away from the clear lens segment.") See, also, TOI's 2008 BSR

Contains Highly Confidential Information—Subject to Protective Order

69. The notion of a wider ophthalmic lens market is apparent throughout other TOI documents as well. In a 2002 press release announcing the launch of a new Transitions product generation, TOI President (then Manager of Sales and Business Development) David Cole stated that the "growth in the plastic photochromic market is coming from the conversion of the clear lens wearer."[75] TOI business plans likewise recognize the clear lens market as its primary competition.[76]

70. The potential to shift clear lens wearers to photochromic lenses is the foundation of the rebate and marketing programs that are at issue in this case. Programs such as the Strategic Retail Agreement ("SRA") program and the STAR Laboratory and Retail programs encourage TOI's partners to expand their share of Transitions sales by offering financial incentives to convert clear lens wearers to photochromic lens wearers. By offering Business Building Funds ("BBFs") to partners who achieved a 10 to 25 percent share of Transitions lenses in their overall lens sales, TOI has increased its market penetration.[77]

71. Other photochromic lens suppliers also view clear lenses as competing with photochromic lenses. Prior to its current legal dispute with TOI, Vision-Ease shared a similar view that clear lenses were a competitive constraint on photochromic lenses. In a letter to the Federal Trade Commission regarding a proposed merger between Vision-Ease and TOI, counsel for Vision-Ease's parent company, Insight Equity, stated, "A market defined as 'photochromic lenses' is too narrow and not justified by the facts and competitive dynamics that Vision-Ease has encountered in the marketplace." The letter then lists "Clear lenses" as the first of a number of "substitute" products.[78]

---

Briefing Document, June 25, 2008 ("2008 BSR Brief"), TOI_0606721 in TOI_0606718 – 97 (Exhibit 1 of the Ligas Deposition). ("The business segment's main priority will remain the core clear-to-dark photochromic technology and business, and to continue to expand the photochromic category through the conversion of clear lens wearers.")

[75] Next Generation Transitions Fuels Photochromic Market Growth, 2002 ("Next Generation Fuels Growth"), TOI_1629172 in TOI_1629172 – 4 (Exhibit 25 to the Cole Deposition, August 9, 2012).

[76] See, e.g., Transitions Optical, Inc. Essilor of America Business Plan 2004 ("EOA 2004 Business Plan"), TNC_0001815 in TNC_0001809 – 20 (Exhibit 20 to the Deposition of Rose Wallace, Associate Director of ECP Marketing at TOI, July 19, 2012 ("Wallace Deposition")).

[77] For an example of the STAR Laboratory Agreement, see Transitions Optical, Inc. 2008 STAR Laboratory Program Agreement ("2008 STAR Lab Agreement"), TOI_1131612 – 6 (Exhibit 14 of the Cole Deposition April 5, 2012). For an example of the STAR Retail Agreement, see Transitions Optical Inc. 2005 STAR Partner Retail Program ("2005 STAR Retail Program"), TOI_1132457 – 60 (Exhibit 44 of the Deposition Connie Falvo, Director of External Affairs at TOI, May 22, 2012 ("Falvo Deposition")). For an example of the SRA Agreement, see Transitions Optical, Inc. 2009 Strategic Retail Account Program Agreement ("2009 SRA Program"), TOI_687070 – 4 (Exhibit 8 of the Deposition of Susan Cashion, Associate Director of US ECP Sales Development at TOI, June 8, 2012 ("Cashion Deposition")).

[78] Insight Equity (Vision-Ease)/PPG (Transitions) HSR Filing, June 19, 2007 ("HSR Filing"), VEL-MDL036025 in VEL-MDL036023 – 7 (Exhibit 3 of the Deposition of Douglas Hepper, President and CEO at Vision-Ease, August 1, 2012 ("Hepper Deposition August 1, 2012")).

Contains Highly Confidential Information—Subject to Protective Order

72.     Customers of TOI also recognize that photochromic lenses compete with clear lenses in the larger ophthalmic lens market.

73.     Industry data support that TOI's business strategy has been successful and that consumer switching from clear to photochromic lenses has actually occurred.  From 2000 through 2011, domestic shipments of photochromic lenses grew significantly faster than domestic shipments of all corrective ophthalmic lenses.[81]  This indicates that photochromic penetration of the total ophthalmic lens market has been increasing over the time period, which is to say that lens wearers have been switching from clear to photochromic lenses.

74.     Industry data also demonstrate that as the price of photochromic lenses has fallen relative to non-photochromic lenses, the quantity of photochromic lenses purchased relative to non-photochromic lenses has increased.  From 2000 to 2011, the relative price of photochromic lenses decreased at an annualized rate of one percent, while the relative quantity of photochromic lenses increased at an annualized rate of seven percent.[82]  These data suggest that as the price of photochromic lenses has fallen relative to the price of non-photochromic lenses, consumers are switching their purchases from non-photochromic lenses to photochromic lenses.  The fact that the relative sales of photochromic lenses are increasing at the same time that the relative price of photochromic lenses is decreasing is consistent with the econometric evidence presented above and is indicative of substantial substitution.

75.     Plaintiffs allege that the defining characteristic of photochromic lenses places them into their own relevant product market.[83]  Such an assertion is the result, however, of a misunderstanding of the difference between differentiated products and distinct markets.

---

[79]

[80]

[81] Vision Council of America Lens Shipment Reports, 2000 to 2011 ("VCA Shipment Reports, 2000 to 2011").  From 2000 to 2011, domestic shipments of photochromic lenses grew at an annualized rate of 6.4 percent while domestic shipments of all ophthalmic lenses grew at an annualized rate of 0.2 percent.

[82] VCA Shipment Reports, 2000 through 2011.

[83] Indirect Purchaser Complaint, pp. 7 – 8.

NERA Economic Consulting

Contains Highly Confidential Information—Subject to Protective Order

76.    While photochromic lenses have characteristics that distinguish them from clear lenses, such characteristics do not make them so different as to not be considered substitutes by consumers. It has been recognized in economic literature that differentiated product markets include products with a variety of features and that not all products need offer the same set of features or attributes to provide a competitive constraint on one another.[84] For example, while cars with sunroofs and cars without sunroofs have different product characteristics, both nonetheless compete within the same market for automobiles. At a certain price, most consumers would switch between the two differentiated products in these two examples.

77.    Product differentiation occurs within both the photochromic segment and the non-photochromic segment. Both types of lenses can be purchased in single-vision or multifocal designs, for instance, among other options. While these designs may not be viable alternatives to any given consumer, competition at the margin puts pricing pressure on the segments where they overlap. Inframarginal customers benefit from such pricing pressure, including individual customers who may not consider multifocal lenses, for example, when choosing their eyewear. Economic experts in this matter as well as separate matters have cited the price premium over clear lenses at which photochromic lenses sell as evidence of their position in a distinct product market from clear lenses.[85] However, an analysis of 2011 VCA data shows that the price of polycarbonate progressive lenses is 3.6 times the price of polycarbonate SV lenses and the price of plastic progressive lenses ranges from 2 to 14 times the price for plastic single-vision lenses.[86] Such significant price differences do not imply distinct markets, but rather an industry characterized by a variety of product differentiation.

78.    Along the same lines, TOI consistently recognizes "value-added products" (i.e., coatings or enhancements to clear lenses) as a source of competitive pressure.[87] While enhancements such as anti-reflective coatings, specialized hardcoats, and high-index materials are not necessarily mutually exclusive with photochromic lenses, they nonetheless compete for consumer dollars with photochromic treatment. To the extent a

---

[84] See, e.g., Christopher Pleatsikas and David Teece, "The Analysis of Market Definition and Market Power in the Context of Rapid Innovation," *International Journal of Industrial Organization*, Vol. 19 (2001) ("Pleatsikas and Teece"), p. 666. "Technology and features are as important to consumers as price, requiring consideration of price/performance competition rather than price competition alone." See also Pleatsikas and Teece, p. 674. "A 'product's peculiar characteristics and uses' are even less useful [for defining a relevant market], since products (and services) in many high technology industries are highly differentiated. Subdividing the relevant market based on the very product differentiation that is one of the fundamental bases for competition risks defining markets much too narrowly and overstating market power, so that monopoly power is found where none, in fact, exists."

[85] See French Report, ¶30; Merits Report of Hal J. Singer, September 30, 2012 ("Singer Merits Report"), ¶67, and Expert Report of Kenneth C. Baseman, October 8, 2012, Revised to Reflect Errata as of October 19, 2012 ("Baseman Report"), ¶165.

[86] VCA Shipment Report, YTD as of December 2011.

[87] 2008 BSR Brief, TOI_0606734; 2007 BSR, TOI_0980927; 2009 BSR, TOI_1735808 and Transitions Optical 2010 BSR Briefing Document ("2010 BSR Brief"), p.11.

Contains Highly Confidential Information—Subject to Protective Order

lens wearer wants to enhance a pair of clear lenses, adding a photochromic treatment is simply one means of doing so.

## C.    Summary

79.    Based on my review of the evidence produced in this case, including empirical data, ordinary course documents, and deposition testimony from customers and competitors of TOI that I have reviewed, my opinion is that the relevant market comprises both clear and photochromic lenses.

# V.    Market Power

## A.    TOI Does Not Have the Ability to Impose an Anticompetitive Price Increase

### 1.    TOI Accounts for a Small Share of Ophthalmic Lens Shipments

80.    As stated above, a properly defined relevant market includes clear and photochromic lenses. TOI's share of this relevant market is too small to support an inference of market power. While TOI has focused its efforts on growing its share of this market, since 2000, TOI's domestic lens shipments as a share of all domestic ophthalmic lens shipments has never exceeded 20 percent.[88] See **Exhibit 4**. Shares of this magnitude are inconsistent with an inference of TOI having the ability to wield monopoly power.

### 2.    Constraints on TOI's Ability to Raise Price

81.    The purpose of defining a relevant market is to evaluate whether there are sufficient competitive alternatives to which consumers could turn if faced with an attempted price increase for the accused monopolist's product to render the attempted price increase unprofitable.[89] Plaintiffs contend that the relevant market consists only of photochromic lenses and that TOI's share of the alleged market is sufficiently high to support an inference of market power.[90] The analysis above shows that Plaintiffs' alleged relevant market is flawed and that even if TOI has a high share of the photochromic segment, its prices are constrained by non-photochromic lenses.

82.    Much of the discussion and debate as to the appropriate relevant market is to some extent academic. Defining the relevant market only allows an inference of market power.

---

[88] I note again that tinted lenses are included in the measure of all ophthalmic lenses available in the VCA data. I do not have sufficient information that would allow me to exclude tinted lenses from this calculation.

[89] See 2010 Horizontal Merger Guidelines, pp. 11 – 2.

[90] Indirect Purchaser Complaint, pp. 7 – 8.

Contains Highly Confidential Information—Subject to Protective Order

Direct evidence of constraints on TOI's ability to set price for its products demonstrates that TOI does not have pricing power regardless of the boundaries of the relevant market. Moreover, as discussed later in this report, direct evidence that TOI's conduct at issue did not foreclose competition or prevent entry demonstrates that TOI's contracts and alleged exclusionary behavior did not have an anticompetitive effect, however the market is defined.

83.   TOI's pricing power is constrained by countervailing buyer power, including retailers who can promote clear or tinted lenses if TOI were to try to raise prices on its photochromic lenses; retailers' ability to switch to another supplier of photochromic lenses; ECPs who can promote other types of value-added enhancements to ophthalmic lens customers; and, lens casters' ability to develop or license photochromic technology and produce their own photochromic lenses. Each of these factors is consistent with photochromic lenses competing in a wider ophthalmic lens market and facing competition from a range of products to which customers can switch in the event of an attempted price increase by TOI. Because TOI's customers can change their purchasing patterns and shift their purchases to more profitable product mixes if TOI tried to raise the price and increase the cost of its photochromic lenses, TOI cannot exercise anticompetitive market power.

84.   Documents and deposition testimony produced in this case demonstrate that TOI's price is constrained by the competitive alternatives available to lens casters, retailers, ECPs, and end customers.



Contains Highly Confidential Information—Subject to Protective Order

Centers of America ("ECCA") may have used this strategy.[93]  As stated above, these options constrain the price that TOI is able to charge for its photochromic lenses.  An attempted anticompetitive price increase by TOI would simply provide greater incentives for customers, who are resellers of photochromic lenses, to promote more profitable product combinations to their customers.

85.    I also understand from David Cole that TOI's pricing is further constrained at the point of sale by ECPs who can direct their customers to other ophthalmic products in the event of an attempted price increase by TOI.  ECPs exert significant influence over consumers' purchasing decisions and often promote two-pair (i.e., non-photochromic) purchases or alternative value-added enhancements such as AR coatings or higher-index lenses over Transitions lenses.[94]

86.    The ability of TOI's customers and entities closer to the final point of purchase to thwart an attempted price increase by TOI, that would reduce the margins earned by resellers of its products, is illustrated by real world examples of TOI negotiating with its customers and agreeing to roll back pricing for new product launches or to continue offering rebates even when sales volumes fell below agreed upon levels.

87.    TOI sets its pricing based on the relative value of its products to clear lenses in the optical marketplace.  Mr. Cole testified that TOI determines this value from a variety of factors, including consumer feedback from wearer trials and discussions with customers.[95]  While the basic inputs that TOI uses in determining prices enter into a general formula,[96] record evidence indicates that the company has frequently implemented pricing changes on a customer-specific basis when customers do not agree with TOI's assessment of the value of its product offerings relative to competitive alternatives.  Specifically, record evidence demonstrates that TOI was forced to renegotiate prices to lens casters in 2007 and 2008, and was forced to defer a planned price increase in 2009 across all products.

---

[93] See Email from Linda Reynolds, Account Executive at TOI to Kari Morgenthaler, marketing employee at Vision-Ease, et al., June 29, 2004, VEL-MDL070552 in VEL-MDL070552 – 3.  In discussing a potential supply relationship with ECCA, Ms. Reynolds suggests that photochromic lenses have potentially been at odds with ECCA's "overall strategy": "I really don't think it's a Gen V issue with [ECCA] as much as an issue of how Transitions might fit into their overall strategy.  (You know the drill—2 pair sales, Value Positioning, polarized....) [sic]."

[94] Conversation with David Cole, November 1, 2012.

[95] Cole Deposition August 9, 2012, pp. 251 – 2.

[96] Conversation with David Cole, November 1, 2012.  TOI follows a general pricing formula taking into account the following

Contains Highly Confidential Information—Subject to Protective Order

130.    Further, TOI's business model--which is to purchase proprietary lenses from lens casters, apply its photochromic treatments to those lenses, and sell the same lenses back to those lens casters—provides yet another incentive for exclusive supply arrangements. TOI considers its exclusive lens caster customers to be partners and views it photochromic treatment process as an extension of those customers' manufacturing processes.[155] In keeping with this relationship, TOI invests significant time and money in working with lens casters to ensure that its photochromic coatings work with the lens casters' proprietary lenses. I understand that tailoring a photochromic treatment to a specific lens caster's lens requires years of research and development.[156] I understand further that, to this end, TOI shares extensive proprietary information with its lens caster customers, including business strategy and technical information.[157] TOI's exclusive agreements create partnerships between TOI and lens casters that facilitate and maximize such technological exchange.[158] TOI will only rationally undertake the necessary investments if it expects to make enough sales back to lens casters to cover the investment cost. Exclusive contracts thus give TOI greater insurance that its investments with lens casters will be profitable.

---

[155] Cole Deposition, August 7, 2012, pp. 311 – 2. ("Q. Okay. Now, what's the origin of that practice of selling only to lens manufacturers and not to any downstream customers? A ... We essentially created sort of a -- almost a social contract with our partners in that we would partner with them as a -- as almost an extension of their manufacturing arm so that we got broad and wide availability of the product. And at the same time, we -- you know, we were -- we were selling directly to them so that they could -- could offer the product. And then what we would do is help them to promote the product, educate, innovate, be their research-and-development arm. So it was just a -- essentially just a business model. We thought it was the best way to -- to get our product efficiently, effectively, with the broadest choice in the marketplace.")

[156] Conversations with David Cole, November 1, 2012 and John Ligas, October 19, 2012.

[157] Affidavit of David Cole in Corning Litigation, ¶ 8. ("Admittedly, TOI prefers that its customers refrain from dealing in plastic photochromic lenses other than Transitions--but there are no contracts, understandings or agreements that prevent our customers from doing so. There are two main reasons for this preference: -- first, TOI shares extensive proprietary information with its customers, including business strategies and technical information. This information could be easily exploited if these customers were to deal in competing types of plastic photochromic technology.") Affidavit of John S. Ligas in re: Corning Incorporated vs. Transitions Optical, Inc., ("Affidavit of John Ligas in Corning Litigation"), COR1 001810 – 3 in COR1 001810 – 24 (Exhibit 19 of the Ligas Deposition). ("In the course of developing such a business relationship, TOI must disclose a great deal of proprietary information to its lens caster customers. ... TOI discloses much proprietary information to its lens caster customers in the course of conducting tests to improve the compatibility between the lens caster's product and TOI's proprietary processes. ... Specifically, TOI reveals valuable information about how photochromic chemicals interact with the various types of plastic from which the lenses are made. ... Many of TOI's customers also receive information about the proprietary process by which TOI imbibes its lenses. Of particular value are the various imbibing times and temperatures TOI has determined are optimal for making photochromic lenses.... TOI shares many other types of proprietary and confidential information with its customers. For example, TOI reveals much about its special tools and techniques for edging, cleaning, packaging and otherwise handling lens products. These are just a few examples.")

[158] See, e.g., Deposition of Rick Elias, Chief Executive Officer at TOI, July 27, 2012 ("Elias Deposition"), p. 180. ("Q: And as a part – and as a – as a deal point or one of the terms and conditions were that ▮▮ would have to have an exclusive commitment to Transitions; isn't that correct? A: ...I believe one of the deal points was that – on this was they were looking to move into a full partnership with Transitions, which would allow – ▮▮ is a very technical company, which would allow technical interchanges between the two companies and would result in an exclusive position with ▮▮ ")

Contains Highly Confidential Information—Subject to Protective Order

casters have expressed similar views of Transitions' superior quality and performance.[164] Upstream purchasing decisions of Transitions lenses have also been driven by consistent demand for those lenses at the ECP and consumer levels.

## C.   TOI's Rebate and Marketing Programs Are Pro-Competitive

134.   Record evidence shows some that lens casters, retailer, and wholesale labs received rebates and other incentives from TOI for exclusively purchasing or preferably purchasing TOI's photochromic products. Rebates paid to lens casters were typically amounts equal to a percentage of the lens casters' purchases. As noted in the September 17, 2012 Expert Report of Gregory K. Leonard, Ph.D., in the Indirect Purchaser Action ("Leonard Class Cert Report"), lens casters receive rebates from TOI for marketing, growth, and other promotional efforts while working with TOI to increase sales of Transitions products to the benefit of both TOI and the lens caster.[167]



[167] Transitions Optical Inc. Strategic Partnership Agreement with ▮▮▮▮▮▮, July 1, 2010, TOI_1799369 in
TOI_1799369 – 76. Leonard Class Cert Report, pp. 59 – 60.

Contains Highly Confidential Information—Subject to Protective Order

150. Plaintiffs make a similar allegation against TOI in relation to TOI's relationship with customer and lens caster Vision-Ease in 2005. Plaintiffs allege that, upon the launch of Vision-Ease's polycarbonate photochromic product LifeRx, TOI terminated its supply agreement with Vision-Ease and refused to supply Vision-Ease with photochromic lenses for several years, preventing Vision-Ease from selling a full line of photochromic products.[199] While TOI did inform Vision-Ease in June 2005 that TOI would cancel the supply agreement between the two parties effective September 30, 2005, Plaintiffs' allegation reflects a skewed and incomplete interpretation of the record.[200] Based on my review of the documents and deposition testimony produced in this case, it is my opinion that TOI's response to Vision-Ease's entry is consistent with a competitive marketplace and not anticompetitive.

151. TOI's conduct with respect to Vision-Ease upon Vision-Ease's launch of a competing product reflects a reasonable competitive response to a business relationship that had fundamentally changed. I understand from David Cole, President of TOI, and John Ligas, Director of Research and Development at TOI, that TOI's relationships with its lens caster customers are characterized by the extensive sharing of proprietary technical and strategic information.[201] In a similar regard, at the time of the LifeRx launch, TOI and Vision-Ease had been collaborating to develop a photochromic polycarbonate bifocal

---

[199] Indirect Purchaser Complaint, pp. 14 – 5. Vision-Ease did not manufacture plastic photochromic lenses at the time of TOI's alleged conduct.

[200] Letter from Richard C. Elias to Doug Hepper, June 13, 2005, TOI_1154779 (Exhibit 21 to Cole Deposition August 7, 2012). ("Per Section 2 of the Standard Lens Supply Agreement, please consider this letter notification that Transitions Optical, Inc. intends to cancel the agreement with Vision- Ease Lens as of September 30, 2005. As we discussed, this notification is a formality and we sincerely hope that a new agreement reflecting an enhanced business relationship will be in place before the expiration date.")

[201] Conversation with David Cole, November 1, 2012; Affidavit of David Cole in Corning Litigation, p. 4. ("Admittedly, TOI prefers that its customers refrain from dealing in plastic photochromic lenses other than Transitions--but there are no contracts, understandings or agreements that prevent our customers from doing so. There are two main reasons for this preference: -- first, TOI shares extensive proprietary information with its customers, including business strategies and technical information. This information could be easily exploited if these customers were to deal in competing types of plastic photochromic technology") and Affidavit of John S. Ligas in re: Corning Incorporated vs. Transitions Optical, Inc., January 9, 1999 ("Affidavit of John Ligas in Corning Litigation"), CORI 001810 – 3 in CORI 001810 – 24 (Exhibit 19 to the Ligas Deposition). ("In the course of developing such a business relationship, TOI must disclose a great deal of proprietary information to its lens caster customers. ... TOI discloses much proprietary information to its lens caster customers in the course of conducting tests to improve the compatibility between the lens caster's product and TOI's proprietary processes. ... Specifically, TOI reveals valuable information about how photochromic chemicals interact with the various types of plastic from which the lenses are made. ... Many of TOI's customers also receive information about the proprietary process by which TOI imbibes its lenses. Of particular value are the various imbibing times and temperatures TOI has determined are optimal for making photochromic lenses.... TOI shares many other types of proprietary and confidential information with its customers. For example, TOI reveals much about its special tools and techniques for edging, cleaning, packaging and otherwise handling lens products. These are just a few examples.")

Contains Highly Confidential Information—Subject to Protective Order

196.    Depending on the specification used and how the Class is defined, Dr. French estimates
        damages ranging from ██████████████████████ [250]

## B.   Flaws in Dr. French's Estimation of the TOI Overcharge

## 1.   Dr. French Incorrectly Calculates Net Prices for His Regression

197.    Dr. French calculates net prices for his regression using rebate data produced by Dr. Greg
        Leonard, the Defendant's class certification expert in this matter.[251]  What Dr. French
        fails to disclose is the structure of the rebates produced by Dr. Leonard and how this
        impacts his regression.

198.    Dr. French includes all of the transaction data produced by TOI in his regression, which
        span from 2000 through May 2011.  Dr. Leonard produced data on rebates per lens by
        lens caster and year from 2005 through 2010.  While Dr. Leonard did not produce data on
        rebates from 2000 through 2004, such data have in fact been produced by TOI.  Dr.
        French appears to rely solely on the data produced by Dr. Leonard and has made no
        attempt to augment this information using the data on earlier rebates produced by TOI.

199.    This means that Dr. French's regression, in which price is the dependent variable, is
        using net prices for some years and gross prices for others.  Given that what Dr. French is
        purporting to measure is the difference in prices in different time periods, it is
        inappropriate to apply rebates in this manner, as it does not allow for a consistent and
        meaningful comparison.

200.    I have estimated Dr. French's regression without incorporating Dr. Leonard's rebate data
        into the prices.[252]  Using this specification, in which a consistent measure of price is used
        throughout the damage period, Dr. French's own model finds that TOI's customers paid
        *lower* prices in every year of his "before" period with the exception of 2010, in which
        prices are estimated to be approximately 0.2 percent higher than the baseline "after"
        period.  See **Exhibit 13**.  As discussed further below, the increased price for 2010 as
        compared to Dr. French's baseline period is statistically significant, but too small to be
        economically significant.  If prices before April 2010 are lower than the benchmark
        prices after April 2010, then this model implies there are no damages to the Class.

---

[250] French Report, ¶¶ 121 – 2.

[251] See French Report, ¶ 111.  Dr. French appears to take issue with Dr. Leonard's characterization of these payments as rebates
("These payments in kind and many others like them are not conventionally considered rebates.")  See French Report,
footnote 171.  It is not clear why Dr. French has decided to include the rebates produced by Dr. Leonard in his calculation of
net prices when he does not consider them to be actual rebates.

[252] Data have not been produced to allow for the calculation of rebates for 2011.  Often rebates earned in one year will not be paid
until sometime the following year.  Given that the transaction data from 2011 represents nearly half of Dr. French's baseline
period (and his model fails to find the impact of TOI's conduct if data from 2011 are excluded), a regression using net prices
is not feasible.

Contains Highly Confidential Information—Subject to Protective Order

rendering his results unreliable, and at worst, the effect he is observing has no causal connection to the alleged anticompetitive conduct by TOI. For Dr. French to adequately explain the results his regression finds, he would need to explain why the impact of TOI's conduct is greatest in 2000 and declines thereafter; no part of Dr. French's description of the alleged anticompetitive conduct of TOI is consistent with this notion.

214.   In fact, it appears as though much of the conduct that Dr. French opines is anticompetitive occurs in 2005 or later: the alleged "termination" of the supply agreement with Vision-Ease occurred in 2005. Moreover, many of the lens caster and retailer exclusive agreements were entered into or continued to be in effect after much of Dr. French's overcharge has disintegrated. TOI's share of the photochromic segment also does not appear to be decreasing as Dr. French's but-for prices move closer and closer to TOI's actual prices. All of this suggests that factors other than TOI's conduct at issue are causing the overcharge that Dr. French estimates.

215.   Examining prices for photochromic and non-photochromic lenses subsequent to the end of TOI's exclusive agreements demonstrates that Dr. French's regression is not measuring anything specific to photochromic lenses. Lens casters' average selling price for photochromic lenses in February 2012 was $41.76, slightly higher than the $41.32 in April 2010, the final month of TOI's exclusive agreements. Non-photochromic lenses, however, exhibited a small decline in price over the same period, from $11.38 in April 2010 to $10.96 in February 2012.[262] This suggests that the effect found by Dr. French is actually caused by broader changes in the market as opposed to any actions taken by TOI, since a similar effect is observed in the non-photochromic lens segment.

216.   In addition, there were other factors causing TOI's strategy to evolve during mid-2010 unrelated to TOI's exclusive agreements. One example of this is the growth in digital resurfacing, which altered demand conditions for specific lens types in TOI's portfolio of products. Digital resurfacing allows labs to convert SFSV lenses into progressive lenses. This technological development affected demand for both categories of lenses.[263] The alterations in the market for SFSV lenses also had implications for demand for FSV lenses. This market shift could have spurred price changes by TOI that were unrelated to the expiration of its exclusive agreements. Changes in demand between the before and after periods not controlled for by Dr. French undermine the validity of his statistical results.

---

[262] The Vision Council Lens Shipment Reports, April 2010 and February 2012.

[263] Conversation with David Cole, November 1, 2012. See also 2007 BSR, TOI_0980935 – 6 in TOI_0980924 – 98.

EXHIBIT

7



**NERA**
ECONOMIC CONSULTING

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, NY 10601
Tel: 1-914-448-4000, Fax: 1-914-448-4040

*Privileged and Confidential*
*Draft and Preliminary*

# *Memo*

| | |
|---|---|
| To: | *Transitions Data* |
| Date: | 26 January 2012 |
| From: | Transitions team |
| Subject: | *Call with John Ligas regarding quality pricing* |

- Five "lens critical design factors" related to photochromic lenses:

  - Clarity

  - Activation – how long it takes to go from clear to dark

  - Uniform color – grey or brown

  - Fading – how long it takes to go from dark to clear

  - Fatigue

    - Aging of the plastic can result in a clear lens turning a yellow tint

    - The color change can degrade with time

- Other attributes contributing to the quality of photochromic lenses are:

  - Chemistry – the marriage of the dye to the lens

  - Process

  - Equipment

- There are reasons why a consumer may want a second pair of sunwear. One reason is that Transitions product generation 3 (T3) through Transitions production generation 6 (T6) do not activate in a car. Another reason is photochromic lenses wear out with extended use in the sun. This is termed "long-term fatigue". T3 through T6 have also never been polarized. People who spend extensive amounts of time in the sun, such as a lifeguard, may want to consider purchasing a second, polarized pair of sunglasses. (Note: Transitions is launching a new product line this year with polarized lenses, but this will not be considered T7.)

A division of Oliver, Wyman Limited

HIGHLY CONFIDENTIAL



Stiroh_0000001

Page 2
26 January 2012
*Call with John Ligas regarding 2*

*Privileged and Confidential*
*Draft and Preliminary*

**REDACTED**

Page 3
26 January 2012
*Call with John Ligas regarding 2*

**Privileged and Confidential**
**Draft and Preliminary**

### REDACTED

- Bleach Color:

    o This is a proxy for clarity. The goal of Transitions is to achieve the clarity of a clear lens.

    o %T: The amount of light let in through the lens. With a typical clear lens, 92% of light is let in, with the remaining 8% of light getting bounced or reflected off.

        ▪ For example, with T-III 1.5 Imb, 87% of light is let in through the lens. The rest of the light is absorbed by the dye or is reflected off. 87% is already pretty good in terms of clarity.

        ▪ According to John Ligas, the jump from 87% to 88% from T3 to T4 may appear small but is considered a big quality jump.

- Activated %T @ 30 sec:

    o The amount of light that is being let in through the lens after 30 seconds of activation at room temperature.

- %T Activation:

    o The amount of light that is being let in through the lens after full activation at 10°C, 23°C, and 35°C. A dark polarized pair of sunglasses has a %T of 15. According to John Ligas, a %T of 4 is not necessarily considered too dark.

- Activated Color @ 23°C: The color of the lens after it has been activated. The a* variable measures the color on the red/green spectrum while b* measures the blue/yellow spectrum (positive is more yellow, while negative is more blue).

- Fade Performance:

    o t 1/2: The time in seconds it takes to go from full activation back to 50% clear lens.

    o t 3/4: The time in seconds it takes to go from full activation back to 75% of clear lens

Stiroh_0000003

Page 4
26 January 2012
*Call with John Ligas regarding 2*

*Privileged and Confidential*
*Draft and Preliminary*

- o   time to 70%T: The time in minutes it takes to get to 70%T.

- Fatigue Data:

  - o   Fatigue is directly related to how much the glasses are worn while outside. A specific accelerated test is conducted in the Transitions labs to ensure the test is equal across generations.

    - ▪   Delta b*: How much more yellow does the clear lens get over time? According to John Ligas, a 1.5 is considered excellent, with little tint over time. A Delta b of 5 is considered a large change from a clear lens to a yellow tint over time.

- UV Protection:

  - o   The percent of UV light that is being protected. According to J. Ligas, it is exceptional to maintain UV protection across products and generations.

                    **REDACTED**

Page 5
26 January 2012
*Call with John Ligas regarding 2*

*Privileged and Confidential*
*Draft and Preliminary*



**REDACTED**

- Are improvements made to a product within a generation or just from generation to generation?

  - The performance of a product only changes from generation to generation. Generations may be three or four years long, and since inventories have a shelf life, it's important that the product produced at the beginning of a generation be identical to the product produced at the end of a generation.

- Can you give us an indication for the breadth of a product line?

  - The product contains some of the following types, and each manufacturer's type is different:

    - 1.5

    - Trivex

Page 6
26 January 2012
*Call with John Ligas regarding 2*

*Privileged and Confidential*
*Draft and Preliminary*

- Mid-Index

- Polycarbonate

- 1.6

- 1.7

- 1.4

  - There are also four types of lenses:

    - Finished single vision (FSV)

    - Semi-finished single vision

    - Bi-focal, tri-focal

    - Progressives

- Can you tell us more about Transitions anti-reflective lenses (AR)?

  - The US market is behind in anti-reflective coating. This is because anti-reflective coating blocks the UV light needed to activate Transition lenses. The AR coating is also brittle, so when applied to any type of lens that is at all flexible, the AR coating cracks.

  - Europa is a product line part of the T5 generation. The hardness in the lens is built up so the AR coating is applied to the top, hardest part of the lens, which prevents the AR coating from cracking.

HIGHLY CONFIDENTIAL



**NERA**
ECONOMIC CONSULTING

NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York 10601
Tel: 914-448-4000  Fax: 914-448-4040
www.nera.com

# MEMO

TO:        Transitions Files
DATE:      October 20, 2012
FROM:      Transitions Team
SUBJECT:   Call with John Ligas

On October 19, 2012, NERA spoke with John Ligas, head of R&D for TOI, to discuss product improvements and product development in further detail.

### Competitors with Photochromic Technology

- ███████████ has been in the photochromic market as long as TOI and has been a big enabler of other competing photochromic products. Most competing photochromic products utilize ████████ technology. It is possible to analyze a lens and determine whose photochromic technology is being used. ██████████████████████ all use ████████ technology.

- SunSensors uses Corning photochromic technology and worked with Flomel (?) to use their dyes in the process.

### Product Development

- The 1st generation took 5 years to develop. The 2nd generation was much quicker to develop because TOI was able correct for the obvious issues in the first generation, a bit like dealing with "low hanging fruit". Later generations are more difficult to develop because adding even more features and making the product even more robust than the first two generations requires significant work. Also, trying to make the improvements on all types of lenses takes time and investment as well. TOI raises the bar each time they come out with a new generation. ███████████████████████████████████████████████████████████████████████████

- There are two phases in developing a new generation of product: 1) research and 2) development. The research phase includes determining which materials, substrates, and dyes to use. The development phase entails working with customers and the technical team to adapt the technology to the customers' needs.

- The imbibition process doesn't work with polycarbonate lenses, so TOI had to develop the transbonding process.

HIGHLY CONFIDENTIAL

EXHIBIT
Stiroh-18
DC 1/16/13

Stiroh_0000007

Page 2
October 20, 2012
Call with John Ligas

- ████████████████████████████████████████████████ TOI has 117 people working on research and product development.

- Coatings for 1.6 and 1.67 index lenses took about 5 years to develop because TOI was having a distortion problem. The lens was becoming distorted after TOI applied its photochromic treatments to the 1.6s and 1.67s.

- TOI is working to convert clear lens wearers to photochromic wearers. This means TOI must be able to apply photochromic coatings to all materials/substrates/designs that clear lenses come in.

- There is a tremendous amount of ongoing development in the clear lens industry and TOI needs to react to all of those changes. With every innovation in clear lenses, TOI needs to be able to turn those innovations into photochromic products. TOI needs to be able to have a photochromic product in every clear lens type available.

**Working with Lens Casters**

- Every lens caster situation is different. Some lens casters prefer to do extensive testing on TOI's technology to ensure it adapts to their lenses and send over 10,000 lenses to test. Some decide to only test 100 lenses.

- There are instances where TOI must tell its customers that adapting its technology to their lens would be easier if they used certain materials, designs, or substrates. For example, TOI worked with PPG to develop a new lens material with a better monomer that absorbs its photochromic dyes better. PPG and TOI designed the CR-607 monomer. CR-607 is a slightly more expensive material and only used for TOI products. All of TOI's 1.5 imbibed products use CR-607. TOI then had to work with the lens casters to ensure that each lens manufacturer was able to make its lenses in CR-607 so TOI could ensure its photochromic coatings were being used on this better material.

- TOI is constantly learning what lens casters need. Any raw material change or change in generation must be discussed with the lens casters. For example, one input manufacturer alerted TOI it would be changing a component of the material used in hard coating. This resulted in TOI undertaking 1-1.5 years of testing to determine if their coating would continue to work on the hard coating with the new input. TOI needed to foresee if there would be potential for a problem in the market place.

HIGHLY CONFIDENTIAL

NERA Economic Consulting

Page 3
October 20, 2012
Call with John Ligas

- Sometimes lens casters will approach TOI and ask to design a photochromic product specifically for them.

  o For example, Younger had a technology and wanted to blend that with TOI's photochromic technology. So TOI developed Younger Drivewear which is a product/technology exclusive to that specific lens caster. Younger is also currently still developing products with TOI exclusively for Younger.

  o The Velocity line was developed specifically for Sola Optical.

  o From 2000 – 2001, TOI worked with VE on their technology.

  o Signet approached TOI to develop a photochromic 1.6 specifically for Signet. But, there were problems that never resolved.

  o Shamir had a product that would yellow and show signs of fatigue, so TOI worked with Shamir to fix those problems.

- Sometimes a lens casters asks to be exclusive on a particular product.

**Product Launches**

- Whenever TOI launches a new generation, it rolls it out all at once to all customers. Sometimes lens casters are just slow to pick up a product, but the rollout is meant for all lens casters who are ready for the newest generation.

- TOI will not put a lens on the market if there's any known potential for a technical problem.

- The Vantage product line, which is TOI's new polarized photochromic, underwent limited testing in stores. This testing was to gauge how customers would react and to understand how labs would handle polarized lenses. It had nothing to do with technical testing, which had already been completed by the time the store testing happened.

- Pre-generation 1 underwent regional testing to gauge the market in different regions of the US. This was before TOI was formed.

- TOI is still launching T6 products because lens casters continue to have products they want in 1.60.

**Third Party Review**

HIGHLY CONFIDENTIAL

Stiroh_0000009

NERA Economic Consulting

Page 4
October 20, 2012
Call with John Ligas

- There are two main third parties that conduct testing and reviews for the optical industry.

  - Colt: [This is the main one.]  TOI has a more extensive testing regimen than Colt's.  All TOI lenses go through its testing regimen.  But sometimes lens casters will request a Colt review.  In those instances, TOI sends the lenses off to Colt, Colt reviews them, and then sends the review to the lens caster and TOI.

  - NSL

- ISO and ANSI offer guidelines on optical products, all of TOI's products meet those guidelines.

- American Optometry Association Seal of Approval is given when products successfully block UV rays.

EXHIBIT

8

## Michael M. Buchman

| | |
|---|---|
| **From:** | Jacobson, Jonathan <jjacobson@wsgr.com> |
| **Sent:** | Thursday, February 14, 2013 4:31 PM |
| **To:** | Michael M. Buchman; Weick, Daniel; Pak, Chul; Bank, Jeffrey; Davis, Lisa; Lee, Tiffany; Corp, Robert; Kim, Stefanie; Ji, Yuan |
| **Cc:** | 'Sean Boyce'; Laddie Montague; 'Susan Kupfer'; 'jbarton@glancylaw.com'; Bart Cohen; 'Michael Lindsay'; 'ralph.matthew@dorsey.com'; Ben Barnow; woreilly@jonesday.com; Shelli M Bushman; Jenna MacNaughton; sschwaiger@gelaw.com; Lance Harke; 'Howard Bushman (HBushman@harkeclasby.com)'; 'Erich Schork (e.schork@barnowlaw.com)' |
| **Subject:** | RE: Photochromic Litigation: Objections to Subpoena to Testify |

Jefrrey Bank will attend with either Shaena McPadden or Luke Kline.  Given the wholly unwarranted burden and expense this will entail, and your stubborn refusal to acknowledge the rules of civil procedure, you are responsible for all the expenses that will be incurred by Transitions in this connection.

Incidentally, if you review the subpoena, you will see that it was not signed and, therefore, was not "duly served."

---

**From:** Michael M. Buchman [mbuchman@pomlaw.com]
**Sent:** Thursday, February 14, 2013 4:03 PM
**To:** Jacobson, Jonathan; Weick, Daniel; Pak, Chul; Bank, Jeffrey; Davis, Lisa; Lee, Tiffany; Corp, Robert; Kim, Stefanie; Ji, Yuan
**Cc:** 'Sean Boyce'; Laddie Montague; 'Susan Kupfer'; 'jbarton@glancylaw.com'; Bart Cohen; 'Michael Lindsay'; 'ralph.matthew@dorsey.com'; Ben Barnow; woreilly@jonesday.com; Shelli M Bushman; Jenna MacNaughton; sschwaiger@gelaw.com; Lance Harke; 'Howard Bushman (HBushman@harkeclasby.com)'; 'Erich Schork (e.schork@barnowlaw.com)'
**Subject:** RE: Photochromic Litigation: Objections to Subpoena to Testify

Please be advised the subpoena has been duly served and we intend to proceed with the deposition as noticed.

To be clear, if you and your client do not appear we will formally record your absence and move to compel.

We will also reserve the right to seek sanctions for your failure to comply with the subpoena.

If, however, you decide to appear, please let us know today who will be attending as we need to notify security in our building.

Michael M. Buchman
Pomerantz Grossman Hufford
Dahlstrom & Gross LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Direct Dial: (646) 581-9961
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Mobile: (917) 270-1549
Firm Website: pomlaw.com

**From:** Del Vecchio, Ariana [mailto:adelvecchio@wsgr.com]
**Sent:** Tuesday, February 12, 2013 12:08 PM
**To:** Adam Giffords Kurtz
**Cc:** 'Sean Boyce'; Laddie Montague; 'Susan Kupfer'; 'jbarton@glancylaw.com'; Bart Cohen; 'Michael Lindsay'; 'ralph.matthew@dorsey.com'; Ben Barnow; woreilly@jonesday.com; Michael M. Buchman; Shelli M Bushman; Jenna MacNaughton; sschwaiger@gelaw.com; Jacobson, Jonathan; Weick, Daniel; Pak, Chul; Bank, Jeffrey; Davis, Lisa; Lee, Tiffany; Corp, Robert; Kim, Stefanie; Ji, Yuan; Del Vecchio, Ariana
**Subject:** Photochromic Litigation: Objections to Subpoena to Testify

Dear Counsel,

Attached please find a courtesy copy of TOI and NERA's Objections to the Subpoena to Testify. Hard copies will follow by U.S. postal mail.

Kind regards,

Ariana

Ariana Del Vecchio
Senior Litigation Paralegal (New York Office)
Wilson Sonsini Goodrich & Rosati, PC
1301 Avenue of the Americas, 39th Floor
New York, New York 10019
Direct Dial: (212) 497-7779
Email: adelvecchio@wsgr.com

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any     attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 661-1100 and permanently delete all copies of the email and any attachments.

E

X

H

I

B

I

T

9

WSGR  **Wilson Sonsini Goodrich & Rosati**
PROFESSIONAL CORPORATION

1301 Avenue of the Americas, 40th Floor
New York, NY 10019-6022

PHONE 212.999.5800
FAX 212.999.5899

www.wsgr.com

**VIA ELECTRONIC & U.S. MAIL**                    January 9, 2013

F. Matthew Ralph, Esq.
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
*Attorneys for Insight Equity A.P.X, LP,*
*d/b/a Vision-Ease Lens Worldwide*

Re:    *In re Photochromic Lens Antitrust Litigation*

Dear Counsel:

Enclosed and served upon you by U.S. postal mail is a true and correct copy of the Subpoena to Produce Documents to Kenneth C. Baseman.

Courtesy copies have been sent to you via e-mail.

Regards,

Ariana Del Vecchio
Senior Litigation Paralegal

Enclosures

cc:    Ben Barnow, Esq. (via e-mail w/ encl)
       Michael Lindsay, Esq. (via e-mail w/encl)
       William O'Reilly, Esq., Shelli Bushman, Esq., John Majoras, Esq.,
           Sean Boyce, Esq. (via e-mail w/ encl)
       H. Laddie Montague, Esq., Bart Cohen, Esq., Jenna MacNaughton,
           Esq. (via e-mail w/ encl)
       Susan Kupfer, Esq., Michael Buchman, Esq. (via e-mail w/ encl)
       Joseph Barton, Esq. (via e-mail w/ encl)

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| In re Photochromic Lens Antitrust Litigation | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   8:10-md-02173-JDW-EAJ

(If the action is pending in another district, state where:

Middle District of Florida                  )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Kenneth C. Baseman, MiCRA, Microeconomic Consulting & Research Associates, Inc., 1155 Connecticut Avenue, N.W., Suite 900, Washington, DC 20036

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: See Schedule A.

| Place:  Wilson Sonsini Goodrich & Rosati, PC 1301 Avenue of the Americas, 40th Floor New York, NY 10019 | Date and Time: 01/16/2013 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  01/09/2013

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  **Transitions Optical, Inc.** , who issues or requests this subpoena, are:

Jeffrey C. Bank, Wilson Sonsini Goodrich & Rosati, PC, 1301 Avenue of the Americas, 40th Floor, New York, NY 10019, jbank@wsgr.com, 212-497-7761

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   8:10-md-02173-JDW-EAJ

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*   Kenneth C. Baseman
was received by me on *(date)*                         .

☐  I served the subpoena by delivering a copy to the named person as follows:

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                            *Server's signature*

                              _____
                                            *Printed name and title*

                              _____
                                            *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## Schedule A

## DEFINITIONS

The following Document Requests are to be read, interpreted and answered with reference to the following definitions and instructions:

1. "All" and "Any" mean both each and every.

2. "And" and "Or" shall have both conjunctive and disjunctive meanings.

3. "Communication" shall mean any oral or written exchange between two or more parties, including but not limited to electronic mail, voice mail, letters, contracts, and any other document attached thereto.

4. "Document" shall have the same full meaning as in Rule 34 of the Federal Rules of Civil Procedure.

5. "Expert Report" shall mean the Expert Report of Kenneth C. Baseman dated October 8, 2012 submitted in this Litigation.

6. "This Litigation" shall mean *In re Photochromic Lens Antitrust Litigation*, MDL Docket No. 2173, Case No. 8:10-md-02173-JDW-EAJ (M.D. Fla.).

7. "Person" shall mean any individual, individual proprietorship, corporation, partnership, joint venture, association and any other legal entity, and any director, officer, employee or agent working or acting on behalf thereof, and means both the singular and plural.

8. "Vision-Ease" shall mean Plaintiff Insight Equity A.P. X, LP, d/b/a Vision-Ease Lens Worldwide, Inc.

9. "You" or "Your" shall refer to Kenneth C. Baseman, persons working under his supervision, and any other person who assisted in the drafting of the Expert Report or the analyses on which the conclusions therein are based.

## INSTRUCTIONS

1. All Versions To Be Produced. Copies of all versions of a document shall be produced.

2. Claims of Undue Burden. If you refuse to produce documents on the ground that compliance would be unduly burdensome, set forth the number and nature of documents needed to be searched, the location of the documents, and the number of person-hours and costs that would be involved in conducting the search.

3. Construction of Terms. As used herein, the words "And," "And/Or" and "Or" shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of these Document Requests any information that might be deemed outside their scope by another construction. The singular form of a word shall refer to the plural and vice-versa.

4. <u>Documents Subject to Production</u>. These document requests call for the production of all responsive documents in your possession, custody or control (as those terms are defined by the relevant law) without regard to the physical location of such documents.

5. <u>Produced as Maintained in Business</u>. All documents should be produced in the same order as they are kept or maintained by you in the ordinary course of your business. Data should be produced in machine-readable format and/or in native format.

6. <u>Claims of Privilege</u>. For each document withheld based upon a claim of privilege, please provide a privilege log identifying the document(s) withheld in accordance with Fed. R. Civ. P. 26(b)(5).

## DOCUMENT REQUESTS

1. All documents or communications by which Douglas Hepper, Chief Executive Officer of Vision-Ease, communicated information relied upon in the Expert Report, including but not limited to the statements reflected in paragraphs 296-300 of the Expert Report.

2. All notes or other recorded impressions of any conversations or oral communications by which Douglas Hepper, Chief Executive Officer of Vision-Ease, communicated information relied upon in the Expert Report, including but not limited to the statements reflected in paragraphs 296-300 of the Expert Report.

COUNTY OF NEW YORK STATE
OF NEW YORK ss.:

## AFFIDAVIT OF SERVICE

ARIANA DEL VECCHIO, being duly sworn deposes and says:

I am not a party to this action, am over 18 years of age, and am employed by the law firm of Wilson Sonsini Goodrich & Rosati, P.C., with offices located at 1301 Avenue of the Americas, 40th Floor, New York, New York 10019.

On January 9, 2013, I caused the following Subpoena to Produce Documents to Kenneth C. Baseman to be served via e-mail and U.S. Postal mail upon:

**F. Matthew Ralph**
DORSEY & WHITNEY LLP
50 South Sixth Street
Minneapolis, MN 55402
Ralph.Matthew@dorsey.com

by depositing a true and correct copy of said documents enclosed in a postage-paid, properly addressed wrapper, in a post office or official depository under the exclusive care and custody of the United States Postal Service.

Sworn to before me this 9th day of

January, 2013

Notary Public

GI...... .......CIOS
NOTARY PUBLIC. State of New York
No. 01PA6070071
Qualified in New York County
Commission Expires July 11, 2014