# EXHIBIT L

# (REDACTED)



NERA
ECONOMIC CONSULTING

HIGHLY CONFIDENTIAL — OUTSIDE COUNSEL'S EYES ONLY — SUBJECT TO PROTECTIVE ORDER



# Expert Report of Lauren J. Stiroh, Ph.D.

In Re Photochromic Lens Antitrust Litigation –
Nouveau Vision, Inc. et al. Plaintiffs

December 3, 2012

Contains Highly Confidential Information—Subject to Protective Order

photochromic lens segments.  Moreover, as explained below, there are valid pro-competitive business reasons for TOI to have entered into the agreements in question.

# VI.  There Are Pro-Competitive Justifications for the TOI Conduct at Issue

119.  Plaintiffs allege that TOI has engaged in exclusionary behavior at the lens caster, wholesale laboratory, and retailer levels through a variety of means, including the use of exclusive dealing arrangements, the alleged termination of agreements with lens casters who sold competing photochromic products, the alleged withholding of a lower-priced private label photochromic product from US markets, and the alleged tying of rebates and marketing support to customers' sales of Transitions lenses.  Despite Plaintiffs' claims to the contrary, TOI's conduct represents pro-competitive behavior in a competitive industry characterized by high fixed costs of development and the credible threat of entry and free-riding.

## A.    TOI Substantially Built the Photochromic Segment of the Market

120.  Over the past two decades, TOI has undertaken significant and costly efforts to develop and market photochromic lens technology.[142] TOI has invested heavily in R&D to develop its six generations of Transitions products, with the launch of the seventh generation imminent.  As shown in **Exhibit 10**, TOI's R&D investments grew substantially from 2000 through 2010, growth that is positively correlated with the growth in US photochromic shipments over this period.  As discussed above and was shown in **Exhibit 7**, TOI has improved the quality of its products from generation to generation.  The improvements to the quality of Transitions brand products have been recognized at the ECP level.[143]

121.  In addition to innovation and improvements in quality, TOI has also made substantial investments in educating the market about the benefits of its products.  TOI's marketing program is described by the company's management as a "push-pull" model, oriented around educating upstream entities like lens casters, labs, and ECPs on one side (to "push" Transitions) and generating consumer demand on the other (to "pull" on those upstream entities).[144] TOI credits this product education marketing for growing the photochromic category.  Direct-to-consumer advertising has been a cornerstone of TOI's business model since at least 1995.  TOI has built its brand and the photochromic category though various outlets, including television, print, and digital media, and

---

[142] Other manufacturers of photochromic lenses do not have the same incentive to develop the photochromic segment of the ophthalmic lens industry because other manufacturers also make clear and tinted lenses.

[143] See, e.g., TOI Presentation, "Transitions VI ECP Qualitative Test Executive Summary," June 2007 TOI_0791470 in TOI_0791466 – 86.  See, also, Ligas Deposition, pp. 26 – 49.

[144] See, e.g., TOI BSR Update GMC Meeting, June 2003, TOI_0114185 in TOI_0114169 – 282 (Exhibit 30 to the Deposition of Johanna DiChiara, former Account Executive at TOI, July 6, 2012).

Contains Highly Confidential Information—Subject to Protective Order

through public relations with such high-profile associations as the PGA Tour.[145]  In addition to consumer advertising, TOI has deployed resources to educate entities at various levels of the ophthalmic lens distribution chain, including lens casters, wholesale laboratories, and integrated retailers.[146]  For example, TOI operates the Transitions Academy, an educational seminar for industry participants.[147]

122.    Representatives from lens casters have testified that such "pull" marketing initiatives have served to increase sales of all photochromic lenses.



123.    TOI's marketing investments have built a national brand name for the company that has become virtually synonymous with the photochromic category.  Industry participants at various levels of the ophthalmic lens supply chain have testified that the Transitions brand is the most widely recognized brand of photochromic lenses.[150]  Plaintiffs such as

---

[145] Cole Deposition April 5, 2012, pp. 60 – 3.  ("Q:…Does Transitions engage in direct-to-consumer advertising today? A: Yes. Q: When did Transitions first begin direct consumer advertising? A: Very small amounts in 1992, '93, but our most -- you know, the first significant effort in direct-to-consumer advertising began in 1995. Q: And what types of direct-to-consumer advertising did Transitions use over the past 12 years in connection with photochromic lens sales? A: Television media, print media, the websites, Internet, public relations. We've used all different types of media, like cooperative advertising with retailers, promotional opportunities with different -- with different retailers. … Q: Are there any others that you can think of as you sit here today? A: You know, we use a multitude of different avenues. Now with the exploding use of digital, the ability to use, you know, Facebook, Twitter, to have different websites for different public relations purposes or programs that we have, to do banner advertising on Internet, to do Web search; all of those things would be inclusive in a broad consumer outreach, yes. Q: And in your last answer you refer to a 'public relations program.' What did you mean by that, sir? A: We -- we use public relations in a multitude of forms. We've -- for instance, we've utilized our association with the PGA Tour to reach out to consumers about eye health.")

[146] See, e.g., Transitions Optical, Inc. 2005 Trade Marketing and Education Strategy, 2005, TNC_0002106 – 7 in TNC_0002094 – 109 (Exhibit 22 to the Wallace Deposition).

[147]



Contains Highly Confidential Information—Subject to Protective Order

Joseph Bistricer, an ECP at B&B Eyes in New York, have testified that Transitions products are the only photochromic lenses of which he is aware.[151]  Record evidence also shows that non-Transitions branded products are confused with Transitions products.[152]

124.  Because of TOI's investments in educating consumers about photochromic lenses and generating consumer demand for photochromic coatings, other photochromic suppliers are able to benefit from that effort and make sales of photochromic products without the same level of investment in consumer awareness.  TOI's conduct at issue in this case, including exclusive agreements with lens casters or retailers, preferred customer agreements with retailers, and marketing support and rebates tied to performance are designed to protect TOI's investment in building the photochromic segment and prevent free-riding on TOI's brand recognition.

## B.   TOI's Contracts and Agreements Are Efficient and Pro-Competitive

125.  As stated above, TOI's investments in R&D and marketing have effectively grown the entire photochromic segment and increased ECP and consumer understanding of photochromic lenses.  To the extent that TOI has entered into exclusive agreements with its customers or resellers, such agreements are a rational mechanism to protect these considerable investments and prevent free-riding.

126.  These sorts of agreements ensure that the sales made as a result of TOI's investments are not substantially diverted from TOI or that competing photochromic manufacturers do not benefit from lower average costs in bringing their products to market.[153]

127.  Such free-riding can also occur as a result of the unique branding dynamics of the photochromic segment.  Much in the manner that a "Kleenex" is synonymous with facial tissue, "Transitions" is often conflated with photochromic lenses in general.  Though TOI has actively tried to prevent this phenomenon, there is evidence that this tendency remains pervasive among industry participants.[154]  Given the inherent difficulty in

---

[151] Deposition of Joseph Bistricer, former President of B&B Eyes, June 13, 2012, p. 88. ("Q: And so you could have purchased any photochromic brand lens that you wanted for your – for B&B Eyes?  A: Yes.  Q: Why did you chose to purchase Transitions brand photochromic lenses?  A: Again, not aware of competing products.")

[152] See, e.g., Binder of TOI Consumer Complaints, 2009 – 2011 ("Binder of Complaints to TOI"), TOI_1499762 in TOI_1499762 – 90. The first three entries in this log show that Vision-Ease LifeRx products were being returned to TOI.

[153] Affidavit of David Cole in Corning Litigation, ¶ 8.

[154] The Branding Basics Guidelines in TOI's Strategic Retail Account program state that a retailer should never use the word "transitions" to refer generally to photochromic lenses.  See Transitions Optical Branding Basics Guidelines, Exhibit B of the 2009 SRA Program, TOI_1134105 in TOI_1134054 – 108 (Exhibit 32 to the Cole Deposition August 7, 2012). See, also, Clarke Deposition, p. 109.  ("A:…People that drive a lot need sun wear because the Transitions will not change very well – sorry, I'm using the name – it's like Apple, it's like every tablet is an iPad….") and Email from Velma M. Zavala on behalf of [TOI] Customer Service to Sales and Marketing (TOI), May 22, 2000, TOI_1456464.

Contains Highly Confidential Information—Subject to Protective Order

including any sort of trademark on ophthalmic lenses, a risk exists for TOI's products to be mistaken for the lower-quality products of competitors.  ECPs, labs, and retailers may engage, for example, in "bait and switch" tactics in which a salesperson leverages consumer awareness of the Transitions brand to ultimately induce a purchase of a non-Transitions photochromic lens instead.  TOI has received feedback from customers who believed the photochromic lenses they requested and subsequently purchased from a particular retailer or ECP were Transitions, but were ultimately discovered to be another (sometimes lower-performing) brand.[155]

128.   Indeed, even among ECPs, there is evidence of confusion between Transitions- and non-Transitions-branded products.[156]  I understand, for example, that TOI has received complaints related to delamination of lenses.[157]  This defect occurred with LifeRx, a Vision-Ease photochromic product, and cannot occur with Transitions products, which are manufactured using a different technology that does not include lamination.  If potential consumers gain a negative impression of photochromic lenses as a result of quality problems experienced with photochromic lenses manufactured by TOI's competitors, TOI's sales and reputation can suffer.  Exclusive contracts are a reasonable mechanism for TOI to mitigate this risk.

129.   Further, TOI's business model—which is to purchase proprietary lenses from lens casters, apply its photochromic treatments to those lenses, and sell the same lenses back to those lens casters—provides yet another incentive for exclusive supply arrangements.  TOI considers its exclusive lens caster customers to be partners and views it photochromic treatment process as an extension of those customers' manufacturing processes.[158]  In keeping with this relationship, TOI invests significant time and money in working with lens casters to ensure that its photochromic coatings work with the lens casters' proprietary lenses.  I understand that tailoring a photochromic treatment to a specific lens caster's lens requires years of research and development.[159]  I understand further that, to this end, TOI shares extensive proprietary information with its lens caster

---

[155] Email from Jan Curtis to Jim F. Schaefer Re: Transitions Questions, July 24, 2001, TOI_1456520 in TOI_1456520 – 1; Internal TOI email chain, June 11, 2011 through June 18, 2007, TOI_1221166 – 7; Internal TOI email chain, August 12, 2006 through August 14, 2006, TOI_0890030 – 1.

[156] See, e.g., Email from Ross Gatlin at Insight Equity to Michael Ness et al. at Vision-Ease re:LensCrafters Visit/Story, April 24, 2006, VEL-MDL113994 (Exhibit 4 to the Gibbons Deposition).  In this document, secret shoppers from Vision-Ease report that an ECP at LensCrafters believed the photochromic lens inventory in his store consisted of Transitions products (sold by EOA), though the products were actually Vision-Ease LifeRx.

[157] See, e.g., Binder of Complaints to TOI, TOI_1499762.

[158] Cole Deposition, August 7, 2012, pp. 311 – 2.  ("Q: Okay. Now, what's the origin of that practice of selling only to lens manufacturers and not to any downstream customers? A: … We essentially created sort of a -- almost a social contract with our partners in that we would partner with them as a -- as almost an extension of their manufacturing arm so that we got broad and wide availability of the product. And at the same time, we -- you know, we were -- we were selling directly to them so that they could -- could offer the product. And then what we would do is help them to promote the product, educate, innovate, be their research-and-development arm. So it was just a -- essentially just a business model. We thought it was the best way to -- to get our product efficiently, effectively, with the broadest choice in the marketplace.")

[159] Conversations with David Cole, November 1, 2012 and John Ligas, October 19, 2012.

Contains Highly Confidential Information—Subject to Protective Order

customers, including business strategy and technical information.[160]   TOI's exclusive agreements create partnerships between TOI and lens casters that facilitate and maximize such technological exchange.[161]   TOI will only rationally undertake the necessary investments if it expects to make enough sales back to lens casters to cover the investment cost.  Exclusive contracts thus give TOI greater insurance that its investments with lens casters will be profitable.

130.   Lens casters also benefit from their relationships with TOI.  Benefits to lens casters include monetary payments, preferred pricing agreements, and access to a greater range of high quality photochromic products in a similar range of options and materials as the lens caster's non-photochromic products.  For example, in June 2005, Optima signed an exclusive agreement with TOI.  According to the agreement, Optima agreed to exclusively market Transitions brand photochromic lenses in exchange for TOI's assistance in developing and implementing cooperative marketing programs with Optima.[162]   In September 2006, TOI renewed its exclusive contract with Carl Zeiss/Sola. Under this agreement, Carl Zeiss agreed to exclusively distribute Transitions brand plastic photochromic products in exchange for a lump sum payment of ███████ a payment equivalent to one percent of Carl Zeiss's net purchases of Transitions lenses, and ██████ annually in marketing funds for initiatives that mutually benefited both Carl Zeiss and TOI.  TOI also agreed to purchase 30 percent of generic lens substrate requirements from Carl Zeiss.[163]   Also in 2006, Shamir entered into an exclusive

---

[160] Affidavit of David Cole in Corning Litigation, ¶ 8. ("Admittedly, TOI prefers that its customers refrain from dealing in plastic photochromic lenses other than Transitions--but there are no contracts, understandings or agreements that prevent our customers from doing so. There are two main reasons for this preference: -- first, TOI shares extensive proprietary information with its customers, including business strategies and technical information. This information could be easily exploited if these customers were to deal in competing types of plastic photochromic technology.") Affidavit of John S. Ligas in re: Corning Incorporated v. Transitions Optical, Inc., ("Affidavit of John Ligas in Corning Litigation"), COR1 001810 – 3 in COR1 001810 – 24 (Exhibit 19 of the Ligas Deposition). ("In the course of developing such a business relationship, TOI must disclose a great deal of proprietary information to its lens caster customers. … TOI discloses much proprietary information to its lens caster customers in the course of conducting tests to improve the compatibility between the lens caster's product and TOI's proprietary processes. … Specifically, TOI reveals valuable information about how photochromic chemicals interact with the various types of plastic from which the lenses are made. … Many of TOI's customers also receive information about the proprietary process by which TOI imbibes its lenses.  Of particular value are the various imbibing times and temperatures TOI has determined are optimal for making photochromic lenses… TOI shares many other types of proprietary and confidential information with its customers.  For example, TOI reveals much about its special tools and techniques for edging, cleaning, packaging and otherwise handling lens products.  These are just a few examples.")

[161] See, e.g., Deposition of Rick Elias, Chief Executive Officer at TOI, July 27, 2012 ("Elias Deposition"), p. 180. ("Q: And as a part – and as a – as a deal point or one of the terms and conditions were that Augen would have to have an exclusive commitment to Transitions; isn't that correct?  A: …I believe one of the deal points was that – on this was they were looking to move into a full partnership with Transitions, which would allow – Augen is a very technical company, which would allow technical interchanges between the two companies and would result in an exclusive position with Augen.")

[162] Lens Supply Agreement between Transitions Optical, Inc. and Optima, Inc., June 2005, TOI_0612682 – 9.

[163] Carl Zeiss also granted TOI rights to its technology.  Heads of Agreement between Carl Zeiss Vision Group (CZV) and Transitions Optical, Inc. (TOI), August 2006, TOI_0385092 – 105 and Patent License Agreement Between CZV and TOI, September 26, 2006, TOI_0829884 – 95.

Contains Highly Confidential Information—Subject to Protective Order

agreement with TOI where TOI offered preferred pricing to Shamir in exchange for Shamir's exclusive distribution of Transitions plastic photochromic products.[164]

131.  Finally, an exclusive agreement cannot be considered anticompetitive when the same result (i.e., a buyer's exclusive purchasing of a single brand) would have occurred absent the agreement at issue, all else equal.  As stated above, TOI has made significant investments in improving the quality of its products from generation to generation and the quality of Transitions lenses is consistently recognized as a standard in the marketplace.   Indeed, representatives from multiple lens casters have testified that their purchasing decisions have been driven by the lenses' superior quality and reputation in the marketplace.

132.  ███████████ for example, has testified that ██████ continued relationship with TOI is a direct result of the quality of the Transitions product portfolio.[165]  He testified that other photochromic products were consistently of lower quality and fell below Transitions' standard in the marketplace.[166]  Representatives from other lens casters have expressed similar views of Transitions' superior quality and performance.[167]  Upstream purchasing decisions of Transitions lenses have also been driven by consistent demand for those lenses at the ECP and consumer levels.  ███████ testified that ███ did not pursue a relationship with Vision-Ease specifically regarding Vision-Ease's LifeRx photochromic product, for example, because ████ did not perceive the demand at the ECP level and marketing at the consumer level to be comparable to Transitions, among additional concerns about inferior performance.[168] ████████████████

---

[164] Lens Supply Agreement between TOI and Eyal Optical Industry, Ltd., October 1, 2006, TOI_0612784 – 803.

[165] Rybacki Deposition, p. 104.  ("To me, if there was a better product on the market at a competitive or more competitive price, we would certainly look at it. I've looked at other products. I've studied other products. But they were never as good [as Transitions]. So it wouldn't make sense for us to introduce an inferior product.")

[166] 

[167] See, e.g., Deposition of Jean Carrier-Guillomet, President and CEO at Essilor of America, May 8, 2012 ("Carrier-Guillomet Deposition Vol. II"), pp. 608 – 9. ("The -- I'm not sure if we can say there is a comparable product. That's a matter of perception. It's not my perception that Vision-Ease is comparable products [sic] to Transitions. Q: And are you -- when you say that, are you talking strictly about quality or something else? A: Quality, performance.")

[168] ████████████████████████████████████████

Contains Highly Confidential Information—Subject to Protective Order

███████████████ has also testified that ECPs have consistently demanded Transitions lenses and that ██████ procurement decisions have simply satisfied that demand.[169]

## C.    TOI's Rebate and Marketing Programs Are Pro-Competitive

133.    Record evidence shows that some lens casters, retailers, and wholesale labs received rebates and other incentives from TOI for marketing, exclusively purchasing or preferably purchasing Transitions photochromic products.  Rebates paid to lens casters were typically amounts equal to a percentage of the lens casters' purchases.  As noted in the Leonard Class Cert Report lens casters receive rebates from TOI for marketing, growth, and other promotional efforts while working with TOI to increase sales of Transitions products to the benefit of both TOI and the lens caster.[170]

134.    Incentives and rebates were also available to retailers through programs such as the STAR Partner Retail Program.  Through these agreements TOI provided Business Building Funds ("BBFs"), quarterly statements of retail growth and training and other support to retail sales professionals.  BBFs were paid on a per-lens pair basis depending upon the volume share.  In exchange for these benefits, the retailer agreed to maintain a certain level of Transitions volume, share, and volume growth at each retail location throughout the year.  In some instances, the retailers agreed to exclusively carry TOI products at retail locations.[171]  For example, Doctors Vision entered into a STAR Partner Retail agreement with TOI in April 2008.  Through this agreement, Doctors Vision would achieve "Platinum Plus" status by maintaining above 15% share of Transitions products at its retail locations.  In exchange, TOI would pay Doctors Vision ██████per pair in BBFs.  Doctors Vision would receive an additional ██████per pair in BBFs by attaining a 20-24 percent year over year volume growth.[172]  As another example, Eye Care Centers of America could accrue up to ████████per year which would be paid to Eye Care Centers of America upon the completion of mutually agreed upon marketing events such as advertising campaigns and educational programs.  Eye Care Centers could also accrue ████████per year in enhanced marketing funds for use in specific product



---

[169] █████████████████████████████████████████████████████████

[170] Transitions Optical Inc. Strategic Partnership Agreement with Shamir Optical Inc., July 1, 2010, TOI_1799369 in TOI_1799369 – 76.  Leonard Class Cert Report, ¶ 94.

[171] See, e.g., Transitions Optical, Inc. 2008 STAR Partner Retail Program Agreement with Doctors Vision Center, April 14, 2008 ("Doctors Vision 2008 STAR Agreement"), TOI_0834215 in TOI_0834212 – 5.  See also Transitions Optical, Inc. 2006 STAR Partner Retail Program Agreement with Emerging Vision, Inc., December 8, 2005, ("Emerging Vision 2006 STAR Agreement"), TOI_1132370 – 1.

[172] Doctors Vision 2008 STAR Agreement, TOI_0834215, Leonard Class Cert Report, ¶ 93, and Exhibit 25.

Contains Highly Confidential Information—Subject to Protective Order

promotions geared towards growing sales of TOI products at Eye Care Centers of America retail locations.[173]

135.   Rebates were also available to wholesale laboratories through STAR Laboratory Partner Agreements.  Through this program, TOI provided labs with BBFs and quarterly updates on business growth as well as training and other support to laboratory professionals.  In exchange for those funds, the laboratories had to attain particular sales levels and promote TOI lenses as the laboratory's preferred photochromic product.  STAR laboratories would also be expected to promote TOI products at trade shows, promote TOI products to ECPs, and participate in TOI product launches.[174]  Apex Optical Company, for example, entered into a STAR lab program with TOI in 2001.  Under this contract Apex had to sell at least 13 percent of its total lenses sold as TOI products.  In exchange for those and other marketing efforts, TOI would pay Apex BBFs at a rate of $0.45 per pair if between 13 percent and 16 percent of all lenses sold were TOI lenses.  If Apex achieved a level above 16 percent, TOI would pay them $0.55 per pair in BBFs.[175]

136.   Plaintiffs allege that these agreements were part of a course of conduct carried out to facilitate and maintain its monopoly power in the relevant market.[176]  These allegations ignore, however, valid business justifications for the agreements as well as the testimony of industry participants that such programs have had pro-competitive effects.

137.   TOI's agreements at the retailer and laboratory level target the point at the ophthalmic lens distribution chain where the decision to purchase photochromic lenses is made.  Lens casters, in many ways, simply facilitate downstream demand in the industry – they fill orders as they receive them.[177]  It is important for TOI, therefore, to direct resources to influencing sales at downstream levels.  Because of the importance of the consumer "pull" down through the distribution chain, reducing upstream prices to lens casters would likely not be as effective in generating sales as creating programs downstream with labs and retailers.

138.   In addition to efficiency justifications, TOI's rebate and marketing programs have also served pro-competitive ends.  Representatives from multiple lens casters have testified that TOI's marketing co-op funds have reduced the costs of marketing programs that promote Transitions lenses and have been instrumental in driving the growth of their photochromic lens sales.  ████████████████████████████████████████

---

[173] Memo RE: 2006/2007 Transitions Optical Partnership Agreement from George Gebhardt to Pat Huot and Connie Falvo, November 28, 2005, TOI_0834219 – 20.

[174] See, e.g., Transitions Optical Inc., 2008 STAR Partner Laboratory Agreement with RX Optical, January 30, 2008, TOI_1131424 – 8. See also, Transitions Optical Inc. STAR Partner Laboratory Program Agreement with RX Optical, December 6, 2005, TOI_1132824 – 6.

[175] Transitions Optical, Inc. Laboratory STAR Agreement with Apex Optical Company, September 17, 2001, TOI_1749469.

[176] Direct Purchaser Complaint, ¶¶ 94 – 100.

[177] See, e.g., Biggs Deposition, p. 86.  ("It is supply and demand.  We – we supply what the ECPs want in the marketplace, and they decide exactly what technology to look for, and I go out and get it.")

Contains Highly Confidential Information—Subject to Protective Order



[178]   These effects are all consistent with TOI's rebate and marketing programs serving pro-competitive ends.

### D.   The Allegation that TOI Has Withheld Private Label Products Is Inaccurate and Ignores Pro-Competitive Justifications

139.   Plaintiffs allege there was demand within the US for TOI to produce a private label, lower priced product similar to what it was producing outside the US but refused to do so.[182]   I understand that this is inaccurate.  Testimony and documentary evidence indicate that TOI offered private label products in the US in the past.  However, TOI has not seen sufficient demand for these products among its customers in the US market and prefers to strengthen its own brand, in which it has invested heavily.  Thus, TOI's actions with respect to offering private label products for sale in the US are reasonable and pro-competitive.

---



[182] Direct Purchaser Complaint, ¶ 63.

Contains Highly Confidential Information—Subject to Protective Order

concessions to at least four lens casters between 2007 and 2008.  In one instance, TOI provided price concessions to Younger stemming from Younger's concerns over the entry of Vision-Ease's LifeRx.  In a separate instance, Hoya actually rejected a proposed price increase in 2009.  TOI has also provided price concessions to customers downstream through increased BBFs or marketing funds.[240]

## VIII. Analysis of Dr. Singer's Damages Models

193.   Even if all of the allegations against TOI are upheld and the Court concludes TOI is liable for damages, Dr. Singer's models cannot be relied upon to determine damages due to the flaws I will discuss below.  Correcting the flaws in Dr. Singer's model demonstrates that there is no damage to the class due to the alleged improper conduct.

### A.   Overview of Dr. Singer's Damages Models

194.   Dr. Singer presents two damage models.  The first one, Dr. Singer's "before-after" approach, uses prices charged after July 22, 2010 (when the last of TOI's exclusive agreements ended) to estimate the prices that would have been charged to lens casters in the but-for world, without the agreements at issue.[241]  Dr. Singer estimates that prices fell by between 0.35 percent and 0.39 percent each month since July 22, 2010.[242]  Dr. Singer relies on these price declines to estimate how much lower prices would have been absent TOI's exclusive contracts.  He estimates that prices would have been between 0.35 percent and 0.39 percent lower than actual prices in March 2006, and the gap between actual prices and but-for prices would grow by an additional 0.35 percent to 0.39 percent in each month until July 2010.  Thus, Dr. Singer estimates that the alleged "overcharge" allegedly attributed to the acts at issue was between 0.35 percent and 0.39 percent in March 2006 but between approximately 19 and 21 percent in July 2010.[243]  Dr. Singer then multiplies these "overcharges" by TOI's monthly sales to lens caster customers other than EOA ("Group A").  Dr. Singer estimates damages to Group A customers as ███████ ████ in aggregate using data from March 2006 through July 2010.  Using data from March 2006 through May 2011, he finds aggregate damages to Group A customers of ████████████[244]

195.   Dr. Singer's second method, the "lens caster foreclosure share" approach, determines overcharges based on his estimates of the share sales to of lens casters allegedly

---

[240] Conversation with David Cole, November 1, 2012.

[241] Singer Merits Report, ¶ 139.

[242] Singer Merits Report, ¶ 143.  It is my understanding that TOI ended all exclusive agreements during the period from April 22, 2010 through July 22, 2010.

[243] Singer Merits Report, ¶ 145.

[244] Singer Merits Report, Table 12, p. 101.

Contains Highly Confidential Information—Subject to Protective Order

foreclosed from competition by TOI's exclusive contracts.[245]  The "lens-caster foreclosure share" approach is used to estimate the extent to which an increase in TOI's lens caster foreclosure share is associated with higher prices charged to lens casters.[246]  Dr. Singer finds that a 1 percentage point increase in the lens caster foreclosure share is associated with a 0.07 percent to 0.09 percent increase in prices charged to lens casters.[247]  Dr. Singer multiplies this estimated effect by the foreclosure share estimated in each month to determine aggregate damages to Group A.  Using data from March 2006 through July 2010, Dr. Singer estimates damages to Group A of ███████████ Using data from March 2006 through May 2011, he estimates damages of █████████[248]

196.   Dr. Singer uses the "overcharges" to Group A from these two models to estimate damages to EOA's retailer and lab customers ("Group B") and to ELOA's retailer and ECP customers ("Group C").  Dr. Singer calculates Group B damages by estimating the "price transfer" effect (also referred to as "pass-through") to Group B and applies that to the overcharges estimates from his Group A models to estimate Group B damages.[249]  Dr. Singer estimates damages to Group B customers between ██████████ and ███████ █████ depending on which Group A model is used and the period of the alleged harm.[250]

197.   Finally, Dr. Singer estimates the price transfer effect to ELOA's retailer and ECP customers ("Group C") and applies that to the overcharges estimates from his Group A models.[251]  Because ELOA does not buy directly from TOI, this is a two-step approach.  In the first step, Dr. Singer measures the price effect based on the sales price from TOI to EOA and the price that EOA, through its EEP business units, charges ELOA.  The second step determines the effect of the price that EOA charges on ELOA on the price that ELOA charges Group C customers.  The Group C price effect is then estimated by multiplying the two price effects together.  As with Group B, Dr. Singer multiplies the price effect by the overcharges from his Group A models to estimate damages.  Dr. Singer finds damages to Group C between ████████ and ███████████ depending on which Group A model is used and the period of the alleged harm.[252]

---

[245] This approach is similar to the model put forth by Dr. Singer in his Class Certification Report, but as I will discuss in more detail below, it is different and, in fact, Dr. Singer never puts forth the model from his Class Cert Report in his Merits Report.  At a minimum, I would have expected him to explain why he abandons the approach he previously presented to the court.

[246] Singer Merits Report, ¶ 147.

[247] Singer Merits Report, Table 10, p. 92.

[248] Singer Merits Report, Table 12, p. 101.

[249] Singer Merits Report, ¶¶ 153 – 8.

[250] Singer Merits Report, Table 12, p. 101.

[251] Singer Merits Report, ¶¶ 153 – 58.

[252] Singer Merits Report, Table 12, p. 101.

NERA Economic Consulting

Contains Highly Confidential Information—Subject to Protective Order

## B.     The Damages Estimated by Dr. Singer Are Not Caused by TOI's Allegedly Anticompetitive Actions

198.    When properly calculated, overcharges should stem from the acts at issue. Dr. Singer's aggregate overcharges do not. This is because Dr. Singer has not provided any causal link between the conduct at issue and the effect that his models measure, nor has he provided an explanation for his observed overcharge that is related to the allegedly anticompetitive conduct by TOI.

199.    For example, because his "before-after" model finds that prices of photochromic lenses declined after July 2010, Dr. Singer concludes that the conduct at issue artificially kept prices high while exclusive contracts were in effect. However, some of the conduct at issue actually ended before July 2010. For instance, TOI's exclusive agreement with Carl Zeiss expired in September 2009.[253] In addition, some of the changes occurring in the market that affected prices were actually unrelated to TOI's conduct. As discussed above, the increase in digital resurfacing changed the demand conditions faced by TOI and applied pricing pressure to certain of its products.

200.    Examining prices for photochromic and non-photochromic lenses subsequent to the end of TOI's exclusive agreements demonstrates that Dr. Singer's before-after regression is not measuring anything specific to photochromic lenses. Lens casters' average selling price for photochromic lenses in February 2012 was $41.76, slightly higher than the $41.54 in July 2010, the final month of TOI's exclusive agreements. Non-photochromic lenses, however, exhibited a small decline in price over the same period, from $11.29 in July 2010 to $10.96 in February 2012.[254] This suggests that the effect found by Dr. Singer is actually caused by broader changes in the market as opposed to any actions taken by TOI, since a similar effect is observed in the non-photochromic lens segment.

201.    In addition, there were other factors causing TOI's strategy to evolve during mid-2010 unrelated to TOI's exclusive agreements. One example of this is the growth in digital resurfacing, which altered demand conditions for specific lens types in TOI's portfolio of products. Digital resurfacing allows labs to convert SFSV lenses into progressive lenses. This technological development affected demand for both categories of lenses.[255] The alterations in the market for SFSV lenses also had implications for demand for FSV lenses. This market shift could have spurred price changes by TOI that were unrelated to the expiration of its exclusive agreements. Changes in demand between the before and after periods not controlled for by Dr. Singer undermine the validity of his statistical results.

---

[253] Memo entitled, "Transitions Optical / Carl Zeiss Vision—Amendment to Supply Agreements" from Michael Ruggeri to P. Smith et al., October 16, 2006, TOI_0861430 in TOI_0861430 – 4.

[254] VCA Data, July 2010 and February 2012.

[255] Conversation with David Cole, November 1, 2012. See also 2007 BSR, TOI_0980935 – 6 in TOI_0980924 – 98.

Contains Highly Confidential Information—Subject to Protective Order

### C.   Dr. Singer's Damages Models Do Not Demonstrate Impact on a Class-Wide Basis

202.    Even if I assume, for hypothetical purposes, that Dr. Singer's damage method were reliable, his analysis still fails to demonstrate impact or injury on a Class-wide basis.  It has been recognized in antitrust literature that a proper analysis of Class-wide damages must adequately account for individual differences among Class members.  If all Class members are combined in a single damages specification, that specification will not provide accurate measures of individual effects.  Even if there is a measureable average adverse effect of some alleged misconduct, a single specification for the entire class, as Dr. Singer employs, cannot rule out that a substantial number of putative Class members experienced no injury.[256]

203.    For purposes of illustration, assume that, before a firm's alleged anticompetitive conduct, a group of 100 customers each paid $20 for that firm's product.  Assume further that after the firm's alleged anticompetitive conduct, 50 of those customers paid $30 for that firm's product, and the other 50 customers continued to pay $20 for that firm's product.  Even though, on average, the firm's customers experienced an average price increase of $5, half of that firm's customer's actually experienced no change in price.  A damages model that simply averages overcharges across all customers would find adverse impact on customers that, in fact, experienced none.   I understand that, as a legal matter, if the plaintiffs' damage theory does not demonstrate harm to all, or substantially all of the class, the class certification decision may be revisited and overturned.

204.    Dr. Singer's models fail to measure impact on an individual basis for each Class member, and fail to establish impact on all, or substantially all, of the Class.  Each of Dr. Singer's models relies on a pooled sample of the Class members and relies on a single coefficient as a measure of damage.  While some of Dr. Singer's specifications do include a "buyer fixed effects" control, Dr. Singer fails to link such buyer-specific controls to the variables measuring the impact of TOI's allegedly anticompetitive conduct.  The variable of interest in each of Dr. Singer's specifications, then, simply measures an average impact that does not vary by individual Class member.   Such specifications obscure important differences among Class members and find impact where, in fact, there is none.  This flaw is amplified in Dr. Singer's analysis by other errors that he makes that cause him to find an average effect, where in fact there is none.

---

[256] See, e.g., Bret M. Dickey and Daniel L. Rubenfield, "Antitrust Class Certification: Towards an Economic Framework," *NYU Annual Survey of American Law*, Vol. 66, March 2011, pp. 462 – 3.  ("It follows that the single regression approach will not provide accurate measures of individual effects.  It is important to note that even if there is a measureable average adverse effect of the conspiracy, if one relies on the estimation of a single regression, the possibility that a substantial number of putative class members will not have been injured cannot be ruled out.")

Contains Highly Confidential Information—Subject to Protective Order

## D.     Specific Flaws in Dr. Singer's Group A  Models

205.     Even if Dr. Singer's overarching damage models were a valid measure of damages attributable to TOI's conduct, and did take into account differences among Class members, other flaws in his regression analyses show that his models greatly overstate the impact, if any, of TOI's conduct.

## 1.     Flaws in Dr. Singer's "Before-After" Model

206.     Dr. Singer presents four specifications of his before-after model, two of which rely on incorrect data.  In particular, two specifications rely on a cost variable in the underlying TOI transactional dataset that Defendants informed Plaintiffs was incorrect.  On May 14, 2012, Defendants sent a letter to Plaintiffs informing them that the standard cost data provided in the TOI transactional dataset "was inaccurate." Within that letter was a file containing the correct costs for 2000 to 2004 and instructions on how to rely on the previously produced cost card data to obtain correct costs for 2000 to 2010.[257]  However, Dr. Singer chose to report the results relying on the wrong costs in his report and instead relegated the models using the correct costs to Appendix A.  Furthermore, Dr. Singer does not refer to these results, nor does he calculate the damages that they would imply, at any point in the body of his report.  I will focus my critique of Dr. Singer's before-and-after model on his specifications that use correct data, as any conclusions based on a model using incorrect data are, obviously, not reliable.

207.     Dr. Singer presents two different versions of his before-and-after model using corrected data.  The first controls for product characteristics in isolation (e.g., one effect for a polycarbonate lens, another for a progressive lens, etc.), which he refers to as using product mix dummy variables.  His second specification controls for product characteristics in tandem (e.g., a control for a polycarbonate, progressive, uncoated, generation 3 lens), which he refers to as using "product fixed effects."  Econometric tests show that the second specification should be favored.[258]

208.     In both models, Dr. Singer includes variables measuring median age and household income in his regression. Other than noting that these variables "may affect price," Dr. Singer does not explain the theory behind the inclusion of these variables.[259]  The correct specification of a model should be driven first and foremost by theory.  If a regressor

---

[257] Letter from Ariana Del Vecchio to F. Matthew Ralph, Bart Cohen, Howard Bushman, and Sean Boyce, May 14, 2012.

[258] The second set of more granular product controls are jointly significant even after the less granular variables are already accounted for.  I note that it is possible to control for product at a still more granular level than Dr. Singer's "product fixed effects."  While Dr. Singer has controlled for certain product characteristics, he has not included a true fixed effect for product in his model.  Controlling for these factors could be valuable if Dr. Singer has omitted important product characteristics from his product controls.  For the purposes of my critique of Dr. Singer's before and after model, I focus on his "product fixed effects" specification.

[259] Singer Merits Report, ¶ 192.

Contains Highly Confidential Information—Subject to Protective Order

does not have the correct sign as predicted by economic theory, it is a signal that the equation is misspecified or that underlying data problems make the results unreliable.[260]

209.  If Dr. Singer included age and income in his models to control for factors affecting demand, then economic intuition would suggest that as age and as income increase, demand for photochromic lenses would increase.  As such, it would be expected that holding all else equal, the coefficient on age and income would be positive, meaning that as incomes rise or the population ages, demand for photochromics, and correspondingly their price would also increase.  This econometric reasoning is further bolstered by TOI's own demographic research.  As of February 2007, the median age of a consumer purchasing Transitions-brand products was between 45 and 54 years while the average consumer was 49 years old.  The median household income of consumers purchasing Transitions products was $59,000.[261]  According to the United States Census in 2007, the median household income in the US was $51,000 and the median age was 37 years.[262]  Given the demographics of the typical Transitions-brand consumer, economic intuition suggests that as age or income increase, the demand for photochromic lenses would increase as well.

210.  However, in Dr. Singer's before-after model both variables have a counterintuitive sign when the correct costs are used.  As noted above, this indicates that the model is misspecified.[263]  This misspecification is not limited to just Dr. Singer's "before-after" model.  This misspecification is also apparent in a comparison of Dr. Singer's cross-price elasticity regressions, lens caster foreclosure regression, Group B regression, and Group C Upstream regressions.  Dr. Singer finds that the variables for income and age have counterintuitive or conflicting effects on the demand for photochromics depending on which model he uses.  When relying on corrected costs, Dr. Singer finds that household income and median age can have opposite effects on the demand for photochromics depending on which model is employed.  Dr. Singer finds a negative effect of median age and a positive effect of median income on the demand for photochromics in his cross-price elasticity regression.  The fact that the effects of the variables do not remain consistent across the damages models indicate that the models are not properly specified.

---

[260] See: Peter Kennedy, A Guide to Econometrics, Sixth Edition, (Blackwell Publishing, 2008) ("Kennedy"), p. 71 and 368 (A wrong sign is an indication that "there is undoubtedly some shortcoming in one's theory, data, specification, or estimation procedure" (p. 368)).

[261] Transitions Advertising Tracking Study Wave 12 Report by Lieberman Research Group, March 2, 2007, TOI_1738172 at slide 70.

[262] "US Census Bureau Median Age by Sex," http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_07_1YR_B01002&prodType=table (Accessed November 19, 2012).  "US Census Bureau Median Household Income in the Past 12 Months (In 2007 Inflation-Adjusted Dollars)," http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_07_1YR_B19013&prodType=table (Accessed November 19, 2012).

[263] In Dr. Singer's models the coefficient on income is positive and significant in the model using the wrong cost and flips to negative and significant in the models with the right cost variables.  This is further evidence that the specification of the model is not robust.

Contains Highly Confidential Information—Subject to Protective Order

**Exhibit 12** shows the inconsistencies in the effects of age and income across all of Dr. Singer's models.

211.   At the class certification stage, Dr. Singer and Dr. Leonard both proposed econometric models that did not include either age or income.  I, therefore, reran Dr. Singer's proposed before-after model with the specification he favored in his class certification report, dropping those two variables.  Without the age and income variables from Dr. Singer's regression, the coefficient on the variable measuring the price decline after the end of the TOI's agreements is no longer significant at the 5 percent level.  See **Exhibit 13.**  The magnitude of the price decline is also substantially decreased, from approximately 0.45 percent per month to approximately 0.15 percent per month.  This fact indicates that Dr. Singer's measure of impact is unreliable.  He obtains a seemingly statistically significant result only because he has arbitrarily included control variables that are demonstrably flawed.

212.   An analyst cannot arbitrarily assert that one coefficient is reliable and robust because it is of the expected sign, when other coefficients in the same model have the wrong sign.  Unexpected and unexplainable results call into question the entirety of the analysis, and the fact that the coefficient of interest is rendered statistically insignificant without the troublesome variables shows that the flawed variables matter importantly to the overall results.

213.   Moreover, if the price decline is allowed to vary by customer, Dr. Singer's model finds a significant coefficient on the price decline variable for only three customers when the problematic variables are removed: Seiko, Shamir, and Pixel.[264]  **Exhibit 13** shows the results of these modifications.  This finding demonstrates that Dr. Singer has not demonstrated impact on a Class-wide basis.  Further, these three customers account for less than 4 percent of the lenses sold by TOI during the damage period.  These results are consistent with my earlier findings that TOI did not possess monopoly power and that its actions did not have an anticompetitive impact.

214.   The fact that Dr. Singer's model shows price increases for only Seiko, Shamir, and Pixel has important downstream implications.  The lack of a price increase for EOA implies that damages for all Plaintiffs in Groups B and C are $0.

---

[264] An F-Test of the individual customer coefficients demonstrates that they are significant even after a before-after effect is controlled for overall.  This result applies a generally accepted method for determining the significance of multiple variables called the Sequentially Rejective Bonferroni Procedure.  See Yosef Hochberg and Ajit C. Tamhane, Multiple Comparison Procedures (John Wiley & Sons, Inc. 1987), pp. 2, 57 – 8.  I cannot agree with Dr. Singer that this is evidence of an overcharge, since it clearly is not happening in any kind of marketwide, systematic way.

Contains Highly Confidential Information—Subject to Protective Order

## 2.      Dr. Singer's Damages Calculations Based on His Before-After Model Rely on Over-Extrapolation of His Results

215.    Even if one were to assume that Dr. Singer's erroneous regression were correct, there is no support for Dr. Singer's method of extrapolating his results from a 10-month observation period to a 53-month damage period.[265] The transaction data produced by TOI end in May 2011, and Dr. Singer estimates that prices declined for 10 months after the conduct at issue ceased.  Then Dr. Singer makes the aggressive assumption that prices would have fallen continuously for 53 months in the but-for world.  His model does not provide any support for this aggressive assumption and Dr. Singer does not present any economic theory explaining why it would take this long for prices to adjust to a competitive level, or for his assumption that the competitive level is approximately 19 to 21 percent below the observed price level.[266] So, in essence, Dr. Singer uses a price decline that he finds over a 10-month period and applies that back over a 5-year period. When using econometrics for forecasting, the forecaster generally tries to forecast as short a period of time, from as long a period as possible.  Typically the accuracy of a forecast decreases as the time horizon increases.[267]  Here, Dr. Singer forecasts a period that is 5-times as long as the period on which he bases his forecast.

216.    There is no information in Dr. Singer's "after" period that supports his assumption that competitive prices would be 20 percent below actual prices.  According to Dr. Singer's own model, between July 2010 and May 2011, prices fell by only about 4 percent.[268] However, Dr. Singer's alleged overcharge reaches a level that is 5 times this amount.

217.    Dr. Singer also makes the assumption that after the 53-month price decline, the but-for and actual prices will only begin to converge only at the same rate as they were separated; that is, he appears to assume that it would take an additional 53 months for the but-for price and actual price to be equal.  If his model is taken at face value, Dr. Singer claims that Plaintiffs will continue to incur damages until late 2014.[269]  He does not appear to provide any justification for why he expects such a slow response from the market to the end of TOI's alleged anticompetitive conduct.

218.    Dr. Singer's only justification for this assumption appears to be that TOI allegedly engaged in its anticompetitive conduct for at least the 53-month period in which he imposes his increasing decline in price.  Dr. Singer has provided no evidence or rationale as to why the period during which prices would decline absent anticompetitive conduct must be at least as long as the period during which the anticompetitive conduct occurred;

---

[265] Singer Merits Report, ¶ 145 and Footnote 325.  Dr. Singer extrapolates from late-July 2010 through March 2011, a ten month period, to a 53-month period.

[266] Singer Merits Report, ¶ 145.

[267] For a discussion of forecasting, see Wooldridge, pp. 652 – 61.

[268] For methodology, see Singer Merits Report, ¶ 145.

[269] Production to Singer Merits Report, Master Damages Spreadsheet.xlsx tab "Group A Overcharges."

Contains Highly Confidential Information—Subject to Protective Order

indeed, it is not at all apparent why this would be the case.  Moreover, Dr. Singer assumes that the decline in price more than 4 years after the end of TOI's exclusive agreements would be just as swift as it was in the year immediately after the agreements were terminated, and once again Dr. Singer offers no evidence why such an assumption should be considered reasonable.

### 3.   Dr. Singer's Lens Caster Foreclosure is Misspecified and Relies on Inaccurate Data

219.   As mentioned above, Dr. Singer also puts forth a damages model based on TOI's lens caster foreclosure share.[270]  Dr. Singer attempts to estimate the share of the photochromic segment covered by TOI's exclusive contracts and refers to that as the foreclosure share. He then determines the effect that increases in his foreclosure share have on TOI's prices. The model assumes that the market is limited to photochromic lenses, which I have shown is not the case.  But even putting that significant error aside, this model suffers from the same problems as the before-after model discussed above.

220.   Similar to his before-after model, Dr. Singer provides four different specifications of his lens caster foreclosure model, two in Table 10 and two in Appendix A, each relying on the TOI transactional dataset.  In each specification the dependent variable is the natural log of price paid to TOI by lens casters.  The key explanatory variable is the twelve-month moving average of the monthly lens caster foreclosure share.  Like the before-after model, each specification also includes control variables that Dr. Singer alleges "may also affect price," such as cost, median household income, median age, and a time trend.[271]  And, like the before-after model, Dr. Singer has two controls for product mix, one model using product mix dummy variable controls for lens material, design, coat, and generation, and the other model using "product fixed effects," which integrates the four different lens components and combines them into one variable fixed effect.

221.   Once again, Dr. Singer uses incorrect cost data in the TOI transactional dataset in two of his specifications.  Because a regression model using incorrect data should not be relied upon, my critique below focuses only on the lens caster foreclosure model which relies on the correct data and is reported in Dr. Singer's Appendix A.

222.   The results of Dr. Singer's foreclosure model are similar to the results of his before-after model.  Notably, the signs on age and income, when using the correct costs, are counter to economic intuition.  But, when those two variables are removed, the significance on his key variable, the foreclosure share, disappears.

223.   Furthermore, interacting TOI's foreclosure share variable with customer fixed effects shows how prices paid by individual lens casters react to changes in TOI's lens caster

---

[270] As I describe in Section 4 below, this model is different from the exclusivity model that Dr. Singer put forth in his class certification report.

[271] Singer Merits Report, ¶ 150.

Contains Highly Confidential Information—Subject to Protective Order

foreclosure share.  Running Dr. Singer's lens caster foreclosure model by customer with the corrected costs, dropping median income and median age, shows only Pixel, Seiko, Shamir, Sola, and Tecni-Lens have a significant and positive coefficient on the foreclosure share variable.  These customers accounted for only 3 percent of sales from March 2006 through May 2011.  The fact that only five customers were impacted provides further evidence that Dr. Singer has not demonstrated impact or injury on a Class-wide basis.  Further, EOA did not experience higher prices with an increase in TOI's foreclosure share.[272]  Again, because EOA did not experience higher prices with an increase in even Dr. Singer's erroneous foreclosure share model after the age and income variables are removed, there are no damages to Group B or C customers.  I report these results in **Exhibit 14**.

### 4.     Dr. Singer Did Not Use the Lens Caster Exclusivity Model Presented in Class Certification

224.    The foreclosure model that Dr. Singer presented in his merits report is not the same model that he proposed in his class certification report.[273]  In his class certification report, Dr. Singer sought to estimate the causal effect of TOI's "exclusivity share," which he defined as the percentage of TOI's sales to customers that were covered by "exclusive agreements," on the price paid to TOI by customers at the lens caster level.[274]  In his class certification report, Dr. Singer claimed that if the average price paid by a lens caster increased in response to an increase in exclusivity share, holding constant all other factors affecting the lens caster's price, then the lens caster was affected by the alleged conduct at issue.  Dr. Singer chose only to present a modified version of his exclusivity model in Appendix B, Table B-1 of his merits report.

225.    Dr. Singer's initial model does not support the findings of his current report.  Applying the exclusivity model that Dr. Singer put forth in his class certification report to the same data that he used throughout his merits report (i.e. dropping variables for age, income, and monthly time trends) shows that the magnitude of exclusivity share coefficient falls from 0.27, his result found in his class certification report, to 0.01.  It should also be noted that the coefficient for the exclusivity share is no longer significant in Dr. Singer's

---

[272] It should be noted that Dr. Singer's foreclosure shares are wrong.  This occurs because, in the data that Dr. Singer relied upon, TOI's sales to Sola, which was an exclusive TOI customer prior to its acquisition by Carl Zeiss in 2005, were not appropriately identified in the data for the period 2000 – 2005.  Those sales were incorrectly attributed to Carl Zeiss, and Dr. Singer has not appropriately reclassified those sales.  I understand that sales to Carl Zeiss in late 2005 and 2006 were exclusive under Sola's agreement with TOI.  Correcting Dr. Singer's foreclosure shares shows similar results, and that even in the model with the corrected foreclosure shares EOA did not experience higher prices associated with higher foreclosure shares.

[273] I further address this model in Section 3 above.

[274] Singer Class Cert Report, ¶¶ 152 – 154.

Contains Highly Confidential Information—Subject to Protective Order

specification 2 after applying the "product fixed effects" that Dr. Singer endorses in his merits reports.  I present the results of these regressions in **Exhibit 15**.[275]

## E.    Group B and C Class Members Alleged Damages Are Not Caused by TOI's Conduct

226.    Dr. Singer claims that TOI's allegedly exclusionary conduct is statistically associated with higher prices paid by lens casters, and these increases are transferred further down the supply chain to class members in groups B and C.[276]  However, as discussed above, there is no reason to believe that TOI's allegedly exclusionary conduct is statistically associated with higher prices paid by lens casters generally, or EOA specifically.  Therefore, the methodology used by Dr. Singer to show that price increases to EOA were transferred to Group B and C class members is irrelevant.  Put simply, if there are no anticompetitive overcharges at the direct customer level, then there can be no downstream damages.

227.    Additional flaws, discussed below, associated with his price transfer regressions, also make Dr. Singer's conclusions on the impact to Group B and C customers unreliable.

## 1.    Specific Flaws in Dr. Singer's Price Transfer Models for Group B

228.    To estimate the effects of TOI's allegedly exclusionary conduct on proposed Class members in Group B, Dr. Singer estimates the percentage of the allegedly higher prices paid by EOA to TOI that are passed through to EOA's downstream customers – wholesale labs and retailers.  To do so, Dr. Singer combines TOI's transactional data with sales data from EOA business units that sell to Group B (IDD, IR, Nassau, and Retail).[277]  Prices paid by EOA customers (Group B Class members) for the each product over time are derived from the EOA sales data while the prices paid by EOA to TOI for those products are derived from TOI's transactional sales data.

229.    Dr. Singer proposes two regression specifications to assess econometrically the extent to which an increase in input prices (TOI's sales prices) was transferred by EOA to Group B Class members.[278]  In each specification the dependent variable is the natural log of price paid to EOA by Group B Class members.  The key explanatory variable is the price paid by EOA to TOI for the lenses.  Each specification also includes control variables similar to those incorporated in his Group A models, including median household income, median age, a yearly time trend, monthly fixed effects, and buyer fixed effects.[279]  Again,

---

[275] For the same reason I mention above, Dr. Singer's exclusivity shares are incorrect as well.  However, correcting his exclusivity shares shows similar results as are described here.

[276] Singer Merits Report, ¶ 161.

[277] Singer Merits Report, ¶ 155.

[278] Singer Merits Report, Table 11, Specifications 1 and 2, p. 96.

[279] Singer Merits Report, ¶¶ 157 – 8.

Contains Highly Confidential Information—Subject to Protective Order

as with his Group A analysis, his first specification uses product mix dummy variables and his second specification uses "product fixed effects."

230.   For the same reasons discussed above, Dr. Singer's use of product mix dummy variables fails to account fully for differences in product quality that result in different prices charged for different products.  However, in a model of cost pass-through, these differences are magnified.  Because the purpose of this model is to determine to what degree costs are passed along, it is important to isolate the cost differences.  Mixing products with different price points by either using a simple set of product mix dummies or not defining the "product fixed effects" with enough granularity omits important differences in product quality that affect prices.  The omission of such key variables results in a problem called omitted variable bias, which leads to biased and unreliable results.  Thus, while both specifications are flawed, Dr. Singer's first specification is more unreliable, so I focus primarily his second specification.[280]

231.   But even in Dr. Singer's second specification, his proposed "product fixed effects" still do not fully control for differences between products.  Like his Group A regressions, Dr. Singer builds his "product fixed effects" by combining the four product characteristics he used in his product mix dummy specification: lens material, lens design, lens coating (uncoated or hard), and lens generation.  However, Dr. Singer's current model has taken a step back in terms of granularity.  The model presented in the Singer Class Cert Report used a lens design that not only took into account the category of lens (e.g., FSV or SFSV), but also the brand of lens (e.g., Accolade or Comfort).  In his current model, Dr. Singer no longer controls for the brand, but does not address why he made this change.  Because these brands have different characteristics and price points, brand is likely an important control variable and thus likely important to include in his model.[281]

232.   In my opinion, keeping the design variable in its more extended form, as Dr. Singer originally proposed in his class report, is the appropriate methodology to control for differences in product quality and price more fully. In fact, the use of a standard econometric test shows the importance of including this more complete set of product controls, which accounts for brand differences, relative to the "product fixed effects" that Dr. Singer used. The test strongly rejects the model with Dr. Singer's "product fixed effects" in favor of the model with the more complete set of "product fixed effects" accounting for brand differences.  Using the design variable Dr. Singer put forth in his class report to construct the "product fixed effects," but otherwise not changing his model specification, I find a statistically insignificant coefficient of 0.02 on the cost variable instead of a statistically significant coefficient of 0.76 as found by Dr. Singer in his Table 11, column 2 of his merits report. In other words, if I keep the same design variable as

---

[280] I was unable to exactly replicate Dr. Singer's regression results using the code and data provided in his backup materials.  The discrepancies are minor, however, and do not materially impact the results of the analyses.

[281] **Exhibit 16** provides examples of different prices for different brands with similar costs and the same specifications for lens material, lens coating, and lens generation that were collapsed by Singer in the same "progressive" category of his lens design variable used to construct his "product fixed effects" specification.

Contains Highly Confidential Information—Subject to Protective Order

Dr. Singer originally proposed in his class report, and use exactly the same specification as Dr. Singer's regression presented in Table 11, Column 2, I find no statistically significant price transfer effects from EOA to Group B Class members.

233.   As mentioned above, Dr. Singer's price transfer regression also added age and income in to the Group B regression he proposed in the class certification phase.  And, like the Group A results, the signs on these variables are not robust and in some cases counter to economic theory.  For example, while income has the expected sign in both Group B specifications it is not significant in one of them, and age has the wrong sign in both models.  Removing the variables does not change the results in any meaningful way; the coefficient on the pass-through variable is still small and positive, but statistically insignificant.  The results for all of the modifications discussed above that I perform to Dr. Singer's specification presented at Table 11, column 2 of his merits report can be found in **Exhibit 17**.

## 2.    Specific Flaws in Dr. Singer's Price Transfer Models for Group C

234.   Dr. Singer's Group C Class members are made up of customers purchasing from ELOA.  Because ELOA does not buy directly from TOI, Dr. Singer estimates the price transfer effect in two steps.  First, the transfer from EOA to EOLA, then the transfer from EOLA to retailers and ECPs.  Dr. Singer refers to his first step as his Group C Upstream models and the second step as the Group C Downstream models.  Ultimately, to estimate the effect on Group C, Dr. Singer multiplies his Upstream and Downstream transfer estimates together.

235.   Dr. Singer's Upstream model is exactly the same as his Group B model.  It uses the same type of EOA data, just for a different business unit, EEP, which makes sales to ELOA.  The variables, including the way he builds his "product fixed effects," are identical to the Group B model and, therefore, each of the criticisms I discussed above with respect to his Group B models hold for his Group C Upstream models.   Adjusting Dr. Singer's Group C Upstream model to account for his more granular lens design variable that includes the lens brand results in a small, positive, and significant coefficient on the cost variable, which is his variable of interest.  The coefficient is about 0.17, which implies that a 1 percent increase in price would lead to a 0.17 percent increase in the price passed from EOA to ELOA.  While statistically significant, this value is much smaller than the 0.94 value Dr. Singer reports using the fixed effects built off of his new, less granular lens design variable.

236.   Dr. Singer's Downstream models are structured in much the same way that his Group B and Group C Upstream models are structured, but they rely upon data from ELOA.  Because these models require a different set of data, there are two distinct differences between these sets of models. The "product fixed effects" are different between the Group B and Upstream models and the Downstream model.  However, he again has chosen to use a less granular lens design definition that ignores the brand information that he has in the data.  Even using this less granular lens design, the coefficient on his lens

Contains Highly Confidential Information—Subject to Protective Order

cost of about 0.49, would lead to a 0.09 percent change in the price charge by ELOA for a 1 percent change in the price charged by TOI.  Using the more granular approach in his Group C Downstream model produces a nonsensical result: raising the price to ELOA results in lower prices to retailers and labs.[282]

237.    Dr. Singer has also included age and income in his Group C regressions and the results are further evidence that these variables are not having the effect Dr. Singer intended.  In his Upstream model the age coefficient is negative and significant in his product fixed effect version, but positive and significant in his Downstream models.  Income is positive in his Upstream specifications, but negative and significant in the Downstream specifications.  This is further support for not including these variables.  Removing both age and income from the Group C Upstream and Downstream models does not have a marked impact on the results.  The results for all the modifications discussed above that I perform to Dr. Singer's specifications presented at Table 11, columns 4 (for Group C Upstream) and 6 (for Group C Downstream) of his merits report can be found in **Exhibit 18** and **Exhibit 19**, respectively.

238.    The foregoing discussion demonstrates that the models that Dr. Singer constructs to estimate damages due to alleged overcharges by TOI are flawed and unreliable.  For the reasons I state above, Dr. Singer's models cannot be relied upon to calculate damages due to Defendants' allegedly anticompetitive conduct.

## F.    Specific Flaws in Dr. Singer's Analysis of Rebates

239.    As discussed above, record evidence shows some lens casters, retailers, and wholesale labs received rebates and other incentives from TOI for exclusive or preferred purchasing of TOI photochromic products.  Rebates paid to lens casters were typically set at a fixed percentage of the lens casters' dollars purchased.  As noted in the Leonard Class Cert Report, lens casters and resellers receive rebates from TOI for marketing, growth, and other promotional efforts while working with TOI to increase sales of TOI's products to the benefit of both TOI and the lens caster or reseller.[283]

240.    Dr. Singer opines that it is not necessary to adjust his damages calculations to account for rebates, though he does then make such an adjustment if the court determines it is appropriate.[284]

241.    Rebates are an important factor that lens casters and resellers take into account when making their purchasing decisions and cannot be dismissed as irrelevant to price determination.  For example, price negotiations between lens casters and resellers are often resolved by TOI making concessions by increasing BBFs or other marketing funds

---

[282] This is further evidence that Dr. Singer's approach is not robust.

[283] Leonard Class Cert Report, ¶ 91.

[284] Singer Merits Report, ¶¶ 171 – 92.

Contains Highly Confidential Information—Subject to Protective Order

to a particular lens caster or reseller.[285]  Further record evidence on this matter shows lens casters and resellers rely on these financial incentives.[286]

242.    Because TOI's rebates affect the prices paid by lens casters and resellers, there is no justification for presenting a damages analysis without these adjustments.  Rebates are an important factor in the purchasing decisions of lens casters and resellers, and therefore rebates and incentive payments cannot and should not simply be ignored, as Dr. Singer suggests. In the event that the Court finds that rebates are necessary in estimating damages, it is appropriate to reduce damages using the alternative approach suggested by Dr. Singer, in which case, final damages, if found, should be reduced by approximately ▮▮▮▮▮▮▮ to account for the rebates and incentives offered by TOI.[287]

## IX.    Inconsistencies in the Analyses of Dr. Singer and Dr. French

243.    Dr. Singer and Dr. Gary L. French, expert for the end consumer Plaintiffs in a separate action, employ similar models to estimate the impact of TOI's alleged anticompetitive conduct on price.  In particular, both experts use a "before-after" model to ascertain how prices that TOI charged to lens casters increased due to the company's exclusive agreements using an "after" period where TOI no longer was party to any such agreements.  However, the but-for prices calculated by the two experts diverge significantly.

244.    Dr. Singer constructs his model to estimate an overcharge that increases over time.  He concludes that absent TOI's exclusive agreements, price would have fallen by 0.35 to 0.39 percent each month for 53 months after the agreements ended.[288]  In Dr. Singer's model, the smallest alleged overcharge occurs at the beginning of the damage period and grows to about 19 to 21 percent by the end of the damage period.[289]  Dr. Singer assumes that in the but-for world TOI's exclusive agreements would have ended in March 2006, and the impact of those agreements would have increased over the next 53 months, peaking at nearly at 19 to 21 percent in July 2010 before falling slightly through May 2011.

245.    In contrast, Dr. French's model assumes a different overcharge structure.  He estimates a separate overcharge for each year from 2000 through 2010 and finds that the but-for price

---

[285] Conversation with David Cole, November 1, 2012.

[286] 

[287] See Singer Merits Reports, ¶¶ 190 – 1.

[288] Singer Merits Report, ¶ 145.

[289] Singer Merits Report, ¶ 145.

Contains Highly Confidential Information-- Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 12

# Coefficient Sign and Statistical Significance of Demand Drivers in Dr. Singer's Regression Models

|  | Coefficient Sign and Statistical Significance | | | |
|  | Median Age | | Median Income | |
|  | Corrected Costs | Erroneous Costs | Corrected Costs | Erroneous Costs |
|  | (a) | (b) | (c) | (d) |
| **Cross-Price Elasticity Regression** | | | | |
| Spec 1 | Negative | Negative | Positive* | Positive* |
| Spec 2 | Negative | Negative | Positive* | Positive* |
| Spec 3 | Negative | Negative | Positive* | Positive* |
| **"Before-After" Regression** | | | | |
| Spec 1 | Negative* | Negative | Negative* | Positive* |
| Spec 2 | Negative | Negative | Negative* | Positive* |
| **Lens Caster Foreclosure Regression** | | | | |
| Spec 1 | Negative* | Negative | Negative | Positive |
| Spec 2 | Negative* | Negative* | Negative* | Positive* |
| **Group B Regression** | | | | |
| Spec 1 | Negative | -- | Positive | -- |
| Spec 2 | Negative* | -- | Positive* | -- |
| **Group C Upstream Regression** | | | | |
| Spec 1 | Negative | -- | Positive | -- |
| Spec 2 | Negative* | -- | Positive | -- |
| **Group C Downstream Regression** | | | | |
| Spec 1 | Positive* | -- | Negative* | -- |
| Spec 2 | Positive* | -- | Negative* | -- |

-- not applicable

Note: * denotes that the variable is statistically significant at the 5% level.

Sources: Merits Report of Hal J. Singer, Ph.D., September 30, 2012, Tables 1, 9 - 11, and A-1 - A-3.

Contains Highly Confidential Information–Subject to Protective Order

**Adjustments to Specification 2 of Dr. Singer's "Before-After" Model
Regression Results after Dropping Age and Income Variables**

|  | Coefficient (P-Value) | | |
|---|---|---|---|
|  |  | After Dropping Age and Income Variables | |
| Variable | Dr. Singer Table A-2, Specification 2 | Aggregate Price Change | Price Change by Customer |
| (a) | (b) | (c) | (d) |
| Before-After Indicator | -0.0045* (0.000) | -0.0015 (0.061) | -- -- |
| Natural Log of Cost | 0.3743* (0.000) | 0.3707* (0.000) | 0.3703* (0.000) |
| Year | 0.0242* (0.015) | 0.0092* (0.000) | 0.0088* (0.000) |
| Constant | -42.8403* (0.018) | -16.3293* (0.000) | -15.6611* (0.000) |
| **Customer Before-After Indicators** |  |  |  |
| Augen | -- -- | -- -- | 0.0093* (0.000) |
| Carl Zeiss | -- -- | -- -- | -0.0020 (0.053) |
| EOA | -- -- | -- -- | 0.0016* (0.005) |
| Hoya | -- -- | -- -- | -0.0005 (0.473) |
| Microvision Optical | -- -- | -- -- | 0.0106* (0.000) |
| Optima | -- -- | -- -- | 0.0119 (0.027) |
| Oakley | -- -- | -- -- | 0.0156* (0.000) |
| Pixel | -- -- | -- -- | -0.0194* (0.000) |
| REM Eyewear | -- -- | -- -- | 0.0009 (0.639) |
| Seiko | -- -- | -- -- | -0.0240* (0.000) |
| Shamir | -- -- | -- -- | -0.0107* (0.000) |
| X-Cel | -- -- | -- -- | 0.0011 (0.252) |
| Younger | -- -- | -- -- | 0.0032* (0.002) |
| "Product Fixed Effects" | Yes | Yes | Yes |
| Customer Fixed Effects | Yes | Yes | Yes |
| Monthly Fixed Effects | Yes | Yes | Yes |
| $R^2$ | 0.906 | 0.905 | 0.907 |
| Number of Observations | 30,960 | 30,960 | 30,960 |

-- not applicable

Contains Highly Confidential Information--Subject to Protective Order

Notes:  P-values are shown in parentheses; * represents coefficients that are significant at the 5% level after
        accounting for multiple comparisons.
        Standard errors are clustered by product category and month.
        Coefficients are not estimated for BBGR, Bell Sports Inc., LensCrafters, Shield Tech LLC, Sola, Signet
        Armorlite USA, Tecnol North America, Tecni-Lens, The Spectacle Lens Group, and Vision-Ease
        because of insufficient data.
        Data for model are from January 2000 through May 2011.

Source:  Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 14

**Adjustments to Specification 2 of Dr. Singer's Foreclosure Model**
**Regression Results after Dropping Age and Income Variables**

| | Coefficient (P-Value) | | |
| --- | --- | --- | --- |
| | | After Dropping Age and Income Variables | |
| Variable | Dr. Singer Table A-3, Specification 2 | Aggregate Price Change | Price Change by Customer |
| (a) | (b) | (c) | (d) |
| 12-Month Moving Average Foreclosure Share | 0.086* | 0.009 | -- |
| | (0.000) | (0.291) | -- |
| Natural Log of Cost | 0.387* | 0.385* | 0.389* |
| | (0.000) | (0.000) | (0.000) |
| Invoice Year | 0.069* | 0.010* | 0.010* |
| | (0.000) | (0.000) | (0.000) |
| Constant | -123.470* | -18.363* | -17.097* |
| | (0.000) | (0.000) | (0.000) |
| **Customer-Foreclosure Indicators** | | | |
| Augen | -- | -- | -0.070 |
| | -- | -- | (0.039) |
| Carl Zeiss | -- | -- | 0.003 |
| | -- | -- | (0.804) |
| EOA | -- | -- | -0.002 |
| | -- | -- | (0.841) |
| Hoya | -- | -- | -0.009 |
| | -- | -- | (0.397) |
| LensCrafters | -- | -- | -0.109 |
| | -- | -- | (0.639) |
| Microvision Optical | -- | -- | -0.207* |
| | -- | -- | (0.000) |
| Optima | -- | -- | -0.177* |
| | -- | -- | (0.000) |
| Oakley | -- | -- | -0.231* |
| | -- | -- | (0.000) |
| Pixel | -- | -- | 0.307* |
| | -- | -- | (0.000) |
| REM Eyewear | -- | -- | -0.021 |
| | -- | -- | (0.574) |
| Seiko | -- | -- | 0.204* |
| | -- | -- | (0.000) |
| Shamir | -- | -- | 0.134* |
| | -- | -- | (0.000) |
| Sola | -- | -- | 0.950* |
| | -- | -- | (0.000) |
| Signet Armorlite | -- | -- | -0.962 |
| | -- | -- | (0.423) |
| Tecni-Lens | -- | -- | 1.179* |
| | -- | -- | (0.000) |
| Vision-Ease | -- | -- | 0.161 |
| | -- | -- | (0.213) |
| X-Cel | -- | -- | -0.038* |
| | -- | -- | (0.000) |
| Younger | -- | -- | -0.055* |
| | -- | -- | (0.000) |

Contains Highly Confidential Information--Subject to Protective Order

**Adjustments to Specification 2 of Dr. Singer's Foreclosure Model**
**Regression Results after Dropping Age and Income Variables**

| | Coefficient (P-Value) | | |
| --- | --- | --- | --- |
| | | After Dropping Age and Income Variables | |
| Variable | Dr. Singer Table A-3, Specification 2 | Aggregate Price Change | Price Change by Customer |
| (a) | (b) | (c) | (d) |
| "Product Fixed Effects" | Yes | Yes | Yes |
| Customer Fixed Effects | Yes | Yes | Yes |
| Monthly Fixed Effects | Yes | Yes | Yes |
| $R^2$ | 0.913 | 0.912 | 0.914 |
| Number of Observations | 22,197 | 22,197 | 22,197 |

-- not applicable

Notes: P-values are shown in parentheses; * represents coefficients that were significant at the 5% level after
accounting for multiple comparisons.
Standard errors are clustered by product and year.
Data for model are from January 2000 through May 2011.

Source: Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

Contains Highly Confidential Information--Subject to Protective Order
Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 15

## Adjustments to Dr. Singer's Merits Exclusivity Model
## Consistent with His Class Certification Model

| Variable | Coefficient (P-Value) | | |
| --- | --- | --- | --- |
| | Dr. Singer's Class Cert. Model [1] | Adjusted Merits Specification 1 [2] | Adjusted Merits Specification 2 [2] |
| (a) | (b) | (c) | (d) |
| 12-Month Moving Average Exclusivity Share | 0.271* | 0.010* | 0.006 |
| | (0.000) | (0.043) | (0.179) |
| Natural Log of Cost | 0.481* | 0.385* | 0.384* |
| | (0.000) | (0.000) | (0.000) |
| Invoice Year | -0.011* | 0.012* | 0.010* |
| | (0.003) | (0.000) | (0.000) |
| Constant | 23.141* | -22.908* | -17.596* |
| | (0.001) | (0.000) | (0.000) |
| "Product Fixed Effects" | No | No | Yes |
| Product Mix Dummy Variables | Yes | Yes | No |
| Customer Fixed Effects | Yes | Yes | Yes |
| Monthly Fixed Effects | No | No | No |
| $R^2$ | 0.930 | 0.883 | 0.912 |
| Number of Observations | 945 | 22,197 | 22,197 |

Notes: P-values are shown in parentheses; * represents coefficients that are significant at the 5% level.

Standard errors are clustered by product and year.

Data from model are from January 2000 through May 2011.

[1] The exclusivity model Dr. Singer put forth in his class certification report is identical to that which he puts forth in his merits report, except that he does not include the age and income variables from the specification in the former report. See Class Certification Report of Hal J. Singer, Ph.D., June 15, 2012, Table 11, Specification 1.

[2] I have adjusted Dr. Singer's model to incorporate the TOI Transaction data he uses in his merits report rather than the price card data Dr. Singer used in his class certification report.

Sources: Backup materials to Class Certification Report of Hal J. Singer, Ph.D., June 15, 2012;

Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

Contains Highly Confidential Information--Subject to Protective Order

## Quarterly Weighted Average Prices of Varilux PAL Lenses by Brand
## Plastic Hard-Coated Lenses from the T6 Generation
## Q1 2008 through Q3 2012



Source: Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

NERA Economic Consulting

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 17

**Summary of Specification Testing on Dr. Singer's Group B Price Transfer Regression Model**

| Variable | Coefficient (P-Value) | | | |
|---|---|---|---|---|
| | Dr. Singer Table 11, Specification 2[1] | Dropping Non-Robust Controls [2] | Accounting for Brand Differences [3] | Dropping Non-Robust Controls and Accounting for Brand Differences [4] |
| (a) | (b) | (c) | (d) | (e) |
| Natural Log of Cost | 0.762* | 0.759* | 0.024 | 0.019 |
| | (0.000) | (0.000) | (0.421) | (0.561) |
| Year | 0.033* | -0.005* | 0.021* | -0.008* |
| | (0.001) | (0.000) | (0.000) | (0.000) |
| Income | 0.002* | -- | 0.001 | -- |
| | (0.020) | -- | (0.152) | -- |
| Age | -0.206* | -- | -0.165* | -- |
| | (0.000) | -- | (0.000) | -- |
| Constant | -64.970 | 11.946 | -38.594 | 20.845 |
| | (0.132) | (.) | (.) | (0.420) |
| "Product Fixed Effects" | Yes | Yes | Yes | Yes |
| Accounting for Brand Differences[5] | No | No | Yes | Yes |
| Buyer Fixed Effects | Yes | Yes | Yes | Yes |
| Monthly Fixed Effects | Yes | Yes | Yes | Yes |
| Dropping Age and Income | No | Yes | No | Yes |
| $R^2$ | 0.850 | 0.850 | 0.878 | 0.878 |
| Number of Observations | 375,191 | 375,191 | 375,191 | 375,191 |

-- not applicable

Notes: P-values are shown in parentheses.
* represents coefficients that are significant at the 5% level.
Data for model are from January 2005 through July 2012.
The results shown here are produced using double precision.

[1] I was unable to exactly replicate Dr. Singer's regression results using the code and data provided in his backup materials.

[2] This adjustment takes Dr. Singer's Specification from column b and drops the variables for age and income.

[3] This adjustment takes Dr. Singer's Specification from column b and accounts for brand differences.

[4] This adjustment takes Dr. Singer's Specification from column b and accounts for brand differences and drops the variables for age and income.

[5] I expand on Dr. Singer's design variable used to create his product fixed effects to account for brand differences. Whereas Dr. Singer groups Accolade, Adaptar, Comfort, Definity, Ellipse, Espera, Liberty, Natural, Ovation, Panamic, and others as "progressive" or "PAL," I treat each brand separately.

Source: Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

Contains Highly Confidential Information--Subject to Protective Order

## Summary of Specification Testing on Dr. Singer's Group C Upstream Price Transfer Regression Model

| Variable | Coefficient (P-Value) | | | |
| --- | --- | --- | --- | --- |
| | Dr. Singer Table 11, Specification 4 | Dropping Non-Robust Controls [1] | Accounting for Brand Differences [2] | Dropping Non-Robust Controls and Accounting for Brand Differences [3] |
| (a) | (b) | (c) | (d) | (e) |
| Natural Log of Cost | 0.938* | 0.934* | 0.170* | 0.165* |
| | (0.000) | (0.000) | (0.000) | (0.000) |
| Year | 0.028* | 0.003* | 0.009 | 0.000 |
| | (0.039) | (0.003) | (0.129) | (0.665) |
| Income | 0.000 | -- | -0.001 | -- |
| | (0.644) | -- | (0.052) | -- |
| Age | -0.146* | -- | -0.064* | -- |
| | (0.039) | -- | (0.040) | -- |
| Constant | -50.492* | -5.990* | -12.953 | 2.106 |
| | (0.042) | (0.008) | (0.229) | (0.081) |
| | | | | |
| "Product Fixed Effects" | Yes | Yes | Yes | Yes |
| Accounting for Brand Differences [4] | No | No | Yes | Yes |
| Buyer Fixed Effects | Yes | Yes | Yes | Yes |
| Monthly Fixed Effects | Yes | Yes | Yes | Yes |
| Dropping Age and Income | No | Yes | No | Yes |
| | | | | |
| $R^2$ | 0.914 | 0.914 | 0.951 | 0.951 |
| Number of Observations | 252,385 | 252,385 | 252,385 | 252,385 |

-- not applicable

Notes: P-values are shown in parentheses.
* represents coefficients that are significant at the 5% level.
Data for model are from January 2005 through July 2012.
The results shown here are produced using double precision.

[1] This adjustment takes Dr. Singer's Specification from column b and drops the variables
for age and income.
[2] This adjustment takes Dr. Singer's Specification from column b and accounts for brand differences.
[3] This adjustment takes Dr. Singer's Specification from column b and accounts for brand differences and
drops the variables for age and income.
[4] I expand on Dr. Singer's design variable used to create his product fixed effects to account for brand
differences.  Whereas Dr. Singer groups Accolade, Adaptar, Comfort, Definity, Ellipse, Espera, Liberty,
Natural, Ovation, Panamic, and others as "progressive" or "PAL," I treat each brand separately.

Source: Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.

Contains Highly Confidential Information--Subject to Protective Order

## Summary of Specification Testing on Dr. Singer's Group C Downstream Price Transfer Regression Model

| Variable | Coefficient (P-Value) | | | |
|---|---|---|---|---|
| | Dr. Singer Table 11, Specification 6 | Dropping Non-Robust Controls [1] | Accounting for Brand Differences [2] | Dropping Non-Robust Controls and Accounting for Brand Differences [3] |
| (a) | (b) | (c) | (d) | (e) |
| Natural Log of Cost | 0.494* | 0.490* | -0.073* | -0.060* |
| | (0.000) | (0.000) | (0.000) | (0.000) |
| Year | -0.042* | -0.003* | 0.041* | 0.000 |
| | (0.002) | (0.013) | (0.000) | (0.373) |
| Income | -0.004* | -- | 0.001 | -- |
| | (0.000) | | (0.136) | |
| Age | 0.195* | -- | -0.225* | -- |
| | (0.005) | | (0.000) | |
| Constant | 80.867* | 9.558* | -68.887* | 6.205* |
| | (0.001) | (0.000) | (0.000) | (0.000) |
| "Product Fixed Effects" | Yes | Yes | Yes | Yes |
| Accounting for Brand Differences [4] | No | No | Yes | Yes |
| Seller Fixed Effects | Yes | Yes | Yes | Yes |
| Monthly Fixed Effects | Yes | Yes | Yes | Yes |
| Dropping Age and Income | No | Yes | No | Yes |
| $R^2$ | 0.730 | 0.730 | 0.758 | 0.758 |
| Number of Observations | 3,096,039 | 3,096,039 | 3,096,039 | 3,096,039 |

-- not applicable

Notes: P-values are shown in parentheses.
* represents coefficients that are significant at the 5% level.
Data for model are from January 2005 through July 2012.
The results shown here are produced using double precision.

[1] Taking Dr. Singer's Specification from column b and dropping the variables for age and income.

[2] Taking Dr. Singer's Specification from column b and accounting for brand differences.

[3] Taking Dr. Singer's Specification from column b and accounting for brand differences and dropping the variables for age and income.

[4] I expand on Dr. Singer's design variable used to create his product fixed effects to account for brand differences. Whereas Dr. Singer groups Accolade, Adaptar, Comfort, Definity, Ellipse, Espera, Liberty, Natural, Ovation, Panamic, and others as "progressive" or "PAL," I treat each brand separately.

Source: Backup materials to Merits Report of Hal J. Singer, Ph.D., September 30, 2012.