UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE: PHOTOCHROMIC LENS
ANTITRUST LITIGATION

MDL Case No.: 8:10-MD-2173-T-27EAJ

_____/

## REPORT AND RECOMMENDATION

Before the Court are **Indirect Purchaser End-User Plaintiffs' Amended Motion for Class Certification and Memorandum of Law in Support** (Dkt. 290), **Defendant Transitions Optical, Inc.'s Memorandum in Opposition to Indirect Purchaser End-User Plaintiffs' Motion for Class Certification** (Dkt. 446), and **Indirect Purchaser End-User Plaintiffs' Reply in Support of Their Motion for Class Certification** (Dkt. 451).[1] Gregory Leonard, Ph.D. ("Dr. Leonard") testified for Transitions Optical, Inc. ("Defendant") at the hearing on the motion for class certification.[2]

The Court has reviewed the parties' briefs, their supporting affidavits including expert reports, and the transcript from the hearing. After due consideration, the Court recommends denying the motion for the proposed classes of Indirect Purchaser End-User Plaintiffs ("Indirect Purchaser Plaintiffs").

---

[1] Also before the Court are the Declaration of Christopher C. Casper in Support of the Indirect End-Payor Plaintiffs' Motion for Class Certification (Dkt. 308), Declaration of Janet S. Netz, Ph.D (Dkt. 448), Expert Report of Gary L. French, Ph.D. (Dkt. 449), Declaration of Erich P. Schork Filed in Support of Indirect Purchaser End-User Plaintiffs' Reply in Support of Their Motion for Class Certification (Dkt. 354), Declaration of Daniel P. Weick in Opposition to Indirect Purchaser End-User Plaintiffs' Motion for Class Certification (Dkt. 326), and Expert Report of Gregory K. Leonard, Ph.D., Indirect Purchaser Action (Dkt. 447).

[2] The motion was referred to the undersigned for a report and recommendation. (Dkt. 296)

**Background**

This case involves photochromic lenses, or prescription eyeglasses that darken automatically when exposed to ultraviolet light and fade back to clear indoors. Indirect Purchaser Plaintiffs[3] allege that Defendant, the leading maker of photochromic lens treatments, engaged in anticompetitive conduct that ultimately caused Indirect Purchaser Plaintiffs to pay artificially inflated prices for their photochromic eyeglasses.

Starting at the top of the distribution chain,[4] Indirect Purchaser Plaintiffs claim that Defendant's conduct raised prices for the lens casters that distribute Defendant's lenses to wholesale laboratories. (Dkt. 290 at 12) In turn, the laboratories sold the lenses at higher prices to other entities, including independent eye care practitioners and retail chains. At the bottom of the chain, consumers allegedly paid artificially high prices as the entities above passed on the increased costs.

Indirect Purchaser Plaintiffs contend that Defendant exercised control at all levels of distribution. For example, they claim that Defendant entered into long-term exclusionary agreements with more than fifty (50) retailers nationwide, including many of the largest retail chains in the country such as Sears, Target, and Costco. (Dkt. 290 at 13; Dkt. 434 at 146) Additionally, Defendant required wholesale laboratories to sell its lenses on a preferential basis and prohibited them from promoting competitors' brands. (Dkt. 290 at 13) Indirect Purchaser Plaintiffs assert that

---

[3] In addition to the proposed class in this motion, there also is a proposed class of Direct Purchaser Plaintiffs and a non-class plaintiff, Insight Equity A.P.X. d/b/a Vision-Ease Lens Worldwide. As stated below, this Court has recommended denying Direct Purchaser Plaintiffs' motion for class certification. (Dkt. 471)

[4] A diagram that illustrates the distribution chain from Defendant to consumers is included in App. I.

such practices kept competitors from gaining access to substantial portions of the market, thereby depriving consumers of lower-priced options. (Dkt. 434 at 147)

According to Plaintiffs, these practices attracted the attention of the Federal Trade Commission ("FTC"), which began investigating Defendant in 2009. In April 2010, the FTC and Defendant entered into a consent decree that bars Defendant from enforcing exclusionary arrangements and other conduct.

Here, Indirect Purchaser Plaintiffs seek certification of a class comprising individual consumers who purchased photochromic lenses manufactured or distributed by Defendant for the consumer's own use from 1999 to the present. The class representatives[5] are suing Defendant under the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 et seq. (Count I); state antitrust laws (Count II); state consumer protection and unfair practices act laws (Count III); and unjust enrichment (Count IV). (Dkt. 186 at 26-39)

Indirect Purchaser Plaintiffs' motion for class certification proposes three classes in the alternative as follows:

>   (1)  a twenty-seven repealer[6] jurisdiction class under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat.

---

[5] Indirect Purchaser Plaintiffs' class representatives are Howard Achtman of Michigan; Keith Forbes of Maine; Keith Brian Roller of Florida; Axhi Sabani of Wisconsin; Eldridge Donald Wilcox of Kansas; John Donohoe, Amanda Gable, and Caryl O'Keefe of California; and Gabby Klein, Edmund Moores, and Phyllis Sternemann of New York.

[6] Indirect purchasers do not have standing to sue for antitrust injury under the Sherman Act pursuant to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). However, some states have enacted laws extending antitrust standing to indirect purchasers, or consumers. Sullivan v. DB Invs., Inc., 667 F.3d 273, 293 (3d Cir. 2011) (citation and footnote omitted). These states are referred to as "Illinois Brick repealers," or repealer jurisdictions. Id.

     §§ 501.201 et seq.;[7]
(2) a seven-repealer state antitrust, consumer protection and/or unjust enrichment class for the class representatives' states – California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin; or
(3) a Florida consumer protection and/or unjust enrichment class with certification in the other states to be determined by the transferor courts upon MDL remand.

(Dkt. 290 at 15)

Although three options are presented, Indirect Purchaser Plaintiffs emphasize the first proposal for a nationwide class encompassing twenty-seven jurisdictions.

## **Legal Standard**

The class advocate bears the burden of showing that the requirements of Federal Rule of Civil Procedure 23 are satisfied. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997). Under Rule 23(a), plaintiffs must prove numerosity, commonality, typicality, and adequacy of representation. In addition, at least one subsection of Rule 23(b) must be satisfied. Vega v.

---

[7] Indirect Purchaser Plaintiffs describe the twenty-seven repealer jurisdiction class as:

All persons who indirectly purchased photochromic lenses manufactured and/or distributed by Transitions, for their own use and not for resale, at any time from January 1, 1999, to the present (the "Class") in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, and/or Wisconsin. Excluded from the Class are Transitions and its parents, subsidiaries, and affiliates; all federal, state, or local governmental entities; and any judge or judicial officer presiding over this matter.

(Dkt. 290 at 11 n.4)

Specifically, Indirect Purchaser Plaintiffs contend that Defendant violated FDUTPA by: (1) conduct that amounted to unfair methods of competition and unfair acts in the conduct of trade and commerce under Fla. Stat. § 501.204(1); (2) violating standards of fairness as set forth and interpreted by the Federal Trade Commission or the federal courts under Fla. Stat. § 501.203(3)(b); and (3) practices that constituted an unlawful monopolization or attempt to monopolize pursuant to Fla. Stat. § 501.203(3)(c).

4

T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009) (footnote and citation omitted). Indirect Purchaser Plaintiffs seek certification under Rule 23(b)(3), which requires that common questions of law or fact predominate and that a class action is superior to other methods for adjudicating the case.

While a court must conduct a "rigorous analysis" to determine whether the requirements of Rule 23 have been satisfied, Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (citation omitted), class certification is not a decision on the merits of the underlying suit. Thus, courts reviewing motions for class certification should "avoid merits determinations to the extent practicable[.]" Babineau v. Fed. Express Corp., 576 F.3d 1183, 1190 (11th Cir. 2009). However, "the court may, and sometimes must, inquire into the merits in order to determine whether the requirements of Rule 23 have been satisfied." Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co., 458 F. App'x 793, 794 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted). This is because "class determination[s] generally involve[] considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Wal-Mart, 131 S. Ct. at 2552 (citations and internal quotation marks omitted).

## Analysis

Indirect Purchaser Plaintiffs contend that they meet all the requirements of Rule 23(a) and 23(b)(3). In response, Defendant asserts that Indirect Purchaser Plaintiffs fail to satisfy adequacy under Rule 23(a) but does not challenge the remaining criteria of numerosity, commonality, and typicality. Defendant also claims that Indirect Purchaser Plaintiffs do not meet the dual requirements of predominance and superiority under Rule 23(b)(3).

The court has an independent obligation to review each element of Rule 23, even when a

defendant does not challenge a requirement. See Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1216 n.37 (11th Cir. 2003) (citations omitted). But in this case, the motion for class certification founders, at a minimum, on the predominance requirement under Rule 23(b)(3).[8] In full, Rule 23(b)(3) provides that a class action may be maintained if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Predominance is "perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." Vega, 564 F.3d at 1278 (citation omitted). In establishing that common issues control, "it is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." Klay v. Humana, Inc., 382 F.3d 1241, 1254 (l1th Cir. 2004) (citation and internal quotation marks omitted). Although similar to the commonality element of Rule 23(a)(2), "the predominance criterion is far more demanding." Amchem, 521 U.S. at 624 (citation omitted). It "imposes a more rigorous obligation upon a reviewing court to ensure

---

[8] Previously, this Court recommended denying certification for a proposed class of Direct Purchaser Plaintiffs for not satisfying adequacy under Rule 23(a) and predominance under Rule 23(b)(3). (Dkt. 471) Central to that determination was Direct Purchaser Plaintiffs' failure to demonstrate: (1) that the interests of lens casters did not fundamentally conflict with those of the class representatives as required for adequacy under Rule 23(a); and (2) a workable methodology to measure impact on all class members through common evidence under the predominance requirement of Rule 23(b)(3).

that issues common to the class predominate over those affecting only individual class members." Sullivan, 667 F.3d at 297 (citation omitted).

Among other reasons, Indirect Purchaser Plaintiffs contend that they establish predominance by showing antitrust impact on a classwide basis. They explain that their expert on class certification, Janet S. Netz, Ph.D. ("Dr. Netz") describes various methodologies to demonstrate impact on lens casters, retailers, and individual consumers. (Dkt. 448) They also contend that Gary L. French, Ph.D. ("Dr. French") confirmed Dr. Netz's findings in his subsequent expert report on the merits. (Dkt. 449) Indirect Purchaser Plaintiffs maintain that they need not show impact on every member of the class.

However, under the law of this Circuit, predominance requires a methodology capable of showing that every class member was impacted by the antitrust violation. See Shumate & Co. v. National Ass'n of Securities Dealers, Inc., 509 F.2d 147, 155 (5th Cir. 1975) ("[P]roof of injury to business or property of *each class member* is critical for the determination of defendants' liability to any individual.") (emphasis added); see also Sikes v. Teleline, Inc., 281 F.3d 1350, 1365 (11th Cir. 2002) (reversing class certification after finding that it was not possible to determine class-wide injury through common proof); Alabama v. Blue Bird Body Co., 573 F.2d 309, 327-28 (5th Cir. 1978) (reversing grant of class certification where the court expected individual inquiries to be necessary).[9]

As discussed below, because Indirect Purchaser Plaintiffs do not put forth a method for establishing sufficient impact on lens casters, they do not meet the predominance requirement for

---

[9] Decisions of the former Fifth Circuit handed down on or before September 30, 1981 are binding on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

7

23(b)(3).[10]

**A. Dr. Netz's analysis of lens casters**

Dr. Netz's report is a detailed narrative account, supported by documentary and testimonial evidence, of Defendant's business practices and her conclusions about their effect on the market for photochromic lenses. In addition, Dr. Netz undertakes several "illustrative studies" to quantify the impact of the conduct at different points in the distribution chain and ultimately measures damages in the form of "pass through" rates[11] to consumers, or the amount of overcharge resulting from the anticompetitive conduct.[12]

However, as Indirect Purchaser Plaintiffs have acknowledged, the key to any impact analysis is demonstrating that lens casters paid artificially inflated prices.[13] Without this impact at the top, there can be no overcharge to pass onto the wholesale laboratories, eye care practitioners, and retailers who eventually sell eyeglasses to consumers. And it is the ultimate purchasers, the

---

[10] A number of complex issues are raised by this motion, including whether FDUTPA can be applied extraterritorially, whether Indirect Purchaser Plaintiffs establish a workable methodology for calculating damages, and whether the statute of limitations bars some claims. Regardless of these other issues, central to the motion is whether proof of impact on the lens casters is established under the predominance requirement.

[11] Pass-through rates are routinely used to show how changes in cost impact price. (Dkt. 448 at 54) As Dr. Netz explains: "Economists refer to changes in downstream prices when upstream costs change as 'pass-through' (or 'pass-on'). Pass-through can occur at each stage of the manufacturing and distribution process." (Id.)

[12] Dr. Netz calculates pass-through rates for lens casters, wholesale laboratories, integrated optical retailers including Costco, Wal-Mart, and Sam's Club, and eye care practitioners. (Dkt. 448 at 71-81) Her results show pass-through rates exceeding 100 percent. Dr. Netz notes: "For example, if a $5 increase in costs causes prices to increase by $6, then the pass-through rate is 125 [percent]." (Id. at 55 n.201) The exact figures are redacted from the publicly available report.

[13] At the hearing on the motion, counsel for Indirect Purchaser Plaintiffs stated, "I do agree with almost everyone who stood before you and said we do have to show impact, first, at the lens caster level, and then we have to show pass-through to the customer." (Dkt. 434 at 209)

consumers, who constitute the proposed class members for Indirect Purchaser Plaintiffs.

Dr. Netz identifies three potential methods for measuring impact on lens casters, including a before-and-after approach in which prices paid by lens casters before the FTC consent decree are compared with prices paid after the FTC consent decree under the theory that prices should decrease after Defendant stopped certain business practices under the terms of the agreement. (Dkt. 448 at 64-67) The other two methodologies are: (1) tracking how Transitions lowered its prices on one particular product in response to a competitor's introduction of a similar product; and (2) comparing Transitions' prices in the United States with its prices in geographic markets with greater competition.[14] (Id. at 62-63)

Dr. Netz's description of the methodologies is mostly theoretical. Nowhere in her report does Dr. Netz document impact on each lens caster, although she summarily concludes that lens casters "suffered common impact." (Id. at 44) Additionally, Dr. Netz conducts illustrative studies to demonstrate how damages could be measured on lens casters as well as downstream sources in the distribution chain – wholesale laboratories, integrated optical retailers, and eye care practitioners. (Id. at 71-81) In her illustrative studies, Dr. Netz focuses on two of the largest lens casters, Younger and Essilor of America, to show how the prices they paid for specific products changed as Defendant's prices fluctuated over time.[15] Her precise calculations are redacted from the publicly available report. (Id. at 71-72)

---

[14] Although Dr. Netz described three methods in her report, Indirect Purchaser Plaintiffs subsequently concluded that the before-and-after approach is "most suitable." (Dkt. 451 at 13 n.13) Additionally, this is the only approach utilized by Dr. French in his merits report. (Dkt. 449 at 49-57)

[15] For example, Dr. Netz looked at changes in pricing for particular bifocal, plastic, and trifocal lenses sold by Defendant.

9

In challenging Dr. Netz's report on behalf of Defendant, Dr. Leonard contends that her models do not account for rebates paid to lens casters, variations in pricing, and other market complexities, such as the buying power of managed health organizations or large retailers such as Wal-Mart. (See Dkt. 447) Moreover, Defendant claims that Dr. Netz's use of multiple illustrative studies shows that separate calculations are needed for each entity and fails to provide a methodology based on common evidence as required. See, e.g., In re Flash Memory Antitrust Litig., No. C 07–0086, 2010 WL 2332081, at *12 (N.D. Cal. June 9, 2010) (finding that Dr. Netz's illustrative studies of five direct purchasing entities "actually underscore[d] the individualized nature of the evidence that will be required to show impact"). But see In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 601-02 (N.D. Cal. 2010) (granting motion for class certification and relying on Dr. Netz's fifty-three pass-through studies to show how defendants' overcharges to direct purchasers ultimately were passed onto consumers).

**B. Dr. French's analysis of lens casters**

In addition to Dr. Netz, Indirect Purchaser Plaintiffs rely on the merits report subsequently submitted by Dr. French, who undertook a more detailed analysis of impact on lens casters using the before-and-after approach pegged to the FTC consent decree. Using regression analysis, Dr. French estimates the percentage of overcharge to lens casters annually from 2000 through April 2010, which is the month in which the FTC consent decree was signed. (Dkt. 449 at 49-53; 92-94) Going beyond impact on lens casters, Dr. French further calculates pass-through price increases of more than 100 percent to consumers within each state included in the proposed classes.[16] (Dkt. 449 at 55, 97) Dr. French does not explain how his findings on impact to lens casters correlate with the

---

[16] The exact pass-through rates are redacted from the publicly available document.

conclusions on the same subject from Direct Purchaser Plaintiffs' expert, Hal Singer, Ph.D. ("Dr. Singer"), although Dr. French lists Dr. Singer's report as a source for his own report. (Id. at 9)

Testifying at the hearing, Dr. Leonard faulted Dr. French's calculations for, among other reasons, averaging prices that lens casters paid for Defendant's products, rather than analyzing prices paid by individual lens casters.[17] (Dkt. 434 at 168-69; 171) Instead, Dr. French explains in his report that lens casters paid "the same or similar" prices, thereby presuming that lens casters were affected in the same manner.[18] (Dkt. 449 at 39) Thus, Dr. French concludes that "all, or very nearly all" of the lens casters would have been injured by Defendant's conduct. (Id.)

Regardless of the statistical outcomes in the findings of Dr. Leonard, Dr. Netz, and Dr. French, Indirect Purchaser Plaintiffs have not demonstrated a workable methodology for establishing impact on lens casters, the same deficiency shared by Direct Purchaser Plaintiffs, whose expert concluded that 12 percent to 14 percent of lens casters were not affected by Defendant's conduct (Dkt. 441 at 10, 87-89). Yet it is indisputable that impact at the lens-caster level is also a

---

[17] Indirect Purchaser Plaintiffs dispute this characterization of Dr. French's methodology, asserting that he accounted for potential differences among lens casters by fixed-effect variables. (Dkt. 434 at 210-11) However, as discussed above, Dr. French did not use prices that were specific to each lens caster, theorizing instead that all lens casters paid similar or the same prices. Therefore, his approach is not designed to determine whether each lens caster was impacted individually.

[18] In relevant part, Dr. French explained his assumption for impact on lens casters as follows:

> TOI sells essentially all of its photochromic lenses to lens casters, a relatively small group of direct customers, at formulaic prices with common "Target Margins" for a given material and design combination. Given that TOI's pricing policy is "designed to be fair and consistent to all customers," and "pricing is based on Target Margin rather than different sell-price levels to customers," any increase in the Target Margin – the common element that links the prices across all lens casters – would impact all of TOI's customers.

(Dkt. 449 at 39 (internal footnotes omitted))

prerequisite for establishing the ultimate harm to consumers – Indirect Purchaser Plaintiffs – in the form of pass-through rates.

Although Dr. Netz theorizes that impact can be quantified through three different approaches, she fails to demonstrate how any of them establish a workable methodology.[19] Given the requirement in this Circuit to show impact on all class members using a workable methodology, this leads to the unavoidable conclusion that Indirect Purchaser Plaintiffs have failed to prove that issues common to the class predominate over those affecting only individual class members as mandated by Rule 23(b)(3)'s predominance requirement.

While the Court is mindful that class certification is not a determination on the merits, Indirect Purchaser Plaintiffs' ability to establish impact at the critical level of the lens casters depends upon the findings of their experts. See Wal-Mart, 131 S. Ct. at 2552 (citations and internal quotation marks omitted). Having failed to demonstrate a methodology capable of establishing impact at this level, Indirect Purchaser Plaintiffs cannot satisfy the predominance prerequisite under Rule 23(b)(3), and an analysis of the other factors under Rule 23 to certify a class action would be a futile exercise.

## **Conclusion**

Accordingly, for the foregoing reasons, it is **RECOMMENDED** that:

(1) Indirect Purchaser Plaintiffs' Amended Motion for Class Certification (Dkt. 290) be **DENIED**.

---

[19] Dr. Leonard conducted his own analysis of impact on lens casters using the before-and-after method proposed by Dr. Netz. He found mixed results in that some lens casters paid lower prices after the consent decree, while others paid higher prices. (Dkt. 447 at 39-42) His exact calculations are redacted from the publicly available report.

**Date: May 24, 2013**

ELIZABETH A JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

Any party objecting to the factual findings in this report and recommendation shall file with the objections a copy of the hearing transcript and provide specific citations to relevant portions of the transcript.

**Copies to:**
**Counsel of record**
**District Judge**

**Appendix I**



(Dkt. 186 at 12; Dkt. 447 at 29)