UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| IN RE: PHOTOCHROMIC LENS | ) | |
| ANTITRUST LITIGATION | ) | MDL Docket No. 2173 |
| | ) | |
| _____) | | |
| | ) | Case No. 8:10-MD-2173-JDW-EAJ |
| This Filing Relates To: | ) | |
| | ) | |
| Case No. 8:10-CV-1158 | ) | Hon. James D. Whittemore |
| Case No. 8:10-CV-1358 | ) | |
| Case No. 8:10-CV-1825 | ) | Hon. Elizabeth A. Jenkins |
| Case No. 8:10-CV-1840 | ) | |
| Case No. 8:10-CV-2089 | ) | |
| Case No. 8:10-CV-2090 | ) | |
| Case No. 8:10-CV-2091 | ) | |
| Case No. 8:10-CV-2418 | ) | |
| _____) | | |

**INDIRECT PURCHASER END-USER PLAINTIFFS' OBJECTIONS
TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1)(C), Indirect Purchaser End-User Plaintiffs ("IPPs"), by and through their counsel, respectfully submit the following objections to the Magistrate Judge's Report and Recommendation of May 24, 2013 [Dkt. #513] ("R&R").

## I.    INTRODUCTION

The R&R misstates applicable law. It is widely accepted that plaintiffs can satisfy Rule 23(b)(3)'s "predominance of common questions" requirement by proffering common evidence demonstrating "widespread injury to the class." The R&R held that *dicta* from *Shumate & Co. v. National Association of Securities Dealers, Inc.*, 509 F.2d 147 (5th Cir. 1975), compels that a plaintiff proffer evidence at the class certification stage demonstrating that all class members were harmed by a defendant's misconduct. The R&R's approach to predominance is not the law in this or any other circuit and has been expressly rejected by a number of courts, including the Fifth Circuit Court of Appeals.

The R&R also misstates the evidence presented in the record. The R&R incorrectly concludes that: (i) IPPs' expert, Dr. Gary L. French, Ph.D, did not use price data specific to each lens caster; (ii) Dr. French presumed impact; (iii) Dr. French averaged prices; and (iv) Dr. French used the report of the direct purchaser plaintiffs' expert, Dr. Hal Singer, Ph.D, as a source for his conclusions. Each of these findings is flatly contradicted by the record.

Antitrust cases, including indirect purchaser cases, are commonly certified for class treatment. IPPs' economist experts, Dr. Janet S. Netz, Ph.D and Dr. French, each performed an extensive review and analysis of Transitions' transactional pricing data, Transitions' pricing policies and practices, and the characteristics of the photochromic lens market.[1] Based upon these reviews and their experience, Dr. French and Dr. Netz each opined that this action is

---

[1] *See* Declaration of Janet S. Netz, Ph.D ("Netz Rep.") at 6-12, 44, 45-47 [Dkt. #448]; Expert Report of Gary L. French, Ph.D ("French Rep.") ¶¶ 11, 14-22, 62-64 [Dkt. #449].

especially appropriate for class treatment, because Transitions sold its photochromic lenses to a limited number of lens caster customers its prices were virtually uniform, its prices rarely changed, and its photochromic lenses reached consumers through a uniform distribution chain.[2] Dr. French employed a "before-and-after" benchmark analysis to calculate antitrust impact comparing Transitions' pricing prior to the FTC consent decree with its prices after the FTC consent decree.[3] Dr. French inputted into the regression model: (i) prices that Transitions' individual lens caster customers were charged, for specific products, on specific dates, net any applicable rebates and/or returns; (ii) annual cost data reported by Transitions on a product and lens caster level; and (iii) an appropriately specified demand variable based on the products at issue.[4] The price and cost data were individually input into the regression and pooled to arrive at an annual overcharge percentage at the lens caster level.[5] Dr. French's analysis empirically demonstrates that widespread antitrust impact can be proven through common proof.[6]

Class certification has been granted in numerous actions where similar methodologies were employed. IPPs submit that the same result is appropriate here. Accordingly, the Court should reject the R&R and grant IPPs' motion for class certification.

## II.  STATEMENT OF FACTS

### A. Background

From 1999 until at least April 2010, Transitions monopolized the photochromic lens market and engaged in a variety of anticompetitive conduct designed to preserve its monopoly

---

[2] Netz Rep. at 17, 22-23, 45-48; French Rep. ¶¶ 62-74, 88 and Appendix C.

[3] French Rep. ¶¶ 96-113.

[4] *Id.* ¶¶ 108-113.

[5] *Id.* ¶¶ 111-113.

[6] *Id.*

power and corresponding ability to charge supracompetitive prices. *See* Netz Rep. at 23-24, 38; French Rep. ¶¶ 58-61.

Transitions leveraged its status as a monopolist and adopted an "all-or-nothing" policy of terminating any lens caster customer that agreed to market or sell a competitor's photochromic lens product. *See* Netz Rep. at 24-26, 34-35, 48, n.191; French Rep. ¶¶ 52-55, 66-68, 80-83. The policy forced its lens caster customers to make a choice: (i) carry Transitions photochromic lenses as its exclusive photochromic lens offering; or (ii) carry a competitor's offering and lose millions in revenues as a result of the termination of its relationship with Transitions. Transitions summarily terminated its otherwise mutually profitable relationships with Signet Armorlite, Vision-Ease, and Rodenstock for violating this policy. *See* Netz Rep. at 24, 25; French Rep. ¶¶ 52, 56. The significant time, money, and intellectual property necessary to introduce a new competing photochromic product, and the risk of losing millions of dollars from the termination of their relationship with Transitions, provided lens casters with strong incentives to submit to Transitions' exclusivity and pricing demands. *See* Netz Rep. at 21-23; French Rep. ¶¶ 69-74.

Transitions also used exclusivity agreements to preserve its monopoly power. Transitions entered into exclusivity agreements with lens casters that distributed the overwhelming majority of all photochromic lenses in the United States, exclusivity and *de-facto* exclusivity agreements with a number of national and regional retailers, and exclusionary agreements with a number of ophthalmic laboratories. Netz Rep. at 28-35; French Rep. ¶¶ 51, 56-57, 77-79. The express purpose of these agreements was to foreclose competition. French Rep. ¶¶ 67 n.101, 94.

When a potential competitor attempted to enter the photochromic lens market, Transitions worked with Essilor of America and other lens casters to eliminate such competition. Transitions worked with these lens casters to undercut potential competitors at national retailers

and to prevent any competitor from gaining a foothold in the photochromic lens market. On one occasion, for the express purpose of thwarting a potential competitor's entry into the market, Transitions teamed up with lens casters Essilor of America and Sola to introduce a limited offering of a private label product at LensCrafters only. French Rep. ¶ 62 n.86.

Consumers bore the brunt of these policies. Transitions' monopoly power enabled it to dictate pricing to its lens caster customers and to charge supracompetitive prices (monopoly overcharges) for its photochromic lenses. Netz Rep at 5, 24, 34, 38, 39; French Rep. ¶¶ 62-64, 112-13. These overcharges were passed through the distribution chain and resulted in consumers, including IPPs, paying prices for Transitions photochromic lenses that were higher than they would have been absent Transitions' unlawful conduct. Netz Rep at 51-61; French Rep. ¶¶ 89, 95, 114-22.

## B. The FTC Consent Decree

On March 3, 2010, the Federal Trade Commission ("FTC") filed a Complaint[7] against Transitions relating to the anticompetitive conduct alleged herein and announced that it had entered into a proposed Consent Order with Transitions. The Director of the FTC's Bureau of Competition described Transitions' conduct as follows:

> Transitions crossed the line between aggressive competition and illegal exclusionary conduct . . . [and Transitions'] actions prevented others from competing on the merits, and consumers were forced to pay more for these lenses as a result. Such conduct runs afoul of the antitrust laws and is unacceptable.[8]

The Consent Order, which is in effect for 20 years, became final on April 22, 2010, and, among other things, prohibits Transitions from: (i) entering into certain exclusionary agreements or

---

[7]   Complaint, *In the Matter of Transitions Optical, Inc.* (Mar. 3, 2010), available at: http://www.ftc.gov/os/caselist/0910062/100303transopticalcmpt.pdf. (last accessed June 7, 2013).

[8] *FTC Bars Transitions Optical, Inc. from Using Anticompetitive Tactics to Maintain Its Monopoly* (Mar. 3, 2010), available at http://www.ftc.gov/opa/2010/03/optical.shtm (last accessed June 7, 2013).

policies; (ii) limiting the information its customers give to consumers regarding its competitor's photochromic products; (iii) imposing exclusivity requirements on its customers; and (iv) retaliating against any customer that buys or sells Transitions photochromic lenses on a non-exclusive basis.[9]

### C. IPPs' Motion for Class Certification

IPPs' Motion for Class Certification requested that the Court certify the following class under Florida's Deceptive and Unfair Trade Practice Act:

> All persons who indirectly purchased photochromic lenses manufactured and/or distributed by Transitions, for their own use and not for resale, at any time from January 1, 1999, to the present in Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, and/or Wisconsin ("Repealer Class").[10]

Alternatively, IPPs requested certification of state-wide classes for each class representative's home state—California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin—under these state's applicable antitrust, consumer protection, and/or unjust enrichment laws.

### D. The R&R

On May 24, 2013, the Magistrate Judge filed her R&R recommending denial of Plaintiffs' Motion for Class Certification. Relying upon a 38 year-old Fifth Circuit decision, the Magistrate Judge held that Rule 23(b)(3)'s predominance element necessitates a showing at the class certification stage that all lens casters suffered antitrust impact. *See* R&R at 7 (citing *Shumate & Co. v. Nat'l Ass'n of Securities Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir. 1975). The

---

[9] *See* FTC, Decision and Order, *In the Matter of Transitions Optical, Inc.* (Apr. 22, 2010), available at http://www.ftc.gov/os/caselist/0910062/100427transopticaldo.pdf (last accessed June 7, 2013).

[10] Excluded from the Class are Transitions and its parents, subsidiaries, and affiliates; all federal, state, or local governmental entities; and any judge or judicial officer presiding over this matter.

Magistrate Judge concluded that IPPs have not demonstrated a workable methodology for establishing impact on every lens caster. R&R at 11. Although the exact rationale behind the R&R is somewhat difficult to discern, the R&R faults IPPs' Dr. French for not explaining how his impact analysis was different from that of the expert proffered by the direct purchaser plaintiffs. *Id.* The R&R also concluded that Dr. French's analysis was "not designed to determine whether each lens caster was impacted individually," because he "did not use prices that were specific to each lens caster, theorizing instead that all lens casters paid similar or the same prices." *Id.* The R&R stated further that Dr. French presumed that lens casters were affected in the same manner, based on a determination that lens casters paid "the same or similar" prices, and, based on this presumption, concluded that "all, or very nearly all" lens casters were injured by Transitions' conduct. *Id.* The R&R did not determine whether the requirements of Rule 23(a) were satisfied or whether Rule 23(b)(3)'s superiority requirement was satisfied.

## III.   ARGUMENT

### A.  Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1)(C), a district judge must engage in a *de novo* review of all legal conclusions contained within a magistrate judge's report and recommendation, *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1132 (M.D. Fla. 2012), and a *de novo* review of the record with respect to all findings of fact contained in a magistrate judge's report and recommendation that are specifically and timely objected to. *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 512-13 (11th Cir. 1990). The *de novo* standard requires that a district judge give fresh consideration to all findings of fact contained in a magistrate judge's report and recommendation that are timely objected to, based upon an independent review of the record. *Id.* ("The *de novo* review requirement is essential to the constitutionality of section 636").

The Court must engage in "rigorous" analysis of the record and applicable law when determining whether the prerequisites of Rule 23 have been satisfied. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) (quotations and citations omitted). A party seeking class certification must demonstrate that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy are satisfied, and that the requirements of one of the subsections of Rule 23(b)(3) are also satisfied.[11] *See* Fed. R. Civ. P. 23. Here, IPPs seek certification under Rule 23(b)(3) and, thus, must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rigorous analysis of Rule 23 in antitrust cases will frequently lead to class certification. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814-15 (7th Cir. 2012).

## B. The R&R Misstates Applicable Law

The R&R adopts an interpretation of Rule 23(b)(3)'s predominance requirement that is not the law. A plaintiff's burden at the class certification stage is to show that common evidence can be used to establish "widespread injury to the class." *See In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 227 (E.D. Pa. 2012) (citing *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 320–21 (E.D. Mich. 2001) (citing *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 523 (S.D.N.Y. 1996)); *Meijer, Inc. v. Warner Chilcott Holdings, Co. III, Ltd.,* 246 F.R.D. 293, 309–310 (D.D.C. 2007) (same); *In re K–Dur Antitrust Litig.,* No. 01–1652, 2008 WL 2699390, at *18 (D.N.J. Apr. 14, 2008) (same)). When demonstrating that common proof can be used to establish widespread injury to the class, a plaintiff is not required to prove the element of

---

[11] The R&R correctly notes that numerosity, commonality, and typicality have not been contested in this matter. R&R at 5.

antitrust impact. *See, e.g., In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008). "Only when it is apparent that 'a great many persons' have not been impacted should a court deny class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D 1, 40 (D.D.C. 2012) (quoting *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009).

The R&R departs from this accepted standard based on an incorrect interpretation of the substance and significance of a limited excerpt from *Shumate & Co. v. National Association of Securities Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir. 1975). The excerpt from this outdated decision does not constitute binding authority that "predominance requires a methodology capable of showing that every class member was impacted by the antitrust violation." R&R at 7. The *Shumate* court affirmed a directed verdict based on the determination that the plaintiffs failed to provide evidence that they suffered damages relating to two alleged conspiracies. 509 F.2d at 155. The court's affirmance of the lower court's directed verdict ended the litigation. *See id.* As an afterthought and in a section titled "MISCELANEOUS POINTS ON APPEAL," the court remarked that the lower court did not abuse its discretion in finding that class certification would not have been appropriate, because "in this case" proving the alleged conspiracies' effects on proposed class members would have necessitated individual inquiries. *Id.* at 156 (emphasis in original). The statement was expressly limited to the facts of that case and is mere *dicta*, as it was not necessary to the court's affirmance of the lower court's judgment.[12] *Id.* Thus, the language does not constitute precedential authority and did not announce a heightened approach to interpreting Rule 23(b)(3)'s predominance requirement. *See Randall v. Scott*, 610 F.3d 701, 708 (11th Cir. 2010) ("*Dicta* is neither the law of the case nor binding precedent") (quotation omitted); *Epolito v. Prudential Ins. Co. of Am.*, 737 F. Supp. 2d 1364, 1381 n.8 (M.D. Fla. 2010)

---

[12] *See United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case") (citations and quotations omitted).

("'[T]he aforementioned statement is merely dicta and not binding on this Court.'"). The R&R is incorrect in concluding otherwise.

The R&R's approach also finds no support in *Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002), or *State of Ala. v. Blue Bird Co.*, 573 F.2d 309 (5th Cir. 1978). Neither of these decisions supports requiring a showing at the class certification stage that every class member was impacted. The *Sikes* court reversed the lower court's class certification order based on its determination that proving the plaintiffs' RICO claims would require individualized proof as to reliance, injury, and damages. *Sikes*, 281 F.3d at 1361-66. And, the *Blue Bird* court sustained class certification of the plaintiffs' state law claims and remanded the case for further consideration on nationwide class allegations after finding that the plaintiffs failed to show what type of proof was available to prove such claims. *Blue Bird Co.*, 573 F.2d at 327-28. *Blue Bird* further illustrates the lack of precedential value of *Shumate*. The Fifth Circuit Court of Appeals decided *Blue Bird* three years after *Shumate*, and therein stated that "this Court has not had the opportunity to deal extensively with exactly what type of proof will establish the impact element of an antitrust cause of action, and the effect this proof will have on class certification." *Id.* at 327.

Moreover, the Fifth Circuit Court of Appeals recognized in *Mims v. Stewart Title Guaranty Co.,* 590 F.3d 298 (5th Cir. 2009), that "[c]lass certification is not precluded simply because a class may include persons who have not been injured by defendant's conduct." *Id.* at 308. *Mims* does not recognize or even mention *Shumate*. In addition to the Fifth Circuit Court of Appeals, a number of courts have expressly rejected the approach endorsed by the R&R.[13] For

---

[13] *See, e.g., Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 823 (7th Cir. 2012); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) (en banc); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010); *In re Chocolate Confectionary*

example, in *Kohen v. Pacific Investment Management Co.*, the Seventh Circuit Court of Appeals recognized that:

> [A] class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification.

571 F.3d 672, 677 (7th Cir. 2009). And, numerous class actions have been certified in Florida and across the country where a class may include persons who have not been injured.[14] Thus, the R&R's interpretation of Rule 23(b)(3)'s predominance requirement was incorrect and should be rejected, as IPPs' burden at the class certification stage is to show that common evidence can be used to establish "widespread injury to the class." *See In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 227 (E.D. Pa. 2012).

## C.   The R&R Misstates the Record

The R&R incorrectly concludes that Dr. French did not use price data specific to each lens caster, that Dr. French presumed impact, that Dr. French used Dr. Singer's report as a source for his conclusions, and that Dr. French averaged prices. Each of these findings is directly contradicted by the record and should be rejected.

### 1.   Dr. French's Conclusions Are Based on His Analysis of Lens Caster and Product Specific Price Data

The R&R incorrectly concluded:

> Dr. French did not use prices that were specific to each lens caster, theorizing instead that all lens casers paid similar or the same prices. Therefore, his

---

*Antitrust Litig.*, 289 F.R.D. 200, 222-23 (M.D. Pa. 2012); *In re Checking Account Overdraft Litig.*, 275 F.RD. 666, 678 n.9 (S.D. Fla. 2011); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D 1, 40 (D.D.C. 2012).

[14] *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004); *In re Fla. Microsoft Antitrust Litig.*, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 228.

approach is not designed to determine whether each lens caster was impacted individually.

R&R at 11 n.17.

Dr. French's impact analysis used price data specific to each lens caster and product. Dr. French used a "before and after" benchmark regression analysis to calculate the amount of overcharge (antitrust impact) paid by Transitions' direct lens caster customers as the result of its unlawful anticompetitive conduct, which compared the prices that Transitions' lens caster customers paid for Transitions photochromic lenses before April 22, 2010, to those paid by Transitions' lens caster customers paid for Transitions photochromic lenses after that date. *See* French Rep. ¶¶ 96-101. In formulating his analysis, Dr. French began with Transitions' sales data to all of its direct customers from December 1999 through May 2011, which included the sales order date, prices paid, invoiced quantities of lenses, lens caster customer names, and product descriptions.[15] *See Id.* ¶ 111. Dr. French then adjusted the data accordingly to account for returns, cancellations, and credits/debits, and specific rebates identifiable from Transitions' general ledger. *Id.* Dr. French's report expressly states that his "*regression analysis is run on data at the level of sales order, customer, product and price.*" *Id.* (emphasis added). Dr. French also used Transitions' cost data from 2000 to 2011, which "report data on year, customer, product, and manufacturing costs at different stages of production." *Id.* All of this was explained in Dr. French's report. The R&R's conclusion that Dr. French did not use lens caster specific data is wrong and should be rejected.

---

[15] IPPs sought additional transactional data from Transitions relating to sales occurring between June 1, 2011 and August 31, 2012, to explore whether prices continued to drop post Consent Decree. The Magistrate Judge denied IPPs' request and the Court overruled IPPs' objection to same. IPPs and Dr. French believe that an analysis of the requested data would further support that "the anticompetitive effects of [Transitions'] objectionable conduct are greater than those estimated with the existing benchmark period." *See* French Rep. ¶ 111 n.170.

## 2.  Dr. French Did Not Presume Impact

The R&R also incorrectly concluded that Dr. French presumed that Transitions' lens caster customers paid overcharges as a result of Transitions' anticompetitive conduct. R&R at 11. As noted above, Dr. French's report used Transitions' transactional data and empirically demonstrated that all of Transitions' lens caster direct customers paid overcharges. The R&R quotes (R&R at 11 n.18) from part of the following statement in support of this conclusion:

> TOI sells essentially all of its photochromic lenses to lens casters, a relatively small group of direct customers, at formulaic prices with common "Target Margins" for a given material and design combination. Given that TOI's pricing policy is "designed to be fair and consistent to all customers," and "pricing is based on Target Margin rather than different sell-price levels to customers," any increase in the Target Margin—the common element that links the prices across all lens casters—would impact all of TOI's customers. Appendix C to this report presents empirical evidence of the virtual uniformity of TOI's selling prices to its direct customers. In most years, prices were the same or similar across customers, and when they changed, they changed for all customers, suggesting that all first purchasers paid the high monopoly prices and were therefore injured. To the extent TOI's Target Margins were supracompetitive, all, or very nearly all, of TOI's direct customers would be injured by TOI's charging of supracompetitive prices (*i.e.*, the overcharge). My empirical estimation of the overcharge appears in this report's Section V.

French Rep. ¶ 88 (internal citations omitted). This paragraph does not support that Dr. French presumed impact. Rather, citing to the record and his own empirical analysis, Dr. French conveys that Transitions sold its photochromic lenses to a relatively small group of direct customers at formulaic prices that were based on common target margins, and that his analysis of changes in Transitions' prices suggests that all lens casters paid monopoly prices and were injured. Dr. French goes on to state that "[t]o the extent TOI's Target Margins were supracompetitive, all, or very nearly all, of TOI's direct customers would be injured by TOI's charging of supracompetitive prices (*i.e.*, the overcharge)," and references his empirical

estimation of overcharges. *Id*. The R&R's conclusion that Dr. French applied a presumption is wrong and should be rejected.

### 3.  Dr. French Did Not Average Prices

The Magistrate Judge incorrectly cites to a statement made by Transitions' counsel for the following proposition:

> Testifying at the hearing, Dr. Leonard faulted Dr. French's calculations for, among other reasons, averaging prices that lens casters paid for Defendant's products, rather than analyzing prices paid by individual lens casters.

R&R at 11. Transitions' counsel's accusation of averaging is both mathematically and factually incorrect. As noted above, Dr. French's regression analysis used price data specific to each lens caster and product. Dr. French's regression results are based on Transitions' "pooled lens caster purchase data. Although a single overcharge coefficient is estimated for each year of the misconduct period, the results are not averaged across the lens casters." Second Report of Gary L. French, Ph.D ¶ 117 (Jan. 21, 2013) ("French Reply Rep."), the relevant excerpts of which are attached as Exhibit A to the Declaration of Erich P. Schork ("Schork Decl."). Dr. French provided in Appendix C to his Report, an analysis of TOI's prices across lens casters demonstrating that there was a significant similarity in the prices paid by lens casters. French Rep. ¶ 88 and Appendix C. This strong similarity in TOI's prices from one lens caster to another justifies Dr. French's use of a pooled data regression model that generated a class-wide overcharge percentage.

Dr. French went further in his merits reply report and calculated an overcharge percentage for each of Transitions' lens caster customers for each year in the class period in which there was sufficient data. French Reply Rep. ¶ 116. This analysis demonstrates that

virtually all lens casters were impacted—the only exceptions being two small lens casters that collectively purchased less than 15,500 lenses. French Reply Rep. Exh. 14.

### 4.  Dr. French Did Not Use Dr. Singer's Report as a Source

The R&R incorrectly concluded that Dr. French used Dr. Singer's report as a "source" for his report. R&R at 10-11 (citing French Rep. at 9). The R&R cites to a page of Dr. French's report providing examples of specific items that Dr. French reviewed or instructed others working under his direction to review, including:

- First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs, and transcripts of the depositions of a number of fact and expert witnesses;

- The class certification stage expert reports of Dr. Janet Netz (June 15, 2012) for the indirect purchaser end-user class, Dr. Hal Singer (June 15, 2012) for the direct purchaser class, and Dr. Gregory Leonard (September 17, 2012) for the defendant;

- Photochromic lens transaction data spanning December 1999 to May 2011 produced by Transitions;

French Rep. ¶ 11. The cited language serves to identify some of the numerous materials that Dr. French and his staff reviewed and considered in preparing his report and in no way reasonably supports that Dr. French used Dr. Singer as a source for his conclusions. Under the R&R's approach, Dr. French also used Dr. Leonard, one of Transitions' experts, as a source for his report, which is of course incorrect. This finding of fact is wrong and must be rejected.

The R&R incorrectly faults Dr. French for not explaining how his findings on impact to lens casters correlate to those of Dr. Singer. R&R at 10-11. Substantial differences exist between the theories being advanced by IPPs and the direct purchaser plaintiffs and IPPs were under no obligation to correlate their findings with those of the direct purchaser plaintiffs. Moreover, even a cursory comparison of Dr. French's report with Dr. Singer's report reveals significant

differences. For example, on March 12, 2013, the Magistrate Judge issued a report and recommendation that took issue with Dr. Singer's report for using three distinct models, using price card data, and using a statistical significant of 50 percent. *Id.* at 16-22 [Dkt. #271]. IPPs take no position as to the merits of these conclusions. However, it is readily apparent that none of these criticisms could reasonably be applied to Dr. French's report, as Dr. French used one model, used Transitions' transactional data in formulating his conclusions, and employed a robust statistical significance level. French Rep. ¶¶ 95-112. Thus, the Magistrate Judge was wrong to fault Dr. French for not correlating his findings with those of Dr. Singer.

### D.  Widespread Impact Can Be Established Through Common Proof

The R&R wrongly concluded that IPPs have not demonstrated a workable methodology for establishing impact on lens casters. The R&R does not explain the bases for this conclusion.

IPPs have demonstrated that they can establish widespread impact through common proof. *See In re Flonase Antitrust Litig.*, 284 F.R.D. at 227 (collecting cases). As detailed in their reports, Dr. Netz and Dr. French each performed an extensive review and analysis of: Transitions' transactional pricing data; Transitions' pricing policies and practices; the nature of photochromic lens products; and the characteristics of the photochromic lens market. Netz Rep. at 6-12, 44, 45-47; French Rep. ¶¶ 11, 14-22, 62-64. Based upon their reviews of the record, Dr. Netz and Dr. French each concluded that Transitions' prices of photochromic lenses were not significantly constrained by other vision products; significant barriers to entry existed in the photochromic market, because photochromic products are protected by intellectual property rights and access to a limited distribution chain is crucial to successful entry into the market; and calculating impact is particularly susceptible to common proof, because Transitions sold its photochromic lenses to a small number of direct customers and Transitions used a standardized

formulaic pricing model. Netz Rep. at 17, 22-23, 45-48; French Rep. ¶¶ 62-74, 88 and Appendix C.

Dr. Netz and Dr. French concluded that antitrust impact could reliably be established through common evidence and proposed use of a "before-and-after" benchmark approach that compared TOI's pricing prior to the FTC consent decree with its prices after the FTC consent decree. Netz Rep. at 62-64; French Rep. ¶¶ 96-107. Dr. French designed and ran a regression analysis using product and lens caster specific pricing data and concluded that all of Transitions' lens caster customers paid an overcharge as a result of Transitions' anticompetitive conduct. French Rep. ¶¶ 108-13. The methodology employed by Dr. French is a widely-accepted means of establishing impact in antitrust cases and many courts have certified monopolization claims for class treatment, including indirect purchaser claims, where this methodology has been employed. French Rep. ¶ 96; *see, e.g., In re Flonase Antitrust Litig*., 284 F.R.D at 232; ABA Handbook Antitrust Law Development, pp. 876-79 (5th ed. 2002). Dr. French's analysis demonstrates that virtually all lens casters paid an overcharge during the relevant time period. *See* French Reply Rep. ¶ 116 and Exh. 14. The only exceptions are Microvision Optical and REM Eyewear, which together purchased fewer than 15,500 lenses from Transitions during the damage period. French Reply Rep. ¶ 116. This represents a miniscule portion of Transitions' sales during the damage period, as Transitions sold approximately 199,015,935 photochromic lenses between January 2002 and July 2010 alone. *See* French Rep. Exh. 5.

A number of courts have certified unlawful monopolization claims, including indirect purchaser claims, where similar analysis has been employed. For example, in the Florida Microsoft antitrust case, as in this case, the plaintiffs brought claims under FDUPTA alleging that a company engaged in anticompetitive conduct, including exclusive dealing, to exclude

competition and maintain its monopoly power. *In re Florida Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 31423620, at *1 (Fla. Cir. Ct. Aug. 26, 2002). Relying on economic principles and his review of the record, the plaintiffs' expert opined that impact and damages could be established through use of a "benchmark" or "yardstick" approach comparing prices from a period where Microsoft faced competition to periods where Microsoft's monopoly was established. *Id.* at **7-9. And, as in this case, one of the defendant's principal arguments at class certification was that proving antitrust impact and damages on a class-wide basis would be overly complex, necessitating individualized analysis and rendering class certification inappropriate. *Id.* The court rejected the defendant's argument. *Id.* And, a number of other courts certified classes in Microsoft state antitrust cases where methodologies similar to that used by the plaintiffs' expert in the Florida Microsoft case were employed.[16]

The court's decision in *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012), an indirect purchaser monopolization action, is further instructive. There, based on general economic principles and his analysis of market data, the plaintiffs' expert opined that common impact could be established through use of a "'yardstick' methodology—comparing prices in the actual world with prices in a hypothetical 'but for' world without [the defendant's] misconduct." *Id.* at 220. When opposing class certification, the defendant argued that common questions did not predominate because the plaintiffs' expert's methodology relied upon aggregated data, uninjured class members remain in the class, and complex individualized inquires would be necessary to prove impact and damages. *Id.* at 221. After conducting an extensive review of the plaintiffs' expert's report and the record, the court rejected the defendant's arguments and

---

[16] *See In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d 668, 676 (S.D. 2003); *Bellinder v. Microsoft Corp.*, Nos. 99-CV-17089, 2001 WL 1397995, at *6-7 (Kan. Dist. Ct. Sept. 7, 2001); *Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, at *8 (Minn. Dist. Ct. Mar. 30, 2001), *aff'd* 645 N.W.2d 393 (Minn. 2002); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 290 (N.D. 2003).

certified four indirect purchaser state-wide classes relating to unlawful monopolization claims. *See id*; *see also In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126 (E.D. Pa. 2011) (certifying indirect purchaser classes under, *inter alia*, California, Florida, New York, and Wisconsin law); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010) ("*LCD*") (certifying indirect purchaser classes under, *inter alia*, California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin law); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004) (certifying a number of indirect purchaser state-wide classes).

When opposing class certification, Transitions declined to address this substantial authority head on. Rather, Transitions raised a theoretical exclusive dealing argument, arguing that in "every exclusive dealing case, prices must be decreased, at least to some customers, in order to secure exclusivity." Transitions' Memorandum in Opposition to IPPs' Motion for Class Certification, at 4 (Sept. 17, 2012) [Dkt. #446]. As an initial matter, this argument ignores substantial aspects of IPPs' claims. IPPs allege Transitions engaged in a variety of anticompetitive unlawful conduct designed to maintain its monopoly power. Although this conduct included exclusive dealing, it was not so limited. Courts have rejected similar attempts by defendants in antitrust cases to re-characterize and limit the scope of the antitrust violations alleged by plaintiffs. *See LCD*, 267 F.R.D. at 607. Moreover, even if this were an exclusive dealings case, which it is not, a number of exclusive dealing cases have been certified on both a wholesaler and consumer basis.[17]

Transitions' theoretical argument fails to account for the coercive effect of Transitions' "all or nothing" policy and falls flat when applied to the facts of this case. Transitions leveraged

---

[17] *See Bradburn Parent/Teacher Store, Inc. v. 3M*, 2004 U.S. Dist. LEXIS 16193, *43 (E.D. Pa. Aug. 17, 2004); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs.*, 225 F.R.D. 208, 219 (S.D. Ohio May 12, 2003); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco*, 262 F.R.D. 58 (S.D. Ohio 2003) (certifying class in an exclusive dealings case functionally identical to this case).

its monopoly power and adopted and enforced a policy of terminating lens caster customers that marketed or sold a competing photochromic product. When faced with Transitions' exclusivity demands, lens casters were forced to make a choice: (1) carry Transitions photochromic lenses as its exclusive photochromic lens offering; or (2) carry a competitor's offering and lose millions in revenues as a result of the termination of its relationship with Transitions. The significant time, money, and intellectual property necessary to introduce a new competing photochromic product, and the risk of losing millions of dollars from the termination of their relationship with Transitions, provided lens casters with strong incentives to submit to Transitions' exclusivity and pricing demands. Transitions' failure to account for the coercive effects of its own conduct dooms its exclusivity argument.

Transitions also opposed class certification on grounds that this case is too complex. Antitrust defendants make this argument in virtually every case in an attempt to separate themselves from the substantial authority certifying antitrust cases for class treatment. This argument has been regularly rejected in similar indirect purchaser monopolization actions. For example, in a number of state indirect purchaser actions where it was alleged that Microsoft had unlawfully abused its monopoly power, Microsoft argued that there were a number of complexities and variances in the marketplace and that a complex distribution chain would prohibit establishing whether, and to what extent, any monopolistic overcharge was passed on to consumers.[18] These courts overwhelmingly rejected Microsoft's complexity argument and certified indirect purchaser classes.[19] As the court explained in *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 246 (E.D. Mich. 1997):

---

[18] *See, e.g., In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d 688, 677 (S.D. 2003).

[19] *See In re South Dakota Microsoft Antitrust Litig.*, 657 N.W.2d at 677; *In re Florida Microsoft Antitrust Litig.*, 2002 WL 31423620, at *13-15; *Bellinder v. Microsoft Corp.*, Nos. 99-CV-17089, 2001 WL 1397995, at *5-7 (Kan.

The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands . . .  If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving the issues. I believe defendants' complexity arguments are exaggerated, should not intimidate or overwhelm this Court, and should not prevail.

*See also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 689 (N.D. Ga. 1991) (certifying a class and rejecting the defendants' argument that common proof could not be used to establish injury because of "the nonstandardized nature of the airline injury and the variety of competitive factors that may affect a specific sale"); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (certifying a direct purchaser class and rejecting the defendants' complexity of the market argument, stating "neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that  . . . the price range was affected generally").

Also instructive on this point are *LCD* and *In re Static Random Access Memory (SRAM) Antitrust Litigation*, 264 F.R.D. 603, 608 (N.D. Cal. 2009) ("*SRAM*"). In both cases, the indirect purchaser plaintiffs alleged that the defendants engaged in a price-fixing conspiracy, the products at issue varied and were sold in a number of markets, and the defendants sold to a variety of customers, large and small, through a variety of distribution channels. *See LCD*, 267 F.R.D. at 603; *SRAM*, 264 F.R.D. at 605-06. In those cases, as in this case, the defendants argued that product variation and the complexity of the distribution chain were too complex for pass through

---

Dist. Ct. Sept. 7, 2001); *Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, at *8-12 (Minn. Dist. Ct. Mar. 30, 2001), *aff'd* 645 N.W.2d 393 (Minn. 2002); *In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust Litig.*, No. D-0101-CV-2000-1697 (N.M. Dist. Ct. Sept. 30, 2002); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 291-96 (N.D. 2003); *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct. June 28, 2001); *Friedman v. Microsoft Corp.*, CV-2000-000722 (Ariz. Super. Ct. Nov. 15, 2000 & July 13, 2001); *Comes v. Microsoft Corp.*, 696 N.W.2d 318 (Iowa 2005); *Microsoft I-V Cases*, No. J.C.C.P. No. 4106 (Cal. Super. Ct. Aug. 29, 2000); *but see A & M Supply v. Microsoft Corp.*, 654 N.W.2d 572 (Mich. Ct. App. 2002); *Melnick v. Microsoft Corp.*, Nos. 99-CV-709-752, 2001 WL 1012261 (Me. Super. Ct. Aug. 24, 2001).

to be reliably established through common evidence. *See id.* The courts rejected the defendants' complexity arguments. *See LCD*, 267 F.R.D. at 604; *SRAM*, 264 F.R.D. at 614. Notably, Transitions' expert, Dr. Leonard, submitted an expert report in *SRAM* articulating the same individualized analysis he presents here in support of his conclusion that the direct purchaser class should not be certified. *In re Static Random Access Memory* (*SRAM) Antitrust Litig.*, 2008 WL 4447592, at *6-8 (N.D. Cal. Sept. 29, 2008).

## IV.  CONCLUSION

For the foregoing reasons, Indirect Purchaser End-User Plaintiffs, by and through counsel, respectfully request that the Court enter an Order rejecting the Magistrate Judge's R&R and certifying the Repealer Class or, alternatively, certifying state-wide classes for California, Florida, Kansas, Maine, Michigan, New York, and Wisconsin under each state's applicable antitrust, consumer protection, and/or unjust enrichment laws, and entering such further relief as the Court deems just and appropriate.

Dated:  June 7, 2013

_/s/ Ben Barnow_____
Ben Barnow
Erich P. Schork
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504

_/s/ Michael M. Buchman_____
Marc I. Gross
Michael M. Buchman
POMERANTZ GROSSMAN HUFFORD
   DAHLSTROM & GROSS LLP
600 Third Avenue, 20th Floor
New York, NY  10016
Tel: (212) 661-1100
Fax: (212) 661-8665

| | |
|---|---|
| /s/ Lance A. Harke | /s/ Susan G. Kupfer |
| Lance A. Harke | Susan G. Kupfer |
| HARKE CLASBY & BUSHMAN LLP | GLANCY BINKOW & GOLDBERG LLP |
| 9699 NE Second Avenue | One Embarcadero Center, Suite 760 |
| Miami Shores, FL 33138 | San Francisco, CA  94111 |
| Tel: (305) 536-8220 | Tel: (415) 972-8160 |
| Fax: (305) 536-8229 | Fax: (415) 972-8166 |

*Interim Co-Lead Counsel for the putative*
*Indirect Purchaser End-User Class*

**CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

The undersigned hereby certifies that the preceding document was caused to be served electronically this 7th day of June 2013 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


_/s/ Ben Barnow_____