# EXHIBIT A
# (REDACTED)



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER



# Expert Report of Lauren J. Stiroh, Ph.D.

In Re Photochromic Lens Antitrust Litigation –
Achtman et al. Plaintiffs

December 3, 2012

Contains Highly Confidential Information—Subject to Protective Order

| | | |
|---|---|---:|
| I. | Introduction | 1 |
| | A. Qualifications | 1 |
| | B. Assignment | 1 |
| | C. Materials Relied Upon | 1 |
| | D. Summary of Opinions | 2 |
| | | |
| II. | Nature of the Case | 4 |
| | | |
| III. | Background | 4 |
| | A. History of TOI, EOA, and ELOA | 4 |
| | B. Ophthalmic Lens Options | 6 |
| | C. Distribution Chains for Prescription Lenses | 8 |
| | D. TOI's Relationships with Lens Casters | 11 |
| | | |
| IV. | Relevant Market | 13 |
| | A. Quantitative Evidence Shows that Photochromic Lenses Are in the Same Relevant Market as Non-Photochromic Lenses | 15 |
| |    1. Analysis of Co-Price Movements Shows that Photochromic and Non-Photochromic Lenses Are in the Same Relevant Market | 15 |
| |    2. Analysis of Cross-Price Elasticities Demonstrates that Non-Photochromic Lenses Constrain the Prices of Photochromic Lenses | 17 |
| | B. Qualitative Evidence Shows that Photochromic Lenses Compete With Non-Photochromic Lenses | 21 |
| | C. Summary | 25 |
| | | |
| V. | Market Power | 25 |
| | A. TOI Does Not Have the Ability to Impose an Anticompetitive Price Increase | 25 |
| |    1. TOI Accounts for a Small Share of Ophthalmic Lens Shipments | 25 |
| |    2. Constraints on TOI's Ability to Raise Price | 25 |
| |    3. Competition in the Photochromic Segment of the Market | 29 |
| | B. TOI's Customer and Reseller Agreements Do Not Foreclose Competition | 31 |
| | C. There is No Evidence of Anticompetitive Outcomes in the Market | 35 |
| | | |
| VI. | There Are Pro-Competitive Justifications for the TOI Conduct at Issue | 38 |
| | A. TOI Substantially Built the Photochromic Segment of the Market | 38 |
| | B. TOI's Contracts and Agreements Are Efficient and Pro-Competitive | 40 |
| | C. TOI's Rebate and Marketing Programs Are Pro-Competitive | 44 |
| | D. The Allegation that TOI Has Withheld Private Label Products Is Inaccurate and Ignores Pro-Competitive Justifications | 47 |
| | E. TOI's Alleged Terminations of Photochromic Competitors Reflect Reasonable Competitive Responses | 50 |
| | | |
| VII. | Critique of the Opinions of Dr. French | 53 |
| | A. Overview of Dr. French's Report and Analysis | 53 |
| | B. Flaws in Dr. French's Analysis of the Relevant Market | 54 |
| |    1. Dr. French's Claim that Photochromic Lenses and Non-Photochromic Lenses Are Not Functional Substitutes Is Incorrect | 54 |

Contains Highly Confidential Information—Subject to Protective Order

2. Dr. French's Analysis of the Price Differences Between Photochromic Lenses and Non-Photochromic Lenses Is Insufficient to Show They Are In Separate Markets 56
3. Dr. French's Analysis of the Documentary Evidence on Market Definition Is Misleading and Incomplete 57
4. Dr. French's Econometric Analysis of the Relevant Market Is Incomplete 58
C. Flaws in Dr. French's Analysis of TOI's Market Power 61

VIII. Analysis of Dr. French's Damages Model 63
A. Description of Dr. French's Damages Models 63
B. Flaws in Dr. French's Estimation of the TOI Overcharge 65
1. Dr. French Incorrectly Calculates Net Prices for His Regression 65
2. Dr. French's Results Are Dependent on the Functional Form of the Overcharge that He Has Selected 66
3. Dr. French Inaccurately Estimates the Standard Errors in His Regression 66
4. Dr. French Improperly Averages the Results of His Regression and Does Not Examine Whether All of TOI's Customers Are Impacted 67
5. Dr. French's Results Are Not Consistent with Other Experts Analyzing The Same Issues or His Own Analysis of the Conduct at Issue 68
C. Flaws in Dr. French's Estimation of the Pass-Through of the Alleged TOI Overcharge 70
1. Dr. French Has Not Demonstrated Pass-Through from Wal-Mart to Consumers 70
2. Results from Wal-Mart Cannot Be Extrapolated Market-Wide and Therefore Dr. French Has Not Demonstrated Damages on a Class-Wide Basis 71
3. Dr. French Has Not Limited the Pass-Through Ratio to 100 Percent 72
4. Dr. French Does Not Control for Any Other Costs or Other Factors Specific to Wal-Mart 74
D. Dr. French's Calculation of Damages Suffers from Other Errors 74
1. Dr. French Fails to Account for Managed Care 74
2. Dr. French Fails to Account for Other Discounts Available to Class Members 76
3. Dr. French Fails to Apply the Statute of Limitations on Recovery 77
4. Dr. French Ignores Accused Sales that Are Subject to Damages in the Action Brought by Lens Casters, Retailers, Labs, and ECPs 77

IX. Inconsistencies in the Analyses of Dr. French and Other Plaintiff Experts in Related Matters 78
A. Inconsistencies between Dr. French and Dr. Singer 78
B. Inconsistencies between Dr. French and Dr. Netz 79

X. Conclusions 80

Contains Highly Confidential Information—Subject to Protective Order

# I.   Introduction

## A.   Qualifications

1.   My name is Lauren J. Stiroh.  I am an economist and Senior Vice President of NERA Economic Consulting.  NERA was founded in 1961 and provides research and analysis in the field of applied microeconomics, including the economics of competition, regulation, and finance.  A substantial portion of NERA's consulting work, as well as my own work, is in the determination of economic damages.

2.   I have provided economic consulting services and testimony in a number of antitrust liability and damages cases and have testified at trial and in deposition regarding a variety of business practices.  These include, for example, commercial disputes, business interference, breach of contract, allegations of monopolization, price predation, unlawful tie-ins, price discrimination, abuse of market power, and patent infringement.  I have experience with damages issues in a range of industries including industrial chemicals, automotive services, consumer products, pharmaceuticals, biotechnology, medical devices, agricultural products, advertising and promotion, and semiconductors.

3.   I received my Ph.D. in economics from Harvard University in 1996.  Prior to that, I completed my B.A. in economics from the University of Western Ontario in 1990 and my M.A. from the University of British Columbia in 1991.  My curriculum vitae, which includes a list of my prior expert testimony, is appended to this report as **Exhibit 1**.  NERA is being compensated at my usual rate of $650 per hour.  NERA's compensation does not depend on the outcome of this litigation.

## B.   Assignment

4.   I have been asked by counsel for Transitions Optical, Inc. ("TOI") to review and comment on the opinions expressed in the report of Plaintiffs' expert Dr. Gary L. French, submitted on October 1, 2012 in connection with *In Re: Photochromic Lens Antitrust Litigation* ("French Report").  In particular, I have been asked to opine on the conclusions reached by Dr. French regarding the allegation that TOI possesses, and has improperly exercised, market power, and the alleged anticompetitive impact of TOI's agreements with lens casters and retailers on the prices of Transitions photochromic lenses charged to Plaintiffs and to the Proposed Class.

## C.   Materials Relied Upon

5.   In preparing this report, I, and economists working under my direction, have reviewed the Expert Merits Report of Gary L. French, Ph.D.; Declaration of Janet S. Netz, Ph.D.; Expert Class Certification Reports of Gregory K. Leonard, Ph.D. in the Direct and Indirect matters; Expert Report of Kenneth C. Baseman; Expert Class Certification and Expert Merits Reports of Hal J. Singer, Ph.D.; Expert Report of Donald M. Nicholson;

Contains Highly Confidential Information—Subject to Protective Order

documents and data referenced therein; additional documents and deposition testimony produced in connection with this case; and other publicly available documents.

6.    I have also submitted reports in two separate matters concerning the economic impact of much of the same conduct that is at issue here.  My reports in those matters are the Expert Report of Lauren J. Stiroh, Ph.D. in connection with *In Re Photochromic Lens Antitrust Litigation – Nouveau Vision, Inc. et al. Plaintiffs* and the Expert Report of Lauren J. Stiroh, Ph.D. in connection with *Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*  My opinions in this matter are informed by the analysis and research conducted for those related reports, as well as this report.  The opinions expressed in this report are also based on my training and experience as an economist.  A complete list of the sources of information and materials I relied upon in forming my opinion is presented in **Exhibit 2**.  In addition to the materials listed in **Exhibit 2**, I and members of my team have had numerous conversations with TOI employees, including David Cole, President of TOI, and John Ligas, Director of Research and Development at TOI.

## D.    Summary of Opinions

7.    Based on my analysis to date, I have reached the following opinions:

i.    The relevant market at issue includes both photochromic and non-photochromic lenses.  Empirical analysis reveals that the prices of photochromic lenses and non-photochromic lenses move together, respond in similar ways to common economic conditions, and that the price of non-photochromic lenses constrains the price of photochromic lenses.  Record evidence supports these empirical findings.  The testimony of industry participants, TOI's ordinary course documents, and TOI's customer agreements all support the opinion that photochromic lenses are a segment of the wider market for ophthalmic lenses and that photochromic and non-photochromic lenses are viable competitive alternatives to each other.

ii.    TOI cannot impose an anticompetitive price increase in a properly defined relevant market.  TOI's price is constrained by competitive alternatives including clear lenses and photochromic lenses manufactured by other entities.  TOI would not have the ability to impose an anticompetitive price increase even if the market was restricted to photochromic lenses.  TOI faces pricing constraints from photochromic competitors as well as downstream purchasers, including lens casters, eye care practitioners, and retailers.

iii.    TOI's customer and reseller agreements do not foreclose competition in the photochromic lens segment.  Record evidence shows that TOI's agreements do not prevent and have not prevented its competitors from making sales of photochromic products to the wholesale laboratories and retailers with STAR agreements, BBF agreements, or even alleged "exclusive" agreements.  In addition to direct evidence that TOI's agreements have not foreclosed competition,

Contains Highly Confidential Information—Subject to Protective Order

an analysis of TOI's agreements reveals that the proportion of the photochromic lens distribution chain allegedly foreclosed by TOI's agreements is too small to substantially restrain trade and inhibit products from reaching end consumers.

iv.  There is no evidence of anticompetitive impact in a properly defined relevant market or in the photochromic segment of the relevant market.  Over the alleged damage period, output in the photochromic lens segment has expanded, innovation and entry has occurred, and TOI has aggressively invested in research and development that has improved the quality and performance of its lenses.

v.  TOI's supply and reseller agreements at issue are efficient and pro-competitive. TOI's exclusive agreements with its customers are a reasonable mechanism to prevent free-riding and protect TOI's investment in brand building and customer education.  TOI's rebate and marketing agreements are intended to, and have had the effect of, growing the photochromic segment.

vi.  TOI's actions with respect to its supply agreements with lens casters Signet Armorlite and Vision-Ease are not anticompetitive and reflect reasonable competitive responses on the part of TOI to fundamentally changed business relationships.  TOI's actions in this regard are consistent with what one would expect to observe in a competitive marketplace and are not anticompetitive.

vii.  Plaintiffs' allegation that TOI withheld a lower-priced private label photochromic product from the market is inconsistent with the record and ignores pro-competitive justifications for TOI's actions, including the fact that TOI did not perceive market demand for the product.

viii.  Dr. French's determination that photochromic lenses and non-photochromic lenses are not functional substitutes is incomplete, misleading, and flawed.  Dr. French's opinion is based on a misspecified model and misinterpretations of documents produced in this matter.

ix.  Dr. French does not demonstrate impact and injury on a Class-wide basis.  His damage methods are based on averages that obscure important differences across Class members.  Dr. French's damages models find impact where, in fact, there is none.

x.  Dr. French's damages models are further flawed because they suffer from misspecifications, inconsistencies, and rely on inaccurate data.  Due to the flaws in his analyses and conclusions, Dr. French's damages estimates cannot be relied upon.  Correcting these flaws demonstrates that there is no evidence of impact or harm to the Class.  Properly specified, damages to the Class are $0.

xi.  Dr. French's findings are inconsistent with the opinions that Dr. Hal J. Singer, an expert for lens caster, retailer, lab, and ECP plaintiffs in a separate matter, put

Contains Highly Confidential Information—Subject to Protective Order

forth and with the conclusions that Plaintiffs' Expert Dr. Janet S. Netz put forth in the class certification stage of this matter.

xii.  I find no evidence of anticompetitive conduct, and no evidence that TOI has overcharged lens casters and resellers.  Even if TOI's conduct was found to be anticompetitive, I find no evidence of impact of the agreements at issue on Class members' purchasing prices.

8.  The opinions and discussion set forth in this report are based on my analysis of this matter to date.  I reserve the right to revise my opinions if additional information is provided to me.

## II.  Nature of the Case

9.  Plaintiffs Howard Achtman, John Donohoe, Keith Forbes, Amanda Gable, Gabby Klein, Edmund Moores, Caryl O'Keefe, Keith Brian Roller, Axhi Sabani, Phyllis Sternemann, and Eldridge Donald Wilcox allege that "[f]rom at least 1999 to present, [TOI] possessed monopoly power in the product market for the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses in the United States and…engaged in unlawful and exclusionary acts and practices that included…refusing to do business with any lens caster that marketed or sold a competitor's photochromic lens and entering into exclusionary agreements at all levels of the photochromic lens distribution chain."[1]

10.  Plaintiffs allege that such conduct – all of which relates to exclusive dealing – increased the prices paid by indirect purchasers for TOI's photochromic lenses, including those paid by Plaintiffs.  In addition, Plaintiffs allege that Essilor of America, Inc. ("EOA") and Essilor Laboratories of America, Inc. ("ELOA") acted as co-conspirators with TOI to suppress competition in the Plaintiffs' alleged market of photochromic lenses.[2]

## III.  Background

## A.  History of TOI, EOA, and ELOA

11.  EOA is a Delaware corporation and ELOA is a North Carolina corporation.  Both corporations have their principal place of business in Dallas, Texas.[3]  EOA is a prominent

---

[1] First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs, November 14, 2011, Case No. 8:10-MD-2173-JDW-EAJ, ("Indirect Purchaser Complaint"), p. 2.  TOI is the product of a joint venture between PPG Industries, Inc. and Essilor International SA in 1990.  PPG owns 51 percent and Essilor International, EOA's parent company, owns 49 percent.  (Indirect Purchaser Complaint, p. 6.)

[2] Indirect Purchaser Complaint, pp. 2 and 6 – 8.

[3] Indirect Purchaser Complaint, pp. 6 – 7.

Contains Highly Confidential Information—Subject to Protective Order

lens caster and wholesale lens distributor while ELOA is the largest optical lab network in the US.[4]  Both EOA and ELOA are owned by Essilor International SA.[5]

12.     TOI is a Delaware corporation with its principal place of business in Pinellas Park, Florida.[6]  TOI was founded in 1990 through a joint venture between PPG Industries Inc. ("PPG") and Essilor International SA ("Essilor International") for the purpose of developing a plastic photochromic lens.[7]  The joint venture was brought about in an effort to bring plastic lenses to the photochromic segment of the industry, which had traditionally been available in glass.[8]  The joint venture was structured with PPG having 51 percent ownership and Essilor International having 49 percent ownership in TOI.[9]

13.     Photochromic lenses are prescription lenses that have been treated with a photochromic coating.  The first glass photochromic product was produced by Corning Incorporated ("Corning") in the 1960s.[10]  The coating activates, or darkens, upon exposure to ultraviolet rays and fades back to a clear lens when no longer exposed to sunlight.[11]  At the time of the joint venture, photochromic coatings had only been successfully applied to glass lenses using a technique developed by Corning.[12]  Transitions lenses were the first commercially successful plastic photochromic lenses.[13]

14.     TOI introduced its first photochromic lenses in 1991.  Since then, it has continued to improve its product offerings through subsequent generations to increase activation rate and fade speed and to make its photochromic option available for more lens types.  In 1992, TOI began manufacturing its second generation of Transitions lenses, which

---

[4] "About Us," www.eloa.com/About+Us/ (Accessed October 15, 2012) and "Essilor USA The Leader in Optical Lenses," www.essilorusa.com/EN/aboutus/EssilorUSA/Pages/default.aspx (Accessed October 15, 2012).  In the 1980s  before the inception of TOI, EOA had a 30 percent share of the lens manufacturing industry.  (Conversation with David Cole, President at TOI, November 1, 2012.)

[5] "Essilor USA The Leader in Optical Lenses", www.essilorusa.com/EN/aboutus/EssilorUSA/Pages/default.aspx (Accessed November 28, 2012) and "Essilor USA Organization," www.essilorusa.com/EN/aboutus/EssilorUSAPages/Organization.aspx (Accessed November 28, 2012).

[6] Indirect Purchaser Complaint, p. 6.

[7] "About PPG Industries," www.ppg.com/en/ourcompany/Pages/default.aspx (Accessed November 28, 2012).  In 1990, Essilor owned a patent related to photochromic processing and PPG was a leading manufacturer of plastics.  (Conversation with David Cole, November 1, 2012.)

[8] Conversation with David Cole, November 1, 2012.

[9] Indirect Purchaser Complaint, p. 6.

[10] Conversation with David Cole, November 1, 2012.

[11] "The Benefits of Transitions® Adaptive Lenses," http://en-us.transitions.com/en/explore/see-the-difference.aspx (Accessed September 6, 2012).  Indirect Purchaser Complaint, p. 7.

[12] Conversation with David Cole, November 1, 2012.

[13] "Focal Point - Photochromic Lenses: Success Through Balance," http://www.essilortransitions.com/resources/essilor-focalpoint.pdf (Accessed November 13, 2012).

Contains Highly Confidential Information—Subject to Protective Order

incorporated improvements to lens clarity and darkness.[14]  From 1993 through 1999, TOI expanded globally, setting up production facilities and sales offices throughout Europe, Asia/Pacific, South America, and Australia.  In 1997, TOI began manufacturing its third generation of Transitions lenses and its first photochromic lenses in an impact-resistant polycarbonate material.  By 2000, TOI had expanded its product lines to include almost every prescription grade in which clear lenses are offered.  In 2001, TOI launched its Next Generation line of Transitions lenses and its first line of lenses in a Trivex material.[15]  In 2005, TOI released its fifth generation incorporating improvements to the speed at which the lens fades back to clear.[16]  In 2008, TOI released its sixth generation and most advanced commercially-released technology to date, with improvements in both activation and fade speed.[17]

15.     Since 1993, TOI has won many Optical Laboratories Association awards recognizing excellence in lens materials, lens treatments, and marketing.[18]  In 2005, TOI launched its "Eye Didn't Know That!" campaign, the ophthalmic industry's most extensive educational campaign geared towards teaching children, parents, and teachers more about healthy vision and eye care basics.[19]  TOI is currently the nation's largest manufacturer and seller of photochromic lenses.[20]  TOI has over 1,200 employees worldwide and offers over 100 lens options in the most popular lens materials and designs.[21]

## B.     Ophthalmic Lens Options

16.     Ophthalmic lenses are currently available in four types of lens materials: plastic, glass, polycarbonate, and Trivex.  The various materials come in different indices that measure the lens's ability to refract light.  Generally, materials with a higher refraction index allow for thinner and lighter lenses.[22]  Standard plastic lenses are typically made of the

---

[14] Deposition of John Ligas, Director of Research and Development at TOI, July 20, 2012 ("Ligas Deposition"), pp. 17, 20 and 26.

[15] "Company History," http://www.transitions.com/aboutcompany/history.aspx (Accessed October 15, 2012) ("TOI Company History").  Like polycarbonate lenses, Trivex is a lens material designed to be thinner, lighter and up to 10x more impact resistant than regular plastic or glass lenses.  Trivex lenses also offer 100 percent UV protection.  Trivex is composed of a urethane-based monomer and is made from a cast molding process similar to plastic lenses.  For more information, see "Polycarbonate vs. Trivex Eyeglass Lenses – Which is Right for You?" http://www.allaboutvision.com/lenses/polycarb.htm (Accessed November 12, 2012) ("Polycarbonate vs. Trivex Lenses").

[16] Ligas Deposition, pp. 45 – 6.

[17] "Company Information."  http://en-us.transitions.com/en/media/Pages/CompanyInformation.aspx (Accessed October 15, 2012)("TOI Company Information") and TOI Company History.

[18] TOI Company Information.

[19] "Eye Didn't Know That!" http://www.eyedidntknowthat.info/about/ (Accessed October 15, 2012).  TOI Company History.

[20] Indirect Purchaser Complaint, p. 2.

[21] TOI Company History.

[22] "Glossary" http://www.vision-ease.com/home/consumers/glossary.aspx?letter=I (Accessed October 26, 2012) ("Glossary").

Contains Highly Confidential Information—Subject to Protective Order

allyl CR-39, and are available in a low to medium index of 1.50-1.56 and in a high or very high index of 1.60-1.74.  High index plastic lenses are about 20 percent thinner than the standard 1.50 plastic lens and more suitable for very nearsighted people who require an extremely thin lens.  Glass lenses come in a variety of indices from 1.50-1.90 and provide maximum clarity but are typically very heavy and capable of shattering.  Polycarbonate is a more impact-resistant material and makes for lenses that are both stronger and lighter than those of glass or plastic.  Polycarbonate lenses are available in 1.59 index.[23]  Trivex lenses are just as durable and lightweight as polycarbonate lenses, but tend to offer more clarity.  Trivex lenses are available in a 1.53 index.[24]

17.    Prescription lenses also come in a variety of lens designs depending on the vision correction needed.  Single-vision ("SV") lenses have the same magnification throughout the entire lens to provide correction for one particular vision field: distance vision, intermediate vision, or near vision.  Single-vision lenses typically correct for nearsightedness, farsightedness, or astigmatism.  Bifocal lenses have two levels of magnification, one correcting for distance vision and one correcting near vision.  Trifocal lenses build on bifocals by adding a third magnification for intermediate vision.  Progressive lenses are similar to bi- and trifocal lenses except that the magnification gradually changes without any visible line separating magnifications.  Bifocals, trifocals, and progressive lenses can all be considered types of multifocal lenses.[25]

18.    A technological trend known as "digital resurfacing" in the ophthalmic lens industry has emerged in recent years.  Laboratories have developed technology to digitally resurface semi-finished single-vision ("SFSV") lenses into progressive lenses.  Because progressive lenses are more expensive than SFSV lenses, purchasing SFSV lenses and employing digital resurfacing technology is a cost-effective strategy for labs and lens casters.[26]

19.    In addition to the variety of lens materials and designs described above, consumers may also choose among various add-ons and other features for their lenses.  Potential add-ons include coatings such as anti-reflective, polarization, scratch resistance, mirror, anti-fog, tinting, ultraviolet protection, and photochromic treatments.[27]

---

[23] "Eyeglasses: A Global Strategic Business Report," March 2008 ("Eyeglasses Strategic Report"), TOI_1657531 and TOI_1657543 – 4 in TOI_1657499 – 998.

[24] Polycarbonate vs. Trivex Lenses.

[25] Glossary.

[26] See, e.g., TOI 2007 Business Strategy Review, 2007 ("2007 BSR"), TOI_0980928 and TOI_0980935 – 6 in TOI_0980924 – 98.

[27] See "Eyeglass Coatings: Anti-Reflective, Scratch Resistant, Anti-For and UV," http://www.allaboutvision.com/lenses/coatings.htm (Accessed November 12, 2012); "Photochromic Lenses: An Overview of Transitions and Other Photochromic Brands" http://www.allaboutvision.com/lenses/photochromic.htm (Accessed

Contains Highly Confidential Information—Subject to Protective Order

20.     Finally, all lenses require frames, with yet more choices for the consumer.  Frames come in a wide variety of price points from low-cost plastic or metal frames to more expensive designer frames from brands like Coach, Dolce and Gabbana, and Brooks Brothers.

21.     The many options for lens material, lens design, lens coatings and treatments, and frame style lead to a wide range of price points at which the final pair of ophthalmic glasses is sold to consumers.  For example, the price a lens caster charges labs or retailers can range from less than $5 for a plastic single-vision lens to almost $60 for a plastic high-index progressive lens.  Similarly, the price a lens caster charges a lab for photochromic lenses can range from approximately $20 to upwards of $80 per pair.[28]  The price TOI charges to lens casters ranges from about ▉ to ▉ per lens.[29]  Consumers can also choose from a range of prices for eyeglass frames from as low as $30 to $170.[30]  The ultimate price consumers pay for a pair of prescription eyeglasses depends on the overall mix of lens material, lens design, frame design, and coatings, combined with any pricing promotions or specials offered by the retailer or eye-care practitioner ("ECP").

## C.     Distribution Chains for Prescription Lenses

22.     Distribution chains for prescription lenses are complex.  Lens casters, such as EOA, Carl Zeiss, and Younger, manufacture and sell untreated lenses, known as lens blanks to wholesale labs.  Wholesale labs sell the lenses to eye-care practitioners ("ECPs"), such as ophthalmologists, opticians, and optometrists, on a made-to-order basis.[31]

23.     When an ECP places an order with a wholesale lab for a specific prescription lens, labs must first grind the lens to match the prescription.  Then they may polish semi-finished lenses, apply various anti-reflective or anti-scratch coatings, fit the lenses to eyeglass frames, and sell the finished eyeglasses to the ECP just as the ECP ordered them.  While some wholesale labs operate independently, labs can be owned, controlled by, or vertically aligned with lens casters, or owned and operated by optical retail chains that

---

November 12, 2012); "Polarized Sunglasses," http://www.allaboutvision.com/sunglasses/polarized.htm (Accessed November 12, 2012) and "Sport Sunglasses: Controlling Light, Enhancing Performance," www.allaboutvision.com/sportsvision/sports-sunglasses.htm (Accessed November 28, 2012).

[28] The Vision Council Lens Shipment Report, Year-to-Date as of December 2010 ("VCA Shipment Report, YTD as of Dec 2012").

[29] Expert Report of Gregory K. Leonard, Ph.D. in the Indirect Purchaser Action, September 17, 2012 ("Leonard Class Cert Report"), Exhibits 20 and 21.

[30] "Shop by Brand: Low to High" http://www.framesdirect.com/eyewear-category/eyeglasses.html, (Accessed November 11, 2012).

[31] Wholesale optical laboratories and optical retailers each represent approximately half of the downstream market for ophthalmic products.  Indirect Purchaser Complaint, p. 9.

Contains Highly Confidential Information—Subject to Protective Order

offer both lab and ECP services.[32]  Wholesale labs can employ their own sales forces to promote and market specific lenses to ECPs.[33]

24.  Optical retailers include national chains, such as Costco or Wal-Mart; regional chains, such as SVS or Doctors Vision Center; and smaller chains such as Marion Eye Center and Fishers Optical.[34]  Optical retailers typically have their own ECPs who sell directly to consumers.  Integrated retailers perform the same processes as wholesale labs in the grinding of the lenses, fitting of the frames, and delivering of the finished good to the end consumer.[35]

25.  TOI operates as an additional step in the distribution chain before the lenses are sold to wholesale labs and ECPs.  TOI buys lens blanks directly from lens casters and applies its proprietary photochromic coating to the untreated lenses.  TOI then sells the photochromic lenses back to the lens casters, who in turn sell them to wholesale optical labs and integrated retailers along with clear and tinted lenses.[36]

26.  TOI's business strategy is to sell both specialty and generic photochromic lenses.  In the case of its specialty products, TOI sells its photochromic lenses to the same lens caster that originally sold TOI the lens blank.  In the case of its generic products, TOI may sell its photochromic products to any lens caster regardless of which lens caster initially supplied the lens blank.[37]

27.  Another factor in the distribution chain for TOI's photochromic lenses is the presence of managed vision care.  When consumers purchase Transitions lenses from a retailer or ECP, their vision plan may cover part or all of the cost of their lenses.  Record evidence indicates that this was the case for at least one purchase made by a named Plaintiff.[38]

28.  There are a variety of managed vision care plans that offer consumers discounts, co-payments or allowances on their eyewear purchases.  Managed vision care plans provide varying levels of coverage for photochromic and Transitions lenses.  Vision Service Plan

---

[32] Indirect Purchaser Complaint, pp. 9 – 11.

[33] Indirect Purchaser Complaint, p. 10.

[34] Excel file indicating TOI sales at various national and regional retail accounts, 2011, TOI_1842613.  Buyer Sales Summary Data, 2010.

[35] Indirect Purchaser Complaint, p. 11.

[36] Indirect Purchaser Complaint, p. 9.

[37] TOI refers to its products that are not necessarily sold to the same lens caster that supplied the lens blank as "generic" products. It does not indicate an unbranded product.  Deposition of David Cole, President at TOI, August 7, 2012 ("Cole Deposition August 7, 2012"), pp. 334 – 5, and Deposition of David Cole, President at TOI, April 5, 2012 ("Cole Deposition April 5, 2012"), p. 174.

[38] McKinleyville Optometric Center Receipt, dated December 22, 2004, IP-DON-000001 (Exhibit 5 to the Deposition of Jon Donohoe, Indirect Purchaser Plaintiff, June 28, 2012 ("Donohoe Deposition")).

Contains Highly Confidential Information—Subject to Protective Order

("VSP"), the largest vision benefits provider in the US,[39] offers three advertised plans: the choice plan, the signature plan and the exam plus plan.  These plans advertise co-payments of $62-82 on photochromic lenses or a discount of 20 percent on lens options.[40] Similarly, ██████████████████████████████████████████████████████████████ ████████████████████████████[41]

29.     Managed vision care and vision insurance plans cover about half of the US population. Survey results indicate that in 2011, 48 percent of the US adult population was covered by a managed vision care or vision insurance plan.[42]  Documentary and survey evidence suggest that this percentage has been relatively stable throughout the recent years.[43]

30.     As described further later in my report, any examination of harm to consumers of ophthalmic lenses of any kind is incomplete without a thorough consideration of issues related to these vision plans.

31.     Plaintiffs in this matter include any consumers who purchased photochromic lenses manufactured by TOI during the period from January 1999 to the present (the "Class Period") in the US (the "Class").[44]  **Figure 1** illustrates the distribution chains for TOI products.

---

[39] "About VSP," https://www.vsp.com/about-vsp.html, (Accessed November 28, 2012).

[40] Co-pays vary based on lens type (i.e. single-vision, multifocal, etc.).  See VSP's website for information on the three plans listed above, at https://visionplans.vsp.com/vsp-plans.html?WT.ac=tn-vspplans (Accessed December 1, 2012).

[41] ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

[42] "2012 Consumer Perceptions of Managed Vision Care," *Jobson Optical Research*, 2012, p. 6.

[43] In 2003, approximately 48 percent of the US population was covered by pre-paid, employer sponsored managed vision care. By 2005, managed vision care programs represented about half of all lenses sold, and about 48 percent of consumers had a vision plan.  In 2008, 2009 and 2010, 49 percent, 50 percent and 43 percent of survey respondents in the US were covered by a managed vision care or insurance plan respectively.  (See BSR Update GMC Meeting, June 2003, TOI_0114231 in TOI_0114169 – 282 (Exhibit 30 of the Deposition of Johanna DiChiara, former Account Executive at TOI, July 6, 2012 ("DiChiara Deposition")); Optical Products 2006 Business Strategy Review, TOI_0982609 in TOI_0982597 – 652 (Exhibit 22 of the Deposition of Rick Elias, Senior Vice President of Optical Products and Specialty Materials at PPG, July 27, 2012 ("Elias Deposition")); Lens Manufacturers Managed Care and National Retail at TOI, December 14, 2005, TOI_0843755 in TOI_0843749 – 78 (Exhibit 11 of the Deposition of Patrick D. Huot, Director of Managed Care and Online Retail, May 10, 2012 ("Huot Deposition")) and "2012 Consumer Perceptions of Managed Vision Care," *Jobson Optical Research*, 2012, p.16).

[44] Indirect Purchaser Complaint, p. 20.

Contains Highly Confidential Information—Subject to Protective Order

**Figure 1 (Reproduced from Indirect Purchaser Complaint)**



## D.   TOI's Relationships with Lens Casters

32.    From TOI's inception, close relationships with lens casters have been central to its
business model to enable TOI to maintain control over the quality of its products.[45]
Generally, these relationships involve a substantial sharing of proprietary information and
data, including business strategies and technical information, with the goal of
transforming high quality clear lenses into high quality photochromic products.[46]  TOI
serves as an extension of lens casters' manufacturing, development, and marketing efforts
in its partnership with lens casters.  For example, President of TOI, David Cole,
explained that TOI partners with lens casters to obtain a wide array of lens blanks.  TOI
sells its photochromic products directly back to lens casters allowing them to carry a wide

---

[45] Conversation with David Cole, November 1, 2012.

[46] Affidavit of David J. Cole in *re: Corning Incorporated v. Transitions Optical, Inc.*, January 15, 1999 ("Affidavit of David Cole in Corning Litigation") (Exhibit 4 of the Cole Deposition August 7, 2012), p. 4.

Contains Highly Confidential Information—Subject to Protective Order

array of photochromic products.  TOI also helps promote its products and innovate the product line, making TOI an extension of lens casters' research and development arm.[47]

33.   TOI has partnerships with many lens casters.  Below, I explain two of those important partnerships in more detail.

34.   Sola was one of TOI's most important lens caster partners in the early days of the joint venture.  Sola was an independent lens caster that, in the 1980s, had an estimated 30 percent share of the ophthalmic lens manufacturing industry.[48]  I understand that Sola was initially hesitant to do business with TOI, because of TOI's relationship with Essilor International.  TOI sought to ensure Sola, and its customers generally, that it would strive to maintain fairness among all its customers and not exhibit favoritism toward Essilor entity.  Eventually Sola became the first lens caster outside the joint venture to enter into an exclusive agreement with TOI.[49]  In 2005, Sola merged with Carl Zeiss Vision.  The combined entity became the leading global supplier of ophthalmic lenses.[50]

35.   The partnership between Sola and TOI proved successful.  Sola became the second largest purchaser of Transitions lenses after EOA.[51]  Sola negotiated an agreement with TOI to supply 30 percent of the lens blanks for TOI's generic products, whereas previously TOI had been sourcing the entire generic supply from Essilor International and its subsidiaries.  TOI and Sola became sufficiently close partners that TOI constructed a manufacturing facility in Australia, where Sola is based, so that Sola's supply needs could be better met.[52]

36.   In addition, TOI has also maintained a partnership with Hoya and has helped Hoya develop relationships with downstream customers.  ██████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

---

[47] Deposition of David Cole, President at TOI, August 9, 2012 ("Cole Deposition August 9, 2012"), pp. 311 – 2.  Cole Deposition August 7, 2012, pp. 311 – 2.

[48] Conversation with David Cole, November 1, 2012.

[49] Conversation with David Cole, November 1, 2012.

[50] "Abstract: The 21st Century," http://vision.zeiss.com/about-us/en_de/company-history/abstract_the_21st_century.html (Accessed November 13, 2012) ("Abstract: The 21st Century").

[51] Conversation with David Cole, November 1, 2012.

[52] Conversation with David Cole, November 1, 2012 and Agreement for Termination of Lease and Reployment of Assets between TOI and Carl Zeiss Vision, September 26, 2006 ("TOI-CZV Termination of Lease"), TOI_0611632 – 6.

Contains Highly Confidential Information—Subject to Protective Order

██████████████████████████████████████████████

## IV.   Relevant Market

37.   The economic analysis of a plaintiff's antitrust claims typically begins with defining the relevant market.  As a general matter, the purpose of market definition in the context of antitrust analysis is to evaluate the range of competitive alternatives that are available to a firm's customers.[54]  The greater the number of options that are available to a consumer, the lesser the scope for an accused monopolist to profit from attempting to raise price.  If an accused monopolist cannot profit from a price increase, then it does not have market power, and therefore is unable to affect market prices via the conduct at issue in the case.

38.   The Supreme Court has held that products "reasonably interchangeable by consumers for the same purposes" make up the relevant product market.[55]  Consumers use TOI's photochromic lenses to correct their vision and provide protection from the sun's glare when the glasses are worn outdoors.  Plaintiffs and their expert have asserted that because photochromic lenses have a unique attribute, in that they darken when exposed to direct sunlight, they are in a separate relevant market from other lenses.  In this section, I evaluate whether other non-photochromic ophthalmic products are sufficiently interchangeable by consumers for photochromic lenses that they constrain the prices that TOI and other manufacturers are able to charge for photochromic lenses.

39.   Specifically, I evaluate whether consumers are likely to view clear lenses as a substitute for photochromic lenses and would opt to purchase clear lenses instead of photochromic lenses if faced with an anticompetitive price increase for photochromic lenses.  I analyze both quantitative and qualitative information in reaching my opinions.  Using available market data, I apply two separate empirical tests of relevant market definition to data produced by Plaintiffs, Defendants, and independent third parties.  Both tests suggest that photochromic and non-photochromic lenses compete in the same relevant market, and that the prices of non-photochromic lenses serve as competitive constraints on the price of photochromic lenses.[56]

---

[53] ████████████████████████████████████████████

████████████████████████████████████████████

[54] US Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* issued August 19, 2010 ("2010 Horizontal Merger Guidelines"), p. 7.

[55] See *US v. E.I. du Pont De Nemours and Co.*, 351 U.S. 377, 76 S.Ct. 994 (1956).

[56] For purposes of this report, I accept Plaintiffs' definition of the geographic market as the United States.

Contains Highly Confidential Information—Subject to Protective Order

40.     The first empirical test examines co-price movements over time between photochromic and non-photochromic lenses.  If the prices of these two products are found to move closely in step with each other, this is evidence that both products are being affected by similar market forces and price shocks.  This approach has received support in economic literature.  Economists George Stigler and Robert Sherwin describe this method as "captur[ing] the essential role of competition in dominating the price movements within each part of the market."[57]  I find the prices of photochromic and non-photochromic lenses to be highly correlated over time.  This indicates that the two categories of products are affected by similar market forces and provides evidence that they are in the same relevant market.

41.     A second empirical test examines the effect of a change in the price of the hypothesized competing product, non-photochromic lenses, on consumer demand for the product whose market scope is in question, photochromic lenses.  Specifically, this test estimates the "cross-price elasticity of demand" for photochromic lenses with respect to the price of non-photochromic lenses.  The cross-price elasticity of demand measures the percent change in the quantity of photochromic lenses purchased in response to a one percent change in the price of non-photochromic lenses.  Estimating the cross-price elasticity of demand is a commonly employed technique for defining the relevant product market as it provides a direct measure of consumer willingness to substitute from one product to another in response to a price change.[58]  Applying this test, I find that as non-photochromics become relatively less expensive and/or photochromics become relatively more expensive, consumers move away from photochromic lenses.  The sensitivity of photochromic demand to the price of non-photochromic products serves to constrain the price of photochromic lenses.

42.     Documents, data, and testimony produced in this litigation also support the opinion that non-photochromics, specifically clear lenses, constrain the price of photochromic lenses.  TOI grew by convincing ophthalmic lens wearers to switch from clear lenses to photochromic lenses.  Since its inception, TOI has viewed clear lenses as its primary competition and has focused its marketing efforts on convincing clear lens buyers to switch to photochromic lenses.

43.     The following sections describe in greater detail the quantitative and qualitative analyses outlined above.  The analysis of market data, documents, and deposition testimony produced in this case all demonstrate that the appropriate relevant market in which to evaluate TOI's conduct includes non-photochromic lenses in addition to photochromic lenses.

---

[57] See George Stigler and Robert Sherwin, "The Extent of the Market," *Journal of Law and Economics*, Vol. 28, No. 3 (1985): 555 – 85, at p. 557.

[58] See Order in the matter of *In Re Live Concert Antitrust Litigation*, United States District Court for the Central District of California, filed on March 23, 2012, pp. 29 – 30.

Contains Highly Confidential Information—Subject to Protective Order

## A.    Quantitative Evidence Shows that Photochromic Lenses Are in the Same Relevant Market as Non-Photochromic Lenses

### 1.    Analysis of Co-Price Movements Shows that Photochromic and Non-Photochromic Lenses Are in the Same Relevant Market

44.    As discussed above, one method for determining whether two products are in the same relevant market is to measure the extent to which their prices movements are correlated.[59] A positive and statistically significant correlation in the prices of two goods is considered evidence of those goods belonging to the same relevant market.  For instance, Richard Posner concludes that "The cleanest approach [to determining a relevant market] involves measuring the correlation between price movements…"[60]

45.    The logic behind the correlation test is that if two goods belong to the same relevant market, then their prices will be similarly affected by common market forces, resulting in the prices of these two goods moving together over time.  In contrast, if two products were in different markets, then one would expect them to be affected by individual market forces, perhaps in addition to some common market forces, causing more independent price movements over time.

46.    Data produced by the Vision Council Association ("VCA") indicate that the price of photochromic lenses is highly positively correlated with the price of non-photochromic lenses.[61]  VCA data provide monthly observations for the average price of photochromic and non-photochromic lenses separately.  Calculating the correlation of the average monthly price of photochromic lenses and the average monthly price of all non-photochromic lenses from January 2000 through February 2012 yields:

$$\text{Correlation}(P_t^{Photochromic}, P_t^{Non-Photochromic}) = 0.902$$

47.    This high degree of positive price correlation suggests that the two products are responding in similar ways to similar market forces.[62]  However there are a number of caveats to this conclusion.  First, because all lenses (photochromic and non-

---

[59] Correlation is a statistical measure of the degree to which two series move in unison.  Correlation is, by definition, bound between -1 and 1, with a correlation near 1 indicating that the two series move together in the same direction, a correlation near -1 indicating that the two series move together but in opposite directions, and a correlation near zero indicating that the two series are likely unrelated.  For a discussion on the use of correlation between price movements to show whether two products are close substitutes see, e.g., Richard Posner, Antitrust Law 2nd Edition (University of Chicago Press, 2001) ("Posner Antitrust Law"), pp. 149 – 51.  See also, Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, (Addison Wesley, 2005) ("Carlton and Perloff"), pp. 647 – 8.

[60] See Posner Antitrust Law, p. 149.

[61] This is the same data relied upon by Dr. French for use in his market definition analysis.

[62] The correlation is statistically significant at the 99 percent level.

Contains Highly Confidential Information—Subject to Protective Order

photochromic) incorporate the same base material, changes in the underlying cost of the substrate will also lead to similar changes in the prices of the products. Thus, additional tests are needed to determine whether the high correlation of the two price series is an artifact of underlying cost changes affecting both markets, or reflects the prices of the two products responding in similar ways to common demand shocks.

48.   In addition, VCA data do not disaggregate "non-photochromic lenses" into sub-categories of "clear" and "tinted" lenses. If it were the case that clear lenses are substitutes for photochromic lenses while tinted lenses are complements, then the VCA data are likely to understate any positive price correlation in the two broad categories. This is because a potential substitute is being aggregated with a potential complement, creating opposing forces in price movements.

49.   Furthermore, while the above correlation test informs us that the prices of photochromic and non-photochromic lenses tend to move together over time, it is important to distinguish whether this correlation is indeed the result of common economic forces affecting both of these goods in a relevant market, or simply a byproduct of the fact that prices tend to increase over time, so two independent price series may appear correlated simply due to inflation.

50.   To add robustness to my correlation analysis, I perform three robustness checks on the data to control for such phenomena. I evaluate 1) whether the correlation persists after de-trending the data, 2) whether the correlation persists after removing the common cost component of prices and, 3) whether the prices of photochromic and non-photochromic lenses are co-integrated, allowing us to infer that they indeed move together. The results of all three tests (which are described in greater detail in the footnote to this sentence) supports my opinion that the high correlation that is observed between the prices of photochromics and non-photochromics suggests that they are in the same relevant market and are affected by common economic forces.[63]

---

[63] In the first robustness check, I de-trend each price series, thereby removing the part of the series that naturally drifts upwards over time, and leaving only the price movements that are caused by non-inflationary economic factors. A correlation test of the de-trended series returns a correlation value of 0.498, which is statistically significant at the 0.001 percent level. Similarly, in my second robustness check, I de-trend each price series, but do so by removing the part of the series that is associated with changes in a price index for plastics and resins, key inputs in the cost of lenses, photochromic or otherwise. A correlation test of these two cost-de-trended series returns a correlation value of 0.66, which is statistically significant at the 0.001 percent level. A third robustness check involves tests of what statisticians refer to as cointegration. A series of values that tends to drift over time away from their current level, without coming back to that original level, is referred to as a non-stationary series. If two non-stationary series tend to drift together, those series are said to be cointegrated. Cointegrated series may differ from one another by varying amounts in the short run due to short run economic factors that affect one but not the other, but in the long run, they tend to move together. Both a Dickey-Fuller and Phillips-Perron test inform us that both photochromic prices and non-photochromic prices are non-stationary. The Johansen test of cointegration informs us that the prices of photochromic and non-photochromic lenses are indeed cointegrated. These tests are significant with 99 percent confidence and, as such, further suggest that photochromic and non-photochromic lenses are affected by common economic forces in the same relevant market. I perform the Johansen test using three lags, as this is the proper number to include according to Akaike's information criterion, Schwarz's Bayesian information criterion, and the

Contains Highly Confidential Information—Subject to Protective Order

51.     The finding of a high, positive, and statistically significant degree of price correlation between photochromic and (broadly defined) non-photochromic lenses is one piece of evidence that non-photochromic lenses are in the same relevant market as photochromic lenses.  Below, I describe additional tests that further indicate that non-photochromic lenses constrain the price of photochromic lenses.

## 2.     Analysis of Cross-Price Elasticities Demonstrates that Non-Photochromic Lenses Constrain the Prices of Photochromic Lenses

52.     Cross-price elasticity of demand measures the percent change in sales of one good in response to a one percent change in the price of another good.  A positive, and statistically significant, cross-price elasticity of demand between two products indicates that the two products are substitutes in the eyes of consumers.  An increase in the price of one product leads to an increase in sales of the other product suggesting that consumers substitute away from one of the products when it becomes relatively more expensive and toward the other product that has become relatively less expensive.

53.     A negative (and statistically significant) cross-price elasticity indicates that the two products are complements in the eyes of consumers.  When the price of one product increases, the combined price of the two products that consumers like to purchase together is now higher, and consumers respond by buying less of the bundle.

54.     The cross-price elasticity also measures the degree to which the price of one good is constrained by the price of another good within a relevant market.  If the cross-price elasticity is small, then a change to the price of one product has little impact on demand for the other product.

55.     As such, the cross-price elasticity of demand for photochromics with respect to the price of non-photochromics will inform us of the extent to which consumers shift their purchases of lenses away from photochromics in response to a decrease in the price of non-photochromic lenses.  In their textbook on the economics of industrial organization, economists Carlton and Perloff discuss the use of cross-price elasticities to determine a relevant market in antitrust litigation writing:

> To intelligently discuss a cross-elasticity, one must specify whether it is the cross-elasticity of Product A with respect to the price of Product B or vice versa.  Although these two different cross-elasticities are usually not

---

Hannan and Quinn information criterion.  See Robert Pindyck and Daniel Rubinfeld, Econometric Models and Economic Forecasts, Fourth Edition, (McGraw-Hill, 1998) ("Pindyck and Rubinfeld"), Chapter 16.  In addition, see Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, Fourth Edition, (South Western Cengage Learning, 2009) ("Wooldridge"), Chapter 18, and Johansen, Søren, "Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregressive Models," *Econometrica*, Vol. 59, No. 6 (November, 1991), pp. 1551 – 80.

Contains Highly Confidential Information—Subject to Protective Order

> distinguished in court decisions, they are not equal in general. The relevant cross-elasticity of demand when the question is whether the market for Product A should include Product B is the cross-elasticity of demand for Product A with respect to the price of Product B.[64]

56.   In this case, we are trying to answer the question: are photochromics in the same relevant market as non-photochromics? Put in terms of the description offered by Carlton and Perloff: "The relevant cross-elasticity of demand when the question is whether the market for [photochromics] should include [non-photochromics] is the cross-elasticity of demand for [photochromics] with respect to the price of [non-photochromics]." In other words, it will inform us of whether the prices of photochromic lenses are constrained by the prices of non-photochromic lenses. If non-photochromic prices do constrain photochromic prices – i.e. if the cross-price elasticity of demand for photochromics with respect to the price of non-photochromics is found to be positive – this would suggest that these products are sold in the same relevant market and photochromic producers compete for sales with producers of non-photochromics.

57.   I use VCA data to calculate the cross-price elasticity of demand for photochromic lenses with respect to the price of non-photochromic lenses.[65] Specifically, I utilize an estimation technique known as "two-stage least squares" ("2SLS") to estimate the following regression:

$$\ln(Q_t^p) = b_0 + b_1 \ln(P_t^p) + b_2 \ln(P_t^n) + b_3 Age_t + b_4 Income_t + b_5 Trend + \sum_{i=1}^{11} b_{i+5}(D_{i,t}) + u_t$$

58.   Where $Q_t^p$ is the left-hand-side ("LHS") or dependent variable that is being explained by right-hand-side ("RHS") or independent variables. Here $Q_t^p$ represents the quantity of all photochromic lenses purchased during month t, $P_t^p$ represents the average price of photochromic lenses during month t, $P_t^n$ represents the average price of non-photochromic lenses during month t, $Age_t$ is the median age in the US in year t, $Income_t$ is the median US income in month t, $Trend$ is a deterministic linear time trend that increases at a rate of one unit per year, and $D_{i,t}$ are 11 indicators for each month of the year except for one.[66] The term $u_t$ is an error term.

---

[64] Carlton and Perloff, p. 648.

[65] Dr. French also uses VCA data to estimate the cross-elasticity of demand, but calculates the cross-elasticity of demand for non-photochromics with respect to the price of photochromics. As described above, and further discussed in my critique of Dr. French's analysis, in my opinion, the equation as specified here (which is also supported by Carlton and Perloff) is an important piece of the analysis that Dr. French's analysis ignored.

[66] Median US income is used rather than total or average US income because median income is a more representative measure of household wellbeing than these other two options.

Contains Highly Confidential Information—Subject to Protective Order

59.   Because the quantity of a good sold and its price are simultaneously determined through the interaction of supply and demand, economists refer to Q and P as being endogenous. In this case, endogeneity arises because price influences quantity sold, but quantity sold may also influence the price.  This endogeneity problem results in standard regression estimation procedures producing biased results, because one of the supposedly independent RHS variables (Price) is not actually independent, instead it is being influenced by the LHS variable (Quantity).  One solution to the endogeneity problem is the 2SLS approach employed by the present analysis, which uses instrumental variables to isolate supply shifters in order to control for some of this endogeneity bias.[67]  By determining the effect of shifting supply on prices and quantities, while demand is presumably not changing, one is able to more cleanly estimate demand.

60.   **Figure 2** describes the basic idea behind 2SLS analysis (aka instrumental variables analysis) as used for demand estimation.[68]  The graph on the left shows the seemingly pattern-less cloud of prices and quantities one would observe in the data as a result of varying levels of supply and demand that jointly determine prices over time, as pictured in the second figure.  The graph on the right shows how, by isolating just changes in supply (i.e. through instrumental variables and 2SLS analysis), we are able to obtain an idea about the shape of the demand curve.[69]

---

[67] Instrumental variables are the variables selected by the econometrician to help control for the endogeneity problem by accounting for only the endogenous portion of the endogenous RHS variable without imposing upon the remaining, non-endogenous, portion of the endogenous variable.  See James Stock and Mark Watson, Introduction to Econometrics, (Pearson Education, Inc. 2003) ("Stock and Watson"), p. 333 ("A valid instrumental variable ('instrument') must satisfy two conditions, known as instrument relevance and instrument exogeneity: 1. Instrument Relevance: [correlation of the endogenous variable and the instrumental variable is non-zero].  2. Instrument Exogeneity: [correlation of the instruments and the omitted variables is zero]….   The two conditions for a valid instrument are vital for instrumental variables regression....")

[68] Stock and Watson, p.336.

[69] Dr. French also acknowledges this endogeneity problem and likewise employs a 2SLS analysis using instrumental variables.

Contains Highly Confidential Information—Subject to Protective Order

## Figure 2



61. In the 2SLS analysis presented below I treat the prices of photochromic lenses as being endogenous with the quantity of photochromic lenses sold, and control for this using a monthly Producer Price Index (PPI) for plastics and resins.[70] This PPI is a sensible instrument as it is likely to cause shifts in photochromic supply, but not demand.

62. **Exhibit 3** presents the results of this 2SLS analysis.

63. The relevant cross-price elasticity is provided by the coefficient estimate for the natural log of the price of non-photochromics, $ln(P_t^n)$. According to my analysis, a one percent increase in the price of non-photochromic lenses leads to an increase in demand for photochromic lenses of 1.69 percent. Conversely, as the price of non-photochromic lenses decreases, the results show that consumers will shift their consumption away from photochromic lenses. This estimate of cross-price elasticity is statistically significant and therefore evidence that non-photochromic lens prices constrain the price of photochromic lenses in the relevant market.

64. The negative and statistically significant coefficient for the natural log of the price of photochromics $ln(P_t^p)$ is the expected sign for a product with a downward sloping demand curve. The value of -2.71 tells us that a one percent increase in the price of photochromics will result in a 2.71 percent decrease in sales of photochromic lenses. Because this value is greater than one in magnitude, we refer to demand for photochromic lenses as being elastic, and infer that an increase in the price of photochromic lenses will result in a decrease in total revenues obtained from the sale of these lenses.[71]

---

[70] See US Bureau of Labor Statistics: Producer Price Index – Commodity Series [Series ID = WPU66].

[71] "If demand is very responsive to price – that is, it is very elastic [greater than 1 in magnitude] – then an increase in price will reduce demand so much that revenue will fall." (Hal R. Varian, Intermediate Microeconomics, A Modern Approach, 5th Edition, (W. W. Norton & Company, 1999) ("Varian"), p. 271.)

Contains Highly Confidential Information—Subject to Protective Order

65.   As mentioned above, one limitation of the VCA data is that clear and tinted prescription lenses are grouped into a singular "non-photochromic" category.  To the extent that some categories of products in the non-photochromic segment are, in fact, complements to photochromics (e.g., tinted lenses), the degree of substitutability described by the above elasticity analysis would likely be understated, meaning that photochromic sales may actually be even more sensitive to the prices of clear lenses than is indicated by **Exhibit 3**. This would mean that the cross-price elasticity estimate of 1.69 should be treated as a conservative estimate of the degree to which consumers shift away from photochromics in response to a decrease in non-photochromic prices (or an increase in the relative photochromic prices).

## B.   Qualitative Evidence Shows that Photochromic Lenses Compete With Non-Photochromic Lenses

66.   Customer switching behavior is an important indicator of the range of competitive alternatives in a relevant market.  The products or companies that a firm focuses on when trying to drive more sales of its own products indicate the types of products or companies that the firm views as its competitors.

67.   Since its inception, TOI has focused its marketing efforts on converting wearers of clear lenses to photochromic lenses.  Every wearer of clear lenses is a potential customer for photochromic lenses.  Indeed, I understand from John Ligas, Director of Research and Development at TOI, that TOI has sought to develop a photochromic lens for almost every corresponding clear lens design.[72]  To convert clear lens wearers to photochromic lenses, TOI and other manufacturers of photochromic lenses must price their products such that the price to the consumer of adding photochromic treatments is commensurate with the added benefit the consumer gains by having lenses that darken when exposed to sunlight.

68.   The potential for consumer switching from clear to photochromic lenses is at the core of TOI's growth strategy.  Throughout TOI's annual Business Strategy Reviews ("BSR"s), the company has recognized its primary competition as the "clear lens market" and its primary growth opportunity as greater penetration of that segment.[73]  Consistent with this strategy, TOI business metrics regularly measure the penetration of Transitions lenses as a percentage of the entire prescription lens market.[74]

---

[72] Conversation with John Ligas, Director of Research and Development at TOI, October 19, 2012.

[73] See, e.g., 2007 BSR, TOI_0980940 in TOI_0980924 – 98.  (TOI states that it "considers its primary competition and growth opportunity to be greater penetration of the clear lens market, and has defined it as the primary strategic growth opportunity upon the continued conversion of clear lens wearers to photochromic lenses.")

[74] See, e.g., Transitions Optical 2009 Business Strategy Review ("2009 BSR"), TOI_1735808 in TOI_1735792 – 871. (TOI notes that it had been successful in "continuing to take share away from the clear lens segment.")  See, also, TOI's 2008 BSR

Contains Highly Confidential Information—Subject to Protective Order

69.     The notion of a wider ophthalmic lens market is apparent throughout other TOI
        documents as well.  In a 2002 press release announcing the launch of a new Transitions
        product generation, TOI President (then Manager of Sales and Business Development)
        David Cole stated that the "growth in the plastic photochromic market is coming from the
        conversion of the clear lens wearer."[75]  TOI business plans likewise recognize the clear
        lens market as its primary competition.[76]

70.     The potential to shift clear lens wearers to photochromic lenses is the foundation of the
        rebate and marketing programs that are at issue in this case.  Programs such as the
        Strategic Retail Agreement ("SRA") program and the STAR Laboratory and Retail
        programs encourage TOI's partners to expand their share of Transitions sales by offering
        financial incentives to convert clear lens wearers to photochromic lens wearers.  By
        offering Business Building Funds ("BBFs") to partners who achieved a 10 to 25 percent
        share of Transitions lenses in their overall lens sales, TOI has increased its market
        penetration.[77]

71.     Other photochromic lens suppliers also view clear lenses as competing with
        photochromic lenses.  Prior to its current legal dispute with TOI, Vision-Ease shared a
        similar view that clear lenses were a competitive constraint on photochromic lenses.

                                                                                              [78]

---

Briefing Document, June 25, 2008 ("2008 BSR Brief"), TOI_0606721 in TOI_0606718 – 97 (Exhibit 1 of the Ligas
Deposition).  ("The business segment's main priority will remain the core clear-to-dark photochromic technology and
business, and to continue to expand the photochromic category through the conversion of clear lens wearers.")

[75] Next Generation Transitions Fuels Photochromic Market Growth, 2002 ("Next Generation Fuels Growth"), TOI_1629172 in
TOI_1629172 – 4 (Exhibit 25 to the Cole Deposition, August 9, 2012).

[76] See, e.g., Transitions Optical, Inc. Essilor of America Business Plan 2004 ("EOA 2004 Business Plan"), TNC_0001815 in
TNC_0001809 – 20 (Exhibit 20 to the Deposition of Rose Wallace, Associate Director of ECP Marketing at TOI, July 19,
2012 ("Wallace Deposition")).

[77] For an example of the STAR Laboratory Agreement, see Transitions Optical, Inc. 2008 STAR Laboratory Program Agreement
("2008 STAR Lab Agreement"), TOI_1131612 – 6 (Exhibit 14 of the Cole Deposition April 5, 2012).  For an example of
the STAR Retail Agreement, see Transitions Optical Inc. 2005 STAR Partner Retail Program ("2005 STAR Retail
Program"), TOI_1132457 – 60 (Exhibit 44 of the Deposition Connie Falvo, Director of External Affairs at TOI, May 22,
2012 ("Falvo Deposition")).  For an example of the SRA Agreement, see Transitions Optical, Inc. 2009 Strategic Retail
Account Program Agreement ("2009 SRA Program"), TOI_687070 – 4 (Exhibit 8 of the Deposition of Susan Cashion,
Associate Director of US ECP Sales Development at TOI, June 8, 2012 ("Cashion Deposition")).

[78] Insight Equity (Vision-Ease)/PPG (Transitions) HSR Filing, June 19, 2007 ("HSR Filing"), VEL-MDL036025 in VEL-
MDL036023 – 7 (Exhibit 3 of the Deposition of Douglas Hepper, President and CEO at Vision-Ease, August 1, 2012
("Hepper Deposition August 1, 2012")).

Contains Highly Confidential Information—Subject to Protective Order

72.   Customers of TOI also recognize that photochromic lenses compete with clear lenses in the larger ophthalmic lens market. [79] [80]

73.   Industry data support that TOI's business strategy has been successful and that consumer switching from clear to photochromic lenses has actually occurred.  From 2000 through 2011, domestic shipments of photochromic lenses grew significantly faster than domestic shipments of all corrective ophthalmic lenses.[81]  This indicates that photochromic penetration of the total ophthalmic lens market has been increasing over the time period, which is to say that lens wearers have been switching from clear to photochromic lenses.

74.   Industry data also demonstrate that as the price of photochromic lenses has fallen relative to non-photochromic lenses, the quantity of photochromic lenses purchased relative to non-photochromic lenses has increased.  From 2000 to 2011, the relative price of photochromic lenses decreased at an annualized rate of one percent, while the relative quantity of photochromic lenses increased at an annualized rate of seven percent.[82]  These data suggest that as the price of photochromic lenses has fallen relative to the price of non-photochromic lenses, consumers are switching their purchases from non-photochromic lenses to photochromic lenses.  The fact that the relative sales of photochromic lenses are increasing at the same time that the relative price of photochromic lenses is decreasing is consistent with the econometric evidence presented above and is indicative of substantial substitution.

75.   Plaintiffs allege that the defining characteristic of photochromic lenses places them into their own relevant product market.[83]  Such an assertion is the result, however, of a misunderstanding of the difference between differentiated products and distinct markets.

---

[79]

[80]

[81] Vision Council of America Lens Shipment Reports, 2000 to 2011 ("VCA Shipment Reports, 2000 to 2011").  From 2000 to 2011, domestic shipments of photochromic lenses grew at an annualized rate of 6.4 percent while domestic shipments of all ophthalmic lenses grew at an annualized rate of 0.2 percent.

[82] VCA Shipment Reports, 2000 through 2011.

[83] Indirect Purchaser Complaint, pp. 7 – 8.

Contains Highly Confidential Information—Subject to Protective Order

76.  While photochromic lenses have characteristics that distinguish them from clear lenses, such characteristics do not make them so different as to not be considered substitutes by consumers.  It has been recognized in economic literature that differentiated product markets include products with a variety of features and that not all products need offer the same set of features or attributes to provide a competitive constraint on one another.[84]  For example, while cars with sunroofs and cars without sunroofs have different product characteristics, both nonetheless compete within the same market for automobiles.  At a certain price, most consumers would switch between the two differentiated products in these two examples.

77.  Product differentiation occurs within both the photochromic segment and the non-photochromic segment.  Both types of lenses can be purchased in single-vision or multifocal designs, for instance, among other options.  While these designs may not be viable alternatives to any given consumer, competition at the margin puts pricing pressure on the segments where they overlap.  Inframarginal customers benefit from such pricing pressure, including individual customers who may not consider multifocal lenses, for example, when choosing their eyewear.  Economic experts in this matter as well as separate matters have cited the price premium over clear lenses at which photochromic lenses sell as evidence of their position in a distinct product market from clear lenses.[85]  However, an analysis of 2011 VCA data shows that the price of polycarbonate progressive lenses is 3.6 times the price of polycarbonate SV lenses and the price of plastic progressive lenses ranges from 2 to 14 times the price for plastic single-vision lenses.[86]  Such significant price differences do not imply distinct markets, but rather an industry characterized by a variety of product differentiation.

78.  Along the same lines, TOI consistently recognizes "value-added products" (i.e., coatings or enhancements to clear lenses) as a source of competitive pressure.[87]  While enhancements such as anti-reflective coatings, specialized hardcoats, and high-index materials are not necessarily mutually exclusive with photochromic lenses, they nonetheless compete for consumer dollars with photochromic treatment.  To the extent a

---

[84] See, e.g., Christopher Pleatsikas and David Teece, "The Analysis of Market Definition and Market Power in the Context of Rapid Innovation," *International Journal of Industrial Organization*, Vol. 19 (2001) ("Pleatsikas and Teece"), p. 666.  "Technology and features are as important to consumers as price, requiring consideration of price/performance competition rather than price competition alone."  See also Pleatsikas and Teece, p. 674.  "A 'product's peculiar characteristics and uses' are even less useful [for defining a relevant market], since products (and services) in many high technology industries are highly differentiated.  Subdividing the relevant market based on the very product differentiation that is one of the fundamental bases for competition risks defining markets much too narrowly and overstating market power, so that monopoly power is found where none, in fact, exists."

[85] See French Report, ¶30; Merits Report of Hal J. Singer, September 30, 2012 ("Singer Merits Report"), ¶67, and Expert Report of Kenneth C. Baseman, October 8, 2012, Revised to Reflect Errata as of October 19, 2012 ("Baseman Report"), ¶165.

[86] VCA Shipment Report, YTD as of December 2011.

[87] 2008 BSR Brief, TOI_0606734; 2007 BSR, TOI_0980927; 2009 BSR, TOI_1735808 and Transitions Optical 2010 BSR Briefing Document ("2010 BSR Brief"), p.11.

Contains Highly Confidential Information—Subject to Protective Order

lens wearer wants to enhance a pair of clear lenses, adding a photochromic treatment is simply one means of doing so.

## C.   Summary

79.   Based on my review of the evidence produced in this case, including empirical data, ordinary course documents, and deposition testimony from customers and competitors of TOI that I have reviewed, my opinion is that the relevant market comprises both clear and photochromic lenses.

# V.   Market Power

## A.   TOI Does Not Have the Ability to Impose an Anticompetitive Price Increase

## 1.   TOI Accounts for a Small Share of Ophthalmic Lens Shipments

80.   As stated above, a properly defined relevant market includes clear and photochromic lenses.  TOI's share of this relevant market is too small to support an inference of market power.  While TOI has focused its efforts on growing its share of this market, since 2000, TOI's domestic lens shipments as a share of all domestic ophthalmic lens shipments has never exceeded 20 percent.[88]  See **Exhibit 4**.  Shares of this magnitude are inconsistent with an inference of TOI having the ability to wield monopoly power.

## 2.   Constraints on TOI's Ability to Raise Price

81.   The purpose of defining a relevant market is to evaluate whether there are sufficient competitive alternatives to which consumers could turn if faced with an attempted price increase for the accused monopolist's product to render the attempted price increase unprofitable.[89]  Plaintiffs contend that the relevant market consists only of photochromic lenses and that TOI's share of the alleged market is sufficiently high to support an inference of market power.[90]  The analysis above shows that Plaintiffs' alleged relevant market is flawed and that even if TOI has a high share of the photochromic segment, its prices are constrained by non-photochromic lenses.

82.   Much of the discussion and debate as to the appropriate relevant market is to some extent academic.  Defining the relevant market only allows an inference of market power.

---

[88] I note again that tinted lenses are included in the measure of all ophthalmic lenses available in the VCA data.  I do not have sufficient information that would allow me to exclude tinted lenses from this calculation.

[89] See 2010 Horizontal Merger Guidelines, pp. 11 – 2.

[90] Indirect Purchaser Complaint, pp. 7 – 8.

Contains Highly Confidential Information—Subject to Protective Order

Direct evidence of constraints on TOI's ability to set price for its products demonstrates that TOI does not have pricing power regardless of the boundaries of the relevant market. Moreover, as discussed later in this report, direct evidence that TOI's conduct at issue did not foreclose competition or prevent entry demonstrates that TOI's contracts and alleged exclusionary behavior did not have an anticompetitive effect, however the market is defined.

83.   TOI's pricing power is constrained by countervailing buyer power, including retailers who can promote clear or tinted lenses if TOI were to try to raise prices on its photochromic lenses; retailers' ability to switch to another supplier of photochromic lenses; ECPs who can promote other types of value-added enhancements to ophthalmic lens customers; and, lens casters' ability to develop or license photochromic technology and produce their own photochromic lenses. Each of these factors is consistent with photochromic lenses competing in a wider ophthalmic lens market and facing competition from a range of products to which customers can switch in the event of an attempted price increase by TOI. Because TOI's customers can change their purchasing patterns and shift their purchases to more profitable product mixes if TOI tried to raise the price and increase the cost of its photochromic lenses, TOI cannot exercise anticompetitive market power.

84.   Documents and deposition testimony produced in this case demonstrate that TOI's price is constrained by the competitive alternatives available to lens casters, retailers, ECPs, and end customers. Retailers like Luxottica, who manufacture eyeglass frames in addition to selling lenses, prefer to market two non-photochromic pairs (i.e., clear and tinted) rather than market one photochromic pair because it would make a larger profit on the sale of two frames rather than just one.[91]



Contains Highly Confidential Information—Subject to Protective Order

██████████████████████████████████████[93]   As stated above, these options constrain the price that TOI is able to charge for its photochromic lenses.  An attempted anticompetitive price increase by TOI would simply provide greater incentives for customers, who are resellers of photochromic lenses, to promote more profitable product combinations to their customers.

85.     I also understand from David Cole that TOI's pricing is further constrained at the point of sale by ECPs who can direct their customers to other ophthalmic products in the event of an attempted price increase by TOI.  ECPs exert significant influence over consumers' purchasing decisions and often promote two-pair (i.e., non-photochromic) purchases or alternative value-added enhancements such as AR coatings or higher-index lenses over Transitions lenses.[94]

86.     The ability of TOI's customers and entities closer to the final point of purchase to thwart an attempted price increase by TOI, that would reduce the margins earned by resellers of its products, is illustrated by real world examples of TOI negotiating with its customers and agreeing to roll back pricing for new product launches or to continue offering rebates even when sales volumes fell below agreed upon levels.

87.     TOI sets its pricing based on the relative value of its products to clear lenses in the optical marketplace.  Mr. Cole testified that TOI determines this value from a variety of factors, including consumer feedback from wearer trials and discussions with customers.[95]  While the basic inputs that TOI uses in determining prices enter into a general formula,[96] record evidence indicates that the company has frequently implemented pricing changes on a customer-specific basis when customers do not agree with TOI's assessment of the value of its product offerings relative to competitive alternatives.  Specifically, record evidence demonstrates that TOI was forced to renegotiate prices to lens casters in 2007 and 2008, and was forced to defer a planned price increase in 2009 across all products.

---

[93] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[94] Conversation with David Cole, November 1, 2012.

[95] Cole Deposition August 9, 2012, pp. 251 – 2.

[96] Conversation with David Cole, November 1, 2012.For more information, see Transitions Optical, Inc. – Civil Investigation Demands, Files 091-0062 & 091-0047, July 10, 2009 ("TOI Response to Specifications"), TOI_1134013 – 4 in TOI_1134004 – 29 (Exhibit 38 of the Cole Deposition August 7, 2012).

Contains Highly Confidential Information—Subject to Protective Order

88.    In mid-2007, EOA effectively exerted pressure on TOI to modify the terms of the Transitions VI product launch.



89.    In 2007,



90.    In 2008, another of TOI's key lens caster partners, Hoya, also successfully exerted downward pricing pressure on TOI



TOI's negotiations with Hoya demonstrate that TOI does not have sufficient market power to impose market-wide price increases.

91.    These examples illustrate that TOI is not able to impose its pricing goals on its customers, and instead must negotiate prices and respond to competitive conditions.  The fact that

---

[97] Email from John Carrier to Bertrand Roy re: Transitions VI, July 2007, ESOA-02-00016073 (Exhibit 50 of the Carrier-Guillomet Deposition).

[98]



[99]

[100] TOI Transaction Data.  For this analysis, I calculated a weighted average price by product and year and excluded products that were returned, products which prices were extreme outliers in the data, and products that did not appear in both years.  I have further used +/- $0.10 as the threshold for a price increase/decrease.

[101] Cole Deposition August 9, 2012, p. 267; see, e.g., Letter from Barney Dougher at Hoya Vision Care to Rick Elias and Brett Craig at TOI, December 10, 2008, TOI_0606352 – 3; Email from Michael Ruggeri at PPG to Rick Elias at TOI et al. re: Inflationary/Economic Price Changes, December 18, 2008, TOI_0721718; Email from Paddy McDermott at TOI to Gerry Bottero et al. re: Hoya Pricing 2009, December 2008, TOI_0055447 – 9; Letter from Brett Craig at TOI to Laurent Vacherot at Essilor International, December 17, 2009, TOI_0112509 – 10 and December Monthly Report from Brett Craig/Mike Ruggeri at TOI to Rick Elias at TOI, December 22, 2008, TOI_0524055 – 8.

[102] TOI Transaction Data.  For this analysis, I calculated a weighted average price by product and year and excluded products that were returned, products which prices were extreme outliers in the data, and products that did not appear in both years.  I have further used +/- $0.10 as the threshold for a price increase/decrease.

Contains Highly Confidential Information—Subject to Protective Order

TOI not only engaged in price negotiations with customers, but, as a direct result of those negotiations, was compelled to substantially withhold price increases on products accounting for a majority of its sales to certain lens casters, shows that TOI cannot exercise monopoly power.

### 3.        Competition in the Photochromic Segment of the Market

92.    Even if the relevant market were restricted to just photochromic lenses, sufficient competition exists within this segment to discipline pricing. Since TOI introduced its first generation of photochromic lenses, at least 30 competing photochromic products have entered the market. This demonstrates that, regardless of the contours of the relevant market, TOI's conduct has not foreclosed entry and TOI faces competition in the photochromic segment. **Exhibit 5** shows the dates on which other manufacturers or resellers began offering photochromic products in the US. I note that the list includes manufacturers that produce clear lenses in addition to photochromic lenses, whereas TOI specializes in photochromic lenses.

93.    TOI's high share of sales of photochromic lenses is an artifact of the fact that TOI was the first company to successfully produce a plastic photochromic lens and that TOI has engaged in an aggressive marketing campaign to educate ECPs and consumers about photochromic lenses.[103] However, even with a high share of photochromic sales, TOI is still vulnerable to competition from other photochromic lens suppliers in addition to competition from non-photochromic lenses as described above.

94.    TOI has responded to competitive pressures from other suppliers of photochromic lenses by implementing price changes to lens casters for those lens casters' sales at certain downstream retailers. In late 2005, Luxottica informed EOA that EOA would lose its photochromic business at Cole Vision to Vision-Ease if it did not make price concessions on TOI products.[104] TOI responded by entering into an agreement to discount the prices of its products at Cole Vision as well as Pearle Vision ███████████████████ ████████████████████████[105] In 2007, TOI extended a ████████ rebate to Younger on Trivex lenses (which TOI considered to be a competing product to a polycarbonate bifocal,

---

[103] See, e.g., Wallace Deposition, p. 255. ("A: That has always been a large part of our plan, is to advertise and build a brand directly with the consumer."), and Transitions Marketing Communication Plan Wholesale Laboratories and Independent Eye Care Professionals, 2000, TNC_0000805 – 9 (Exhibit 25 to the Wallace Deposition).

[104] Attachment to Email from Patrick Huot to Connie Falvo and David Cole re: Luxottica, October 5, 2005, TOI_1412138 (Exhibit 11 to the Deposition of David Cole, President at TOI, August 8, 2012 ("Cole Deposition August 8, 2012")).

[105] Letter from Laurent Dosseville at TOI to Ken Engelhart, former Senior Vice President  at EOA, February 10, 2006, TNC_0030583 – 4 in TNC_0030583 – 5 (Exhibit 9 to the Deposition of Laurent Dosseville, Business Manager at TOI, June 21, 2012 ("Dosseville Deposition")).

Contains Highly Confidential Information—Subject to Protective Order

which is a product that it did not supply) that was supposed to expire in 2006.[106]  These downward adjustments in price provide direct evidence that TOI's prices are constrained by competitive alternatives, even within the photochromic segment.

95.    TOI also engaged in various price negotiations to meet competition from Vision-Ease at Wal-Mart.[107]  From June 2005 through April 2009, TOI provided EOA with a rebate for photochromic polycarbonate FSV sales made at Wal-Mart.[108]  In the first half of 2008, TOI (through lens casters such as EOA, Carl Zeiss, Younger, and Seiko) discounted all Transitions lenses sold at Wal-Mart as part of a 90-day "rollback" program.[109]  Through this program, a ▮ per pair discount was provided to Wal-Mart, with TOI contributing ▮ and lens casters contributing ▮[110]  Through the same lens casters, TOI enacted another such rollback in early 2009.[111]  Again, these discounts provide direct evidence that TOI's prices are constrained by competitive alternatives, even within the photochromic segment.

96.    In addition to competition from existing photochromic and clear lens suppliers, the price that TOI can charge for its lenses is also constrained by the ability of lens manufacturers to enter the photochromic segment.  Potential competing photochromic lens manufacturers can gain entry to the photochromic segment by partnering with large buyers to guarantee sufficient demand for their products.  Indeed, the success of Vision-Ease's 2005 entry into the photochromic segment was facilitated in large part by its securing of supply arrangements with large national retailers such as LensCrafters and Wal-Mart.[112]  These downstream relationships not only accelerated Vision-Ease's

---

[106] Email from Patty Spivey to Dave Cole et al. Re: Yngr Trivex FT28 Rebate, September 2006, TOI_1463252 – 3 (Exhibit 13 to the Cole Deposition August 8, 2012).

[107] Email from Scott Henning, Director of US ECP Sales and Marketing at TOI, to Linda Reynolds, Account Executive at TOI, et al., July 21, 2005, TOI_1568587 in TOI_1568587 – 9 (Exhibit 30 to the Deposition of Patrick Huot, Director of Managed Care and Online Retail at TOI, May 10, 2012 ("Huot Deposition")).  ("[Wal-Mart] thrive[s] on playing suppliers against each other to drive down price.")

[108] 2009 – Essilor Lens Manufacturer Pricing Rebates, Attachment to Email from Patty Spivey to Brian Hauser et al., September 22, 2009 ("2009 Essilor Pricing Rebates"), TOI_1486344 in TOI_1486343 – 4 ( Exhibit 7 to the Deposition of Elliott Reshard, Strategic Accounts Manager of the Central Region at TOI, June 12, 2012 ("Reshard Deposition")).

[109] "Rebate / $ Discount Request and Approval Form," July 30, 2008, TOI_0466887 in TOI_0466887 – 9 (Exhibit 34 to Deposition of Brian Hauser, General Manager of US and Canada at TOI, June 6, 2012.)

[110] Deposition of Scott Henning, Director of US ECP Sales and Marketing at TOI, August 17, 2012, pp. 54 – 7.  2009 Essilor Pricing Rebates.

[111] Email from Scott Henning to Drew Smith and Alex Louw re: Walmart Feb rollback invoices, March 2009, TOI_1163356 (Exhibit 19 to the Deposition of Alex Louw, Director of Lens Manufacturer & Trade Sales, Retail and Canada at TOI, May 2, 2012 ("Louw Deposition")).

[112]


Contains Highly Confidential Information—Subject to Protective Order

penetration in the segment, but also enabled Vision-Ease to make the necessary investments to bring its products to market.[113]  Such partnerships impose yet another constraint on TOI's ability to exercise market power.

97.   Finally, I understand from John Ligas, Director of Research and Development at TOI, that Tokuyama Corporation, a Japanese chemical manufacturer, has had photochromic technology as long as TOI has been manufacturing photochromic lenses and has supplied its technology to major lens casters such as Carl Zeiss, Augen, Rodenstock, and Hoya.[114] The availability of photochromic technology to lens manufacturers indicates lens manufacturers have the ability to make and sell their own photochromic lenses.  This constrains the price that TOI (and other photochromic lens suppliers) are able to charge for photochromic lenses, and also creates incentives for TOI to improve the quality of its products and the efficiency of its manufacturing processes.

98.   The foregoing considerations demonstrate that TOI does not possess anticompetitive monopoly power.  TOI's customers have the ability to purchase photochromic lenses from alternative sources, or license photochromic technology and manufacture the lenses themselves if faced with an attempted anticompetitive price increase.  The substantial entry in the photochromic segment is inconsistent with an inference of monopoly behavior or anticompetitive conduct in the photochromic segment.

## B.   TOI's Customer and Reseller Agreements Do Not Foreclose Competition

99.   Plaintiffs allege that TOI's supply, marketing, and rebate agreements with lens casters, wholesale laboratories, and retailers have effectively excluded competition in the purported relevant market for photochromic lenses.[115]  Even if I again accept, for purposes of this discussion, that the relevant market is limited to photochromic lenses, the allegation that TOI's customer agreements have foreclosed competition is inconsistent with market evidence and the distribution dynamics of the ophthalmic lens industry.

100.   Plaintiffs' allegation that TOI's STAR or BBF contracts foreclose competitors from selling photochromic lenses is not supported by documents or data. ████████████████



---

[113] ███████████████████████████████████████

[114] Conversation with John Ligas, October 19, 2012.

[115] Indirect Purchaser Complaint, pp. 13 – 7.

Contains Highly Confidential Information—Subject to Protective Order



101.    Further, there is evidence that labs owned by lens casters with agreements with TOI purchased photochromic lenses from Vision-Ease. [black bar] [118]  This market evidence shows that the agreements have not foreclosed competition in the relevant market proposed by Plaintiffs.

102.    Moreover, notwithstanding the evidence of actual entry and competition discussed above, the proportion of the alleged relevant market foreclosed by TOI's agreements is too small to meaningfully restrain trade of photochromic lenses.  I understand that courts have recognized that exclusive dealing arrangements only foreclose competition to the extent that they restrain products from reaching the end consumer.  If competitors in a given market can reach end consumers through alternative distribution channels to those allegedly being foreclosed, there is generally less cause for anticompetitive concern.[119]  Antitrust literature has also recognized the importance of looking beyond the alleged foreclosure of a particular channel and considering the use of alternative channels in reaching end consumers.[120]

---

[116] Vision-Ease/Insight Equity presentation, "Current Month Performance," December 13, 2006, VEL-MDL328854 at slides 33 – 4.

[117] Vision-Ease sales data.

[118] Vision-Ease sales data.

[119] See, e.g., *Omega Environmental Inc., et al. v. Gilbarco, Inc., et al.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  ("[E]xclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern…. If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market.")  (Emphasis is in the original document.)

[120] See, e.g., Richard M. Steuer, "Exclusive Dealing in Distribution," *Cornell Law Review* Vol. 69 (1983 – 4) ("Steuer"), p. 124. ("In estimating foreclosure, courts should look beyond the particular channel of distribution affected and determine whether competitors can reach the ultimate market through alternative channels.")

Contains Highly Confidential Information—Subject to Protective Order

103.   Photochromic lenses reach end consumers through a variety of distribution channels.  As shown and described above, photochromic lens manufacturers like TOI or Corning distribute lenses through lens casters that then sell downstream to wholesale laboratories or integrated retailers.  Alternatively, lens casters that manufacture their own photochromic lenses, such as Hoya or Vision-Ease, sell directly to wholesale laboratories or integrated retailers.  Photochromic lenses ultimately reach end consumers through ECPs (who purchase lenses from wholesale laboratories) or through integrated retailers.

104.   The percentage of sales made by lens casters that have an exclusive agreement with TOI is irrelevant in assessing the competitive impact of those agreements.  Most competing photochromic manufacturers are lens casters themselves.  Rodenstock, Hoya, Vision-Ease, and Augen manufacture their own brand of photochromic lenses and are lens casters themselves.  Lens casters cannot be foreclosed by TOI's agreements with other lens casters.  Put another way, TOI's agreement with Carl Zeiss, for example, does not foreclose any other lens caster from selling its own photochromic lenses to labs and retailers.  Because each lens caster has its own access to downstream channels of distribution, TOI's exclusive contracts with other lens casters cannot foreclose the market to any lens caster wishing to distribute its own photochromic lenses to downstream customers.

105.   While TOI did have exclusive agreements with some retailers, it did not have any exclusive agreements with wholesale labs, which account for approximately 63 percent of retail photochromic lens sales to end users.[121]  This means that 63 percent of TOI photochromic lenses reach the end user without going through the integrated retail channel, but rather go through the lab channel and are ultimately sold to end consumers by ECPs.  When these two channels are combined, retailers with exclusive contracts with TOI only represented between 11 and 12 percent of sales of photochromic lenses from 2006 through 2008.  Therefore, only 11 to 12 percent of the wholesale lab and integrated retail channels for photochromic lenses is allegedly "foreclosed" by TOI's agreements.  I calculated the share of sales to all end users made through exclusive retailers by relying on the "percentage of photochromic sales through integrated retail channel attributable to TOI's exclusive contracts" that Dr. Hal J. Singer, expert for Lens Caster, Retailer, Lab, and ECP Plaintiffs in a separate action, reports in Table 8 of his merits report, and supplementing the denominator with sales of photochromic lenses through the laboratory channel, which Dr. Singer excludes.[122]  This alleged foreclosure share across both the laboratory and integrated retail channel is too small to meaningfully restrict competition.

---

[121] Production to Singer Merits Report.

[122] Singer Merits Report, Table 8.  This is consistent with the results reported in Table 7 of the Class Certification Report of Hal J. Singer, Ph.D., June 15, 2012.

Contains Highly Confidential Information—Subject to Protective Order

106. These companies need not rely upon their lens caster competitors to access the downstream market. Vision-Ease, for example, enjoyed a successful launch of LifeRx by securing supply agreements with key retailers such as LensCrafters and Wal-Mart, as mentioned above. Given the substantial share of the laboratory and retailer channels available to photochromic competitors—nearly 90 percent—the alleged foreclosure of the lens caster channel is unlikely to have a material effect on photochromic lenses reaching end consumers. Indeed, it has been recognized that competition among different modes of distribution (so-called "intertype" competition) can actually enhance competition overall.[123]

107. TOI's marketing and rebate agreements with wholesale laboratories and optical retailers have likewise not served to foreclose competition in the alleged relevant market for photochromic lenses. Plaintiffs allege that the exclusive or preferred clauses of such agreements have foreclosed downstream outlets for photochromic lenses and created barriers to entry.[124] Because, as I will explain in more detail below, such programs have pro-competitive justifications and have led to pro-competitive market outcomes, Plaintiffs are incorrect to assert that the programs have foreclosed entry.

108. TOI's payments under these agreements need not be, and are not, tied to exclusivity clauses.[125] Not all STAR retail agreements required retailers to exclusively sell TOI photochromic products, and TOI actually offered similar incentives to STAR retailers without exclusivity clauses. None of TOI's STAR laboratory agreements contained exclusivity clauses.[126] A review of rebates paid to lens casters over time shows that the rebates TOI paid to lens casters were also not necessarily tied to exclusivity. For example, Exhibit 23 in the Expert Report of Gregory K. Leonard, Ph.D., in the Indirect Purchaser Action shows that TOI paid Hoya rebates between ███ and ███ per pair of lenses purchased between 2005 and 2010, during which time Hoya was not an exclusive customer of TOI.[127]

109. Given that TOI paid rebates to lens casters and downstream resellers regardless of exclusivity, and given that other photochromic competitors made sales to resellers with rebate agreements with TOI, it is not accurate to argue that TOI's rebate programs foreclosed competitors from accessing buyers in these channels. Competitors could have competed with TOI's rebates by offering similar discounts to TOI's customers or a higher

---

[123] See, e.g., Steuer, pp. 123 – 4.

[124] Indirect Purchaser Complaint, pp. 16 – 7.

[125] Indirect Purchaser Complaint, pp. 16 – 7.

[126] Singer Merits Report, ¶186.

[127] See Leonard Class Cert Report, Exhibit 23. Dr. French does not note Hoya as an exclusive customer of TOI during this time. See French Report, p. 32 and Exhibit 5.

Contains Highly Confidential Information—Subject to Protective Order

quality product.  ███████████████████████████[128]

## C.   There is No Evidence of Anticompetitive Outcomes in the Market

110. Antitrust monopoly power is the ability to profitably maintain prices significantly above—or output, quality, or innovation below—competitive levels for a sustained period of time.  The antitrust concern with allowing firms to exercise monopoly power unchecked is that output will be lower, prices higher and quality impaired compared to what we might expect in a more competitive environment.  Even if again I assume, hypothetically, that the relevant market is limited to photochromic lenses, available market evidence is inconsistent with anticompetitive outcomes.  Over the last decade, output has expanded, entry has occurred, quality has improved, and quality-adjusted prices have declined.  These real-world outcomes reflect the market conditions one would expect in a competitive market.

111. Output of photochromic lenses has increased significantly over the last decade.  US shipments of photochromic lenses nearly doubled from 2000 to 2011, increasing at an annualized rate of 6.4 percent.[129]  This growth in output has significantly outpaced the growth of all ophthalmic lenses, which has been relatively flat over the same period.[130]

112. Entry in the photochromic segment has occurred regularly over the past two decades.  At least 18 companies (including TOI) have introduced photochromic lenses and at least 30 new products have come to market.[131]  See **Exhibit 5** for a summary of entry in the photochromic segment since 1991, when TOI launched its Generation I product.

113. The significant quality improvements in photochromic lens technology stands in apparent contradiction to any inference that this is a market constrained by monopolistic behavior.  In their analysis of technology-driven markets, Pleatsikas and Teece (2001) note, "Where innovative activity is high, it is unlikely that monopoly power exists.  High R&D spending relative to sales is generally an indication that participants view product performance as the ultimate arbiter of competitive strength."[132]  Record evidence shows the ophthalmic lens market to be one in which quality improvements and innovations are important dimensions of competition, with TOI actively working to increase product quality.

---

[128] ████████████████████████████████

[129] VCA Shipment Reports, 2000-2011.

[130] VCA Shipment Reports, 2000-2011.  Domestic shipments of all ophthalmic lenses increased by 0.2 percent from 2000 to 2011.  Domestic shipments of non-photochromic lenses declined by 8.4 percent over this period.

[131] This Exhibit includes subsequent generations of a manufacturer's photochromic lenses.

[132] Pleatsikas and Teece, p. 690.

Contains Highly Confidential Information—Subject to Protective Order

114. TOI's focus on innovation and product improvement is evidenced by its significant expenditures in R&D.  As shown in **Exhibit 6**, TOI's R&D expenditures outpaced its growth in domestic net sales from 2000 through 2010, and each year from 2007 through 2010, TOI's R&D expenditures have increased as a proportion of its domestic net sales.

115. TOI's R&D expenditures have resulted in improvements in TOI's photochromic lenses in key measures of product performance.  **Exhibit 7**, a matrix summarizing improvements in TOI's products from generation to generation, shows that TOI has improved its products from generation to generation in key measures of performance.[133]

116. In **Exhibit 7**, I focus on five key quality characteristics: clarity, darkness, fade speed, activation speed, and fatigue.  Clarity, or percent transmission ("T"), measures the amount of light that passes through a lens.  As a benchmark, clear lenses typically have a 92 percent transmission.  TOI's products have improved from an 86 percent transmission to almost 89 percent transmission from Generation II transbonded to Generation VI imbibed and transbonded.  The activation speed, or the time it takes the lens to transition from clear to dark, is measured by the percent transmission after thirty seconds at 23 degrees Celsius.  As shown, TOI was able to improve activation speed from almost 40 percent transmission after thirty seconds in Generation II transbonded down to a 27 percent transmission after thirty seconds in Generation VI imbibed and transbonded.  Fade speed, or the time it takes to fade from a darkened state back to a clear lens, is measured by the time in seconds it takes a darkened lens to achieve 50 percent transmission.  For TOI's transbonded products, fade speed increased from over 100 seconds, or almost one minute and forty seconds, down to just over one minute and twenty seconds, or 83 seconds from Generation II to Generation VI.  The darkness of the lens after activation is measured by the percent transmission after thirty seconds of activation.  This metric has improved from 22 percent transmission with Generation II transbonded down to a 12 percent transmission with Generation VI imbibed and transbonded.  Finally, fatigue is measured by the degree of yellowing or tinting over time, or a delta b*.  According to Mr. Ligas, a lens with 1.5 delta b* shows very little yellowing over time.  TOI has decreased fatigue from 2.5 delta b* in Generation II transbonded down to 1.5 delta b* in Generation VI imbibed and transbonded.[134]

117. **Exhibit 8** shows TOI's quarterly weighted average prices from Q1 2000 through Q2 2011 compared to quality-adjusted weighted average prices if one were to adjust prices for each of the key quality characteristics I address above.  Here I show the overall weighted average price TOI charged lens casters remained relatively flat from 2000

---

[133] See, also, Ligas Deposition, pp. 24 – 8, 34 – 5, and 44 – 9.  Mr. Ligas states that various improvements have been made to clarity in the deactivated state, activation speed, and color between each generation of Transitions brand lenses.  Clarity and darkness improved from the first to second generations.  Clarity improved from the second to third generation.  Fade speed improved from the fourth to fifth generations.  Clarity, darkness, and fade speed improved from the fifth to sixth generation.

[134] Conversations with John Ligas, January 26, 2012 and October 19, 2012.

Contains Highly Confidential Information—Subject to Protective Order

through May 2010.  However, as explained above, the quality of TOI's products have increased from generation to generation.  Increases in quality absent any substantial increases in prices mean prices adjusted for quality decline over time.  By adjusting the weighted average prices by TOI's improvement in each key quality characteristic from generation to generation, I show that the quality-adjusted price actually declined over time.

118.   Elsewhere in this report, I have noted that other photochromic suppliers could compete with TOI on price or match the rebate TOI offered as a growth incentive.  However, one of the reasons why TOI has been able to maintain a large share of photochromic sales, notwithstanding its competitors' ability to meet its price, is the fact that TOI's products have performed better than competing photochromic products.  **Exhibit 9** compares contemporaneous-generation Transitions lenses with Corning's SunSensors using the same key factors and metrics I discuss above.  These matrices demonstrate that Transitions lenses are superior to the lenses of TOI's photochromic competitors along key measures of quality.  Transitions Generation IV performs better than the relevant Corning's SunSensors product in all five key quality characteristics.  Transitions Generation VI also performs better than Corning's SunSensors on all five quality characteristics as well.  Transitions Generations IV and VI get noticeably darker than SunSensors, achieving a 14 and 12 percent T compared with SunSensors' 23 and 20 percent T.[135]

119.   Another competing product of Transitions lenses is Vision-Ease's LifeRx, which is not included in **Exhibit 9**.  However, while LifeRx may perform as well as Transitions lenses in the metrics discussed above, LifeRx suffers from a delamination product which has contributed to customer perception that LifeRx is a poor quality product.  This delamination issue, which has persisted since the initial launch of LifeRx in 2005 through 2012, has impaired the reputation of LifeRx in the industry.[136]  For example,



[135] Conversations with John Ligas, January 26, 2012 and October 19, 2012.

Contains Highly Confidential Information—Subject to Protective Order



138

120. The fact that output has expanded, quality has improved and entry has occurred are inconsistent with Plaintiffs' allegation that TOI's conduct has impaired competition in the photochromic lens segments.  Moreover, as explained below, there are valid pro-competitive business reasons for TOI to have entered into the agreements in question.

# VI.   There Are Pro-Competitive Justifications for the TOI Conduct at Issue

121. Plaintiffs allege that TOI has engaged in exclusionary behavior at the lens caster, wholesale laboratory, and retailer levels through a variety of means, including the use of exclusive dealing arrangements, the alleged termination of agreements with lens casters who sold competing photochromic products, the alleged withholding of a lower-priced private label photochromic product from US markets, and the alleged tying of rebates and marketing support to customers' sales of Transitions lenses.  Despite Plaintiffs' claims to the contrary, TOI's conduct represents pro-competitive behavior in a competitive industry characterized by high fixed costs of development and the credible threat of entry and free-riding.

## A.   TOI Substantially Built the Photochromic Segment of the Market

122. Over the past two decades, TOI has undertaken significant and costly efforts to develop and market photochromic lens technology.[139]  TOI has invested heavily in R&D to develop its six generations of Transitions products, with the launch of the seventh generation imminent.  As shown in **Exhibit 10**, TOI's R&D investments grew substantially from 2000 through 2010, growth that is positively correlated with the growth in US photochromic shipments over this period.  As discussed above and was shown in **Exhibit 7**, TOI has improved the quality of its products from generation to generation.  The improvements to the quality of Transitions brand products have been recognized at the ECP level.[140]

123. In addition to innovation and improvements in quality, TOI has also made substantial investments in educating the market about the benefits of its products.  TOI's marketing

---

[138] Re: 2009 delam proposal, VEL-MDL042526 in VEL-MDL042526 – 7.

[139] Other manufacturers of photochromic lenses do not have the same incentive to develop the photochromic segment of the ophthalmic lens industry because other manufacturers also make clear and tinted lenses.

[140] See, e.g., TOI Presentation, "Transitions VI ECP Qualitative Test Executive Summary," June 2007, TOI_0791470 in TOI_0791466 – 86.  See, also, Ligas Deposition, pp. 26 – 49.

Contains Highly Confidential Information—Subject to Protective Order

program is described by the company's management as a "push-pull" model, oriented around educating upstream entities like lens casters, labs, and ECPs on one side (to "push" Transitions lenses) and generating consumer demand on the other (to "pull" on those upstream entities).[141]  TOI credits this product education marketing for growing the photochromic category.  Direct-to-consumer advertising has been a cornerstone of TOI's business model since at least 1995.  TOI has built its brand and the photochromic category though various outlets, including television, print, and digital media, and through public relations with such high-profile associations as the PGA Tour.[142]  In addition to consumer advertising, TOI has deployed resources to educate entities at various levels of the ophthalmic lens distribution chain, including lens casters, wholesale laboratories, and integrated retailers.[143]  For example, TOI operates the Transitions Academy, an educational seminar for industry participants.[144]

124.   Representatives from lens casters have testified that such "pull" marketing initiatives have served to increase sales of all photochromic lenses.



[145]

---

[141] See, e.g., TOI BSR Update GMC Meeting, June 2003, TOI_0114185 in TOI_0114169 – 282 (Exhibit 30 to the DiChiara Deposition).

[142] Cole Deposition, April 5, 2012, pp. 60 - 3.  ("Q:…Does Transitions engage in direct-to-consumer advertising today?  A. Yes.  Q. When did Transitions first begin direct consumer advertising?  A: Very small amounts in 1992, '93, but our most -- you know, the first significant effort in direct-to-consumer advertising began in 1995.  Q: And what types of direct-to-consumer advertising did Transitions use over the past 12 years in connection with photochromic lens sales?  A: Television media, print media, the websites, Internet, public relations.  We've used all different types of media, like cooperative advertising with retailers, promotional opportunities with different -- with different retailers.…  Q: Are there any others that you can think of as you sit here today?  A: You know, we use a multitude of different avenues.  Now with the exploding use of digital, the ability to use, you know, Facebook, Twitter, to have different websites for different public relations purposes or programs that we have, to do banner advertising on Internet, to do Web search; all of those things would be inclusive in a broad consumer outreach, yes.  Q: And in your last answer you refer to a 'public relations program.'  What did you mean by that, sir?  A: We -- we use public relations in a multitude of forms.  We've -- for instance, we've utilized our association with the PGA Tour to reach out to consumers about eye health.")

[143] See, e.g., Transitions Optical, Inc. 2005 Trade Marketing and Education Strategy, 2005, TNC_0002106 – 7 in TNC_0002094 – 109 (Exhibit 22 to the Wallace Deposition).

[144]

[145]



Contains Highly Confidential Information—Subject to Protective Order

█████████████████████████████████████████████████████ [146]

125.   TOI's marketing investments have built a national brand name for the company that has become virtually synonymous with the photochromic category.  Industry participants at various levels of the ophthalmic lens supply chain have testified that the Transitions brand is the most widely recognized brand of photochromic lenses.[147]  Joseph Bistricer, an ECP at B&B Eyes in New York, has testified that Transitions products are the only photochromic lenses of which he is aware.[148]  Record evidence also shows that non-Transitions branded products are confused with Transitions products.[149]

126.   Because of TOI's investments in educating consumers about photochromic lenses and generating consumer demand for photochromic coatings, other photochromic suppliers are able to benefit from that effort and make sales of photochromic products without the same level of investment in consumer awareness.  TOI's conduct at issue in this case, including exclusive agreements with lens casters or retailers, preferred customer agreements with retailers, and marketing support and rebates tied to performance are designed to protect TOI's investment in building the photochromic segment and prevent free-riding on TOI's brand recognition.

## B.   TOI's Contracts and Agreements Are Efficient and Pro-Competitive

127.   As stated above, TOI's investments in R&D and marketing have effectively grown the entire photochromic segment and increased ECP and consumer understanding of photochromic lenses.  To the extent that TOI has entered into exclusive agreements with its customers or resellers, such agreements are a rational mechanism to protect these considerable investments and prevent free-riding.  These sorts of agreements ensure that the sales made as a result of TOI's investments are not substantially diverted from TOI or

---



[146] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[147] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[148] Deposition of Joseph Bistricer, former President of B&B Eyes, June 13, 2012, p. 88.  ("Q: And so you could have purchased any photochromic brand lens that you wanted for your – for B&B Eyes?  A: Yes.  Q: Why did you choose to purchase Transitions brand photochromic lenses?  A: Again, not aware of competing products.")

[149] See, e.g., Binder of TOI Consumer Complaints, 2009 – 2011 ("Binder of Complaints to TOI"), TOI_1499762  in TOI_1499762 – 90.  The first three entries in this log show that Vision-Ease LifeRx products were being returned to TOI.

Contains Highly Confidential Information—Subject to Protective Order

that competing photochromic manufacturers do not benefit from lower average costs in bringing their products to market.[150]

128.     Such free-riding can also occur as a result of the unique branding dynamics of the photochromic segment.  Much in the manner that a "Kleenex" is synonymous with facial tissue, "Transitions" is often conflated with photochromic lenses in general.  Though TOI has actively tried to prevent this phenomenon, there is evidence that this tendency remains pervasive among industry participants.[151]  Given the inherent difficulty in including any sort of trademark on ophthalmic lenses, a risk exists for TOI's products to be mistaken for the lower-quality products of competitors.  ECPs, labs, and retailers may engage, for example, in "bait and switch" tactics in which a salesperson leverages consumer awareness of the Transitions brand to ultimately induce a purchase of a non-Transitions photochromic lens instead.  TOI has received feedback from customers who believed the photochromic lenses they requested and subsequently purchased from a particular retailer or ECP were Transitions, but were ultimately discovered to be another (sometime lower-performing) brand.[152]

129.     Indeed, even among ECPs, there is evidence of confusion between Transitions- and non-Transitions-branded products.[153]  I understand, for example, that TOI has received complaints related to delamination of lenses.[154]  This defect occurred with LifeRx, a Vision-Ease photochromic product, and cannot occur with Transitions products, which are manufactured using a different technology that does not include lamination.  If potential consumers gain a negative impression of photochromic lenses as a result of quality problems experienced with photochromic lenses manufactured by TOI's competitors, TOI's sales and reputation can suffer.  Exclusive contracts are a reasonable mechanism for TOI to mitigate this risk.

---

[150] Affidavit of David Cole in Corning Litigation, p. 4.

[151] The Branding Basics Guidelines in TOI's Strategic Retail Account program state that a retailer should never use the word "transitions" to refer generally to photochromic lenses.  See Transitions Optical Branding Basics Guidelines, Exhibit B of the 2009 SRA Program, TOI_1134105 in TOI_1134054 – 108 (Exhibit 32 to the Cole Deposition August 7, 2012).  See, also, Clarke Deposition, p. 109.  ("A:…People that drive a lot need sun wear because the Transitions will not change very well – sorry, I'm using the name – it's like Apple, it's like every tablet is an iPad….")  See, also, Email from Velma M. Zavala on behalf of [TOI] Customer Service to Sales and Marketing (TOI), May 22, 2000, TOI_1456464.

[152] Email from Jan Curtis to Jim F. Schaefer Re: Transitions Questions, July 24, 2001, TOI_1456520 in TOI_1456520 – 1; Internal TOI email chain, June 11, 2011 through June 18, 2007, TOI_1221166 – 7; Internal TOI email chain, August 12, 2006 through August 14, 2006, TOI_0890030 – 1.

[153] ████████████████████████████████████████████████████████████████████

[154] See, e.g., Binder of Complaints to TOI, TOI_1499762.

Contains Highly Confidential Information—Subject to Protective Order

130.   Further, TOI's business model--which is to purchase proprietary lenses from lens casters, apply its photochromic treatments to those lenses, and sell the same lenses back to those lens casters—provides yet another incentive for exclusive supply arrangements.  TOI considers its exclusive lens caster customers to be partners and views it photochromic treatment process as an extension of those customers' manufacturing processes.[155]  In keeping with this relationship, TOI invests significant time and money in working with lens casters to ensure that its photochromic coatings work with the lens casters' proprietary lenses.  I understand that tailoring a photochromic treatment to a specific lens caster's lens requires years of research and development.[156]  I understand further that, to this end, TOI shares extensive proprietary information with its lens caster customers, including business strategy and technical information.[157]  TOI's exclusive agreements create partnerships between TOI and lens casters that facilitate and maximize such technological exchange.[158]  TOI will only rationally undertake the necessary investments if it expects to make enough sales back to lens casters to cover the investment cost.  Exclusive contracts thus give TOI greater insurance that its investments with lens casters will be profitable.

---

[155] Cole Deposition, August 7, 2012, pp. 311 – 2.  ("Q. Okay.  Now, what's the origin of that practice of selling only to lens manufacturers and not to any downstream customers?  A … We essentially created sort of a -- almost a social contract with our partners in that we would partner with them as a -- as almost an extension of their manufacturing arm so that we got broad and wide availability of the product.  And at the same time, we -- you know, we were -- we were selling directly to them so that they could -- could offer the product.  And then what we would do is help them to promote the product, educate, innovate, be their research-and-development arm.  So it was just a -- essentially just a business model.  We thought it was the best way to -- to get our product efficiently, effectively, with the broadest choice in the marketplace.")

[156] Conversations with David Cole, November 1, 2012 and John Ligas, October 19, 2012.

[157] Affidavit of David Cole in Corning Litigation, ¶ 8.  ("Admittedly, TOI prefers that its customers refrain from dealing in plastic photochromic lenses other than Transitions--but there are no contracts, understandings or agreements that prevent our customers from doing so.  There are two main reasons for this preference: -- first, TOI shares extensive proprietary information with its customers, including business strategies and technical information.  This information could be easily exploited if these customers were to deal in competing types of plastic photochromic technology.") Affidavit of John S. Ligas in re: Corning Incorporated vs. Transitions Optical, Inc., ("Affidavit of John Ligas in Corning Litigation"), COR1 001810 – 3 in COR1 001810 – 24 (Exhibit 19 of the Ligas Deposition).  ("In the course of developing such a business relationship, TOI must disclose a great deal of proprietary information to its lens caster customers. … TOI discloses much proprietary information to its lens caster customers in the course of conducting tests to improve the compatibility between the lens caster's product and TOI's proprietary processes. …  Specifically, TOI reveals valuable information about how photochromic chemicals interact with the various types of plastic from which the lenses are made. …  Many of TOI's customers also receive information about the proprietary process by which TOI imbibes its lenses.  Of particular value are the various imbibing times and temperatures TOI has determined are optimal for making photochromic lenses.…  TOI shares many other types of proprietary and confidential information with its customers.  For example, TOI reveals much about its special tools and techniques for edging, cleaning, packaging and otherwise handling lens products.  These are just a few examples.")

[158] See, e.g., Deposition of Rick Elias, Chief Executive Officer at TOI, July 27, 2012 ("Elias Deposition"), p. 180.  ("Q: And as a part – and as a – as a deal point or one of the terms and conditions were that Augen would have to have an exclusive commitment to Transitions; isn't that correct?  A: …I believe one of the deal points was that – on this was they were looking to move into a full partnership with Transitions, which would allow – Augen is a very technical company, which would allow technical interchanges between the two companies and would result in an exclusive position with Augen.")

Contains Highly Confidential Information—Subject to Protective Order

131.   Lens casters also benefit from their relationships with TOI.  Benefits to lens casters
       include monetary payments, preferred pricing agreements, and access to a greater range
       of high quality photochromic products in a similar range of options and materials as the
       lens caster's non-photochromic products.  For example, in June 2005, Optima signed an
       exclusive agreement with TOI.  According to the agreement, Optima agreed to
       exclusively market Transitions brand photochromic lenses in exchange for TOI's
       assistance in developing and implementing cooperative marketing programs with
       Optima.[159]  In September 2006, TOI renewed its exclusive contract with Carl Zeiss/Sola.
       Under this agreement, Carl Zeiss agreed to exclusively distribute Transitions brand
       plastic photochromic products in exchange for a lump sum payment of ███████, a
       payment equivalent to ████████ of Carl Zeiss's net purchases of Transitions lenses,
       and ██████ annually in marketing funds for initiatives that mutually benefited both
       Carl Zeiss and TOI.  TOI also agreed to purchase 30 percent of generic lens substrate
       requirements from Carl Zeiss.[160]  Also in 2006, Shamir entered into an exclusive
       agreement with TOI where TOI offered ████████ to Shamir in exchange for
       Shamir's exclusive distribution of Transitions plastic photochromic products.[161]

132.   Finally, an exclusive agreement cannot be considered anticompetitive when the same
       result (i.e., a buyer's exclusive purchasing of a single brand) would have occurred absent
       the agreement at issue, all else equal.  As stated above, TOI has made significant
       investments in improving the quality of its products from generation to generation and
       the quality of Transitions lenses is consistently recognized as a standard in the
       marketplace.  Indeed, representatives from multiple lens casters have testified that their
       purchasing decisions have been driven by the lenses' superior quality and reputation in
       the marketplace.

133.   ███████████████, for example, has testified that ██████ continued relationship
       with TOI is a direct result of the quality of the Transitions product portfolio.[162]  He
       testified that other photochromic products were consistently of lower quality and fell
       below Transitions' standard in the marketplace.[163]  Representatives from other lens

---

[159] Lens Supply Agreement between Transitions Optical, Inc. and Optima, Inc.,  June 2005, TOI_0612682 – 9.

[160] Carl Zeiss also granted TOI rights to its technology.  Heads of Agreement Between Carl Zeiss Vision Group (CZV) and
       Transitions Optical, Inc. (TOI), August 2006, TOI_0385092 – 105 and Patent License Agreement Between CZV and TOI,
       September 26, 2006, TOI_0829884 – 95.

[161] Lens Supply Agreement Between TOI and Eyal Optical Industry, Ltd., October 1, 2006, TOI_0612784 – 803.

[162] 

[163]

Contains Highly Confidential Information—Subject to Protective Order

casters have expressed similar views of Transitions' superior quality and performance.[164] Upstream purchasing decisions of Transitions lenses have also been driven by consistent demand for those lenses at the ECP and consumer levels. ███████ testified that ████ did not pursue a relationship with Vision-Ease specifically regarding Vision-Ease's LifeRx photochromic product, for example, because ████ did not perceive the demand at the ECP level and marketing at the consumer level to be comparable to Transitions lenses, among additional concerns about inferior performance.[165] ████████████████████ ████████████████, has also testified that ECPs have consistently demanded Transitions lenses and that ████ procurement decisions have simply satisfied that demand.[166]

## C.    TOI's Rebate and Marketing Programs Are Pro-Competitive

134.    Record evidence shows some that lens casters, retailer, and wholesale labs received rebates and other incentives from TOI for exclusively purchasing or preferably purchasing TOI's photochromic products.  Rebates paid to lens casters were typically amounts equal to a percentage of the lens casters' purchases.  As noted in the September 17, 2012 Expert Report of Gregory K. Leonard, Ph.D., in the Indirect Purchaser Action ("Leonard Class Cert Report"), lens casters receive rebates from TOI for marketing, growth, and other promotional efforts while working with TOI to increase sales of Transitions products to the benefit of both TOI and the lens caster.[167]



---

[164] See, e.g., Deposition of Jean Carrier-Guillomet, President and CEO at Essilor of America, May 8, 2012 ("Carrier-Guillomet Deposition Vol. II"), pp. 608 – 9.  ("The -- I'm not sure if we can say there is a comparable product.  That's a matter of perception.  It's not my perception that Vision-Ease is comparable products [sic] to Transitions.  Q: And are you -- when you say that, are you talking strictly about quality or something else?  A: Quality, performance.")

[165] 

[166] 

[167] Transitions Optical Inc. Strategic Partnership Agreement with Shamir Optical Inc., July 1, 2010,  TOI_1799369 in TOI_1799369 – 76.  Leonard Class Cert Report, pp. 59 – 60.

Contains Highly Confidential Information—Subject to Protective Order

135. Incentives and rebates were also available to retailers through programs such as the
STAR Partner Retail Program.  Through these agreements TOI provided Business
Building Funds ("BBFs"), quarterly statements of retail growth and training and other
support to retail sales professionals.  BBFs were paid on a per-lens pair basis depending
upon the volume share.  In exchange for these benefits, the retailer agreed to maintain a
certain level of Transitions volume, share, and volume growth at each retail location
throughout the year.  In some instances, the retailers agreed to exclusively carry TOI
products at retail locations.[168]  For example, Doctors Vision entered into a STAR Partner
Retail agreement with TOI in April 2008.  Through this agreement, Doctors Vision
would achieve "Platinum Plus" status by maintaining above 15 percent share of
Transitions products at its retail locations.  In exchange, TOI would pay Doctors Vision
█████ per pair in BBFs.  Doctors Vision would receive an additional █████ per pair in
BBFs by attaining a 20-24 percent year over year volume growth.[169]  As another example,
Eye Care Centers of America could accrue up to █████ per year which would be paid
to Eye Care Centers of America upon the completion of mutually agreed upon marketing
events such as advertising campaigns and educational programs.  Eye Care Centers could
also accrue █████ per year in enhanced marketing funds for use in specific product
promotions geared towards growing sales of TOI products at Eye Care Centers of
America retail locations.[170]

136. Rebates were also available to wholesale laboratories through STAR Laboratory Partner
Agreements.  Through this program, TOI provided labs with BBFs and quarterly updates
on business growth as well as training and other support to laboratory professionals.  In
exchange for those funds, the laboratories had to attain particular sales levels and
promote Transitions lenses as the laboratory's preferred photochromic product.  STAR
laboratories would also be expected to promote TOI products at trade shows, promote
TOI products to ECPs, and participate in TOI product launches.[171] █████████

[168] See, e.g., Transitions Optical, Inc. 2008 STAR Partner Retail Program Agreement with Doctors Vision Center, April 14, 2008 ("Doctors Vision 2008 STAR Agreement"), TOI_0834215 in TOI_0834212 – 5.  See also Transitions Optical, Inc. 2006 STAR Partner Retail Program Agreement with Emerging Vision, Inc., December 8, 2005, ("Emerging Vision 2006 STAR Agreement"), TOI_1132370 – 1.

[169] Doctors Vision 2008 STAR Agreement, TOI_0834215, Leonard Class Report, p. 61, and Exhibit 24.

[170] Memo RE: 2006/2007 Transitions Optical Partnership Agreement from George Gebhardt to Pat Huot and Connie Falvo, November 28, 2005,  TOI_0834219 – 20.

[171] See, e.g., Transitions Optical Inc., 2008 STAR Partner Laboratory Agreement with RX Optical, January 30, 2008, TOI_1131424 – 8. See also, Transitions Optical Inc. STAR Partner Laboratory Program Agreement with RX Optical, December 6, 2005, TOI_1132824 – 6.

Contains Highly Confidential Information—Subject to Protective Order



137.   Plaintiffs allege that these agreements were part of a course of conduct carried out to facilitate and maintain its monopoly power in the relevant market.[173]  These allegations ignore, however, valid business justifications for the agreements as well as the testimony of industry participants that such programs have had pro-competitive effects.

138.   TOI's agreements at the retailer and laboratory level target the point at the ophthalmic lens distribution chain where the decision to purchase photochromic lenses is made.  Lens casters, in many ways, simply facilitate downstream demand in the industry – they fill orders as they receive them.[174]  It is important for TOI, therefore, to direct resources to influencing sales at downstream levels.  Because of the importance of the consumer "pull" down through the distribution chain, reducing upstream prices to lens casters would likely not be as effective in generating sales as creating programs downstream with labs and retailers.

139.   In addition to efficiency justifications, TOI's rebate and marketing programs have also served pro-competitive ends.  Representatives from multiple lens casters have testified that TOI's marketing co-op funds have reduced the costs of marketing programs that promote Transitions lenses and have been instrumental in driving the growth of their photochromic lens sales.



---



172 ██████████████████████████████████████████████████████████

173 Indirect Purchaser Complaint, pp. 16 – 7.

174 ██████████████████████████████████████████████████████████

175 ██████████████████████████████████████████████████████████

176 ██████████████████████████████████████████████████████████

177 ██████████████████████████████████████████████████████████

Contains Highly Confidential Information—Subject to Protective Order



[178]   These effects are all consistent with TOI's rebate and marketing programs serving pro-competitive ends.

### D.   The Allegation that TOI Has Withheld Private Label Products Is Inaccurate and Ignores Pro-Competitive Justifications

140.   Plaintiffs allege there was demand within the US for TOI to produce a private label, lower priced product similar to what it was producing outside the US but refused to do so.[179]   I understand that this is inaccurate.  Testimony and documentary evidence indicate that TOI offered private label products in the US in the past.  However, TOI has not seen sufficient demand for these products among its customers in the US market and prefers to strengthen its own brand, in which it has invested heavily.  Thus, TOI's actions with respect to offering private label products for sale in the US are reasonable and pro-competitive.

141.   TOI's business strategy is largely focused on building brand strength for its Transitions products.  TOI has invested heavily in various forms of advertising to consumers to gain brand recognition.[180]   Because TOI made such investments in the Transitions brand, the company prefers to strengthen and extend this brand rather than offer unbranded, private label products.  There are valid business justifications for this preference.  David Cole, president of TOI, suggested that the relabeling of Transitions lenses as private label products can be confusing for customers and ECPs.[181]   Alex Louw, TOI's Director of Retail Sales, explained that branding is about building brand recognition among

---

[178]

[179] Indirect Purchaser Complaint, p. 8.

[180] Wallace Deposition, p. 255.  ("That has always been a large part of our plan, is to advertise and build a brand with the consumer.")

[181] Cole Deposition August 9, 2012, pp. 208 – 10.

Contains Highly Confidential Information—Subject to Protective Order

consumers, which private label products do not help TOI to do.[182]  Despite this preference, I understand that TOI has remained open to offering unbranded, private label products where demand exists.

142.   In the late 1990s, TOI began providing a private label, mid-index photochromic product called Views to LensCrafters in the US.[183]  LensCrafters sold this product until LifeRx's entry in 2005.[184]  While TOI made Views for a number of years, the product did not help TOI's clear lens penetration at LensCrafters.  In fact, Views had only about a ▉ percent penetration rate, significantly lower than the market penetration at the time.[185]  This experience is further support for TOI's emphasis on building the brand.

143.   TOI has offered non-branded or private label products on a case-by-case basis.[186]  A 2008 BSR Briefing document defines one of TOI's strategic objectives as "further expand the photochromic category by introducing, where applicable a trade brand and product line and an unbranded product line to be strategically deployed in both developed and developing regions."[187]

144.   In addition, TOI has introduced a second-tier, non-Transitions-branded product called Acclimates.  Acclimates was developed by TOI as a private label product to be sold at a lower price point than Transitions lenses, with the goal of expanding the photochromic category in developing markets.  This product was launched in Latin America and Eastern Europe in 2005 and was successful in expanding the growth of both the photochromic segment of the lens market, and the sales of Transitions branded lenses in those regions.[188]

---

[182] Louw Deposition, pp. 181 – 2.  ("Q: I mean, you expand the brand by increasing sales in one way; right?  A: No.  Brand expansion is measured by consumers' awareness of your brand, not necessarily by selling more products.  Private labels aren't lower cost.  Private labels are just the retailers' attempt to own something and grow that brand themselves that they own.")

[183] Ligas Deposition, pp. 136 – 7.

[184] Memo Re: "June 2006 Monthly Report" from Mike Ruggeri to Rick Elias, June 29, 2006, TOI_0890248 in TOI_0890246 – 51 (Exhibit 5 of the Deposition of Brett Craig, former President and Chief Executive Officer at TOI, July 31, 2012).

[185] Conversation with David Cole, November 1, 2012.

[186] See, e.g., PPG's Optical Products 2006 Business Strategy Review, TOI_0982611 in TOI_0982597 – 652 (Exhibit 22 of the Elias Deposition).

[187] 2008 BSR Brief, TOI_0606742 in TOI_0606718 – 97.

[188] Ligas Deposition, p. 131 and 2008 BSR Brief, TOI_0606742 in TOI_0606718 – 97.  ("Since launching Acclimates in those regions, a positive dynamic has occurred in that the photochromic category has grown, the Transitions Brand has grown, and the Acclimates line has grown, adding incrementally to our business rather than cannibalizing the branded Transitions line of lens products.")

Contains Highly Confidential Information—Subject to Protective Order

145.   Like some other private label products, Acclimates was designed to be a lower performing product than Transitions branded lenses.[189]  An analysis of TOI's product improvement matrix indicates that Acclimates was of a lower quality than Transitions branded lenses in four major categories: clarity, darkness, activation speed and fade-back speed.  This holds both when comparing Acclimates against the corresponding Transitions-IV, and the Acclimates II against the corresponding Transitions-VI.  For example, the Transitions branded products were approximately two to three percent clearer indoors than either Acclimates product, considered a significant quality difference by TOI's Director of Research & Development, John Ligas.[190]  In addition, the Transitions branded products blocked about 20 percent more light than the Acclimates products after they had been activated for 30 seconds.  The Acclimates products take between an additional 72 seconds and one minute and 36 seconds to fade back to 50 percent clear lens.[191]  **Exhibit 11** compares Acclimates with a current-generation Transitions branded lens in key measures of photochromic lens performance.

146.   While I understand that TOI plans to introduce Acclimates in North America at some point, TOI has not historically perceived a demand for these products in the US market.  Acclimates was not sold in the US because TOI was unable to "develop a particular market" for the product and there was insufficient downstream demand because downstream resellers preferred to stick with the Transitions branded product rather than develop a private label product that consumers were not aware of and were not demanding.[192]  Rick Elias, Chief Executive Officer of TOI, explained that TOI was willing to offer the product in the US, though customer interest was not sufficient to justify the level of investment necessary to bring the product to market.[193]

[194]

---

[189] 2008 BSR Brief, TOI_0606742 in TOI_0606718 – 97.  ("Acclimates was a lesser performing product than Transitions lenses and was offered at a price point 30 percent to 50 percent below Transitions branded lenses.")

[190] Conversation with John Ligas, January 26, 2012.

[191] **Exhibit 11.**

[192] Cole Deposition, April 5, 2012, pp. 37 – 8 and Louw Deposition, pp. 254 - 5.

[193] Elias Deposition, pp. 368 – 9.  ("Q: Has Transitions stepped up the introduction of Acclimates now into the US market?  A: I - - I don't think their policy -- Transitions' policy has changed on Acclimates.  The product was available.  It was in their product line.  If there was consumer demand, if people had -- if Transitions' partners had put together a business case that there was support for the level of investment to bring the product in the market, it was available.  The -- I think the challenge with Acclimates in this market is, while there was a lot of discussions [sic], at the end of the day customers could never justify bringing the product to market.  There didn't seem to be an interest by the channel for the product.")

[194] 2008 BSR Brief, TOI_0606750.

Contains Highly Confidential Information—Subject to Protective Order

147.   Therefore, based on my review of the documents and deposition testimony produced in this case, I do not see any support for Plaintiffs' assertions that there was demand in the US for a private label product, or that TOI refused to make a private label product available to meet such demand.  Moreover, TOI's business decisions with respect to the potential introduction and sale of private label photochromic products reflect pro-competitive business decisions, given the business environment in which TOI operates.

## E.   TOI's Alleged Terminations of Photochromic Competitors Reflect Reasonable Competitive Responses

148.   

149.   I understand that in the two years following the settlement agreement, Signet began promoting its photochromic products as superior to TOI's and its sales of TOI products declined sharply.[197]                                             TOI elected to end its partnership with Signet.  TOI's conduct with respect to its relationship with Signet is actually consistent with terms laid out in the settlement agreement, which permitted TOI to terminate Signet (during the two-year period) upon declining sales or promotion.[198]  Despite Plaintiffs' allegations, TOI's conduct with respect to its relationship with Signet is not anticompetitive.  Obligating TOI to maintain a relationship with a customer that is shifting sales to a competing product does not serve to enhance competition.  Competition is the result of individual competitors acting in their own best interests to maximize profits.  Forcing competitors to maintain unprofitable relationships does not further the goals of protecting competition.

---

[195] Indirect Purchaser Complaint, pp. 13 – 4.

[196] Settlement Agreement between Corning, Inc. and TOI, September 16, 1999 ("Corning Settlement Agreement"), TOI_1912765 – 9 (Exhibit 4 to Deposition of Bruno Salvadori, Chairman of the Board at Signet Armorlite, July 26, 2012 ("Salvadori Deposition")).

[197] See Transitions Marketing Communication Plan: Wholesale Laboratories and Independent Eye Care Professionals, January – June 2000, TNC_0000806 in TNC_0000805 – 9 (Exhibit 25 to Wallace Deposition).  In this document, TOI notes that labs associated with Corning and Signet have been positioning SunSensors as superior to Transitions.  See, also, Signet Armorlite, Inc. Photochromic Sales and Market Share 1998-2008, SIGN2-03-00000004 in SIGN2-03-00000001 – 84 (Exhibit 1 to Salvadori Deposition).  These data show Signet's sales of Transitions lenses declining in both dollar and share terms from 1999 through 2001.

[198]

Contains Highly Confidential Information—Subject to Protective Order

150. Plaintiffs make a similar allegation against TOI in relation to TOI's relationship with customer and lens caster Vision-Ease in 2005. Plaintiffs allege that, upon the launch of Vision-Ease's polycarbonate photochromic product LifeRx, TOI terminated its supply agreement with Vision-Ease and refused to supply Vision-Ease with photochromic lenses for several years, preventing Vision-Ease from selling a full line of photochromic products.[199] While TOI did inform Vision-Ease in June 2005 that TOI would cancel the supply agreement between the two parties effective September 30, 2005, Plaintiffs' allegation reflects a skewed and incomplete interpretation of the record.[200] Based on my review of the documents and deposition testimony produced in this case, it is my opinion that TOI's response to Vision-Ease's entry is consistent with a competitive marketplace and not anticompetitive.

151. TOI's conduct with respect to Vision-Ease upon Vision-Ease's launch of a competing product reflects a reasonable competitive response to a business relationship that had fundamentally changed. I understand from David Cole, President of TOI, and John Ligas, Director of Research and Development at TOI, that TOI's relationships with its lens caster customers are characterized by the extensive sharing of proprietary technical and strategic information.[201] In a similar regard, at the time of the LifeRx launch, TOI and Vision-Ease had been collaborating to develop a photochromic polycarbonate bifocal

---

[199] Indirect Purchaser Complaint, pp. 14 – 5. Vision-Ease did not manufacture plastic photochromic lenses at the time of TOI's alleged conduct.

[200] Letter from Richard C. Elias to Doug Hepper, June 13, 2005, TOI_1154779 (Exhibit 21 to Cole Deposition August 7, 2012). ("Per Section 2 of the Standard Lens Supply Agreement, please consider this letter notification that Transitions Optical, Inc. intends to cancel the agreement with Vision- Ease Lens as of September 30, 2005. As we discussed, this notification is a formality and we sincerely hope that a new agreement reflecting an enhanced business relationship will be in place before the expiration date.")

[201] Conversation with David Cole, November 1, 2012; Affidavit of David Cole in Corning Litigation, p. 4. ("Admittedly, TOI prefers that its customers refrain from dealing in plastic photochromic lenses other than Transitions--but there are no contracts, understandings or agreements that prevent our customers from doing so. There are two main reasons for this preference: -- first, TOI shares extensive proprietary information with its customers, including business strategies and technical information. This information could be easily exploited if these customers were to deal in competing types of plastic photochromic technology") and Affidavit of John S. Ligas in re: Corning Incorporated vs. Transitions Optical, Inc., January 9, 1999 ("Affidavit of John Ligas in Corning Litigation"), COR1 001810 – 3 in COR1 001810 – 24 (Exhibit 19 to the Ligas Deposition). ("In the course of developing such a business relationship, TOI must disclose a great deal of proprietary information to its lens caster customers. … TOI discloses much proprietary information to its lens caster customers in the course of conducting tests to improve the compatibility between the lens caster's product and TOI's proprietary processes. … Specifically, TOI reveals valuable information about how photochromic chemicals interact with the various types of plastic from which the lenses are made. … Many of TOI's customers also receive information about the proprietary process by which TOI imbibes its lenses. Of particular value are the various imbibing times and temperatures TOI has determined are optimal for making photochromic lenses.… TOI shares many other types of proprietary and confidential information with its customers. For example, TOI reveals much about its special tools and techniques for edging, cleaning, packaging and otherwise handling lens products. These are just a few examples.")

Contains Highly Confidential Information—Subject to Protective Order

product.[202]  To this end, TOI senior management has testified that Vision-Ease's launch of LifeRx necessitated a new type of partnership between the two companies.[203]

152.    I understand that, despite TOI's attempts to reach an alternative agreement with Vision-Ease after June 2005,  [204] Moreover, in December 2009, TOI and Vision-Ease entered into a lens supply agreement.[205]

[206]

153.    Further, there is no evidence that any of TOI's actions prevented Vision-Ease from offering a full line of photochromic products (i.e., glass, polycarbonate, and plastic), as Plaintiffs allege.[207]

[208]

---

[202] Cole Deposition, August 7, 2012, p. 535.  ("Q: Now, how did Transitions learn that Vision-Ease was going to launch a competitive photochromic product?  A: We -- we had been working with Vision-Ease for -- for actually quite a while on some technical collaboration to develop a polycarbonate bifocal and to strengthen and extend that relationship with Vision-Ease.")

[203] Cole Deposition, August 7, 2012, p. 539.  ("Q: And then as a result of that, you understood that the Transitions relationship with Vision-Ease would be coming to an end?  A: Well, what -- no.  It wasn't that the Transitions relationship with Vision-Ease was coming to an end.  That would never be my goal.  My goal would be to always develop the relationship with -- with the partner.  I don't -- I don't like to give up that our partners wouldn't want to be partners with Transitions.  I believe we offer a better value proposition.  What I do understand is that the agreements that we had and the previous agreement and the technical work we were doing on this -- on this development, that really was coming -- that part was -- we needed to formally sort of end that and then work toward seeing how we could redevelop this relationship and redefine what the -- what the relationship was with Vision-Ease.")  See, also, Elias Deposition, p. 200.  ("…I then sent Doug [Hepper] the letter saying that we were ending the current supply relationship with him because it was no longer applicable based on their new position in the market, but that we would be willing to sit down and talk to them about a relationship going moving forward.")

[204] 

[205] Lens Purchase and Sale Agreement between TOI and Vision-Ease, December 15, 2009 ("TOI-Vision-Ease 2009 Lens Supply Agreement"), TOI_1653697 – 709 (Exhibit 37 to the Cole Deposition, August 7, 2012).

[206] Hepper Deposition July 11, 2012, pp. 99 – 100.

[207] Indirect Purchaser Complaint, p. 14.  See also French Report, ¶ 73.

[208]

Contains Highly Confidential Information—Subject to Protective Order



Given this range of options, Vision-Ease's failure to sell a full line is in no way tied to TOI's alleged conduct.

154.   In sum, TOI's business responses to Signet and Vision-Ease are consistent with what I would expect to find in a competitive marketplace and do not reflect anticompetitive behavior.

# VII.   Critique of the Opinions of Dr. French

## A.   Overview of Dr. French's Report and Analysis

155.   Dr. French opines that TOI has monopoly power in the market for photochromic lenses in the United States, which he argues is the relevant market in this matter.  He claims that TOI's agreements with lens casters, labs, and retailers had the effect of preserving TOI's monopoly power and that such agreements had an anticompetitive impact.  He opines that these agreements allowed TOI to charge a supracompetitive price from January 2000 to April 2010, and further assumes that TOI's customers, and all downstream entities in the distribution chain, were able to pass on the alleged overcharge fully to end consumers, who are the Plaintiffs in this action.  Dr. French estimates that TOI's conduct resulted in damages to Plaintiffs between ██████ and ██████████ depending on which states are included in the Class and which of Dr. French's two regression specifications is adopted.[212]

156.   Dr. French's analysis of the relevant market mischaracterizes documents, ignores evidence contrary to his opinion, and relies on a misspecified empirical model.  A more complete examination of the evidence and corrections to Dr. French's flawed model lead to the correct conclusion that the relevant market for TOI's products includes at a minimum clear ophthalmic lenses.

---



[211] See Mannchen Deposition, pp. 174 – 94.

[212] French Report, ¶ 13.

Contains Highly Confidential Information—Subject to Protective Order

157.   Dr. French's examination of TOI's market power (or lack thereof) is also flawed.  He ignores procompetitive rationale for TOI's actions and often assigns unilateral responsibility to TOI for outcomes of bilateral negotiations with other companies.  These errors lead him to the false opinion that TOI possessed monopoly power during the Class Period, and that the conduct at issue represents an improper exercise of market power as opposed to valid and pro-competitive responses of a competitor to evolving market conditions.

158.   Dr. French's estimation of damages is unreliable.  His analysis suffers from numerous flaws, and correcting any one of these individually refutes his opinion that TOI's conduct resulted in higher prices to its customers.  First, Dr. French's model to estimate TOI's overcharge to its customers inappropriately compares net prices and gross prices.  Second, Dr. French's model does not accurately estimate the precision of his coefficients, which leads to apparent statistical significance when in fact there is none.  Third, the model is not robust to other functional forms of the overcharge, and does not produce results that corroborate Dr. French's analysis of TOI's conduct.  Fourth, Dr. French does not examine whether a hypothetical overcharge could be passed on by TOI's lens caster customers, and instead simply estimates whether a single retailer, Wal-Mart, could pass on to its customers a cost increase that is assumed to occur several levels upstream.  Fifth, Dr. French extrapolates the results he obtains for Wal-Mart not only to lens casters, but also to all other retailers, labs, and ECPs, and therefore he has not even made an attempt to prove that damages occurred on a Class-wide basis.  Finally, Dr. French's damages calculation ignores the presence of managed care and the effect it has on reducing or eliminating the impact of TOI's alleged misconduct on photochromic lens wearers, the Class of Plaintiffs in this litigation.

## B.   Flaws in Dr. French's Analysis of the Relevant Market

## 1.   Dr. French's Claim that Photochromic Lenses and Non-Photochromic Lenses Are Not Functional Substitutes Is Incorrect

159.   Dr. French argues that photochromic lenses constitute their own relevant product market, and that the relevant geographic market is the United States.  Dr. French claims that non-photochromic lenses are not functional substitutes for photochromic lenses because photochromic lenses darken when exposed to sunlight and clear and fixed tint lenses do not.[213]  Dr. French's assertion fails to consider the fundamental question of whether consumers would switch from photochromic to clear lenses (or vice versa) if faced with a price increase for photochromics.

---

[213] French Report, ¶ 28.

Contains Highly Confidential Information—Subject to Protective Order

160.   Dr. French's market definition argument is based on the flawed premise that only
products that share the same features can compete in a relevant market.  This is an
incorrect basis for market determination, and confuses features with function.  The fact
that one product has a characteristic feature not shared by another product does not mean
*a priori* that consumers do not substitute between those two products, or that those
products do not constrain the pricing of one another.

161.   There are also other add-on coatings for lenses that add features not shared by other
lenses, including polarization, scratch-resistant coatings, and anti-reflective coatings.
Many of these other add-on features can be applied to a lens that has already been treated
with a photochromic coating.  Dr. French does not appear to believe that photochromic
lenses with these other coatings compete in separate relevant markets from photochromic
lenses that have not had such coatings applied.  Dr. French has made no argument and
presented no evidence as to why a photochromic coating is fundamentally different from
these other lens enhancements.  If photochromic lenses were in a separate relevant market
because they darken when exposed to sunlight, then other types of lenses should also be
in separate relevant markets for the specific features they add, and Dr. French should
have conducted separate analyses for each product with a unique set of characteristics in
the photochromic segment.

162.   Based on Dr. French's argument, single-vision and progressive lenses would also be in
separate markets.  A progressive lens provides the consumer with a benefit that is not
offered by a single-vision lens.  A single-vision lens does not allow the consumer to fully
correct her vision from both near and far distances the way that a progressive lens would,
and may require the user to purchase two pairs of glasses to get the same benefits as one
pair of multifocal lenses.

163.   Dr. French's analysis of the relevant market that makes a distinction between
photochromic and non-photochromic lenses but ignores other distinguishing features of
the finished product is arbitrary and incomplete.  An accurate and complete assessment of
the relevant market should consider in the first instance the products that consumers
switch between when making their lens purchases.  This may be revealed through an
analysis of consumer switching behavior, pricing patterns, and documents and data
showing the set of products that lens manufacturers take into account when setting prices,
offering incentives and marketing their products.

Contains Highly Confidential Information—Subject to Protective Order

## 2.   Dr. French's Analysis of the Price Differences Between Photochromic Lenses and Non-Photochromic Lenses Is Insufficient to Show They Are In Separate Markets

164.   Dr. French argues that the difference in price between photochromic and non-photochromic lenses implies they are in different markets.[214]  While different price points may suggest that two products do not constrain the pricing of one another, to use this fact as evidence to attempt to prove that the products do not compete is incorrect.  Two products are determined to be in same relevant market based on whether the prices respond similarly to common exogenous market forces and how demand for one responds to changes in price of the other, not on whether the level of prices is similar.  As shown above, the prices of non-photochromic lenses are highly correlated with photochromic lenses and respond similarly to exogenous market factors.

165.   Examining price levels alone leads to erroneous conclusions.  For example, there are many add-on features of automobiles that can cause a significant mark-up in price, such as sunroofs.  Despite the fact that cars with sunroofs are significantly more expensive than cars without sunroofs, it would be incorrect to say that otherwise identical cars, one with a sunroof and one without, are in separate relevant markets.

166.   Dr. French finds that because photochromic lens prices charged to labs and retailers are "nearly four times higher than that of non-photochromic lenses," "non-photochromic lenses are not close substitutes for photochromic lenses," and they are therefore not in the same relevant market.[215]

167.   Again, as described above, Dr. French's method for defining the relevant market is arbitrary.  If the approach were valid, Dr. French would once again similarly have to conclude that single-vision lenses and progressive lenses are not in the same market: an analysis of 2011 VCA data shows that the price of polycarbonate progressive lenses is 3.6 times the price of polycarbonate SV lenses and the price of plastic progressive lenses ranges from 2 to 14 times the price for plastic single-vision lenses.[216]

168.   A better way to infer if the products are in the same market is to observe whether their prices move together.  See above for my analysis of the co-price movements in photochromic and non-photochromic lenses.  Using the Vision Council data also relied on by Dr. French, I show above that the correlation between photochromic prices and non-photochromic prices (i.e., a measure of whether they tend to move in the same patterns) is extremely high.  As described above, this suggests that prices of

---

[214] French Report, ¶ 29.

[215] French Report, ¶ 29.

[216] VCA Shipment Report, YTD as of December 2011.

Contains Highly Confidential Information—Subject to Protective Order

photochromic and non-photochromic lenses are influenced by similar economic factors, and provides, at a threshold level, stronger evidence that the two products are in the same market than a simple observation regarding their price points.

## 3.    Dr. French's Analysis of the Documentary Evidence on Market Definition Is Misleading and Incomplete

169.    Dr. French cites to several documents that he claims supports his definition of the relevant market as comprising only photochromic lenses. His analysis of these documents is misleading and incomplete.

170.    Dr. French primarily relies on documents that talk about a "photochromic market" or "photochromic segment" to bolster his opinion that clear lenses do not constrain the prices of photochromic lenses.[217] However, the documents that Dr. French relies on do not meaningfully offer any insight into appropriate market definition for antitrust purposes. His review of the documents reveals only how market participants name particular market niches. His review does not consider how firm and customer actions reveal information about the set of competitive constraints in the relevant market.

171.    Moreover, Dr. French appears to have misinterpreted at least one of the documents he cites in his report. Dr. French cites an EOA document that states that "EOA opportunities exist in tinted, polarized, mirror coatings, fashion Rx and plano sunwear **without** compromising photochromic sales," and infers from this that EOA believed that non-photochromic lenses "were not sufficiently close substitutes to cannibalize sales of photochromic lenses."[218] The opinion Dr. French reaches from this document is overbroad. The document talks about the competitive relationship between tinted lenses (sunglasses) and photochromic lenses but does not say anything about the competitive relationship between clear and photochromic lenses, and clear lenses make up the majority of "non-photochromic lenses."

172.    Dr. French ignores the documentary evidence described above showing that clear lenses and photochromic lenses constrain the pricing of one another. In addition, while Dr. French notes that TOI's exclusivity agreements concern only exclusivity with respect to photochromic lenses, he ignores the myriad agreements in which TOI provides payments to labs and retailers if they achieve targets with respect to the share of total lenses.[219] Therefore, Dr. French's qualitative analysis of the market is arbitrary, and based on

---

[217] French Report, ¶ 32.

[218] See French Report, ¶ 31and Essilor of America 2004 Sunwear Business Plan, ESOA-01-00016741 in ESOA-01-00016724 – 73 (emphasis in original document).

[219] See, e.g., STAR Partner Laboratory Program Agreement between TOI and Aspen Optical, 2005, TOI_1132166 in TOI_1132164 – 6 (Exhibit 2 to the Deposition of Carlos Perez, former Director of Sales in North America at TOI, May 31, 2012) for an example of an agreement awarding BBFs on the basis of TOI sales as a share of a laboratory's total lens sales.

Contains Highly Confidential Information—Subject to Protective Order

misinterpretation and a meaningless review of uninformative statements in company business documents.

## 4.       Dr. French's Econometric Analysis of the Relevant Market Is Incomplete

173.    Dr. French purports to show that photochromic lenses and non-photochromic lenses are not substitutes, and therefore in separate markets, by calculating the cross-price elasticity of non-photochromic lenses with respect to the price of photochromic lenses using monthly, aggregate, sales data from January 1999 to February 2012, obtained from the Vision Council of America (VCA).

174.    Dr. French's regression model takes the following form:

$$\log(Q_t^n) = b_0 + b_1 \ln(P_t^n) + b_2 \ln(P_t^p) + b_3 \ln(Pop_t) + \sum_{i=1}^{11} b_{i+3}(D_{i,t}) + u_t$$

175.    Where $Q_t^n$ is the "dependent variable" that is being explained by the right-hand-side "independent variables."  Here, $Q_t^n$ represents the quantity of all non-photochromic lenses purchased during month t, $P_t^p$ represents the average price of photochromic lenses during month t, $P_t^n$ represents the average price of non-photochromic lenses during month t,[220] $Pop_t$ is the population of the US aged 50 or greater, and $D_{i,t}$ are 11 indicators for each month of the year except for one.  The term $u_t$ is an error term that may include omitted variables.

176.    Dr. French's results, presented in his Exhibit 3, allegedly show that "a one percent increase in the photochromic lens price leads to a 0.44 percent decrease in the demand for non-photochromic lenses."[221]  He opines that this is evidence that "photochromic and non-photochromic lenses are not substitutes," and that "[c]onsumers will not respond to an increase in prices for photochromic lenses by substituting them with non-photochromic lenses."[222]

177.    The primary flaw with Dr. French's model is that it looks at only one side of the market. His model takes quantity of non-photochromic lenses as its dependent variable, and in doing so, estimates the cross-price elasticity of demand for non-photochromics with respect to the price of photochromics.  As shown above, estimating the model with the quantity of photochromics as the left-hand-side variable demonstrates that non-

---

[220] All price and quantity data was obtained by Dr. French from the Vision Council of America (VCA).

[221] French Report, ¶ 41.

[222] French Report, ¶ 41.

Contains Highly Confidential Information—Subject to Protective Order

photochromic prices do constrain demand for photochromic lenses.[223]  Dr. French's market definition regression examines only one half of the market and does not necessarily contradict my findings.  Dr. French omits quantity of photochromics sold from his analysis, leaving him unable to analyze the effect of price changes on photochromic sales.  This omission also leaves Dr. French unable to determine whether non-photochromic prices constrain photochromic prices.

178.   That Dr. French finds a negative cross-price elasticity of demand for non-photochromics with respect to the price of photochromics is not necessarily evidence that the cross-price elasticity of demand for photochromics with respect to the price of non-photochromics should also be negative.  Dr. French's analysis does not rule out the possibility that non-photochromics may still be substitutes for photochromics and therefore serve to constrain the prices of photochromics.  The fact that substitution between two products can be asymmetric is supported by accepted economic theory.  For example, economist Kris de Jaegher points out that, using standard economic theory "…it is perfectly possible for Good 1 to be a gross substitute for Good 2, while Good 2 is a gross complement to Good 1."[224]  Economic research contains empirical evidence showing that it is possible for Good A to be a substitute for Good B, but for Good B to be a complement of Good A.[225]  Jaegher writes that "[c]andidates for pairs of goods that exhibit strong asymmetric gross substitutability are all-in-one devices versus special-purpose devices."[226]  Photochromic lenses are all-in-one in the sense that they provide the features of clear lenses in addition to the additional feature of tinting when outdoors.  This is consistent with photochromic lenses exhibiting asymmetric substitutability with clear lenses.

179.   Another possible explanation for Dr. French's counter-intuitive result of a positive cross-price elasticity of demand for non-photochromic lenses is that the VCA data do not include any metric of product quality.  It is often the case that, as product quality increases, both consumer demand for the product and the price of the product increase.  As such, if one cannot control for product quality in the analysis, price and quantity may

---

[223] For a discussion on the importance of estimating the proper cross-price elasticity, see above.  See also Carlton and Perloff, p. 647 – 8.

[224] Kris de Jaegher, "Asymmetric Substitutability: Theory and Some Applications," *Economic Inquiry*, Vol. 47, No. 4, October 2009 ("Asymmetric Substitutability: Theory and Some Applications"), p. 838.  Good A is a gross substitute for Good B for a given consumer if that consumer will purchase more of Good A in response to an increase in the price of Good B. Gross complements imply the opposite relationship between purchases of Good A and price of Good B.

[225] Economists Christopher Garbacz and Herbert G. Thompson find evidence of strong asymmetric gross substitutability between land-line or wireline (relatively inexpensive) phones and cellular (relatively more expensive) phones.  The authors write, "…although wireline phones are substitutes [for mobile phones] in the mobile market, the contrary is not true – mobile phones are not substitutes [for wireline phones] in the wireline market, and in fact may be considered complements.  This lack of symmetry has important implications for properly defining telecom markets."  (Christopher Garbacz and Herbert G. Thompson Jr., "Demand for Telecommunication Services in Developing Countries," *Telecommunications Policy*, Vol. 31, Issue 5, June 2007, p. 276.)

[226] Asymmetric Substitutability: Theory and Some Applications, p. 852.

Contains Highly Confidential Information—Subject to Protective Order

appear to be positively correlated, where if product quality were controlled for (i.e., held constant) this relationship may disappear.  If photochromic price is increasing because photochromic quality is increasing over the approximately 13-year period Dr. French examines, then it would not be surprising to observe consumers switching from non-photochromics as the price (and quality) of photochromics increases.[227]  In fact, as I show above, the quality-adjusted price of photochromic lenses has declined over time, while the unadjusted price has remained relatively constant.  For this reason, Dr. French's finding that photochromics are not a substitute for non-photochromics should be considered carefully in light of the fact that his analysis is unable to control for improvements in photochromic product quality between 1999 and 2012.

180.  Another flaw in Dr. French's analysis is his poor selection of instrumental variables for his 2SLS analysis.  As explained above and illustrated in **Figure 2**, the selection of proper instrumental variables for demand estimation analysis involves finding variables that will shift supply but not affect demand.  For example, in my analysis I utilize a PPI for the cost of plastics and resins as an instrumental variable, as the cost of these inputs is likely to affect the supply of photochromic lenses but not have any effect on consumer demand for photochromics.  Dr. French, on the other hand, selects annual shifters and US household income as his instrumental variables.[228]  Income is generally considered by economists to be, along with price, one of the key determinants of demand for any good.  As such, income is an inappropriate instrumental variable in this analysis.  Dr. French's annual shifters are likely to be correlated with movements in demand as well, making these instruments inappropriate.

181.  Furthermore, Dr. French's measure of income is poorly selected.  Dr. French utilizes nominal US monthly aggregated income (in billions of dollars) for his measure of income; this figure is not likely to be representative of a typical consumer's wealth because it is not indexed to the overall price levels that determine how far a dollar of income can go in one year relative to another.  Nominal income is therefore not likely to be an appropriate variable in any demand analysis, be it incorporated as an instrumental variable or an explanatory variable.[229]

182.  In summary, Dr. French's market definition regression analysis should be disregarded due to flaws in its implementation and reliance on incorrect data.  Because of these critical shortcomings, Dr. French's analysis does not provide evidence contrary to my findings that the prices of photochromic lenses are constrained by the prices of non-photochromic lenses in a relevant market comprised of both photochromic and, at a minimum, clear lenses.

---

[227] As shown in Section V above, the quality of photochromic lenses improved markedly over this 13-year period.

[228] French Report, footnote 42.

[229] I incorporate real median income as an explanatory variable in my relevant market analysis.

Contains Highly Confidential Information—Subject to Protective Order

## C.      Flaws in Dr. French's Analysis of TOI's Market Power

183.   Dr. French opines that TOI refused to sell to any lens caster customer that would not accept exclusivity as a condition of its supply relationship with TOI.  As discussed above, TOI's conduct with respect to its supply agreements with its customers was the result of bilateral negotiations between two parties.  These examples are cases in which TOI exercised sound business judgment and are not indicative of monopoly power.  Dr. French appears to either ignore or disregard the valid business justification for both TOI and its customers to enter into such agreements.

184.   Dr. French claims that TOI ended its supply relationship with Signet Armorlite when Signet began to sell Corning's photochromic SunSensors product.[230]  Dr. French's description of the evolution of the relationship between TOI and Signet Armorlite is incorrect.

185.   Record evidence indicates that Signet was not interested in maintaining a business relationship with TOI prior to the end of the supply agreement between the two companies.  I understand that Signet began promoting Corning's product as superior to TOI's.[231]

186.   Analysis performed by TOI shows that SunSensors were of inferior quality compared to Transitions lenses.  Transitions lenses were darker than SunSensors when exposed to UV light, clearer indoors, and able to react to the presence of lack of UV light faster than SunSensors.[232]  Bruno Salvadori, President and former CEO at Signet, testified that Corning's inability to improve its range of product offerings and unwillingness to aggressively market SunSensors were issues for Signet.[233]  Record evidence indicates that the end of the business relationship between TOI and Signet appeared to be a mutual decision as cited above.  However, even if this were not the case, TOI's decision not to supply its product to a customer that was erroneously disparaging its product to downstream customers is not an indicator of anticompetitive conduct.

187.   Dr. French claims that TOI ended its supply agreement with Vision-Ease when Vision-Ease introduced its proprietary photochromic product LifeRx.[234]  He is incorrect in his characterization with respect to the end of this agreement.  The end of the relationship

---

[230] French Report, ¶ 52.

[231] See Transitions Marketing Communication Plan: Wholesale Laboratories and Independent Eye Care Professionals, January – June 2000, TNC_0000805 – 9 (Exhibit 25 to Wallace Deposition).

[232] See **Exhibit 9**.  Bruno Salvadori, President and Former CEO of Signet Armorlite, testified that he believed SunSensors was of comparable quality to Transitions lenses (Salvadori Deposition, pp. 38 – 42).  I have not seen what testing Mr. Salvadori bases this opinion on.

[233] See Salvadori Deposition, pp. 99 – 102.

[234] French Report, ¶ 53.

Contains Highly Confidential Information—Subject to Protective Order

between TOI and Vision-Ease was simply a competitive response on the part of TOI to an evolving business relationship.

188.    TOI personnel have testified that TOI understood that LifeRx's introduction necessitated a new type of relationship between the companies, but not that their interaction would cease altogether.[237]  Similar to the situation with Signet, even if TOI had been the party to unilaterally end its agreement with Vision-Ease, which is not the case, TOI had a valid business justification for doing so given that Vision-Ease was making damaging statements about the quality of a TOI's products.  Such conduct would not be indicative of monopoly power, but is instead simply a sound business decision.

189.   In addition, the deposition testimony just referenced states that TOI had the expectation that the companies would eventually be able to reach a mutually acceptable agreement to allow the supply relationship to continue. [238]  In fact, TOI and Vision-Ease entered into another supply agreement in late 2009.[239]  However, Vision-Ease did not make a single purchase of Transitions lenses in the US from the execution of this supply agreement through the end of the sales data produced by TOI, and I understand from David Cole that it still has not done so.  This lack of purchases made by Vision-Ease under the new supply agreement confirms my opinion that the end of the relationship between Vision-Ease and TOI was not a unilateral action taken by TOI in the manner portrayed by Dr. French.

---

[237] Cole Deposition August 7, 2012, p. 539.  ("Q. And then as a result of that, you understood that the Transitions relationship with Vision-Ease would be coming to an end?  A: Well, what -- no.  It wasn't that the Transitions relationship with Vision-Ease was coming to an end.  That would never be my goal.  My goal would be to always develop the relationship with -- with the partner.  I don't -- I don't like to give up that our partners wouldn't want to be partners with Transitions.  I believe we offer a better value proposition.  What I do understand is that the agreements that we had and the previous agreement and the technical work we were doing on this -- on this development, that really was coming -- that part was -- we needed to formally sort of end that and then work toward seeing how we could redevelop this relationship and redefine what the -- what the relationship was with Vision-Ease.")

[238]

[239] TOI-Vision-Ease 2009 Lens Supply Agreement, TOI_1653698 – 705 in TOI_1653697 – 705.

Contains Highly Confidential Information—Subject to Protective Order

190.    Dr. French also claims that the fact that TOI did not offer private label products or its unbranded product Acclimates in the US is evidence of TOI's anticompetitive behavior.[240]  There is no economic reason why it is anticompetitive for TOI to offer its private label products or Acclimates product in some geographies but not others.  TOI's Acclimates product is of lower quality that its branded products,[241] and it generally did not introduce it in industrialized nations.  In addition, the strength of the Transitions brand is a cornerstone of TOI's business model, and the fact that TOI does not sell private label products is consistent with this notion.  Dr. French also ignores the testimony discussed above stating that TOI was willing to make the Acclimates product available if sufficient demand existed among consumers.[242]  The fact that TOI has a different product line for South America than for Western Europe and the United States simply shows an understanding of differences in the end markets in those geographic locations and is not a reflection of an improper exercise of monopoly power.

191.    A firm does not require anticompetitive market power to make decisions about where to market certain of its products.  Simply because the Acclimates product is sold at a lower price point than TOI's branded products does not mean that the product is a better value from the perspective of consumers.  In particular, given the inferior quality of the Acclimates product, it is likely that many consumers view the branded TOI products to be a superior value buy.  Moreover, I understand from David Cole that when TOI did sell its private label Views product at LensCrafters, sales were very limited and the product experienced minimal success.[243]

# VIII. Analysis of Dr. French's Damages Model

## A.    Description of Dr. French's Damages Models

192.    Dr. French estimates damages in two stages.  First, he estimates the overcharge to TOI's lens caster customers resulting from TOI's competitive conduct.  He then conducts an analysis of how price changes of TOI's products are passed on by Wal-Mart (which does not purchase directly from TOI) to Wal-Mart's customers.

---

[240] French Report, ¶ 62.

[241] In particular, TOI's Acclimates products were not as dark in the presence of UV radiation, as clear indoors, or as fast switching between the two states as the contemporary generation of TOI's branded product.  See **Exhibit 11**.

[242] Elias Deposition, pp. 368 – 369.  ("Q: Has Transitions stepped up the introduction of Acclimates now into the US market?  A: I -- I don't think their policy -- Transitions' policy has changed on Acclimates.  The product was available.  It was in their product line.  If there was consumer demand, if people had -- if Transitions' partners had put together a business case that there was support for the level of investment to bring the product in the market, it was available.  The -- I think the challenge with Acclimates in this market is, while there was a lot of discussions [sic], at the end of the day customers could never justify bringing the product to market.  There didn't seem to be an interest by the channel for the product.")

[243] Conversation with David Cole, November 1, 2012.

Contains Highly Confidential Information—Subject to Protective Order

193.    Dr. French estimates the overcharge to TOI's customers using a before-after model, with the period after April 2010, when most of TOI's exclusive contracts had ended, serving as the benchmark for what prices should have been prior to April 2010 absent TOI's alleged anticompetitive conduct.  He estimates a model that allows for a separate overcharge for each year from 2000 to 2010 (with the overcharge in 2010 confined to January through April).  Dr. French reports two versions of his model using different control variables for changes in demand: in one he uses the annual US population over age 50, and in the other he uses an annual time trend.  Dr. French controls for the cost of TOI's products, as well as fixed effects associated both with the product and the customer in his models.[244]  See **Exhibit 12** for a depiction of the but-for prices estimated by Dr. French's model.

194.    The second part of Dr. French's calculation of damages requires estimating the portion of the alleged overcharge paid by lens casters that is passed on to end consumers (commonly referred to as pass-through).  To do so, Dr. French utilizes data from Wal-Mart combined with prices charged by TOI to Wal-Mart to estimate the effect of the price charged by TOI on the prices charged by Wal-Mart to its customers.[245]  Dr. French allows the estimated pass-through percentage to vary by state.  He controls for fixed effects for each state, product, and lens caster that sold the lens to Wal-Mart, as well as for the average difference between prices at Wal-Mart and Sam's Club.[246]  Dr. French claims that he has limited the pass-through ratio so that it does not exceed 100 percent since to do otherwise would imply "'cost-plus' or mark-up pricing."[247]

195.    Dr. French finds that the overcharge on Transitions lenses sold to lens casters falls over time in both of his models.  He estimates that the overcharge was approximately 12 to 15 percent in 2000 and falls to a negligible amount in 2010.[248]  He also finds that an increase in the TOI price to lens casters is associated with a ▮▮▮▮▮▮▮▮▮▮▮ increase in the price Wal-Mart charged to its customers.[249]  For the purposes of his damages calculations, Dr. French claims to limit the price increase to consumers to be proportional to his estimated overcharge levied by TOI on its customers (i.e., a pass-through rate of 100 percent).

---

[244] See French Report, ¶¶ 95 – 112 and Exhibits 8 – 11.  When I replicate Dr. French's model, the regression has slightly fewer observations than that reported by Dr. French in his Exhibit 8 (206,389 vs. 206,470).  This discrepancy does not appear to impact the numerical results in any material way.

[245] Dr. French lags the prices so that his model measures the effect of the price charged by TOI from 12 weeks prior on the price charged by Wal-Mart.  This is to allow for the gap between when a lens is sold by TOI and when it is sold to a consumer, as there are also intermediate transactions that must occur.  See French Report, ¶ 115.

[246] See French Report, ¶ 117 and Exhibit 12.

[247] See French Report, ¶ 119.

[248] See French Report, Exhibit 8.

[249] See French Report, ¶ 119 and Exhibit 12.

Contains Highly Confidential Information—Subject to Protective Order

196.    Depending on the specification used and how the Class is defined, Dr. French estimates damages ranging from ███████ to ███████.[250]

## B.    Flaws in Dr. French's Estimation of the TOI Overcharge

## 1.    Dr. French Incorrectly Calculates Net Prices for His Regression

197.    Dr. French calculates net prices for his regression using rebate data produced by Dr. Greg Leonard, the Defendant's class certification expert in this matter.[251]  What Dr. French fails to disclose is the structure of the rebates produced by Dr. Leonard and how this impacts his regression.

198.    Dr. French includes all of the transaction data produced by TOI in his regression, which span from 2000 through May 2011.  Dr. Leonard produced data on rebates per lens by lens caster and year from 2005 through 2010.  While Dr. Leonard did not produce data on rebates from 2000 through 2004, such data have in fact been produced by TOI.  Dr. French appears to rely solely on the data produced by Dr. Leonard and has made no attempt to augment this information using the data on earlier rebates produced by TOI.

199.    This means that Dr. French's regression, in which price is the dependent variable, is using net prices for some years and gross prices for others.  Given that what Dr. French is purporting to measure is the difference in prices in different time periods, it is inappropriate to apply rebates in this manner, as it does not allow for a consistent and meaningful comparison.

200.    I have estimated Dr. French's regression without incorporating Dr. Leonard's rebate data into the prices.[252]  Using this specification, in which a consistent measure of price is used throughout the damage period, Dr. French's own model finds that TOI's customers paid *lower* prices in every year of his "before" period with the exception of 2010, in which prices are estimated to be approximately 0.2 percent higher than the baseline "after" period.  See **Exhibit 13**.  As discussed further below, the increased price for 2010 as compared to Dr. French's baseline period is statistically significant, but too small to be economically significant.  If prices before April 2010 are lower than the benchmark prices after April 2010, then this model implies there are no damages to the Class.

---

[250] French Report, ¶¶ 121 – 2.

[251] See French Report, ¶ 111.  Dr. French appears to take issue with Dr. Leonard's characterization of these payments as rebates ("These payments in kind and many others like them are not conventionally considered rebates.")  See French Report, footnote 171.  It is not clear why Dr. French has decided to include the rebates produced by Dr. Leonard in his calculation of net prices when he does not consider them to be actual rebates.

[252] Data have not been produced to allow for the calculation of rebates for 2011.  Often rebates earned in one year will not be paid until sometime the following year.  Given that the transaction data from 2011 represents nearly half of Dr. French's baseline period (and his model fails to find the impact of TOI's conduct if data from 2011 are excluded), a regression using net prices is not feasible.

Contains Highly Confidential Information—Subject to Protective Order

201.   This implies that Dr. French's conclusion that TOI's conduct has resulted in increased prices to its customers is driven by his selective allocation of rebates and inappropriate melding of gross and net prices.

## 2.   Dr. French's Results Are Dependent on the Functional Form of the Overcharge that He Has Selected

202.   Dr. French has chosen a model that estimates a different increase in price for each year of the "before" period.  If Dr. French's model were correctly specified, I would expect it to be robust to other methods of estimating the price increase.  However, Dr. French's model fails this test of robustness.

203.   Often these types of "before-after" models specify a single change in price between the two relevant periods.[253]  If Dr. French's model is altered to estimate the change in price between the after period and entire before period, instead of individual years therein, the results show that TOI's customers actually paid lower prices before April 2010.  See **Exhibit 13**.

204.   The fact that Dr. French's conclusion does not hold unless the "before" period is broken down into segments calls into question the reliability of his results.  One cannot opine that Dr. French's results are true to a reasonable degree of economic certainty when the results do not hold up to other reasonable specifications of the model.

## 3.   Dr. French Inaccurately Estimates the Standard Errors in His Regression

205.   Dr. French also fails to account for the likelihood that the standard errors estimated in his regression are biased (likely downwards).  The cost variable used by Dr. French as one of his explanatory variables varies only by product and year, while price, which serves as his dependent variable, varies by customer, product, and sales order date.  In other words, the cost is the same for all customers and sales order dates for a given product and year combination.  It is likely that there are unobserved conditions specific to a particular product and year that would lead to correlation in the error term among customers and dates within that combination.  Put differently, there are many observations for each product and year that have all have the same cost value.  This will tend to drive the variance down and understate the standard error. In such circumstances, the "default"

---

[253] Dr. Leonard's models from his class certification reports estimate the price change after the end of TOI's exclusive agreements in this manner.

Contains Highly Confidential Information—Subject to Protective Order

regression results will overstate the level of precision of the estimates, and it is possible to conclude that a particular coefficient is statistically significant when in fact it is not.[254]

206.   In such cases, economists use a measure of the standard errors that is robust to these pitfalls.[255]   The common solution is to calculate a standard error that accounts for observations that are clustered (known as clustered standard errors).   When I apply clustered standard errors to Dr. French's regressions, none of his 11 coefficients measuring the difference in price between the before and after periods are statistically significant.[256]   See **Exhibit 13**.

207.   This result shows that while Dr. French's regression estimates positive coefficients on variables measuring the change in price between the two periods, these changes are not estimated precisely enough for one to reasonably conclude that a price change occurred. Instead, the proper inference is that there is no evidence in the data of a price difference between the before and after periods in either direction.   This result suggests that Dr. French's before-after model does not actually demonstrate an overcharge.   Therefore, Dr. French's model does not show that there are any damages.

## 4.   Dr. French Improperly Averages the Results of His Regression and Does Not Examine Whether All of TOI's Customers Are Impacted

208.   Dr. French's regression specifications do not allow for any variation by customer in the estimated price differences.   As discussed in the literature, averaging the variable(s) measuring impact will fail to provide a correct estimate of the individual effects that may be present in the data.[257]

209.   Indeed, allowing Dr. French's annual price difference coefficients to vary by purchaser shows that there is considerable variation depending on the particular buyer.   Not all customers experienced higher prices in Dr. French's "before" period compared with his "after" period.   The coefficients intended to measure the alleged overcharge are negative for some customers in some years or do not show a statistically significant difference

---

[254] Brent R. Moulton, "An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables in Micro Units." *The Review of Economics and Statistics.* Vol. 72, No. 2, May 1990 ("An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables"), p. 334.

[255] An Illustration of a Pitfall in Estimating the Effects of Aggregate Variables in Micro Units, p. 334.

[256] This result applies a generally accepted method for determining the significance of multiple variables at once called the Sequential Bonferroni Procedure.   It is not clear if Dr. French applied a procedure to adjust for multiple comparisons or not, as it does not impact his initial regression results.   See Yosef Hochberg and Ajit C. Tamhane, *Multiple Comparison Procedures*, First Edition (New York: John Wiley and Sons, 1987), pp. 2 and 57–-8.

[257] See, e.g., Brett M. Dickey and Daniel L. Rubinfeld, "Antitrust Class Certification: Towards an Economic Framework," *NYU Annual Survey of American Law*, Vol. 66, 2011, p. 462 – 3.

Contains Highly Confidential Information—Subject to Protective Order

from the after period.[258]  The alleged impact found by Dr. French is a result of flaws in his model and the fact that he only allows for one average effect across all customers.

210.    The fact that Dr. French's models show a range of outcomes for individual purchasers is consistent with my opinion that TOI's alleged conduct did not have an anticompetitive impact on its customers' prices.  Moreover, the fact that some customers did not have prices that were higher during the alleged damage period compared to Dr. French's "after" period demonstrates that the alleged impact that Dr. French purports to find is not Class-wide, even if there were no other errors in Dr. French's analysis.  Dr. French's failure to account for customer-specific differences obscures the fact that the proper inference from the data is that TOI's actions did not have an anticompetitive effect.

## 5.    Dr. French's Results Are Not Consistent with Other Experts Analyzing The Same Issues or His Own Analysis of the Conduct at Issue

211.    Dr. French's model implies that overcharge paid to TOI by lens casters was highest in 2000 and trends downward after that, becoming *de minimis* in 2010.[259]  See **Exhibit 12** for a comparison of TOI's actual prices and Dr. French's but-for prices.  Dr. French claims that the overcharge falls over time because demand for photochromic lenses was increasing from 2000 to 2010.[260]  Dr. French does no analysis to determine what factors are driving that increase in demand, or what implications it has for his opinions regarding whether TOI's conduct is anticompetitive.

212.    Crucially, Dr. French's explanation of the declining overcharge during the Class Period has nothing to do with conduct by TOI.  This implies that his damages model is not in fact measuring the impact of TOI's conduct in any meaningful way.  Dr. French has not provided any causal link between the conduct at issue and the effect that his model measures.  While he has attempted to justify the decreasing overcharge by attributing it to fluctuations in demand, he has not provided any explanation for his observed overcharge that is related to alleged anticompetitive conduct by TOI in any way.

213.    Dr. French uses separate variables that attempt to control for demand in his two specifications: the US population over age 50 and an annual time trend.[261]  The fact that Dr. French attempts to explain the coefficients on his key variables by attributing them to fluctuations in demand when he has explicitly included other variables purporting to control for demand implies that at best, he has failed to adequately control for demand,

---

[258] The variation among customers also exists in Dr. French's models if any of the modifications discussed above are applied.

[259] See French Report, Exhibits 8 – 9.

[260] French Report, ¶ 112.

[261] French Report, ¶ 112.

Contains Highly Confidential Information—Subject to Protective Order

rendering his results unreliable, and at worst, the effect he is observing has no causal connection to the alleged anticompetitive conduct by TOI.  For Dr. French to adequately explain the results his regression finds, he would need to explain why the impact of TOI's conduct is greatest in 2000 and declines thereafter; no part of Dr. French's description of the alleged anticompetitive conduct of TOI is consistent with this notion.

214.   In fact, it appears as though much of the conduct that Dr. French opines is anticompetitive occurs in 2005 or later: the alleged "termination" of the supply agreement with Vision-Ease occurred in 2005.  Moreover, many of the lens caster and retailer exclusive agreements were entered into or continued to be in effect after much of Dr. French's overcharge has disintegrated.  TOI's share of the photochromic segment also does not appear to be decreasing as Dr. French's but-for prices move closer and closer to TOI's actual prices.  All of this suggests that factors other than TOI's conduct at issue are causing the overcharge that Dr. French estimates.

215.   Examining prices for photochromic and non-photochromic lenses subsequent to the end of TOI's exclusive agreements demonstrates that Dr. French's regression is not measuring anything specific to photochromic lenses.  Lens casters' average selling price for photochromic lenses in February 2012 was $41.76, slightly higher than the $41.32 in April 2010, the final month of TOI's exclusive agreements.  Non-photochromic lenses, however, exhibited a small decline in price over the same period, from $11.38 in April 2010 to $10.96 in February 2012.[262]  This suggests that the effect found by Dr. French is actually caused by broader changes in the market as opposed to any actions taken by TOI, since a similar effect is observed in the non-photochromic lens segment.

216.   In addition, there were other factors causing TOI's strategy to evolve during mid-2010 unrelated to TOI's exclusive agreements.  One example of this is the growth in digital resurfacing, which altered demand conditions for specific lens types in TOI's portfolio of products.  Digital resurfacing allows labs to convert SFSV lenses into progressive lenses.  This technological development affected demand for both categories of lenses.[263]  The alterations in the market for SFSV lenses also had implications for demand for FSV lenses.  This market shift could have spurred price changes by TOI that were unrelated to the expiration of its exclusive agreements.  Changes in demand between the before and after periods not controlled for by Dr. French undermine the validity of his statistical results.

---

[262] The Vision Council Lens Shipment Reports, April 2010 and February 2012.

[263] Conversation with David Cole, November 1, 2012.  See also 2007 BSR, TOI_0980935 – 6 in TOI_0980924 – 98.

Contains Highly Confidential Information—Subject to Protective Order

## C.   Flaws in Dr. French's Estimation of the Pass-Through of the Alleged TOI Overcharge

217.   In the prior section, I showed that Dr. French's estimation of overcharges at the lens caster level is subject to data errors, not robust to small changes in specification, and that his results are inconsistent with his theory of TOI's allegedly anticompetitive conduct. Properly estimated with consistent data, Dr. French's own model fails to find a statistically significant overcharge on lens caster prices, much less an overcharge that could be reliably attributed to the conduct at issue. Because Dr. French's model fails to find an upstream overcharge, there is no basis to assume that downstream customers, including the Plaintiffs in this litigation, paid higher prices as a result of the conduct at issue. This means that any analysis of the amount that costs from TOI are passed-through to consumers by the downstream distribution channel is irrelevant. Put simply, if there are no overcharges by TOI, there can be no damages to the Plaintiffs in this litigation.

218.   However, even if Dr. French's estimate of overcharges at the lens caster level were reliable, which it is not, his estimate of cost pass-through of any overcharges that reach the retail level is incomplete, incorrect, and cannot serve as a reliable measure of damages. Moreover, even if it were correct, Dr. French's analysis with respect to Wal-Mart does not demonstrate the impact of TOI's conduct on a Class-wide basis. Therefore, I offer a critique of Dr. French's pass-through analysis below in the event that Dr. French amends his analysis to prove an overcharge to upstream customers.

## 1.   Dr. French Has Not Demonstrated Pass-Through from Wal-Mart to Consumers

219.   Dr. French's entire estimate of damage to end consumers is based on an analysis of cost pass-through at one retailer: Wal-Mart. Wal-Mart purchases photochromic and non-photochromic lenses from both lens casters and labs, but not from TOI. Dr. French has not provided any analysis to show or establish that any of the entities from whom Wal-Mart purchased photochromic lenses paid any overcharge for the lenses they purchased *and* passed on some fraction of that overcharge to Wal-Mart or other customers.

220.   If Wal-Mart's suppliers did not pay an overcharge (because there was not one to pay) or if they did not pass on any hypothetical overcharge to Wal-Mart, then there is no cost increase for Wal-Mart to pass onto consumers. Dr. French has not established that lens casters paid higher prices as a result of TOI's alleged conduct due to the flaws in his before-after model. Further, despite sales data from at least one lens caster (EOA), Dr. French has not even attempted to establish that lens casters passed on any of the alleged overcharge to labs or other entities upstream from Wal-Mart. Further still, Dr. French has not established that labs paid and passed on any alleged overcharge to retailers including Wal-Mart. And finally, Dr. French has not established, or even examined, whether Wal-Mart paid an overcharge on the lenses it purchased and sold to the Class.

Contains Highly Confidential Information—Subject to Protective Order

221.    Finally, as discussed above, there is myriad documentary evidence that Wal-Mart was able to resist any hypothetical overcharge levied by TOI, if in fact one occurred.[264]  Thus, it is not clear that Wal-Mart in fact would have faced anticompetitive prices from TOI, were TOI able to impose a price increase on its lens caster customers.  As such, it is incorrect to conclude any customer purchasing Transitions lenses at Wal-Mart suffered harm due to TOI's conduct, much less conclude that all consumers suffered harm based on Wal-Mart's prices.

## 2.    Results from Wal-Mart Cannot Be Extrapolated Market-Wide and Therefore Dr. French Has Not Demonstrated Damages on a Class-Wide Basis

222.    Even if Dr. French had established that Wal-Mart paid anticompetitive prices for the photochromic lenses it purchased and passed some portion of that overcharge to its customers, there is no basis to assume that Wal-Mart's experience is representative of retailers generally.  Dr. French has not presented any evidence that the conduct at issue had any impact Class-wide.  Dr. French uses the results he finds for Wal-Mart to assume not only that pass-through from retailers to consumers is 100 percent for all retailers, but also that pass-through is 100 percent at every level for every channel of the distribution chain.  It is improper for Dr. French to assume that the results of his pass-through model for Wal-Mart would also apply to all other retailers in the market, much less to make the aggressive assertion that this would apply more generally to every other level of the supply chain.

223.    Wal-Mart is a low-cost retailer and the second-largest seller of corrective lenses in the US.[265]  Therefore, Wal-Mart has very different incentives and demand factors when determining the extent to which it can pass-through cost increases (or decreases) than other smaller retailers with different customer bases, pricing dynamics, and distribution chains.

224.    I understand that the burden is on Dr. French to explain why his assumption that the results he obtains for Wal-Mart can be extrapolated to the rest of the Class is valid, but he

---

[264] See Email from Scott Henning, Director of US ECP Sales and Marketing at TOI, to Linda Reynolds, Account Executive at TOI, et al, July 21, 2005, TOI_1568587 in TOI_1568587 – 9 (Exhibit 30 to the Huot Deposition).  ("[Wal-Mart] thrive[s] on playing suppliers against each other to drive down prices.")  From June 2005 through April 2009, TOI provided EOA with a rebate for photochromic polycarbonate FSV sales made at Wal-Mart.  (2009 Essilor Pricing Rebates, TOI_1486344 in TOI_1486343 – 4.)  In the first half of 2008, TOI (through EOA) discounted all Transitions lenses sold at Wal-Mart as part of a 90-day "rollback" program.  Through this program, TOI and EOA provided a █ discount to Wal-Mart, with TOI contributing █ and EOA contributing █.  (Deposition of Scott Henning, Director of US ECP Sales and Marketing at TOI, August 17, 2012, pp. 54 – 7.)  Through EOA, TOI enacted another such rollback in early 2009.  (2009 Essilor Pricing Rebates, TOI_1486344 in TOI_1486343 – 4.)

[265] "Leading Retailers Climb to a New Sales Record," http://www.visionmonday.com/CMSDocuments/2012/5/cover_story_VM051412.pdf (Accessed November 12, 2012).

Contains Highly Confidential Information—Subject to Protective Order

does not even address the issue.  In particular, Dr. French presents no evidence that Wal-Mart is similar to other retailers in the marketplace.  He does not consider whether Wal-Mart possesses more buyer power than other retailers, or whether Wal-Mart would be more or less likely to be able to pass on increases in cost to its customers when compared with other retailers.  Wal-Mart's buying power could also mean that it earns higher margins on its sales relative to other retailers, which may make extrapolating estimates of pass-through to other resellers even more complicated.  Dr. French has made no effort to examine the extent to which Wal-Mart is similar, if at all, to other retailers and therefore his model and analysis do not support an inference of pass-through generally among retailers.

225.    Dr. French also presents no evidence as to why Wal-Mart's experience would be applicable to ECPs, who differ even more substantially from Wal-Mart than other retailers.  ECPs tend to purchase lenses in much lower volumes than retailers and make purchases solely from labs.  Retailers that have an integrated lab network, like Wal-Mart, can buy directly from lens casters.  Given these differences, it is inappropriate to extrapolate even an exhaustive study of retailer pass-through to the ECP channel, much less one based on a single retailer with unique characteristics.

226.    Similarly, Dr. French has given no reason why he believes Wal-Mart's experience would be in any way representative of customers of managed care entities.  Managed care entities purchase lenses in very large quantities, and sources indicate that they have considerable bargaining power which would allow them to resist, if not reject, increases in price.[266]

227.    Dr. French has not presented any evidence, analysis, or even argument as to why his extrapolation of the Wal-Mart results is appropriate.  Therefore, his model cannot provide any support for the notion that the alleged impact of TOI's conduct occurred on a Class-wide basis.

## 3.        Dr. French Has Not Limited the Pass-Through Ratio to 100 Percent

228.    Dr. French's claim that he has capped the pass-through ratio at 100 percent is not correct.  In order to cap the pass-through ratio at 100 percent, it would be necessary to apply this cap at all levels of the supply chain.  Because Dr. French has only measured pass-through at one level, he is not able to limit pass-through in this manner, and instead can only cap the pass-through at 100 percent at one specific point in the supply chain.  To properly remove "mark-up pricing" from his calculation of pass through, it is necessary for Dr. French to ensure that any "mark-ups" are relative to price increases at the point in the supply chain immediately preceding the pass-through he is measuring.

---

[266] See, e.g., Essilor-Transitions Executive Meeting Notes and Action Items, August 29, 2008, ESOA-02-00021726 in ESOA-02-00021726 – 7 (Exhibit 44 to Carrier-Guillomet Deposition).

Contains Highly Confidential Information—Subject to Protective Order

229. A simple example illustrates this issue in Dr. French's methodology.  Assume, for instance, that TOI increases the price to its lens caster customers by $1, but those lens casters were only able to pass on $0.50 of that price increase to Wal-Mart; now assume that Wal-Mart was able to use "mark-up pricing" to increase the price to consumers by $1.50.  Dr. French's model would only see the fact that TOI increased price by $1, and that Wal-Mart increased price by $1.50, and would completely ignore the fact that the lens caster only increased its price to Wal-Mart by $0.50.  Thus, Dr. French's model would claim that pass-through from TOI to consumers was the full $1 price increase implemented by TOI, but in fact this $1 includes the "mark-up pricing" by Wal-Mart that he claims to remove.  The only way to actually exclude any "mark-up pricing" would be to estimate pass-through throughout the entire supply chain, which Dr. French has not done.

230. This issue becomes more salient in light of issues examined by Dr. Netz, the Plaintiffs' expert for class certification in this matter, and Dr. Singer, the merits expert for the lens caster, retailer, lab, and ECP Plaintiffs in a separate action brought against TOI.

231. Dr. Netz estimates pass-through by lens casters EOA and ▮▮▮▮▮ in her class certification report in this matter.  In both cases she finds instances of pass-through of less than 100 percent.[267]  Dr. French's assumption that pass-through at the lens caster level is 100 percent despite his failure to do any analysis related to the issue is even more problematic given that Plaintiffs' own expert concluded that this was not necessarily the case.

232. Dr. Singer also estimates the pass-through from EOA to its lab and retailer customers.  In my report in that matter, I correct for the fact that Dr. Singer does not control for certain product characteristics in his analysis (factors for which Dr. Singer did control in his class certification report in the same matter).  When this correction is made, Dr. Singer's model, though it still contains other flaws, finds that EOA was only able to pass-through less than 5 percent of a cost increase to its customers.[268]  If, simply by way of illustration,

---

[267] Declaration of Janet S. Netz, Ph.D., June 15, 2012, ("Netz Report"), pp. 68 – 73.  Dr. Netz estimates a lens caster pass-through rate as low as 64 percent.  I also note that Dr. Leonard cited flaws in Dr. Netz's models that suggest lens caster pass-through is even lower, in one case estimating a negative pass-through.  (Expert Report of Gregory K. Leonard, Ph.D. in the Indirect Purchaser Action, September 17, 2012, p. 74).

[268] In my report rebutting Dr. Singer, I show that correcting his model to improve its product fixed effects to better control for lens design reduces the coefficient on his cost variable to approximately .024.  This means that a 100 percent increase in the price charged by TOI to EOA implies a 2.4 percent increase in the price charged by EOA to its customers.  Because the average TOI price in Dr. Singer's data is ▮▮▮▮, and the average EOA price in Dr. Singer's data is ▮▮▮▮, this would imply that an increase in the TOI price of ▮▮▮▮ results in an increase of ▮▮▮ in the EOA price.  In other words, this result suggests pass-through is just over 4 percent.

Contains Highly Confidential Information—Subject to Protective Order

it is assumed that other lens casters are not able to pass on a larger portion of cost increases than EOA, Dr. French's damages would be reduced to less than ███████.[269]

## 4.      Dr. French Does Not Control for Any Other Costs or Other Factors Specific to Wal-Mart

233.    Putting aside the above issues, Dr. French's regression also suffers from omitted variables bias.  While Dr. French does not include the cost of the lenses as paid by Wal-Mart, he also fails to account for any other costs incurred by Wal-Mart.  To the extent that Wal-Mart began to incur additional costs unrelated to Transitions lenses (for instance, an increase in employee benefits or change in shipping costs), it may have increased the prices for Transitions lenses for reasons completely unrelated to TOI's conduct.  Dr. French has made no effort to identify or control for any of these Wal-Mart-specific factors, a fatal flaw, particularly given that Wal-Mart is the only entity he uses in estimating pass-through.  If it were the case that unobserved factors specific to Wal-Mart are creating a spurious correlation in the data, there would be no way to compare the results to other instances of pass-through given the limited nature of Dr. French's analyses.

## D.      Dr. French's Calculation of Damages Suffers from Other Errors

234.    In addition to the flaws in Dr. French's estimation of overcharge and pass-through detailed above, he also errs in his calculation of damages even if one were to assume that his estimated parameters were correct, which they are not.  In particular, Dr. French makes no effort to compensate for the presence of managed vision care plans, which can reimburse consumers in whole or in part for their lens purchases, or for discounts that may have been available to Class members through various organizations.  To the extent that a consumer did not incur the entire purchase price of the lens, it is inappropriate to assign damages to that consumer as if they had done so.  In addition, I understand from counsel that there are limitations on the recovery by Plaintiffs based on statute of limitations and on laws in certain states that prohibit multiple recovery for both upstream and downstream customers.

## 1.      Dr. French Fails to Account for Managed Care

235.    The omission of managed vision care from Dr. French's analysis leads to an overestimation of damages incurred by the proposed Class.  Some, potentially significant, percentage of the Class, including at least one of the named plaintiffs, received reimbursement for part or all of their Transitions purchases.  If a member of the proposed

---

[269] Note that this is merely meant to be an illustration of the potential impact of the failure by Dr. French to examine pass-through at more than one level of the supply chain.  I do not believe it is appropriate to extrapolate from EOA's position to all other lens casters in the marketplace without performing further analysis.

Contains Highly Confidential Information—Subject to Protective Order

Class received reimbursement for their Transitions purchases, or otherwise did not bear the full cost of the alleged overcharge, then that Class member was not harmed by the conduct at issue, even if the conduct affected prices paid by customers not covered by a managed vision plan.  Dr. French has not presented evidence or arguments suggesting that insurance premiums have increased due to TOI's alleged misconduct, nor has he discounted his estimates to account for managed care coverage.  As such, damages are overstated due to these omissions.

236.   Record evidence indicates that at least one named Plaintiff received coverage for the cost of their Transitions lenses.  Plaintiff John Donohoe purchased a pair of Transitions lenses on December 22, 2004.  His receipt from McKinleyville Optometric Center indicates that VSP covered the total cost of adding TOI's photochromic treatment to his lenses.[270]  On December 18, 2007, Mr. Donohoe purchased Transitions lenses from A to Z Eye Care.[271]  His receipt and VSP statement from this purchase indicate that VSP covered approximately 55 percent of the cost of his Transitions coating.[272]  Mr. Donohoe testified in his deposition that he receives his vision coverage through his union, CCPOA.[273]  I understand that CCPOA's vision coverage through VSP fully covers Transitions lenses, which indicates that Mr. Donohoe has access to full coverage of Transitions lenses were he to choose to purchase them in the future.[274]

237.   Due to data constraints, it is not possible to calculate the amount by which Dr. French's damage estimate should be reduced to account for the presence of managed care in offsetting potential price increases to end users.  However, information produced in this case and other publicly available information do show that managed vision care programs covered a significant share of the eyewear purchases during part of the Class Period.  ELOA sales data indicate the dollar amount sold by ELOA during the years 2005 through 2010 and the amount billed to and/or paid by several managed vision care providers during those years.  Analyzing this data shows that VSP alone covered ███ percent of the costs of eyewear sold by ELOA during these years.  The data also indicate additional coverage of these costs by Cigna and Humana, two other managed vision care providers.[275]

---

[270] "McKinleyville Optometric Center Receipt", April 26, 2010, IP-DON-00001 (Exhibit 5 of the Deposition of John Donohoe, Indirect Purchaser Plaintiff, June 28, 2012 ("Donohoe Deposition")).

[271] "A to Z Eye Care Statement," April 28, 2010, IP-DON-000004 (Exhibit 4 of the Donohoe Deposition).

[272] "A to Z Eye Care Statement," April 28, 2010, IP-DON-000004 and IP-DON-000005 (Exhibits 4 and 9 of the Donohoe Deposition).

[273] Donohoe Deposition, p. 41.

[274] "Benefits Detail," IP-DON-000011 in IP-DON-00011 – 3 (Exhibit 8 of the Donohoe Deposition).  This coverage plan is effective as of March 1, 2012.

[275] ELOA Base Lab Data.  The calculation of the share of sales to VSP uses net price.

Contains Highly Confidential Information—Subject to Protective Order

238.   The scope of managed vision care coverage in the US during at least part of the Class Period indicates that such coverage is a crucial factor when considering the potential for TOI's conduct to harm consumers, and demonstrates further that the alleged harm that Dr. French calculates cannot be extrapolated Class-wide.  Any consumer whose photochromic lens purchase was covered by a managed care plan using a co-pay or a percentage discount would have any alleged overcharge either mitigated or eliminated entirely.  As a result of his failure to address this issue in any fashion, Dr. French's damage estimate is potentially greatly overstated, and there are no Class-wide damages.

## 2.      Dr. French Fails to Account for Other Discounts Available to Class Members

239.   Class members may also have received other discounts on their purchases of Transitions lens purchases during the Class Period, insulating them from harm from TOI's alleged misconduct.  The American Association of Retired Persons ("AARP") offers a 40 percent discount on Transitions lenses at select retailers for its members who are age 50 and older.[276]  Dr. French uses the population aged 50 or over as a proxy for the demand for Transitions lenses in his own calculations.[277]

240.   Other discounts and promotional offers may also reduce the cost of Transitions lenses to Class members, offsetting or eliminating the alleged overcharge from TOI's alleged conduct, such that those Class members are undamaged.  The receipts of several named Plaintiffs indicate some form of discount or promotional offer that reduced their cost and limited the extent to which covered customers may have been harmed, if at all, by TOI's conduct.

241.   For example, Plaintiff Caryl O'Keefe received employee discounts covering approximately 10 to 18 percent of the cost of her vision correction products for purchases on May 3, 2005, May 22, 2007, and August 6, 2009.[278]  This was in addition to a Kaiser insurance payment for part of her purchase on at least two of those dates.[279]  Plaintiff Axhi Sabani received a discount on both produced receipts that reduced the total costs of his eyewear purchases by around 30 percent.[280]  Plaintiff Brian Keith Roller received a

---

[276] See AARP website for discount information at http://discounts.aarp.org/offer/aarp-vision-discounts-program/deal/77625/uSource/OLO, (Accessed November 20, 2012).

[277] French Report, ¶ 109.

[278] KP Optical Services, Invoice, dated May 3, 2005, IP-COK-000001 (Exhibit 3 of the Deposition of Caryl O'Keefe, July 6, 2012 ("O'Keefe Deposition")); Invoice History Record, dated August 6, 2009, IP-COK-000003 in IP-COK-000003 – 4 (Exhibit 5 of O'Keefe Deposition) and KP Optical Services, Invoice, dated May 22, 2007, IP-COK-000005 (Exhibit 6 of O'Keefe Deposition).

[279] O'Keefe Deposition, pp. 27 – 8.

[280] Photocopy of Receipts from Wal-Mart, IP-AS-00001 (Exhibit 3 of the Deposition of Axhi Sabani, July 13, 2012).

Contains Highly Confidential Information—Subject to Protective Order

discount on all three produced receipts, covering approximately 11 to 40 percent of the costs for his eyewear purchases.[281]  Plaintiff Phyllis Sternemann received an AARP discount covering 30 percent of her eyewear purchase in December 2010.[282]  Plaintiff Keith Forbes was eligible through his employment by the State of Maine for a reimbursement on his eyewear purchases of $125 and has applied for this reimbursement at least three times.[283]  To the extent that any of these Plaintiffs paid an overcharge on their Transitions lenses, this overcharge would be mitigated or in some cases even eliminated by these discounts and reimbursements.  Dr. French has made no effort to adjust his damages calculations in light of this evidence, and therefore his damages are overstated and unreliable.  Moreover, these discounts once again imply that there is no Class-wide impact of the alleged conduct.

## 3.    Dr. French Fails to Apply the Statute of Limitations on Recovery

242.    I understand from counsel that recovery in this case is limited based on laws concerning statute of limitations.  Dr. French does not appear to have taken this into account.  Limiting the collection of damages to only the period for which I understand that recovery is permitted reduces damages to between ███████ and ██████ for the 7 states for which there is a named Plaintiff, and to between ██████ and ██████ for the full "repealer" class as defined by Dr. French.[284]  This reduces his damages by over 75 percent.

## 4.    Dr. French Ignores Accused Sales that Are Subject to Damages in the Action Brought by Lens Casters, Retailers, Labs, and ECPs

243.    I also understand from counsel that state laws in California, Minnesota, and Wisconsin prohibit indirect plaintiffs from receiving recovery in cases where an upstream purchaser has already claimed damages.  Dr. French erroneously includes these states in his calculation of damages.  Removing these states reduces Dr. French's damages estimate to between ██████ and ████████ for the seven-state class and between ██████ and ████████ for the "repealer" class, a reduction of over 30 percent.

---

[281] Invoice from Eye Surgery Associates, dated September, 27, 2011, IP-Roller-00002 (Exhibit 3 of the Deposition of Brian Keith Roller, June 22, 2012 ("Roller Deposition")) and Invoice from Eye Surgery Associates, dated September 27, 2011, IP-Roller-00002 (Exhibit 4 of Roller Deposition).

[282] IP-STERN-000001 (Exhibit 4 of the Deposition of Phyllis Sternemann, June 27, 2012 ("Sternemann Deposition")) and Sternemann Deposition, p. 60.

[283] Deposition of Keith Forbes, July 6, 2012, pp. 36 – 7, 66, 74 and Exhibits 6, 8, and 11.

[284] For the states with a named Plaintiff, I understand that the limit on recovery is three years prior to filing for Kansas; four years prior to filing for California, Florida, Michigan, and New York; and six years for Maine and Wisconsin.  For the full "repealer" class, I understand that the limit is four years.

NERA Economic Consulting

Contains Highly Confidential Information—Subject to Protective Order

244.   Combining this correction with the one above concerning the statute of limitations reduces Dr. French's damages even further.  Damages for the 7-state class are ████████ to ████████, or ████████ to ████████ for the "repealer" class, using Dr. French's own models, with no other corrections.  Thus, these two modifications alone, leaving aside all the methodological flaws in how Dr. French arrives at his estimates, reduce his damages by over 85 percent.

## IX.   Inconsistencies in the Analyses of Dr. French and Other Plaintiff Experts in Related Matters

### A.   Inconsistencies between Dr. French and Dr. Singer

245.   Dr. French and Dr. Hal J. Singer, expert for the lens caster, lab, ECP, and retailer Plaintiffs in a separate action, employ similar models to estimate the impact of TOI's alleged anticompetitive conduct on price.  In particular, both experts use a "before-after" model to ascertain how prices that TOI charged to lens casters increased due to the company's exclusive agreements using an "after" period where TOI no longer was party to any such agreements.  However, the but-for prices calculated by the two experts diverge significantly.

246.   Dr. Singer constructs his model to estimate an overcharge that increases over time.  He concludes that absent TOI's exclusive agreements, price would have fallen by 0.35 to 0.39 percent each month for 53 months after the agreements ended.[285]  In Dr. Singer's model, the smallest alleged overcharge occurs at the beginning of the damage period and grows to about 19 to 21 percent by the end of the damage period.[286]  Dr. Singer assumes that in the but-for world TOI's exclusive agreements would have ended in March 2006,[287] and the impact of those agreements would have increased over the next 53 months, peaking at nearly at 19 to 21 percent in July 2010 before falling slightly through May 2011.

247.   In contrast, Dr. French's model assumes a different overcharge structure.  He estimates a separate overcharge for each year from 2000 through 2010 and finds that the but-for price would have been between 12 and 15 percent lower in 2000, but that the hypothetical overcharge would decrease each year until it is essentially zero in 2010.[288]  His findings are the polar opposite of those of Dr. Singer.  Both models cannot be right.

---

[285] Singer Merits Report, ¶ 145.

[286] Singer Merits Report, ¶ 145.

[287] March 2006 represents the beginning of the class period for the matter in which lens caster, retailer, lab, and ECP Plaintiffs have filed suit against TOI.

[288] Dr. French's overcharge for 2010 applies only to the months January through April.  See French Report, Exhibit 8.

Contains Highly Confidential Information—Subject to Protective Order

248.   The but-for prices presented by Dr. Singer and Dr. French contradict one another.  In the first month in which he finds an alleged overcharge, March 2006, Dr. Singer's but-for price is less than 0.4 percent lower than the actual TOI price.  Dr. French, however, finds an alleged overcharge of 12 to 15 percent in the first month for which he calculates but-for prices, January 2000.  The last month for which the experts estimate but-for prices diverge similarly.  Dr. French finds an alleged overcharge of less than 0.2 percent in April 2010, the final month for which he calculates but-for prices, while Dr. Singer finds an overcharge of 19 to 21 percent in July 2010, the final month for which he estimates damages in one of his calculations.  See **Exhibit 14** for a comparison of the two experts' but-for prices and the divergent overcharges they imply.

249.   As the Exhibit shows, Plaintiffs' experts also differ in their findings of how the alleged overcharges evolve over time.  Even though their models are supposedly measuring the effect of the same TOI conduct, Dr. French apparently finds that TOI's alleged monopoly power weakens over time while Dr. Singer's opinions imply that TOI's conduct allowed it to increase the hypothetical overcharge over time.

250.   These two positions cannot be reconciled.  While I have pointed out various flaws in each of the experts' models separately in my reports in the two matters, the fact that two independent experts, both attempting to measure the same thing, could find such divergent results confirms my opinion that neither expert has properly and reliably estimated the impact of TOI's conduct, and instead their models are simply finding spurious effects due to misspecifications.  However, even if the Court were to disagree with any or all of my findings regarding specific flaws in the analyses of the two opposing experts, it is important to note that it is not possible for both Dr. Singer and Dr. French to be correct in their assessment of impact and damage.  It would be illogical and irreconcilable for the Court to accept the conclusions of both Plaintiffs' experts due to these disagreements.

## B.   Inconsistencies between Dr. French and Dr. Netz

251.   Dr. French estimates one instance of pass-through in his report.  He does not estimate any model measuring pass-through from lens casters to retailers, from lens casters to labs, from labs to retailers, from labs to ECPs, or from ECPs to consumers.  In addition, he does not estimate pass-through from retailers to consumers for any retailer except Wal-Mart.  He claims that his failure to do so is due to inadequacies in the data from other third-parties.[289]

252.   Dr. French's claim that other data could not be used to estimate pass-through is in direct opposition to the position of Dr. Netz, Plaintiffs' class certification expert, who in fact

---

[289] French Report, ¶ 118.

Contains Highly Confidential Information—Subject to Protective Order

used several of the data sets that Dr. French found lacking to estimate pass-through.[290] Dr. French's contention that these data are not satisfactory for these purposes implies that a substantial portion of Plaintiffs' class certification expert report is fundamentally flawed.

253.   Dr. French's opinion that other data are insufficient to estimate pass-through should be taken into account before any decision is made with respect to class certification based on Dr. Netz's opinions.  The fact that Plaintiffs' own expert appears to find a substantial portion of Dr. Netz's analysis to be flawed, in conjunction with the criticisms made by Dr. Leonard of that analysis, strongly indicates that the class certification arguments put forth by Dr. Netz are unreliable.

254.   In addition, Dr. Netz stated that Plaintiffs' merits expert should be expected to estimate more instances of pass-through than she did.[291]  Instead, Dr. French has estimated far fewer.  The fact that Plaintiffs' own class certification expert felt that extrapolating from one retailer to the entire market was not a reliable methodology to estimate pass-through underscores the fatal and uncorrectable error made by Dr. French.

255.   These contradictions between the two Plaintiffs' experts in this matter suggests that if the Class were certified on the basis of Dr. Netz's opinions, the Court's decision should be reconsidered in light of discrepancies in the opinions of Dr. French and Dr. Netz.  As noted above, Dr. French's analysis cannot be extrapolated to the Class, and Dr. French's report does not provide any analysis of whether the alleged impact of TOI's conduct had an effect Class-wide.

# X.   Conclusions

256.   TOI does not have sufficient market power in a properly defined relevant market for the conduct at issue to have had an anticompetitive impact on prices for photochromic lenses.  TOI faces constraints on its ability to impose price changes including competitive threats from other photochromic lens suppliers and the ability of its customers to divert sales to other ophthalmic lenses to avoid cost increases caused by TOI.  Plaintiffs' expert Dr. French's opinions regarding the relevant market and TOI's alleged market power are based on flawed data analysis and ignore direct evidence of strong price and quality competition even in the market segment that he opines is a relevant market.  Dr. French's

---

[290] See Netz Report, pp. 68 – 9 (estimating pass-through using data produced by ▓▓▓▓), pp. 69 – 72 (estimating pass-through using data produced by EOA), pp. 72 – 3 (estimating pass-through using data produced by ELOA), pp. 73 – 4 (estimating pass-through using data produced by Costco), and pp. 76 – 7 (estimating pass-through using data produced by ECP Adirondack).

[291] See Netz Report, p. 77.  ("The analyses presented above are examples intended to demonstrate the common empirical methods that one can employ to estimate the pass-through rate.  In addition to the data referenced above, I have received data from other third-parties that may prove useful for measuring pass-through using the methods illustrated above; I also expect to receive additional data as discovery continues.")  See also the Deposition of Janet S. Netz, August 29, 2012, pp. 210 – 1.

Contains Highly Confidential Information—Subject to Protective Order

opinions regarding impact and damages allegedly arising from TOI's conduct are also flawed and unreliable. The damages calculated by Dr. French are not connected to the conduct at issue, nor do they demonstrate injury and impact on a Class-wide basis. Further, the impact that Dr. French finds in his regression model is eliminated once flaws in his specification are corrected.

Signed this 3rd day of December, 2012:

Lauren J. Stiroh



NERA Economic Consulting
360 Hamilton Avenue, 10th Floor
White Plains, New York  10601
Tel: 1 (914) 448-4000  Fax: 1 (914) 448-4040
www.nera.com

# NERA
Economic Consulting

**Lauren J. Stiroh**
Senior Vice President

National Economic Research Associates, Inc.
360 Hamilton Avenue, 10th Floor
White Plains, New York  10601
+1.914.448.4000 Fax +1.914.448.4040
Direct dial: +1.914.448.4143
lauren.stiroh@nera.com

**Contains Highly Confidential Information – Subject to Protective Order**          **Exhibit 1**

# LAUREN J. STIROH
## SENIOR VICE PRESIDENT

Dr. Stiroh specializes in the economics of antitrust, intellectual property, and commercial damages. She has conducted research, prepared expert reports, and testified in court on a variety of issues arising from antitrust allegations such as monopolization, exclusionary conduct, tying, vertical restrictions, price fixing, predatory pricing, price discrimination, and abuse of standard setting. Dr. Stiroh has analyzed the competitive effects of mergers, acquisitions, and joint ventures. She has also written expert reports and consulted on matters related to assessing impact and damages in class action litigation. She has performed or critiqued damage calculations in more than a dozen industrial settings.

Dr. Stiroh has also written and testified on the subject of intellectual property value and valuation. She has assessed and critiqued damages from patent, copyright, and trademark infringement in industries including semiconductors, biotechnology, pharmaceuticals, medical devices, and consumer products. Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy*, *Litigation and Management*, published in 2005.

Much of Dr. Stiroh's work and research focuses on the intersection of antitrust and intellectual property litigation. She has written articles and given speeches on this subject for the American Bar Association, Law Seminars International, the Practicing Law Institute, and the 2002 US Department of Justice and Federal Trade Commission joint hearings on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy." She has analyzed market power in technology markets and evaluated the competitive implications of licensing arrangements, including tying and patent pooling provisions.  In 2010 she participated in the ABA Stanford Law School Symposium on Antitrust and Innovation.

Dr. Stiroh has presented her research before the FTC, the DOJ, the Canadian Competition Bureau, and in expert testimony.  In 2010 she was inducted into the YWCA-NYC Academy of Women Leaders.

Dr. Stiroh holds a Ph.D. in Economics from Harvard University, an M.A. in Economics from the University of British Columbia and a B.A. in Economics from the University of Western Ontario.

Lauren J. Stiroh

## Education

**Harvard University**
Ph.D., Economics, August 1996

**University of British Columbia**
M.A., Economics, November 1991

**University of Western Ontario**

B.A., Economics, June 1990

## Professional Experience

**NERA Economic Consulting**

March 2005-  *Senior Vice President.*  Directs projects in the economics of antitrust, intellectual property and consumer damages.

2002-2005    *Vice President.*

1999-2002    S*enior Consultant.*

1996-1999    *Senior Analyst.*

**Unidad de Desarrollo Social**

March 1994   *Consultant.*  Prepared two studies for the National Planning Department concerning the

August 1994  effect of the trade liberalization in Colombia on the distribution of income.

**Harvard University**

1994-1996    *Research Assistant.* Research Assistant for Professor Dale Jorgenson. Estimated human capital and national income accounts.

**Harvard University**

1993-1996    *Teaching Fellow in Economics.*  Taught principles of economics, the introductory and core course in economics at Harvard College.

## Honors and Professional Activities

YWCA-NYC Academy of Women Leaders, Class of 2010.

Vice-Chair, American Bar Association, Section of Antitrust Law, Trial Practices Committee.

Member, American Economic Association.

Derek Bok Teaching Award, 1996.

Harvard University Scholarship 1991-1994.
Social Sciences and Humanities Research Council of Canada Fellowship 1991-
1994.

University Graduate Fellowship (University of British Columbia) 1990-1991.
Huron College Corporation Scholarship (University of Western Ontario) 1987-
1989.

## Selected Industry Experience

- Advertising and Marketing Media
    - Coupons
    - In-store Advertising
    - Outdoor Advertising
    - Yellow Pages
- Biotechnology
- Book Publishing
- Consumer Goods
    - Bicycle Components
    - Contact Lenses
    - Food and Beverages
    - Powered Toothbrushes
    - Recreational Vehicle Accessories
    - Lawn and Garden Products
- E-commerce
- Entertainment
    - Movie Exhibition
    - Movie Theatres
    - Sports Entertainment Exhibition
- Fast Food Franchises

- Herbicides
- Industrial Chemicals
- Information Technology/Information Systems
    - Data Backup Systems
    - Magnetic Recording Media
    - Microfiche/Microfilm
    - Rewriteable CDs
    - Computer Memory
    - Integrated Circuits and Semiconductors
- Marine Engines
- Medical Devices
- Pharmaceuticals
- Real Estate
- Sporting Events
- Textile Rental

## Expert Testimony and Reports (2002-2012)

### *News America Marketing In-Store Services, LLC v. Yves Anidjar, et al.*

Deposition testimony on behalf of Plaintiff, News America Marketing In-Store Services, LLC in connection with *News America Marketing In-Store Services, LLC v. Yves Anidjar, et al.*, May 9, 2012.

Expert Report on behalf of Plaintiff, News America Marketing In-Store Services, LLC in connection with *News America Marketing In-Store Services, LLC v. Yves Anidjar, et al.*, April 13, 2012.

***FutureFuel Chemical Company v. National Biodiesel Board***

Expert Report on behalf of Defendant, National Biodiesel Board in connection with *FutureFuel Chemical Company v. National Biodiesel Board*, April 13, 2012.

***M.V.B. Collision, Inc., d/b/a Mid Island Collision v. Allstate Insurance Company***

Supplemental Report on behalf of Defendant, Allstate Insurance Company in connection with *M.V.B. Collision, Inc. v. Allstate Insurance Company,* March 30, 2012.

Testimony on behalf of Defendant, Allstate Insurance Company in the United States District Court for the Eastern District of New York in connection with *M.V.B. Collision, Inc., d/b/a Mid Island Collision v. Allstate Insurance Company,* January 30, 2012.

Expert Report on behalf of Defendant, Allstate Insurance Company in connection with *M.V.B. Collision, Inc. v. Allstate Insurance Company,* December 1, 2009.

***Arkema, Inc. and Arkema France v. Honeywell International, Inc.***

Deposition testimony on behalf of Plaintiffs, Arkema, Inc. and Arkema France in connection with *Arkema, Inc. and Arkema France v. Honeywell International, Inc.*, December 22, 2011.

Expert Report on behalf of Plaintiffs, Arkema, Inc. and Arkema France in connection with *Arkema, Inc. and Arkema France v. Honeywell International, Inc.,* December 13, 2011.

***Fred Potok, Individually and as Trustee of FLOORgraphics, Inc. Minority Shareholder Trust, v. Richard Rebh; George Rebh; Michael Devlin; Yves Anidjar; FLOORgraphics, Inc.; News America Marketing In-Store Services, LLC; News America Marketing In-Store LLC and News America Marketing In-Store Services, Inc.***

Expert Report on behalf of Defendants, News America In-Store Services LLC et al. in connection with *Fred Potok, Individually and as Trustee of FLOORgraphics, Inc. Minority Shareholder Trust, v. Richard Rebh et al.,* October 17, 2011.

***Specialty Retailers, Inc. v. Main Street NA Parkade, LLC and Label Shopper Corporate Store, LLC***

Trial testimony on behalf of Defendants, Main Street NA Parkade, et al. in connection with *Specialty Retailers, Inc. v. Main Street NA Parkade, LLC and Label Shopper Corporate Store, LLC,* March 24, 2011.

Deposition testimony on behalf of Defendants, Main Street NA Parkade, et al. in connection with *Specialty Retailers, Inc. v. Main Street NA Parkade, LLC and Label Shopper Corporate Store, LLC,* February 11, 2011.

Deposition testimony on behalf of Defendants, Main Street NA Parkade, et al. in connection with *Specialty Retailers, Inc. v. Main Street NA Parkade, LLC and Label Shopper Corporate Store, LLC,* February 11, 2011.

Expert Report on behalf of Defendants, Main Street NA Parkade, et al. in connection with *Specialty Retailers, Inc. v. Main Street NA Parkade, LLC and Label Shopper Corporate Store, LLC,* December 17, 2010.

### Carl Blessing, et al. v. Sirius XM Radio, Inc.

Deposition testimony on behalf of Defendant, Sirius XM Radio, Inc., in connection with *Carl Blessing, et al. v. Sirius XM Radio, Inc.*, March 15, 2011.

Expert Report on behalf of Defendant, Sirius XM Radio, Inc., in connection with *Carl Blessing, et al. v. Sirius XM Radio, Inc.*,  January 4, 2011.

### SanDisk Corporation v. Phison Electronics Corp., et al.

Deposition testimony on behalf of Plaintiff, SanDisk Corporation in connection with *SanDisk Corporation v. Phison Electronics, Corp., et al.,* January 19, 2011.

Expert Report on behalf of Plaintiff, SanDisk Corporation in connection with *SanDisk Corporation v. Phison Electronics, Corp., et al.,* December 22, 2010.

### Boston Scientific Corporation v. Medinol Ltd.

Testimony on behalf of Defendant, Medinol, Ltd. in the arbitration hearing in connection with *Boston Scientific Corporation v. Medinol, Ltd.,* September 8, 2010.

Supplemental Report on behalf of Defendant, Medinol, Ltd. in connection with *Boston Scientific Corporation v. Medinol, Ltd.,* September 2, 2010.

Expert Report on behalf of Defendant, Medinol, Ltd. in connection with *Boston Scientific Corporation v. Medinol, Ltd.*, June 11, 2010.

### Re The New City of Toronto Third Party Sign Tax and Sign By-Law

Cross-Examination testimony on behalf of Pattison Outdoor Advertising LP in connection with *The New City of Toronto Third Party Sign Tax and Sign By-Law,* August 13, 2010.

First Supplementary Affidavit and Second Supplementary Affidavit on behalf of Pattison Outdoor Advertising LP in connection with *The New City of Toronto Third Party Sign Tax and Sign By-Law,* July 23, 2010.

Expert Report, Affidavit and Supplemental Affidavit on behalf of Pattison Outdoor Advertising LP in connection with *The New City of Toronto Third Party Sign Tax and Sign By-Law*, April 13, 2010.

### Netscape Communications Corporation, v. ValueClick, Inc., et al.

Deposition testimony on behalf of Plaintiff, Netscape Communications Corporation in connection with *Netscape Communications Corporation v. ValueClick, Inc., et al.*, September 17, 2009.

Rebuttal Report on behalf of Plaintiff, Netscape Communications Corporation in connection with *Netscape Communications Corporation v. ValueClick, Inc., et al.*, September 11, 2009 (with Christine S. Meyer).

Expert Report on behalf of Plaintiff, Netscape Communications Corporation in connection with *Netscape Communications Corporation v. ValueClick, Inc., et al.*, August 31, 2009 (with Christine S. Meyer).

### United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.

Declaration in Further Support of Defendants, Dey, Inc., Dey L.P., and Dey L.P., Inc.'s Motion for Partial Summary Judgment in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* August 27, 2009.

Supplemental Declaration in Support of Defendants, Dey, Inc., Dey L.P., and Dey L.P., Inc.'s Motion for Partial Summary Judgment in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* June 29, 2009.

Declaration in Support of Defendants, Dey, Inc., Dey L.P., and Dey L.P., Inc.'s Motion for Partial Summary Judgment in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* June 25, 2009.

Deposition testimony on behalf of Defendants, Dey, Inc., Dey L.P., Inc., and Dey L.P. in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* May 12-13, 2009.

Rebuttal Report on behalf of Defendants, Dey, Inc., Dey L.P., Inc., and Dey L.P. in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* May 7, 2009.

Expert Report on behalf of Defendants, Dey, Inc., Dey L.P., Inc., and Dey L.P. in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* March 6, 2009.

Declaration in Support of Defendants, Dey, Inc., Dey L.P., Inc., and Dey L.P.'s Motion to Compel Discovery in connection with *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., v. Dey, Inc.,* February 11, 2009.

### *Abbott Laboratories, et al. v. Church & Dwight, Inc.*

Deposition testimony on behalf of Plaintiff, Abbott Laboratories in connection with *Abbott Laboratories, et al. v. Church & Dwight, Inc.,* July 1, 2009.

Rebuttal Report on behalf of Plaintiff, Abbott Laboratories in connection with *Abbott Laboratories, et al. v. Church & Dwight, Inc.,* May 29, 2009.

Expert Report on behalf of Plaintiff, Abbott Laboratories in connection with  *Abbott Laboratories, et al. v. Church & Dwight, Inc.,* April 17, 2009.

### *Lanard Toys, Ltd. v. Dollar General Corporation, et al.*

Expert Report on behalf of Defendants, Dollar General Corporation and Dolgencorp, Inc. in connection with *Lanard Toys, Ltd. v. Dollar General Corporation, et al.,* May 7, 2009.

### *DigaComm, LLC. v. Vehicle IP, LLC*

Testimony on behalf of Respondents, Vehicle IP, LLC and Bradley Larschan in the arbitration hearing in connection with *DigaComm, LLC. v. Vehicle IP, LLC, Bradley Larschan*, October 30, 2008.

Deposition testimony on behalf of Defendant, Vehicle IP, LLC in connection with *DigaComm, LLC v. Vehicle IP, LLC, Bradley Larschan* (Arbitration and Federal Litigation), September 22, 2008.

Expert Report on behalf of Defendant, Vehicle IP, LLC in connection with *DigaComm, LLC v. Vehicle IP, LLC, Bradley Larschan* (Arbitration), September 12, 2008.

Expert Report on behalf of Defendants, Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III and Andrew Seamons in connection with *DigaComm, LLC v. Vehicle Safety and Compliance, LLC, Pittco Capital Partners, LP, Pittco Capital Partners II, LP, J.R. "Pitt" Hyde III and Andrew Seamons* (Federal Litigation), September 12, 2008.

### *Re Hydrogen Peroxide Antitrust Litigation*

Deposition testimony on behalf of Defendant, Arkema, Inc. in connection with *In Re Hydrogen Peroxide Antitrust Litigation*, July 31, 2008.

Expert Report on behalf of Defendant, Arkema, Inc. in connection with *In Re Hydrogen Peroxide Antitrust Litigation*, July 7, 2008.

Lauren J. Stiroh

### *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.*

Testimony on behalf of Plaintiffs, Dairy Queen Operators' Association, et al, in the arbitration hearing in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* May 22, 2008 and June 25, 2008.

Rebuttal Report on behalf of Plaintiffs, Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* May 2, 2008.

Deposition testimony on behalf of Plaintiffs, Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* March 19, 2008.

Expert Report on behalf of Plaintiffs, Dairy Queen Operators' Association, et al., in connection with *Dairy Queen Operators' Association, et al. v. International Dairy Queen, Inc. et al.,* March 14, 2008.

### *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold*

Trial testimony on behalf of Defendant, Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* February 6, 2008.

Deposition testimony on behalf of Defendant, Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* January 25, 2008.

Expert Report on behalf of Defendant, Ronald Gold in connection with *Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc., and Ronald Gold,* January 18, 2008.

### *HCI Technologies, Inc. v. Avaya, Inc.*

Testimony on behalf of Plaintiff, HCI Technologies, Inc. in the arbitration hearing in connection with *HCI Technologies, Inc. v. Avaya, Inc.,* October 15, 2007.

Expert Report on behalf of Plaintiff, HCI Technologies, Inc. in connection with *HCI Technologies, Inc. v. Avaya, Inc.,* May 31, 2007.

### *AVX Corporation and AVX Limited v. Cabot Corporation*

Declaration in Support of Plaintiffs, AVX Corporation and AVX Limited's Motion to Compel Discovery in connection with *AVX Corporation and AVX Limited v. Cabot Corporation,* September 19, 2007.

Lauren J. Stiroh

Declaration in Support of Plaintiffs, AVX Corporation and AVX Limited's Motion to Compel Discovery in connection with *AVX Corporation and AVX Limited v. Cabot Corporation,* March 1, 2007.

### *Floorgraphics, Inc. v. News America Marketing In-store Services, Inc., et al.*

Declaration in Support of Defendants Motion for Summary Judgment in connection with *Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc. and News America Marketing In-Store, Inc.,* September 19, 2007.

Deposition testimony on behalf of Defendants, News America Marketing In-store Services, Inc., et al. in connection with *Floorgraphics, Inc. v. News America Marketing In-store Services, Inc. et. al.,* August 16, 2007.

Expert Report on behalf of Defendants, News America Marketing In-store Services, Inc., et al. in connection with *Floorgraphics, Inc. v. News America Marketing In-store Services, Inc. et. al.,* July 13, 2007.

### *Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., AKA NASCAR and International Speedway Corporation*

Deposition testimony on behalf of Defendants, National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation in connection with *Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation,* June 19-20, 2007.

Expert Report on behalf of Defendants, National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation in connection with *Kentucky Speedway, LLC. v. National Association Of Stock Car Auto Racing, Inc., and International Speedway Corporation,* May 25, 2007.

### *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.*

Deposition testimony on behalf of counter-claim Plaintiffs, F. Hoffmann-LaRoche, Ltd. et al. in connection with *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.,* May 31, 2007.

Expert Report on behalf of counter-claim Plaintiffs, F. Hoffmann-LaRoche, Ltd. et al. in connection with *Amgen, Inc. v. F. Hoffmann-LaRoche, Ltd., et al.,* April 6, 2007.

### *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.*

Deposition testimony on behalf of Defendants, Kmart Corporation and Footstar, Inc.  in connection with *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc*., March 21, 2007.

Expert Report on behalf of Defendants, Kmart Corporation and Footstar, Inc. in connection with *adidas America, Inc. and adidas-Salomon AG v. Kmart Corporation and Footstar, Inc.*, January 5, 2007.

### Peter Wachtell v. Capital One Financial Corporation

Deposition testimony on behalf of Defendants, Capital One Financial Corp. in connection with *Peter Wachtell v. Capital One Financial Corp.,* March 15, 2007.

Expert Report on behalf of Defendants, Capital One Financial Corp. in connection with *Peter Wachtell v. Capital One Financial Corp.,* January 12, 2007.

### William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation

Deposition testimony on behalf of Plaintiffs, William J. LaPoint and John M. Nehra, et. al. in connection with *William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation,* January 16-17, 2007.

Expert Report on behalf of Plaintiffs, William J. LaPoint and John M. Nehra, et. al. in connection with *William J. LaPoint and John M. Nehra et al. v. AmerisourceBergen Corporation,* November 22, 2006.

### Re Sulfuric Acid Antitrust Litigation

Deposition testimony on behalf of Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* February 22-23, 2006.

Expert Report on behalf of Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* February 3, 2006.

Deposition testimony on behalf of Defendants in connection with *Re Sulfuric Acid Antitrust Litigation*, January 16, 2004.

Expert Report on behalf of Defendants in connection with *Re Sulfuric Acid Antitrust Litigation,* December 16, 2003.

### United Asset Coverage, Inc. v. Avaya, Inc.

Trial testimony on behalf of Plaintiff, United Asset Coverage, Inc. at the Preliminary Injunction Hearing in connection with *United Asset Coverage, Inc. v. Avaya, Inc.,* Northern District of Illinois, October 28, 2005 and November 7, 2005.

Expert Report on behalf of Plaintiff, United Asset Coverage, Inc., in connection with *United Asset Coverage, Inc. v. Avaya, Inc.,* October 12, 2005.

### Orbit Irrigation Products, Inc. v. L. R. Nelson Corporation

Deposition testimony on behalf of Defendant, L.R. Nelson Corporation, Inc. in connection with *Orbit Irrigation Products, Inc. v. L .R. Nelson Corporation*, September 15, 2005.

Deposition testimony on behalf of Defendant, L. R. Nelson Corporation, Inc. in connection with *Orbit Irrigation Products, Inc. v. L .R. Nelson Corporation*, May 7, 2003.

Rebuttal Report on behalf of Defendant, L. R. Nelson Corporation, Inc., in connection with *Orbit Irrigation Products, Inc. v. L.R. Nelson Corporation,* February 6, 2003.

Expert Report on behalf of Defendant, L. R. Nelson Corporation, Inc., in connection with *Orbit Irrigation Products, Inc. v. L.R. Nelson Corporation,* January 15, 2003.

### Theme Promotions, Inc. v. News America FSI, Inc.

Trial testimony on behalf of Defendant, News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* United States District Court in the Northern District of California, August 24-25, 2005.

Declaration in Support of Defendant, News America FSI, Inc.'s, Motion for Summary Judgment in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* July 22, 2005.

Deposition testimony on behalf of Defendant, News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* July 20, 2005.

Rebuttal Report on behalf of Defendant, News America FSI, Inc. in connection with *Theme Promotions, Inc. v. News America FSI, Inc.,* June 9, 2005.

### Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.

Deposition testimony on behalf of Defendants, National Collegiate Athletic Association, et al., in connection with *Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.*, June 14, 2005.

Expert Report on behalf of Defendants, National Collegiate Athletic Association, et al., in connection with *Metropolitan Inter-Collegiate Basketball Association v. National Collegiate Athletic Association, et al.*, June 12, 2005.

**BTG International Limited v. Zimmer Holdings, Inc. et al.**

Rebuttal Report on behalf of Plaintiff, BTG International Limited in connection with *BTG International Limited v. Zimmer Holdings, Inc. et al.,* March 29, 2005.

Expert Report on behalf of Plaintiff, BTG International Limited in connection with *BTG International Limited v. Zimmer Holdings, Inc. et al.,* March 7, 2005.

**International Truck and Engine Corporation vs. Caterpillar Inc.**

Expert Report on behalf of Plaintiff, International Truck and Engine Corporation in connection with *International Truck and Engine Corporation vs. Caterpillar Inc.,* February 18, 2005.

**Piatti Restaurant Company v. Steiner Corporation et. al.**

Expert Report on behalf of Defendant, Steiner Corporation in connection with *Piatti Restaurant Company v. Steiner Corporation et. al.,* February 14, 2005.

**Kevin T. Keleghan v. Sears, Roebuck & Company and Alan J. Lacy**

Deposition testimony on behalf of Defendants, Sears, Roebuck & Company and Alan J. Lacy, in connection with *Kevin T. Keleghan v. Sears, Roebuck & Company and Alan J. Lacy,* November 5, 2004.

**U.S. Philips Corporation v. Princo Corporation and Princo America Corporation and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.**

Deposition testimony on behalf of Plaintiff, U.S. Philips Corporation, in connection with *U.S. Philips Corporation v. Princo Corporation and Princo America Corporation and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.,* September 28, 2004.

Rebuttal Report on behalf of Plaintiff, U.S. Philips Corporation, in connection with *U.S. Philips Corporation v. Princo Corporation and Princo America Corporation, and Gigastorage Corporation and Gigastorage U.S.A. v. U.S. Philips Corporation and Koninklijke Philips Electronic N.V.,* September 14, 2004.

**The Proctor & Gamble Company v. The Coca-Cola Company**

Deposition testimony on behalf of Defendant, The Coca-Cola Company in connection with *The Proctor & Gamble Company v. The Coca-Cola Company,* August 31, 2004.

Expert Report on behalf of Defendant, The Coca-Cola Company in connection with *The Proctor & Gamble Company v. The Coca-Cola Company,* July 12, 2004.

Lauren J. Stiroh

*Auscape International, et al., v. National Geographic Society*

Rebuttal Report on behalf of Defendant, National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* July 15, 2003.

Deposition testimony on behalf of Defendant, National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* May 29, 2003.

Expert Report on behalf of Defendant, National Geographic Society in connection with *Auscape International, et al., v. National Geographic Society, et al.,* April 2, 2003.

*Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*

Deposition testimony on behalf of Defendant, Battlebots, Inc. in connection with *Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*, October 2, 2002.

Expert Reports on behalf of Defendant, Battlebots, Inc. in connection with *Astor Holdings Inc. et al. v. Edward "Trey" Roski, III and BattleBots, Inc.*, May 2002 and June 2002.

*Menasha Corporation v. News America Marketing In-Store, Inc*

Deposition testimony on behalf of Defendant, News America Marketing In-Store, Inc. in connection with *Menasha Corporation v. News America Marketing In-Store, Inc.*, August 13 and 14, 2002.

*Joint Hearings of the US DOJ and FTC*

Written submission "Standard Setting and Market Power," to the Joint Hearings of the United States Department of Justice and the Federal Trade Commission on "Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy," Washington, D.C., April 18, 2002 (with Richard T. Rapp).

*Rambus, Inc.*

Report in connection with *Rambus, Inc.*, "Supplemental Economic Considerations Bearing on FTC Enforcement," April 12, 2002 (with Richard T. Rapp).

## Presentations (2008-2012)

Panelist, "Presenting an Effective Damages Case in Light of Recent Federal Circuit Precedent," sponsored by *The Licensing Executives Society (U.S.A. and Canada), Inc. (LES Workshop),* San Diego, CA, October 19, 2011.

Panelist, "The Fundamentals of Working with Economic Experts Committee Program,"
co-sponsored by *The ABA Section of Antitrust Law,* Teleconference, April 29, 2011.

Panelist, "Princo v. ITC" Telebriefing sponsored by *Law Seminars International*,
September 30, 2010.

Panelist, "Patent Hold Up:  When Does the Abuse of a Private Standard Setting Process
Amount to Actionable Conduct Under Section 2 of the Sherman Act or Deception Under
Section Under Section 5 of the FTC Act?," presented by *The Philadelphia Bar
Association Antitrust Law Committee of the Business Law Section's CLE Program*,
Philadelphia, PA, September 21, 2010.

Panelist, "Antitrust and Innovation Symposium: Unilateral Conduct, Licensing and
Innovation," co-sponsored by *The ABA Section of Antitrust Law and Stanford Law
School,* Stanford, CA, May 21, 2010.

Panelist, "Taking and Defending Expert Deposition Testimony," co-sponsored by *The
ABA Section of Antitrust Law, Economics and Trial Practices Committees*, April 21,
2009.

Panelist, "Antitrust Economics for Attorneys:  The Economics of Innovation and
Intellectual Property,"  presented by *The Economics and Intellectual Property
Committees of the American Bar Association's Section of Antitrust* Law, Washington,
D.C., July 23, 2008.


# Publications

"FTC Requires Patentee to Fulfill Licensing Commitments To A Standard-Setting
Organization To Prevent Consumer Harm" co-authored with Eugene L. Chang, Esq.,
William H. Rooney, Esq. and Heather M. Schneider, Esq., Willkie Farr & Gallagher,
LLP, *The Metropolitan Corporate Counsel*, 2008.

Chapter 14:  "Proving Causation in Damage Analyses" in <u>Economics of Antitrust,
Complex Issues in a Dynamic Economy</u>, edited by Dr. Lawrence Wu, NERA Economic
Consulting, 2007.

Co-editor, <u>Economic Approaches to Intellectual Property Policy, Litigation, and
Management</u>.  Edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA
Economic Consulting, September 2005.

Chapter 1:  "Uncertainty in the Economics of Knowledge and Information" in <u>Economic
Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr.
Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

Chapter 3:  "A Practical Guide to Damages" co-authored with Dr. Gregory K. Leonard, in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

Chapter 15:  "Standard Setting and Market Power" co-authored with Dr. Richard T. Rapp in <u>Economic Approaches to Intellectual Property Policy, Litigation, and Management</u>, edited by Dr. Gregory K. Leonard and Dr. Lauren J. Stiroh, NERA Economic Consulting, 2005.

"The Relevant Market in Intellectual Property/Antitrust Litigation" co-authored with Alyssa A. Lutz, Ph.D., *Intellectual Property Antitrust,* Practicing Law Institute, 2001 and 2002.

"Modern Methods for the Valuation of Intellectual Property," co-authored with Richard T. Rapp, *Protecting Your Intellectual Property Assets*, Practicing Law Institute, 1998.

"Returns to Education, Human Capital and Income Inequality in Colombia," Ph.D. Thesis, Harvard University, August 1996.

May 2012

Contains Highly Confidential Information – Subject to Protective Order                                                    Exhibit 2

## Materials Relied Upon by Lauren J. Stiroh, Ph.D.

### Court Documents

First Amended Consolidated Complaint of Indirect Purchaser End-User Plaintiffs, *In Re Photochromic Lens Antitrust Litigation*, United States District Court Middle District of Florida Tampa Division, Case No. 8:10-md-2173-JDW-EAJ, November 14, 2011

### Expert Reports

Expert Report of Lauren J. Stiroh, Ph.D., *In Re Insight Equity A.P. X., LP, d/b/a Vision-Ease Lens Worldwide v. Transitions Optical, Inc.*, December 3, 2012

Expert Report of Lauren J. Stiroh, Ph.D., *In Re Photochromic Lens Antitrust Litigation- Nouveau Vision, Inc. et al. Plaintiffs*, December 3, 2012

Expert Report of Gregory K. Leonard, Ph.D. in the Direct Purchaser Action, September 17, 2012 and accompanying production

Expert Report of Gregory K. Leonard Ph.D. in the Indirect Purchaser Action, September 17, 2012 and accompanying production

Class Certification Report of Hal J. Singer, Ph.D., June 15, 2012 and accompanying production

Merits Report of Hal J. Singer, Ph.D., September 30, 2012 and accompanying production

Expert Report of Gary French, Ph.D., October 1, 2012 and accompanying production

Declaration of Janet Netz, Ph.D., June 15, 2012 and accompanying production

Expert Report of Kenneth Baseman, October 8, 2012, Revised to Reflect Errata as of October 19, 2012 and accompanying production

Expert Report of Donald M. Nicholson, October 8, 2012 and accompanying production

### Depositions

Deposition of Connie Achman, Vice President of Sales and Marketing at X-Cel Optical, August 29, 2012 and accompanying exhibits

1

Deposition of Howard Achtman, Indirect Purchaser Plaintiff, July 13, 2012 and accompanying exhibits

Deposition of Ronald Biggs, Director of Procurement at Hoya, August 21, 2012 and accompanying exhibits

Deposition of Joseph Bistricer, former President of B&B Eyes, June 13, 2012 and accompanying exhibits

Deposition of Carl Bracy, former Vice President of Marketing at Essilor of America, July 6, 2012 and accompanying exhibits

Deposition of Jean Carrier-Guillomet, President and CEO of Essilor of America, Volumes I and II, May 7, 2012 and May 8, 2012 and accompanying exhibits

Deposition of Susan Cashion, Associate Director US ECP Sales Development at TOI, June 8, 2012 and accompanying exhibits

Deposition of Scott Clarke, President of Central Illinois Vision Associates, June 20, 2012 and accompanying exhibits

Deposition of David Cole, 30 (b) (6), President at TOI, April 5, 2012 and accompanying exhibits

Deposition of David Cole, 30 (b) (6), President at TOI, August 7, 2012, Volume II and accompanying exhibits

Deposition of David Cole, 30 (b) (6), President at TOI, August 8, 2012, Volume III and accompanying exhibits

Deposition of David Cole, 30 (b) (6), President at TOI, August 9, 2012, Volume IV and accompanying exhibits

Deposition of David Cole, President at TOI, Volumes I and II, August 8, 2012 and accompanying exhibits

Deposition of David Cole, President at TOI, Volumes III and IV, August 9, 2012 and accompanying exhibits

Deposition of Robert Colucci, President of Independent Distribution Division at Essilor of America, July 20, 2012 and accompanying exhibits

Deposition of Brett Craig, former President and COO at TOI, July 31, 2012 and accompanying exhibits

Deposition of Michael Daley, former Consultant at Essilor of America, July 18, 2012 and accompanying exhibits

2

Contains Highly Confidential Information – Subject to Protective Order      Exhibit 2

Deposition of Johanna DiChiara, former Account Executive at TOI, July 6, 2012 and accompanying exhibits

Deposition of Jon Donohoe, Indirect Purchaser Plaintiff, June 28, 2012 and accompanying exhibits

Deposition of Laurent Dosseville, Business Manager at TOI, June 21, 2012 and accompanying exhibits

Deposition of Paul Dougher, President of Hoya Vision Care North America, August 25, 2012 and accompanying exhibits

Deposition of Rick Elias, CEO of TOI and Senior Vice President of Optical Products and Specialty Materials at PPG, July 27, 2012 and accompanying exhibits

Deposition of Ken Engelhart, former Senior Vice President at Essilor, June 6, 2012 and accompanying exhibits

Deposition of Michael Todd Eubanks, Founder and President of Optical Supply, June 28, 2012 and accompanying exhibits

Deposition of Richard Faber, Vice President and CFO of Vision-Ease, July 10, 2012 and accompanying exhibits

Deposition of Connie Falvo, Director of External Affairs at TOI, May 22, 2012 and accompanying exhibits

Deposition of Keith Forbes, Indirect Purchaser Plaintiff, July 6, 2012 and accompanying exhibits

Deposition of Amanda Gable, Indirect Purchaser Plaintiff, July 27, 2012 and accompanying exhibits

Deposition of Timothy Gibbons, National Account Manager at Vision-Ease, July 12, 2012 and accompanying exhibits

Deposition of Real Goulet, President of Essilor Labs of America, May 15, 2012 and accompanying exhibits

Deposition of Dale Clinton Harmeier, Lab Manager at Florida Optical, June 27, 2012 and accompanying exhibits

Deposition of Derek Harris, Ph.D., Vice President of Research and Development at Vision-Ease, July 27, 2012 and accompanying exhibits

Deposition of Brian Hauser, General Manager of the US & Canada at TOI, May 24, 2012 and accompanying exhibits

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

Deposition of Tara Hehr, Account Executive for Managed Vision Care at TOI, June 14, 2012 and accompanying exhibits

Deposition of Scott Henning, Director of US ECP Sales and Marketing at TOI, August 17, 2012 and accompanying exhibits

Deposition of Douglas Hepper, President and CEO at Vision-Ease, July 11, 2012 and accompanying exhibits

Deposition of Douglas Hepper, President and CEO at Vision-Ease, August 1, 2012 and accompanying exhibits

Deposition of Bernadette Hiskey, Director of Product Marketing at Carl Zeiss Vision, Inc., September 19, 2012 and accompanying exhibits

Deposition of Patrick Huot, Director of Managed Care and Online Retail at TOI, May 10, 2012 and accompanying exhibits

Deposition of Gabby Klein, Indirect Purchaser Plaintiff, July 12, 2012 and accompanying exhibits

Deposition of Chris Landers, former Manager of Mid-Sized Retail at Vision-Ease, July 26, 2012 and accompanying exhibits

Deposition of Grady Lenski, Managing Director of Adjacencies at TOI, August 10, 2012 and accompanying exhibits

Deposition of Jean-Marc Leroy, Vice President of Lenses at Essilor of America, June 8, 2012 and accompanying exhibits

Deposition of John Ligas, Director of Research and Development at TOI, July 20, 2012 and accompanying exhibits

Deposition of Alex Louw, Director of Sales for Lens Manufacturer and Retail and Director of Canada at TOI, May 2, 2012 and accompanying exhibits

Deposition of Timothy Mannchen, former Director of Business Development at Vision-Ease, June 1, 2012 and accompanying exhibits

Deposition of Sidney Moore, former Salesperson for the Midwest Region at Vision-Ease, June 12, 2012 and accompanying exhibits

Deposition of Ed Moores, Indirect Purchaser Plaintiff, June 26, 2012 and accompanying exhibits

Deposition of Thomas Moravec, former Senior Research Scientist at Vision-Ease, June 21, 2012 and accompanying exhibits

Contains Highly Confidential Information – Subject to Protective Order                  Exhibit 2

Deposition of Michael Ness, President of Hoya Lens of America and former Vice President of Marketing and Sales at Vision-Ease, Volumes I and II, August 21, 2012 & August 22, 2012 and accompanying exhibits

Deposition of Janet Netz, Ph.D., Economic Expert, August 29, 2012 and accompanying exhibits

Deposition of Steven Nussbaumer, Executive Director for group operations in the UK and Ireland at Essilor, June 15, 2012 and accompanying exhibits

Deposition of Caryl O'Keefe, Indirect Purchaser Plaintiff, July 6, 2012 and accompanying exhibits

Deposition of Carlos Perez, former Director of Sales in North America at TOI, May 31, 2012 and accompanying exhibits

Deposition of Gen Pharm, Administrator and CEO at Florida Eye Clinic and Florida Optical Express, June 27, 2012 and accompanying exhibits

Deposition of Elliott Reshard, Strategic Accounts Manager of the Central Region at TOI, June 12, 2012 and accompanying exhibits

Deposition of Barry Resnick, Director of Marketing and Customer Support Services at Vision-Ease, June 26, 2012 and accompanying exhibits

Deposition of Barry Resnick, 30 (b) (6), Director of Marketing and Customer Support Services at Vision-Ease, July 6, 2012 and accompanying exhibits

Deposition of Karen Roberts, Vice President of Global Business Solutions and Customer Enablement at Carl Zeiss Vision, September 19, 2012 and accompanying exhibits

Deposition of Brian Keith Roller, Indirect Purchaser Plaintiff, June 22, 2012 and accompanying exhibits

Deposition of Timothy Rongstitch, Director of Sales at Vision-Ease, June 19, 2012 and accompanying exhibits

Deposition of Michael Ruggeri, Business Controller for Optical and Specialty Materials at PPG, August 15, 2012 and accompanying exhibits

Deposition of Kevin Rupp, CFO at Essilor, July 12, 2012 and accompanying exhibits

Deposition of Michael Rybacki, Senior Vice President of Sales and Marketing at Seiko, September 14, 2012 and accompanying exhibits

Deposition of Axhi Sabani, Indirect Purchaser Plaintiff, July 13, 2012 and accompanying exhibits

5

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

Deposition of Bruno Salvadori, Chairman of the Board at Signet Armorlite, July 26, 2012 and
accompanying exhibit

Deposition of Scott Schaller, former Assistant Sales Manager at Essilor of America, June 29,
2012 and accompanying exhibits

Deposition of Hal Singer, Ph.D., Economic Expert, August 31, 2012 and accompanying exhibits

Deposition of Phyllis Sternemann, Indirect Purchaser Plaintiff, June 27, 2012 and accompanying
exhibits

Deposition of Timothy Sutich, Owner and CEO of Nouveau Vision, June 12, 2012 and
accompanying exhibits

Deposition of Rose Wallace, Associate Director of ECP Marketing at TOI, July 19, 2012 and
accompanying exhibits

Deposition of Gina Wallraff, former Director of Market Analysis at Vision-Ease, July 9, 2012
and accompanying exhibits

Deposition of Eldridge Wilcox, Indirect Purchaser Plaintiff, June 20, 2012 and accompanying
exhibits

**Bates Stamped Documents**

| | | |
|---|---|---|
| ESOA-01-00016724-73 | TOI_0524055-58 | TOI_1653697-705 |
| EVC-000015 | TOI_0606352-53 | TOI_1657499-998 |
| EVC-000022-23 | TOI_0611632-36 | TOI_1735792-871 |
| EVC-000036-47 | TOI_0612682-89 | TOI_1749469-78 |
| TNC_0026517 | TOI_0612784-803 | TOI_1799369-76 |
| TNC_0026523 | TOI_0721718 | TOI_1832958 |
| TNC_0026884 | TOI_0791466-86 | TOI_1949563 |
| TNC_0026877 | TOI_0829884-95 | TOI_1957493 |
| TNC_0026880 | TOI_0834212-15 | TOI_1958035 |
| TNC_0026887 | TOI_0834219-20 | VEL-MDL070552-53 |
| TNC_0026890 | TOI_0980924-98 | VEL-MDL123758 |
| TNC_0049773-74 | TOI_1131748-49 | VEL-MDL196736-37 |
| TOI_0055447-49 | TOI_1132134-35 | VEL-MDL328854 |
| TOI_0112509-10 | TOI_1134117-23 | |
| TOI_0385092-105 | TOI_1499762-90 | |

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

Other TOI Documents

Transitions Optical 2010 BSR Briefing Document, June 15, 2010

**Conversations**

Conversation with David Cole, November 1, 2012

Conversations with John Ligas, January 26, 2012 and October 19, 2012

**Data**

Buyer and Seller Sales Summary Data

| | |
|---|---|
| Buyer Sales 2006.csv | Seller Sales 2006.csv |
| Buyer Sales 2007.csv | Seller Sales 2007.csv |
| Buyer Sales 2008.csv | Seller Sales 2008.csv |
| Buyer Sales 2009.csv | Seller Sales 2009.csv |
| Buyer Sales 2010.csv | Seller Sales 2010.csv |
| TOIIDs with Parents.xlsx | TOI_Buying_Group_Detail.csv |

Vision-Ease Sales Data

2004 thru 2007.accdb
2008 thru 2011.accdb
Table Definitions.docx

ELOA Base Lab Data

| | |
|---|---|
| 2005Q1Base.xlsx | 2008Q1Base.xlsx |
| 2005Q2Base.xlsx | 2008Q2Base.xlsx |
| 2005Q3Base.xlsx | 2008Q3Base.xlsx |
| 2005Q4Base.xlsx | 2008Q4Base.xlsx |
| 2006Q1Base.xlsx | 2009Q1Base.xlsx |
| 2006Q2Base.xlsx | 2009Q2Base.xlsx |
| 2006Q3Base.xlsx | 2009Q3Base.xlsx |
| 2006Q4Base.xlsx | 2009Q4Base.xlsx |
| 2007Q1Base.xlsx | 2010Q1Base.xlsx |
| 2007Q2Base.xlsx | 2010Q2Base.xlsx |
| 2007Q3Base.xlsx | 2010Q3Base.xlsx |
| 2007Q4Base.xlsx | 2010Q4Base.xlsx |
| | ELOA Data.mdb |

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

## EOA Lens Sales Data

| | |
|---|---|
| AFF 2005 Data.xls | NEP 2005 Data.xls |
| AFF 2006 Data.xls | NEP 2006 Data.xls |
| AFF 2007 Data.xls | NEP 2007 Data.xls |
| AFF 2008 Data.xls | NEP 2008 Data.xls |
| AFF 2009 Data.xls | NEP 2009 Data.xls |
| AFF 2010 Data.xls | NEP 2010 Data.xls |
| EEP 2005 Data.xls | RETAIL 2005 Data.xls |
| EEP 2006 Data.xls | RETAIL 2006 Data.xls |
| EEP 2007 Data.xls | RETAIL 2007 Data.xls |
| EEP 2008 Data.xls | RETAIL 2008 Data.xls |
| EEP 2009 Data.xls | RETAIL 2009 Data.xls |
| EEP 2010 Data.xls | RETAIL 2010 Data.xls |
| ELAC 2005 Data.xls | VX 2005 Data.xls |
| ELAC 2006 Data.xls | VX 2006 Data.xls |
| ELAC 2007 Data.xls | VX 2007 Data.xls |
| ELAC 2008 Data.xls | VX 2008 Data.xls |
| ELAC 2009 Data.xls | VX 2009 Data.xls |
| ELAC 2010 Data.xls | VX 2010 Data.xls |
| IR 2005 Data.xls | WHSL 2005 Data.xls |
| IR 2006 Data.xls | WHSL 2006 Data.xls |
| IR 2007 Data.xls | WHSL 2007 Data.xls |
| IR 2008 Data.xls | WHSL 2008 Data.xls |
| IR 2009 Data.xls | WHSL 2009 Data.xls |
| IR 2010 Data.xls | WHSL 2010 Data.xls |

## TOI Sales Transactions Database

Customer_lookup.dta
MAP-027.docx
Prodtype_lookup.dta
Product Lookup - final.xlsx
Transitions_sales_2000_2011.dta

## Essilor Data

Customers with Essilor Parent (from backup file essilor_lenssales_20052010).csv
Elasticity Regression Dataset.csv
EOA_Master_Dataset_2005-2012.dta
Nassau_Data_2005-2010_with costs.dta

## Third Party Data

Adirondack Sales Data.xlsx

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

Attachment - Transitions Lens Sales 2005 to 2011 by Brand R1.pdf
CWC-000001 2007-2009 Buy Doc 12-06.xls
CWC-000001 2007-2009 Buy Doc 12-06.xls
CWC-000002  2007-2009 Oct-07 Buy Doc T6 Jun-08.xls
CWC-000003  2009-2010 BUY DOC 6-30 Effective Dec 1-08 ~ Nov. 30-10.xls
CWC-000004  2010-2014 BUY DOC 7-28-11 Effective Dec 1-10 ~ Dec. 31-11.xls
CWC-000005  2010-2014 BUY DOC 12-22-11 Effective Jan 1-12 ~ Dec 31-12.xls
FTC info for spec 6   2005 to May 31 2009.xlsx
FTC info for spec 7   2005 to May 31 2009.xls
LUX_000867.pdf
LUX_000854.pdf
LUX_000877.pdf
LUX_000810.pdf
WM2011-24104C000836.xls
WM2011-24104C001238.xls
WM2011-24104C001260.xls
WM2011-24104C017950.xlsx
WM2011-24104C019519.xls
WM2011-24104C023858.xls
WM2011-24104C019418_HIGHLY CONFIDENTIAL-OUTSIDE COUNSEL'S EYES ONLY_AE.xlsx
WM2011-24104C023655.xls
Legal Request 41688 Part 1.txt
Legal Request 41688 Part 2.txt
Legal Request 41689 5182012 Production.txt
Partner Lab Customer List-Aggregate.csv
Base Lab Customer List - 2005-2010-Aggregate.csv
Group C ELOA PartnerLab Regression Dataset.dta
Group C ELOA Baselab Regression Dataset.dta
Elasticity Regression Dataset.csv (was already cited for group B, is the same dataset)

National Retailer Sales Data

TOI_1478842
TOI_1596833
TOI_1842613

Vision Council Production

| | | |
|---|---|---|
| VC00000391 | VC00003837 | VC00013203 |
| VC00000417 | VC00003881 | VC00013251 |
| VC00000469 | VC00003921 | VC00013299 |
| VC00000513 | VC00003965 | VC00013348 |
| VC00000561 | VC00004009 | VC00013397 |

9

Contains Highly Confidential Information – Subject to Protective Order                     Exhibit 2

| | | |
|---|---|---|
| VC00000640 | VC00004053 | VC00013446 |
| VC00000719 | VC00004097 | VC00013495 |
| VC00000798 | VC00004141 | VC00013538 |
| VC00000873 | VC00004228 | VC00013587 |
| VC00000948 | VC00004272 | VC00013700 |
| VC00001023 | VC00004322 | VC00013879 |
| VC00001098 | VC00004454 | VC00013928 |
| VC00002258 | VC00004498 | VC00013969 |
| VC00002302 | VC00004542 | VC00014018 |
| VC00002346 | VC00004586 | VC00014067 |
| VC00002390 | VC00004630 | VC00014116 |
| VC00002439 | VC00004674 | VC00014159 |
| VC00002483 | VC00004718 | VC00014208 |
| VC00002527 | VC00004762 | VC00014257 |
| VC00002571 | VC00004806 | VC00014306 |
| VC00002615 | VC00004850 | VC00014355 |
| VC00002659 | VC00004925 | VC00014404 |
| VC00002703 | VC00004965 | VC00014447 |
| VC00002747 | VC00008025 | VC00014497 |
| VC00002787 | VC00008073 | VC00014541 |
| VC00002831 | VC00008121 | VC00014592 |
| VC00002871 | VC00008121 | VC00014642 |
| VC00002915 | VC00008217 | VC00014686 |
| VC00002959 | VC00008265 | VC00014736 |
| VC00003007 | VC00008313 | VC00014786 |
| VC00003051 | VC00008361 | VC00014836 |
| VC00003095 | VC00008440 | VC00014886 |
| VC00003135 | VC00008536 | VC00014931 |
| VC00003179 | VC00008584 | VC00014981 |
| VC00003223 | VC00008632 | VC00015038 |
| VC00003267 | VC00012548 | VC00015088 |
| VC00003311 | VC00012596 | VC00015138 |
| VC00003355 | VC00012644 | VC00015243 |
| VC00003399 | VC00012692 | VC00015293 |
| VC00003443 | VC00012732 | VC00015343 |
| VC00003487 | VC00012780 | VC00015393 |
| VC00003527 | VC00012828 | VC00015438 |
| VC00003571 | VC00012868 | VC00015488 |
| VC00003611 | VC00012916 | VC00015538 |
| VC00003655 | VC00012964 | VC00015588 |

Contains Highly Confidential Information – Subject to Protective Order                           Exhibit 2

| VC00003661 | VC00013014 | VC00015638 |
| VC00003705 | VC00013054 | VC00044542 |
| VC00003749 | VC00013107 | VC00057799 |
| VC00003793 | VC00013155 | VC00079599 |

**Publicly Available Information**

Court Cases

*Omega Environmental Inc., et al. v. Gilbarco, Inc., et. al.*, 127 F.3d 1157 (9th Cir. 1997)

Order in the matter of *In Re Live Concert Antitrust Litigation, United States District Court for the Central District of California*, March 23, 2012

*U.S. v. du Pont De Nemours and Co.*, 351 U.S. 377, 76 S.Ct. 994 (1956)

Data

US Bureau of Labor Statistics: Producer Price Index – Commodity Series [Series ID = WPU66]

Literature

"2012 Consumer Perceptions of Managed Vision Care," *Jobson Optical Research*, 2012

Carlton, Dennis and Jeffrey Perloff. Modern Industrial Organization. 4th ed. New York: Addison-Wesley, 2005

Dickey, Bret and Daniel Rubinfeld, "Antitrust Class Certification: Towards an Economic Framework," *NYU Annual Survey of American Law*, 66 (2011): 459-486

Garbacz, Christopher and Herbert Thompson Jr., "Demand for Telecommunication Services in Developing Countries," *Telecommunications Policy*, 31, no. 5 (2007)

Hochberg, Yosef and Ajit Tamhane. Multiple Comparison Procedures. 1st ed. New York: Wiley & Sons, 1987

Jaegher, Kris de, "Asymmetric Substitutability: Theory and Some Applications," *Economic Inquiry*, 47, no. 4 (October 2009): 838-855

Johansen, Soren, "Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregressive Models," *Econometrica*, 59, no. 6 (November, 1991): 1551-1580

Moulton, Brent, "An Illustration of a Pitfall Estimating the Effects of Aggregate Variables in Micro Units," *The Review of Economics and Statistics*, 72, no.2 (May 1990): 334-338

Pindyck, Robert and Daniel Rubinfeld. <u>Econometric Models Economic Forecasts</u>. 4th ed. McGraw Hill, 1998

Pleatsikas, Christopher and David Teece, "The Analysis of Market Definition and Market Power in the Context of Rapid Innovation," *International Journal of Industrial Organization*, 19 (2001): 665-693

Posner, Richard. <u>Antitrust Law</u>. 2nd ed. Chicago: University of Chicago Press, 2001

Steuer, Richard, "Exclusive Dealing in Distribution," *Cornell Law Review*, 69 (1983-84): 101-134

Stigler, George and Robert Sherwin, "The Extent of the Market," *Journal of Law and Economics*, 28, no. 3 (1985): 555-585

Stock, James and Mark Watson. <u>Introduction to Econometrics</u>. Boston: Pearson Education, Inc., 2003

US Department of Justice and Federal Trade Commission, "*Horizontal Merger Guidelines*," issued August 19, 2010

Varian, Hal. <u>Intermediate Microeconomics, A Modern Approach</u>. 5th ed., New York: W.W. Norton & Company, 1999

Woolridge, Jeffrey. <u>Introductory Econometrics A Modern Approach</u>. 4th ed. Ohio: South Western Cengage, 2009

<u>Websites</u>

"AARP Website," available at http://discounts.aarp.org/offer/aarp-vision-discounts-program/deal/77265/uSource/OLO, accessed November 20, 2012

"About PPG Industries," available at www.ppg.com/en/ourcompany/Pages/default.aspx, accessed November 28, 2012

"About Us," available at www.eloa.com/About+Us/, accessed October 15, 2012

"About VSP," available at https://www.vsp.com/about-vsp.html, accessed November 28, 2012

"Abstract: The 21st Century," available at http://vision.zeiss.com/about-us/en_de/company-history/abstract_the_21st_century.html, accessed November 13, 2012

"AugenSOL Photochromic Lenses: A New Brand of Photochromic Performance," available at http://www.midwestlens.com/blogger/2011/06/augensol-photochromic-lenses-a-new-brand-of-photochromic-performance/, accessed November 13, 2012

Contains Highly Confidential Information – Subject to Protective Order                    Exhibit 2

"Company History," available at http://www.transitions.com/aboutcompany/history.aspx, accessed October 15, 2012

"Company Information," available at http://en-us.transitions.com/en/media/Pages/CompanyInformation.aspx, accessed October 15, 2012

"Essilor USA Organization," available at www.essilorusa.com/EN/aboutus/EssilorUSAPages/Organization.aspx, accessed November 28, 2012

"Essilor USA The Leader in Optical Lenses," available at www.essilorusa.com/EN/aboutus/EssilorUSA/Pages/default.aspx, accessed October 15, 2012

"Eye Didn't Know That!" available at http://www.eyedidntknowthat.info/about/, accessed October 15, 2012

"Eyeglass Coatings: Anti-Reflective, Scratch Resistant, Anti-For and UV," available at http://www.allaboutvision.com/lenses/coatings.htm, accessed November 12, 2012

"Focal Point – Photochromic Lenses: Success Through Balance," available at http://www.essilortransitions.com/resources/essilor-focalpoint.pdf, accessed November 13, 2012

"Glossary," available at http://www.vision-ease.com/home/consumers/glossary.aspx?letter=l, accessed October 26, 2012

"Leading Retailers Climb to a New Sales Record," available at http://www.visionmonday.com/CMSDocuments/2012/5/cover_story_VM051412.pdf, accessed November 12, 2012

"Photochromic Lenses: An Overview of Transitions and Other Photochromic Brands," http://www.allaboutvision.com/lenses/photochromic.htm, accessed November 12, 2012

"Polarized Sunglasses," available at http://www.allaboutvision.com/sunglasses/polarized.htm, accessed November 12, 2012

"Polycarbonate vs. Trivex Eyeglass Lenses – Which is Right for You?" available at http://www.allaboutvision.com/lenses/polycarb.htm, accessed on November 12, 2012

"Shop by Brand: Low to High," available at http://www.framesdirect.com/eyewear-category/eyeglasses.html, accessed November 11, 2012

"Sport Sunglasses: Controlling Light, Enhancing Performance," available at www.allaboutvision.com/sportsvision/sports-sunglasses.htm, accessed November 28, 2012

"The Benefits of Transitions® Adaptive Lenses," available at http://en-us.transitions.com/en/explore/see-the-difference.aspx, accessed on September 6, 2012

Contains Highly Confidential Information – Subject to Protective Order                                        Exhibit 2

"Vision-Ease Lens Introduces LifeRx FSV," http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/42.aspx, accessed October 26, 2012

"Vision-Ease Lens Introduces LifeRx® Light Responsive D35 Bifocal," http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/28.aspx,accessed October 26, 2012

"Vision-Ease Lens Introduces New LifeRx Light-Responsive Trifocal," available at http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/17.aspx, accessed October 26, 2012

"Vision-Ease Lens Intros LifeRX D28 Line," http://www.visionmonday.com/Default.aspx?TabId=211&content_id=28275&SkinSrc=[L]Skins/VM2007/PagePrint&ContainerSrc=[L] Containers/VM2007/SimpleContainer&dnnprintmode=true, accessed October 26, 2012

"VSP's Website," available at https://visionplans.vsp.com/vsp-plans.html?WT.ac=tn-vspplans, accessed December 1, 2012

14

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 3

## Two-Stage Least Squares Estimation of the Cross-Price Elasticity of Demand of Photochromic Lenses with Respect to the Price of Non-Photochromic Lenses

|  | Coefficient (P-Value) |
|---|---|
| **Dependent Variable** |  |
| Quantity of Photochromic Lenses | -- |
|  | -- |
| **Independent Variable** |  |
| Natural Log of the Price of Photochromic Lenses ($\ln(P_t^p)$) | -2.714* |
|  | (0.037) |
| Natural Log of the Price of Non-Photochromic Lenses ($\ln(P_t^n)$) | 1.694* |
|  | (0.001) |
| Median Income | 0.024* |
|  | (0.022) |
| Median Age | 0.019 |
|  | (0.960) |
| Constant | 16.119 |
|  | (0.236) |
| Monthly Fixed Effects | Yes |
| Annual Time Trend | Yes |
| $R^2$ | 0.908 |
| Number of Observations | 143 |

Notes: P-values are shown in parentheses.
　　　 * represents significance at the 5% level.
　　　 Data for model are from January 2000 through February 2012.

Source: VCA Data.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 4

## TOI Domestic Shipments
## as a Proportion of Total Domestic Ophthalmic Lens Shipments
## 2000 through 2010

| Year | TOI Domestic Shipments | Total Domestic Ophthalmic Lens Shipments | TOI Domestic Shipments as a Proportion of Total Domestic Ophthalmic Lens Shipments |
|:---:|:---:|:---:|:---:|
| | ------------------(Pairs)-------------------- | | ------------(Percent)------------ |
| | | | [(b) / (c)] |
| (a) | (b) | (c) | (d) |
| 2000 | ■ | 74,773,940 | ■ % |
| 2001 | ■ | 72,992,827 | ■ |
| 2002 | ■ | 74,544,646 | ■ |
| 2003 | ■ | 70,468,311 | ■ |
| 2004 | ■ | 67,876,109 | ■ |
| 2005 | ■ | 66,401,678 | ■ |
| 2006 | ■ | 67,519,575 | ■ |
| 2007 | ■ | 71,616,497 | ■ |
| 2008 | ■ | 76,724,817 | ■ |
| 2009 | ■ | 76,083,797 | ■ |
| 2010 | ■ | 75,916,229 | ■ |

Sources: TOI Sales Transaction Data;
VCA Shipment Reports, 2000 through 2010.

Contains Highly Confidential Information--Subject to Protective Order

### Launch of Photochromic Products in the United States
### 1991 through 2011

| Year of Launch | Manufacturer or Licensee | Photochromic Product |
|---|---|---|
| 1991 | Transitions Optical, Inc. | Generation I |
| 1992 | Transitions Optical, Inc. | Generation II |
| 1995 | Asahi | Lite Photon |
|  | Hoya Vision Care | Hoyalux-Bios |
|  | Indo | Indochromic |
| 1997 | Corning | PGX |
|  | Corning | PG T&D |
|  | Corning | SunSensitive |
|  | Indo | Futuras |
|  | Polycore | InstaLens |
|  | Rodenstock | SunMatic |
|  | Rodenstock | ColorMatic Superdark |
|  | Transitions Optical, Inc. | Generation III |
| 1998 | Hoya Vision Care | Hilux II |
|  | Innotech | Photoshades |
|  | Rodenstock | ColorMatic Dark |
| 1999 | Corning | SunSensors |
|  | Rodenstock | ColorMatic Extra |
| 2001 | Groupe Couget | Avia 4th Gen |
|  | Hoya Vision Care | SunGray VI |
|  | Indo | Superfin |
|  | Transitions Optical, Inc. | Next Generation |
| 2002 | Opticast | OptiShades Smoke |
| 2004 | Oliver Peoples | OPX lenses |
|  | Signet Armorlite | Kodak InstaShades |
| 2005 | Hoya Vision Care | SunTech |
|  | Transitions Optical, Inc. | Generation V |
|  | Vision-Ease Lens | LifeRx |

Contains Highly Confidential Information–Subject to Protective Order

## Launch of Photochromic Products in the United States
### 1991 through 2011

| Year of Launch | Manufacturer or Licensee | Photochromic Product |
|---|---|---|
| 2006 | Corning | SunSensors+ |
| | Daejin Optical | Sunfree Ramia |
| | Hoya Optical | Misty |
| | Rodenstock | Contrast |
| | Scopus | SunScope |
| 2007 | Rodenstock | Photocolor |
| 2008 | Transitions Optical, Inc. | Generation VI |
| | Vision-Ease Lens | LifeRx Green |
| 2009 | Corning | SunSensors HPC |
| | Vision-Ease Lens | LifeRx Trifocal |
| 2010 | Vision-Ease Lens | LifeRx D35 |
| 2011 | Augen Optics | AugenSOL |
| | Carl Zeiss Vision | PhotoFusion |
| | Vision-Ease Lens | LifeRx D28 |
| | Vision-Ease Lens | LifeRx FSV |

Notes: Launch dates are approximate.  This list may not be exhaustive.

Sources:  "AugenSOL Photochromic Lenses: A New Brand of Photochromic Performance,"
http://www.midwestlens.com/blogger/2011/06/augensol-photochromic-lenses-a-new-brand-of-photochromic-performance/, accessed November 13, 2012.
"LifeRX Green Launch," VEL_MDL176855 in VEL_MDL176855-86 (Exhibit 9 of the Derek Harris Deposition).
"Photochromic Lenses: An Overview of Transitions and Other Photochromic Brands,"
http://www.allaboutvision.com/lenses/photochromic.htm, accessed November 13, 2012.
"Vision-Ease Lens Introduces LifeRx FSV,"
http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/42.aspx, accessed October 26, 2012.
"Vision-Ease Lens Introduces LifeRx® Light Responsive D35 Bifocal,"
http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/28.aspx, accessed October 26, 2012.
"Vision-Ease Lens Introduces New LifeRx Light-Responsive Trifocal,"
http://www.vision-ease.com/home/about-us/news/mid/582/newsid582/17.aspx, accessed October 26, 2012.
"Vision-Ease Lens Intros LifeRX D28 Line,"
http://www.visionmonday.com/Default.aspx?TabId=211&content_id=28275&SkinSrc=[L]Skins/VM2007/PagePrint&ContainerSrc=[L] Containers/VM2007/SimpleContainer&dnnprintmode=true, accessed October 26, 2012.
TOI_1134020-5 in TOI_1134004-29 (Exhibit 38 of the David Cole, August 7th, 2012 Deposition),
"Transitions Optical, Inc. - Civil Investigative Demands," Files 091-0062 & 091-0047.
Transitions Optical, Inc. website at http://www.transitions.com/aboutcompany/history.aspx, accessed November 13, 2012.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.

Exhibit 6

# TOI Research and Development Expenditures Compared to Domestic Net Sales
## 2000 through 2010

| Year | R&D Expenditures | Domestic Net Sales | R&D Expenditures as a Proportion of Domestic Net Sales |
|:---:|:---:|:---:|:---:|
| | --------------------(Dollars)-------------------- | | --------(Percent)-------- |
| | | | [b) / (c)] |
| (a) | (b) | (c) | (d) |
| 2000 | ▆ | ▆ | ▆ % |
| 2001 | ▆ | ▆ | ▆ |
| 2002 | ▆ | ▆ | ▆ |
| 2003 | ▆ | ▆ | ▆ |
| 2004 | ▆ | ▆ | ▆ |
| 2005 | ▆ | ▆ | ▆ |
| 2006 | ▆ | ▆ | ▆ |
| 2007 | ▆ | ▆ | ▆ |
| 2008 | ▆ | ▆ | ▆ |
| 2009 | ▆ | ▆ | ▆ |
| 2010 | ▆ | ▆ | ▆ |
| CAGR: | ▆ | ▆ | |

Note: TOI's annual R&D expenditures are taken from TOI's
 year-end TSGA reports. If more than one report
 appears for any year, I have used the lowest R&D figure.

Sources: TOI Sales Transaction Data; TOI_1832958; TOI_1949563;
 TOI_1957493; TOI_1958035; TNC_0026517; TNC_0026523;
 TNC_0026884; TNC_0026877; TNC_0026880; TNC_0026887;
 TNC_0026890.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 7

## Comparison of Key Measures of Photochromic Lens Performance Transitions Lenses Across Generations

| Performance Measure | Imbibed Products: Transitions Generation | | | | Transbonded Products: Transitions Generation | | | |
|---|---|---|---|---|---|---|---|---|
| | III | IV | VI | Quality Improved?[6] | II | V | VI | Quality Improved?[6] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | (i) |
| Clarity (%T)[1] | ■ | ■ | ■ | ✓ | ■ | ■ | ■ | ✓ |
| Darkness (%T)[2] | ■ | ■ | ■ | ✓ | ■ | ■ | ■ | ✓ |
| Fade Speed (sec)[3] | ■ | ■ | ■ | ✓ | ■ | ■ | ■ | ~ |
| Activation Speed (%T)[4] | ■ | ■ | ■ | ✓ | ■ | ■ | ■ | ~ |
| Fatigue (Delta b*)[5] | ■ | ■ | ■ | ✓ | ■ | ■ | ■ | ✓ |

Notes:

[1] Clarity is measured by bleach color %T.

[2] Darkness is measured by activated %T at 23 degrees Celsius (30 minutes).

[3] Fade Speed is measured by time to 50% clarity.

[4] Activation Speed is measured by %T activated after 30 seconds.

[5] Fatigue is measured by yellowing or tinting.

[6] A check mark indicates that Transitions lenses have a better quality measure with the introduction of each generation. A ~ mark indicates Transitions VI lenses have a better quality measure than Transitions II, but not Transitions V.

Sources: TNC_0049773.xls and TNC_0049774.xls.

NERA Economic Consulting

Contains Highly Confidential Information--Subject to Protective Order

## TOI  Quality-Adjusted  and  Unadjusted  Quarterly  Weighted  Average  Price
### Q1 2000  through  Q2 2011



Notes: Quality-adjusted prices are calculated using percentage change in difference from optimal quality. Clarity is measured by bleach color %T, darkness is measured by activated %T at 23 degrees Celsius (30 minutes), fade speed is measured by time to 50% clarity, activation speed is measured by %T activated after 30 seconds, and fatigue is measured by yellowing. 92%T is used for optimal clarity, 15%T is used for optimal darkness, and delta b* of 1.5 is used for optimal fatigue.

Sources: TOI Transaction Data; TOI Product Type Lookup; TOI Standard Cost Data; Product Improvement Matrix; discussions with John Ligas, Director of Research and Development at TOI.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 9

# Comparison of Key Measures of Photochromic Lens Performance
# Transitions-Branded Lenses Compared to Competing Photochromic Lenses

| Performance Measure | Compared to Transitions IV | | | Compared to Transitions VI | | |
|---|---|---|---|---|---|---|
| | Corning SunSensors Grey | Transitions IV | Transitions Better? | Corning SunSensors 1.56 Grey | Transitions VI | Transitions Better? |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Clarity (%T)[1] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Darkness (%T)[2] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Fade Speed (sec)[3] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Activation Speed (%T)[4] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Fatigue (Delta b*)[5] | ■ | ■ | ✓ | ■ | ■ | ✓ |

Notes:

[1] Clarity is measured by bleach color %T.

[2] Darkness is measured by activated %T at 23 degrees Celsius (30 minutes).

[3] Fade Speed is measured by time to 50% clarity.

[4] Activation Speed is measured by %T activated after 30 seconds.

[5] Fatigue is measured by yellowing or tinting.

Sources: TNC_0049773.xls and TNC_0049774.xls.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 10

## Growth in TOI Research & Development Expenditures
## Relative to Growth in Domestic Shipments of Photochromic Lenses
## 2000 through 2010



Note: See Exhibit 6 for TOI's annual R&D expenditures over this time period.

Sources: TOI_1832958; TOI_1949563; TOI_1957493; TOI_1958035; TNC_0026517; TNC_0026523; TNC_0026884; TNC_0026877; TNC_0026880; TNC_0026887;
TNC_0026890; VCA Shipment Reports, 2000 through 2010.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.
Exhibit 11

# Comparison of Key Measures of Photochromic Lens Performance
# Acclimates Compared to Transitions-Branded Lenses

| Performance Measure | Acclimates Generation I | | | Acclimates Generation II | | |
|---|---|---|---|---|---|---|
| | Acclimates Grey | Transitions IV | Transitions Better?[6] | Acclimates II 1.5 Grey | Transitions VI | Transitions Better?[6] |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| Clarity (%T)[1] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Darkness (%T)[2] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Fade Speed (sec)[3] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Activation Speed (%T)[4] | ■ | ■ | ✓ | ■ | ■ | ✓ |
| Fatigue (Delta b*)[5] | ■ | ■ | X | ■ | ■ | X |

Notes:

[1] Clarity is measured by bleach color %T.

[2] Darkness is measured by activated %T at 23 degrees Celsius (30 minutes).

[3] Fade Speed is measured by time to 50% clarity.

[4] Activation Speed is measured by %T activated after 30 seconds.

[5] Fatigue is measured by yellowing or tinting.

Sources: TNC_0049773.xls and TNC_0049774.xls.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.

Exhibit 12

## Comparison of Dr. French's Model 1 But-For Average Monthly Prices to Actual Average Monthly Prices
### January 2000 through March 2010



Source: Backup materials to Expert Report of Gary L. French, Ph.D., October 1, 2012.

NERA Economic Consulting

## Summary of Specification Testing on Dr. French's Before-After Regression Model

| | Coefficient (P-Value) | | | | | |
|---|---|---|---|---|---|---|
| | Gross Prices | | Aggregate Price Difference | | Standard Error Correction | |
| Variable | Spec 1 | Spec 2 | Spec 1 | Spec 2 | Spec 1 | Spec 2 |
| (a) | (b) | (c) | (d) | (e) | (f) | (g) |
| **Annual Price Differences** | | | | | | |
| 2000 | -0.070* (0.000) | -0.077* (0.000) | -- | -- | 0.124 (0.018) | 0.150 (0.015) |
| 2001 | -0.101* (0.000) | -0.106* (0.000) | -- | -- | 0.077 (0.105) | 0.100 (0.073) |
| 2002 | -0.100* (0.000) | -0.105* (0.000) | -- | -- | 0.062 (0.146) | 0.081 (0.102) |
| 2003 | -0.082* (0.000) | -0.086* (0.000) | -- | -- | 0.064 (0.089) | 0.080 (0.066) |
| 2004 | -0.072* (0.000) | -0.075* (0.000) | -- | -- | 0.057 (0.085) | 0.069 (0.064) |
| 2005 | -0.059* (0.000) | -0.062* (0.000) | -- | -- | 0.036 (0.194) | 0.046 (0.142) |
| 2006 | -0.054* (0.000) | -0.055* (0.000) | -- | -- | 0.024 (0.300) | 0.031 (0.224) |
| 2007 | -0.047* (0.000) | -0.049* (0.000) | -- | -- | 0.010 (0.572) | 0.015 (0.434) |
| 2008 | -0.021* (0.000) | -0.022* (0.000) | -- | -- | 0.016 (0.203) | 0.019 (0.161) |
| 2009 | -0.004* (0.000) | -0.003* (0.000) | -- | -- | 0.013 (0.071) | 0.013 (0.073) |
| 2010 | 0.002* (0.000) | 0.002* (0.000) | -- | -- | 0.002 (0.019) | 0.002 (0.019) |
| **Overall Price Difference** | -- -- | -- -- | -0.007* (0.000) | -0.008* (0.000) | -- -- | -- -- |
| Cost | 0.122* (0.000) | 0.122* (0.000) | 0.112* (0.000) | 0.111* (0.000) | 0.122* (0.000) | 0.122* (0.000) |
| Population over 50 | -0.138* (0.000) | -- | 0.144* (0.000) | -- | 0.569* (0.005) | -- |
| Annual Trend | -- | -0.004* (0.000) | -- | 0.003* (0.000) | -- | 0.017* (0.005) |
| Constant | 4.206* (0.000) | 2.671* (0.000) | 0.954* (0.000) | 2.573* (0.000) | -3.941 (0.095) | 2.406* (0.000) |
| Product Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| Customer Fixed Effects | Yes | Yes | Yes | Yes | Yes | Yes |
| $R^2$ | 0.980 | 0.980 | 0.978 | 0.978 | 0.979 | 0.979 |
| Number of Observations | 206,389 | 206,389 | 206,389 | 206,389 | 206,389 | 206,389 |

-- not applicable

Notes: P-values shown in parentheses; * represents significance at the 5% level after accounting for
    multiple comparisons.
    Standard errors are clustered by product and year in columns (f) and (g).
    Dr. French's Price Difference coefficients measure the change in price for the given period from the
    baseline period of May 2010 through May 2011.

Source: Backup materials to Expert Report of Gary L. French, Ph.D., October 1, 2012.

Contains Highly Confidential Information--Subject to Protective Order

Expert Report of Lauren J. Stiroh, Ph.D.

Exhibit 14

## Comparison of Dr. Singer's and Dr. French's But-For Average Monthly Prices to Actual Monthly Average Prices
### January 2000 through May 2011



Sources: Backup materials to Merits Report of Hal J. Singer, Ph. D., September 30, 2012, and Expert Report of Gary L. French, Ph.D., October 1, 2012.

NERA Economic Consulting