# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN RE: | : MDL DOCKET NO. 2173 |
| PHOTOCHROMIC LENS | : CASE NO: 8:10-cv-2040 |
| ANTITRUST | : |
| LITIGATION | : HON. JAMES D. WHITTEMORE |

* * *

FEBRUARY 15, 2013

* * *

Videotaped deposition of GARY L. FRENCH, PH.D., taken at 1050 Connecticut Avenue NW, 10th Floor, Washington, D.C., commencing at 8:57 a.m. before Debbie Leonard, Registered Diplomate Reporter, Certified Realtime Reporter.

* * *

VERITEXT NATIONAL COURT REPORTING COMPANY
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, PA 19103

the number seven sound too high, too low or just right?

A. I just don't know. I'll accept your representation.

Q. Of all the entities that Dr. Netz analyzed, how many do you look at?

A. How many did I look at?

Q. Yes.

A. On my own or you mean in reading her report?

Q. Let me restate it. Of all the entities that Dr. Netz identified, how many are utilized in your report for pass-through analysis?

A. I don't think any are.

Q. Well, you use Walmart, correct?

A. Yeah. Did she do Walmart? I don't remember now.

Q. Dr. Netz, in terms of injury at the first purchaser level as you call it, Dr. Netz proposed a methodology based on analysis of the impact of the Trivex product. Do you recall that in her report?

A. Yeah. I think she mentioned

maybe that would be a benchmark. I don't remember much about it.

Q. You didn't use that benchmark, did you?

A. No.

Q. Why not?

A. Well, I like the benchmark I chose.

Q. Did you do any work in connection with the Trivex method to see if it would work?

A. No.

Q. She also proposes an international yardstick method. Do you recall that?

A. Yes.

Q. Did you attempt any work on that method?

A. No.

Q. So the one -- one method that she addresses that you utilize is the before-and-after method, correct?

A. After in this case, yes, uh-huh. During and after.

aggregate is true for the individual lens casters and other customers of TOI.

Q. Now, in the footnote on the second page, you identify a number of first purchasers that had no benchmark sales, and those include SOLA and Vision-Ease, correct?

A. Yes.

Q. What do you mean by, "had no benchmark sales"?

A. They didn't purchase from -- they didn't purchase from TOI after May 2010.

Q. So you have not analyzed the degree to which, if at all, SOLA or Vision-Ease incurred an overcharge prior to May 2010, have you?

A. Well, because they don't have a benchmark period, I can't run the regression separately for them. I think the aggregate regression applies to them as well as all the others.

Q. But the answer to my question is no, you've not done that analysis for them?

A. It's impossible to run a

separate regression when they didn't have any purchases in the period. But if everybody else was paying overcharges based on their benchmark period sales and prices, then it's reasonable to presume that the others were, too, plus a predominant basis, certainly the lens casters were injured.

Q. Now, turn to the first page of Exhibit 5. And look in the column for Augen for 2002. There's a coefficient of negative .247. What does that mean?

A. For Augen it means that in that -- in that year, that's -- a negative number means there was no overcharge to them.

Q. And what does the twenty-four seven mean?

A. Well, that's -- that's the coefficient estimate for that year.

Q. Does that mean they were undercharged by 24.7 cents per lens?

A. In an arithmetic sense, it could mean that, yes.

Q. And that would be 24 cents and --

A. No, no it doesn't mean 24 cents. This is not the overcharge itself. This is the coefficient. There's another calculation you have to make to get from the overcharge -- from the coefficient to the overcharge.

Q. So what is this in terms of dollars per lens?

A. Well, I would have to calculate it, and I couldn't do that sitting here.

Q. Roughly?

MS. KUPFER: Objection. He said he couldn't do it.

MR. JACOBSON: I'm asking him for --

THE WITNESS: I mean, you would have to --

MR. JACOBSON: -- a ballpark figure.

THE WITNESS: You would have to subtract E to the minus minus 247 and subtract that from one to do it. I don't know that I can come up with a ballpark in my head for that.

GARY L. FRENCH, PH.D.

BY MR. JACOBSON:

Q. All right. Fair enough. Isn't that by far the largest coefficient on this page?

A. The whole page? I don't know. I haven't looked.

Q. In terms of absolute value.

A. It's certainly -- I mean, I can try to look at all of them if you'd like. It's one of the largest, if not the largest.

Q. And another really large one is Augen for the next year, 2003, at 24.2, correct?

A. Yes.

Q. And you have negative overcharges for Augen also in 2008 --

A. Yes.

Q. -- and 2010 and 2001. All that true?

A. Well, 2010 is not significant, so I wouldn't conclude that it's negative in 2010. But there is one significant one in 2001.

Q. And 2005 -- 2009 -- excuse

me -- there's no significant overcharge either, is there?

A. No.

Q. And in 2007, there's no significant overcharge?

A. That's correct.

Q. So the only significant overcharge for Augen is in 2000 with the coefficient of 0.85, correct?

A. Yes.

Q. So is Augen injured?

A. I guess in 2000 it was.

Q. Is Augen injured, in your judgment?

MS. KUPFER: Objection as to form. Let me just object to the form of that question.

THE WITNESS: I think in 2000 the numbers say they were injured in that year. And in other years it's not -- they were not injured or it doesn't appear that they were injured or we don't know because it wasn't statistically significant. So

GARY L. FRENCH, PH.D.

I looked at it that way.

Augen is one of many. I think most of the class members in most years were injured, and you can argue about Augen if you want as an individual entity, but overall, I think the injury is quite pervasive throughout the class.

BY MR. JACOBSON:

Q. And what about end users who purchase photochromic lenses that were manufactured by Augen in 2002, 2003? Are they injured?

A. They may not be in those particular years or from those -- particular thing, from that particular company.

Q. And in the way that you've done your analysis, you can't say whether SOLA or Vision-Ease are more comparable to Augen or to another firm such as Younger, can you?

MS. KUPFER: Objection as to form.

THE WITNESS: I don't know that you can say that one way or the other.

Augen -- part of this has to do with statistical significance in the number of observations. The companies that are larger and constitute most of the class sales have lots of observations. They're all significant. They all have their correct sign.

Some of the other companies that didn't buy as much from TOI, in part because I think there were few observations, we don't always get statistical significance.

BY MR. JACOBSON:

Q. The values for Augen in 2002 and 2003 have quite high T statistics, don't they?

A. They do.

Q. So those are --

A. You know, I didn't try to hide that. It's right there in the table.

Q. And so those are highly statistically significant?

A. Those particular ones are, yes.

Q. So we can agree that, without

doing a different model to show injury or lack of injury to Vision-Ease or SOLA, we just don't know --

MS. KUPFER: Objection --

BY MR. JACOBSON:

Q. -- whether on your type of analysis indirect purchasers who purchase lenses from those suppliers were injured or not?

MS. KUPFER: Objection as to form.

THE WITNESS: Well, I can't show it by this -- by this measure. I mean, generally, I've shown that the prices that TOI charges across lens casters tend to be quite similar, so therefore those ones which didn't have benchmark period purchases were likely injured as well, I think, because of that. But I can't run this regression for them.

BY MR. JACOBSON:

Q. So until it was -- until it merged with Zeiss, SOLA was either the

largest or second largest lens caster in the United States, was it not?

A. It was a big one. I don't know if it was second largest, but it was a large one, yes.

Q. And in theory, because of its size, it might have been able to bargain for lower prices from Transitions as opposed to higher prices, correct?

MS. KUPFER: Objection as to form.

THE WITNESS: Well, you'd think if anybody could do that, Essilor could. And it has statistically significant overcharges in almost all years. So I don't know that I would agree with that.

BY MR. JACOBSON:

Q. Are you familiar with the 1996 agreement between SOLA and Transitions?

A. I know there was one. I don't know that I recall its provisions.

Q. Are you aware that, among other things, Transitions erected a plant in

Australia to serve SOLA?

MS. KUPFER: Objection.

THE WITNESS: I wasn't aware of that.

BY MR. JACOBSON:

Q. Are you familiar at all with the terms of the SOLA 1996 agreement with Transitions?

A. I don't remember them here.

Q. So if there were considerations other than strict purchase price flowing from Transitions to SOLA from 1996 through 2005, you would not have incorporated them in your analysis, would you?

MS. KUPFER: Object --

THE WITNESS: Well --

MS. KUPFER: Objection. He answered the question.

THE WITNESS: I don't have any overcharges for SOLA here, so I don't know how -- why it would be relevant.

BY MR. JACOBSON:

Q. In your damages analysis overcharges decreased -- not in a linear

fashion, but they generally decrease over time from 2000 to 2010, correct?

A. Yes.

Q. Why?

A. Well, I think the main reason is, after Vision-Ease entered the market in 2005, TOI seems to have, in general, lowered its prices some by increasing rebates.

Q. And are you familiar with Dr. Singer's work in this MDL?

A. Somewhat.

Q. And he comes to the opposite conclusion, right, that overcharges increased after Vision-Ease entered?

MS. KUPFER: Object -- objection. Foundation.

THE WITNESS: I didn't read that part of Dr. Singer's report, so I'm not certain.

BY MR. JACOBSON:

Q. Why do you think at the lens caster level you come out with such different numbers than Dr. Singer does in terms of alleged overcharge?

GARY L. FRENCH, PH.D.

* * *

(The court reporter read from the record as follows:)

* * *

QUESTION: "When, in your judgment, had TOI anti-competitively monopolized a relevant market?"

* * *

THE WITNESS: I think when they started those kinds of conduct, they're a monopoly -- they already had the monopoly, but it was, I guess, a legitimately gotten monopoly early on.

And then at some point, when they took these anti-competitive steps to maintain their monopoly, then I think it was an anti-competitive monopoly at that point. And that seemed to begin around 1999.

BY MR. JACOBSON:

Q. Okay. Around 1999. So you referred to the parting of ways with Rodenstock in 1996. That was prior to the time that you've identified anti-competitive

to '99 has to do with when -- that's what we discussed earlier today. We think --

BY MR. JACOBSON:

Q. Let me interrupt. Not to be rude. There's a statute of limitations issue.

A. Yes.

Q. You're familiar with the statute of limitations?

A. Yeah, you have to have fraudulent concealment, I think, to go back further, right?

Q. Have you examined fraudulent concealment?

A. I have not.

Q. Have you seen any evidence of fraudulent concealment?

A. No, I haven't looked at it. I haven't even attempted to look at fraudulent concealment.

Q. Now, at pass-through, you look only at Walmart, correct?

A. Yes.

GARY L. FRENCH, PH.D.

Q. You don't look at lens casters to see whether they pass through any overcharge from Transitions, do you?

A. I didn't -- I didn't have sufficient data to look at anybody but Walmart and Sam's.

Q. And who is Walmart buying from?

A. I don't know. I would have to go back and look. It's in the data. And we have a customer code and a vendor code. So, I mean, you can find it out.

Q. They're not buying from TOI, are they, directly?

A. Oh, you mean -- oh, no, no.

Q. Walmart.

A. I don't think so. I don't think any retailer buys from TOI directly, although it confuses me why lens casters [sic] is among their direct -- their customers. I guess that was for the Views product, I suppose, but I don't know.

I didn't think they sold directly to retailers, but in their own data, lens -- LensCrafters is there. So that's a




## Revised Exhibit 14. Regression Results Demonstrating Impact on First Purchasers

| Year | Essilor | Carl Zeiss | Younger | X-Cel | Hoya | Seiko | Shamir | Augen |
|---|---|---|---|---|---|---|---|---|
| 2000 | 0.103 *** | 0.069 *** | 0.124 *** | 0.115 *** | | 0.183 *** | 0.013 | 0.085 *** |
| | (25.52) | (17.17) | (28.53) | (26.61) | | (13.00) | (0.51) | (9.20) |
| 2001 | 0.068 *** | 0.020 *** | 0.081 *** | 0.078 *** | | 0.289 *** | | -0.063 *** |
| | (18.16) | (5.56) | (20.41) | (19.83) | | (24.75) | | (-6.56) |
| 2002 | 0.061 *** | 0.018 *** | 0.081 *** | 0.077 *** | 0.079 *** | 0.275 *** | 0.175 *** | -0.247 *** |
| | (18.04) | (5.45) | (22.39) | (21.30) | (6.08) | (24.33) | (6.50) | (-23.64) |
| 2003 | 0.061 *** | 0.033 *** | 0.087 *** | 0.064 *** | 0.083 *** | | 0.154 *** | -0.242 *** |
| | (20.00) | (11.00) | (25.83) | (18.63) | (8.54) | | (18.41) | (-12.08) |
| 2004 | 0.056 *** | 0.029 *** | 0.079 *** | 0.049 *** | 0.073 *** | | 0.150 *** | |
| | (20.63) | (11.08) | (26.58) | (15.68) | (10.99) | | (21.06) | |
| 2005 | 0.049 *** | 0.003 | 0.074 *** | 0.060 *** | 0.068 *** | 0.220 *** | 0.102 *** | |
| | (20.93) | (1.19) | (28.53) | (21.71) | (18.70) | (39.09) | (13.09) | |
| 2006 | 0.031 *** | 0.002 | 0.058 *** | 0.037 *** | 0.047 *** | 0.372 *** | 0.052 *** | |
| | (15.57) | (0.95) | (25.69) | (14.72) | (17.06) | (67.71) | (8.41) | |
| 2007 | 0.003 | -0.008 *** | 0.054 *** | 0.027 *** | 0.035 *** | 0.366 *** | 0.047 *** | 0.021 |
| | (1.52) | (-5.51) | (28.52) | (12.52) | (14.25) | (79.32) | (11.38) | (0.56) |
| 2008 | 0.011 *** | 0.011 *** | 0.031 *** | 0.025 *** | 0.055 *** | 0.332 *** | 0.020 *** | -0.008 ** |
| | (9.34) | (10.23) | (20.41) | (13.61) | (32.94) | (129.19) | (9.89) | (-2.23) |
| 2009 | 0.004 *** | 0.024 *** | 0.046 *** | 0.032 *** | 0.050 *** | 0.150 *** | 0.042 *** | 0.003 |
| | (4.57) | (29.82) | (35.26) | (20.35) | (34.85) | (70.23) | (24.77) | (0.95) |
| 2010 | 0.003 *** | 0.005 *** | 0.035 *** | 0.004 * | 0.034 *** | 0.061 *** | 0.037 *** | -0.003 |
| | (3.79) | (6.12) | (22.55) | (1.93) | (19.52) | (19.77) | (16.37) | (-0.90) |
| Standard Cost | | 0.092 *** | | | | | | |
| | | (88.75) | | | | | | |
| Population over 50 | | 0.407 *** | | | | | | |
| | | (27.23) | | | | | | |
| $R^2$ | | 0.982 | | | | | | |
| Number of Observations | | 206,389 | | | | | | |

Note: T-statistic is presented in parentheses below the Coefficient. Coefficient estimates for customer fixed effects and product fixed effects are not shown. *** Indicates a coefficent that is statistically significant at the 0.001 level. ** Indicates a coefficient that is statistically significant at the 0.05 level. * Indicates a coefficient that is statistically significant at the 0.10 level. Statistical significance at the 0.05 level is unchanged using robust standard errors, with the exception of the following: Augen (2007 and 2010), Oakley (2005, 2007 and 2010), Optima (2007 and 2009), REM Eyewear (2009), and X-Cel (2010). The following first purchasers had no benchmark sales and therefore there were insufficient data to estimate customer-specific overcharges on their purchases: LensCrafters, Oracle Lens Manufacturing, Sola, Tecni-Lens, Tecnol North America, Vision-Ease.

**Revised Exhibit 14. Regression Results Demonstrating Impact on First Purchasers**

| Year | Signet Armorlite | Oakley | Optima | Microvision Optical | Pixel | REM Eyewear |
|---|---|---|---|---|---|---|
| 2000 | 0.056 *** | | | | | |
| | (6.84) | | | | | |
| 2001 | 0.016 | | | | | |
| | (1.63) | | | | | |
| 2002 | | | | | | |
| 2003 | | | | | | |
| 2004 | | | | | | |
| 2005 | | 0.027 | 0.043 ** | | | |
| | | (0.81) | (2.42) | | | |
| 2006 | | 0.018 ** | 0.036 ** | | | |
| | | (2.21) | (2.70) | | | |
| 2007 | | 0.010 | 0.025 ** | | | -0.116 ** |
| | | (1.00) | (2.02) | | | (-2.91) |
| 2008 | | 0.002 | -0.001 | | | -0.048 |
| | | (0.19) | (-0.08) | | | (-1.60) |
| 2009 | | 0.001 | 0.003 | | 0.043 *** | 0.015 |
| | | (0.09) | (0.38) | | (6.42) | (0.49) |
| 2010 | | -0.003 | 0.000 | -0.345 *** | 0.029 *** | 0.004 |
| | | (-0.26) | (0.00) | (-14.59) | (4.88) | (0.11) |

Note: T-statistic is presented in parentheses below the Coefficient. Coefficient estimates for customer fixed effects and product fixed effects are not shown. *** Indicates a coefficent that is statistically significant at the 0.001 level. ** Indicates a coefficient that is statistically significant at the 0.05 level. * Indicates a coefficient that is statistically significant at the 0.10 level. Statistical significance at the 0.05 level is unchanged using robust standard errors, with the exception of the following: Augen (2007 and 2010), Oakley (2005, 2007 and 2010), Optima (2007 and 2009), REM Eyewear (2009), and X-Cel (2010). The following first purchasers had no benchmark sales and therefore there were insufficient data to estimate customer-specific overcharges on their purchases: LensCrafters, Oracle Lens Manufacturing, Sola, Tecni-Lens, Tecnol North America, Vision-Ease.