## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| IN RE:  PHOTOCHROMIC LENS ANTITRUST LITIGATION | MDL Docket No. 2173 |
| THIS DOCUMENT RELATES TO: ALL CASES | Case No. 8:10-md-2173-JDW-EAJ <br><br> Hon. James D. Whittemore <br> Hon. Elizabeth A. Jenkins |

## JOINT STATUS REPORT

Plaintiff Insight Equity A.P.X. d/b/a Vision-Ease Lens Worldwide ("Vision-Ease" or "VE") and Defendant Transitions Optical, Inc. ("Transitions" or "TOI") submit this Joint Status Report pursuant to the Court's June 11, 2013 Order (Dkt. 518) deferring a ruling on Vision-Ease's Motion for an Order to Show Cause Why Transitions Should Not Be Held in Contempt (Dkt. 483).[1]  The purpose of this Joint Status Report is to update the arguments and information in Vision-Ease's motion and Transitions' opposition in light of the Order and Transitions' subsequent production of a supplemental privilege log (Dkt. 528).

### I.      Vision-Ease's Supplemental Statement

The documents at issue in this motion can be divided into two categories.  The documents primarily at issue contain allegedly privileged information that was (1) disclosed by Transitions, PPG, and Essilor to Stephen Reiss, the arbitrator of the underlying cost

---

[1] The Court subsequently granted a joint request to extend the deadline to file this Joint Status Report to July 19, 2013.  Dkt. 530.

allocation dispute,[2] and/or (2) exchanged between PPG and Essilor employees who were engaged in the dispute before the arbitration occurred.[3]  Transitions has asserted that the "common interest" exception excused what would otherwise have been a waiver of the privilege as to each of these documents.

The other documents at issue were apparently never disclosed to third parties but were nevertheless withheld on extremely questionable grounds of privilege that.[4]  The alleged "common interest" privilege does not apply to any of these documents.  Because Transitions has not satisfied its burden to substantiate any of its privilege claims, the Court should order Transitions to produce unredacted versions of all the previously redacted or withheld documents.  Alternatively, the Court should enter an order in the form requested by VE, directing Transitions to submit the documents to the Court and justify each claim of privilege.  Dkt. 483-1.

### A.     Transitions Fails to Meet Its Burden to Prove that Any of the Withheld Information or Documents Is Privileged

Transitions bears the burden to prove each element of the attorney-client privilege for each item of redacted information and each document withheld.[5]  Dkt. 518 at 3 (citing

---

[2] These documents include PPG's 92-page submission, starting at TNC_0050799, Transitions invoices, from TNC_0049968 to TNC_0050892, and Essilor's 17-page submission, starting at TNC_0050780.

[3] These documents are listed in VE's motion, Dkt. 483 at p. 8, fn. 7-8, 10.

[4] These documents are listed in VE's motion, Dkt. 483 at p. 15, fn. 15, 17 and at p. 16 fn. 18.

[5] Transitions ignores this burden in its response below and argues that the Court should simply uphold all of its privilege claims, without examination, claiming that a common interest necessarily existed.

*Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 667 (M.D. Fla. 2010)).  For each privileged item that was disclosed to a third party, TOI also bears the burden of proving that the privilege was not waived due to a common interest privilege.  *E.g.*, *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989).  This burden requires TOI to prove that "(1) the communicating parties shared an identical legal interest, (2) the communication was made in the course of and in furtherance of the joint legal effort, and (3) the privilege had not been waived."  *See also Glynn v. EDO Corp.*, Civil No. JFM-07-01660, 2010 WL 3294347, *7 (D. Md. Aug. 20, 2010) (to be protected under the common interest privilege, communications "must first satisfy the traditional requisites for the attorney-client or work product privilege ....") (citing cases).

Transitions' opposition brief and privilege logs (Dkts. 483-2 and 528) do not prove the elements of either the attorney-client privilege or common interest privilege.  Transitions has thus failed to meet its burden of proof for any document, much less all of them.[6]

---

[6] Transitions argues below that it has no burden until the Court orders it to assume the burden by ruling on VE's original motion.  Transitions essentially argues that VE has not met a "burden" (that does not even exist) to disprove a common interest and thus trigger Transitions' burden to substantiate all of its privilege claims.  There is no support for Transitions' argument that VE must make a threshold showing in order to trigger Transitions' duty to substantiate its privilege claims, and the procedural defense that Transitions invokes here was essentially created by Transitions. VE does not possess, and therefore cannot provide to the Court, any information and documents that Transitions has redacted or withheld on the basis of privilege and that VE is attempting to challenge.  In fact, VE cannot even file the redacted versions of the documents at issue without incurring substantial costs because Transitions has designated all of them "highly confidential" and requires that they be filed under seal.

**1.   Transitions' Privilege Log Does Not Establish the Existence of Privilege**

TOI's privilege log does not provide enough information to establish that any document is privileged because the log does not explain, for any document, (1) which individuals were clients who requested or received legal advice, or (2) which individuals were lawyers or agents of lawyers who gave legal advice or responded to requests for legal advice from clients.  Much of the information in the log is also ambiguous.  The log contains only one entry for each underlying document, but many of the underlying documents are email chains containing multiple communications, among large numbers of people, and multiple redactions.

To give but one typical example, TNC_0051000 is an email chain that begins with an email from a PPG lawyer, Glenn Bost, to an Essilor lawyer, Carol Xueref.  The initial email does not reflect legal advice or a request for legal advice.  Xueref's email responding to Bost is nevertheless redacted in part based on an unestablished claim of privilege.  Bost's email responding to Xueref's response is also redacted on the same basis.  Xueref then forwarded these allegedly privileged emails to other individuals, some of whom VE knows to be Essilor employees who are not lawyers (e.g., Xavier Fontanet) and others who are unidentified and unknown to VE (e.g., Nicole Lebrun and Marie-Laurence Faidit).  Faidit responded to Xueref and copied an Essilor employee who is not a lawyer (Laurent Vacherot).[7]  Vacherot then forwarded the entire email chain to PPG's Rick Elias, who in turn forwarded it back to PPG lawyer Bost, without any accompanying request for legal advice.

---

[7] The latter two emails are in French.

4

TOI's privilege log entry asserts that the "author" of TNC_0051000 is Elias (even though the email chain contained multiple authors); that the "recipient" is Bost (though the chain contained multiple recipients); that the email contained no CCs (though numerous people were copied on portions of the chain); and that the legal advice concerns "allocation of costs of FTC Investigation shared in furtherance of common interest" (even though PPG and Essilor were adverse on the issue of allocating costs).  Dkt. 528 (Ref. No. 4534).

These descriptions do not satisfy TOI's burden of proof for obvious reasons.  The "legal advice" in TNC_0051000, if any actually exists, appears in Essilor's email to PPG and in PPG's email back to Essilor.  Yet the privilege log does not explain which lawyer provided each item of alleged "legal advice" to which client.[8]  Nor does the privilege log explain how "allocation of costs" – which appears to be a business issue – is really a legal issue.[9]  Nor does the privilege log explain how the allegedly privileged information remained privileged after disclosure both to an adverse corporate party, and then among employees of each corporate party.  Although the log refers to a "common interest" privilege, it does not explain what the "common interest" is, much less how it could arise in the middle of a dispute over which party owes how much.  In sum, TNC_0051000 and its corresponding

---

[8] The log also equivocates as to the relationship between each document and the legal advice about "allocation of costs" that it allegedly contains.  At times the log describes the document as "containing" the advice, and at other times as "memorializing" the advice, without explaining the difference.

[9] The context strongly suggests that any "legal advice" was really legal argumentation about "allocation of costs."  No case supports the extension of a common interest privilege to such communications.

entry on the privilege log do not satisfy TOI's burden of proof but, rather, raise numerous issues that are representative of virtually every other entry on the log.

### 2. Transitions Fails to Meet Its Burden To Prove that a Common Interest Privilege Exists

TOI does not rebut VE's argument that the "resolution of the fee dispute" or the "allocation of costs" cannot be a "common interest" between PPG and Essilor because the parties are adverse on that issue. Instead, TOI argues that some adversity is permitted between parties to a common interest agreement, Dkt. 493 at 5-6, and that the fee dispute was a "necessary and ancillary" part of a larger common interest." *Id.* at 5. These arguments fail for at least the following reasons.

### a. PPG and Essilor Did Not Have Identical Interests as to the Fee Dispute

TOI overlooks the fact that, although the parties to a common interest agreement need not have completely identical interests in all respects, the common interest privilege extends only to communications on the specific interests that are identical. Parties may invoke the common interest privilege "only insofar as their interests were in fact identical; communications relating to matters as to which they held opposing interests would lose any privilege." *In re Rivastigmine Patent Litig.*, No. 05 ND 1661, 2005 WL 2319005, *4 (S.D.N.Y. Sep. 22, 2005); *see also Union Carbide Corp. v. Dow Chemical Co.*, 619 F.Supp. 1036, 1050 (D.Del. 1985) (rejecting assertion of common interest privilege over communications on which parties did not have a common interest); *S.C.M. Corp. v. Xerox Corp.*, 70 F.R.D. 508, 513 (D. Conn. 1976) (same). When parties have both common and adversarial interests, the community of interest does not apply to communications on issues

where the parties are adversarial.  As the court in *Baxter Travenol Labs., Inc. v. Abbott Labs.*,

No. 84 C 5103, 1987 WL 12919, *2 (N.D. Ill. Jun. 19, 1987) explained:

> The community of interest, however, extends only to
> communications relating to the prosecution and litigation of the
> patents [i.e. common interests], and not to those
> communications relating to the parties' rights among
> themselves in the patents [i.e. adversarial interests]. Such
> communications are not related to the parties' joint interest in
> prosecuting the patents; their adversarial interests are
> dominant, and the communications are not privileged.

*Id.* at *2.  All of the communications at issue here relate to the issue on which the

parties were *adverse*.  Every entry of Transitions' privilege log describes the subject matter

of the withheld documents and information as the "allocation of costs of FTC Investigation."

Dkt. 528.  No entry identifies a subject matter on which the parties' interests were aligned.

Consequently TOI's privilege log does not prove that any common interest privilege applies

to any document at issue.

Transitions does not distinguish these cases or rebut them below.  Instead, Transitions

argues that the fact the parties entered into Joint Defense Agreements is enough to prove that

a common interest necessarily exists even as to adverse communications.  But "merely

saying something is so does not make it so."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

130 S.Ct. 1758, 1769 n.7 (2010).

> **b.**      **Transitions Fails To Articulate a Common Legal Interest
> or Prove Actual Cooperation Towards It**

A "common interest" must be a common *legal* interest, as opposed to a common

*commercial* interest.  *E.g.*, *Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*, 160

F.R.D. 437, 447 (S.D.N.Y. 1995).  Transitions fails to articulate a  common legal interest.

TOI suggests, at different points in its brief, that the parties had a common interest "when responding to the FTC investigation," Dkt. 493 at 5, "to wrap up [the] investigations sooner rather than later," *id.* at 6., in "getting both investigations closed," *id.* at 7, and in "formulating a legal strategy for responding to both investigations."  *Id.*

These descriptions of a common interest -- without any concrete supporting evidence that a common legal strategy was, in fact, formulated[10] – are too abstract and general to demonstrate that any privilege exists.  Privileges, as exceptions to the general rule that relevant evidence is discoverable, "are not lightly created nor expansively construed, for they are in derogation of the search for truth."  *United States v. Nixon*, 418 U.S. 683, 710 (1974). "Because the attorney-client privilege obstructs the truth-finding process, it is construed narrowly."  *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991).  The descriptions are simply "conclusory allegations" that fail to satisfy TOI's burden to prove a link between the alleged "common interest" and any specific legal strategy or consequence.  *See Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F.Supp.2d 493, 497 (S.D.N.Y. 2002) (a common commercial interest does not become a common legal interest simply because it involves legal documentation or legal compliance or an interest in avoiding litigation).

"It is not sufficient for the party seeking the protection of the common interest doctrine merely to show that a unified legal interest theoretically existed. Rather, it must also

---

[10] Here, again, Transitions points to the JDAs as the evidence of a "common legal strategy," but the JDAs do not identify any specific legal strategies, and the parties cannot be presumed to have had a common legal strategy as to the cost dispute.

demonstrate that the parties demonstrated cooperation in developing a common legal strategy." *Rivastigmine*, 2005 WL 2319005, *2; *see also Bank Brussels Lambert*, 160 F.R.D. at 448; *For Your Ease Only, Inc. v. Calgon Carbon Co.*, No. 02 C 7345, 2003 WL 21920244, *3 (N.D. Ill. Aug. 11,2003).  Here, Transitions has not presented one iota of evidence that PPG, Transitions, and Essilor (much less Arbitrator Reiss) cooperated in developing a common legal strategy when, from all that appears, they were squabbling over who owed whom.[11]

TOI's conclusory allegations of an overarching "common interest in responding to the FTC investigations" also do not withstand scrutiny because there were two investigations. Both of the investigations affected Essilor's legal interests, but only one of them affected PPG's and Transitions' legal interests.

The purpose of the FTC's investigation of Transitions was "to determine whether the exclusive dealing arrangements by Transitions . . . with lens manufacturers and others are in violation of Section 5 of the Federal Trade Commission Act."  This language derives from the FTC's letter authorizing its investigation. e.g., TOI_1133770, and it appears in the March 12, 2009 JDA between TOI and PPG and in the May 15, 2009 JDA among Transitions, Essilor and PPG (both documents were produced without Bates numbers).  These JDAs articulate common interests in "analyzing issues" and "responding to allegations."  The alleged common legal interests are comprehensible in this context.  PPG and Essilor jointly

---

[11] Arbitrator Reiss cannot possibly have been retained to provide "legal advice" on the alleged common interest in responding to the FTC investigations.  He had nothing to do with the FTC investigations, and TOI did not redact any portion of the award he issued on the fee dispute.

own TOI.  If TOI violated federal law, PPG's and Essilor's interests as owners would be adversely affected.  PPG and Essilor therefore wanted to persuade the FTC that TOI did not violate federal law – an essentially legal analysis.  An alternative way to analyze common legal interests is to consider the "legal consequences."  *In re Vitamin C Antitrust Litig.*, No. MD-06-1738, 2011 WL 197583, *5 (E.D.N.Y. Jan. 20, 2011).  If the FTC were to find TOI liable for violations of federal law, both PPG and Essilor would be adversely affected.  The parties therefore could have had a common interest in responding to the FTC's investigation of TOI.

But the fee dispute unquestionably related to ***both*** investigations, and that is where TOI's theory of a single overarching "common interest" in responding to both investigations breaks down.  The purpose of the FTC's investigation of Essilor was "[t]o determine whether the proposed acquisition of Signet Armorlite, Inc. by Essilor International (Compagnie Generale d'Optique) S.A. is in violation of Section 5 of the Federal Trade Commission Act", to determine whether the transaction, "if consummated, would violate Section 7 of the Clayton Act . . . or Section 5 of the Federal Trade Commission Act," and "to determine whether the requirements of Section 7A of the Clayton Act . . .have been or will be fulfilled with respect to said transaction."  This language appears in the FTC's letter authorizing its investigation. *E.g.*, TNC_0050839.   Transitions' brief does not explain how PPG and Transitions (on the one hand) and Essilor (on the other) could have possibly had a common legal interest in "analyzing issues" and "responding to allegations" regarding Essilor's acquisition of Signet Armorlite.  If the FTC had blocked the transaction, there would have been no legal consequences for PPG or Transitions. *In re Vitamin C Antitrust Litig.*, 2011

WL 197583, *5. Obviously there may have been significant ***commercial*** consequences.  Both PPG and Transitions may have had a commercial interest in Essilor's acquisition succeeding, because the acquisition would (and did) eliminate one of Transitions' few photochromic competitors from the market.  But that common commercial interest is insufficient to establish the existence of a common legal interest.

**c.      The Documents Disclosed to Arbitrator Reiss Cannot Possibly Be Construed as Communications Intended To Further the Common Enterprise**

Common interest communications must be "made in the course of an ongoing common enterprise and intended to further the enterprise."  Dkt. 518 at 4 (quoting *Schwimmer*, 892 F.2d at 243).  The allegedly privileged documents that were disclosed to third parties (i.e. between PPG and Essilor, or by PPG and Essilor to Arbitrator Reiss) cannot possibly be interpreted as communications "intended to further the common enterprise" of responding to the FTC investigations.  Those disclosures had no effect on how the parties responded to the FTC's requests or allegations.  The disclosures did nothing to resolve the FTC's concerns, to hasten the end of the FTC's investigation, or to influence how those investigations were concluded.    The disclosures to Arbitrator Reiss were made in April 2010, at approximately the same time that the FTC investigations concluded.  There is zero evidence that the parties' retention of Arbitrator Reiss had anything to do with the alleged common interest in "responding to the FTC's investigations."

### d.     The Fee Dispute Predated, and Therefore Existed Independently of, Any Common Interest Related to the FTC Investigations

TOI's argument that the fee dispute was a "necessary and ancillary" part of a larger common interest in responding to the FTC investigations also fails as a matter of fact.  Long before the FTC investigation, PPG and Essilor were adversarial on the issue of Essilor's proposed acquisition of Signet because PPG feared the acquisition would provoke an investigation of TOI.  Dkt. 374-40; TNC_0050782-83.  The parties' adversity on the fee issue thus ***predated*** the alleged common interest and cannot have been a "necessary and ancillary" part of it.

TOI's flip assertion that, "[i]n order to pursue a common goal, you've got to decide how you're going to pay for it, and that's what happened here," is not an accurate description of what happened here.  Dkt. 493 at 6.  Communications related to allocations of costs might be protected by the common interest privilege in a situation where, for example, parties with legitimately common interests cooperated to reach an agreement on how to allocate the prospective costs of a common defense.  Obviously, that is not what happened here.  The dispute over cost allocation existed before the alleged common interest arose, and the parties remained adverse on that particular issue throughout the alleged common defense of the FTC investigations.

### 3.   TOI Urges the Court To Adopt a Selective Waiver Rule In Its Favor

It is axiomatic that "the submission of materials to a court in order to obtain a summary judgment utterly precludes the assertion of the attorney-client privilege or work-product immunity."  *Joy v. North*, 692 F.2d 880, 894 (2d Cir. 1982).  Here, Arbitrator Reiss

was retained to adjudicate a dispute and therefore performed the function of a court.  While the parties obviously are entitled to the privacy that an arbitration affords, they are not entitled to invoke the privacy of an arbitration as a "common interest" that shields valid discovery of relevant information.  Nor are the parties entitled to maintain privilege after disclosure to third parties merely because the disclosure was to a few third parties rather than to the general public.

By urging the Court to immunize from discovery documents that were provided to an arbitrator in order to resolve a dispute between PPG and Essilor, TOI is improperly asking the Court to adopt a "selective waiver" rule.  After such a rule was adopted by the Eighth Circuit in 1977, every other court has rejected it except in extremely unusual circumstances that do not apply here.  *E.g.*, *In re Qwest Comms. Int'l, Inc. Secs. Litig.*, 450 F.3d 1179, (10th Cir. 2006) (discussing cases).  "The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit . . . .  The attorney-client privilege is not designed for such tactical employment."  *Permian Corp. v. United States*, 665 F.2d 1214, 1220 (D.C. Cir.1981) (rejecting applicability of "selective waiver" to documents supplied to a third party then subsequently sought in discovery by a private party). *See also Pensacola Firefighters' Relief Pension Fund Board of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 596-97 (N.D. Fla. 2010) (discussing cases and rejecting "selective waiver" argument).

All of the foregoing points make clear that the assertion of a "common interest" as to the cost-dispute documents is pretextual.  It is not based on facts that meet the elements of the claim, but rather on the parties' personal wishes to shield relevant evidence from discovery, without any legitimate justification.  *See Glynn*, 2010 WL 3294347, *7 (finding common interest privilege to be asserted in bad faith when proponent of privilege "could not have reasonably believed [the emails] furthered any ongoing legal effort").

The Court's Order recognized that Transitions' "failure . . .to assert the privilege in its brief of oral argument may dilute the strength of its position on other issues pertaining to the privilege."  Dkt. 518 at 3.  The sudden assertion of privilege as to all of the core information sought by VE's motion supports the conclusion that TOI's assertion of the privilege is pretextual and in bad faith.

### 4.   Communications Predating the Relevant JDAs Cannot, In Any Event, Be Protected by the Common Interest Privilege

"Documents exchanged before a common interest agreement is established are not protected from disclosure."  *Hunton & Williams v. United States Dep't of Justice*, 590 F.3d 272, 285 (4th Cir. 2010) (citing *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir.2005)).  *See also Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F.Supp.2d 493, 498 (S.D.N.Y. 2002).  Here, the earliest JDA including both PPG and Essilor is dated May 15, 2009.  TOI nevertheless redacted information from at least two communications predating the May 15, 2009 JDA: (1) a March 10, 2009 email from PPG's Bost to Essilor's Xueref (TNC_0050805); (2) Xueref's response on March 11, 2009 (TNC_0050807).  There is no justification for such redactions.

In sum, for the foregoing reasons, the Court should order Transitions to produce unredacted versions of all previously redacted or withheld documents or, in the alternative, enter an Order to Show Cause in the form requested by VE.  Dkt. 483-1.

## II.    Transitions Optical, Inc.'s Supplemental Statement

The issue before the Court is more straightforward than VE seems to imply.  In order to decide VE's Motion for An Order to Show Cause, the Court need only answer the following two questions:

- Was there a valid common legal interest as between PPG, Essilor and TOI in responding to the FTC's inquiries concerning Essilor's acquisition of Signet and TOI's exclusive dealing arrangements?

- If so, did that common interest encompass sharing privileged information with the decision-maker these parties retained to resolve their dispute over the allocation of fees incurred by TOI and PPG to respond to the FTC's inquiries?

TOI respectfully submits that the answer to each of these questions is Yes, both for the reasons put forth in its Opposition to VE's motion, and for the additional reasons laid out below.  None of the three parties to the joint defense agreements memorializing a common legal interest waived the attorney-client privilege attaching to certain information by sharing it between or among themselves, or with the decision-maker they engaged to resolve their differences over fees.  Considered together, the information both TOI and VE have put before the Court leads ineluctably to the conclusion that there is no basis for granting VE's motion and ordering TOI to show cause in the burdensome form VE has requested.

**A.     The Details Provided in TOI's Privilege Log Are Sufficient to Establish the Privileges Asserted for the Purpose of Deciding VE's Motion**

At this point in the proceedings, TOI is not properly put to the task of describing and defending the basis for each document withheld or item of information redacted under the common interest doctrine.  It is only in the event that the Court grants both VE's motion to show cause and the specific relief VE requests that TOI would be required to assume that burden.  VE's assertions concerning TOI's burden in opposing its motion confuse the relief VE requests in the unlikely event its motion is granted with what TOI must do to oppose that motion successfully.

The privilege and redaction logs that TOI has provided to the Court and the parties in connection with VE's motion describe the documents withheld or redacted at the same level of detail as the privilege logs VE has provided in this MDL.  It is disingenuous for VE to complain about any lack of specificity when it has submitted its own logs with substantially the same level of detail.  Regardless, TOI's logs, together with additional information provided in this supplemental statement, provide sufficient detail to enable the Court to perform a preliminary assessment of the privilege claims TOI is making under the common interest doctrine and decide VE's motion.

**B.     TOI Has Established a Common Legal Interest with PPG and Essilor**

The best evidence that a common legal strategy was actually formulated and pursued is the parties' commitment to that strategy as expressed in a contemporaneously executed joint defense agreement, or JDA.  Actual cooperation toward a common legal goal "may be definitively shown through a formal collaboration agreement. . . ."  *In re Rivastigmine Patent Litig.*, 2005 WL 2319005, at * 4.  Here, each of PPG, TOI, and Essilor International entered

agreements, all of which have been produced, that consistently defined in plain, pragmatic language their shared interest as responding as required to the FTC's investigation of the acquisition of Signet by Essilor, the FTC's simultaneous investigation of TOI's purported exclusive dealing arrangements, or both.  There are four JDAs: (1) a March 11, 2009 agreement between TOI and Essilor reciting a common interest in responding to the FTC's requests and concerns relating to the Signet acquisition; (2) a March 12, 2009 agreement between TOI and PPG relating to the FTC's investigation of TOI's exclusive dealing arrangements; (3) a May 15, 2009 agreement among TOI, PPG and Essilor relating to the FTC's investigation of TOI's exclusive dealing arrangements ; and (4) a January 21, 2010 agreement among TOI, PPG and Essilor reciting that the parties have entered into other JDAs regarding their communications in connection with both of the FTC's investigations, and agreeing that PPG and Essilor shared a common interest in resolving their dispute over who should pay how much of the legal fees incurred by TOI with the assistance of an outside decision-maker.  Taken together, the four JDAs provide conclusive evidence that both parent companies (PPG and Essilor) and the joint venture they formed (TOI) shared and in fact incurred legal fees in the pursuit of a common interest in convincing the FTC to conclude its two related investigations sooner rather than later.

**C.      The FTC Combined Its Pursuit of Information from TOI for Both Investigations**

When the FTC served TOI with a subpoena in connection with its investigation of TOI's conduct on March 10, 2009, one day after serving TOI with a subpoena in connection with Essilor's acquisition of Signet, the cover letter from the FTC staff noted that the agency had coordinated its discovery to minimize the burden of responding to the requests for

similar information.[12]   TOI was faced with the prospect of providing information and advocacy that the FTC could elect to use for either investigation, or both.  VE argues that PPG and Essilor, as joint owners of TOI, shared with TOI and each other a cognizable common legal interest in persuading the FTC that TOI had not violated the law, but shared no legal interest in responding to the FTC's investigation of the Signet acquisition.  The facts belie this conclusion.  Given that the FTC had combined its requests to TOI for both investigations, the two parent companies' common legal interest encompassed cooperating with TOI in an attempt to satisfy all of the FTC's concerns, whether those concerns grew out of the Signet acquisition, TOI's conduct, or both.  In so doing, they advanced their common legal interest in minimizing the significant amount of time and money required to respond to all of the FTC's inquiries.

> **D.     The Parties Agreed to a Means of Resolving Their Dispute Over the Fees TOI Incurred as Part of Their Pursuit of Their Common Interest**

Faced with the need to respond to the FTC's inquiries, PPG, Essilor, and TOI had agreed as to the need to share privileged information, and had in fact done so.  PPG and Essilor had also tried, without success, to resolve their differences as to the appropriate apportionment of TOI's fees without outside help.  Recognizing that bringing in a neutral decision-maker would be productive only if they shared their own and TOI's privileged information with him, they reached agreement on a dispute-resolution procedure and selected a decision-maker, and timely entered a JDA to make clear that they considered the process they had agreed upon to be a continuation of their pursuit of a common legal interest.  The

---

[12]  TOI_1133768-1133769.

JDA in question had an effective date of January 21, 2010, well before the FTC released its Complaint and proposed consent decree for public comment on March 3, or issued its Decision and Order on April 27.[13]  PPG and Essilor provided Mr. Reiss with their written submissions on April 9 and 11, respectively.[14]

Privileged information shared in situations in which the parties are pursuing opposing interests that are separate from or clearly negate a pre-existing common legal interest may lose its privileged status.  That is not what happened here.  VE's attempt to cast the fee dispute as separate or distinct from the legally-required response to the FTC investigations is supported neither by precedent or the facts.  The discussions between TOI and its parent companies around who should pay for the FTC Investigations, and their retention of Mr. Reiss to resolve that issue, differed significantly from the situations in which courts have rejected the assertion of the common interest doctrine.  Courts have refused to apply the community of interest doctrine to situations in which the parties are adverse on core interests.  For example, where parties who share a valid common interest in prosecuting and exploiting certain patents communicate instead about their adversarial interests in the patents, it is easy to see why a court could (and did) find that the community of interest did not extend to such communications.  *Baxter Travenol Labs., Inc.* 1987 WL 12919, at *2; *see also Union*

---

[13]  http://www.ftc.gov/os/caselist/0910062/ (last accessed July 17, 2013).

[14]  PPG's submission consisted of a letter to Mr. Reiss and attachments including email correspondence between PPG and Essilor and the FTC subpoenas received by TOI.  TNC_0050799-0050891.  Essilor's submission consisted of a letter to Mr. Reiss and twelve attached emails, many of which were communications between Essilor's in-house counsel Carol Xueref and executives at Essilor.  TNC_0050780-0050795.  TOI submitted a chart summarizing the fees it had incurred, and the invoices reflecting those costs.  TNC_0049968-0050892.

*Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036, 1050 (D. Del. 1985).  Allocating rights can pose a fundamental threat to a common interest in pursuing those rights, while allocating the fees incurred in that pursuit poses no such threat.

Nor is it appropriate to treat the parties' joint retention of Mr. Reiss to help them resolve a dispute over legal fees, which necessarily involved their submission of privileged materials to him, as no different than a summary judgment motion in a lawsuit brought by one party entirely adverse to another, in which one party elects to reveal privileged information in order to prevail in the underlying lawsuit, as happened in *Joy*, 692 F.2d at 894.

The fact that PPG and Essilor may have begun to disagree about the hypothetical fees TOI and PPG *could* face in the event the FTC determined to investigate Essilor's acquisition of Signet before the investigation was actually begun does not change the analysis.  Once they were on notice that the FTC was going to investigate the transaction, as well as TOI's exclusive arrangements, they swiftly agreed upon and began to pursue their common interest in responding to the FTC's inquiries under the necessary assumption that they would eventually agree upon an appropriate allocation of the costs of doing so. [15] There is simply no authority for treating communications about allocating the costs of pursuing a common interest as beyond the reach of that interest.

---

[15]  The fact that the written JDA among PPG, Essilor and TOI was signed on May 15, 2009, rather than on March 11 or 12 as the other two JDAs were, does not preclude TOI from protecting from disclosure communication of privileged information between PPG and Essilor prior to May 15.  "The common interest doctrine requires a meeting of the minds, but it does not require that the agreement actually be reduced to writing or that litigation actually have commenced."  *Hunton & Williams*, 590 F.3d at 287.

**E.     The Parties Shared Privileged Information with One Another and with Mr. Reiss in the Good Faith Belief They Were Not Waiving the Privilege**

The parties had a reasonable expectation that information shared between or among themselves and the decision-maker they engaged would be privileged, and the timing of the JDAs supports this assumption.  The four JDAs memorializing the common interest TOI asserts here were signed soon after the events that made them necessary occurred – the instigation of the FTC's coordinated investigations in March 2009, and the parties' growing recognition that they needed outside help to allocate the fees TOI was incurring as a result of those inquiries, culminating in a formal agreement on a process for resolving that issue on January 21, 2010.  None of the complaints later coordinated in this MDL had been filed when the JDAs were entered, and there were no discovery requests pending.

TOI, together with PPG and Essilor, acted in good faith to protect their exchange of privileged information from the time the FTC's inquiries began up to and including their decision to share some of that information with Mr. Reiss.  Since it does not believe it waived the privilege, nor in fact did it do so, TOI is not seeking this Court's approval of a selective waiver.  Unlike those instances in which a selective waiver has been proposed (and rejected), TOI did not share privileged information with a government agency to advance its interests in responding to an investigation only to assert the same information was privileged in subsequent litigation.  *See, e.g. In re Qwest Commc'ns  Int'l, Inc. Secs. Litig.*, 450 F.3d 1179 (disclosure to SEC and DOJ); *Permian Corp.,* 665 F.2d at 1220 (disclosure to USDOE); *Pensacola Firefighters' Relief Pension Fund Board of Trustees*, 265 F.R.D. at 596-97.  Instead, by mutual agreement with its parent companies, TOI shared its privileged information (and its parents shared theirs) with a single individual that all parties to the

21

common interest had agreed could help resolve their differences over the allocation of fees. There is no basis to find an attempted selective waiver on these facts.

TOI has asserted a valid common legal interest that encompasses communications made in the course of the parties' efforts to allocate the costs of pursuing that interest. There is no basis for ordering TOI to produce unredacted versions of all previously redacted or withheld documents, as VE now requests, and there certainly is no justification for imposing on TOI the extraordinary burdens VE seeks in its Motion for an Order to Show Cause. For the reasons stated herein, as well as in TOI's Opposition, VE's motion should be denied.

Dated: July 19, 2013

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ Lisa A. Davis
    Lisa A. Davis

Lisa A. Davis
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Email: ldavis@wsgr.com

*Counsel for Defendant Transitions Optical, Inc.*

DORSEY & WHITNEY LLP

/s/ F. Matthew Ralph
    F. Matthew Ralph

50 South Sixth Street, Suite 1500
Minneapolis, MN  55402-1498
Telephone: (612) 340-2600
Email:  ralph.matthew@dorsey.com

*Counsel for Plaintiff Insight Equity A.P.X,
LP, d/b/a Vision-Ease Lens Worldwide*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused a true and correct copy of the foregoing Joint Status Report to be served via ECF on this 19th day of July 2013.

Dated:  July 19, 2013

<u>          /s/ Lisa A. Davis                    </u>
Lisa A. Davis