# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**IN RE: PHOTOCHROMIC LENS**
**ANTITRUST LITIGATION**

**MDL Docket No. 2173**

**Case No. 8:10-md-02173-T-27EAJ**
**8:10-cv-00984-T-27EAJ**
**8:10-cv-01850-T-27EAJ**
**8:10-cv-02043-T-27EAJ**
**8:10-cv-02051-T-27EAJ**
**8:10-cv-02171-T-27EAJ**

_____/

## <u>ORDER</u>

**BEFORE THE COURT** is the Report and Recommendation (Dkt. 471) of the Magistrate

Judge recommending that Direct Purchaser Plaintiffs' Motion for Class Certification (Dkt. 285) be

denied. Direct Purchasers objected to the Report and Recommendation (Dkt. 486),[1] to which

Defendants responded (Dkt. 495). Defendants also filed "Conditional Cross-Objections" (Dkt. 488),

to which Direct Purchasers responded (Dkt. 494).

---

[1]The Direct Purchasers' objections fail to adhere to the level of decorum expected of members of the Bar. *See* L.R. M.D. Fla. 2.04(h) ("Attorneys and litigants should conduct themselves with civility and in a spirit of cooperation . . . ."). Apparently mistakenly believing that sharply worded criticism of the Magistrate Judge's analysis would make their objections more persuasive, Direct Purchasers resort to unwarranted, unfair and stinging criticism of her Report and Recommendation. They contend she was "misled" as to relevant legal standards,that her Report and Recommendation was rendered without "any reference to the voluminous underlying record" and accuse her of having failed to conduct a rigorous analysis of the issues ("She conducted no analysis, much less a 'rigorous analysis,' in determining that the alleged conflict may exist.") (Dkt. 486 at 11); ("The magistrate judge's conclusion as to every claimed flaw is based on no evidence, a superficial misreading of the evidence, or highly misleading evidence proffered by Defendants and their expert.") (Dkt. 486 at 15). Direct Purchasers also condemn Dr. Leonard's "highly misleading testimony," which allegedly "colored the magistrate judge's view of the case" and led to her "blind acceptance" of his testimony.

It is disrespectful and unbecoming of a lawyer to resort to such language, particularly when directed toward a judicial officer. Its use connotes arrogance, and reflects an unprofessional, if not immature litigation strategy of casting angry aspersions rather than addressing the merits and challenging the recommendations in a dignified and respectful manner. To the extent counsel may perceive that they are not accountable for their unprofessional rhetoric, they are mistaken. Further commentary of this nature demonstrating a lack of respect due to officers and members of the Court will result in the imposition of sanctions.

The Magistrate Judge found that Direct Purchaser Plaintiffs cannot establish adequacy of representation under Rule 23(a)(4) and predominance under Rule 23(b)(3). Upon consideration, the Report and Recommendation (Dkt. 471) is APPROVED *in part* for the reasons discussed below. Direct Purchaser Plaintiffs' Motion for Class Certification (Dkt. 285) is DENIED.

## I.    INTRODUCTION AND SUMMARY OF CLAIMS

### *The Parties and the Claims*

This multi-district litigation involves antitrust claims brought by three distinct groups of Direct Purchaser Plaintiffs based on  Defendant Transitions Optical, Inc.'s alleged anticompetitive conduct in the development, manufacture, and sale of photochromic treatments for corrective ophthalmic lenses. Direct Purchaser Plaintiffs contend that Transitions conspired with co-defendants Essilor of America, Inc. ("EOA") and Essilor Laboratories of America, Inc. ("ELOA") to restrain competition and enforce exclusive dealing agreements at all levels of the distribution chain.[2] Direct Purchasers assert claims for monopolization and conspiracy to monopolize under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. For purposes of the class certification motion, the parties filed a Joint Statement of Stipulated facts, from which this Court draws (Dkt. 421).

Transitions purchases lens blanks from lens manufacturers ("lens casters"), applies its patented photochromic treatment to the lens blanks, then sells the treated lenses back to the lens casters.  The lens casters, including EOA, sell the treated lenses to wholesale labs and optical retailers. The wholesale labs then sell corrective lenses to eye care professionals (ECPs), such as

---

[2] On March 3, 2010, the Federal Trade Commission's released a proposed complaint and consent decree related to its investigation of Transitions' alleged anticompetitive behavior. In April 2010, Transitions and the FTC signed a consent decree barring Transitions from certain trade practices,  including the requirement that its customers enter into exclusivity agreements promising not to sell photochromic lenses made by competing manufacturers. In the wake of the consent decree, numerous direct purchasers, indirect purchasers, and competitors filed antitrust actions against Defendants in federal courts across the country. The Judicial Panel on Multidistrict Litigation centralized the cases in this Court.

ophthalmologists, optometrists, and opticians. The structure of the distribution chain and relevant market is outlined in Figure 1 of the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. 127). *See also* Dkt. 421 ¶ 11.[3]

### *The Proposed Class*

The named Direct Purchaser Plaintiffs are Nouveau Vision, Inc., Optical Supply, Inc., Florida Optical Express, Inc., Central Illinois Vision Associates, Ltd., and B&B Eyes, Inc.[4] They seek certification of a class comprising those entities that purchased photochromic lenses directly from Transitions or its alleged co-conspirators, Essilor of America and ELOA, between March 3, 2006 and the present (the "Class Period"):

> All persons or entities that purchased Transitions lenses directly from any Defendant or any Essilor-owned Lab at any time between March 3, 2006 and the present (the "Class Period"). Excluded from the Class are Defendants and their subsidiaries, parents, or affiliates, and government entities. Also excluded from the Class are persons or entities who, during the Class-Period, purchased only Transitions lenses sold by a non-Defendant, and subsequently resold by an Essilor-owned Lab.

(Dkt. 285 at 7).[5]

The proposed class would include three subcategories, or "groups" of direct purchasers: (1)

---

[3] For a detailed description of the distribution channels for photochromic lenses and the different entities involved in the distribution process, see the transcript of the hearing on the motion for class certification before the Magistrate Judge (Dkt. 444 at 26-31). *See also* Dkt. 421 ¶¶ 11-15, 17, 19.

[4] Nouveau Vision, Inc.,  Optical Supply, Inc., and  Florida Optical Express, Inc. are independent wholesale laboratories. Central Illinois Vision Associates, Ltd. is an optical retailer and eye care practitioner. B&B Eyes, Inc. was formerly an optical retailer and eye care practitioner.  (Dkt. 421 ¶ 7).

[5] The proposed class modifies slightly the class defined in the operative pleading, Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Dkt. 127, T 36, ¶ 127):

> All persons or entities that purchased Transitions lenses directly from any
> Defendant or any Essilor-owned Lab at any time between March 3, 2006 and
> the present (the "Class Period"). Excluded from the Class are Defendants and
> their subsidiaries, parents, or affiliates, whether or not named as a Defendant
> in this Complaint, and government entities.

lens casters who purchased lenses directly from Transitions ("Group A"),[6] (2) laboratories and integrated retailers who purchased directly from EOA ("Group B"),[7] and (3) eye care practitioners ("ECPs") who purchased Transitions lenses directly from Essilor-owned Labs, who in turn purchased those lenses from EOA ("Group C") (Dkt. 285 at 20-21).

None of the named Direct Purchaser Plaintiffs is a lens caster and none is an integrated retailer. Three are independent wholesale laboratories, and two are ECPs. None of the named Direct Purchaser Plaintiffs purchased lenses directly from Transitions. (Dkt. 421, ¶¶ 16, 18, 20). A diagram identifying the subcategories of direct purchasers is attached as Appendix I to the Report and Recommendation. *See also* Dkt. 421 ¶ 11.

The manner in which Plaintiffs define their proposed class, and the way in which they propose to establish the requisite impact on class members from Defendants' alleged anti-competitive conduct, illustrate the challenges which confronted the Magistrate Judge in addressing class certification. To illustrate the diverse nature of the proposed class members and put into

---

[6] Plaintiffs contend that there are approximately 17 lens casters that purchased directly from Transitions. "Lens casters sell and distribute both photochromic lenses and non-photochromic lenses to wholesale ophthalmic laboratories, which including both independent wholesale ophthalmic laboratories ('independent wholesale labs') and lens caster-owned ophthalmic laboratories ('lens caster-owned labs'), and major retailers that operate their own ophthalmic laboratories ('integrated retailers')." (Dkt. 421 ¶ 15). "Integrated retailers" include national regional sales channels (*i.e.*, Walmart and Costco) (*id.* ¶ 21).

[7] Plaintiffs contend that there are approximately 1,500 independent wholesale labs that purchased from EOA during the Class Period. "Wholesale ophthalmic laboratories provide a variety of services to prepare and deliver finished ophthalmic lenses and eyeglasses to their customers, including grinding lenses according to prescription, polishing or edging unfinished ophthalmic lenses, applying certain lens surface treatments (such as certain anti-scratch and anti-reflective coatings), and fitting finished lenses into eyeglass frames" (Dkt. 421 ¶ 17). "Wholesale ophthalmic laboratories, including both independent and lens caster-owned labs, sell ophthalmic lenses, including photochromic lenses, to ophthalmologists, opticians, optometrists . . . and other retailers who do not operate their own integrated ophthalmic laboratories" (*id.* ¶ 19).

Plaintiffs contend that there are over 36,000 integrated retailers and ECPs that purchased directly from Essilor during the Class Period. "ECPs, retailers and integrated retailers sell photochromic lenses to end consumers" (Dkt. 421 ¶ 23).

perspective the certification issues exhaustively discussed in the parties' briefs, the Court borrows

from Defendants' opposition to class certification, none of which can be seriously disputed by

Plaintiffs:

> Plaintiffs' proposed single class ranges from lens manufacturers to wholesale laboratories to retailers to eye care professionals, each of whom purchases different products, from different sellers, at different prices, and in different markets.
> . . .
> Transitions sells photochromic lenses to as many as 17 different lens casters, at prices that are individually negotiated with each lens caster. Lens casters may also receive volume discounts or rebates from Transitions, which may vary across lens casters. Transitions also provides other monetary and non-monetary benefits to its customers, some of which are premised in whole or in part on exclusivity from the lens caster, and which also vary among lens casters.
>
> Lens casters in turn sell those lenses (along with non-photochromic lenses, the vast majority of lenses sold) to more than 1500 independent wholesale labs and lens-caster owned wholesale labs. They also sell lenses to major retailers such as Costco and Wal-Mart, who operate their own labs. Wholesale labs may receive rebates or discounts from lens casters related to their purchase of lenses. Retailers negotiate prices independently with lens casters, often through competitive bidding. Wholesale labs and retailers may also receive financial benefits from Transitions.
>
> Wholesale labs in turn resell the lenses to more than 36,000 different eye care professionals ("ECPs") or retailers. . . . ECPs or retailers may also be eligible for rebates and discounts from the labs, as well as cooperative funds or other financial benefits from Transitions for preferring Transitions photochromic lenses over other photochromic lenses or for agreeing to sell Transitions lenses as their exclusive photochromic lens. Some customers purchase through buying groups, which are able to qualify for volume discounts that the customer might not otherwise reach.

Dkt. 452 at 6-9.

> **The Proposed Class and Class Representatives**. Plaintiffs [sic] proposed class includes lens casters, who purchase directly from Transitions (but who do not purchase lenses from defendants Essilor of America ("EOA") or Essilor Labs of America ("ELOA")), wholesale labs and large integrated retailers with labs, who purchase lenses from EOA (but not from Transitions or ELOA), and ECPs, who purchase lenses from ELOA (but not from Transitions or EOA). See Ptfs.' Br. at 1.
>
> None of the five class representatives are lens casters or integrated retailers. Nouveau

Vision, Florida Optical Express ("FOE") and Optical Supply are independent wholesale optical labs, Central Illinois Vision Associates ("CIVA") is an optical retailer and optometric practice, and B&B Eyes currently has no business operations but at one time was an optical retailer and eye-care practitioner. See Direct Purchaser Ptfs' Consol. Amend. Compl. at 4-6.

Dkt. 452 at 5.

Plaintiffs contend that they "are typical of the class in that they all bought TOI lenses directly from Defendants and/or their subsidiaries, and they all paid artificially-inflated prices for those lenses due to Defendants' conduct." (Dkt. 285 at 15). In sharp contrast, Defendants contend, pointing to the varying characteristics of the proposed class members, that Plaintiffs "have no common method of proving impact on a class-wide basis, which is fatal to . . . certification." (Dkt. 452 at 7). Defendants argue that Plaintiffs' "resulting effort to carve the class into separate "groups" underscores their failure to satisfy typicality, adequacy, and numerosity requirements," and "[e]ven accepting their restructuring, Plaintiffs' results demonstrate that not all class members were impacted." (*Id.* at 8-10).

Notwithstanding that Plaintiffs' expert (Dr. Singer) admits that some of the proposed class members, certain lens casters, actually benefitted from the exclusive agreements they had with Transitions, Plaintiffs contend that the adequacy prong of Rule 23(a)(4) is met, positing "[n]or are there any conflicts between the class representatives and other class members." (*Id.* at 10). As will be discussed, conflicts do exist among the class members and under controlling precedent, certification of the defined class is unwarranted.

## II.    STANDARD OF REVIEW

A district court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). Those portions of the report and recommendation to which

objection is made are accorded *de novo* review. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). Objections

must "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d

1353, 1360 (11th Cir. 2009); *see Leatherwood v. Anna's Linens Co.*, 384 Fed. Appx. 853, 857 (11th

Cir. 2010). In the absence of specific objections, there is no requirement that findings be reviewed

*de novo*. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993). Nevertheless, the district court

reviews the report and recommendation for "clear error" in the absence of objections. *Macort v.

Prem, Inc.*, 208 Fed. Appx. 781, 784 (11th Cir. 2006). Even if no objections to the findings or

recommendations have been filed, the district court may "undertake 'further review . . ., *sua sponte*

or at the request of a party, under a *de novo* or any other standard." *Stephens v. Tolbert*, 471 F.3d

1173, 1176 (11th Cir. 2006) (quoting *Thomas v. Arn*, 474 U.S. 140, 154 (1985)).

## III.   DIRECT PURCHASERS' OBJECTIONS AND DEFENDANTS' CONDITIONAL CROSS-OBJECTIONS

Direct Purchasers' objections can be grouped into two general categories. In the first are

Direct Purchasers' objections relating to the Magistrate Judge's finding that Direct Purchasers failed

to demonstrate "the questions of law or fact common to class members predominate over any

questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Within this first category,

Direct Purchasers specifically object to (1) the Magistrate Judge's determination that the

predominance inquiry requires a showing that "every class member was impacted by the antitrust

violation"; (2) the Magistrate Judge's alleged failure to perform a rigorous analysis of Dr. Singer's

methodology for demonstrating class-wide antitrust impact; (3) the Magistrate Judge's rejection of

Dr. Singer's methodology due to his use of price card, rather than transactional, data; (4) the

Magistrate Judge's rejection of Dr. Singer's methodology due to his use of a 50% statistical

significance level[8]; and (5) the Magistrate Judge's reliance on the report of Dr. Leonard, in which he describes having reached different results utilizing Dr. Singer's statistical model with a different data set and different control variables.

The second category of objections relates to the Magistrate Judge's finding that the named Plaintiffs will not "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Specifically, Direct Purchasers argue that Defendants failed to introduce evidence of a fundamental conflict between the named Plaintiffs and the absent class members. They also contend, for the first time, that should fundamental conflicts exist, lens casters should be excluded from the class definition.[9]

Although the Magistrate Judge recommended that certification be denied, Defendants have filed three "conditional cross-objections" to the Report and Recommendation, which "the Magistrate Judge either declined to reach or did not accept that further justify a ruling denying class certification" (Dkt. 488). First, Defendants argue that the "market circumstances" between the named Plaintiffs and the absent members of the class preclude satisfaction of the typicality requirement under Rule 23(a)(3). Second, they argue that Dr. Singer fails to demonstrate a method of establishing classwide impact through common proof, which defeats the predominance requirement of Rule 23(b)(3). Finally, Defendants argue that the need for certain named Plaintiffs to establish an exception to *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), creates divisions between named Plaintiffs and absent Plaintiffs precluding satisfaction of Rules 23(a)(3) and 23(a)(4).

---

[8]Or, in statistical terms, the use of a *p*-value that is less than or equal to .50.

[9] Arguably, excluding lens casters from the proposed class would eliminate the fundamental conflict the Magistrate found existed in the proposed class as defined by Plaintiffs. As will be discussed, however, the Court declines to modify the proposed class, as Plaintiffs insisted that the class be certified as defined and never proposed modifications to the Magistrate Judge.

## IV.   CLASS CERTIFICATION STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Accordingly, the burden of establishing the propriety of class certification rests with the advocate of the class. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003); *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975).[10]

A class may be certified only if (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims of the representatives are typical of the claims of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly. Fed. R. Civ. P. 23(a). These prerequisites to class certification are referred to as "numerosity, commonality, typicality, and adequacy of representation," and are "designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000).

In addition to the requirements of Rule 23(a), at least one of the three alternative subsections of Rule 23(b) must be satisfied to certify a class. *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009). Direct Purchasers seek certification under Rule 23(b)(3), which requires them to demonstrate (1) that questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available

---

[10]In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

methods for fairly and efficiently adjudicating the controversy. *Id.*[11] Failure to establish any of the required elements of Rule 23(a) or Rule 23(b)(3) precludes class certification. *Valley Drug*, 350 F.3d at 1188 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-18 (1997)).

Evidentiary proof is required to show compliance with Rule 23. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013) (quoting *Dukes*, 131 S.Ct. at 2551-52). The party seeking class certification must prove compliance by a preponderance of the evidence. *See Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2009); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).[12] Since Rule 23 does not impose a mere pleadings standard, it may be necessary to probe behind the pleadings on the certification question, and "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Dukes*, 131 S.Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal citations omitted). The claims, defenses, relevant facts, and applicable substantive law must be understood in order to make a meaningful determination of the certification issues. *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 555 (5th Cir. 2011). And the analysis will frequently "overlap with the merits of the plaintiff's underlying claim," since the "'class

---

[11]The requirements of Rule 23(b)(3) are referred to as "predominance" and "superiority." *Babineau*, 576 F.3d at 1190. In deciding whether common questions predominate and whether a class action is the superior method of adjudicating a controversy, Rule 23 suggests consideration of four "pertinent," but not exclusive, factors: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

[12]This standard is invoked only to the extent it is necessary to "examine the parties' claims, defenses and evidence to ensure that class certification would comport with Rule 23's standards." *Babineau*, 576 F.3d at 1190. The Eleventh Circuit has not expressly addressed the proof required in a class certification proceeding. *See In re HealthSouth Corp. Secs. Lit.*, 261 F.R.D. 616, 624 (N.D. Ala. 2009) (applying preponderance of evidence standard without presuming Circuit would apply same standard).

determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 2552 (quoting *Falcon*, 457 U.S. at 160).[13]

In sum, a class may not be certified without a finding that each Rule 23 requirement is met. *Hydrogen Peroxide*, 552 F.3d at 310. The analysis must be "rigorous" and based on findings supported by the factual record. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266-67 (11th Cir. 2009). Even where the parties have not contested an element of Rule 23, "a court nevertheless has the responsibility of conducting its own inquiry as to whether the requirements of Rule 23 have been satisfied in a particular case." *Valley Drug*, 350 F.3d at 1188.

## V.   THE RULE 23 REQUIREMENTS

### A.    Rule 23(a)(1): Numerosity

To satisfy Rule 23(a)(1), the class advocates must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). As a general rule, less than twenty-one is an inadequate number of class members, while more than forty is sufficient, with numbers in between varying according to other factors. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see Vega*, 564 F.3d at 1267. While mere allegations of numerosity are insufficient, Direct Purchasers need not show the precise number of members in the class. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983). "Nevertheless, a plaintiff still bears the burden of making *some* showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d

---

[13] Similarly, the Eleventh Circuit has counseled that "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n. 15.

at 1267.

The Magistrate Judge found the numerosity requirement satisfied, recounting Direct Purchasers' proffer that their class encompasses approximately 17 lens casters, 1,500 independent wholesale laboratories, and more than 36,000 integrated retailers and independent eye-care professionals that purchased from ELOA (Dkt. 471 at 6). The expert report of Dr. Singer confirms these estimates, using data provided by Defendants. Defendants do not object to this conclusion, and the Magistrate Judge did not err in finding the numerosity requirement satisfied.

### B.      Rule 23(a)(2): Commonality

Direct Purchasers bear a "relatively light burden" to prove the commonality requirement. *Vega*, 564 F.3d at 1268. Rule 23(a)(2) requires only that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The claims of the class members must "depend upon a common contention," which "must be of such a nature that it is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* And commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157). Commonality may be demonstrated by proof that the defendant operated under a general policy that manifested itself in the alleged illegal practices affecting the class members in the same general fashion. *See id.* at 2553 (citing *Falcon*, 457 U.S. at 159).

The Magistrate Judge found the requirement of commonality satisfied, concluding that the allegations of anticompetitive conduct and resulting higher prices create common issues shared by all proposed class members (Dkt. 471 at 6). Defendants do not object to this finding, and it is not erroneous. Direct Purchasers have produced substantial evidence that their claims share questions

12

of law and fact common to the class, including the nature of the alleged anticompetitive conduct and the manner in which Defendants' alleged anticompetitive policy affected prices of lenses. *Accord In re Fla. Cement & Concrete Antitrust Lit.*, 278 F.R.D. 674, 679 (S.D. Fla. 2012) ("[C]ourts have consistently held that the nature of the antitrust conspiracy action compels a finding that common questions of fact and law exist."). In sum, the proposed class action would be able to "generate common *answers* apt to drive the resolution of the litigation," satisfying the commonality requirement. *Dukes*, 131 S.Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

### C.    Rule 23(a)(3): Typicality

The typicality prong requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Class representatives "must possess the same interest and suffer the same injury as the class member to be typical under Rule 23(a)(3)." *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir. 2004)[14]; *see Falcon*, 457 U.S. at 156 ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.").

"In many ways, the commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Prado-Steinman*, 221 F.3d at 1279. There are differences, however. Commonality traditionally refers to characteristics of the class as a whole, while typicality "refers to the individual characteristics of the named plaintiff in relation to the class." *Id.*; *see Gen. Tel. Co. of the Nw., Inc. v. Equal Employment*

---

[14]*Overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

*Opportunity Comm'n*, 446 U.S. 318, 330 (1980) ("The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiffs' claims.").

"[T]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (internal quotations omitted), *disapproved on other grounds Green v. Mansour*, 474 U.S. 64 (1985); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (Typicality "does not requires identical claims or defenses."). Typicality is foreclosed only "if the representative's legal and factual positions are 'markedly different' from those of other class members, and when those differences go to the very subject matter of the litigation." *Burka v. N.Y. City Transit Auth.*, 110 F.R.D. 595, 602 (S.D.N.Y. 1986) (internal citations and quotations omitted).

The Magistrate Judge did not reach an ultimate conclusion as to whether the typicality requirement is met. Rather, she determined that it is a "close call," which could be deferred in favor of the "somewhat related" adequacy of representation inquiry (Dkt. 471 at 9). Defendants object to the Magistrate Judge's failure to reach the typicality question on two grounds, and accordingly, *de novo* review is required.

### 1.   *Fundamental Differences in Market Circumstances*

Defendants first argue that fundamental differences in market circumstances between the named Plaintiffs and other members of the putative class defeat the typicality requirement and therefore preclude class certification. Defendants argue that the claims of the named Plaintiffs are not typical of the seventeen lens casters who purchase directly from Transitions, large retailers such as Wal-Mart and Costco with "enormous clout" to negotiate favorable pricing, and buyers who participated in Transitions' STAR discount programs or in purchasing groups. Direct Purchasers

14

respond that differences in market circumstances and buying power have no impact on the typicality analysis, and that the named Plaintiffs' claims are typical of the putative class because the named Plaintiffs allege that all prices paid by class members during the relevant time were supracompetitive as a result of Defendants' anticompetitive scheme.

Direct Purchasers allege that Defendants conspired and engaged in anticompetitive conduct resulting in supracompetitive prices for all entities or persons who purchased directly from Defendants. With respect to all putative class members, Direct Purchasers allege the same antitrust injury (supracompetitive prices) caused by the same alleged illegal conduct (exclusive dealing). It follows that the named Plaintiffs have the same interest as the absent class members: proving that Defendants' conduct was anticompetitive. Direct Purchasers therefore have demonstrated, notwithstanding market differences between members of the proposed class, that the named Plaintiffs "possess the same interest and suffer the same injury as the class members" and thereby satisfy the typicality inquiry. *Falcon*, 457 U.S. at 156.

Defendants argue that the inclusion of lens casters in the putative class defeats the typicality requirement because none of the named Plaintiffs are lens casters. This argument is inconsistent with the well-established principle that the "typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *Appleyard*, 754 F.2d at 958. The factual distinctions between the lens casters and the named Plaintiffs–which Defendants characterize as "fundamental differences in market circumstances"–do not obviate the shared interest of the lens casters in proving anticompetitive conduct by Defendants and preventing that conduct in the future.

Nor does any purported differentiated buying power of absent class members preclude a

15

finding of typicality. When a defendant engages in anticompetitive activity, all direct purchasers suffer the same "antitrust injury" and have standing to sue for the same injury, even if some direct purchasers wielded inordinate buying power and experienced net economic gains due to the defendant's conduct. *Valley Drug*, 350 F.3d at 1193. As a result, even direct purchasers who experienced a net gain or benefit from the alleged anticompetitive conduct are entitled to bring suit to recover an overcharge. *Id.* Typicality exists where, as here, "all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010).

Although the Magistrate Judge was correct in observing that the typicality requirement is a "close call," I find that the claims of the named Plaintiffs are typical of the proposed class of direct purchasers, each having allegedly suffered the same antitrust injury and having the same interest in remedying anticompetitive activity and recovering any corresponding overcharge.

### 2.    *Illinois Brick*

Defendants argue that because the named Plaintiffs must prove a conspiracy in order to sue certain Defendants under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), as opposed to lens casters, who do not, the claims of the named Plaintiffs are not typical of the lens casters. This argument is unavailing. As noted, *Valley Drug* holds that all direct purchasers from a defendant who allegedly engaged in anticompetitive activity suffer the same antitrust injury and are entitled to seek the same remedy. 350 F.3d at 1193. That is all that is required to satisfy typicality.

Moreover, Plaintiffs' conspiracy claims are alleged on behalf of *all* absent class members against all of the Defendants (*see* Dkt. 127 ¶¶ 149-170). The gravamen of the conspiracy claims is concerted anticompetitive action by the Defendants which impacted the class as a whole. Even if the

16

claims asserted by the named Plaintiffs were not identical to those of the absent lens casters, typicality would not necessarily be defeated. *See Kornberg*, 741 F.2d at 1337 (Typicality "does not require identical claims or defenses."). The alleged conspiracy would still require proof of the underlying anticompetitive activity, demonstrating that the named Plaintiffs have the same interest as the absent lens casters. *See Beck v. Prupis*, 529 U.S. 494, 501 (2000) (considering as "widely accepted," the principle that "a plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortious," and citing numerous cases for the principle that conspiracy is not independently actionable absent proof of predicate tort).

### D.    Rule 23(a)(4): Adequacy of Representation

Despite demonstrating that the named Plaintiffs' claims are typical of the absent class members' claims, that discussion underscores the different characteristics among the named Plaintiffs and many of the other putative class members, particularly the absent lens casters. Direct Purchasers therefore face a significant obstacle in Rule 23(a)(4), which requires a determination that "the representative parties will fairly and adequately protect the interests of the class."

The adequacy of representation analysis entails two separate inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug*, 350 F.3d at 1189 (internal quotation omitted).  "'It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.'" *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting Charles Alan Wright & Arthur R. Miller, 7A *Federal Practice & Procedure* § 1768 at 326 (2d ed. 1986)); *see Gen. Tel. Co.*, 446 U.S. at 331 (Rule 23(a)(4) "is typically construed to foreclose the class action

where there is a conflict of interest between the named plaintiff and the members of the putative class."). If "substantial conflicts of interest" exist among a class, certification is inappropriate. *Valley Drug*, 350 F.3d at 1189. The defendant need not prove actual antagonism between the class members, only the *potential* for a serious and fundamental conflict. *Id.* at 1194.

Nevertheless, adequacy is defeated "only if the conflict between the representative and the class is a *fundamental* one, going to the specific issues in controversy." *Pickett*, 209 F.3d at 1280 (emphasis added); *see Valley Drug*, 350 F.3d at 1189 ("[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy."). More specifically, with respect to this case, a fundamental conflict exists where "some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189.

Claims of "disparate groups cannot be mixed together under Rule 23(a) where the economic reality of the situation leads some class members to have economic interests that are significantly different from–and potentially antagonistic to–the named representatives purporting to represent them." *Id.* at 1195. It follows that a class cannot be certified when some members of the class benefitted from the alleged wrongful conduct, such that the proposed class consists of winners and losers. *Pickett*, 209 F.3d at 1280 ("Thus, a class cannot be certified when . . . it consists of members who benefit from the same acts alleged to be harmful to other members of the class.").[15]

---

[15]*See,e.g.*, *Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (class certification denied where some putative class members derived "great benefit" while others allegedly experienced harm); *In re Terazosin Hydrochloride Antitrust Litig.*, 223 F.R.D. 666, 668 (S.D. Fla. 2004) (denying motion for class certification when plaintiffs "failed to demonstrate – through empirical evidence, data, and an identifiable formula – the absence of the proposed class of any class members who benefitted from the alleged anti-competitive agreements"); *Auto Ventures, Inc. v. Moran*, No. 92-426-CIV-KEHOE, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997). *But see Kohen v. Pacific Invest. Mtg. Co., LLC*, 571 F.3d 672, 678 (7th Cir. 2009) (upholding the grant of class certification even where "some of the class members probably were net gainers").

The Magistrate Judge found that "the potentiality that at least some of the lens casters may have benefitted from the exclusivity agreements" created a "potentially serious conflict" between class representatives and lens casters, which defeated the requirement that the named plaintiffs "will fairly and adequately protect the interests of the class" (Dkt. 471 at 12-13). Accordingly, she concluded that Rule 23(a)(4) could not be met and the class of Direct Purchasers could not be certified.

Direct Purchasers argue that the Magistrate Judge's conclusion is flawed for several reasons. First, they argue that *Valley Drug* and *Pickett* are distinguishable, and neither precludes certification. Second, Direct Purchasers contend that the Magistrate Judge's finding of a "potential," rather than actual, conflict cannot serve as the basis for rejecting certification under Rule 23(a)(4). Third, Direct Purchasers argue that the Magistrate Judge "conducted no analysis, much less a 'rigorous analysis,'" and her conclusion lacked a sufficient evidentiary basis. Fourth, Direct Purchasers argue in the alternative that even if a conflict does exist within the class, that conflict disappeared when the FTC Consent Order took effect in April 2010. Lastly, they suggest for the first time that if a conflict exists, the class should be redefined to exclude lens casters. None of these arguments are persuasive.

### 1.    *Pickett and Valley Drug*

The Magistrate Judge commented that *Valley Drug* and *Pickett* are "formidable barriers to certification in this case." Read together, these cases stand for the proposition that a class cannot be certified if some members of the putative class benefitted from the alleged wrongful conduct while others were harmed, and the resulting conflict between winners and losers within the class creates a fundamental antagonism that precludes certification under Rule 23(a)(4). *See Grimes v. Fairfield Resorts, Inc.*, 331 Fed. Appx. 630, 633 (11th Cir. 2007) ("... the focus of the inquiry is on whether

some party members claim to have been *harmed* by the same conduct that *benefitted* other members of the class, and thus whether class members' interests are actually or potentially in conflict with the interests and objectives of other class members.") (emphasis in original).

*Pickett* was a putative class action brought by cattle producers against Iowa Beef Processors, Inc. for alleged discriminatory marketing practices in violation of the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq. Pickett*, 209 F.3d at 1277. The named plaintiffs were cattle producers who sold cattle raised in feedyards to IBP for slaughter. *Id.* at 1278. In one method of selling cattle to IBP, producers would enter into "forward contracts," under which the producer and IBP would agree on a locked-in price to be paid for the cattle weeks or months before slaughter. The parties to these forward contracts could also enter into "marketing agreements," under which a cattle producer promises to sell most of its cattle to IBP at prices governed by a negotiated formula.

The named plaintiffs alleged that IBP entered into the forward contracts and marketing agreements with producers in order to establish a "captive supply" of cattle committed to IBP, which would enable IBP to depress the market at strategic times and force producers to accept artificially low prices. The plaintiffs initially defined the putative class as all cattle producers who had raised livestock for sale on the open market. The district court refused to certify the proposed class because it included members who had derived an advantage from IBP's practices, as well as those who had been disadvantaged. The plaintiffs moved for reconsideration, narrowing the class to all cattle producers who sold fed cattle directly to IBP.

During the hearing on certification, the plaintiffs' expert testified that an econometric model could efficiently address the damage claims of each individual producer and demonstrate that IBP's practices had a downward effect on prices. The district court certified the narrowed class, but the

20

Eleventh Circuit reversed, holding that the plaintiffs "could not possibly provide adequate representation to a class that includes producers who willingly entered into forward contracts and marketing agreements with IBP as well as those who complain of and claim harm from the practice." *Pickett*, 209 F.3d at 1280-1281.

*Valley Drug* applied *Pickett* to an antitrust class action. In 1987, Abbott Laboratories began selling the chemical compound terazosin hydrochloride under the brand name "Hytrin" for the treatment of hypertension. 350 F.3d at 1184. The drug was immensely successful, and other pharmaceutical companies, including Geneva Pharmaceuticals and Zenith Goldline Pharmaceuticals, quickly created generic versions to compete with Hytrin. After Abbott sued Geneva and Zenith to protect its patent covering the chemical compound, it entered into confidential settlement agreements with Geneva and Zenith, under which Geneva and Zenith agreed to keep their generic drugs off the market. The agreements terminated when the parties entered into a consent agreement with the Federal Trade Commission.

The plaintiffs in *Valley Drug* were regional wholesalers who purchased Hytrin directly from Abbott. They alleged that the settlement agreements violated the Sherman and Clayton acts by keeping less expensive generic drugs off the market, resulting in anticompetitive overcharges. The plaintiffs moved for certification of a class comprised of all persons who purchased Hytrin directly from Abbott up until the time of the FTC consent agreement. The district court certified the class.

As in *Pickett*, the Eleventh Circuit reversed, noting first that Rule 23(a)(4) cannot be satisfied where "the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of the unnamed class members." *Id.* at 1190. It then credited the defendants' argument that the plaintiffs "have not offered any facts to challenge the defendants'

21

assertions that the three national wholesalers, whose transactions with Abbott constitute over fifty percent of the plaintiffs' total claims, experienced a net gain from the absence of generic drugs in the market." *Id.* at 1190. Specifically, the defendants argued that a number of members of the putative class sold drugs under "cost-plus" contracts, pursuant to which they "arguably" made more on the sale of a branded product than they did on the sale of a generic product. *Id.* at 1190.

The Eleventh Circuit held that the regular use of "cost-plus" contracts, combined with the peculiarities of the economic market in which Hytrin and its generic counterparts were sold, meant that the defendants' actions effectively foreclosing the sale of generic drugs resulted in a net economic *benefit* for some members of the class. The court therefore concluded:

> [T]hese class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off when branded drugs dominate the market. Class certification under these circumstances would be inappropriate.

350 F.3d at 1191.

Direct Purchasers attempt to distinguish *Valley Drug* by arguing that the Eleventh Circuit declined to allow certification because the *Valley Drug* plaintiffs did not present any evidence to challenge the defendants' assertions that members of the putative class experienced a net gain (Dkt. 486 at 10). While that may be accurate, it is not a distinguishing factor. *See Valley Drug*, 350 F.3d at 1190. The Eleventh Circuit was constrained by the record before it. Direct Purchasers' arguments will likewise be addressed as framed by this record and the economic market in which Defendants operate. Moreover, the relevant inquiry is whether a *potential* for conflict exists, not actual conflict.

### 2.     Potential Conflicts May Serve to Preclude Class Certification

Direct Purchasers fault the Magistrate Judge for concluding that the "potentiality" of net economic benefit for some members of the putative class is sufficient to support a finding that the

adequacy prong is not satisfied. This argument is squarely rejected in *Valley Drug*. Indeed, the Eleventh Circuit expressly held that a fundamental conflict exists when "interests are actually *or potentially* antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* at 1189 (emphasis added). And at least one panel of the Eleventh Circuit has expressly confirmed "mere potentiality" of fundamental conflict precludes class certification. *See Grimes*, 331 Fed. Appx. at 633 ("This poses a real and fundamental conflict of interest between the named Plaintiffs and class members, transcending the mere "potentiality" threshold sufficient to preclude class certification."); *id.* ("[T]he focus of the inquiry is on . . . whether class members' interests are actually *or potentially* in conflict with the interests and objectives of the other class members.").

Along the same line, Direct Purchasers argue that binding precedent requires Defendants' experts to "conclusively identify any class members who benefitted from Defendants' conduct" (Dkt. 486 at 10). Tellingly, Direct Purchasers cite no such precedent. Moreover, the Eleventh Circuit in *Valley Drug* did not require any such evidentiary proof. ("Bearing in the mind that for purposes of analyzing whether any antagonistic interests exist between the proposed representatives and the rest of the class, 'the defendant does not have to show actual antagonistic interest; the potentiality is enough . . . .'"). *Valley Drug*, 350 F.3d at 1194. In any event, Direct Purchasers have the burden under Rule 23(a)(4) "of demonstrating that no fundamental conflict exists within the class." *Id.* at 1190. They fail to do so.

### 3.     *Fundamental Conflicts Exist Within the Putative Class*

It is clear from *Pickett* and *Valley Drug* that the potential for economic winners and losers to emerge from the same putative class precludes class certification. In the antitrust context, winners emerge when some members of the putative class derive a "net economic benefit from the very same

23

conduct alleged to be wrongful by the named representatives." *Valley Drug*, 350 F.3d at 1190. The entire record must be examined, and in antitrust cases, the entire record includes the market conditions in which the parties operate. *Id.* Here, an examination of the entire record reveals the existence of both economic winners and economic losers within the potential class, which creates a fundamental conflict precluding adequate representation of the class under *Valley Drug* and *Pickett*.

Direct Purchasers' expert, Dr. Singer, admits that the relevant economic question for determining antitrust injury in this case is whether the exclusive dealing arrangements between Transitions and the various lens casters resulted in the lens casters paying higher prices for photochromic lenses than they otherwise would have (Dkt. 441 ¶ 152). To test whether antitrust injury or "impact" was generated by Defendants' exclusive dealing, Dr. Singer conducted a regression analysis examining the impact of a rise in Defendants' exclusivity share of the photochromic lenses market on the prices paid by the seventeen lens casters (*see id.* ¶¶ 152-160). Dr. Singer found that as a whole, the lens casters saw higher prices as Transitions' exclusivity share in the market increased (*id.* ¶ 156 tbl. 11, column 1). When the lens casters were examined individually, however, Dr. Singer concluded that the prices paid by at least two lens casters *decreased* as Transitions' exclusivity share in the market increased (*id.* ¶ 156, tbl. 11, columns 2 & 3). In other words, it is undisputed that at least two lens casters–members of the putative class–benefitted from Transitions' exclusive dealing.

Defendants' expert reached the same conclusion, and expanded the scope of the analysis to determine the effect of the FTC consent decree on price. Dr. Leonard determined that two lens casters saw a statistically significant drop in price when the consent decree ended exclusive dealing,

while eight saw no statistically significant change.[16]

The record therefore demonstrates a fundamental conflict within the class. That is, Defendants have presented evidence, unrebutted by Direct Purchasers, that some members of the putative class benefitted from their exclusive dealing arrangements with Transitions, the very conduct Direct Purchasers claim harmed the class as a whole.[17] Indeed, Direct Purchasers' evidence corroborates Defendants' contention. The lens casters who were "winners" under the exclusive dealing regime therefore do not have the same incentives to prosecute this action as the "losers" do. Under binding Eleventh Circuit precedent, the proposed class cannot be certified because of the potential for a serious and fundamental conflict within the class between the winners and losers. *See*

---

[16]Prices paid by three lens casters, however, *increased* when the FTC consent order ended Transitions' exclusivity arrangements (Dkt. 453 ¶ 77). This result is not entirely surprising. Courts, scholars, and practitioners of antitrust law have long recognized that exclusive dealing is not necessarily illegal and that in many circumstances, it may provide a significant benefit to the buyer, even if it negatively affects other participants in the market, such as consumers and competitors seeking entrance. *See, e.g.*, *Tampa Elec. Co v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961) (noting that an exclusivity, or requirements, contract may "well be of economic advantage to buyers as well as to sellers" because it will "assure supply" and "give protection against price fluctuations"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition."); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) ("[C]ompetition for the contract is a vital form of rivalry, . . . which the antitrust laws encourage rather than suppress. . . . Why would these [buyers] shoot themselves in the feet by signing . . . or favoring . . . exclusive contracts that entrench [the seller] as a monopolist that can apply the squeeze? . . . That [buyers] *like* exclusive deals implies that they serve the interests of [the consumers]."); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 238 (1st Cir. 1983) (Breyer, J.) (noting that legitimate business justifications can support a limited exclusivity contract, including assurances for the buyer of a stable, favorable price); *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 773 (11th Cir. 1983) (Exclusive dealing "does not give rise to antitrust liability without proof of actual competitive injury. . . . [S]uch a unilateral exercise of business judgment is free from scrutiny in the absence of proof of competitive harm, or other underlying illegal behavior."); Philippe Aghion & Patrick Bolton, *Contracts as a Barrier to Entry*, 77 Am. Econ. Rev. 388, 388 (1987) ("[I]t is a widespread opinion among antitrust practitioners that contracts between buyers and sellers are socially efficient.").

[17] Although the lens casters shown to have benefitted from the alleged anticompetitive exclusive agreements comprise but a small number of putative class members, a close reading of *Valley Drug*, *Pickett*, and *Grimes* does not indicate a numerical or indicate a quantifiable threshold of class members having conflicting interests before a fundamental conflict arises.

25

*Valley Drug*, 350 F.3d at 1193; *Pickett*, 209 F.3d at 1280.[18]

### 4.   *The FTC Order Does Not Cure Fundamental Conflicts Within the Class*

Direct Purchasers argue that even if fundamental conflicts exist within the class by virtue of the inclusion of lens casters who benefitted from the exclusive dealing agreements with Transitions, those conflicts no longer exist because the FTC Consent Order dissolved the exclusive dealing arrangements, as well as the potential for exclusive dealing arrangements. This argument is unpersuasive and inconsistent with *Valley Drug*. *See* 350 F.3d at 1186 (refusing to certify class despite entry of FTC consent settlement).

### 5.   *The Class Will Not Be Redefined.*

Direct Purchasers contend for the first time that if their proposed class fails to satisfy the requirements for class certification, it should be modified to exclude some or all lens casters, or subclasses should be created (Dkt. 486 at 13).[19]  Rule 23(c)(1) "empowers district courts to alter or amend class certification orders at *any* time prior to a decision on the merits." *Prado-Steinman*, 221 F.3d at 1273. And courts are authorized to amend class definitions, even if the amendment is made subsequent to the initial class certification pleadings. *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("[H]olding plaintiffs to the plain language of their definition would ignore

---

[18]*Accord Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338-39 (4th Cir. 1998) (conflicts precluding class certification arose where some members of the putative class did not desire the remedy sought by named plaintiffs); *Almonor v. BankAtlantic Bancorp, Inc.*, 261 F.R.D. 672, 677 (S.D. Fla. 2009) (a benefit arguably conferred on a named plaintiff due to defendant's tortious conduct was not enjoyed by other members of the putative class, creating classes of "winners and losers" and therefore precluding class certification); *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 451 (S.D. Iowa 2009) (existence of winners and losers in the putative class precludes class certification under Rule 23(a)(4)); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*, 247 F.R.D. 156, 177-78 (C.D. Cal. 2007) (adequacy of representation requirement not satisfied when some class members derived a net economic benefit from conduct alleged to be wrongful).

[19]This argument was raised in passing in a footnote in Direct Purchasers' Reply in support of their motion for class certification (Dkt. 443 at 4 n.7).

the ongoing refinement and give-and-take inherent to class action litigation, particularly in the formation of a workable class definition. District courts are permitted to limit or modify class definitions to provide the necessary precision."); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("The district court must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts.").[20]

Direct Purchasers' request comes too late, however, and contradicts their arguments to the Magistrate Judge.[21] Had Direct Purchasers argued to the Magistrate Judge that she should either exclude lens casters from the class definition or create subclasses, she would have been able to evaluate whether the new class or subclasses met the requirements of Rules 23(a) and 23(b)(3), and those determinations could have been reviewed. Instead, Direct Purchasers chose not to give the Magistrate Judge this option, as she noted (Dkt. 471 at 5 n.10) ("However, this issue need not be addressed as Direct Purchaser Plaintiffs do not seek certification of subgroups, and the Court does not find it necessary to recommend that approach."). Considering the argument at this point would discourage the practice of presenting all possible arguments to the magistrate judge when a matter

---

[20]*Richardson* was cited for this proposition in *Shin v. Cobb Cnty. Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001).

[21] During the hearing on the Motion for Class Certification, Plaintiffs' counsel responded to the Magistrate Judge's question about certifying subclasses or classes within a class as follows:

> There is no dispute as to Your Honor's ability to do that. It is our view that it is by no means necessary in this case. And defendants can speak for themselves, but they have taken the view that it would be improper for us to raise that issue at this stage because we did not raise it in our opening brief.
>
> They can speak more to that, **but it is our view that the class as proposed satisfies the Rule 23 standard in its entirety and that using subclasses would not only add nothing, it would detract from the case and that it would make things unnecessarily complicated**; and as I'm going to say, the -- the lack of complications, the efficiency, to be gained is the key standard behind Rule 23(b)(3), and I will get into that a little bit more.

(Dkt. 444 at 10-11) (emphasis added).

is referred. *See Williams v. McNeil*, 557 F.3d 1287, 1290-91 (11th Cir. 2009) ("[T]o require a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court.") (quoting *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000)).

A district court has the discretion to decline to address an argument not raised before the magistrate judge, and that discretion is appropriately exercised here. *Shultz v. Sec. of U.S. Air Force*, 522 Fed. Appx. 503, 506 (11th Cir. 2013). After years of litigation, Direct Purchasers cannot now suggest a new construction of the class because it appears the proposed definition is in jeopardy. *See Paterson-Leitch Co. v. Mass. Municipal Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) ("[I]t would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and–having received an unfavorable recommendation–shift gears before the district court."). Accordingly, the class definition will not be modified. *Accord Grimes*, 331 Fed. Appx. at 634 (affirming denial of class certification where district court where plaintiffs did not take opportunity to amend proposed class); *In re Currency Conversion Fee Antitrust Litig.*, 229 F.R.D. 57, 62 (S.D.N.Y. 2005) (denying request to create subclasses when plaintiffs did not raise issue prior to motion for reconsideration); *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 409 (M.D. Fla. 2004) (refusing to limit overly broad class definition when plaintiff requested use of revised class in reply in support of motion for class certification); *cf. Allied Orthopedic*, 247 F.R.D. at 169 (refusing to *sua sponte* remove from class definition members who are fatal to certification). And in any event, removing lens casters from the class would not cure other defects which preclude certification under the predominance analysis of Rule 23(b)(3), as will be discussed. *Accord Grimes,* 331 Fed. Appx. at 634.

Because the putative class includes direct purchasers (lens casters) who enjoyed a net economic benefit from the alleged anticompetitive activity, there exists a potential for fundamental conflict within the class. Direct Purchasers have therefore failed to satisfy their burden of demonstrating that the representative parties will fairly and adequately protect the interests of the class. Accordingly, the proposed class does not satisfy Rule 23(a)(4) and may not be certified.

### E.    Rule 23(b)(3): Predominance

The Magistrate Judge found that Plaintiffs "failed to demonstrate by a preponderance of the evidence a workable methodology to gauge impact on all members of the class through methods based on common evidence" (Dkt. 471 at 21), and therefore failed to satisfy the requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Direct Purchasers object to this conclusion.

Rule 23(b)(3) tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, but it is far more demanding than the commonality, typicality, and adequacy inquiries of Rule 23(a). *Comcast*, 133 S.Ct. at 1432; *Amchem*, 521 U.S. at 623-24. To satisfy Rule 23(b)(3), the questions in a class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over questions that are subject only to individualized proof. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997). "Common issues of fact and law predominate if they 'ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay v. Humana, Inc.,* 382 F.3d 1241, 1255 (11th Cir. 2004) (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)) (alteration in original).

In conducting the predominance inquiry, courts must "take into account 'the claims, defenses,

29

relevant facts, and applicable substantive law,' . . . to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant." *Id.* at 1254 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311 (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)). Although individual treatment of the *essential* elements of a case precludes certification, it "is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." *Id.*; *see Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1196 (2013) ("Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof.") (internal quotations and alterations omitted).

A "close look" must be taken at whether common questions predominate over individual ones and a "rigorous analysis" must be conducted that may "entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 133 S.Ct. at 1432 (internal quotations omitted). Free-ranging merits inquiries are not permitted at the certification stage, however. *Amgen*, 133 S.Ct. at 1194-95. "Merits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

The predominance inquiry begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton* Co., 131 S.Ct. 2179, 2184 (2011). Direct Purchasers assert five causes of action against Defendants: (Count I) Monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, against Transitions only; (Count II) Attempted monopolization in violation of Section 2 of the Sherman Act, against Transitions only; (Count III) Conspiracy to

monopolize in violation of Section 2 of the Sherman Act, against all Defendants; (Count IV) Conspiracy to attempt to monopolize in violation of Section 2 of the Sherman Act, against all Defendants; and (Count V) Conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against all Defendants (*see* Dkt. 127 at ii, ¶¶ 136-170).

To prevail on their antitrust claims, Direct Purchasers must demonstrate (1) a violation of antitrust laws, (2) direct injury (or impact) from the violation, and (3) measurable damages. *See Hydrogen Peroxide*, 552 F.3d at 311; *Meijer, Inc. III*, 246 F.R.D. at 307; *Terazosin Hydrochloride*, 220 F.R.D. 672, 695 (S.D. Fla. 2004) (citing *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981)).

Defendants do not dispute that the first element of an antitrust claim–a violation of antitrust laws–is a common issue susceptible to generalized proof. Rather, they focus on the second and third elements, arguing that Direct Purchasers cannot establish antitrust impact with generalized proof common to the class, and that Direct Purchasers have not produced a workable methodology utilizing common proof to calculate damages.

Accordingly, to meet the predominance requirement, Direct Purchasers must show by a preponderance of the evidence "(1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that [was] common to the class rather than individual to its members'; and (2) that the damages resulting from that injury were 'measurable on a class-wide basis' through the use of a 'common methodology.'" *Comcast*, 133 S.Ct. at 1430 (quoting *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 154 (E.D. Pa. 2010)).

As both parties recognize, "[p]redominance is a test readily met" in certain cases alleging

antitrust violations. *Amchem*, 521 U.S. at 625. Nevertheless, mere proof of an antitrust conspiracy is insufficient to meet the predominance requirement. In *Amchem*, the Supreme Court held that predominance cannot be satisfied by merely showing that all members of the class have been exposed to harmful conduct. *Amchem*, 521 U.S. at 623-24. Rather, the requirement of predominance is "far more demanding." *Id.* at 624.

The lesson taken from *Amchem*, as acknowledged by the former Fifth Circuit, is that "there are no hard and fast rules which have developed regarding the suitability of a particular type of antitrust case for class action treatment. The unique facts of each case will generally be the determining factor governing certification." *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 316 (5th Cir. 1978); *see also Messner*, 669 F.3d at 815 ("We understand the comment [in *Amchem*] to mean that careful application of Rule 23 is necessary in antitrust cases, as in all cases, and that in antitrust cases, 'Rule 23, when applied rigorously, will frequently lead to certification.'") (quoting Robert H. Klonoff, *Antitrust Class Actions: Chaos in the Courts*, 11 Stan. J.L. Bus. & Fin. 1, 7 (2005)).

## 1.    *Antitrust Impact*

An antitrust plaintiff cannot establish a cause of action under section 4 of the Clayton Act by merely demonstrating an antitrust violation. *See J. Truett Payne*, 451 U.S. at 562 ("[P]roof of a violation does not mean that a . . . purchaser has actually been 'injured' within the meaning of § 4."); *Blue Bird*, 573 F.2d at 317 ("Proof of a violation of the Sherman Act standing alone does not establish civil liability under [§] 4 of th Clayton Act."). Rather, the plaintiff must also establish "cognizable" or "actual" injury "attributable to an antitrust violation," along with "some approximation of damage." *J. Truett Payne*, 451 U.S. at 561-62 (citing *Perkins v. Standard Oil Co.*,

395 U.S. 642, 648 (1969)); *see Fla. Rock*, 710 F.2d at 782 (Section 4 plaintiff "must also prove 'an injury to his business resulting from the defendant's wrongful actions, and some indication of the amount of the damage done.'") (quoting *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 694 (5th Cir. 1975)). The "cognizable" or "actual" injury-in-fact discussed is known as "antitrust impact." *See Blue Bird*, 573 F.2d at 317.

Establishing antitrust impact requires proof that "there is a causal relation between the alleged antitrust violation and an injury to plaintiff's business." *Fla. Rock*, 710 F.2d at 782; *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) ("To establish antitrust injury, the plaintiff must demonstrate . . . an injury to the plaintiff which flows from that which makes defendant's acts unlawful.") (internal quotations omitted); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). A plaintiff must "introduce substantial probative facts demonstrating that some damage flowed from the unlawful conspiracy," and the causal relation "must be proved as a matter of fact with a fair degree of certainty." *Fla. Rock*, 710 F.2d at 782; *Blue Bird*, 573 F.2d at 317. The causation requirement is "vital" to proving antitrust claims in the Eleventh Circuit. *Blue Bird*, 573 F.3d at 317.

Whether antitrust impact is common to the class and subject to generalized proof is "of utmost importance" in the predominance inquiry. *Blue Bird*, 573 F.2d at 320; *see In re Rail Freight Fuel Surcharge Antitrust Litig. - MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013) ("Meeting the predominance requirement demands more than common evidence the defendants colluded to raise fuel surcharge rates. The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy."). Where causal impact cannot be established for every class member through proof common to the class, "the need to establish

33

antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl.*, 339 F.3d at 302.

In her Report and Recommendation, the Magistrate Judge concluded that "Eleventh Circuit precedent on predominance requires a methodology capable of showing that *every class member* was impacted by the antitrust violation" (Dkt. 471 at 10). In support, she cited a trilogy of binding cases holding that impact on each member of the class must be susceptible to common, class-wide proof. *See Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1365 (11th Cir. 2002); *Blue Bird*, 573 F.2d at 327-28; *Shumate v. Nat'l Ass'n of Secs. Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir. 1975).

Direct Purchasers argue that this conclusion results from an incorrect reading of *Shumate*, *Blue Bird*, and *Sikes*, and is inconsistent with other cases addressing certification of antitrust classes. Instead of harm to each member of the class, Direct Purchasers argue, the class advocates need only demonstrate "widespread harm to the class." In support of their argument, Direct Purchasers point to other courts bound by decisions of the former Fifth Circuit, which found predominance satisfied even where the common proof demonstrated that members of the putative class were not harmed. *See Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *In re Checking Acc't Overdraft Litig.*, 275 F.R.D. 666, 678 n.9 (S.D. Fla. 2011).

As a preliminary matter, neither *Mims* nor *Checking Account Overdraft* are persuasive in this context. In *Checking Account Overdraft*, the district court never addressed the element of antitrust impact. The footnote cited by Direct Purchasers notes only that "the presence of individualized defenses as to a small number of class members would not destroy the predominance of common liability questions," a principle that is neither novel nor in conflict with the Magistrate Judge's conclusion. *See Checking Acc't Overdraft*, 275 F.R.D. at 678 n.9.

34

In *Mims*, the plaintiffs alleged violations of the Real Estate Settlement Procedure Act and brought various related state law claims, and the district court granted the plaintiffs' motions for class certification for both the federal and state law claims. *Mims*, 590 F.3d at 301-02. Addressing the certification of the state law claims, the Fifth Circuit held that "[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct." *Id.* at 307-08 (citing *Kohen*, 571 F.3d at 677). Direct Purchasers argue that this statement supports their argument that they need only demonstrate widespread harm to the class, rather than demonstrating the ability to prove impact on each member of the class with common evidence. This argument is unpersuasive and not supported by *Mims*. The Fifth Circuit's statement was directed to the definition of the class, not the predominance requirement. *See id.* Indeed, the predominance requirement is not even mentioned in the opinion.

Unsupported by *Mims* or *Checking Account Overdraft*, Direct Purchasers' argument depends on whether the Magistrate Judge's conclusion was well-founded in the binding precedent of *Sikes*, *Blue Bird*, and *Shumate*. After careful consideration of these cases and a rigorous analysis of the claims and evidence of record, which in this case requires a foray into the merits, I agree with the Magistrate Judge that Direct Purchasers were obligated to present common, generalized proof capable of proving antitrust impact on *all* members of the putative class, which they fail to do.

In *Shumate*, the plaintiffs alleged that the defendants violated the Sherman Act by conspiring to exclude certain securities from being listed on the NASDAQ exchange and then ignoring securities that were listed. *Shumate*, 509 F.2d at 149. The district court denied the plaintiffs' motion to certify a class, finding that even if an antitrust conspiracy were proven, the controlling question on liability would be whether each class member suffered antitrust injury. *Id.* at 155. This question

35

of antitrust injury, the district court found, would be too difficult to address in a class action, precluding certification. *Id.*

The former Fifth Circuit affirmed. The court noted that proof of antitrust injury was "critical for the determination of defendants' liability to any individual," and that the case was not one "where liability can be shown as to all class members, with only the amount of damage to be determined as to each," in which case certification may have been appropriate. *Id.* Because antitrust impact–and therefore liability–could not be shown with common proof "*as to all class members*," the district court was within its discretion to find that common questions did not predominate. *Id.* (emphasis added).

*Shumate* was followed by *Blue Bird*, in which the plaintiffs brought two distinct claims against six manufacturers of school bus bodies and seven Alabama distributors of those bus bodies. 573 F.2d at 311. The first claim was brought against all of the defendants on behalf of all governmental entities in Alabama that purchase school bus bodies, and alleged price-fixing in violation of section 1 of the Sherman Act. *Id.* The second was brought on behalf of all governmental entities in the United States that purchase school bus bodies against only the manufacturers, and alleged price-fixing and conspiracy to monopolize in violation of sections 1 and 2 of the Sherman Act. *Blue Bird*, 573 F.2d at 311. Under Rule 23(b)(3), the district court certified a "state class" on the first claim and a "national class" on the second. *Id.*

The former Fifth Circuit affirmed certification of the state class, but reversed on the nationwide class. *Id.* at 330. The court concluded that the record provided insufficient evidence of antitrust impact on each member of the proposed national class, and the predominance requirement therefore could not be met. *Id.* at 323. Of particular importance, the former Fifth Circuit recognized

that while price-fixing cases are often suitable for class certification, this one was not because "neither the products involved nor the purchasers appear to be standardized," noting that the products "have been marketed under various arrangements at different times." *Id.* at 322.

The court then turned to the question of whether antitrust impact was susceptible to classwide proof. *Id.* at 324. After discussing and distinguishing the approaches of other Circuits, the court noted that "this Circuit places great importance on the 'impact' element of an antitrust cause of action." *Id.* at 327. Importantly, *Blue Bird* characterized *Shumate* as "a recognition that '*impact' is a question unique to each particular plaintiff* and one that must be proved with certainty." *Id.* at 327 (emphasis added). To that end, the court concluded that "*each plaintiff* must still prove that this conspiracy was actually implemented . . . and that it did in fact cause him injury." *Id.* at 327 (emphasis added).

In another critical passage, the court emphasized that the rules authorizing class actions cannot alter the substantive proof required to prove a claim. *Id.* at 327. In other words, the fact that plaintiffs are absent and asserting a claim through the mechanics of Rule 23 does not abrogate the class representatives' burden to prove, by a preponderance of the evidence, that each member of the class suffered antitrust impact. Read as a whole, *Blue Bird* places great emphasis on the individualized nature of antitrust impact.

Unlike *Shumate* and *Blue Bird*, *Sikes* did not concern an antitrust violation. Rather, the plaintiffs in *Sikes* alleged the defendants engaged in racketeering activity in violation of the federal RICO statute, 18 U.S.C. §§ 1961-1968. *Sikes*, 281 F.3d at 1353. The Eleventh Circuit had previously held that each plaintiff in a RICO case must demonstrate reliance on the deceptive conduct–a causal requirement somewhat akin to antitrust impact. *Id.* at 1354; *see id.* at 1360 ("When a civil RICO

37

claim is predicated upon mail or wire fraud, the plaintiff must additionally show that 'he was injured by reason of the defendant's acts of deception.") (quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991)).[22]

After acknowledging *Pelletier*, the district court in *Sikes* determined that reliance could be presumed, and therefore proven by common evidence, because of the factual similarities in the class members' cases. The Eleventh Circuit rejected that theory, ultimately determining that mail and wire fraud allegations are not subject to class-wide resolution because each plaintiff must show reliance on an individual basis. *Id.* at 1361-62. The Eleventh Circuit further concluded that a class action was inappropriate because "[t]o allow recovery by persons who have not been injured or to allow recovery for an injury greater than that caused by the offending conduct would run counter to the plain language of the statute," noting, just as in *Blue Bird*, that "class treatment may not serve to lessen the plaintiffs' burden of proof" or abrogate the substantive rights of the parties. *Id.* at 1365. Because injury-in-fact and damages would involve extensive individualized inquiries, a class action was not sustainable. *Id.* at 1366.

The Magistrate Judge correctly read *Shumate* and *Blue Bird* to require Direct Purchasers to present common evidence capable of demonstrating that *each member* of the class suffered antitrust impact. Whether each class member suffered injury as a result of the alleged anticompetitive conduct can be determined "only by an individualized examination of the particular characteristics of the class member's" purchases, and not by "generalized proof." *See Nichols v. Mobile Bd. of Realtors,*

---

[22]*Sikes* was later abrogated by the United States Supreme Court in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), on this very point as it related to mail fraud. *See id.* at 649 ("[N]o showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.").

*Inc.,* 675 F.2d 671, 676, 679 (5th Cir. Unit B 1982).[23] The predominance requirement therefore cannot be met. *Id.* This conclusion is consistent with the "utmost importance" placed on the impact element at the certification stage by the former Fifth Circuit. *Blue Bird*, 573 F.2d at 327.[24]

The Magistrate Judge's conclusion that Direct Purchasers must be able to demonstrate impact on *each* class member through common proof is also consistent with the nature of the antitrust violation alleged in this case, exclusive dealing. It is well established that exclusive dealing, in isolation, does not give rise to antitrust liability. *Tampa Elec.*, 365 U.S. at 333; *Fla. Rock*, 710 F.2d at 773. Liability in exclusive dealings cases arises only upon proof of "actual competitive injury."

---

[23]In this respect, the element of antitrust impact is distinguishable from the element of materiality addressed in *Amgen*. There, the district court certified a securities fraud action brought under Rule 10b-5, and the Ninth Circuit affirmed. *Amgen*, 133 S.Ct. at 1193-94. The Supreme Court granted certiorari "to resolve a conflict among the Courts of Appeals over whether district courts must require plaintiffs to prove . . . the element of materiality before certifying a class action under § 10(b) and Rule 10b-5." *Id.* at 1194. Affirming certification of the class, the Supreme Court held that materiality need not be proven at the class certification stage for two reasons: First, the question of materiality is "an objective one," *Id.* at 1195 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)), and if information is material to one plaintiff, it is material to all other plaintiffs, and materiality can therefore be proved "through evidence common to the class." *Id.* Second, "there is no risk whatever that a failure of proof on the common question of materiality will result in individual questions predominating." *Id.* at 1196. Rather, a failure of proof on the question of materiality will result in the termination of the entire litigation on the merits "for one and for all," rather than the persistence of some, but not all, of the plaintiffs' claims. *Id.*

 Antitrust impact, on the other hand, is not an "objective" question. *Id.* at 1195. Rather, the element of antitrust impact requires proof of an individualized "causal relation between the alleged antitrust violation and an injury to plaintiff's business." *Fla. Rock*, 710 F.2d at 782; *see also ZF Meritor*, 696 F.3d at 281 ("To establish antitrust injury, the plaintiff must demonstrate . . . an injury to the plaintiff which flows from that which makes defendant's acts unlawful."); *Bell Atl.*, 339 F.3d at 302 (establishing antitrust impact "requires the plaintiff to demonstrate a causal connection between the specific antitrust violation at issue and an injury to the . . . antitrust plaintiff").

[24]While some courts have stated that class certification is not precluded when a proposed class includes members who have not been harmed by the defendants' conduct, *see, e.g., Kohen*, 571 F.3d at 677 ("What is true is that a class will often include persons who have not been injured by the defendant's conduct . . . . Such a possibility or indeed inevitability does not preclude class certification."); *In re Nexium (Esomeprazole) Antitrust Litig.*, ___ F.R.D. ___, No. 12-md-02409-WGY, 2013 WL 6019287, at *8 (D. Mass. Nov. 14, 2013) (certifying class despite evidence that more than *de minimis* number of members of putative class suffered no impact), those decisions do not place the same "utmost importance" on proving impact. *Blue Bird*, 573 F.3d at 317. And whether the discussion in *Kohen* is even relevant to a predominance inquiry is questionable. In *Kohen*, the Seventh Circuit was addressing "statutory standing" at the inception of a case, and whether the court had subject matter jurisdiction based on allegations of harm to some members of the class. 571 F.3d at 676-77. Even *Kohen* acknowledged, however, that "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Id.* at 677.

*Fla. Rock*, 710 F.2d at 773.[25]

Moreover, contrary to Direct Purchasers' argument, the principle that named plaintiffs must prove that *each* class member suffered antitrust impact is not novel or unique, particularly in cases involving negotiated transactions, such as those that occurred here. *See In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 370 (C.D. Cal. 2011) ("Often in cases involving negotiated transactions, as opposed to purchases based on list prices, such common proof is elusive.") (citing *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382–84 (S.D.N.Y. 1996); *In re Flash Memory Antitrust Litig.*, No. C 07–0086 SBA, 2010 WL 2332081 at *7–*8 (N.D. Cal. June 9, 2010)). Many courts have reached the same conclusion, including those bound by decisions of the former Fifth Circuit.[26]

Indeed, one of the few Courts of Appeals to address class certification in antitrust litigation since the Supreme Court's decision in *Comcast* specifically rejected the argument made by Direct Purchasers. In *Rail Freight*, the D.C. Circuit reviewed the district court's decision to certify a class,

---

[25]The requirement of proving "actual competitive injury" stands in contrast to claims of price-fixing, as alleged in *Blue Bird* and forming the basis for the certified state class there. Price-fixing is *per se* illegal under antitrust law, and price-fixing plaintiffs need not establish injury-in-fact in order to be awarded damages. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) (reaffirming that price-fixing agreements are *per se* unlawful under the Sherman Act).

[26]*See, e.g.*, *Bell Atl.*, 339 F.3d at 302 ("[W]here fact of damage cannot be established for *every class member* through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.") (emphasis added); *Cement & Concrete*, 278 F.R.D. at 682 ("Common issues of fact and law predominate if they have a direct impact on *every class member's* effort to establish liability and on every class member's entitlement to injunctive relief.") (emphasis added, citations and quotations omitted); *Allied Orthopedic*, 247 F.R.D. at 165 ("[C]lass certification is precluded where plaintiffs have not shown that the fact of injury element can be proven for *all* class members with common evidence.") (emphasis added); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136, 144 (D. N.J. 2002) ("Plaintiff must establish that *each class member* has, in fact, been injured by the alleged conduct.") (emphasis added). *See also* 2A Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 331 (3d ed. 2007) ("The fact that some class members may not have been damaged at all generally defeats certification because the fact of injury, or 'impact,' must be established by common proof." ).

which relied on the same cases cited by Direct Purchasers–*Mims* from the Fifth Circuit and *Kohen* from the Seventh Circuit. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 40 (D.D.C. 2012). The D.C. Circuit reversed on that very point, holding that under *Comcast*, the district court's acceptance of a "plausible" statistical method that included uninjured plaintiffs within the putative class contravened *Comcast*'s "command[]" that courts take a "hard look at the soundness of statistical models that purport to show predominance." *Rail Freight*, 725 F.3d at 255.

Direct Purchasers concede in their objections that they cannot use the current common evidence to demonstrate that all class members suffered antitrust impact. They admit that Dr. Singer's "preliminary results showed injury to 15 of 17 (88 percent) or 12 out of 14 (86 percent) of the [*sic*] Group A and either 1,465 out of 1,465 (100%) or 1,219 out of 1,352 (90%) of Group B, the two groups for which Plaintiffs had obtained preliminary results at the class certification stage" (Dkt. 486 at 8). Given Dr. Singer's results admitting that common evidence can demonstrate antitrust impact on only 86% and 90% of Groups A and B, Direct Purchasers are unable to "utilize the identical evidence on behalf of every member of the class to prove [the element of antitrust impact]." *Vega*, 564 F.3d at 1272.

Equally fatal to certification is that Direct Purchasers offer no methodology for demonstrating antitrust impact on members of Group C of the putative class. Dr. Singer abruptly concludes that an analysis similar to those performed for Groups A and B "could be" performed "at the merits phase" to determine whether Defendants' conduct resulted in antitrust impact on the class members in Group C (Dkt. 441 ¶ 170).[27]  Instead of demonstrating that his methodology would result in the same

---

[27] The objections do not discuss the lack of data for Group C, commenting only that proof of overcharge to Essilor is sufficient because Groups B and C bought directly from Essilor.

conclusion for Group C, however, Dr. Singer claims that the data requires "significant preparation before it can be used," and that once that preparation is complete, the data could be used at the merits phase (*id.* ¶ 171).

Dr. Singer's theoretical assertion is insufficient. Experts are required to demonstrate their methodology is capable of utilizing common evidence, yet Dr. Singer does not even attempt to do so for an overwhelming majority of the class.[28] *See Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 299, 2004-1 Trade Cases P 74, 445 (5th Cir. 2004) (denying class certification in antitrust case where "[t]he expert did not offer a formula based on regression analysis, but merely opined that one could be found"); Pierre Cremieux et al., *Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis*, 17 Geo. Mason L. Rev. 939, 948 (2010) ("In general, an expert opining on class certification issues should test, rather than assume, that the effects of an alleged violation are common across products and other relevant dimensions.").[29]

_____

[28] *See In re Graphics Processing Units Antitrust Litig.* [*GPU*], 253 F.R.D. 478, 492 (N.D. Cal. 2008) ("[C]ourts . . . are increasingly skeptical of plaintiffs' experts who offer only generalized and theoretical opinions that a particular methodology may serve this purpose without also submitting a functioning model that is tailored to market facts in the case at hand.") (quoting Ian Simmons et al*., Rigorous Analysis in Class Certification Proceedings,* ANTITRUST 65, 65 (Summer 2007)).

[29] In his merits report (Dkt. 457-2), Dr. Singer sets forth a proposed method of demonstrating antitrust impact on Groups B and C. (Dkt. 457-2, ¶¶153-161). This data was provided to Defendants for the first time in Direct Purchasers' Reply in support of the motion for class certification, and Defendants had no opportunity to respond, making the merits report an improper rebuttal report. *See Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1066 (C.D. Cal. 2010); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 879 (S.D. Ohio 2010); *Procter & Gamble Co. v. McNeil-PPC, Inc.*, 615 F. Supp. 2d 832, 838 (W.D. Wis. 2009).
Even if the merits report is considered, it is based on a faulty assumption which renders its conclusions doubtful. In order to construct a regression for Groups B and C, Dr. Singer presumes that the price increases for the lens casters would manifest themselves in the form of price increases to members of Group B and Group C. This assumption rests on two faulty premises. First, the results from the Group A regression in the merits report consist of an average price increase across *all* lens casters, while the members of Groups B and C are direct purchasers of EOA, only. Dr. Singer never demonstrates that EOA suffered impact that can be passed through to the purchasers in Groups B and C. This leads to the second faulty premise, which is that EOA, a co-Defendant and alleged co-conspirator of Transitions, suffered antitrust impact. Dr. Singer offers no common proof that could be used to demonstrate that EOA was impacted.

The predominance inquiry of Rule 23(b)(3) is therefore not satisfied.

### 2.     *Dr. Singer's Methodology*

The Magistrate Judge also concluded that Direct Purchasers had not satisfied the predominance inquiry due to flaws in the methodology utilized by Dr. Singer. Specifically, the Magistrate Judge faulted Dr. Singer for using "price card" data when constructing his regressions, rather than actual transactional data, which reflect the prices actually paid to Transitions by lens casters. When Defendants' expert utilized transactional data, rather than price card data, only two of fourteen lens casters were found to have been impacted by the alleged anticompetitive conduct. The Magistrate Judge also found that Dr. Singer's use of a 50% statistical significance measure in his regressions, rather than the more rigorous 5% measure, rendered his models incapable of providing a reliable, working methodology through which Direct Purchasers could prove impact.

Direct Purchasers contest the Magistrate Judge's findings. They argue that Dr. Singer's use of price card data is "[i]rrelevant," yet entirely consistent with sound and accepted econometric practice. They contend the same for the 50% significance measure, likewise arguing that the degree of statistical significance utilized by Dr. Singer is irrelevant to the predominance inquiry.

### a.     Dr. Singer's use of price card, rather than transactional, data is fatal to Direct Purchasers' motion for class certification.

Even if Direct Purchasers were not required to demonstrate antitrust impact as to all members of the class, they fail to provide a workable methodology for demonstrating that the claims can be proven with common evidence because Dr. Singer failed to use the actual transactional prices when that data was available.

---

Moreover, Dr. Singer recognized no such possibility of impact when he *excluded* EOA from his individualized impact analysis in his initial certification report.

Methodologies that fail to account for non-standard pricing often scuttle the predominance inquiry in antitrust cases.[30] Nevertheless, in certain instances, the use of list or standardized pricing in econometric models–even though sale prices were negotiated–may suffice. In such instances, however, an expert must analyze the relevant markets and demonstrate that the anticompetitive behavior elevated the list prices and, more importantly, that the "list prices serve as a reference or benchmark for pricing or pricing negotiations" between the plaintiffs and the defendants. *See, e.g.*, *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006).[31]

Dr. Singer fails to demonstrate the requisite correlation between the price card data and transactional data, as would be required for the use of price card data to satisfy the predominance inquiry. *Accord In re Milk Prods. Antitrust Litig.*, 195 F.3d 420 (8th Cir. 1999) (denying certification where sales were made using formula unrelated to list prices).[32] Indeed, Dr. Singer's failure to take

---

[30]*See, e.g.*, *Blades v. Monsanto Co.*, 400 F.3d 562, 572-74 (8th Cir. 2005) (individual questions predominated where evidence showed that list prices varied depending on the market, and customers often did not pay list prices); *Piggly Wiggly*, 100 Fed. Appx. at 298 (affirming district court's decision that individualized determination would be required because many class members negotiated a price rather than accepting list price); *GPU*, 253 F.R.D. at 490-91 (predominance not satisfied where "vast majority of sales were primarily executed between wholesalers" and defendant and "without any regard to a price list"); *Diamonds*, 167 F.R.D. at 284 (finding individual questions predominate with respect to price-fixing claims of direct purchasers who paid non-list prices based on the cost of production and negotiations with particular customers); *Burkhalter Travel Agency v. MacFarms Int'l Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (predominance not satisfied where defendants price product in different ways in different markets, and purchasers have varying degrees of leverage in negotiations). *See generally Robinson v. Tex. Auto Dealers Ass'n*, 387 F.3d 416, 423 (5th Cir. 2004) (finding predominance not satisfied where class included members with divergent negotiating histories); *Flash Memory*, 2010 WL 2332081, at *5 ("As a general matter, antitrust claims predicated on negotiated transactions, as opposed to purchases based on list prices, often entail consideration of individualized proof of impact."); *GPU*, 253 F.R.D. at 489 ("Factors favoring certification have been price lists and commodity products as opposed to individually negotiated deals and customized products.").

[31]*See generally In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 89 (D. Conn. 2009) (listing cases); *In re Carbon Black Antitrust Litig.*, No. Civ.A.03-10191-DPW, MDL No. 1543, 2005 WL 102966 (D. Mass. Jan. 18, 2005) (correlation between list and non-list pricing allowed predominance requirement to be satisfied).

[32] In his merits report, Dr. Singer concludes that 72% of the price card observations match the transactional data (Dkt. 457-2 at 89 n.332). A 72% correlation rate does not establish that price card data served as an appropriate benchmark for negotiations or negotiated prices. Nor does Dr. Singer refer to any other evidence demonstrating such a relationship. Moreover, the 72% match rate includes what Dr. Singer refers to as "near matches," observations in the price card data that have near equivalent observations in the transaction data. Dr. Singer's definition of near equivalent

transactional data into account within his regressions precludes a finding that he has provided a workable methodology for applying common evidence to common questions that predominate. *See GPU*, 253 F.R.D. at 496 ("[I]f individual customers qualify for volume discounts at some times but not others, the regression would need to take this into account. . . . When there is substantial variation in fundamental aspects of the price data of this type, individual inquiries are necessary to understand the factors that shaped the price that specific customers paid.") (quoting ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL, PRACTICE, AND TECHNICAL ISSUES 224 (ABA Publishing 2005)).

In this instance, price card data is irrelevant to whether a Direct Purchaser suffered antitrust impact, given the substantial evidence showing that prices were negotiated, rather than based on list prices, that purchasers were entitled to discounts, rebates, and special pricing programs, and that larger customers and managed care plans were able to extract lower prices due to buying power (Dkt. 453 ¶¶ 67, 68). Dr. Singer's failure to account for the actual price paid, a critical factor in determining antitrust impact, renders his regressions legally deficient. *Cf. Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 153 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.").

Direct Purchasers argue that Dr. Singer was only required to provide a methodology for

---

observations is fairly broad, however. A near equivalent observation is any data point in the transactional data within one year and with a price difference of up to 5% of any data point in the price card data. Dr. Singer does not explain his reasoning for concluding that prices within a 10% range over a period of a year "nearly match." And the 5% differential in price and one year timeframe are unacceptably broad, considering that Dr. Singer's regressions are based on monthly changes in price averaging no more than four-tenths of one percent, more than ten times smaller than the difference Dr. Singer allows for a "match."

In sum, even if Dr. Singer's merits report is considered, Direct Purchasers cannot demonstrate that the price card data used are correlative "benchmarks" or "references" for the actual transactions that occurred.

45

demonstrating common impact, and the Magistrate Judge applied an unnecessarily strict standard by critiquing his choices in structuring the methodology and regressions. That argument is inconsistent with recent class certification jurisprudence demonstrating that "[i]t is now clear . . . that Rule 23 not only authorizes a hard look at the soundness of the statistical models that purport to show predominance–the rule commands it." *Rail Freight*, 725 F.3d at 255. The inquiry mandated in *Rail Freight* requires courts to determine whether expert evidence is persuasive, "which may require the Court to resolve methodological disputes," just as the Magistrate Judge did here. *High-Tech Employee*, 2013 WL 5770992, at *14. *See also Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005) ("In order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable.").

> b. <u>Dr. Singer's use of a 50% measure of statistical significance is not necessarily fatal to his methodology.</u>

Direct Purchasers also argue that the Magistrate Judge erred by determining that Dr. Singer's regressions are unreliable because he utilizes a 50% measure of statistical significance ($p \leq .50$). They argue that Dr. Singer's measure of statistical significance is irrelevant to the question of predominance and, in any event, the use of a $p$-value less than or equal to .50 does not, by itself, render a study unreliable. Defendants contend that the Magistrate Judge correctly discounted the studies because they lack statistical rigor.

Scientific convention usually requires the use of a $p$-value that is less than or equal to .05 ($p \leq .05$) in order for the results of a correlative study or regression to be statistically significant. *See Eastland v. Tenn. Valley Auth.*, 704 F.2d 613, 622 (11th Cir. 1983) ("Generally . . . a probability

level of .05 is accepted as statistically significant. . . . [A] probability level of .0546 . . . [is] at the borderline of statistical significance."); *Hamer v. City of Atlanta*, 872 F.2d 1521, 1526 (11th Cir. 1989); *Segar v. Smith*, 738 F.2d 1249, 1282 (D.C. Cir. 1984); *In re Ephedra Prods. Liability Litig.*, 393 F. Supp. 2d 181, 193 (S.D.N.Y. 2005). Numerous courts have adopted the $p \leq .05$ level as sufficient to support an inference of discrimination in Title VII cases.[33]

There is not, however, any "precise level in the law" at which statistical significance is sufficient to permit the inference derived from a correlative study. *Segar*, 738 F.2d at 1282; *see Rendon v. AT&T Techs.*, 883 F.2d 388, 397-98 (5th Cir. 1989) (rejecting argument that there is a strict legal benchmark requiring a particular number of standard deviations to demonstrate data has statistical significance). And most courts have rejected the arbitrary application of a 5% threshold. *See Thomas v. Deloitte Consulting LP*, No. 3-02-CV-0343-M, 2004 WL 1960097, at *5 (N.D. Tex. Sep. 2, 2004) (listing cases).

Social scientists use different measures of statistical significance for various reasons, often due to a limiting factor, such a small sample size. "Whether a given [result] should be regarded as statistically significant must be determined on a case by case basis since the value signifying statistical significance is dependent upon sample size." *Overton v. City of Austin*, 871 F.2d 529, 544 (5th Cir. 1989) (Jones, J., concurring). "It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a

---

[33]*See, e.g.*, *Segar*, 738 F.2d at 1282; *Vuyanich v. Rep. Nat'l Bank of Dallas*, 505 F. Supp. 224, 348 (N.D. Tex. 1980), *vacated on other grounds* 723 F.2d 1195 (5th Cir. 1984); *Cooper v. Univ. of Tex. at Dallas*, 482 F. Supp. 187, 194 (N.D. Tex. 1979) ("It has become a convention in social science to accept as statistically significant values which have a probability of occurring by change 5% of the time or less."). *See also Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) ("As a general rule . . ., if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.").

particular case, is too low to make the study worth the consideration of judge or jury." *Kadas*, 255 F.3d at 363.

When questioned on his use of the 50% measure at the hearing before the Magistrate Judge, Dr. Singer explained that he imposed the 50% measure for two reasons. First, he used the *p*-value of less than or equal to .50 because he believed that the limited data set for certain lens casters prevented the use of a lower *p*-value because the study would then lack the "power to detect impact" (Dkt. 444 at 50:8; *see also id.* at 52:15-21). Second, he used the 50% level in an effort to avoid false negatives, or what statisticians refer to as "Type 2 errors" (*id.* at 53:11-54:2).

Dr. Leonard's testimony did not controvert those explanations. Although Dr. Leonard explained that using a 50% level of statistical significance is "simply out of bounds of what economists do" (*id.* at 109:22-23), he did not specifically address Dr. Singer's reasons for using the much higher level of statistical significance.

In *In re Seroquel Products Liability Litigation*, the court noted that "an expert's opinion should be seriously questioned, and perhaps even excluded altogether, when the expert can point to *no* evidence showing a statistically significant [result]." No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806434, at *12 (M.D. Fla. June 18, 2009). Nevertheless, the court refused to exclude a statistically insignificant study, where the *p*-value was greater than .05, because other studies supported a statistically significant correlation. *Id.* Due to the supporting evidence, the court found that the issue of statistical significance went to the weight of the expert's opinion and was more properly reserved for cross-examination.

As in the *Seroquel* litigation, there is sufficient evidence in Dr. Singer's merits studies at a 10% measure of statistical significance to allow Dr. Singer's class certification regressions at the

50% level to pass muster. The Eleventh Circuit requires that an expert "come forward with plausible statistical or economical methodologies to demonstrate impact on a class-wide basis." *Klay*, 382 F.3d at 1259. Despite the use of a less rigorous measure of statistical significance, Dr. Singer's methodologies are "plausible," especially given his explanations for using the less rigorous measure and the absence of any conflicting testimony from Dr. Leonard with regard to those explanations.

Although his studies test the boundaries of reliable evidence permitted under *Daubert*, as well as the Supreme Court's directive in *Comcast* that statistical models prove with precision impact and damages on a classwide basis, 133 S.Ct. at 1433,[34] I cannot agree that Dr. Singer's use of a 50% measure of statistical significance, by itself, is sufficient justification for denying class certification.[35]

## VI.   CONCLUSION

Nevertheless, disagreement with the Magistrate Judge on the issue of statistical significance does not absolve Direct Purchasers' other failures to prove compliance with Rule 23. Direct Purchasers have not sustained their burden of demonstrating that the named Plaintiffs would adequately represent the absent class members because substantial evidence demonstrates the potential for fundamental conflicts within the class between those class members who experienced a net economic gain as a result of the exclusive dealing, and those who suffered net economic harm. *See* Fed. R. Civ. P. 23(a)(4). *Accord Valley Drug*, 350 F.3d at 1191; *Pickett*, 209 F.3d at 1280-81. Moreover, Direct Purchasers have failed to demonstrate that common issues predominate over

---

[34]*See also Rail Freight*, 725 F.3d at 253-54 ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury."); *id.* at 255 ("It is now clear . . . that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance–the rule commands it.").

[35]Direct Purchasers cite *Columbus Drywall & Insulation, Inc. v. Masco Corp.* as accepting a 50% measure of statistical significance, but that case contains no language that could be construed to support such a proposition. 2009 WL 856306, at *10 (N.D. Ga. Feb. 9, 2009).

49

individualized ones, as the expert reports in this case demonstrate that Direct Purchasers cannot utilize common proof to demonstrate the crucial element of antitrust impact as to *each* member of the class. *See* Fed. R. Civ. P. 23(b)(3). *Accord Blue Bird*, 573 F.2d at 320-21; *Shumate*, 509 F.2d at 155.[36]

Accordingly, the Report and Recommendation (Dkt. 471) is **APPROVED** *in part* for the reasons set forth in this Order. Direct Purchaser Plaintiffs' Motion for Class Certification (Dkt. 285) is **DENIED**.

**DONE AND ORDERED** this 3rd day of April, 2014.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

---

[36]Because Direct Purchasers are unable to demonstrate that questions of law or fact common to class members predominate over individualized questions, it is unnecessary to address whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).